## Exhibit 2

## TRANSLATION FROM SPANISH

**T.V. AZTECA SOCIEDAD ANÓNIMA BURSATIL DE CAPITAL VARIABLE.**
**VS**
**CYRUS 1740 MASTER FUND, L.P.; CANARY SC MASTER FUND, L.P.; CYRUS OPPORTUNITIES MASTER FUND II, LTD; CRESCENT 1, L.P.; CRS MASTER FUND, L.P.; CYRUS SELECT OPPORTUNITIES MASTER FUND, LTD; CYRUS SELECT OPPORTUNITIES MASTER FUND II, L.P.; PC INVESTORS III, LLC; PETERSON CAPITAL INVESTORS, LLC ET AL.**

**TRIAL: ORDINARY COMMERCIAL PROCEEDINGS.**

**COMPLAINT.**

**ACTING CIVIL JUDGE OF THE**
**SUPERIOR COURT OF JUSTICE FOR**
**MEXICO CITY.**
**IN ATTENTION TO**

**YANET SANDOVAL CARRILLO** representing **TV AZTECA SOCIEDAD ANÓNIMA BURSÁTIL DE CAPITAL VARIABLE** (hereinafter followed by the acronym 'S.A.B.

C.V.'), as proven with deed number 163,678 dated June 9, 2022, made before Mr. Eduardo Garduño García Villalobos, head of the Notary Public office no. 135 in Mexico City, registered in the Notary's register of the Notary Public office no. 211 of the same entity, attached hereto as **APPENDIX 1**. I hereby request Your Honor to return the certified copies of the document in question after comparing them against the unauthenticated copies attached hereto as **APPENDIX 2**. I further request that the address for service located at **BOSQUE DE ALISOS 29, PLANTA BAJA, COLONIA BOSQUES DE LAS LOMAS, ALCALDÍA CUAJIMALPA, C.P. 05120 IN THIS MEXICO CITY** is acknowledged; moreover, to authorize to the broadest extent and in general, the provisions of section 112 of the Code of Civil Procedure for the Federal District (today Mexico City) lawyers **JORGE ISAAC GASTÉLUM MIRANDA** with professional license number 1059194, **MARIA TERESA LLANTADA VOIGT** with professional license number 1328623, **ALFONSO PASAPERA MORA** with professional license number 1690959, **MAURICIO ZARZA CERECER** with professional license number 4537782, **BRUNO GASTÉLUM GLENDER** with professional license number 11679883, **ALEJANDRA GRANADOS COLD** with professional license number XXX, **LILIA CERA ROSENBERG** with professional license number XXX, all issued under the name of the counselors above by the General Directorate of Professions of the Secretariat of Public Education. **ELSA OLIVA MIRANDA GARDUÑO, VÍCTOR ADRIAN RICO MIRANDA and DIEGO FLORES TAPIA, FRIDA RODRIGUEZ PAREDES, URIEL ALBERTO GARDUÑO CANO,** before you I respectfully hereby appear and state the following:
That I hereby, pursuant to sections 2111 and other applicable sections of the Federal Civil Code and related sections 95, 110, 112, 114, 116, 125, 143, 255, 258, 259 and any and all other related and applicable sections under the Code of Civil Procedure for Mexico City, filed a complaint to initiate **ORDINARY COMMERCIAL PROCEEDINGS** against the legal entities below at their addresses where they may be summoned to trial:
1.    **CYRUS 1740 MASTER FUND, L.P.**; with address at 65 EAST 55TH STREET, 35TH FLOOR, New York, New York, 10022, USA
2.    **CANARY SC MASTER FUND**; with address at 65 EAST 55TH STREET, 35TH FLOOR, New York, New York, 10022, USA

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

3.      **L.P.; CYRUS OPPORTUNITIES MASTER FUND II, LTD;** with address at 65 EAST 55TH STREET, 35TH FLOOR, New York, New York, 10022, USA

4.      **CRESCENT 1, LP; with address at** 65 EAST 55TH STREET, 35TH FLOOR, New York, New York, 10022, USA

5.      **CRS MASTER FUND, L.P.**; with address at 65 EAST 55TH STREET, 35TH FLOOR, New York, New York, 10022, USA

6.      **CYRUS SELECT OPPORTUNITIES MASTER FUND, LTD;** with address at 65 EAST 55TH STREET, 35TH FLOOR, New York, New York, 10022, USA

7.      **CYRUS SELECT OPPORTUNITIES MASTER FUND II, L.P.;** with address at 65 EAST 55TH STREET, 35TH FLOOR, New York, New York, 10022, USA

8.      **PC INVESTORS III, LLC; PETERSON CAPITAL INVESTORS, LLC;** with address at 65 EAST 55TH STREET, 35TH FLOOR, New York, New York, 10022, USA

9.      **CONTRARIAN EMERGING MARKETS, LP;** with address at 411 West Putnam Avenue, Suite 425, Greenwich, CT 06830, USA

10.     **BOSTON PATRIOT SUMMER ST, LLC;** with address at 411 West Putnam Avenue, Suite 425, Greenwich, CT 06830, USA

11.     **CONTRARIAN EM II, LP; with address at** 411 West Putnam Avenue, Suite 425, Greenwich, CT 06830, USA

12.     **EMMA 1 MASTER FUND, L.P.;** with address at 411 West Putnam Avenue, Suite 425, Greenwich, CT 06830, USA

13.     **E1 SP, A SEGREGATED PORTFOLIO OF EMAP SPC;** with address at 411 West Putnam Avenue, Suite 425, Greenwich, CT 06830, USA

14.     **EMMA 2 FUND, L.P.;** with address at 411 West Putnam Avenue, Suite 425, Greenwich, CT 06830, USA

15.     **INVESCO ADVISERS, INC**; with address at 1555 Peachtree Street, N.E., Suite 1800, Atlanta, Georgia 30309, USA

16.     **ALLIANCE UNITED INSURANCE COMPANY;** with address at 88 Black Falcon, First Floor, East Side, Suite 167, Boston, Massachusetts 02210, USA

17.     **FIDELITY HANOVER STREET TRUST:** with address at 88 Black Falcon, First Floor, East Side, Suite 167, Boston, Massachusetts 02210, USA

18.     **FIDELITY EMERGING MARKETS DEBT CENTRAL FUND;** with address at 88 Black Falcon, First Floor, East Side, Suite 167, Boston, Massachusetts 02210, USA

19.     **FIDELITY HASTINGS STREET TRUST:** with address at 88 Black Falcon, First Floor, East Side, Suite 167, Boston, Massachusetts 02210, USA

20.     **FIDELITY SERIES EMERGING MARKETS DEBT FUND;** with address at 88 Black Falcon, First Floor, East Side, Suite 167, Boston, Massachusetts 02210, USA

21.     **FIAM EMERGING MARKETS DEBT COMMINGLED POOL;** with address at 88 Black Falcon, First Floor, East Side, Suite 167, Boston, Massachusetts 02210, USA

22.     **FIDELITY EMERGING MARKETS DEBT MULTI-ASSET BASE FUND;** with address at 88 Black Falcon, First Floor, East Side, Suite 167, Boston, Massachusetts 02210, USA

23.     **CUSTODY BANK OF JAPAN, LTD;** with address at 88 Black Falcon, First Floor, East Side, Suite 167, Boston, Massachusetts 02210, USA

24.     **FIDELITY SUMMER STREET TRUST: FIDELITY GLOBAL HIGH INCOME FUND;** with address at 88 Black Falcon, First Floor, East Side, Suite 167, Boston, Massachusetts 02210, USA

25.     **JNL/FIDELITY INSTITUTIONAL ASSET MANAGEMENT TOTAL BOND FUND;** with address at 88 Black Falcon, First Floor, East Side, Suite 167, Boston, Massachusetts 02210, USA

26.     **FIDELITY SUMMER STREET TRUST: FIDELITY NEW MARKETS INCOME FUND;** with address at 88 Black Falcon, First Floor, East Side, Suite 167, Boston, Massachusetts 02210, USA

27.     **STATE TEACHERS RETIREMENT SYSTEM OF OHIO;** with address at 88 Black Falcon, First Floor, East Side, Suite 167, Boston, Massachusetts 02210, USA

*Mrs. Paola Montserrat Jiménez Bolaños* – Expert Interpreter & Translator English – Spanish – Portuguese – French
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

Page 3

**28.    FIAM EMERGING MARKETS DEBT FUND, LLC;** with address at 88 Black Falcon, First Floor, East Side, Suite 167, Boston, Massachusetts 02210, USA
**29.    FIDELITY SALEM STREET TRUST: FIDELITY SAI TOTAL BOND FUND;** with address at 88 Black Falcon, First Floor, East Side, Suite 167, Boston, Massachusetts 02210, USA
**30.    FIDELITY INCOME FUND: FIDELITY TOTAL BOND FUND;** with address at 88 Black Falcon, First Floor, East Side, Suite 167, Boston, Massachusetts 02210, USA
**31.    TRINITY UNIVERSAL INSURANCE COMPANY;** with address at 88 Black Falcon, First Floor, East Side, Suite 167, Boston, Massachusetts 02210, USA
**32.    UNITED INSURANCE COMPANY OF AMERICA;** with address at 88 Black Falcon, First Floor, East Side, Suite 167, Boston, Massachusetts 02210, USA
**33.    VARIABLE INSURANCE PRODUCTS FUND V: STRATEGIC INCOME PORTFOLIO;** with address at 88 Black Falcon, First Floor, East Side, Suite 167, Boston, Massachusetts 02210, USA
**34.    BANK OF NEW YORK MELLON, AS TRUSTEE;** with address at 101 Barclay Street, 7th floor East New York, NY 10286, USA
**35.    THE BANK OF NEW YORK MELLON, LONDON BRANCH, AS PRINCIPAL PAYING AGENT;** with address at 101 Barclay Street, 7th floor East New York, NY 10286, USA

Given the extraordinary circumstances that the country is going through and appealing to the social responsibility that all individuals, legal entities, instrumentalities, and authorities are to assume to overcome the unprecedented health, social and economic emergency that we are facing, I have drafted writing this complaint as follows to make its reading and understanding easier.

## TABLE OF CONTENTS

BACKGROUND                                                                                          3
BACKGROUND RELATED TO THE PLAINTIFF                                                  7
JURISDICTION                                                                                       18
CONTRACTS ENTERED INTO BETWEEN THE PLAINTIFF AND THE CO-DEFENDANTS IN EFFECT DURING THE COVID-19 EMERGENCY AND TAX CONTINGENCIES.    24
COMMUNICATIONS, DOCUMENTS AND RESOLUTIONS RELATED TO THE COVID-19 VIRUS EMERGENCY                                                                    27
CLAIM TIMELINESS                                                                                 43
LEGAL CONCEPTS APPLICABLE TO THE CASE                                              45
EFFECTS OF THE DECLARATION OF AN ACT OF GOD OR FORCE MAJEURE EVENT
                                                                                                           100
APPLICABLE LAW                                                                                  118
PRODUCTION OF EVIDENCE                                                                      118

## BACKGROUND

Our Political Constitution provides for in sections 1, 14, 16, 17, 133 that all people are human rights-holders, and its principles are to be interpreted in accordance with this Constitution and international treaties, so as to ensure that all people are given the widest possible protection at all times.  In addition, it provides for that all authorities, within the scope of their powers, have the duty to promote, respect, protect and ensure human rights in accordance with the principles of universality, interdependence, indivisibility, and progress. Therefore, no one can be deprived of their freedom of having property or holding rights, without being heard in trial before the relevant courts as per the proceedings' formalities and in accordance with the referred regulations.

In turn, sections 1, 2, 75 subsections XIV and XXV, 1063, 1377 of the Commercial Code, provide for that commercial acts are governed by the provisions of said Code and, in the absence of a

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

3

provision, special trade laws are to be enforced, and failing that, the Federal Code of Civil Procedure and ultimately by the local Code of Civil Procedure are to be applied. On the other hand, it provides for that all disputes between parties that are not required to be subject to a special procedure as per the commercial laws, these are to be tried in ordinary proceedings.

In accordance with the Federal Civil Code of Supplementary application to the Commercial Code, section 2111 provides for that no one is required to perform in case of force majeure events, except when they have caused or contributed thereto, when they have expressly assumed that responsibility or when required by law. This means that debtors are not to be held liable as a breach may have been produced due for causes other than their will, nor they have contributed to it. Lastly, the Code of Civil Procedure for Mexico City establishes in sections 95, 110, 112, 114, 116, 125, 143, 255, 258, 259 that all court disputes, whether main or incidental, shall be initiated by a lawsuit filed before the relevant jurisdiction, which effects will consist of marking the beginning of the proceeding, and determining the amount of the relief being sought, and which requirements are mentioned herein.

From the foregoing, we must necessarily conclude that the action that hereby is brought to court must be tried through Ordinary Commercial Proceedings, as this lawsuit deals with legal acts which have an impact in the commercial domain. Therefore, if commercial acts are the basis of Commercial Law; therefore, it shall also be that of Commercial trials, which are filed to be tried by a Civil Judge of the Superior Court of Justice of Mexico City.

In addition to the foregoing, the present case meets the admissibility criteria, as attached hereto is the Power-of-Attorney that proves the legal capacity to appear in court, the documents on which the action is based as well as all the documents in our possession and that serve as evidence, and the unauthenticated copies, which are legible for reading, both of the complaint and of the other referred documents.

Your Honor is asked to analyze the statements below, assess the evidence that proves the action of my Principal and decide in accordance with the Law the legal situation that is seriously affecting my client to this day, derived from the force majeure event and sanitary emergency that impacted the whole world for three years and the protection of human rights established in the Political Constitution of the United Mexican States, for which Your Honor is asked to decide this trial as per the following:

## MATTER IN DISPUTE

**ONE.** My client claims through this ordinary commercial complaint the recognition of the legal scenario under the Mexican law and declared by the health authorities, i.e., **Acts of God and Force Majeure events**, caused by the SARS-CoV2 virus (COVID-19) outbreak pandemic; due to the impossibility of performing the obligations assumed in force during the event until today, caused after complying with the administrative actions in place to deal with the serious illness that required priority attention.

**TWO.** The co-defendants (Person under whose name a Bond is registered in the Payment Registry) declared the Early Maturity of the obligations agreed in the Issuance Contract dated August 9, 2017, entered into by TV AZTECA, S.A.B. DE C.V. as Issuer, THE BANK OF NEW YORK MELLON as Trustee, and THE BANK OF NEW YORK MELLON, LONDON BRANCH, as Principal Paying Agent, on the subscription of Bonds in the amount of USD $400,000,000 of aggregate principal amount; as a consequence of failing to pay interests on February 9, 2021, August 9, 2021 and February 9, 2022, due to alleged breach by my client.

**THREE.** Since a **FORCE MAJEURE** event took place, my client was in a different legal situation other than the one when it undertook its commitments with third parties, by virtue of the fact that the declared pandemic stemmed from an unpredictable event, resulting in the health authorities taking extraordinary measures to combat and mitigate it in our country, which caused an imbalance and impossibility to pay said interests and possibly future third-party obligations that will be narrated later.

4

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

Accordingly, it is appropriate to declare that **there was no default**, **much less Early Maturity did not take place**; on the contrary, under said statements it is attached to law **release** to the plaintiff of the liability agreed in the Issuance Contract dated August 9, 2017, as their will did not intervene when it came to comply with the sanitary measures, until the circumstances under which they were assumed in said contract change.

From the foregoing, various legal consequences that must be declared by this Superior Court of Justice of Mexico City, upon verifying that Acts of God and Force Majeure events took place are claimed, as they prevented my client from being able to make the payment claimed:

## REMEDIES SOUGHT

**ONE.** The court order whereby Your Honor will decree that **acts of God and force majeure events** (sovereign acts) took place, as these are recognized in Mexican laws and decreed by the health authorities, caused by the SARS-CoV2 virus (COVID-19) outbreak pandemic; due to the impossibility of my client to perform the obligations assumed in force during the event to this date, due to the order to comply with the administrative actions taken to deal with the serious illness that required priority attention.

**TWO.** The court order by which Your Honor will decree that **acts of God or force majeure events** (sovereign acts) took place to perform the obligations arising from the execution of the Issuance Contract dated August 9, 2017, entered into by **TV AZTECA, SAB, DE C.V.** *as Issuer*, **THE BANK OF NEW YORK MELLON** *as Trustee*, and **THE BANK OF NEW YORK MELLON, LONDON BRANCH**, *as Principal Paying Agent*, by virtue of the actions decreed on March 11, 2020 by the World Health Organization due to the SARS-CoV2 virus (COVID-19) outbreak pandemic, and due to an increase in the number of existing cases in those countries where infections were confirmed, as it was considered a public health emergency of international relevance and that reached the Mexican State in order to protect the right to health.

**THREE.** The court order by which Your Honor will decree that **acts of God or force majeure events** (sovereign acts) took place to perform the obligations arising from the execution of the Issuance Contract dated August 9, 2017, entered into by **TV AZTECA, SAB, DE C.V.** *as Issuer*, **THE BANK OF NEW YORK MELLON** *as Trustee*, and **THE BANK OF NEW YORK MELLON, LONDON BRANCH**, *as Principal Paying Agent*, in compliance with what was ordered on the plenary session held on March 19, 2020 by the General Health Council recognizing a pandemic caused by the SARS-CoV2 virus, COVID-19 in Mexico, as a serious disease that required attention priority, as a health authority and which general provisions are mandatory in the entire country.

**FOUR.** The court order by which Your Honor will decree that **acts of God or force majeure events** (sovereign acts) took place to perform the obligations arising from the execution of the Issuance Contract dated August 9, 2017, entered into by **TV AZTECA, SAB, DE C.V.** *as Issuer*, **THE BANK OF NEW YORK MELLON** *as Trustee*, and **THE BANK OF NEW YORK MELLON, LONDON BRANCH**, *as Principal Paying Agent*, in compliance with the determinations made on March 24, 2020 by the Secretariat of Health establishing preventive measures that were taken to mitigate and control the health risks that the SARS-CoV2 virus disease ( COVID-19) entails; specifically aimed at the private sector that continued to work to deal with the contingency, *inter alia*, the branch of the **telecommunications and media**; mandatory resolutions applicable nationwide.

**FIVE.** The court order by which Your Honor will decree that **acts of God or force majeure events** (sovereign acts) took place to perform the obligations arising from the execution of the Issuance Contract dated August 9, 2017, entered into by **TV AZTECA, SAB, DE C.V.** *as Issuer*, **THE BANK OF NEW YORK MELLON** *as Trustee*, and **THE BANK OF NEW YORK MELLON, LONDON BRANCH**, *as Principal Paying Agent*, in compliance with the Decree published on March 27, 2020 by the President, as the head of the Federal Executive Power, on the various extraordinary

5

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

actions taken in the country regions affected in terms of general health, to combat the serious illness caused by the SARS-CoV2 virus (COVID-19) that required priority attention.

**SIX.** The court order by which Your Honor will decree that **acts of God or force majeure events** (sovereign acts) took place to perform the obligations arising from the execution of the Issuance Contract dated August 9, 2017, entered into by **TV AZTECA, SAB, DE C.V.** *as Issuer*, **THE BANK OF NEW YORK MELLON** *as Trustee*, and **THE BANK OF NEW YORK MELLON, LONDON BRANCH**, *as Principal Paying Agent*, legal concepts recognized by the Secretary of Health and President of the General Health Council when issuing on March 30, 2020 the **"Resolution by which the pandemic caused by the SARS-CoV2 virus (COVID-19) is declared a health emergency due to force majeure events", with the purpose of protecting the health of Mexican citizens.**

**SEVEN.** As a result of the remedies sought above, the court order by which Your Honor will decree the <u>**material and legal impossibility**</u> of the performance of the obligations assumed in the Issuance Contract dated August 9, 2017, executed by **TV AZTECA** *as Issuer*, **THE BANK OF NEW YORK MELLON** *as Trustee*, and **THE BANK OF NEW YORK MELLON, LONDON BRANCH**, *as Principal Paying Agent*, **until things go back to normal when said agreement was executed on the expiration of the obligations established therein, as long as circumstances are back to normal when said instrument was executed**; by entirely holding the debtor and the creditor harmless.

**EIGHT.** As a result of the foregoing, Your Honor will irrefutably declare that my client **did NOT fail to perform the contractual obligations** assumed in the Issuance Contract dated August 9, 2017, and its annexes.

**NINE**. Likewise, the court order by which Your Honor **urges creditors to restructure the debt** as agreed by the parties in order not to affect their credits. This scenario is similar to what was agreed in said agreement as "Mexican Restructuring", on the payment of the Bond Subscription in the amount of USD $400,000,000 as principal and of the interests accrued on February 9, 2021, August 9, 2021, and February 9, 2022.

**TEN.** Consequently, from the remedies sought, the court order by which Your Honor will **pass judgment upon the agreement executed to restructure credits and to have it approved and executed by the contracting parties** so as to safeguard their rights.

**ELEVEN.** The court order by which Your Honor will decree that, as acts of God and force majeure event took place which prevented the performance of the obligations assumed by my client as they were beyond their control, during the health emergency, **the Early Maturity of the principal payment or the premium was NOT to take place, nor is the payment of interest** on February 9, 2021, August 9, 2021 and February 9, 2022; **nor delinquency or interest on arrears or any other additional amount**, if any, established in the Issuance agreement dated August 9, 2017.

**TWELVE**. The court order by which your honor decrees the legal ineffectiveness of the document entitled *"Notice of Early Maturity"* dated May 3, 2022, for the arguments and considerations that will be stated in the lawsuit below.

**THIRTEEN.** The court order by which Your Honor will decree the legal ineffectiveness of the document entitled *"Notice of Early Maturity"* dated May 3, 2022, allegedly signed by the Co-defendants in terms of what was agreed in the Issuance agreement dated August 9, 2017, for not complying with and not meeting the formalities provided for in sections 11.1 and 6.2 of said agreement.

***FOURTEENTH.*** The court order by which Your Honor will decree the legal ineffectiveness of the document entitled *"Notice of Early Maturity"* dated May 3, 2022, as its alleged signatories failed to prove the legal capacity they supposedly have to represent the Co-defendants.

**FIFTEEN.** The court order by which Your Honor will decree the legal ineffectiveness of the document entitled *"Notice of Early Maturity"* dated May 3, 2022, as the alleged signatories failed to prove which entities are the multiple legitimate Holders of the Bonds they represent.

6

*Mrs. Paola Montserrat Jiménez Bolaños* – Expert Interpreter & Translator English – Spanish – Portuguese - French
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

**SIXTEEN**. The court order by which Your Honor will decree the legal ineffectiveness of the document entitled *"Notice of Early Maturity"* dated May 3, 2022, by virtue of the fact that there is no legitimate proof, and, therefore, validity of the digital signatures affixed on the "*Notice of Early Maturity"*.

**SEVENTEEN.** The court order by which Your Honor will decree the legal ineffectiveness of the document entitled *"Notice of Early Maturity"* dated May 3, 2022, since the signatories failed to prove the ownership claimed on their alleged property, nor are they Holders in accordance with the provisions of sections 1.1, 1.2, 1.3 (a), and 2.5 of the referred Issuance agreement.

**EIGHTEEN.** The court order by which Your Honor will decree the legal ineffectiveness of the document entitled *"Notice of Early Maturity"* dated May 3, 2022, since the signatories failed to prove the Bond principal amount they allegedly hold.

**NINETEENTH.** The court order by which Your Honor will decree the legal ineffectiveness of the document entitled *"Notice of Early Maturity"* dated May 3, 2022, the signatories failed to prove that they are the effective holders of at least 25% of the principal amount of the duly registered and authenticated outstanding Bonds.

**TWENTY**. The court order by which Your Honor will decree the legal ineffectiveness of the document entitled *"Notice of Early Maturity"* dated May 3, 2022, since the document was not notified to TV AZTECA and/or the Subsidiary Guarantors.

**TWENTY-ONE.** The court order by which Your Honor will decree the legal ineffectiveness of the document entitled *"Notice of Early Maturity"* dated May 3, 2022, since the notification was given to a person named *"McColm, Elizabeth",* who was not entitled, and, therefore, authorized to receive notifications under the terms agreed in the referred Issuance agreement.

**TWENTY-TWO.** The court order by which Your Honor will decree the legal ineffectiveness of the document entitled *"Notice of Early Maturity"* dated May 3, 2022, as TV AZTECA and the Subsidiary Guarantors were not informed of the formalities and requirements agreed upon in section 11.1 of the referred Issuance agreement.

**TWENTY-THREE**. The court order by which Your Honor will decree that, as the early maturity did not take place and to pass judgment upon the agreement executed to restructure credits, it is not appropriate to require the payment of the premium, the accrued and unpaid interest, and other amounts owed under certain 8.250% Senior Bonds maturing in 2024. For this reason, Your Honor must render the Issuance agreement dated August 9, 2017, null and void.

**TWENTY-FOUR.** Any court expenses and legal that may be incurred into are to be borne by the defendants.

For the requests above, I further explain the following:

## BACKGROUND RELATED TO THE PLAINTIFF

1.    TV AZTECA SAB DE CV is a Mexican company incorporated by deed sixty-two thousand one hundred and ten, dated June 2, 1993, made before Joaquín Talavera Sánchez, notary public fifty for the Federal District, which first copy was registered in the Public Registry of Commerce of the Federal District in the *commercial folio number one hundred and sixty-seven thousand three hundred and forty-six*, on July 13, 1993, whereby the incorporation of "CONTROLADORA MEXICANA DE COMUNICACIONES", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, based in Mexico City, Mexico, with a duration of ninety and nine years, which included a foreigner exclusion clause, with a minimum capital stock of FIFTY THOUSAND NEW PESOS - MXN, (currently FIFTY THOUSAND PESOS - MXN). An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 3** for all legal purposes.

2.    By deed thirty-eight thousand six hundred and ninety, dated December thirty-one, nineteen ninety-four, made before Armando Gálvez Pérez Aragón, Notary Public one hundred three for the Federal District, which first copy was registered in the Public Registry of Commerce of the District Federal under the *commercial folio one hundred sixty-seven thousand three hundred forty-six*, on March fourteen, nineteen ninety-five, the notarization of two documents was

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

recorded as follows: (i) the first one stating the resolutions adopted outside the company meeting, dated September twenty-first, nineteen ninety-four, in which, among other resolutions, to decrease the variable capital of the company, as well as to transform the variable capital to a fixed minimum was agreed upon; consequently, *section six of the Bylaws was amended* as per the terms established in said resolutions; and, (ii) stating the resolutions adopted outside the company's meeting, dated September twenty-two, 1994, in which, among other resolutions, it was agreed to fully amend the company's bylaws as per the terms established in said resolutions. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 4** for all legal purposes.

3.      By deed thirty-eight thousand six hundred ninety-one, dated December thirty-one, nineteen ninety-four, made before Armando Gálvez Pérez Aragón, Notary Public one hundred three for the Federal District, which first copy was registered in the Public Registry of Commerce of the Federal District under the *commercial folio one hundred sixty-seven thousand three hundred forty-six,* on March twenty-two, nineteen ninety-five, the notarization of the merger was recorded by the incorporation of Controladora Mexicana de Comunicaciones, S.A. de C.V., as the merging entity, and Inversora Mexicana de Comunicaciones, S.A. de C.V., as the merged entity. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 5** for all legal purposes.

4.      By deed thirty-eight thousand six hundred ninety-three, dated December thirty-one, nineteen ninety-four, made before Armando Gálvez Pérez Aragón, Notary Public one hundred three for the Federal District, which first copy was registered in the Public Registry of Commerce of the Federal District under the *commercial folio one hundred sixty-seven thousand three hundred forty-six,* on March twenty-two, nineteen ninety-five, the notarization of resolutions adopted outside the company meeting, dated September twenty-six, nineteen ninety-four, was recorded, in which, among other resolutions, the minimum fixed capital reduction was agreed upon; consequently *section six of the Bylaws was amended* as per the terms established in said resolutions. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 6** for all legal purposes.

5.      By deed thirty-eight thousand six hundred ninety-four, dated December thirty-one, nineteen ninety-four, made before Armando Gálvez Pérez Aragón, Notary Public one hundred three for the Federal District, which first copy was registered in the Public Registry of Commerce of the Federal District under the *commercial folio one hundred sixty-seven thousand three hundred forty-six,* on March twenty-two, nineteen ninety-five, the notarization of resolutions adopted outside the company meeting, dated September twenty-seven, nineteen ninety-four, was recorded, in which, among other resolutions, the minimum fixed capital reduction was agreed upon; consequently *section six of the Bylaws was amended* as per the terms established in said resolutions. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 7** for all legal purposes.

6.      By deed thirty-eight thousand seven hundred, dated December thirty-one, nineteen ninety-four, made before Armando Gálvez Pérez Aragón, Notary Public one hundred three for the Federal District, which first copy was registered in the Public Registry of Commerce of the Federal District for the original corporation under the *commercial folio one hundred sixty-seven thousand three hundred forty-six,* on March twenty-two, nineteen ninety-five and for the new corporation under the commercial folio *one hundred ninety-seven thousand eight hundred forty-nine,* on April nineteen, nineteen ninety-five, the notarization of resolutions adopted outside the company meeting, dated October thirty-first, nineteen ninety-four, was recorded, in which, among other resolutions, the spin-off of Controladora Mexicana de Comunicaciones, S.A. de C.V., through the transfer of parts of its assets, liabilities and capital stock to the new corporation "Grupo Cotsa, S.A. de C.V." was agreed upon, and as a consequence the decrease in the company's capital stock and the full *amendment* of their *Articles of Incorporation* as per the terms established in said

8

*Mrs. Paola Montserrat Jiménez Bolaños* **– Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52) 1 55 3916-0805
www.languagesolutions.com.mx

resolutions. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 8** for all legal purposes.

7.        By deed thirty-eight thousand seven hundred seventeen, dated December thirty-one, nineteen ninety-four, made before Armando Gálvez Pérez Aragón, Notary Public one hundred three for the Federal District, which first copy was registered in the Public Registry of Commerce of the Federal District under the *commercial folio one hundred sixty-seven thousand three hundred forty-six,* on March twenty-two, nineteen ninety-five, the notarization of the resolutions adopted outside the company meeting, dated November eight, nineteen ninety-four, was recorded, in which, among other resolutions, the minimum fixed capital reduction was agreed upon by repaying the stock and, consequently *section six of the Bylaws was amended* as per the terms established in said resolutions. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 9** for all legal purposes.

8.        By deed thirty-eight thousand seven hundred eighteen, dated December thirty-one, nineteen ninety-four, made before Armando Gálvez Pérez Aragón, Notary Public one hundred three for the Federal District, which first copy was registered in the Public Registry of Commerce of the Federal District under the *commercial folio one hundred sixty-seven thousand three hundred forty-six,* on March fourteen, nineteen ninety-five, the notarization of resolutions adopted outside the company meeting, dated December second, nineteen ninety-four, was recorded, in which, among other resolutions, the minimum fixed capital increase was agreed upon and, consequently *section six of the Bylaws was amended* as per the terms established in said resolutions. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 10** for all legal purposes.

9.        By deed forty-two thousand four hundred forty-seven, dated August second, nineteen ninety-five, made before Armando Gálvez Pérez Aragón, Notary Public one hundred three for the Federal District, which first copy was registered in the Public Registry of Commerce of the District Federal under the *commercial folio number one hundred sixty-seven thousand three hundred forty-six,* the notarization of the minutes of the extraordinary shareholders' meeting of the company, dated June twenty-three, nineteen ninety-five, was recorded, wherein the ratification of the acts carried out by the company due to corporate restructuring was agreed upon. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 11** for all legal purposes.

10.        By deed forty-nine thousand three hundred seventeen, dated September three, nineteen ninety-six, made before Armando Gálvez Pérez Aragón, Notary Public one hundred three for the Federal District, which first copy was registered in the Public Registry of Commerce of the Federal District under the *commercial folio number one hundred sixty-seven thousand three hundred forty-six,* on November thirteen, nineteen ninety-six, the minutes of the extraordinary shareholders' meeting of the company, dated July eighteen, nineteen ninety-six, were recorded, wherein the *amendment of the company name* was agreed upon as "TV *AZTECA*", *SOCIEDAD ANONIMA DE CAPITAL VARIABLE,* which resulted in the amendment of *section one of its bylaws.* An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 12** for all legal purposes.

11.        By policy eight hundred sixty-two, dated January thirty-one, nineteen ninety-seven, made before Mauricio Oropeza Estrada, commercial notary public fourteen for the Federal District, which first original was registered in the Public Registry of Commerce of the Federal District under the *commercial folio number one hundred sixty-seven thousand three hundred forty-six,* on March thirty-one, nineteen ninety-seven, whereby the minutes of the extraordinary shareholders' meeting of the company, dated November nineteen, nineteen ninety-six, were recorded, whereby the ratification of the acts carried out by the company due to corporate restructuring was agreed upon. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 13** for all legal purposes.

9

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

12.    By policy eight hundred sixty-three, dated January thirty-one, nineteen ninety-seven, made before Mauricio Oropeza Estrada, commercial notary public fourteen for the Federal District, which first original was registered in the Public Registry of Commerce of the Federal District under the *commercial folio number one hundred sixty-seven thousand three hundred forty-six*, on March thirty-first, nineteen ninety-seven, by means of which, the notarization of the minutes of the extraordinary general shareholders' meeting of the company, dated January twenty-first, nineteen ninety-seven, was recorded, whereby, among other resolutions, *the amendment of sections twelve and fourteen of its bylaws was agreed upon.* An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 14** for all legal purposes.

13.    By deed ten thousand four hundred seventy-five, dated August five, nineteen ninety-seven, made before Joel Chirino Castillo, notary public ninety for the Federal District, which first copy was registered in the Public Registry of Commerce of the Federal District under the *commercial folio number one hundred sixty-seven thousand three hundred forty-six,* on September eight, nineteen ninety-seven, the notarization of the minutes of the extraordinary shareholders' meeting of the company, dated July seventeen, nineteen ninety-seven, was recorded, in which, among other resolutions, the restructuring of the capital stock was agreed upon to consequently create a trust for the issuance of Irredeemable Ordinary Participation Certificates and carry out a public offering of securities issued by the company; as well as the *full amendment of its Bylaws* as per the terms therein was agreed upon. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 15** for all legal purposes.

14.    By deed eleven thousand six, dated May seven, nineteen ninety-eight, made before Joel Chirino Castillo, notary public ninety for the Federal District, which first copy was registered in the Public Registry of Commerce of the Federal District under the *commercial folio number one hundred sixty-seven thousand three hundred forty-six,* on July twenty-three, nineteen ninety-eight, the notarization of the minutes of the ordinary and extraordinary shareholders' meeting of the company, dated March twenty-seven, nineteen ninety-eight, was recorded, in which, among other resolutions, *the amendment of paragraphs four, fourteen and twenty-three of section sixth of its bylaws was agreed upon.* An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 16** for all legal purposes.

15.    By deed eight thousand three hundred fifteen, dated June eight, nineteen ninety-nine, made before José Luis Villavicencia Castañeda, Notary public two hundred eighteen for the Federal District, which first copy was registered in the Public Registry of Commerce of the Federal District under the *commercial folio number one hundred sixty-seven thousand three hundred forty-six, the transcription of its bylaws was recorded.* An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 17** for all legal purposes.

16.    By deed nine thousand eight hundred ninety-three, dated April three two thousand, made before José Luis Villavicencio Castañeda notary two hundred and eighteen of the Federal District, which first copy was registered in the Public Registry of Commerce of the Federal District under the *commercial folio number one hundred sixty-seven thousand three hundred forty-six,* on May second, two thousand, the notarization of the minutes of the ordinary and extraordinary shareholders' meeting of the company, dated January twenty-seven, two thousand, was recorded, whereby, among other resolutions, *the amendment of sections twenty-seven, twenty-eight and twenty-nine of its bylaws was agreed upon.* An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 18** for all legal purposes.

17.    By means of deed sixty-three thousand seven hundred sixty-six, dated October thirteen, two thousand, made before Jorge Alfredo Domínguez Martínez Notary Public one hundred forty for the Federal District, the *transcription of its bylaws was recorded.* An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 19** for all legal purposes.

18.    By deed twelve thousand nine hundred fifty-eight, dated September twenty-two, two thousand one, made before José Luis Villavicencio Castañeda Notary Public two hundred

*Mrs. Paola Montserrat Jiménez Bolaños* – Expert Interpreter & Translator English – Spanish – Portuguese - French
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

eighteen for the Federal District, which first copy was registered in the Public Registry of Commerce of the Federal District under the *commercial folio number one hundred sixty-seven thousand three hundred forty-six,* on November nine, two thousand one, the partial notarization of the minutes of the extraordinary shareholders' meeting of the company, dated September four, two thousand one, was recorded, whereby the *amendment of sections six, nine, twelve, sixteen, nineteen, twenty-four, twenty-five, twenty-six, twenty-seven, twenty-eight, twenty-nine, thirty-one* and *thirty-four of its Bylaws was agreed upon.* An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 20** for all legal purposes.

19.    By deed number twelve thousand nine hundred sixty-seven, dated October second, two thousand one, made before José Luis Villavicencio Castañeda Notary Public two hundred eighteen for the Federal District, the *transcription of the bylaws* of the company was recorded. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 21** for all legal purposes.

20.    By policy five thousand seven hundred thirty-four, dated July fourteen, two thousand three, made before Mauricio Oropeza Estrada, commercial notary public fourteen for the Federal District, which first original was registered in the Public Registry of Commerce of the Federal District under the *commercial folio number one hundred sixty-seven thousand three hundred forty-six,* on July twenty-five, two thousand three*,* the notarization of the minutes of the general shareholders' meeting of the company, dated April 30, two thousand and three, was recorded, whereby the authorization of the *transcription of the bylaws* of the company was agreed upon. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 22** for all legal purposes.

21.    By policy six thousand thirty-three, dated December twenty-two, two thousand three, made before Mauricio Oropeza Estrada, commercial notary public fourteen for the Federal District, which first original was registered in the Public Registry of Commerce of the Federal District under the *commercial folio number one hundred sixty-seven thousand three hundred forty-six,* on *January twenty-eight, two thousand four,* the notarization of the minutes of the extraordinary shareholders' meeting of the company, dated December nineteen, two thousand three, was recorded, in which, among other resolutions, the following resolutions were approved: *(i)* the *spin-off* of "*TV AZTECA", SOCIEDAD ANONIMA DE CAPITAL VARIABLE,* whereby this same company remained as the original corporation and  resulting in the creation of *"UNEFON HOLDINGS", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE* as a the new corporation, under the terms, conditions and duration established at said meeting; *(iii) a decrease in the fixed capital stock of "TV AZTECA", SOCIEDAD ANONIMA DE CAPITAL VARIABLE* in the amount of *SIXTY-EIGHT MILLION PESOS - MXN* to *ONE THOUSAND SIX HUNDRED TWENTY-SIX MILLION SIX HUNDRED TWELVE THOUSAND ONE HUNDRED FORTY-SEVEN PESOS - MXN, and, (iii) the amendment to sections six and thirty-one of the Bylaws.* An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 23** for all legal purposes.

22.    By policy number six thousand eight hundred sixty-four, dated July fifteen, two thousand five, made before Mauricio Oropeza Estrada, commercial notary public fourteen for the Federal District, which first original was registered in the Public Registry of Commerce of the Federal District in the *commercial folio number one hundred sixty-seven thousand three hundred forty-six,* on *October fourteen, two thousand five,* the *notarization* of the minutes of the extraordinary and general shareholders' meeting of the company, dated November twenty-four, two thousand four were recorded, in which, among other resolutions, the following resolutions were approved: *(i)* the *decrease* of the *fixed capital stock* of said company in the amount of *$382,249,837.00, MXN (three hundred eighty-two million, two hundred forty-nine thousand, eight hundred thirty-seven pesos - MXN)* so the *fixed capital stock* will remain in the amount of *$1,244,362,310.00 - MXN (one thousand two hundred forty-four million three hundred sixty-two thousand three hundred ten pesos - MXN)* and consequently, *(iii)* the *amendment* to paragraph one of section *six*

**11**

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

well as the *amendment* to sections *Twenty-Seven to Thirty-Three of the Bylaws*. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 24** for all legal purposes.

23.      By policy six thousand eight hundred sixty-five, dated July fifteen, two thousand five, made before Mauricio Oropeza Estrada, commercial notary public fourteen for the Federal District, which first original was registered in the Public Registry of Commerce of the Federal District under the *commercial folio number one hundred sixty-seven thousand three hundred forty-six on October fourteen, two thousand five, the notarization* of the minutes of the ordinary and extraordinary shareholders' meeting was recorded, in which, among other resolutions, the following agreements were approved: *(i) the decrease* of the *fixed capital stock* of said company in the amount of *$99.242,220.00 MXN (ninety-nine million, two hundred forty-two thousand, two hundred twenty pesos - MXN)* so the *fixed capital stock* will remain in the amount of *$1,145, 120,090.00 MXN (one thousand one hundred forty-five million one hundred twenty thousand ninety pesos - MXN)*; consequently, *(iii) the amendment* to the first paragraph of section *Six of the bylaws*. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 25** for all legal purposes.

24.      By policy number six thousand eight hundred sixty-six, dated July fifteen, two thousand five, made before Mauricio Oropeza Estrada, commercial notary public for the Federal District, which first original was registered in the Public Registry of Commerce of the Federal District under the *commercial folio number one hundred sixty-seven thousand three hundred forty-six, on October fourteen, two thousand five,* the notarization of the minutes of the special shareholders' meeting for  Series "D-A" shares of the company, dated May thirty, two thousand five was recorded, in which, among other resolutions, the *amendment* to sections *six and twenty of the bylaws* was approved. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 26** for all legal purposes.

25.      By policy six thousand eight hundred sixty-seven, dated July fifteen, two thousand five, made before Mauricio Oropeza Estrada, commercial notary public fourteen for the Federal District, which first original copy was registered in the Public Registry of Commerce of the Federal District under the *commercial folio number one hundred sixty-seven thousand three hundred forty-six, on October fourteen, two thousand five, the notarization* of the minutes of the special shareholders' meeting for Series "D-L" shares of the company, dated May thirty, two thousand five, in which, among other resolutions, the *amendment* to the section *six and twenty-six of the Bylaws* was approved. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 27** for all legal purposes.

26.      By policy number six thousand eight hundred sixty-eight, dated July fifteen, two thousand five, made before Mauricio Oropeza Estrada, commercial notary public fourteen for the Federal District, which first original was registered in the Public Registry of Commerce of the Federal District under the *commercial folio number one hundred sixty-seven thousand three hundred forty-six,* on *October fourteen two thousand five,* the *notarization* of the minutes of the special shareholders' meeting for Series "A" shares of the company was registered, dated May thirty, two thousand five, in which, among other resolutions, the *amendment* to section *six* and *Twenty-six of the Bylaws was approved.* An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 28** for all legal purposes.

27.      By policy six thousand eight hundred sixty-nine, dated July fifteen, two thousand five, made before Mauricio Oropeza Estrada, commercial notary public fourteen for the Federal District, which first original was registered in the Public Registry of Commerce of the Federal District *under the commercial folio number one hundred sixty-seven thousand three hundred forty-six,* on *October fourteen, two thousand five,* the *notarization* of the minutes of the extraordinary shareholders' meeting of the company, dated May thirty, two thousand five was recorded, in which, among other resolutions, the *amendment* to sections *six, nine, eleven, fourteen, sixteen, twenty-one* and *twenty-six of the Bylaws* was approved. An authenticated copy of the public deed

12

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

referred to herein is attached hereto as **ANNEX 29** for all legal purposes.

28.     By policy six thousand eight hundred seventy, dated July fifteen, two thousand five, made before Mauricio Oropeza Estrada, commercial notary public fourteen for the Federal District, which first original was registered in the Public Registry of Commerce of the Federal District under the *commercial folio number one hundred sixty-seven thousand three hundred forty-six,* on *October fourteen, two thousand five,* the *notarization* of the minutes of the extraordinary shareholders' meeting of the company, dated June first, two thousand five at four PM was recorded and the *amendment* to section *Twenty-six of the Bylaws* was approved. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 30** for all legal purposes.

29.     By policy six thousand eight hundred seventy-one, dated July fifteen, two thousand five, made before Mauricio Oropeza Estrada, commercial notary public fourteen for the Federal District, which first original was registered in the Public Registry of Commerce of the Federal District under the *commercial folio numbers one hundred sixty-seven thousand, three hundred forty-six and three hundred twenty-two thousand, nine hundred one,* on *December 9, two thousand five, the notarization* of the minutes of the extraordinary shareholders' meeting of the company, dated June twenty-seven, two thousand five was recorded, wherein the resolution to *merge* the companies *"TV AZTECA", SOCIEDAD ANONIMA DE CAPITAL VARIABLE and "TV SPORTS SERVICES*", and *"SERVICIOS DEPORTIVOS TV", SOCIEDAD ANONIMA DE CAPITAL, whereby "TV AZTECA", SOCIEDAD ANONIMA DE CAPITAL VARIABLE* remained as the original corporation and *"SERVICIOS DEPORTIVOS TV", SOCIEDAD ANONIMA DE CAPITAL VARIABLE* as the new corporation, whereby the resolutions related to said merger below, were approved. "*TV AZTECA", SOCIEDAD ANONIMA DE CAPITAL VARIABLE* shall receive 270,000,000 (two hundred seventy million) own shares or their equivalent in Ordinary Participation Certificates, which are to be canceled; *(ii)* As a result of the merger and due to the cancellation of its own shares by *"TV AZTECA", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE,* the capital stock of *"TV AZTECA", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE* will be *decreased* in the amount of *$30,000,000.00 (Thirty million pesos - MXN); (iii)* the approval of the adjustments to the fully subscribed and paid capital stock of *"TV AZTECA", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE,* derived from the changes thereof consists of the following: (a) stock that has been exercised from the Company's Option Plans from time to time and that has not been recorded in the meeting minutes; (b) the capital increases that have been decreed in the past and that in some cases only part of said increases have been paid; and (c) exchange rate differences in reimbursements paid in recent years; *(iv)* the *validation* of each and every adjustment to the capital stock of *"TV AZTECA", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE,* including a decrease in the capital stock approved on the occasion of the merger that was also formalized through the same instrument, which was established in the amount of $933.23*6,998.00 (nine hundred thirty-three million two hundred thirty-six thousand nine hundred ninety-eight pesos - MXN),* (v) the fully subscribed and paid minimum fixed capital stock of *"TV AZTECA", SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE* is equivalent to the amount of *$933.236,998.00 (nine hundred thirty-three million, two hundred thirty-six thousand, nine hundred ninety-eight pesos - MXN)* resulting in the amendment of paragraph of section Six of the Company's bylaws to that effect. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 31** for all legal purposes.

30.     By policy six thousand eight hundred seventy-four, dated July fifteen, two thousand five, made before Mauricio Oropeza Estrada, commercial notary public fourteen for the Federal District, which first original was registered in the Public Registry of Commerce of the Federal District under the *commercial folio number one hundred sixty-seven thousand three hundred forty-six, on December nine, two thousand five,* the *transcription of the bylaws* of the company was recorded. An authenticated copy of the public deed referred to herein is attached hereto as

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese – French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

Page 14

**ANNEX 32** for all legal purposes.

31.      By policy seven thousand three hundred seventy-three, dated July six, two thousand six, made before Mauricio Oropeza Estrada, commercial notary public fourteen for the Federal District, which first original was registered in the Public Registry of Commerce of the Federal District under the *commercial folio number one hundred sixty-seven thousand three hundred forty-six, on October twenty-three, two thousand six,* the *notarization* of the minutes of the ordinary and extraordinary shareholders' meeting of the company, dated February twenty, two thousand six was recorded, in which, among other resolutions, a *decrease* in the *fixed capital stock* of said company in the amount of *NINETY-FIVE MILLION FOUR HUNDRED THIRTY-FIVE THOUSAND SIX HUNDRED TWENTY-THREE PESOS - MXN,* so that said capital remained in the amount of *EIGHT HUNDRED THIRTY-SEVEN MILLION EIGHT HUNDRED ONE THOUSAND THREE HUNDRED SEVENTY-FIVE PESOS - MXN;* and, consequently, *section six of the bylaws* was amended. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 33** for all legal purposes.

32.      By policy seven thousand six hundred forty-six, dated January twenty-ninth, two thousand seven, made before Mauricio Oropeza Estrada, commercial notary public fourteen for the Federal District, which first original was registered in the Public Registry of Commerce of the Federal District under the *commercial folio number one hundred sixty-seven thousand three hundred forty-six, on April sixteenth two thousand seven*, the *notarization* of the minutes of the ordinary and extraordinary shareholders' meeting of the company, dated December seven, two thousand six was recorded, in which, among other resolutions, a *decrease* of the *fixed capital stock* of said company in the amount of *ONE HUNDRED TWO MILLION ONE HUNDRED TWO THOUSAND PESOS* - MXN, so that said capital remains in the amount of *SEVEN HUNDRED THIRTY FIVE MILLION SIX HUNDRED NINETY-NINE THOUSAND THREE HUNDRED SEVENTY-FIVE PESOS - MXN* and; consequently, the *amendment* to *section six of the bylaws* was approved. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 34** for all legal purposes.

33.      By means of public deed number thirty-four thousand seven hundred, dated May ten, two thousand seven, made before Carlos Antonio Morales Montes de Oca, Notary Public two hundred twenty-seven of the Federal District, which first copy was registered in the Public Registry of Commerce of the Federal District , under the *commercial folio number one hundred sixty-seven thousand three hundred forty-six,* on *May twenty-two, two thousand seven*, the notarization of the minutes of the ordinary and extraordinary shareholders' meeting of the company dated April thirty, two thousand seven was recorded, in which, among other resolutions, the approval of the Irrevocable Trust number 987-8 was approved, created for the issuance of Irredeemable Ordinary Participation Certificates covering stock of the company and as consequence the *amendment* to *section six of the bylaws was approved.* An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 35** for all legal purposes.

34.      By policy number eight thousand seventy, dated December twenty, two thousand seven, made before Mauricio Oropeza Estrada, commercial notary public fourteen for the Federal District, which first original was registered in the Public Registry of Commerce of this city under the *commercial folio number one hundred sixty-seven thousand three hundred forty-six,* on *July seventeen, two thousand eight,* the formalization of the minutes of the ordinary and extraordinary shareholders' meeting of the company dated September twenty-seven, two thousand seven was recorded*, wherein a capital decrease of the fixed capital stock of said company in the amount of SIXTY MILLION EIGHT HUNDRED TWENTY-FIVE THOUSAND PESOS -MXN for said capital in the amount of SIX HUNDRED SEVENTY-FOUR MILLION EIGHT HUNDRED SEVENTY-FOUR THOUSAND THREE HUNDRED SEVENTY-FIVE PESOS - MXN; consequently, the amendment to section six of the bylaws* was approved. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 36** for all legal purposes.

14

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

35.      By policy eight thousand two hundred forty-six, dated June sixteen, two thousand eight, made before Mauricio Oropeza Estrada, commercial notary public fourteen for the Federal District, which first original was registered in the Public Registry of Commerce of this city under the *commercial folio number one hundred sixty-seven thousand three hundred forty-six,* on *July seventeenth, two thousand eight*, *the transcription of the current bylaws* of the company was recorded. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 37** for all legal purposes.

36.      By policy eight thousand nine hundred fifty-four, dated August three, two thousand ten, made before Mauricio Oropeza Estrada, commercial notary public fourteen for the Federal District, which first original was registered in the Public Registry of Commerce of this city under the *commercial folio number one hundred sixty-seven thousand three hundred forty-six,* on *September nine, two thousand ten,* the partial notarization of the minutes of the ordinary and extraordinary shareholders' meeting of the company, dated April thirty, two thousand ten was recorded, wherein a decrease in the fixed capital stock in the amount of NINE MILLION  NINE HUNDRED FORTY-FOUR THOUSAND PESOS - MXN was approved; consequently, said minimum capital stock is equivalent to the amount of SIX HUNDRED SIXTY-FOUR MILLION NINE HUNDRED THIRTY THOUSAND THREE HUNDRED SEVENTY-FIVE PESOS - MXN; consequently, *paragraph one, section six of the bylaws was amended*, as per the terms specified therein. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 38** for all legal purposes.

37.      By policy eight thousand nine hundred seventy, dated August twenty-six, two thousand ten, made before Mauricio Oropeza Estrada, commercial notary public fourteen for the Federal District, which first original was registered in the Public Registry of Commerce for this city under the *commercial folio number one hundred sixty-seven thousand three hundred forty-six,* on *September eight, two thousand ten,* the notarization of the minutes of the extraordinary shareholders' meeting of the company, dated August nineteen, two thousand ten, was recorded, in which, among other resolutions, the *amendment to sections one, four, six, seven, eight, nine, twelve, thirteen, fourteen, sixteen, eighteen, nineteen, twenty-one, twenty-two, twenty-four, twenty-six, twenty-seven, twenty-eight, twenty-nine, thirty, thirty-one, thirty-two, thirty-three, thirty-four and thirty-six of the bylaws* of the company was approved, as per the terms established therein. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 39** for all legal purposes.

38.      By policy eight thousand nine hundred eighty-six, dated September seven, two thousand ten, made before Mauricio Oropeza Estrada, commercial notary public fourteen for the Federal District, the *transcription of the current bylaws* of the company was recorded. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 40** for all legal purposes.

39.      By policy nine thousand two hundred sixty-seven, dated September six, two thousand eleven, made before Mauricio Oropeza Estrada, commercial notary public fourteen for the Federal District, the *transcription of the current bylaws* of the company was recorded. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 41** for all legal purposes.

40.      By policy nine thousand nine hundred eighty-seven, dated April seven, two thousand fourteen, made before Mauricio Oropeza Estrada, commercial notary public fourteen for the Federal District, which first copy was registered in the Public Registry of Commerce of this city under *commercial folio number one hundred sixty-seven thousand three hundred forty-six,* on *June thirty, two thousand fourteen* the *transcription of the current bylaws* of the company was recorded. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 42** for all legal purposes.

41.      By policy ten thousand four hundred thirty, dated June seven, two thousand seventeen, made before Mauricio Oropeza Estrada, public broker fourteen of the Federal District, the *transcription of the current bylaws* of the company was recorded. An authenticated copy of the

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

public deed referred to herein is attached hereto as **ANNEX 43** for all legal purposes.

42.     By deed one hundred forty-nine thousand four hundred three, dated September first, two thousand twenty, made before Eduardo Garduño García Villalobos, Notary Public two hundred eleven for the Federal District, the *transcription of the current bylaws* of the company was recorded. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 44** for all legal purposes.

43.     By deed one hundred fifty-seven thousand nine hundred eighty-five, dated September fifteen, two thousand twenty-one, made before Eduardo Garduño García Villalobos, Notary Public two hundred eleven for the Federal District, which first copy is still pending registration in the Public Registry of Commerce of the Federal District, the notarization of the minutes of the extraordinary shareholders' meeting of the company was recorded, dated June thirty, two thousand twenty-one, wherein the *amendment to section four and six of the Bylaws* was approved. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 45** for all legal purposes.

44.     By deed one hundred sixty thousand four hundred forty-three, dated December twenty-three, two thousand twenty-one, made before Eduardo Garduño García Villalobos, Notary Public two hundred eleven for the Federal District, which first copy is still pending registration in the Public Registry of Commerce of the Federal District, the notarization of the minutes of the extraordinary shareholders' meeting of the company dated December fifteen, two thousand twenty-five, was recorded, in which, among other resolutions, the merger of the company as the original company was approved and which existence subsisted along with the companies "Administradora Grupo TVA", S.A. de C.V.", "Alta Empresa II, S.A. de C.V.", "Azteca Novelas, S.A.P.I. de C.V.", "Azteca Telecasting, S. de R.L. de C.V.", "Azteca Web, S.A. de C.V.", "Comercializadora en Medios de Comunicación de TV Azteca, S.A. de C.V.", "Comerciacom, S.A. de C.V.", "Comercializadora de Publicidad Azteca, S.A. de C.V.", "Estudios Azteca, S.A. de C.V.", "Finbor México, S.A. de C.V.", "Grupo TV Azteca, S.A. de C.V.", "Inversora Mexicana de Producción, S.A. de C.V.", "Profesionales y Administrativos en Servicios Inmobiliarios, S.A. de C.V.", "Red Azteca Internacional, S.A. de C.V.", "Televisión Azteca, S.A. de C.V." and "TV Azteca Comercializadora, S.A. de C.V.", as merged and disappearing companies. An authenticated copy of the public deed referred to herein is attached hereto as **ANNEX 46** for all legal purposes.

45.     Through an ordinary and extraordinary shareholders' meeting, dated April twenty-five, two thousand twenty-two, which is in the process of being registered in the Public Registry of Commerce of the Federal District, among other resolutions, *the amendment to* sections *five* and *six* of the bylaws of the company was approved, as per the terms established therein. An authenticated copy of the meeting minutes mentioned in this number is added to this lawsuit, as **ANNEX 47** for all legal purposes.

46.     By virtue of the different amendments made to the bylaws of said company, registered in the following public deeds - policy number eight thousand nine hundred and seventy, deed one hundred and fifty-seven thousand nine hundred and eighty-five; and the ordinary and extraordinary general meeting of shareholders referred in the previous item; were attached hereto as ANNEXES 39, 45 and 47. I hereby state that the current bylaws of *TV AZTECA*", *SOCIEDAD ANÓNIMA BURSATIL DE CAPITAL VARIABLE,* are the following:

a.     NAME-- ONE.- The company's will be "TV AZTECA", always followed by the words "SOCIEDAD ANÓNIMA BURSÁTIL DE CAPITAL VARIABLE", or its abbreviation, "S.A.B. de C.V."

b.     ADDRESS. TWO.- The company is based in Mexico City, Mexico, but it may open branches or agencies and assign addresses for service anywhere else in Mexico or abroad, without this implying a change in their registered address.

c.     DURATION. THREE.- The duration of the company is ninety-nine years from the registration date of the articles of incorporation in the Public Registry of Property and Commerce.

*Mrs. Paola Montserrat Jiménez Bolaños* – Expert Interpreter & Translator English – Spanish – Portuguese – French
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

16

d.      PURPOSE. FOUR.- The company's purpose is:

i. To use, take advantage of, exploit, and operate frequency bands of the radioelectric spectrum and public or private telecommunications networks, through concessions, authorizations or permits obtained from the relevant authorities.

ii. The production, commercialization, acquisition, distribution, assignment, representation, sale, design, import, export, use, exchange, application or any other form of contracting of all types of events, advertising spaces, radio   series and shows, films, television, restricted television systems, public or private telecommunications networks, the Internet and any other telecommunications system known or yet to be known, including the broadcasting rights of any of these events, series or programs, on its own behalf or on behalf of third parties in Mexico and abroad.

iii. Providing all kinds of services related to telecommunications and broadcasting, through all kinds of electrical, electronic, and mechanical devices.

iv. To promote, establish, organize, exploit, and hold interests in the capital and assets of all kinds of commercial, civil, associations or industrial, commercial service companies or of any other nature, both national and foreign as well as taking part in their management or liquidation.

v. To receive from other legal entities and individuals, and to provide to those companies of which they are a partner or shareholder or to other companies, all those services that may be required to achieve its purposes, such as legal, administrative, financial, treasury, auditing, marketing, preparation of balance sheets and budgets, development of programs and manuals; analysis of operating results, evaluation of information on productivity and possible financing, and the preparation of studies on capital availability, *inter alia*.

vi. To acquire shares, interests or stock in other corporations or civil companies, either by taking part in their constitution or acquiring shares or interests in those that have been incorporated as well as to sell or negotiate such shares or interests and all types of securities permitted by law.

vii. To provide, retain and receive all kinds of technical, consultative, training, and advisory services and execute contracts or agreements to carry out these purposes.

viii. To execute all kinds of agreements with the centralized or decentralized public administration of the Federal Government or local governments or with public or private entities, individuals, or legal entities, whether national or foreign.

ix. To issue, subscribe, take, endorse, and secure negotiable instruments, securities and other documents allowed by the Law. --

x. To buy, sell, lease, sublease, and allow the use, enjoyment, disposal or, in general, the exploitation of all kinds of real estate or personal property, including its parts or accessories.

xi. To provide or receive all kinds of technical and professional assistance or services.

xii. To carry out, supervise or retain, on its own behalf or on behalf of third parties, all kinds of building constructions, real estate complexes, residential developments, buildings or facilities for commercial offices or establishments, industrial, sports, tourist companies, and residential use.

xiii. To obtain and grant all kinds of loans, by granting and receiving, where appropriate, specific sureties, issue bonds and promissory notes, to take, draw, endorse or secure all kinds of negotiable instruments and other documents that protect credit rights and grant bonds or sureties of any kind, regarding any obligations assumed or the certificates issued or taken by third parties.

xiv. To register, purchase, lease, assign, renew, verify the proper use, and utilize trademarks, patents, invention certificates, trade names, industrial drawings, slogans, model registrations, copyrights, inventions, and processes and any and all other industrial and intellectual property rights.

xv. To acquire as property or lease all kinds of real estate or personal property as well as rights in rem and personal interests over them, that may be necessary or convenient for its corporate purpose or for the operations of corporations or civil companies, associations, and institutions, in which the company may have an interest or stock.

xvi. To establish, lease, operate and own sites, factories, workshops, warehouses, facilities, offices,

17

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

and agencies, as well as institutes and training or consulting schools in Mexico or abroad, pursuant to the applicable legislation.

xvii. To act as a commission agent, mediator, distributor, or intermediary and agency activities related to negotiations of all kinds.

xviii. Give guarantees in any way permitted by law, in relation to the obligations assumed by the company or by third parties.

xix. Overall, to carry out all kinds of commercial acts and execute all types of contracts and agreements, as well as operations of any nature that may be convenient to achieve the purposes above, as provided for by Law.

e. NATIONALITY. FIVE.- The Company is Mexican. Except for the provisions of Chapter Two, Title Five, of the Foreign Investment Law and in section Six of these bylaws, no foreign individual or legal entity, may have any interest or hold stock in the company. If for any reason, any of the persons or entities above, due to any event, acquires interest or shares in a company and thus, contravening the provisions of the preceding paragraph, it is agreed from now on that said acquisition shall be null and void, in which case the relevant interest or instruments related thereto shall be canceled; therefore, the capital stock shall be decreased by an amount equal to the value of the canceled share or interest.

## JURISDICTION

However, it is important to note that jurisdiction is the accumulation of powers provided for by law to the court to try certain types of disputes. Therefore, as it is a procedural requirement, the authority must verify that for each matter brought to its attention, it has jurisdiction to try it. Well, despite the fact that section 35 of the Code of Civil Procedure for the Federal District, provides for that lack of jurisdiction is a procedural exception, this condition is to be met for a trial to be valid. This, as per the court opinion below:

*"Digital registration: 161681*
*Proceeding level: Collegiate Circuit Courts*
*Ninth Epoch*
*Matter(s): Civil*
*Dissertation: I.3o.C.970 C*
*Source: Judicial Weekly of the Federation and its Gazette.*
*Volume XXXIV, July 2011, p.1981*
*Type: Sole opinion*
*JUDGE JURISDICTION. IT SHOULD BE DEEMED A PROCEDURAL CONDITION EVEN WHEN IT IS NOT EXPRESSLY STATED AS SUCH IN THE CODE OF CIVIL PROCEDURE FOR THE FEDERAL DISTRICT, IN CONSIDERATION OF ITS LEGAL NATURE.*
*According to section 35 of the Code of Civil Procedure for the Federal District, a judge lacking jurisdiction is deemed a procedural exception. However, based on the general theory of procedure, three conditions are to be met for an action to be validly exercised and tried by the jurisdictional authority: 1) procedural condition, 2) condition required for the exercise of an action and 3) that the action meets the admissibility criteria. Thus, the first term referred above, i.e., 'procedural condition' refers to those assumptions that must be met to validly conduct a trial, i.e., these are related to the procedure, regardless of the nature of the action brought, some examples are - compulsory joinder of defendants, legal capacity, and matter admissibility. On the other hand, there are the necessary conditions to file a complaint, which are said conditions without which a complaint may not be subject to a final ruling, i.e., conditions precedent related to the merits of the filed complaint, inter alia, the right to file a complaint. On the other hand, the elements of a compliance action are a) an obligation; b) that a payment is due; and c) that it has not been performed. Thus, the procedural conditions of an action and the necessary conditions for its exercise concern the merits of the question raised, for which reason, its accreditation is subject to proof and, therefore, it is until the issuance of the final judgment when the Judge declares that said condition has not been met. However, the procedural conditions which are not related to the merits of the matter raised, but to the process; accordingly, the Judge may notice that these have not been met and recognize said fact, without having to wait for the trial to conclude. Furthermore, based on its legal nature, the judge jurisdiction,*

18

*Mrs. Paola Montserrat Jiménez Bolaños* – Expert Interpreter & Translator English – Spanish – Portuguese - French
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

*rather than a procedural exception, should be understood as a procedural condition for the exercise of the action, even when the civil procedural legislation does not establish it as such, as said conditions have not been met, that would mean that all trial actions are null and void."*

Another assumption that is the starting point of this explanation is that modern States aim to avoid abusing of power; therefore, jurisdiction is closely related to the *principle of lawfulness* provided for in section 16 of the Constitution, as, although all judges have jurisdiction, they may only exercise it within the limits of the jurisdiction that has been legally assigned to them. For this reason, the criteria used to determine this jurisdiction are related to matter, amount, degree, and territory, as provided for in section 144 of the Code of Civil Procedure for the Federal District. However, the doctrine has also determined the existence of four other supplementary criteria - prevention, connection, drawing a case from another matter and duty.

In the Mexican legal system, the rule of thumb is that the jurisdiction of court authorities related to the matter is distributed among various courthouses, and to each of them a specialization is assigned, which gives rise to agrarian, civil, fiscal, criminal, and labor courts, *inter alia*; and it is up to each of them to try those cases related to their area of specialty. In the case at hand, as the remedies sought consist of: *a court order recognizing that a force majeure event or acts of God took place, a court order recognizing the material and legal impossibility to perform the plaintiff's obligations, a court order ordering the legal ineffectiveness by operation of law of the document entitled "Notice of Early Maturity",* which are related to and derive from an Issuance agreement dated August 9, 2017, which in accordance with sections 4, 75 and 76 of the Commercial Code, are deemed commercial acts; it is possible to conclude that the competent Judge to try the case is the Civil Judge of the Superior Court of Justice of Mexico City.

The foregoing in accordance with section 59 of the Organic Law of the Judiciary of Mexico City, as it provides for that the Traditional Civil Courts have jurisdiction to try civil and commercial cases.

The jurisdiction criterion by reason of the amount or value, takes into account the *quantum* or the amount in which the value of the suit may be estimated, which, in the case at hand, exceeds the amount provided for in section 105 of the Organic Law of the Judiciary of Mexico City, in which case, the Civil Judges assigned Oral Trials may not be able to try it, as by exclusion, the Traditional Civil Courts have jurisdiction to try the case at hand. On the other hand, jurisdiction the criterion by reason of degree refers to the court level where a case is to be tried, as usually the judicial power is not exercised by a single judge when solving a dispute; for this reason, this claim is also filed before the trial court for a judgment to be handed down in accordance with law. Lastly, jurisdiction by reason of territory refers to the spatial scope within which a judge may validly exercise their judicial power. So as to prove the judge jurisdiction as per this criterion, it is necessary to highlight that in the case at hand, two legal concepts are being resorted to, i.e., force majeure event and acts of God, which the legal doctrine admits in those cases where an obligation is not performed and this fact cannot be attributable to the debtor, as the latter may be prevented from doing so due to an event that is beyond its control and that it may have not foreseen or even so it cannot be avoided. To highlight the difference between both concepts, an act of God implies an event of unpredictable nature, while a force majeure event implies an inevitable man-made event. However, both share a core element, i.e., that the events and consequences are beyond the reasonable control of the parties.

In this case, the pandemic caused by the SARS-CoV2 virus (COVID-19) had a global impact due to high contagion among people, leading to the suspension of non-essential activities, including business activities. From said unforeseeable scenarios, the pandemic is an event that falls in the description of an act of God, while the orders issued by the authorities to suspend activities and to take preventive measures to prevent the spread of the virus are examples of a force majeure event. However, there is a principle called 'sovereign acts', which is more suitable for this case in particular, which stems from an official governmental action, as authors such as Mr. Borja Soriano

19

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

refer. Well, by virtue of the various orders issued by the Mayor of Mexico City, the Secretariat of Health and other competent authorities,  the temporary suspension of activities of various businesses was ordered, and this undoubtedly impacted on and continues to impact on the contractual relationships related to businesses and activities of the parties.

Now, in case of pandemic, so as to learn the legal consequences facing a situation as such under the Mexican legal framework, the Federal Civil Code establishes in section 1847 that a penalty may be enforced whenever the person required to do so has not been able to perform an agreement due to causes attributable to the creditor, act of God or force majeure event. On the other hand, the Civil Code for the Federal District in section 2111 provides for that no one is required to perform in case of acts of God, unless they have caused it or contributed thereto, when they have expressly assumed that liability, or when required by law; furthermore, section 1847 provides for that a penalty may not be enforced when the non-performing party has not been able to perform the agreement due to causes attributable to the creditor, act of God or force majeure event. Accordingly, since these are legal concepts provided for in the Mexican legal system and what caused them were actions by the Mexican authorities, subsection III, section 568 of the Federal Code of Civil Procedure provides for that the <u>local courts shall have exclusive jurisdiction</u> to try those cases that deal with official governmental actions or are related to the internal regime of a State and the federal and state instrumentalities.

To confirm the above, the concept of "official governmental actions" is hereby analyzed. It is implicitly defined in sections 1 and 4 of the Federal Law of Administrative Procedure below:

*"Section 1.- The provisions of this law are public policies of public interest, and are applicable to the **acts, procedures, and resolutions of the centralized Federal Public Administration**, without prejudice to the provisions of the International Treaties to which Mexico is a party.*
*…"*
*(Emphasis added)*

*"Section 4.- General **administrative acts**, such as regulations, **decrees, resolutions**, Mexican Official Standards, communications and formats as well as the guidelines, criteria, methodologies, instructions, directives, rules, manuals, provisions **intended to establish specific obligations** whenever there are no jurisdiction conditions and any others of analogous nature to the previous acts **issued by the instrumentalities and decentralized organizations** of the federal public administration, **are to be published in the Official Gazette of the Federation** to cause legal effects."*
*(Emphasis added)*

 In turn, section 3 of the same law establishes the elements and requirements of an administrative act, which, for the purposes of this lawsuit, allows us to prove that the resolutions issued by the authorities to prevent the spread of the SARS-CoV2 virus (COVID-19) that constitute the principle of *"sovereign acts"* are official governmental actions. Therefore, the national courts are the only ones authorized to analyze these scenarios; consequently, this proves the territorial jurisdiction of the Civil Judge of the Superior Court of Justice of Mexico City. The section below is referred to as grounds of the above:

*Section 3.- The elements and requirements of an administrative act are:*
*I. Being issued by a competent body, through a public servant, and in the event said body*
*is a collegiate body, that it meets the conditions under the law or decree issuing it;*
*II. Having a purpose, whether determined or to be determined; precise as to the circumstances of time and place, and provided for by law;*
*III. Complying with the purpose of public interest established by the regulations, without pursuing other purposes;*
*IV. Issuing them in writing, bearing the hand signature of the issuing authority, except in those cases where the law authorizes other form of issuance;*
*V. Being duly grounded in law and fact; VI.- (Repealed)*
*VII. Being issued subject to the provisions related to the administrative procedure provided for in this Law;*
*VIII. Being issued without any error on the purpose, cause, or motive, or on the purpose of the act; IX. Being issued without fraud or violence;*

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

20

*X. Mentioning the instrumentality issuing it;*

*XI.- (Repealed)*

*XII. Being issued without any error related to the specific identification of the file, documents, or full name of the persons it refers to;*

*XIII. Being issued by stating the place and date of issuance;*

*XIV. As for administrative acts that are to be notified, the office where it is located is to be mentioned for the relevant file to be reviewed;*

*XV. As for appealable administrative acts, any applicable remedies that may be filed are to be listed, and*

*XVI. Being issued by expressly listing all the points proposed by the parties or established by law.*

Consequently, it is hereby concluded that the Civil Judge of the Superior Court of Justice of Mexico City has territorial jurisdiction, as it has been demonstrated in the first place that *"sovereign acts"* preventing the debtor from performing its obligations, consisting of the resolutions issued by the authorities to prevent the spread of the SARS-CoV2 virus (COVID-19). Moreover, it has been proven that said resolutions are official governmental actions and must be submitted exclusively to be tried by the local courts, as provided for in section 568 of the Federal Code of Civil Procedure.

Also, it has been shown that the remedies sought relate to and derive from an Issuance agreement dated August 9, 2017, so that in accordance with sections 4, 75 and 76 of the Commercial Code, these are deemed commercial acts and in compliance with the provisions of section 59 of the Organic Law of the Judiciary of Mexico City; thus, the Traditional Civil Courts have jurisdiction to try the case, since it's a commercial-related lawsuit.

On the other hand, competence by reason of the amount has been proven, since the amount in which the value of the litigation may be estimated, exceeds the amount provided for in section 105 of the Organic Law of the Judiciary of Mexico City and cannot be submitted to be tried by the Civil Judges assigned to Oral Trials; thus, by exclusion the Tradition Civil Courts have jurisdiction to try this case. Similarly, the criterion of competence is accredited by reason of the degree, since it is the first time that the lawsuit is submitted to the knowledge of a judge pending a resolution attached to Law.

## FACTS RELATED TO THE ISSUANCE
## AGREEMENT THAT WAS ALLEGEDLY BREACHED

1.      Bond issuance on August 9, two thousand seventeen, TV Azteca issued Senior Bonds in the amount of $400,000,000.00 USD with a maturity date on August 9, two thousand twenty-four. The bonds are payable semiannually at a rate of 8.25% beginning on February 9, two thousand nineteen.

The original agreement in question is attached hereto as **ANNEX 48**, and its Spanish translation as **ANNEX 49.**

Pursuant to section 3.1, the Issuer's obligation to pay the principal and interests (including default interests) on the Bonds was established before 10:00 am (N.Y. time) on the business day immediately prior to each interest payment date or on the maturity date of the principal, by means of a transfer in dollars in funds immediately available to the Payment Agent (BONY). By paying the bonds in the form of Global Certificates in the manner established above to the account designated by Euroclear or Clearstream. Moreover, if there are Certified Bonds, issued to a Holder personally, by check sent by mail to the registered address of the Bondholder thereof or transfer to the bank account designated by the latter.

Section 6.1 lists examples of non-compliance consisting of:

a.      *Lack of Timely Payment of the Principal:* Non-compliance with the timely payment of the principal upon maturity, including not making the required payment to repurchase the Bonds under the scenario of optional early repayment, Change of Control or Sale of Assets; the principal is due on August nine, two thousand twenty-four.

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

b.      *Lack of Timely Payment of Interests:* Failure to comply for 30 consecutive days or more in making the timely payment of interests at maturity; next interest payments due on February nine and August nine, two thousand twenty-one.

c.      *Merger, Consolidation or Sale of Assets:* The violation or failure to comply with any of the prohibitions related to merger, consolidation or sale of assets established in Section 4.1 of the Indenture (Merger, Consolidation and Sale of Assets) for 20 consecutive days or more after a written notification of such failure (i) by the Trustee to the Issuer or (ii) by 25% or more of the Bondholders to the Issuer and the Trustee;

d.      *Failure to keep the Bond Covenants*: Failure by the Issuer or any Restricted Subsidiary to keep any other covenant or perform any obligation under the Indenture or the Bonds for 45 consecutive days or more after the Issuer receives a written notice from the Trustee or the Bondholders of 25% or more notify the Issuer and the Trustee of said default;

e.      *Failure to perform Obligations that do not derive from the Bonds:* Failure by the Issuer or any Restricted Subsidiary under any debt instrument (issue deed, credit agreement) that: (i) originates from the non-payment of the principal or interests prior to giving any grace period to remedy said default and that this situation has not been remedied or waived; or (ii) such failure results in the early maturity of any indebtedness prior to its maturity date. In any of the cases above, the payment default of one of the debt instruments, in its aggregate, exceeds the amount of USD $25 million;

f.      *Sentences:* Failure by the Issuer or its Restricted Subsidiaries to comply with (pay) any final judicial resolution (not subject to appeal or protection) which amount, in its aggregate, exceeds USD $25 million and said payment obligation is not secured or covered by some type of insurance;

g.      *Insolvency*: That the Issuer or any of its Restricted Subsidiaries initiates or consents a third parties filing an application for commercial insolvency or bankruptcy, as well as the appointment of a receiver or liquidator over a substantial part of its assets or that the Issuer or any of its Restricted Subsidiaries make an assignment of assets for the benefit of any of its creditors;

h.      *If the Bond Sureties are declared null or unenforceable:* Except as otherwise permitted in the Indenture, if any security of payment of the Bonds by any Restricted Subsidiary is judicially declared null or unenforceable or it ceases to be in force or said Restricted Subsidiary, or any person acting in its representation, denies the performance of the secured obligations.

2.      On March 11, 2020, the World Health Organization, through a press release, reported that the disease caused by the SARS-CoV2 virus should be considered a pandemic, due to the rising cases around the world. Therefore, it ordered governments and the society to mitigate the social and economic consequences caused by the pandemic. Well, it would not only result in a health crisis, but it would also affect several sectors. A specialized chapter is added to this lawsuit where a brief compendium of all relevant communications, agreements, declarations, and instruments applicable to the case at hand is made, entitled **COMMUNICATIONS, DOCUMENTS AND RESOLUTIONS RELATED TO THE COVID-19 VIRUS EMERGENCY.**

3.      On May three, twenty twenty-two, a person named "McColm, Elizabeth", with e-mail address emccolm@paulweiss.com, sent an e-mail to various people informing that on that date, the Co-defendants, via email, in contravention of the provisions of the Issuance Agreement, was sent a digital document called "Notice of Early Maturity", by virtue of which they tried to notify TV AZTECA and its Subsidiary Guarantors of the "Acceleration" and/or Early Maturity of the principal and the interest accrued and pending payment of all the Bonds subscribed under the Issuance agreement. This, as they deemed that a "Case of Default" had taken place, as defined in the agreement (hereinafter the "Notice of Acceleration" or "Notice of Early Maturity", indistinctly). For a more convenient reading, I hereby transcribe below the relevant part of said document:

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

"NOTICE OF ACCELERATION dated May three, twenty twenty-two" VIA FACSIMILE OR SPECIALIZED NEXT DAY DELIVERY COURIER: TV Azteca, S.A.B. de C.V. The Guarantors of the Subsidiary under the agreement referred to below Insurgentes Sur 3579 Col. Tlalpan La Joya 14000, Mexico, D.F. Mexico To the attention of: Rodrigo Pliego, cc to: Winston & Strawn, LLP 200 Park Avenue Nueva York, NY 10166-4193 To the attention of: Attorney Allen Miller The Bank of New York Mellon To the attention of: Global Corporate Trust 101 Barclay Street, 7th Floor East Nueva York, NY 10286 USA  Fax number: (212) 815-5603 Subject: 8.250% preferred bonds due in 2024 (the "Bonds") of TV Azteca, S.A.B. de C.V. (the "Company") Common code: 166240646 ISIN: XS1662406468 To whom it may concern, Each of the beneficial owners below (including any undersigned investment adviser or representative of any bondholder) (each, a "Bondholder"), as signed below) hereby declares that said Bondholder is a beneficial owner of the Bonds (or investment adviser or representative of the effective beneficiary(ies) in the principal amount set forth below their signature. 13 This notice is given in connection with the Agreement dated August 9, 2017, executed by the Company, the Guarantors of the Subsidiary, as a party thereof, The Bank of New York Mellon, as a trustee (the "Trustee"), and The Bank of New York Mellon, London branch, as the initial Principal Paying Agent, amended and supplemented on the date herein (the "Agreement"), pursuant to which the Bonds were issued by the Company. The terms defined in the Agreement are used herein just as defined in the Agreement, unless otherwise defined herein. Interest payments on the Bonds due and payable on February 9, 2021, August 9, 2021, and February 9, 2022, respectively, were not paid and have not been paid to the date herein (said defaults shall be hereinafter referred to as "Interest Payment Defaults"). As specified in Section 6.1(a)(2) of the Agreement, given that those failures to pay interest on the Bonds when they became due have continued for 30 consecutive days, in each case, said Defaults on Payment of Interest became Causes of Default under the agreement executed on March 12, 2021, September 9, two 2021 and March 12, 2022, respectively, due to the passage of time. Consequently, in accordance with Section 6.2(a) of the Agreement, the undersigned Bondholders are hereby notified, who altogether are the effective beneficiaries in the aggregate of at least 25% of the principal amount of the Bonds pending payment that the previous Causes of Compliance have been submitted and continue in accordance with the agreement and hereby the unpaid capital (and the premiums, if applicable) and the accrued and unpaid interest with respect to all the Bonds due and payable immediately are declared as provided for in Section 6.2(a) of the Agreement. Therefore, the unpaid capital (and the premiums, if any) and the accrued and unpaid interest with respect to the Bonds are due and payable immediately and the undersigned Bondholders hereby demand payment of all such amounts with respect to the Bonds. This letter is a "Notice of Early Maturity" given pursuant to Section 6.2(a) of the Agreement. Although there will be multiple original signature pages of the counterparts of this document signed by the parties hereto, when delivered to the Company and the Trustee, this letter will constitute a single notice of early maturity delivered by the Bondholders. Each of the undersigned Bondholders expressly reserves all the rights, powers, privileges, and resources available to the Bondholders, directly or through the Trustee, in accordance with the Agreement and the Promissory Notes, applicable by Law or Equity…" The above is proven with: (i) the printout of the e-mail dated May 3, 2022, attached hereto as Annex 4), as well as its translation into Spanish dated May 3, 2022, made by a Certified Expert Translator, attached hereto as Annex 5); and (ii) unauthenticated copy of the document called "Notice of Early Maturity", attached hereto as Annex 6), as well as with its translation into Spanish dated May 10, 2022, made by a Certified Expert Translator, which is attached hereto as Annex 7).

On July 8, 2022, an annulment claim was filed against *CYRUS 1740 MASTER FUND, L.P.; CANARY SC MASTER FUND, L.P.; CYRUS OPPORTUNITIES MASTER FUND II, LTD; CRESCENT 1, L.P.; CRS MASTER FUND, L.P.; CYRUS SELECT OPPORTUNITIES MASTER*

23

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese – French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

***FUND, LTD; CYRUS SELECT OPPORTUNITIES MASTER FUND II, L.P.; PC INVESTORS III, LLC; PETERSON CAPITAL INVESTORS, LLC ET AL.,*** which was filed in the Ninth Civil Court of the Superior Court of Justice of Mexico City, under case file 749/2022.

4.      On July 11, 2022, my client filed a lawsuit under the ordinary proceeding against the document referred to above, which was filed with file number 749/2022 in the ninth civil court; which was admitted on July 12, 2022, and on the same date, precautionary measures were issued in the ancillary proceeding record for the benefit of TV AZTECA S.A.B. DE C.V. with the following consequences:

a.      Maintain the factual situation related to the Issuance agreement dated August nine, two thousand seventeen, entered into by TV AZTECA as Issuer, The Bank of New York Mellon as Trustee, AND THE BANK OF NEW YORK MELLON, LONDON BRANCH, as Principal Paying Agent.

b.      The suspension of the effects and consequences that could derive from the document dated May 3, 2022, which was intended to be served as a Notice of Early Maturity, presumably signed by the co-defendants by virtue of which they sought the "acceleration and/or o early maturity of the principal and the accrued and unpaid interest of all the bonds subscribed to the Issuance Agreement.

c.      The prohibition for Co-defendants to file and/or initiate any procedure aimed at collecting and/or paying the unpaid capital of the Bonds issued under the Issuance agreement dated August nine, two thousand seventeen, and seek the enforcement or materialization based on the document dated May three, two thousand twenty two, which was intended to be used as a of Early Maturity against the Plaintiff or its Subsidiaries, including the Subsidiary Guarantors.

d.      The ordered precautionary measures took effect from that moment and are still in force when this lawsuit was filed.

5.      On August eight, two thousand twenty two, The Bank of New York Mellon notified the early maturity. However, it is noted that the alleged signatory failed to prove its legal capacity to represent the trustee; and it also failed to prove the "multiple entities" that are the alleged Bondholders, or the validity of the signatures stamped on the "Notice of Early Maturity"; likewise, the undersigned failed to prove through any document, that it effectively received instructions from the Bondholders as a whole of at least 25% (twenty-five percent) of the principal amount of the outstanding Bonds (duly registered and authenticated), or any legal document that confirms that the Bondholders it allegedly represents are in fact holders in accordance with the provisions of sections 1.1, 2.3 (a) and 2.5 of the Issuance agreement.

## CONTRACTS ENTERED INTO BETWEEN THE PLAINTIFF AND THE CO-DEFENDANTS IN EFFECT DURING THE COVID-19 EMERGENCY AND TAX CONTINGENCIES.

On August 9, 2017, TV Azteca, S.A.B. de C.V. carried out the issuance of Senior Bonds in the amount of $400,000,000.00 USD with a maturity date on August 9, 2024. The bonds are payable semi-annually at a rate of 8.25% beginning February 9, 2019.

Pursuant to section 3.1, the Issuer's obligation to pay the principal and interests (including default interests) on the Bonds was established before 10:00 am (N.Y. time) on the business day immediately prior to each interest payment date or on the maturity date of the principal, by means of a transfer in dollars in funds immediately available to the Payment Agent (BONY). By paying the bonds in the form of Global Certificates in the manner established above to the account designated by Euroclear or Clearstream. Moreover, if there are Certified Bonds, issued to a Holder personally, by check sent by mail to the registered address of the Bondholder thereof or transfer to the bank account designated by the latter.

Section 6.1 lists examples of non-compliance consisting of:

*Mrs. Paola Montserrat Jiménez Bolaños* – Expert Interpreter & Translator English – Spanish – Portuguese - French
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

a.    *Lack of Timely Payment of the Principal:* Non-compliance with the timely payment of the principal upon maturity, including not making the required payment to repurchase the Bonds under the scenario of optional early repayment, Change of Control or Sale of Assets; the principal is due on August 09, 2024

b.    *Lack of Timely Payment of Interests:* Failure to comply for 30 consecutive days or more in making the timely payment of interests at maturity; next interest payments February 9 and August 9, 2021

c.    *Merger, Consolidation or Sale of Assets*: The violation or failure to comply with any of the prohibitions related to merger, consolidation or sale of assets established in Section 4.1 of the Indenture (Merger, Consolidation and Sale of Assets) for 20 consecutive days or more after a written notification of such failure (i) by the Trustee to the Issuer or (ii) by 25% or more of the Bondholders to the Issuer and the Trustee;

d.    *Failure to keep the Bond Covenants*: Failure by the Issuer or any Restricted Subsidiary to keep any other covenant or perform any obligation under the Indenture or the Bonds for 45 consecutive days or more after the Issuer receives a written notice from the Trustee or the Bondholders of 25% or more notify the Issuer and the Trustee of said default;

e.    *Failure to perform Obligations that do not derive from the Bonds:* Failure by the Issuer or any Restricted Subsidiary under any debt instrument (issue deed, credit agreement) that: (i) originates from the non-payment of the principal or interests prior to giving any grace period to remedy said default and that this situation has not been remedied or waived; or (ii) such failure results in the early maturity of any indebtedness prior to its maturity date. In any of the cases above, the payment default of one of the debt instruments, in its aggregate, exceeds the amount of USD $25 million;

f.    *Sentences:* Failure by the Issuer or its Restricted Subsidiaries to comply with (pay) any final judicial resolution (not subject to appeal or protection) which amount, in its aggregate, exceeds USD $25 million and said payment obligation is not secured or covered by some type of insurance;

g.    *Insolvency*: That the Issuer or any of its Restricted Subsidiaries initiates or consents a third parties filing an application for commercial insolvency or bankruptcy, as well as the appointment of a receiver or liquidator over a substantial part of its assets or that the Issuer or any of its Restricted Subsidiaries make an assignment of assets for the benefit of any of its creditors;

h.    *If the Bond Sureties are declared null or unenforceable:* Except as otherwise permitted in the Indenture, if any security of payment of the Bonds by any Restricted Subsidiary is judicially declared null or unenforceable or it ceases to be in force or said Restricted Subsidiary, or any person acting in its representation, denies the performance of the secured obligations.

In addition, the Issuer should notify the Trustee in writing of any event that could constitute an Event of Default, indicating its custody status and the actions it would take to remedy it.

Pursuant to section 6.2, the early expiration of the agreement was agreed, in case of an "Event of Default", which would cause that the Trustee or the Bondholders of at least 25% of the Bonds to request payment of the principal and interest accrued on the Bonds fully and in advance by means of a written notification sent to the Issuer and the Trustee stating a case of Default.

Once the notification of Early Maturity of the principal and interest of the Bonds has been made, the Bondholders could cancel or rescind said Declaration of Early Maturity and its consequences if any following assumptions took place:

a.    If said cancellation or rescission does not contravene any judgment that may have been issued;

b.    If all the Events of Default have been remedied or waived, except in the case of non-payment of principal or interest that due to the Declaration of Early Maturity have expired early;

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese – French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

c.      If the payment of the unpaid interest is made on its due date (i.e., the interest accrued before the declaration of Early Maturity);

d.      If the Issuer pays the Trustee a compensation and reimburses all the expenses that the Trustee may have incurred into.

2.      In section 6.3, the Remedies for the Event of Default were provided for; otherwise, the Trustee could file any type of action or remedy it deems necessary to be able to collect the principal and interest of the Bonds or to demand performance of any obligation.

3.      Section 6.6 provides for a limitation, in which no Bondholder has the right to initiate a legal action unless the following requirements are met:

a.      Said Bondholder notifies the Trustee in writing that an Event of Default took place and that it continues;

b.      The Bondholders of at least 25% of the Bonds order the Trustee to take any legal action or remedy;

c.      Said Bondholders provide the Trustee with sufficient sureties;

d.      The Trustee fails to initiate a procedure within the following 60 days.

e.      During said unpaid accrued interest of the Bond on or after the date of its respective payment or period of 60 days, the majority of the Bondholders do not give the Trustee an instruction contrary or inconsistent with said request;

The foregoing on the understanding that any Bondholder may initiate legal proceedings to obtain payment of the principal and unpaid accrued interest of the Bond on or after the date of their respective payment.

Pursuant to section 6.7, notwithstanding any provision to the contrary contained in the Agreement, the right of the Bondholders to receive the payment of principal or interest of the Bonds of which they are holders on or after their respective payment date or due date, as well as the right to initiate any judicial procedure to obtain payment may not be limited or restricted without the consent of said Bondholders.

With regard to Section 6.8, it is provided that in the event of default of payment of the principal or accrued interest on the Bonds where it remains unpaid, the Trustee may enforce any judgment in which payment is ordered on its own behalf.

Section 7.1 provides for that the trustee undertakes to perform the duties. However, the trustee cannot be held liable for this thus, relying conclusively on the statements given to the trustee as per the requirements under the agreement. Notwithstanding this, in the event certificates or opinions that by virtue of any of the provisions are to be specifically provided to the Trustee, the Trustee will examine said certificates and opinions to determine whether or not they meet the requirements set forth in the agreement. This, except in the event the default remains.

Similarly, the trustee cannot be held harmless from its own negligent actions or inactions, or, where appropriate, willful actions; unless these are errors of judgment made in good faith by a fiduciary agent. Also, it is established that the trustee will not be responsible for the interests, or the investment of any money received, unless the Trustee agrees so in writing with the Company.

Section 7.5 provides for that if an Event of Default occurs and continues or a trustee has actual knowledge of it, or received a written notice thereof, the trustee must give each holder notice of the default within 90 days. after the trustee becomes aware of it. The foregoing except that, when paying the principal amount, the premium or the interest of any bond, the trustee may withhold the notice if and while a trust officer determines in good faith that withholding the notice is in the best interest of the Bondholders.

In section 11.1 of the Issuance agreement, it was agreed that all notices related to said legal act should be made in writing and delivered in one of the following ways: (i) in person; (ii) by first class mail, postage prepaid; (iii) postage paid; (iv) by overnight messaging; or (v) by fax.

Section 11.6 provides for that if any payment, whether on the principal, premium or interests of any bond, is due on a day that is not a business day, it may be made on the next business day

26

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

and no interests will be accrued. Similarly, if a regular or special registration date results in a day that is not a business day, said registration date will not be affected.

Overall, the sections that supposedly specify Early Maturity are established. However, as it will be stated in later pages, my client claims that it was affected by an act by the health authorities constituting an **act of God and Force Majeure event**, due to the pandemic caused by the SARS-CoV2 virus (COVID-19) outbreak; due to the impossibility of performing the assumed obligations, as it had to observe the administrative acts implemented to deal with the serious illness of priority attention.

This issue will be addressed throughout this trial, to determine that an Act of God and Force Majeure took place due to the impossibility of complying with the referred sections of the Issuance agreement dated August 9, 2017, for the subscription of U.S. Bonds in the amount of $400,000,000 USD dollars of principal value and ancillary payments.

This, since a **FORCE MAJEURE** event took place, my client was in a different legal situation other than the one when it undertook its commitments with third parties, by virtue of the fact that the declared pandemic stemmed from an unpredictable event, resulting in the health authorities taking extraordinary measures to combat and mitigate it in our country, which caused an imbalance and impossibility to pay said interests and possibly future third-party  obligations that will be narrated later.

Accordingly, it is appropriate to declare that **there was no default,  much less Early Maturity did not take place**; on the contrary, under said statements it is attached to law **release** to the plaintiff of the liability agreed in the Issuance Contract dated August 9, 2017, as their will did not intervene when it came to comply with the sanitary measures, until the circumstances under which they were assumed in said contract change.

On the other hand, my client has considerable contingencies in litigation, related to the determination of tax credits for alleged default related to the income tax for fiscal years 2009, 2010 and 2013, in the amounts of $2,447,748,540.35, $33,000,000.00, and $2,615,750,783.00, respectively.

Credit determinants are still in litigation before the Federal Court of Administrative Justice and in the Judicial Branch of the Federation, my client considers that the resolutions are illegal and thus, *sub judice*.

Lastly, it is important to point out that as a result of the act of God or force majeure event that impacted on my client, my client shall also be released from future obligations, as it will be shown later, said circumstance resulted in my principal being in a disproportionality. and equality position before its creditors.

## COMMUNICATIONS, DOCUMENTS AND RESOLUTIONS RELATED TO THE COVID-19 VIRUS EMERGENCY

1.      On March 11, 2020, the World Health Organization, through a press release, reported that the disease caused by the SARS-CoV2 virus should be considered a pandemic, due to the rising cases around the world. Therefore, it ordered governments and the society to mitigate the social and economic consequences caused by the pandemic. Well, it would not only result in a health crisis, but it would also affect several sectors. An unauthenticated copy of the agreement in question is attached hereto as **ANNEX 50** for all legal purposes.

2.      On March 23, 2020, the resolution whereby the General Health Council recognized the SARS-CoV2 virus (COVID-19 disease) pandemic in Mexico as a serious disease of priority attention was published in the Official Gazette of the Federation as well as the preparation and response activities against said pandemic. An unauthenticated copy of the agreement in question is attached hereto as **ANNEX 51** for all legal purposes.

3.      Through the publication in the Official Gazette of the Federation dated March thirty, two thousand twenty, through which the SARS-CoV2 virus (COVID-19) pandemic was declared a

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese – French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

health emergency due to a force majeure event whereby it was determined that the Secretariat of Health would be in charge of taking all the required actions to attend said emergency. An unauthenticated copy of the agreement in question is attached hereto as **ANNEX 52** for all legal purposes.

4.      On March 30, 2020, the Mayor of Mexico City issued the following Resolution:

*PUBLIC ADMINISTRATION OF MEXICO CITY, MAYOR CLAUDIA SHEINBAUM PARDO, PhD, Mayor of Mexico City, pursuant to the provisions of sections 1, 4 fourth paragraph and 122 part A part III of the Political Constitution of the United Mexican States; section 4 of the General Health Law; section 4 part A sections 1 and 3, 9 part D section 3 items b), c) and d) and section 32 part A section 1 of the Political Constitution of Mexico City; sections 4, 7, 10 subsections II, IV and XXII, sections 11, 12, 16 subsections II, III, X and XV, section 20 subsections V and IX and section 21 first paragraph of the Organic Law of the Executive Branch and the Public Administration of Mexico City; section 54 subsection II and section 57 of the Procurement Law for the Federal District; section 63 subsection XVI of the Public Works Law of the Federal District; section 11 first paragraph and section 20 Bis of the Administrative Procedure Law of Mexico City; section 1 subsections IV and VI, section 2, 3, 4 subsections I, IV and VIII, section 5 subsections VIII and IX, sections 7, 11, 15, 16 subsections III, XIV, XVI and XVIII, section 17 subsection I item r), sections 29, 79 , 80, 81, 108 subsections I and VI and section 109 of the Health Law for the Federal District; section 9 of the Organic Law of Mayors of Mexico City; section 7 subsections II, III, X and XV, sections 13 and 303, subsection V of the Internal Regulations of the Executive Branch and the Public Administration of Mexico City; and section 35 of the Health Law for the Federal District Regulations; and*

*WHEREAS That the Political Constitution of the United Mexican States establishes that every person has the right to health protection, for which the Government of Mexico has the obligation to protect and carry out all the necessary actions to do so. Likewise, the Inter-American Commission on Human Rights has emphasized that so as to enforce this right, states must ensure that all health establishments, goods, and services are adapted based on the circumstances such as those that the current pandemic poses in accordance with the principle "pro persona", so that the due and timely care of the population prevails over any other interest of public or private nature. That the President of the Republic, the General Health Council, the Secretariat of Health, and the governments of the states are health authorities. That the General Health Council in an extraordinary session held on March 19, 2020, agreed that the COVID-19 epidemic in Mexico is recognized as a serious disease requiring priority attention. That the authorities of Mexico City will progressively ensure the necessary conditions so that medical care services are available in the local public health institutions, as well as the availability and sufficiency of health personnel and professionals, equipment, supplies and medications. That since the beginning of the spread of COVID-19, the Government of Mexico City has implemented a series of actions aimed at preventing and avoiding its contagion, as well as facing the negative economic and health consequences of its inhabitants and people who are in transit. That the Government of Mexico City published in the Official Gazette of Mexico City on March 19, 20, 23 and 24, 2020 various resolutions aimed at the purposes referred to in the preceding whereas, which essentially suspend terms and deadlines in administrative procedures and paperwork carried out in the instrumentalities, Decentralized Bodies, Entities of the Public Administration and the Mayor's Offices of Mexico City; the temporary suspension of activities of commercial establishments and educational centers, as well as public and private events with a capacity of more than 50 people. That the Law of Administrative Procedure of Mexico City empowers the authorities so that in case of risk to the physical integrity and health of people, they proceed directly to taking the necessary works. That the Procurement Law in force in this City empowers the person in charge of the Government Headquarters, as well as the people in charge of instrumentalities, Decentralized Bodies, Entities, and municipalities, to authorize in cases of extreme urgency the direct contracting of acquisitions, leases, and provision of services, in the case of acts of God, force majeure events, disasters or danger to the safety and integrity of the inhabitants, neighbors and passers-by of this City. That the Secretariat of Health of Mexico City will contribute to the surveillance and control of private and social health services provided by natural persons or legal entities in the territory of Mexico City. That it is consistent with the "Decree declaring extraordinary actions in the affected regions throughout the national territory on general health to combat the serious disease of priority attention caused by the SARS-CoV2 virus (COVID-19)", published in the Official Gazette of the Federation on March 27, 2020, and since Mexico City is an integral part of the National Health System; I have seen fit to issue the:*

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese – French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

*FIRST DECREE DECLARING EXTRAORDINARY ACTIONS IN MEXICO CITY TO AVOID THE CONTAGION AND SPREAD OF COVID-19*

*SECTION ONE.- The purpose of this Decree is to declare the extraordinary health actions pursuant in Mexico City to prevent the contagion and spread of COVID-19.*

*SECTION TWO.- The Secretariat of Health and the Water System of Mexico City are authorized to immediately implement the following extraordinary actions within the scope of their respective powers: I. Use as auxiliary elements all the medical and social assistance resources of the public, social and private sectors existing in the affected areas, neighborhoods, and communities in Mexico City; II. Retain and acquire all types of goods, leases and provision of services at a national or international level, included, but not limited to, medical equipment, diagnostic agents, surgical and healing material and health products, as well as all type of merchandise and objects that are necessary to deal with the contingency, without the need to carry out the public bidding procedure, in the quantities or for the reasons that are deemed necessary to deal with it; III. Import and authorize the import ad acquisition in the national territory of the goods and services listed in the previous section without the need to conduct any administrative procedure, in the quantities or reasons necessary to face the contingency subject matter of this Decree; IV. Take the necessary measures to avoid price speculation and the stockpiling of essential inputs necessary for the goods and services referred to in subsection II of this section; V. Take the necessary actions for the supply of drinking water. The Water System of Mexico City may retain, through direct award procedures under the Public Works and Procurement Laws, both Local and Federal, all types of goods and services related to its attributions so as to allow it to face the emergency that concerns us in an effective, efficient, expeditious and timely manner; and VI. Any other actions that may be deemed necessary.*

*SECTION THREE.- The extraordinary actions listed in the previous section are authorized to the Secretary of Administration and Finance, which may also carry out the necessary consolidated purchases, as well as to the Water System of Mexico City so that they can carry out what is deemed fit within the scope of its powers so as to prevent the contagion and spread of COVID-19.*

*SECTION FOUR.- Municipalities, instrumentalities, and entities of the public administration of Mexico City must liaise and provide the support that may be requested by the Secretariat of Health, the Secretary of Administration and Finance and the Water System of Mexico City for the implementation of mitigation and contagion measures by COVID-19 in Mexico City.*

5.        On March thirty-one, two thousand twenty, the Secretary of Health issued a "Resolution establishing extraordinary actions to attend to the health emergency generated by the SARS-CoV2 virus" in which it ordered the following:

*"SECTION ONE.- **It is established as an extraordinary action, to attend to the health emergency generated by the SARS-CoV2 virus, that the public, social and private sectors must implement the following measures:***

*I. **Immediate suspension is ordered, from March 30 to April 30 of 2020, of non-essential activities,** so as to mitigate the spread and transmission of the SARS-CoV2 virus in the community, to reduce the burden of disease, its complications, and death from COVID-19 in the population residing in the national territory;*

*II.     **Only the following activities, considered essential, may continue to operate:***

*a) Those that are directly necessary to attend to the health emergency, such as the work activities of the medical, paramedical, administrative and support branches throughout the National Health System. Also, those who participate in its supply, services, and supply, among which the pharmaceutical sector stands out, both in its production and in its distribution (pharmacies); the manufacture of supplies, medical equipment, and technologies for health care; those involved in the proper disposal of biohazardous waste, as well as the cleaning and sanitization of medical units at the different levels of care;*

*b) Those involved in public safety and citizen protection; in the defense of national integrity and sovereignty; the procurement and administration of justice; as well as legislative activity at the federal and state levels;*

*c) Those of the fundamental sectors of the economy, financial, tax collection, distribution and sale of energy, fuel and gas stations, generation and distribution of drinking water, food and non-alcoholic beverage industry, food markets,*

*supermarkets, self-service stores, groceries and sale of prepared foods; passenger and cargo transport services; agricultural, fishing and livestock production, agribusiness, chemical industry, cleaning products; hardware stores, courier services, guards in private security work; nurseries and childcare centers, nursing*

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese – French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

*homes for the elderly, shelters and care centers for women victims of violence, and their children; telecommunications and information media; private emergency services, funeral and burial services, storage and cold chain services for essential supplies; logistics (airports, ports and railways), as well as activities which suspension may have irreversible effects for their continuation;*

*d) Those directly related to the operation of government social programs, and*

*e) Those necessary for the conservation, maintenance and repair of the critical infrastructure that ensures the production and distribution of essential services; namely, drinking water, electricity, gas, oil, gasoline, jet fuel, basic sanitation, public transportation, hospital, and medical infrastructure, inter alia, that could be listed in this category;*

*III.    In all the places and venues in which the activities defined as essentials are to observe the following mandatory  practices:*

*a)        Meetings or congregations of more than 50 people may not be held;*

*b)        People are to wash their hands frequently;*

*c)        People are to sneeze or cough by following the respiratory etiquette (covering their nose and mouth with a disposable handkerchief or with their forearm);*

*d) Do not greet by kissing, with a handshake or hug (distanced greeting), and*

*E) All other current healthy distance measures, issued by the Federal Secretariat of Health;*

*IV.    The entire population residing in Mexican territory, including those who arrive there from abroad and who do not participate in essential work activities, were urged to comply with co-responsible measures to stay at home from March 30 to April 20, 2020. Staying at home is understood as being co-responsible for the voluntary limitation of mobility, remaining in the private home or place other than the public space, to the extent possible.*

*V. The co-responsible action to stay at home is strictly applied to any person over 60 years of age, pregnant or in the immediate postpartum period, or with a diagnosis of high blood pressure, diabetes mellitus, chronic heart or lung disease, immunosuppression (acquired or provoked), kidney or liver failure, regardless of whether their work activity is considered essential or not. The essential personnel of public interest may, on a voluntary basis, go to work on site;*

*VI.    Once the period of validity of the measures established in this Resolution has ended, the Secretariat of Health, in coordination with the Secretariat of Economy and the Secretariat of Labor and Social Welfare, will issue the guidelines for an orderly, staggered, and regionalized return to the labor, economic and social activities of the entire population in Mexico;*

*VII.    Until further notice, all censuses, and surveys to be carried out in the national territory that involve the mobilization of people and physical (face-to-face) interaction between them are to be postponed, and*

***VIII.  All the measures established in this Resolution must be applied with strict respect for the human rights of all people.***

*SECTION TWO.- It establishes as an extraordinary action, to attend to the health emergency generated by the SARS-CoV2 virus, the amendment of the composition of the General Health Council, provided for in section 3 of the Internal Regulations of the General Health Council.*

*For the purposes of the preceding paragraph, the following persons will make up the General Health Council, as regular members:*

*a) The Minister of Interior;*

*b) The Minister of Foreign Affairs;*

*c) Minister of National Defense;*

*d) Minister of the Navy;*

*e) The Minister of Security and Citizen Protection, and*

*f) The Minister of Labor and Social Welfare.*

*TEMPORARY SECTIONS*

***ONE.- This Resolution will become effective on the day it was published in the Official Gazette of the Federation.***

*TWO.- The holders referred to in the Second section of this Resolution, will make up the General Health Council while the health emergency persists."*

***\*Bold lettering added by me for emphasis\****

6.        On the same date, March 31, 2020, the Mayor of Mexico City,  Claudia Sheinbaum Pardo, issued a resolution in the Official Gazette of Mexico City in which she decreed the following:

30

*Mrs. Paola Montserrat Jiménez Bolaños – Expert Interpreter & Translator English – Spanish – Portuguese – French*
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

## PUBLIC ADMINISTRATION OF MEXICO CITY

MAYOR, MS. CLAUDIA SHEINBAUM PARDO, PhD, Mayor of Mexico City, pursuant to the provisions of sections 1, 4 and 122, Section A, parts III and V of the Political Constitution of the United Mexican States; sections 1, 2 subsections I, II, IV and V, 3 subsection XVII, 4 subsection IV, 13, Part B, subsections IV, VI and VII, sections 134, 135, 139, 140, 141, 143, 148, 151, 152, 402, 403, 404, 405, 406, 407 of the General Health Law; section 4, Part A, items 1 and 3, 9, Part D, section 3 items c) and d) and 32, Part A, section 1 of the Political Constitution of Mexico City; section 3 subsection II, section 11 subsection I, sections 7, 10 subsections IV and XXII, section 11, 12, 16, 20 subsections V and 21, first paragraph of the Organic Law of the Executive Branch and Public Administration of Mexico City; section 1, subsections I, IV and VI, section 2, 4, subsections I, IV and VIII, section 6, subsection XI, sections 7, 15 subsection I, section 16 subsection XVIII and XXIV, section 17, subsection I, items c), r), s) and ee), sections 22, 23, 24 subsection XXIX, sections 45, 46, 79, 80 subsections I, VII and VIII, and section 108 subsection VI of the Federal District Health Law; section 6, last paragraph, section 7 subsection X, last paragraph and section 13 of the Internal Regulations of the Executive Branch and of the Public Administration of Mexico City; section 25, 137, 139, 140, 141, 142, 143 of the Regulations of the Federal District Health Law; and

WHEREAS

That the human right to health is enshrined in section 4 of the Federal Constitution, which recognizes that every person has the right to health protection, states that the Law will define the terms and conditions for access to healthcare services and will establish the unification of the Federation and the states in matters of general health. That section 4 of the Political Constitution of Mexico City recognizes the human right to health protection and provides for that the authorities of Mexico City must carry out actions for the prevention, treatment, and control of communicable and non-communicable chronic and infectious diseases.

That in accordance with section 2 of the Health Law of the Federal District, the head of Government within the area of its competence, has the obligation to protect the right to health of Mexico City inhabitants.

That the Health Law of the Federal District, section 79 authorizes the Mayor, in the case of communicable diseases, to carry out the activities of epidemiological surveillance, prevention, control, investigation and care of the diseases established in the General Health Law and in the determinations of the federal health authorities. That section 80 of the Health Law for the Federal District states that the activities of prevention, control, epidemiological surveillance, investigation and care of communicable and non-communicable diseases will include, inter alia, timely detection, evaluation of the risk of contracting them and the adoption of measures to prevent them, the dissemination of hygienic measures for the control of illnesses, knowledge of the most usual causes that cause the referred diseases and specific prevention in each case, as well as monitoring compliance, carrying out epidemiological studies within the framework of the local epidemiological surveillance system, the promotion of community participation in the prevention, control and care of illnesses and the others established in the applicable provisions.

That the Government of Mexico City published in its Official Gazette on March 19, 20, 23, 24 and 30, 2020 various actions through Resolutions where preventive measures were determined aimed at controlling and combating the existence, contagion and spread of COVID-19.

That the Mexico City Health System aims, inter alia, to observe the right to health protection, under the terms provided for in the General Health Law, the Health Law for the Federal District, and other applicable legal provisions.

That the General Health Council, in its first extraordinary session on March 19, 2020, determined to become a permanent session in its capacity as health authority and recognized the SARS-Cov2 virus (COVID-19) pandemic as a serious disease of attention priority.

That the Health Council of Mexico City is a body for consultation and support of the Government, as well as a service to society, in matters of health, which is made up of the heads of the Head of Government; and the Secretaries of Health; Government; Administration and Finance; Environment; Inclusion and Social Welfare; Education, Science, Technology and Innovation; the Undersecretariat for Metropolitan Coordination and Government Liaison, and the Health Commission of the Congress of Mexico City. As permanent guests: a representative of the National Academy of Medicine, Federal Health Secretariat, Mexican Institute of Social Security, Institute of Security and Social Services of State Workers, Institute for the Care and Prevention of Addictions in Mexico City, the National Autonomous University of Mexico, and the National Polytechnic Institute, as well as a representative of the Private Medical Services and a representative of the Pharmaceutical Chemical Industry. That within the powers of the Health Council of

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

*Mexico City, is to analyze and advise on the preparation of the actions developed by the City Government for the performance of health policies in the instrumentalities, administrative units, decentralized organisms, and deconcentrated bodies.*

*That in accordance with the Health Law for the Federal District, the Health Alert System of Mexico City has the purpose of warning about the conditions derived from a contingency so as to prevent, preserve, promote, and protect individual and collective health, as well as disseminating the measures to prevent the outbreak, contagion, spread of diseases and, where appropriate, control their progression.*

*That said System includes the Scientific Committee for Epidemiological and Sanitary Surveillance of Mexico City, as well as the Sanitary Traffic Light; which will work together with the Center for Intelligence and Preparation of Epidemiological Response of Mexico City.*

*That the General Health Council in a meeting dated March 30, 2020, recognized the SARS-CoV2 (COVID-19) pandemic in Mexico as a health emergency due to a force majeure event.*

*That the Health Council of Mexico City held its first extraordinary session on March 30, 2020, where it agreed, among other aspects, on the following, to establish the Health Alert System; issue the Sanitary Emergency in Mexico City; strengthen the Scientific Committee for Epidemiological and Health Surveillance of Mexico City and order various agencies so that, within the scope of their powers, they carry out all necessary and relevant actions to attend to the COVID-19 health emergency; thus I issue the: NOTICE ANNOUNCING THE DECLARATION OF HEALTH EMERGENCY DUE TO FORCE MAJEURE BY THE HEALTH COUNCIL OF MEXICO CITY, IN ACCORDANCE WITH THE HEALTH EMERGENCY DECLARED BY THE GENERAL HEALTH COUNCIL, TO CONTROL, MITIGATE AND AVOID THE SPREAD OF COVID-19.*

*ONE. The Sanitary Emergency is issued in Mexico City due to force majeure, to control, mitigate and prevent the contagion and spread of COVID-19.*

*TWO. The Scientific Committee for Epidemiological and Sanitary Surveillance of Mexico City is strengthened with the participation of the Secretariat of Administration and Finance; the decentralized bodies Digital Agency for Public Innovation and Mexico City Water System.*

*THREE. The Secretariat of Health, the Secretariat of Administration and Finance are ordered; to the decentralized bodies Digital Agency for Public Innovation and Mexico City Water System so that, within the scope of their powers, they carry out all necessary and relevant actions to attend to this health emergency.*

*FOUR. The actions established in the Declaration of National Emergency of the General Health Council of the Government of Mexico will be assumed; Likewise, the adequacy of the measures agreed by said Council will be published by means of the corresponding Resolution immediately afterwards.*

*TEMPORARY SECTIONS*

*ONE. Be published in the Official Gazette of Mexico City, for due observance and application.*

*TWO. This Resolution will become effective on the day of its publication in the Official Gazette of Mexico City and will be in force until the Health Council of Mexico City determines the end of the health emergency.*

7.      On April 14, 2020, the Notice was published in the Official Gazette of Mexico City announcing the electronic link where the health recommendations to prevent COVID-19 infections in housing units and condominiums will be made available. In addition to the above, it has been identified that a large part of the meetings and parties have been held in common areas and private units of housing units and condominiums, which represents a high risk of contagion, while observing that said activities are not currently permitted; therefore, it is necessary to strengthen collaborative actions with various authorities of the Public Administration of Mexico City, so as to verify proper compliance with sanitary measures in these environments.

An unauthenticated copy of the agreement in question is attached hereto as **ANNEX 54** for all legal purposes.

8.      On April twenty-first, two thousand twenty, the *"RESOLUTION that modifies another similar resolution that establishes extraordinary actions to attend the health emergency generated by the SARS-CoV2 virus"* was published on March 31, 2020, which reads:

*"Section one.- Subsection I, of Section One of the Resolution establishing extraordinary actions to address the health emergency caused by the SARS-CoV2 virus, published in the Official Gazette of the Federation on March 31, 2020, is amended to read as follows:*

*"SECTION ONE. [...]*

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese – French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

32

*I. Immediate suspension is ordered, from March 30 to **May 30 of 2020**, of non-essential activities, so as to mitigate the spread and transmission of the SARS-CoV2 virus in the community, to reduce the burden of disease, its complications, and death from COVID-19 in the population residing in the national territory; II. to VIII. [...]"*

An unauthenticated copy of the agreement in question is attached hereto as **ANNEX 55** for all legal purposes.

9.       On May fourteen, two thousand twenty, the *"RESOLUTION establishing a strategy for the reopening of social, educational and economic activities, as well as a traffic light system by region to assess weekly the epidemiological risk related to the reopening of activities was issued in each state, and extraordinary actions were established"* was issued. An unauthenticated copy of the agreement in question is attached hereto as **ANNEX 56** for all legal purposes.

This resolution determined, among other things, the following:

***SECTION TWO.-*** *The strategy consists of the reopening of activities in a gradual, orderly, and cautious manner, considering the following stages:*

*i)        **Stage 1**.- Begins on May 18, 2020, with the reopening of activities in the municipalities where there have been no cases of COVID-19 and which, in addition, are not close to other municipalities  with cases of COVID-19;*

***ii) Stage 2.-*** *It goes from May 18 to 31, 2020, and consists of carrying out actions of general application aimed at preparing for the reopening of activities in general, such as the preparation of health protocols for a safe restart of activities, training of personnel on safety in the work environment, readjustment of spaces and productive processes, as well as the implementation of entry filters, sanitization and hygiene of the work space, inter alia, determined by the Secretariat of Health, in accordance with section Four, second paragraph, of this Resolution, and*

***iii) Stage 3.-*** *Begins on June 1, 2020, in accordance with the regional traffic light system for the reopening of social, educational, and economic activities.*

***SECTION THREE.-*** *The traffic light referred to in the First and Second sections and which is incorporated as an Annex hereto, uses colors to determine the appropriate health security measures for work and educational activities and the use of public space, inter alia.*

***SECTION FOUR.-*** *It establishes as an extraordinary action that the activities of the construction industry, mining and those related to the manufacture of transportation equipment, will be considered essential activities.*

*The companies dedicated to the activities referred to in the previous paragraph, may resume work on June 1, 2020.*

**ANNEX**
**TRAFFIC LIGHT BY REGIONS**
**Activities allowed from June 1, 2020**

| Region | Activity | Activity Description |
|---|---|---|
| **Red** | Schools | Suspended |
| | Public space | Suspended |
| | Economic activities **ESSENTIALS ONLY** | Only work activities deemed essential |
| **Orange** | Schools | Suspended |
| | Public space | Reduced capacity in the activities of the public space in open spaces. Indoors suspended |
| | Economic activities General Information | Work activities considered essential and the non-essential activities with a reduced operation |
| **Yellow** | Schools | Suspended |
| | Public space | Capacity allowed in the activities of the public space in open places and in indoors with restrictions |
| | Economic activities in general, | All work activities |
| **Green** | Schools | No restrictions |

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

| | |
|---|---|
| Public space | |
| Economic activities in general, | |

10.     On May 20, 2020, the Mayor of Mexico City submitted the Gradual Plan towards the New Normal in Mexico City, which establishes the strategies that will be implemented to resume work, social, educational, cultural, and economic activities in Mexico City, which must be progressive and adhered to the minimum security standards against the risk of contagion.

11.     To do so, a traffic light system and a Monitoring Committee towards the New Normal of Mexico City was considered, which allows evaluating the epidemiological risk when resuming activities, which is authorized to establish extraordinary actions in addition to those that have already been established. That in an Extraordinary Meeting dated May 28, 2020, the Health Council of Mexico City, agreed to prepare the guidelines of the Gradual Plan towards the New Normal in Mexico City with the purpose of gradually and progressively reopening economic, labor, social, educational, cultural, transportation and government activities in Mexico City.

12.     That on May 29, 2020, the Sixth Resolution establishing the Guidelines for the Implementation of the Gradual Plan Towards the New Normal in Mexico City was published in the Official Gazette of Mexico City and the Committee of Monitoring, which, *inter alia*, establishes that the 'color' of the Epidemiological 'Traffic Light' will be publicly announced in the Official Gazette of Mexico City every Friday, which shall become effective immediately the following Monday.

An unauthenticated copy of the agreement in question is attached hereto as **ANNEX 57** for all legal purposes.

13.     That on June 5, 2020, the First Notice was published in the Official Gazette of Mexico City announcing the 'color' of the Epidemiological 'Traffic Light' in Mexico City, through which the Monitoring Committee of Mexico City  determined that, from June 08 to 14 YTD, the 'color' of the Epidemiological 'Traffic Light' of Mexico City remains 'RED'.

An unauthenticated copy of the agreement in question is attached hereto as **ANNEX 58** for all legal purposes.

14.     Likewise, on June 19, 2020, the Third Notice was published in said official media outlet announcing the 'color' of the Epidemiological 'Traffic Light' in Mexico City, specifying that the color would remain RED.

An unauthenticated copy of the agreement in question is attached hereto as **ANNEX 59** for all legal purposes.

15.     That on July 03 and 10, 2020, the Fifth and Sixth Notice was published in the Official Gazette of Mexico City announcing the 'color' of the Epidemiological 'Traffic Light' in Mexico City, as well as the health protection measures that must be observed, derived from the Monitoring Committee of Mexico City through which it was determined, *inter alia*, that the 'color' of the Epidemiological 'Traffic Light' remains ORANGE.

An unauthenticated copy of the resolution in question is attached hereto as **ANNEX 60** and **61**, respectively, for all legal purposes.

16.     That on July 13, 17 and 24, 2020, the Seventh, Eighth and Ninth Notice was published in the Official Gazette of Mexico City, requiring the resumption of business activities dedicated mainly to the Specialized Book Trade, as well as the Tenth and Eleventh Notice announcing the 'color' of the Epidemiological 'Traffic Light' in Mexico City, as well as the health protection measures that must be observed, respectively; through which it was determined, among other things, that the 'color' of the Epidemiological Traffic Light remains ORANGE.

A unauthenticated copy of the resolutions in question is attached hereto as **ANNEX 62, ANNEX 63 and ANNEX 64**. This, for all legal purposes.

*Mrs. Paola Montserrat Jiménez Bolaños* – Expert Interpreter & Translator English – Spanish – Portuguese - French
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

17.      That on July 28 and 31, 2020, the Twelfth Notice was published in the Official Gazette of Mexico City announcing amendments to the Guidelines for the Implementation of the Gradual Plan towards the New Normal in Mexico City, and the Thirteenth Notice announcing the 'color' of the Epidemiological 'Traffic Light' of Mexico City, the health protection measures that must be observed and the Guidelines for the Implementation of the Gradual Plan towards the New Normal in Mexico City.

An unauthenticated copy of the resolution in question is attached hereto as **ANNEX 65 and 66.** This, for all legal purposes.

18.      That on August 4, 2020, the Fourteenth Notice was published in the Official Gazette of Mexico City, announcing measures that must be observed in restaurants and businesses which main line of business is the sale of prepared foods with ambient music. Likewise, on August 7, 2020, the Fifteenth Notice was published in the same media outlet announcing the 'color' of the Epidemiological 'Traffic Light' of Mexico City and the health protection measures that must be observed. An unauthenticated copy of said resolutions are attached hereto as **ANNEX 67 and 68**.

19.      That on August 14, 21 and 28, 2020, the Sixteenth, Seventeenth and Eighteenth Notices announcing the 'color' of the Mexico City Epidemiological 'Traffic Light' were published in the Official Gazette of Mexico City determining, among other things, that the 'color' of the Epidemiological 'Traffic Light' would remain ORANGE.

An unauthenticated copy of these resolutions in question is attached hereto as **ANNEX 69, 70 and 71.** This, for all legal purposes.

20.      That on September 04, 11 and 18, 2020, the Nineteenth, Twenty-first, Twenty-first and Twenty-second Notices announcing the 'color' of the City's Epidemiological 'Traffic Light' were published in the Official Gazette of Mexico City, as well as the health protection measures that must be observed and in which it was determined, among other things, that the 'color' of the Epidemiological 'Traffic Light' will remain ORANGE.

An unauthenticated copy of these resolutions in question is attached hereto as **ANNEX 72, 73 and 74.** This, for all legal purposes.

21.      That on October 2, 9, 16, 26 and 30, 2020, the Twenty-third, Twenty-fourth, Twenty-fifth, Twenty-sixth, Twenty-seventh and Twenty-eighth Notices were published in the Official Gazette of Mexico City announcing the 'color' of the Epidemiological 'Traffic Light' of Mexico City, as well as the health protection measures that must be observed and in which it was determined, among other things, that the 'color' of the Epidemiological Traffic Light will remain ORANGE.

22.      An unauthenticated copy of these resolutions in question is attached hereto as **ANNEX 75, 76, 77, 78, and 79.** This, for all legal purposes.

23.      That on November 6, 13, 20 and 27, 2020, the Twenty-ninth, Thirty-first, and Thirty-second Notices were published in the Official Gazette of Mexico City, announcing the 'color' of the Epidemiological 'Traffic Light' of the Mexico City, through which the Mexico City Monitoring Committee determined, among other things, that the 'color' of the Epidemiological Traffic Light would remain ORANGE AND RAISED AN ALERT.

An unauthenticated copy of the resolution in question is attached hereto as **ANNEX 81, 82, and 83.** This, for all legal purposes.

24.      On December 4, 2020, the Mayor issued an agreement in the Official Gazette of Mexico City whereby she established:

That in a meeting dated December 4, 2020, the Monitoring Committee of Mexico City, in accordance with the provisions of sections Five and Six establishing the Guidelines for the Implementation of the Gradual Plan Towards the New Normal in Mexico City and the Monitoring Committee is created, established various determinations to provide certainty and legal security to neighboring people, who transit and live in Mexico City; thus, the following was issued: THIRTY-THIRD NOTICE ANNOUNCING THE 'COLOR' OF THE EPIDEMIOLOGICAL 'TRAFFIC LIGHT' IN MEXICO CITY, ESTABLISHING VARIOUS HEALTH

35

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

PROTECTION MEASURES THAT MUST BE OBSERVED DERIVED FROM THE SANITARY EMERGENCY DUE TO COVID-19 AND MODIFYING THE GUIDELINES FOR IMPLEMENTATION FROM THE GRADUAL PLAN TOWARDS THE NEW NORMAL IN MEXICO CITY

ONE. The Monitoring Committee of Mexico City, pursuant to the indicators of the health authorities at the federal and local levels, as well as the epidemiological data it has, mainly due to the hospital occupation of suspected or confirmed cases of COVID-19 in Mexico City, determined that from December 07 to 13 YTD, the 'color' of the Epidemiological 'Traffic Light' of Mexico City would remain BORDERLINE ORANGE.

TWO. Restaurants and businesses which line of business is the sale of prepared foods, malls and shopping centers, convention centers as well as department stores, may not hold events, nor place ice rinks, stands or photo forums with Santa Claus or the Wise Men, or any other activity related to the Christmas holidays, which implies the concentration of people.

THREE. Businesses and activities in Mexico City that are operating may have live, recorded or video-recorded music with a maximum volume limit of 50 dB (A).

FOUR. As of December 5, 2020, restaurants or businesses which line of business is the sale of prepared food, must first assign the tables available outdoors, in accordance with the rules and health protection measures established in the "*Ciudad al Aire Libre*" [Outdoors City] and, once said occupation is covered, they will be able to dispose of the tables that are inside their establishment, having to respect at all times the maximum total permitted capacity of 40%, if they chose to place seats outdoors. In case of not having an outdoor or expansion area, they may continue to provide service indoors, at the permitted capacity of 30%.

FIVE. Businesses with restaurants, sale of prepared foods, gyms, sports clubs, aesthetics, bowling alleys, exhibitions, museums, bookstores, aquariums, amusement parks, casinos, bookmakers, cinemas, theaters, squares, shopping centers, department stores as well as public and private offices, that are carrying out activities in person, as they are essential for the operation of the activity, which pursuant to section FOUR of the Thirty-First Notice, are required to implement the "System for the identification of QR Closed Spaces", they must arrange what is necessary so that the commitment letter that they must place at the entrance of their establishment is in a widely visible place. Likewise, they must inform everyone that, prior to their entry, it is essential to scan the QR code or send the 7 digits that appear below the QR code by SMS text message to the number 51515. People will receive an SMS text message confirming their registration. Likewise, banks, religious services, supermarkets, self-service stores, and pharmacies must invite people to scan the QR code or send the 7 digits that appear below the QR code by text message before entering into number 51515. Owners or persons responsible for said businesses or activities, must enable the necessary technological equipment so that those who do not have a mobile phone may, prior to entering the establishment or activity, register their attendance in the "QR System", through the platform: https://medidassanitarias.covid19.cdmx.gob.mx/

SIX. Section TEN of the Guidelines for the Implementation of the Gradual Plan towards the New Normal in Mexico City is modified, to read as follows: "THIRTEEN. Natural persons or legal entities who own the business or those responsible for the activities that, according to the 'color' of the Epidemiological 'Traffic Light', are operating with a face-to-face workforce of 100 or more people for each work center, must carry out rapid antigen tests at their own expense and on a fortnightly basis, or polymerase chain reaction RT-PCR, for the detection of the SARS-CoV-2 virus, which must be applied in clinical laboratories or places authorized to carry out COVID-19 tests in Mexico City, to at least 3% of the entire workforce, either individually or in groups. A group test is practiced on a group of a maximum of 15 people (preferably those who share spaces or have greater contact with each other) and will consist of taking samples from each one, which will be combined and processed as a single RT-PCR SARS-CoV-2 virus test. Likewise, they must ensure that each of the workers in the group to whom the test was performed a COVID-19 self-diagnosis is made, through the means indicated in section 1 of the NINTH BIS Guideline. If the group test was positive for COVID-19, the entire group will be asked to stay at home and an individual test must be carried out on each member. For the purpose of increasing the tracking, identification and monitoring capacity of positive and suspected cases of COVID-19 of the epidemiological surveillance system referred to in Guideline Eight for the implementation of the Gradual Plan towards the New Normal in the City of Mexico, the natural persons or legal entities who own the business or are responsible for the activities that, according to the 'color' of the Epidemiological 'Traffic Light', are operating, by themselves, or through whomever they designate as responsible for the work center, will have the obligation to report the information indicated below every Monday at https://empresaresponsable.covid19.cdmx.gob.mx/ a) Name

*Mrs. Paola Montserrat Jiménez Bolaños* – Expert Interpreter & Translator English – Spanish – Portuguese - French
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

or company name and Business TIN; b) Business contact number; c) Name of the person making the report; d) Number of tests carried out individually or in groups. In case these are in groups, state the number of samples taken; e) Date when the test was performed; f) Date and test results; g) Name of the laboratory that performed the tests; h) Names of employees with positive results; i) Age of the employees with a positive result; j) Address of the employees with a positive result; and k) Telephone number of the employees with a positive result. Once this process is completed, a proof of COVID-19 test report will be generated through the platform itself, certifying performance of this obligation. The transfer and processing of the referred data will be done pursuant to what is established by the regulations on the protection of personal data."

SEVEN. From December 7, 2020, to January 15, 2021, the terms, and deadlines inherent to the administrative procedures, paperwork and services of the instrumentalities, Decentralized Bodies, Public Administration Entities and Mayors of Mexico City are suspended, as well as the Local Board of Conciliation and Arbitration, in the terms established for this purpose in the specific Resolutions published in the Official Gazette of Mexico City. Likewise, remote work should be fostered.

EIGHT. General meetings held in housing units and condominiums may be held online, through the platforms determined for this purpose and make use of remote technological means for communications and must observe the rules established in the Property Law in force in Mexico City. The Administrations and Surveillance Committees of the housing units and condominiums must allow access to the corresponding authorities to order them to stop carrying out activities that do not comply with the sanitary measures, whenever the neighbors so request. Failure to observe this provision will be sanctioned by the Social Services Office of Mexico City, in the terms of the law on the matter.

NINE. The Administrative Verification Institute, in coordination with the other competent authorities of Mexico City, will carry out the supervision and surveillance activities of businesses and other activities that are operating according to the 'color' of the Traffic Light, so as to verify compliance with the general and specific health protection measures established for each sector. In the event any non-compliance is found during the supervision and surveillance visits, the verifying authority will order the total or partial temporary suspension of the activity for up to 15 calendar days, without prejudice to any other applicable sanction.

**TEN. Emphasis is placed so that face-to-face work in corporate and private sector offices resume until the Monitoring Committee determines that the 'color' of the Mexico City Epidemiological 'Traffic Light' is Green thus, remote work should be privileged. In the event it is necessary for personnel to attend their offices in person, as it is essential for the operation of their activity, they must strictly observe the sanitary measures established in the TENTH, TENTH BIS and ELEVENTH sections of the Guidelines for the Implementation of the Gradual Plan towards the New Normal in Mexico City, as well as those of section TWO of the Fourth Notice by which the 'color' of the Epidemiological 'Traffic Light' of Mexico City is announced, as well as the Health Protection Measures that must be observed; in addition to those previously established within the framework of the New Normal in Mexico City.** The Secretariat of Labor and Employment Promotion, in coordination with the other competent authorities of Mexico City, will carry out the extraordinary labor inspections that may be necessary, when it becomes aware by any means, of work centers that could be violating labor laws during the Health Emergency derived from the pandemic, specifically to carry out the inspection and sanction procedures, where appropriate, provided for in the "General Regulations for Labor Inspection and Application of Sanctions", insofar as it refers to the inspections carried out during the health emergency. Likewise, activities related to face-to-face administrative tasks in public and private universities in Mexico City are suspended, until so determined by the Monitoring Committee of Mexico City.

ELEVEN. The suspension of the sale of alcoholic beverages is emphasized regardless of their graduations, in businesses with a restaurant after 7:00 p.m. Likewise, by means of a Resolution issued by the relevant municipalities, the suspension of the sale of alcoholic beverages regardless of their graduations will be alternated, at the businesses located in the corresponding territorial demarcation, with the exceptions established for this purpose.

TEMPORARY SECTIONS

ONE. Be published in the Official Gazette of Mexico City.

TWO. This Notice will become effective on the day of its publication and shall remain valid until so determined by the Monitoring Committee of Mexico City.

*Mrs. Paola Montserrat Jiménez Bolaños* – Expert Interpreter & Translator English – Spanish – Portuguese - French
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

THREE. Once this Notice comes into effect, all those provisions that contravene section NINE of this Notice shall be rendered null and void. Issued at the Official Residence of the Head of Government of Mexico City, on December 4, 2020.

An unauthenticated copy of the agreement in question is attached hereto as **ANNEX 84** for all legal purposes.

25.      On December 18, 2020, the Mexico City government agreed to change the 'color' of the Mexico City epidemiological 'traffic light' to **RED** as transcribed below:

*"**ONE.** The Monitoring Committee of Mexico City, pursuant to the epidemiological indicators of the health authorities at the federal and local levels, mainly due to hospital occupancy rates and suspected or confirmed cases of COVID-19 in Mexico City, as well as the high levels of contagion, has determined that the 'color' of the Epidemiological 'Traffic Light' in Mexico City is RED; therefore, extraordinary health protection measures are established, which are of urgent implementation and mandatory observance in Mexico City.*

***TWO.** For the purposes of this Notice, the following are considered essential activities for operations in Mexico City during the health emergency due to COVID-19; therefore, operations shall be in compliance with the general and specific health measures: 1. Labor activities of the medical, paramedical, administrative and support branch throughout the Mexico City Health System; 2. Pharmaceutical sector; 3. Cleaning and sanitization of medical units at the different levels of care; 4. Supply, services and supply chains of all essential activities; 5. Manufacture and sale of bread; 6. Tortilla stores; 7. Groceries, convenience and fruit and vegetable stores; 8. Small neighborhood businesses with a maximum of 3 workers; with the exception of those located in perimeters A and B of the Historic Center of Mexico City; 9. Veterinary and sale of animal feed; 10. Laundromats; 11. Dry cleaners; 12. Cleaning supplies store; 13. Moving services; 14. Maintenance services; 15. Manufacture of supplies, medical equipment and technologies for health care; 16. Disposal of biohazardous waste; 17. Financial services (banks, which must ensure a continuous flow of clients and a healthy distance between them); 18. Notary services; 19. Energy sector; 20. Drinking water distribution system; 21. Food and beverage industry; 22. Markets; 23. Supermarkets; 24. Self-service stores; 25. Passenger and cargo transportation services, their services and supply chains; 26. Agricultural, fishing and livestock production; 27. Agroindustry; 28. Chemical industry; 29. Courier and e-commerce services; 30. Postal service; 31. Private security; 32. Nursing homes for the elderly; 33. Shelters and care centers for women victims of violence, and their children; 3. 4. Telecommunications and information media; 35. Emergency services; 36. Car emission testing centers; 37. Funeral and burial services; 38. Storage and cold chain services for essential supplies; 39. Mechanic shop; 40. Spare part shops; 41. Solid waste management; 42. Construction industry; 43. Mining; 44. Manufacturing industry; 45. Sale of prepared food for take away or home delivery only; 46. Hotels with a maximum capacity of 30% and only for accommodation services. This percentage of capacity does not apply to the accommodation of health personnel, refugees or migrants who to stay under an agreement with international organizations; and 47. Programs, procedures and public services required for operations in Mexico City, provided for in the section THREE of the Eleventh Resolution specifying the terms and deadlines for the administrative procedures, proceedings and services of the Public Administration and Municipalities of Mexico City are suspended, to prevent and control the spread of COVID-19, published in the Official Gazette of Mexico City on December 4, 2020.*

***THREE.** The natural or legal persons who own or are responsible for the activities deemed essential must strictly comply with the following health protection measures, as well as the general and specific ones established for each sector, available at https://medidassanitarias.covid19.cdmx.gob.mx/ 1.-Mandatory use of face masks at all times for staff and assistants during their stay in the facilities; 2.- Sanitary checkpoints must be placed for the detection of symptoms and temperature taking for the entry of personnel, suppliers and clients. Those with a temperature greater than 37.5 ºC [96.2 ºF] will not be allowed to enter; 3.- Maintain a healthy distance of 1.5 meters [5 feet] between people; 4.- Constantly disinfect surfaces and objects with which people have contact, as well as other areas of common use; 5.- Enable and define circulation directions for entry and exit; 6.- Place antibacterial gel dispensers with 70% alcohol at the entrance and spaces for common use; 7.- Favor natural ventilation. If this is not possible, the ventilation system may only operate with injection of a minimum of 40% from the outside. Indoor recirculation of air is prohibited. Filter disinfection and cleaning should be carried out frequently; 8.- Businesses which activity is considered essential and have a face-to-face workforce of 100 or more people*

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese – French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

38

*for each work center, must carry out at their own expense and on a fortnightly basis, rapid antigen tests, or else, in RT-PCR, for the detection of the SARS-CoV-2 virus, which must be applied in clinical laboratories or places authorized to perform COVID-19 tests in Mexico City, to at least the 10% of the totality of said workforce, either individually or in groups, under the terms of section TEN of the Guidelines for the Implementation of the Gradual Plan towards the New Normal in Mexico City, published on December 11, 2020 in the Official Gazette of Mexico City; 9.- Implement the "System for the identification of QR Closed Spaces", under the terms of section FOUR of the Thirty-First Notice by which the color of the Epidemiological Traffic Light of Mexico City is published, various health protection measures are established that must be observed derived from the COVID-19 Sanitary Emergency and the amendment to the Tenth and Thirtieth Notices announcing the 'Color' of the Epidemiological 'Traffic Light' of Mexico City, published on November 20, 2020 in the Official Gazette of Mexico City; and 10.- Daily employee temperature measurement. In the event of temperatures above 37.5° C [96.2 °F], workers are to stay at home*

*for 15 days, as well as those with whom they've had close contact, and give immediate notice to the authorities of Mexico City, through the Public Telephone Tracing Service (LOCATEL) or the available digital tools (SMS, website), so that the authority can monitor and order the sanitary measures for the establishment to take to contain and control contagion.*

***FOUR.** Commercial or business activities that are NOT included in the list provided for in section TWO of this Notice, such as department stores, malls, and shopping centers, inter alia, must remain closed from December 19, 2020, to January 10, 2021.*

***FIVE.** Businesses which main lines of business are not deemed essential under section TWO, but which have essential activities such as pharmacies, banks, or the sale of take-away food within their establishment, must remain closed, with the exception of said areas.*

***SIX.** It is reiterated that the celebration of all kinds of festivals, pilgrimages, patron saint festivities, Christmas parties or any other similar celebration in the towns and neighborhoods of Mexico City, which implies the crowds is prohibited. Likewise, the sale of prepared food on public roads is prohibited.*

***SEVEN.** In food markets, only basic basket products and takeaway food may be sold; strictly complying with the guidelines, protocols and/or guidelines for health protection measures established by the City Government and the Mayor's Offices.*

***EIGHT.** The Administrative Verification Institute, in coordination with the other competent authorities of Mexico City, will carry out supervision and surveillance activities for commercial establishments and other essential activities that are operating, so as to verify compliance with general and specific health protection measures established for each sector. "*

Said document is attached hereto as **ANNEX 85.**

26.      On January 8, 2021, the Headquarters of the Government of Mexico City announced that the 'color' of the epidemiological 'traffic light' of Mexico City would be in Red, until another determination is issued, as transcribed below :

***"ONE.** The Monitoring Committee of Mexico City, pursuant to the epidemiological indicators of the health authorities at the federal and local levels, mainly due to hospital occupancy rates and suspected or confirmed cases of COVID-19 in Mexico City, as well as the high levels of contagion, has determined that the 'color' of the Epidemiological 'Traffic Light' in Mexico City remains RED until another determination is made.*

***TWO.** During the validity of the 'color' of the 'red traffic light', the extraordinary health protection measures established in the Thirty-Seventh Notice by which the Monitoring Committee establishes Extraordinary Health Protection Measures to reduce the contagion curve must be observed, derived from the fact that the City is at the Maximum Red Light COVID-19 Emergency Alert published in the Official Gazette of Mexico City on December 21, 2020."*

Said document is attached hereto as **ANNEX 86.**

27.      On February 12, 2021, the government of Mexico City announced, through a forty-fifth notice, the 'color' of the epidemiological 'traffic light' in Mexico City, as well as the health protection measures that must be observed due to the COVID-19 Health Emergency by, which provides for as follows:

***"ONE.** The Monitoring Committee of Mexico City, pursuant to the epidemiological indicators of the health authorities at the federal and local levels, mainly due to hospital occupancy rates and suspected or*

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

*confirmed cases of COVID-19 in Mexico City, has determined that the 'color' of the Epidemiological 'Traffic Light' in Mexico City changes to ORANGE;*

***TWO.*** *As of Monday, February 15, 2021, businesses which main line of business is the sale of prepared foods will be able to provide service on site until 10:00 p.m., allowing a maximum of 5 people per table and only in open spaces or terraces; the foregoing, in accordance with the provisions of the "Ciudad al Aire Libre" [Outdoors City] program. After said hours, they can only provide take-out or delivery service, and must strictly observe the general health protection measures, as well as those specific to this sector, available at: http://medidassanitarias.covid19.cdmx.gob.mx Likewise, as of Monday, February 15, 2021, businesses with a pool service will be able to provide service until 5:00 p.m., only on terraces, and must strictly observe the general measures, as well as the specific health protection measures provided for in the Guidelines for health protection measures for pool halls, available at: http://medidassanitarias.covid19.cdmx.gob.mx. For the purposes of the provisions set forth in the "Ciudad al Aire Libre" [Outdoors City] program, "terrace" means a space with at least one side completely open to the outside; and "outdoors" an open space free of walls;*

***THREE.*** *As of Monday, February 15, 2021, non-essential businesses will maintain customer service outdoors and will be able to provide service inside their establishment with a maximum capacity of 20%, with their customers staying for a maximum of 30 minutes, from Tuesday to Sunday, from 11:00 a.m. to 5:00 p.m., and must strictly observe the general health protection measures, as well as those specific to each sector, available at: http://medidassanitarias.covid19.cdmx.gob.mx;*

***FOUR.*** *As of Monday, February 15, 2021, theaters will be able to resume activities with outdoor staging, strictly observing the general measures, as well as the specific health protection measures provided for in the Guidelines for health protection measures that outdoor theaters must comply with to resume activities towards a safe return to the New Normal in Mexico City, available at: http://covid19.cdmx.gob.mx/medidassanitarias ;*

***FIVE.*** *Starting Monday, February 15, 2021, training gyms and indoor pools will be able to resume activities, only for individual 1-on-1 workouts, by appointment, with hours from 06:00 to 23:00 hours; in the case of swimming pools, they must leave a space of two lanes between people. Likewise, they must strictly observe the general measures, as well as the specific health protection measures provided for in the Guidelines for health protection measures that the closed gym and sports center sector must comply with so as to resume activities towards a safe return to the New Normal in Mexico City, available at: http://covid19.cdmx.gob.mx/medidassanitarias ;*

***SIX.*** *As of Monday, February 15, 2021, religious centers will be able to open their doors to the public, from 7:00 a.m. to 7:00 p.m., Monday through Sunday, without officiating religious ceremonies, and must observe the general protection measures to health, as well as the specific ones, available at: http://covid19.cdmx.gob.mx/medidassanitarias.*

*Likewise, on the occasion of the religious celebration of "Ash Wednesday" on February 17, 2021, religious centers must implement a protocol that ensures the following health protection measures: 1. The religious service must be held in atriums and open areas; 2. Mandatory use of face masks; 3. Keep a safe distance of 1.5 mt (5 feet) meters from other people; and 4. Place antibacterial gel dispensers with 70% alcohol at the entrances to the religious center;*

***SEVEN.*** *The Administrative Verification Institute, in coordination with the other competent authorities of Mexico City, will supervise and oversee any activities that may be running, so as to check compliance with the general and specific health protection measures established for each sector."*

Said document is attached hereto as **ANNEX 87.**

28.      On February 12, 2021, through resolution number 03-09/2021, the Judiciary of Mexico City agreed, *inter alia*, to extend the suspension of work and, therefore, extend the suspension of procedural deadlines in the Judicial Branch of Mexico City from February sixteen to nineteen, two thousand twenty-one. Said resolution is attached hereto as **ANNEX 88**.

29.      Through communication number 03/2021 dated February 19, 2021, by which the 'color' of the Epidemiological 'Traffic Light' of Mexico City was announced, as well as the sanitary measures.  Said resolution is attached hereto as **ANNEX 89.**

30.      That on August 27, 2021, the Seventy-Second Notice was published in the Official Gazette of Mexico City announcing the 'Color' of the Epidemiological 'Traffic Light 'of Mexico City, which

40

*Mrs. Paola Montserrat Jiménez Bolaños* – Expert Interpreter & Translator English – Spanish – Portuguese – French
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

provided for that the 'color' of the Epidemiological 'Traffic Light' in Mexico City remains 'ORANGE'. Said resolution is attached hereto as **ANNEX 90**.

31.     That on September 13, 2021, the Seventy-Second Notice was published in the Official Gazette of Mexico City announcing the 'Color' of the Epidemiological 'Traffic Light 'of Mexico City, which provided for that the 'color' of the Epidemiological 'Traffic Light' in Mexico City remains 'YELLOW'. Said resolution is attached hereto as **ANNEX 91**.

32.     That in the meeting held on October 15, 2021, the Monitoring Committee of Mexico City, in accordance with the provisions of the Fifth Paragraph of the Sixth Resolution establishing the Guidelines for the Implementation of the Gradual Plan Towards the New Normal in Mexico City and the Monitoring Committee is created so as to provide legal certainty to residents, passers-by and inhabitants of Mexico City, the following was announced: SEVENTY-NINTH NOTICE ANNOUNCING THE 'COLOR' OF THE EPIDEMIOLOGICAL 'TRAFFIC LIGHT' OF MEXICO CITY AS WELL AS THE HEALTH PROTECTION ACTIONS THAT MUST BE OBSERVED DERIVED FROM THE HEALTH EMERGENCY BY COVID-19 whereby the following was established:

33.     ONE. The Monitoring Committee of Mexico City, based on epidemiological data, mainly due to the hospital occupation of suspected or confirmed cases of COVID-19 in Mexico City, determined that the 'color' of the Epidemiological 'Traffic Light' of Mexico City changed to 'GREEN'.

Said resolution is attached hereto as **ANNEX 92**.

34.     That in the meeting held on March 04, 2022, the Monitoring Committee of Mexico City, in accordance with the provisions of the Fifth Paragraph of the Sixth Resolution establishing the Guidelines for the Implementation of the Gradual Plan Towards the New Normal in Mexico City and the Monitoring Committee is created so as to provide legal certainty to residents, passers-by and inhabitants of Mexico City, the following was announced: EIGHTY-SECOND NOTICE ANNOUNCING THE COLOR OF THE EPIDEMIOLOGICAL TRAFFIC LIGHT IN MEXICO CITY, AS WELL AS THE HEALTH PROTECTION ACTIONS THAT MUST BE OBSERVED DERIVED FROM THE HEALTH EMERGENCY DUE TO COVID-19 FIRST. The Monitoring Committee of Mexico City, pursuant to epidemiological data, as well as the hospital occupation of suspected or confirmed cases of COVID-19 in Mexico City, determined that the 'color' of the Epidemiological 'Traffic Light' of Mexico City is 'GREEN'.

35.     That in the meeting held on April 22, 2022, the Monitoring Committee of Mexico City, in accordance with the provisions of the Fifth Paragraph of the Sixth Resolution establishing the Guidelines for the Implementation of the Gradual Plan Towards the New Normal in Mexico City and the Monitoring Committee is created so as to provide legal certainty to residents, passers-by and inhabitants of Mexico City, the following was announced: EIGHTY-THIRD NOTICE WHERE THE HEALTH PROTECTION ACTIONS THAT MUST BE OBSERVED DERIVED FROM THE HEALTH EMERGENCY DUE TO COVID-19 ARE DISCLOSED FIRST. As of Monday, April 25, 2022, the general measures for the entry of people to businesses and offices, both governmental and private, cultural, and educational spaces, as well as any other facility, are without effect. Said document is attached hereto as **ANNEX 93.**

To contextualize the seriousness of the impact caused by the pandemic, I attach the Table of Federal Instruments Related to the Contingency of the Covid-19 virus to this lawsuit. Updated as of April 22, 2022, updated as of August 10, 2022, and the related Table of Local Instruments Related to the Covid-19 Virus Emergency. Updated as of April 22, 2022, the URL links to all resolutions mentioned in this chapter may be visited.

FEDERAL                                                                 RESOLUTIONS:
http://www3.contraloriadf.gob.mx/prontuario/index.php/normativas/Template/ver_mas/70404/78/2/0

41

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

LOCAL                                                                                        RESOLUTIONS:
http://www3.contraloriadf.gob.mx/prontuario/index.php/normativas/Template/ver_mas/70140/77/1/0

36.     To contextualize the seriousness of the impact caused by the pandemic, I attach the Table of Federal Instruments Related to the Contingency of the Covid-19 virus to this lawsuit. Updated as of April 22, 2022, updated as of August 10, 2022, and the related Table of Local Instruments Related to the Covid-19 Virus Emergency. Updated on April 22, 2022, as **ANNEXES 94 and 95** respectively.

37.     All the resolutions mentioned in facts 4 to 30 of this complaint constitute well-known facts for Your Honor; therefore, in view of their nature, and pursuant to the provisions of section 286 of the applicable Procedural Code, the evidentiary activity carried out by the parties, presuming its certainty for all legal purposes that may arise.

The foregoing because the Official Gazette of the Federation is the official means of dissemination of the Constitutional Government of the United Mexican States, of a permanent nature and public interest, which serves to publish in the national territory, the laws, decrees, regulations , resolutions, circulars, orders and other acts, issued by the Branches of Government and the Autonomous Constitutional Bodies, in their respective spheres of competence, so that they are applied and compulsorily observed, and which are made available at the official website www.dof.gob.mx through the relevant communication network, it is evident that the content of said official electronic portal constitutes a well-known fact for Your Honor; and, that the Official Gazette of Mexico City is the official means of dissemination of the Government of Mexico City, of a permanent nature and public interest, which  serves to publish in the territory, the laws, decrees, regulations, resolutions, circulars, orders and other acts, issued by the Branches of Government of the state and the Autonomous Constitutional Bodies, in their respective areas of competence, so that they are applied and compulsorily observed, which  are made available at the  official  website  https://www.consejeria.cdmx.gob.mx/gaceta-oficialabout:blank through the relevant communication network, it is evident that the content of said official website constitutes a well-known fact for Your Honor.

The foregoing is further supported by the court opinion and isolated opinion issued by our highest Courts:

*Epoch: Ninth Epoch*
*Registered by: 168124*
*Proceeding level: Collegiate Circuit Courts*
*Court opinion type: Court precedent*
*Source: Judicial Weekly of the Federation and its Gazette*
*Volume XXIX, January 2009*
*Matter(s): Local*
*Dissertation: XX.2o. J/24*
*Page: 2470*
*WELL-KNOWN FACT. IT IS MADE UP OF THE DATA THAT APPEARS ON THE OFFICIAL WEB PAGES THAT THE GOVERNMENT INSTRUMENTALITIES USE TO MAKE AVAILABLE TO THE PUBLIC, AMONG OTHER SERVICES, THE DESCRIPTION OF THEIR PLACES, THE DIRECTORY OF THEIR EMPLOYEES OR THE STATUS OF THEIR RECORDS; THEREFORE , IT IS VALID TO RESORT TO THEM OFFICIALLY TO RESOLVE A PARTICULAR MATTER.*
*The data on the official websites used by the government bodies and made available to the public, among other services, the description of their positions, the directory of their employees or the status of their files, constitute a well-known fact that may be resorted to by the courts, pursuant to section 88 of the Federal Code of Civil Procedure, of supplementary application to the Amparo Law; as the information generated or communicated in this way is part of the global system for disseminating and obtaining data called the "Internet", from which it is possible to obtain, for example, the name of a public servant, the organizational*

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

42

*chart of an institution, as well as the meaning of its resolutions; hence, it is valid for the jurisdictional bodies to resort, at their own initiative, what has been published in that media outlet to resolve a particular matter. SECOND COLLEGIATE COURT OF THE TWENTIETH CIRCUIT.*

*Epoch: Tenth epoch*
*Registered by: 2004949*
*Proceeding level: Collegiate Circuit Courts*
*Court opinion type: Sole opinion*
*Source: Judicial Weekly of the Federation and its Gazette*
*Book XXVI, November 2013, Volume 2*
*Matter(s): Civil, local*
*Dissertation: I.3o.C.35 K (10a.)*
*Page: 1373*
*WEBSITES. ITS CONTENT IS A WELL-KNOWN FACT AND MAY BE ASSESSED IN A JUDICIAL DECISION.*
*The data published in documents or pages located on computer networks constitute a well-known fact for being part of public knowledge through such means at the time a judicial resolution is issued, in accordance with section 88 of the Federal Code of Civil Procedure. Access to the use of the Internet to search information on the existence of legal entities, commercial establishments, addresses and overall, any data published on computer networks, is part of the normal culture of specific sectors of society depending on the type of information. Hence, although it is not possible to affirm that this information is within the reach of all sectors of society, the truth is that it is possible to determine if, pursuant to the type of data, a fact is part of the normal culture of a sector of the society and may be considered as well-known by the judge and, consequently, valued in a judicial decision, as it is an indisputable common fact or opinion, not because of the number of people who are aware of that fact, but because of the notoriety, accessibility, acceptance and impartiality of this knowledge. Therefore, the content of an Internet page that reflects the facts of one of the parties in any trial, can be taken as conclusive evidence, unless there is contrary evidence that was not created at the request of the interested party, as such fact would lead to believe such party is the author of said information and which may be harmful for said party's case.*
*THIRD CIVIL COLLEGIATE COURT FOR THE FIRST CIRCUIT.*
*Amparo under review 365/2012. Mardygras, S.A. de C.V. December 07, 2012. Unanimous vote. Proposing justice: Neófito López Ramos. Secretary: Ana Lilia Osorno Arroyo.*

## CLAIM TIMELINESS

For purposes of admissibility of the claim, it is important to point out that it was until August 5 and 8, 2022 that THE BANK OF NEW YORK MELLON, as Trustee in the Issuance agreement dated August nine, two thousand seventeen, presumably acting under the orders and for the benefit of the Bondholders of the majority in principal of the Bonds, tried to give my client and its Subsidiary Guarantors a notice of "Acceleration" and/or the Early Maturity of the principal and the accrued and unpaid interest of all the Bonds under the Issuance agreement at two different times. This, due to a "Case of Default". For this reason, the court proceeding initiated is admissible.

Likewise, it is important to note that my client requests the recognition of acts of God and force majeure events, which have been defined by the World Health Organization as four spread scenarios of the SARs-CoV-2/COVID-19:

1. Countries without cases (no cases);
2. Countries with 1 or more cases, whether imported or identified locally (cases from time to time);
3. Countries experiencing clusters of cases over time, geographic location, and/or common exposure (clusters of cases);
4. Countries experiencing larger outbreaks of local spread (spread

Each country must take its own actions and necessary measures to stop, disseminate more and prevent their health systems from being saturated due to seriously ill patients with COVID-19. It is important to bear in mind that, depending on the non-pharmacological measures taken by each of the countries, mortality and complications results vary.

43

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

Currently, there are differences in mortality across people with confirmed cases from 0.2 to 7%55. In the end, the strategy is based mainly on the fact that sick people who require medical care do not arrive simultaneously, which causes the hospital infrastructure to collapse.

Based on the actual experience of China, it is possible to find that R0 may vary from 3.8 to 0.32 according to the measures established from self-confinement to the cordon sanitaire. There are models that show that an initial suppression strategy is required to reduce the number of deaths based on preventive measures to mitigate the effects of the pandemic.

The WHO reported that over the past six weeks (July 2022), the weekly number of COVID-19 cases reported worldwide has almost doubled.

Deaths are also on the rise, but not as rapidly as cases so far. However, the increase in cases means that we can expect more hospitalizations and deaths in the coming weeks.

The Omicron variant has many sublineages; in particular the BA.5 sublineage, which is the most transmissible variant detected so far. So, all countries must be prepared. Countries that have dismantled some parts of their pandemic response systems are taking a huge risk.

Accordingly, we understand that the pandemic continues and with it, the possibilities of establishing health measures that cause confinement or mobility of people again, for that reason, acts of God and force majeure events remain until my client is able to return to the conditions before March, year two thousand twenty.

It is also important to determine that my client to this day is still seriously impacted on from the force majeure measure imposed by the Federal Government, as derived from the non-suspension of activities and facing its essential qualified activities, mainly, in the field of telecommunications and media, resulted in assuming 100% of the pandemic risks.

This without considering that, since the ratification of the rating and amendment of the Outlook from Stable to Negative of the AZTECA 17 (issuance) was pursuant to the corporate rating, as published on December 24, 2019, which shows the deterioration observed in the company's operating results over the past twelve months (UDC), with a decrease in revenues of 11.1% and in EBITDA of 36.6% as a result of a lower demand of advertising space by the government, as well as a greater absorption of operating costs and expenses related to its own productions and live productions[1].

Currently, my client reported in its financial statements published by the National Banking and Securities Commission as of May two, two thousand twenty-two, in its balance sheet, the balance in cash and cash equivalents at the end of the quarter was 949 million MXN, compared to 1,671 million MXN a year ago. The company's net debt as of March 31, 2022, was 11,483 million MXN from 10,877 million MXN the previous year.

The restricted cash balance - which shows the amount to make the payments for content broadcasting rights and other short-term obligations of the company - was 1,655 million MXN, compared to 246 MXN the previous year.

And for the publication dated July 28, 2022, its balance to June 30, 2022, TV Azteca's cost-bearing debt was 10,351 million MXN compared to 12,356 million MXN the previous year.

Balance in cash and cash equivalents at the end of the quarter was 1,087 million MXN, compared to 2,281 million MXN a year ago. The company's net debt as of June 30, 2022, was 9,264 million MXN, from 10,075 million MXN a year earlier. And the restricted cash balance – which reflects the amount to make the payments for content broadcasting rights and other short-term obligations of the company – was 1,103 million MXN, compared to 269 million MXN a year ago.

This decrease is shown in the graph below:

---

[1] Publication dated December 24, 2019, in HR Ratings de México, S.A. de C.V., which is a securities rating institution registered with the Securities and Exchange Commission (SEC) of the United States of America as an NRSRO for this type of rating.

*Mrs. Paola Montserrat Jiménez Bolaños* – Expert Interpreter & Translator English – Spanish – Portuguese - French
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx                                                                 44

Page 45



## LEGAL CONCEPTS APPLICABLE TO THE CASE

Now, for this lawsuit to make sense, it is important to analyze in advance the legal concepts that took place in light of the sources of Law that govern them, as well as those that seek to define or explain them. The foregoing because we are facing unprecedented factual situations that undoubtedly lead to legal situations that must be resolved to ensure the rights and legal protection that every human being must enjoy.

Accordingly, and based on the premise above, it is key to understand the concept of speculation in the commercial field and set the limits of speculation to understand the risks assumed by the merchant and those cases when we are unable to perform.

### ACTS OF GOD, MAN-MADE DISASTERS

Acts of God or force majeure events constitute exculpatory

circumstances. Both concepts (act of God and force majeure event) may be used as synonyms since there is no practical distinction of their legal consequences. The Civil Code for Mexico City does not make any differentiation, but in certain sections said Code refers interchangeably to acts of God and force majeure events. However, it should be understood that its applicability is under the same principles. Additionally, our highest courts, in certain precedents, differentiate acts of God and force majeure event, while in other court opinions they use them interchangeably. Various precedents following this criterion are transcribed below.

*"Digital registration: 2003142*
*Proceeding level: Collegiate Circuit Courts*
*Tenth epoch*
*Matter(s): Administrative*
*Dissertation: I.4o.A.38 A (10a.)*
*Source: Judicial Weekly of the Federation and its Gazette. Book XVIII, March 2013, Volume 3, page 2076*
*Type: Sole opinion*

45

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

Page 46

*PATRIMONIAL LIABILITY ATTRIBUTABLE TO THE STATE. CONCEPTS OF ACT OF GOD AND FORCE MAJEURE EVENT AS EXCULPATORY CIRCUMSTANCES.* Pursuant to the patrimonial liability of the State as a product of its irregular administrative activity, although it is true that the claimants must prove it, it is also true that the state instrumentality as the defendant and subject to this rule is constrained to prove that due diligence was taken, in accordance with the law or lex artis of the profession when it comes to providing a service, or that the damages derive from unforeseeable or unavoidable facts or circumstances based on the knowledge of science or technique when they take place, or due to force majeure. In this context, it is necessary to take the acts of God and force majeure event into consideration as exculpatory circumstances of administrative liability. Thus, the first refers to the occurrence of a sudden unforeseen event, by chance or unexpectedly, or that would have been very difficult to foresee to the extent that there are no previous or consistent experiences of the probability or risk that such an event would take place. Moreover, an act of God translates into the occurrence of an unavoidable event, although foreseeable or relatively foreseeable, such as a hurricane or earthquake, of extraordinary nature. Consequently, the important factors to consider are the inevitability of the harmful event and the consequent faultless when the event has nothing to do with whoever may be held liable, or external to a vice or risk of a situation; i.e., what is decisive is to analyze whether the damage may be deemed unforeseeable or, if it may be foreseen, it is inevitable.

*FOURTH ADMINISTRATIVE COLLEGIATE COURT FOR THE FIRST CIRCUIT.*
*Direct Amparo 518/2012. María Silvia Matilde Barriguete Crespo et al. December 13, 2012. Unanimous vote. Proposing justice: Jean-Claude Tron Petit. Secretary: Mayra Susana Martínez Lopez.*

*Digital registration: 245709*
*Proceeding level: Auxiliary Chamber*
*Seventh Epoch*
*Matter(s): Labor*
*Source: Judicial Weekly of the Federation. Volume 121-126, Part Seven, page 81*
*Type: Sole opinion*

*ACTS OF GOD OR FORCE MAJEURE EVENTS. COMPONENTS.* Regardless of the doctrinal criterion that is adopted on whether the concepts of acts of God and force majeure event have the same or different meaning, it cannot be denied that their fundamental elements and their effects are the same, since they are natural events or man-made disasters that are not attributable to the obligor, have an impact on their legal sphere, temporarily or definitively by preventing them from partially or totally performing an obligation, without such acts being directly or indirectly attributable to them through fault, and which impact cannot be avoided with the resources that are normally available in the social environment in which they operate, either to prevent the event or to fight it and resist it.

*Direct Amparo 4010/75. Sindicato de Empleados de Centralab-México, S.A., C.R.O.C. June 27, 1979. Five votes. Proposing justice: Gloria León Orantes. Secretary: Leonel Castillo Gonzalez.*
*Direct Amparo 4008/75. Rosalba Guardiola et al. June 27, 1979. Five votes. Proposing justice: Gloria León Orantes. Secretary: Leonel Castillo Gonzalez.*
*Direct Amparo 4006/75. Gregorio Gallegos Labrado et al. June 27, 1979. Five votes. Proposing justice: Gloria León Orantes. Secretary: Leonel Castillo Gonzalez.*

As mentioned above, the Civil Code for Mexico City does not provide for any concept of act of God or force majeure event. However, there are Civil Codes for other states, such as Tabasco and Quintana Roo, which define acts of God or force majeure events. The first one, in section 2165, and the second one in section 2244. Below, these sections are transcribed for reference.

*"Section 2165. Loss due to acts of God or force majeure events.*
*[…] Act of God or force majeure event is understood as any foreseeable or unforeseeable event, carried out without the intervention of man or with the intervention of one or more persons, determined or indeterminate, which is unavoidable and by virtue of which a good is lost or the performance of the obligation is impossible."*

*"Section 2244.- Act of God is understood as any extraordinary event, natural or human, that cannot be foreseen, and which occurrence causes the loss or deterioration of the property or makes it impossible to*

*Mrs. Paola Montserrat Jiménez Bolaños – Expert Interpreter & Translator English – Spanish – Portuguese – French*
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

46

*perform an obligation; and force majeure event is any event, also extraordinary, natural or human, which caused these same results, which may be foreseen, but not avoided."*

From Roman Law, there is a principle saying that "no one is held to the impossible". The Civil Code for Mexico City does not describe acts of God or force majeure events, but it does enshrine a principle in section 2111 that provides for as follows:

Section 2111.- Nobody is held to perform in case of force majeure events, unless it has caused or contributed to it, when it has expressly accepted that liability, or when the law imposes it.

An act of God or force majeure event may be defined as an unforeseeable or unavoidable event that constitutes an insurmountable obstacle that prevents the performance of an obligation. The Napoleon Code reformed in 2016, in its section 1218, located in chapter IV, "The consequences of an agreement", Section 5, "breach of an agreement" establishes not exactly a concept, but a fact, i.e., when a force majeure takes place and provides for a scenario where an event is beyond the control of the debtor, which cannot be reasonably foreseen and which impact cannot be avoided. This section is transcribed below:

Section 1218.- A force majeure event takes place in contractual matters when an event beyond the control of the debtor, which could not reasonably be foreseen when executing and agreement and which consequences cannot be avoided by taking the appropriate measures, it prevents the debtor from performing its obligation.

If said impediment is temporary, the performance of the obligation will suspend unless the resulting delay justifies terminating the agreement. If the impediment is firm, the agreement will be automatically terminated, and the parties will be released from their obligations under the conditions provided for in sections 1351 and 1351-1.

A force majeure event should not be confused with an assumption in which the obligation, due to unforeseeable, extraordinary circumstances of its performance becomes more onerous or burdensome. In this case, an act of God or force majeure event does not take place, but we are in front of the theory of unpredictability, that has already been studied. Therefore, the force majeure event takes place when there is an insurmountable obstacle that makes it impossible to perform the obligation, due to an unforeseeable or unavoidable event. On the other hand, in the theory of unpredictability, performing the obligation is not impossible, there is no insurmountable obstacle, it only becomes more onerous or burdensome, it is an imbalance in benefits, not an impossibility thereof.

The essential premises that must be considered for the act of God or force majeure event to take place are: 1) a future event, 2) a general insurmountable obstacle, except in exceptional cases, and 3) may be foreseeable but unavoidable (unforeseeable or unavoidable). In summary, the act of God or force majeure event is an unforeseeable or unavoidable future event that constitutes an insurmountable obstacle that makes it absolutely and definitively impossible to perform an obligation.

The First Civil Collegiate Court for the First Circuit, in accordance with the precedent with Registry number 197162, Ninth Epoch, took into account the writers Bonnecase, García Goyena, the Mazeaud brothers and Tunc, to distinguish three categories of events constituting acts of God or force majeure events. Accordingly, they classify them as: 1) natural disasters, 2) man-made disasters, and 3) official governmental actions (*sovereign acts*). This court opinion is transcribed below:

Epoch: Ninth Epoch
Registered by: 197162
Proceeding level: Collegiate Circuit Courts
Court opinion type: Sole opinion
Source: Judicial Weekly of the Federation and its Gazette

47

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

Volume VII, January 1998
Matter(s): Civil
Dissertation: II.1o.C.158 C
Page: 1069

**ACTS OF GOD OR FORCE MAJEURE EVENTS. WHEN THE ACT OR FACT ON WHICH IT IS BASED IS AN OFFICIAL GOVERNMENTAL ACTION.** The legal doctrine is unanimous in admitting that there are times when the failure to perform an obligation cannot be attributable to the debtor, because it may be prevented from performing due to an event that is beyond its control, when it has not been able to foresee it or that even foreseeing it has not been able to avoid it. An event of this nature is called an act of God or force majeure event. The various writers such as Bonnecase, García Goyena, Henri León Mazeaud and André Tunc also agreed in distinguishing three categories of events constituting an act of God or force majeure event, depending on whether they come from events of nature, from man-made acts or from official governmental actions; whether the event comes from any of these sources and, therefore, causes the physical impossibility of the debtor to perform the obligation, which will bring as a logical consequence that it does not incur in delay and cannot be considered guilty for not performing although it may entail civil liability, given that no one is held to the impossible. The main characteristics of this cause of non-attributability for the debtor are unpredictability and generality, since when the event can be foreseen, the debtor must take the relevant actions to avoid it and if he does not do so, there is no act of God or force majeure event; the character of generality implies that the execution of the act is impossible to carry out for any person, it is not enough, therefore, that the execution is more difficult, more onerous or of imbalance in the reciprocal benefits. Thus, when it comes to official governmental actions, which some authors such as Manuel Borja Soriano classify within the category of man-made acts, sovereign acts refer to all those impediments that result from an order or a prohibition from a public authority.

FIRST CIVIL COLLEGIATE COURT FOR THE SECOND CIRCUIT.

Direct Amparo 487/97. USA English Institute, A.C. October 09, 1997. Unanimous vote. Proposing justice: Ricardo Romero Vazquez. Secretary: Elizabeth Serrato Guise.

The same precedent is interesting, given that in addition to alluding to unpredictability it also refers to the generality that implies "that the execution of the act is impossible to carry out by any person, it is not enough, then, that the execution be more difficult, more onerous or imbalance in the reciprocal benefits". Accordingly, in Borja Soriano's view, who refers to Hemard, he stated the following:
The general nature of force majeure events is only required from a debtor of a benefit, not personally. It is not enough that the performance of the obligation is impossible; it is necessary that it is so for everyone; a tenant cannot claim force majeure to evade their leasing obligations, the enemy bombardments in a city that has not been evacuated and in which other tenants continue to live (Hémard, t. II, no. 1504).[2]
Moreover, Gutiérrez y González states that "the requirement of generality is not needed to deem the occurrence of an act of God or force majeure event, in the case of an obligation that is performed by the execution of a personal event..."[3]
### LEGAL ASSUMPTION SCENARIOS DUE TO ACTS OF GOD OR FORCE MAJEURE EVENTS.
Section 2111 of the Civil Code for Mexico City provides for three scenarios, where the debtor is required to respond to an act of God or force majeure event:
1)    who has caused or contributed to it.
2)    It has expressly accepted that liability.

---

[2] Manuel Borja Soriano. *General Theory of Obligations.* Twenty-first edition (Mexico City: Porrúa, 2012) p. 473

[3] Ernesto Gutiérrez y González. *Law of Obligations.* Fifteenth Edition (Mexico City: Porrúa, 2003) p.671

48

*Mrs. Paola Montserrat Jiménez Bolaños* – Expert Interpreter & Translator English – Spanish – Portuguese - French
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

Page 49

3)      The Law imposes it.

In the first scenario, it is clear that the debtor must answer, by virtue of his conduct that caused or contributed to it. The debtor is acting recklessly, negligently, with lack of care or, where appropriate, with intent, for which it must be liable for all damages caused by this recklessness or malice. Let's think about this scenario, you lend your cellphone to "X" person on a Friday and that person agrees to return it on Saturday morning (before 10 a.m.). It turns out that "X" does not give you back your cell phone and on Saturday night "x" goes to a club and some thieves break into that place and steal your cell phone. May "X" claim an act of God or force majeure event? Or, on the contrary, since "X" failed to return the cell phone at the agreed time, does this delay make "X" responsible? Liability in this scenario is based on intention and negligence and not strictly an act of God or force majeure event. I consider this scenario to be a presumption of negligence. In said example, it is clear that "X" cannot resort to an act of God or force majeure event to excuse that "X" failed to perform said obligation. Consequently, "X" shall perform with said obligation. This assumption is otiose thus, section 2111 of the Civil Code of Mexico City is to be modified and the phrase "when it has caused or contributed to it" is to be removed. Going back to the example, "X" is responsible for an illegal act and, consequently, you have the right to be compensated for all damages that have been caused and that must necessarily be caused.

As for the second assumption, by virtue of the principle of the autonomy of the will of the parties, the obligor may modulate its conduct with respect to the liability of expressly accepting the damages caused by an act of God or force majeure event. Accordingly, the obligor may assume them in full or, where appropriate, in part, depending on the convention, but as stated above, this section or sections must be clear and precise, so as to avoid erroneous interpretations on the matter.

Consent must be express, not tacit (facts or acts that assume it or authorize it to assuming it, refer to section 1803 of the Civil Code for Mexico City, transcribed above). In this statutory assumption, section 2111 of the Civil Code for Mexico City, imposes a requirement on the way will is to be expressed, i.e., it shall be express. Therefore, if it was tacitly given, the exception to the exclusion of liability in case of a force majeure event would be inadmissible. Dear reader, in this case, are we facing a formality? If consent is tacit, is the exception in all cases inadmissible or will an exception be admitted in this regard? Would the section be non-existent if consent was not expressly given? In my opinion, if consent is not express, it shall have no legal effects.

It is important that it is always given in writing, and not verbally or by unequivocal signs. Even when an agreement is mutually established, it must be made in writing. In the event limits are agreed or established (consideration, conditions, requirements, etc.), these must be clearly specified in the relevant sections, i.e., if a dispute were to arise and  be submitted before the competent jurisdictional bodies. Consider that you, dear reader, are bound by a deposit agreement to guard and take care of a thoroughbred racing horse and you expressly agree in writing that you only assume fifty percent of the value of the horse in case of death in the event of act of God or force majeure event, exclusively derived from flooding. Therefore, if the horse perishes by fire, you do not assume the force majeure event for this event, as you would only be held responsible in case of a flood.

The Law also imposes on certain scenarios when a debtor has to respond to an act of God or force majeure event. In my opinion, lawmakers established these scenarios based on different teleologies or legal reasons, such as discouraging certain behaviors (sections 812, subsection II and 1900 of the Civil Code for Mexico City), by protecting the author from looseness (sections 2505, 2505 and 2506 of the same Code), ensure performance of an obligation (sections 1959, subsection III, and 2910 of the same Code) and protect certain people (sections 1884, 1929, subsection IV, 2535, 2647, 2648, 2650 and 2757 of the same Code).

From the above we may conclude the following:

An act of God or force majeure event constitutes exculpatory circumstances.

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

Essential characteristics of an act of God or force majeure event is that it may be unforeseeable or foreseeable, but unavoidable.

Civil liability may be assumed for an act of God or force majeure events.

The Law, in certain scenarios, provides for that a person shall assume civil liability due to an act of God or force majeure event.

The debtor responds to civil liability caused by an act of God or force majeure event when it has caused or contributed to it, as its behavior resulted in an illegal act.

The impossibility of performing the obligation derived from act of God or force majeure event may be total or partial.

The impossibility of performing the obligation derived from an act of God or force majeure event may be transitory when there is a temporary insurmountable obstacle. In this case, the obligation is not terminated, the debtor is exonerated for as long as the impossibility lasts (default does not take place).

By an express agreement, civil liability may be regulated due to an act of God or force majeure event, by establishing scenarios, conditions, scope, etc.

When an event is foreseeable but unavoidable, what happens to civil liability due to an act of God or force majeure event?

Please consider dear reader (a), the following case. A doctor has to operate on a patient as an emergency at night. The doctor learned from the news that weeks before drivers of public transportation service would demonstrate and, therefore, it is known that different access roads would be closed (the roads that will be blocked are known). The doctor talks to the patient in the morning and communicates that the surgery will take place at night. The doctor goes out to eat and cannot return to the hospital due to the drivers' demonstration. In this case, is the demonstration foreseeable but inevitable? Is the doctor civilly liable? Did the doctor's recklessness in eating out cause the obligation not to be performed?

An act of God and force majeure event are synonymous and, consequently, cause the same legal consequences.

An act of God or force majeure event may release the debtor from performing the main obligation and from the damages and/or losses, or only from the damages and losses, but not from the main obligation.

In the amended Napoleonic Code, the sections of exclusion or limitation of civil liability are effective, both in contractual and non-contractual matters. However, when it comes to contractual liability, these cannot be excluded or limited, in case of bodily injury. The same hypotheses may apply in our Law.

At this point it should be clarified that although it is true that the SARS-CoV2 virus (COVID-19) pandemic had an impact worldwide, causing infections at alarming levels, it is also true that the suspension of non-essential activities, including commercial ones, was due to an official governmental action, or as authors such as Master Borja Soriano refer, due to sovereign acts, since it was by virtue of a resolution issued and not by the pandemic itself, that the use of the leased property was made impossible, thereby causing the scenario provided for in section 2431 of the applicable substantive Code with effects for both contracting parties.

Please refer to the following isolated court opinion of the First Civil Collegiate Court in for the Second Circuit as basis for your ruling:

*Epoch: Ninth Epoch*
*Registered by: 197162*
*Proceeding level: Collegiate Circuit Courts*
*Court opinion type: Sole opinion*
*Source: Judicial Weekly of the Federation and its Gazette*
*Volume VII, January 1998*
*Matter(s): Civil*

*Mrs. Paola Montserrat Jiménez Bolaños* – Expert Interpreter & Translator English – Spanish – Portuguese - French
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

*Dissertation: II.1o.C.158 C*
*Page: 1069*
*ACTS OF GOD OR FORCE MAJEURE EVENTS. WHEN THE ACT OR FACT ON WHICH IT IS BASED
IS AN OFFICIAL GOVERNMENTAL ACTION.*
*The legal doctrine is unanimous in admitting that there are times when the failure to perform an obligation
cannot be attributable to the debtor, because it may be prevented from performing due to an event that is
beyond its control, when it has not been able to foresee it or that even foreseeing it has not been able to
avoid it. An event of this nature is called an act of God or force majeure event. The various writers such as
Bonnecase, García Goyena, Henri León Mazeaud and André Tunc also agreed in distinguishing three
categories of events constituting an act of God or force majeure event, depending on whether they come
from events of nature, from man-made acts or from official governmental actions; whether the event comes
from any of these sources and, therefore, causes the physical impossibility of the debtor to perform the
obligation, which will bring as a logical consequence that it does not incur in delay and cannot be considered
guilty for not performing although it may entail civil liability, given that no one is held to the impossible. **The
main characteristics of this cause of non-attributability for the debtor are unpredictability and
generality, since when the event can be foreseen, the debtor must take the relevant actions to avoid
it and if he does not do so, there is no act of God or force majeure event; the character of generality
implies that the execution of the act is impossible to carry out for any person,** it is not enough,
therefore, that the execution is more difficult, more onerous or of imbalance in the reciprocal benefits. Thus,
when it comes to official governmental actions, which some authors such as Manuel Borja Soriano classify
within the category of man-made acts, sovereign acts refer to **all those impediments that result from an
order or a prohibition from a public authority. \*Bold lettering added by me for emphasis\***

*FIRST CIVIL COLLEGIATE COURT FOR THE SECOND CIRCUIT.*

*Direct Amparo 487/97. USA English Institute, A.C. October 09, 1997. Unanimous vote. Proposing justice:
Ricardo Romero Vazquez. Secretary: Elizabeth Serrato Guise.*

## I. DIRECT DAMAGE TO TV AZTECA, S.A.B. DE C.V. DUE TO THE SARS-COV2 VIRUS DISEASE  (COVID-19) PANDEMIC AND THE ORDERS BY INTERNATIONAL AND DOMESTIC OFFICIAL GOVERNMENTAL ACTS.

In principle, it is important to highlight that the COVID disease pandemic that was declared has
brought to the justice system in our country, the need to implement criteria to interpret the
regulations related to the recognition of the concepts of acts of God or force majeure events, in
particular the occurrence of both to the specific case, for the reasons below:
a) <u>An act of God</u> implies an unpredictable event of nature. (SARS-CoV2 virus (COVID-19) disease
pandemic.
Globally recognized under the declaration of a Coronavirus (COVID-19) pandemic on March 11,
2020, by the World Health Organization (WHO), in which it decreed a health emergency due to
the COVID-19 pandemic as a case of "act of God or force majeure event", and thereby justify the
breach of contractual obligations without any liability for the obligor.
Implicitly, the existence of COVID-19 constitutes the declaration of a pandemic by an international
organization, or an order by an authority consisting of restricting certain acts in response to said
emergency.
Nationwide, the General Health Council is a health authority which general provisions are
mandatory for the administrative authorities of the country, pursuant to section 9, subsection XVII
of the Internal Regulations of the General Health Council[4], it is up to said Council to approve and

---

[4]"Section 9. The Council shall have the following obligations: […] XVII. To approve and publish in the Official
Gazette of the Federation the declaration of cases of serious illnesses that are causes of emergency that

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

publish in the Official Gazette of the Federation any declaration in cases of serious illnesses related to emergencies that threaten national security, in which the need for priority attention is justified.

It should be noted that on March 19, 2020, the plenary session of the General Health Council recognized the SARS-CoV2 virus, COVID-19 disease pandemic, in Mexico, as a serious disease requiring priority attention. In addition, it sanctions the measures for the preparation, prevention, and control of the SARS-CoV2 virus, COVID-19 disease pandemic that have been designed, coordinated, and supervised by the Secretariat of Health, and implemented by the instrumentalities and entities of the Federal Public Administration, the Legislative and Judicial Branches, the institutions of the National Health System, state governments and various organizations from the social and private sectors.

Likewise, the Secretary of Health and President of the General Health Council issued on March 30, 2020 the "**RESOLUTION DECLARING THE SARS-COV2 VIRUS (COVID-19) DISEASE PANDEMIC A HEALTH EMERGENCY DUE TO A FORCE MAJEURE EVENT** where the SARS-CoV2 virus (COVID-19) disease pandemic was declared a health emergency due to force majeure events, and it was ordered that the Secretariat of Health would determine all the actions that may be necessary to attend to the emergency specified in the paragraph before.

Accordingly, the authorities of Mexico City, through its Health Council of Mexico City, held their first extraordinary meeting on March 30, 2020, where they agreed, among other things, the following - to constitute a Health Alert System; issue the Health Emergency alert in Mexico City; strengthen the Scientific Committee for Epidemiological and Health Surveillance of Mexico City and order the several agencies for them, within the scope of their powers, to carry out all necessary and pertinent actions to attend to the COVID-19 health emergency;

And under said power the following was issued: "**NOTICE TO DECLARE A HEALTH EMERGENCY DUE TO FORCE MAJEURE EVENTS BY THE HEALTH COUNCIL OF MEXICO CITY, IN ACCORDANCE WITH THE HEALTH EMERGENCY DECLARED BY THE GENERAL HEALTH COUNCIL, TO CONTROL, MITIGATE AND AVOID THE SPREAD OF COVID-19**", which ordered issuing the Health Emergency in Mexico City due to force majeure events, to control, mitigate and prevent the contagion and spread of COVID-19.

b. *Force Majeure event* implies an unavoidable man-made event. *(World Health Organization, Federal Executive Branch, General Health Council and Secretariat of Health).*

As previously established, force majeure must meet certain characteristics that differentiate it from other concepts, as established by precedents, the following requirements must be met:

Inevitability

That a fact is inevitable means that the subject does not have the possibility of preventing it from happening or its consequences from becoming effective. In any case, the unavoidable condition will be assessed with the means available and with the activity itself.

Unpredictability

This characteristic determines the impossibility of foreseeing a situation when reality is observed. In the face of natural events, it is not possible to anticipate what will happen or what an event could cause.

The judges have determined that unpredictability must be determined objectively and not caused by the subject.

Extraordinary

Another of the distinctive characteristics of force majeure refers to its origin. The fact is the result of something extraordinary and natural in which the will of the person who is unable to perform its obligation does not intervene.

---

threaten national security, on its own initiative or at the written request of national institutions specialized in the disease, which are accredited by the Council, where the need for priority attention is justified; [...]

52

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese – French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

Page 53

In the environment in which the agent's action takes place, this event is totally external and inevitable.

As in this case, it happened due to a resolution by the head of the Secretariat of Health, in accordance with section 73, subsection XVI, parts 2 and 3 of the Constitution[5] under the discretion of its powers, it signed the general resolution published on March twenty-four, two thousand twenty, in which the actions to be followed in the case of serious epidemics or danger of invasion of exotic diseases in the country were determined, by virtue that this instrumentality has the obligation to immediately dictate the essential preventive measures.

Mainly, the priority to establish the preventive measures that were implemented for the mitigation and control of the health risks that the disease caused by the SARS-CoV2 virus (COVID-19) implies, i.e., those community interventions defined in the "National Day on Social Distancing", which objective is social distancing to mitigate the population transmission of the SARS-CoV2 virus (COVID-19), thus reducing the number of infections from person to person and therefore the spread of the disease, with special emphasis on vulnerable groups, also allowing the expected burden of disease not to be concentrated in reduced time units, with the subsequent benefit of guaranteeing access to hospital medical care for severe cases.

And aimed at the private and social sectors the following:

•        Temporarily suspend the activities of the social and private sectors that involve physical concentrations, transit, or displacement of people from the entry into force of this Resolution and until April 19, 2020.

•        The instrumentalities and entities of the Federal Public Administration and the organizations of the social and private sectors must implement plans that guarantee the continuity of operations for the performance of their essential functions related to the mitigation and control of the health risks that the SARS-CoV2 virus (COVID-19 diseases) implies and protect the human rights of workers, in particular those listed in subsection a) of this section, and of the users of its services.

•        **In the private sector, companies, businesses,** commercial establishments, and all those that are necessary to deal with the contingency will continue to work, namely, hospitals, clinics, pharmacies, laboratories, medical services, financial, **telecommunications, and information media,** hotel and restaurant services, gas stations, markets, supermarkets, miscellaneous, transport services and gas distribution, as long as these do not conduct activities in indoor spaces with crowds.

Likewise, on March thirty-one, two thousand twenty, the Secretary of Health issued a "Resolution establishing extraordinary actions to attend to the health emergency generated by the SARS-CoV2 virus" in which, essentially, it ordered the following:

It is established as an extraordinary action, to attend to the health emergency generated by the SARS-CoV2 virus, that the public, social and **private** sectors must implement the following measures:

---

[5] "Section 73.- The congress is authorized to: […] XVI.- To enact laws on nationality, legal status of foreigners, citizenship, naturalization, colonization, emigration and immigration and general health of the Republic.
1a.- The General Health Council will report directly to the President of the Republic, without the intervention of any Secretary of State, and its general provisions will be mandatory in the country.
2a.- In case of epidemics of a serious nature or danger of invasion of exotic diseases in the country, the Secretariat of Health will have the obligation to immediately dictate the essential preventive measures, subject to being later sanctioned by the President of the Republic.
3a.- The health authority will be executive, and its provisions will be obeyed by the administrative authorities of the Country".

*Mrs. Paola Montserrat Jiménez Bolaños* – Expert Interpreter & Translator English – Spanish – Portuguese - French
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

- The **immediate suspension is ordered**, from March thirty to April thirty, two thousand twenty, of non-essential activities, so as to mitigate the spread and transmission of the SARS-CoV2 virus in the community, to reduce the burden of disease, its complications and death by COVID-19 in the population residing in the national territory;
- **Only the following activities may continue to operate**, considered **essential**, as is **the case of my client:**
❖ Fundamental sectors of the economy, such as financial, tax collection, distribution and sale of energy, fuel and gas stations, production and distribution of drinking water, food and non-alcoholic beverage industry, food markets, supermarkets, self-service stores, groceries and sale of prepared foods, passenger and cargo transportation services; agricultural, fishing and livestock production, agroindustry, chemical industry, cleaning products, hardware stores, courier services, private security guards, nurseries and childcare centers, nursing homes for the elderly, shelters and care centers for women victims of violence and their children, **telecommunications and media**, private emergency services; funeral and burial services; storage and cold chain services for essential supplies; logistics (airports, ports and railways), as well as activities which suspension may have irreversible effects for their continuation.
- In all **the places and venues in which the activities defined as essentials** are to observe the following **mandatory** practices:
❖ Meetings or congregations of more than 50 people may not be held;
❖ People are to wash their hands frequently;
❖ People are to sneeze or cough by following the respiratory etiquette (covering their nose and mouth with a disposable handkerchief or with their forearm);
❖ Do not greet by kissing, with a handshake or hug (distanced greeting), and
❖ All other current healthy distance measures, issued by the Federal Secretariat of Health; Even within these measures, the Secretariat urged the entire population residing in Mexican territory, including those who arrive there from abroad and who do not participate in essential work activities, to comply with co-responsible measures to stay at home from March thirty to April thirty, two thousand twenty Staying at home is understood as being co-responsible for the voluntary limitation of mobility, remaining in the private home or place other than the public space, to the extent possible.

Said resolution determined that the measures established therein should be applied with strict respect for the human rights of all people.

As of that date, both the federal and local health authorities determined that the activities of telecommunications and the media were **considered essential**.

A significant point took place in the catalog imposed by the health authority, since rules for said essential activities were not established on how to consider the flow of acquisitions of supplies of said activities (which supplier is considered non-essential), i.e., it was left at the discretion of each management team that acted proactively and carried out a self-determination on the essential nature of the company's activities causing unavoidable economic damage. As for Mexico City, for such purposes, it was considered feasible to create a file with supporting documentation of the relationship with clients that were in the bucket of essential activities, and it must be kept in sight for review during the corresponding inspection (what could or could have not been carried out by the administrative authority).

A relevant consideration when carrying out the self-determination is whether the suspension of the activities of the company would contribute to the shortage of supplies for the companies that fall in the bucket of essential activities and if it would cause a disruption to the essential activity of the client.

Precisely since the Resolution dated March 30 above does not establish clear rules to consider supply chains as essential activities, having a self-determination file will not ensure the inspector's

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

54

Page 55

favorable decision, but it will serve to expose the necessary elements for said decision. Due to the fact that compliance inspections under the terms of the Resolution dated March 31 have been delegated to health agencies of the thirty-two states of the Republic and to the state offices of the Federal Government, the verification criteria are very diverse. While some inspectors in certain states carry out a reasoned analysis of the self-determination carried out, in other states a restrictive and summary analysis is carried out that in most cases leads to a warning to suspend activities or even sealing off entrances.

A clear example of the important limitation of the Resolution dated March thirty-one, two thousand twenty is that it does not harmonize the classification of essential activities with the regulatory framework applicable to critical infrastructure in the United States, with the consequence of interrupting cross-border chains that are part of NAFTA.

A criterion that has been applied by the Mexican authorities in determining the essential nature of manufacturing activities lies on the premise that manufactured goods are supplied to the Mexican market: according to this interpretation, only those activities that produce goods to be supplied within Mexico are deemed essential. For this reason, the manufacturing plants that export all or most of their production to supply critical infrastructure in the United States faced the possibility of suspending their activities because they failed to meet said criteria.

The extension of the suspension period of non-essential activities until May thirty, two thousand twenty brought with it additional effects on the application of the Agreement dated March thirty-one, which directly affected those that did continue to operate with great shortages.

This without considering the labor issues that have worsened due to the fact that employers have not received support for the payment of wages of a workforce that may be idle as a result of an erroneous application of the essential activity criteria.

Especially as it had an impact on the rapid increase in COVID-19 infections in Mexico, which also affected those essential industries that remained in operation from the beginning and continue to operate to this day.

## II. IMPACT ON MEXICO DUE TO THE OPERATION OF THE TELECOMMUNICATIONS AND MEDIA SERVICES WHEN DECLARED AS <u>ESSENTIAL PUBLIC SERVICES</u> IN THE FACE OF THE PANDEMIC.

The impact of the pandemic resulted in two direct effects: <u>the force majeure event due to the declaration of a health emergency caused by the Coronavirus (COVID-19) pandemic and the force majeure event declared by the international health authorities and the national authorities that made the declaration of serious situation to prioritize the health of Mexicans.</u>

The first case, as already mentioned, **is an unpredictable event of nature, where there is no way to foresee it or mitigate its origin, it is completely beyond the control of the parties in contractual obligations,** by virtue of the fact that it equally impacts on each one of them.

However, **force majeure occurrences have a greater impact as these are caused by the compulsory and mandatory compliance with the official health governmental actions,** by establishing the preventive measures that were implemented to mitigate and control the health risks that the SARS-CoV2 virus disease (COVID-19) implies; specifically in the private sector, of which my client belongs, because companies with the corporate purpose of providing services in telecommunications and information media were ordered to continue operating and working, in which order my client's will did not intervene, but on the contrary, it was issued as a compulsory and mandatory rule aimed at individuals.

Based on this premise, Your Honor will be able to observe the direct impact on my client when an act of God and force majeure event take place, as to this date my client has not been able to meet the contractual obligation that will be specified later.

In other words, **<u>Your Honor is asked to analyze the legal and material impossibility of my client to perform the obligations assumed when executing the Issuance agreement dated August 9, 2017, executed by TV AZTECA *as Issuer*, THE BANK OF NEW YORK MELLON as</u>**

55

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

**Page 56**

*Trustee,* **AND THE BANK OF NEW YORK MELLON, LONDON BRANCH,** *as Principal Paying Agent,* **because the act of God and force majeure event caused by the declaration of a health emergency due to the SARS-CoV2 virus (COVID-19) pandemic took place, as well as the order of mandatory compliance by my client caused by the official governmental acts issued by the health authorities both worldwide by World Organization of Health and by as the Mexican federal authorities, the head of the Federal Executive Branch, the Secretary of Health, the General Health Council and the** Health Council of Mexico City.

To prove to Your Honor that a force majeure event impacted on my client and to prove the direct impact and unequal position it was placed to continue operating as an essential activity in the face of the force majeure event caused by the COVID-19 pandemic, the resolution made at the ordinary and extraordinary shareholders' meeting, dated April 25, two thousand twenty-two is transcribed herein from where the corporate purpose stems from and consists of, *inter alia,* providing essential public services:

1. To use, take advantage of, exploit, and operate frequency bands of the radioelectric spectrum and public or private telecommunications networks, through concessions, authorizations or permits obtained from the relevant authorities.

2. The production, commercialization, acquisition, distribution, assignment, representation, sale, design, import, export, use, exchange, application or any other form of contracting of all types of events, advertising spaces, radio  series and shows, films, television, restricted television systems, public or private telecommunications networks, the Internet and any other telecommunications system known or yet to be known, including the broadcasting rights of any of these events, series or programs, on its own behalf or on behalf of third parties in Mexico and abroad.

3. Providing all kinds of services related to telecommunications and broadcasting, through all kinds of electrical, electronic, and mechanical devices.

The foregoing must be assessed in conjunction with the resolutions issued by the Federal Institute of Telecommunications (IFT) in which TV Azteca, Sociedad Anónima Bursátil de Capital Variable is granted a concession title to use and make use of frequency bands of radioelectric spectrum, as well as a single concession title, both for private use for experimentation purposes, in addition to the concessions listed below:

| CONCESSIONS | DESCRIPTION | CONCESSIONAIRE COMPANY |
|---|---|---|
| AZTECA SPECTRUM CONCESSION TITLES IN FORCE TO 2004 | 11 Spectrum concession titles granted to Televisión Azteca for 179 channels. Effective as of several dates to August 24, 2004 | Televisión Azteca, S.A. de C.V. |

*Mrs. Paola Montserrat Jiménez Bolaños* – Expert Interpreter & Translator English – Spanish – Portuguese - French
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

Page 57

| AZTECA SPECTRUM CONCESSION TITLES IN FORCE FROM 2004 TO 2021 | 11 Spectrum concession renewal titles granted to Televisión Azteca with respect to 179 channels. Valid from August 25, 2004, to December 31, 2021 | Televisión Azteca, S.A. de C.V. |
|---|---|---|
| AZTECA SPECTRUM CONCESSION TITLES IN FORCE FROM 2022 TO 2042 | 3 Spectrum concession titles granted to Televisión Azteca for 179 channels. Valid from January 01, 2022, to January 01, 2042, | Assigned by Televisión Azteca, S.A. de C.V. to Televisión Azteca III, S.A. de C.V. (Proof of registration number 056931 dated March 4, 2022, issued by IFETEL). |
| AZTECA SINGLE SPECTRUM CONCESSION TITLE IN FORCE FROM 2018 TO 2048 | 1 Single concession title granted to Televisión Azteca for commercial use. Valid from January 10, 2018, to January 10, 2048. | Assigned by Televisión Azteca, S.A. de C.V. to Televisión Azteca III, S.A. de C.V. (Proof of registration number 056931 dated March 4, 2022, issued by IFETEL). |
| ADN40 SPECTRUM CONCESSION TITLE IN FORCE FROM 1993 TO 2006 | 1 Spectrum concession title granted to Televisora del Valle de México for 1 channel in Mexico City. Valid from April 19, 1993, to December 12, 2006. | Televisora del Valle de México, S.A. de C.V. |
| ADN40 SPECTRUM CONCESSION TITLE IN FORCE FROM 2006 TO 2021 | 1 Spectrum concession renewal title granted to Televisora del Valle de México for 1 channel in Mexico City. Valid from December 13, 2006, to December 31, 2021 | Televisora del Valle de México, S.A.P.I. de C.V. (formerly S.A. de C.V.) |

57

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

`Page 58`

| ADN40 SPECTRUM CONCESSION TITLE IN FORCE FROM 2022 TO 2042 | 1 Spectrum concession title granted to Televisora del Valle de México for 1 channel in Mexico City. Valid from January 1, 2022, to January 1, 2042. | Televisora del Valle de México, S.A.P.I. de C.V. |
|---|---|---|
| ADN40 SINGLE CONCESSION TITLE IN FORCE FROM 2018 TO 2048 | 1 Single concession title granted to Televisora del Valle de México for commercial use. Valid from January 10, 2018, to January 10, 2048. | Televisora del Valle de México, S.A.P.I. de C.V. |

Concession titles that were granted by the IFT to my client to run the television channels below:

| No. | Population | State | Ticker or acronym | First Programming Channel |
|---|---|---|---|---|
| 1 | Aguascalientes | Ags. | XHJCM-TDT | Azteca Uno |
| 2 | Ensenada | BC | XHENE-TDT | Azteca Uno |
| 3 | Mexicali | BC | XHAQ-TDT | Azteca Uno |
| 4 | San Felipe | BC | XHFEC-TDT | Azteca Uno |
| 5 | Tijuana | BC | XHJK-TDT | Azteca Uno |
| 6 | Cd. Constitución | BCS | XHCOC-TDT | Azteca Uno |
| 7 | La Paz | BCS | XHAPB-TDT | Azteca Uno |
| 8 | San Jose del Cabo | BCS | XHJCC-TDT | Azteca Uno |
| 9 | Campeche | Camp. | XHGE-TDT | Azteca Uno |
| 10 | Cd. Del Carmen | Camp. | XHGN-TDT | Azteca Uno |
| 11 | Escarcega | Camp. | XHPEH-TDT | Azteca Uno |
| 12 | Cd. Jimenez | Chih. | XHJCH-TDT | Azteca Uno |
| 13 | Cd. Juarez | Chih. | XHCJE-TDT | Azteca Uno |
| 14 | Chihuahua | Chih. | XHIT-TDT | Azteca Uno |
| 15 | Hidalgo del Parral | Chih. | XHHPC-TDT | Azteca Uno |
| 16 | Nuevo Casas Grandes | Chih. | XHCGC-DTT | Azteca Uno |
| 17 | Ojinaga | Chih. | XHHR-TDT | Azteca Uno |
| 18 | Arriaga | Chis. | XHOMC-TDT | Azteca Uno |
| 19 | Comitan | Chis. | XHDZ-TDT | Azteca Uno |
| 20 | San Cristobal de las Casas | Chis. | XHAO-DTT | Azteca Uno |
| 21 | Tapachula | Chis. | XHTAP-TDT | Azteca Uno |

*Mrs. Paola Montserrat Jiménez Bolaños* – Expert Interpreter & Translator English – Spanish – Portuguese - French
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

Page 59

| 22 | Cd. Acuña | Coah. | XHHE-TDT | Azteca Uno |
|----|-----------|-------|----------|------------|
| 23 | Monclova | Coah. | XHHC-TDT | Azteca Uno |
| 24 | Parras de la Fuente | Coah. | XHPFC-TDT | Azteca Uno |
| 25 | Sabinas-Nueva Rosita | Coah. | XHCJ-TDT | Azteca Uno |
| 26 | Colima | Col. | XHKF-TDT | Azteca Uno |
| 27 | Manzanillo | Col. | XHDR-TDT | Azteca Uno |
| 28 | Tecoman | Col. | XHTCA-TDT | Azteca Uno |
| 29 | Mexico | CDMX | XHDF-TDT | Azteca Uno |
| 30 | Cuencame | Dgo. | XHVEL-TDT | Azteca Uno |
| 31 | Durango | Dgo. | XHDB-TDT | Azteca Uno |
| 32 | Gomez Palacio (Torreon) | Dgo. | XHGDP-TDT | Azteca Uno |
| 33 | Guadalupe Victoria | Dgo. | XHGVH-TDT | Azteca Uno |
| 34 | Santiago Papasquiaro | Dgo. | XHPAP-TDT | Azteca Uno |
| 35 | Acapulco | Gro. | XHIE-TDT | Azteca Uno |
| 36 | Chilpancingo | Gro. | XHCER-TDT | Azteca Uno |
| 37 | Iguala | Gro. | XIR-TDT | Azteca Uno |
| 38 | Taxco | Gro. | XHIB-TDT | Azteca Uno |
| 39 | Zihuatanejo | Gro. | XHDU-TDT | Azteca Uno |
| 40 | Celaya | Gto. | XHMAS-TDT | Azteca Uno |
| 41 | Tulancingo | Hgo. | XHTGN-TDT | Azteca Uno |
| 42 | Guadalajara | Jal. | XHJAL-TDT | Azteca Uno |
| 43 | Puerto Vallarta | Jal. | XHGJ-TDT | Azteca Uno |
| 44 | Toluca | Mex. | XHXEM-TDT | Azteca Uno |
| 45 | Lázaro Cárdenas | Mich. | XHLCM-TDT | Azteca Uno |
| 46 | Pátzcuaro | Mich. | XHCBM-TDT | Azteca Uno |
| 47 | Cuernavaca | Mor. | XHCUR TDT | Azteca Uno |
| 48 | Tepic | Nay. | XHAF-TDT | Azteca Uno |
| 49 | Monterrey | NL | XHWX-TDT | Azteca Uno |
| 50 | Huajuapan de Leon | Oax. | XHJN-TDT | Azteca Uno |
| 51 | Matias Romero | Oax. | XHIG-TDT | Azteca Uno |
| 52 | Oaxaca | Oax. | XHOXX-TDT | Azteca Uno |
| 53 | Pinotepa Nacional | Oax. | XHINC-TDT | Azteca Uno |
| 54 | Puerto Escondido | Oax. | XHPCE-TDT | Azteca Uno |
| 55 | Salina Cruz | Oax. | XHSCO-TDT | Azteca Uno |
| 56 | Puebla | Pue. | XHPUR-TDT | Azteca Uno |
| 57 | Tehuacan | Pue. | XHTHN-TDT | Azteca Uno |
| 58 | Cancun | Q. Roo | XHCCQ-TDT | Azteca Uno |
| 59 | Chetumal | Q. Roo | XHBX-TDT | Azteca Uno |
| 60 | Felipe Carrillo Puerto | Q. Roo | XHPVC-TDT | Azteca Uno |
| 61 | Querétaro | Qro. | XHQUR-TDT | Azteca Uno |
| 62 | Culiacan | Sin. | XHCUA-TDT | Azteca Uno |
| 63 | Los Mochis | Sin. | XHMSI-TDT | Azteca Uno |

59

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

Page 60

| 64 | Mazatlan | Sin. | XHLSI-TDT | Azteca Uno |
|----|----------|------|-----------|------------|
| 65 | Matehuala | SLP | XHPMS-TDT | Azteca Uno |
| 66 | San Luis Potosí | SLP | XHDD-TDT | Azteca Uno |
| 67 | Tamazunchale | SLP | XHTAZ-TDT | Azteca Uno |
| 68 | Cd. Obregon | Son. | XHCSO-TDT | Azteca Uno |
| 69 | Guaymas | Son. | XHHN-TDT | Azteca Uno |
| 70 | Hermosillo | Son. | XHHSS-TDT | Azteca Uno |
| 71 | Nogales | Son. | XHFA-TDT | Azteca Uno |
| 72 | Villahermosa | Tab. | XHVHT-TDT | Azteca Uno |
| 73 | Cd. Mante | Tamps. | XHBY-TDT | Azteca Uno |
| 74 | Cd. Victoria | Tamps. | XHCVT-TDT | Azteca Uno |
| 75 | Matamoros | Tamps. | XHMTA-TDT | Azteca Uno |
| 76 | Nuevo Laredo | Tamps. | XHLNA-TDT | Azteca Uno |
| 77 | Reynosa | Tamps. | XHREY-TDT | Azteca Uno |
| 78 | San Fernando | Tamps. | XHFET-TDT | Azteca Uno |
| 79 | Soto la Marina | Tamps. | XHHP-TDT | Azteca Uno |
| 80 | Tampico | Tamps. | XHWT-TDT | Azteca Uno |
| 81 | Cerro Azul | Ver. | XHAZL-TDT | Azteca Uno |
| 82 | Coatzacoalcos | Ver. | XHBE-TDT | Azteca Uno |
| 83 | Perote | Ver. | XHIC-TDT | Azteca Uno |
| 84 | Santiago Tuxtla | Ver. | XHSTV-TDT | Azteca Uno |
| 85 | Merida | Yuc. | XHDH-TDT | Azteca Uno |
| 86 | Valladolid | Yuc. | XHKYU-TDT | Azteca Uno |
| 87 | Fresnillo | Zac. | XHKC-TDT | Azteca Uno |
| 88 | Sombrerete | Zac. | XHCPZ-TDT | Azteca Uno |
| 89 | Zacatecas | Zac. | XHLVZ-TDT | Azteca Uno |

As you may see, Your Honor Member, the activity carried out by my client is considered an essential public service, due to the importance and transcendence in the provision of the service aimed at the population when facing the pandemic, based on specific day-to-day information.

In this chapter it will be proven that my client is in a situation caused by the force majeure event established in the law which makes it impossible perform the Issuance agreement dated August 9, 2017, signed by TV AZTECA *as Issuer*, THE BANK OF NEW YORK MELLON *as Trustee*, AND THE BANK OF NEW YORK MELLON, LONDON BRANCH, *as Principal Paying Agent*, as it had to abide by the resolutions issued by a higher authority; otherwise the provisions of sections 4 and 73, subsection XVI, 1st, 2nd and 3rd of the Political Constitution of the United Mexican States would be violated, as well as by the communications by the Federal Institute of Telecommunications.

Due to the health contingency situation that the world continues to go through and specifically in Mexico, the Federal Government has taken a series of actions aimed at preventing and avoiding the spread of the SARS-CoV2 virus (COVID-19), mainly the immediate suspension of non-essential activities and the extension of the health contingency period was ordered, as well as the continuation of operations of companies providing public services in the field of

*Mrs. Paola Montserrat Jiménez Bolaños* – Expert Interpreter & Translator English – Spanish – Portuguese – French
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

telecommunications and media, as is the case of my client, which was decreed as an essential activity.

## a) MANDATORY OFFICIAL GOVERNMENTAL ACTIONS. ISSUED BY A SUPERIOR AUTHORITY.

We restate to Your Honor that the official governmental actions were determined due to the spread of COVID-19, since the Federal Government issued the declaration of a health emergency due to force majeure caused by the disease generated by the SARS-CoV2 virus (COVID- 19), mainly under the following mandatory determinations nationwide:

1. In an extraordinary session held on March 19, 2020, the General Health Council agreed that the epidemic of SARS-CoV2 virus disease (COVID-19) in Mexico is recognized as a serious disease requiring priority attention. In addition, it was mentioned that the Secretariat of Health would establish the required measures for the prevention and control of the SARS-CoV2 virus (COVID-19) pandemic, which would define the specific modalities, start, and end dates, and territorial extension thereof.

2. Through a publication in the Official Gazette of the Federation on March 24, 2020, the Secretary of Health announced the "RESOLUTION establishing the preventive measures that are to be implemented for the mitigation and control of health risks caused by the SARS-CoV2 virus (COVID-19 disease)" which aimed to establish the preventive measures that would be implemented for the mitigation and control of health risks.
*Refer                                              to                                              publication*
*https://www.dof.gob.mx/nota_detalle.php?codigo=5590339&fecha=24/03/2020*

The application of mandatory actions for the public (concession titles), private and social sectors, were as follows:

"SECTION TWO.- The preventive measures that the public, private and social sectors must put in place are the following:
a)    […]

b) Temporarily suspend school activities at all levels, until April 17, 2020, as established by the Secretariat of Public Education;

c) **Temporarily suspend the activities of the public, social and private sectors that involve physical concentrations, transit, or displacement of people from the entry into force of this Resolution and until April 19, 2020.**
The instrumentalities and entities of the Federal Public Administration and the organizations of the social and private sectors must implement plans that guarantee the continuity of operations for the performance of their essential functions related to the mitigation and control of the health risks that the SARS-CoV2 virus (COVID-19 diseases) implies and protect the human rights of workers, in particular those listed in subsection a) of this section, and of the users of its services.

In the public sector, the Heads of the Administration and Finance Departments, their equivalents, or the competent authorities in the institution in question, will determine the essential functions in charge of each institution, which continuity must be ensured in accordance with the previous paragraph.

61

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

**In the private sector, companies, businesses, commercial establishments, and all those that are necessary to deal with the contingency will continue to work, namely,** hospitals, clinics, pharmacies, laboratories, medical services, financial, **telecommunications, and information media,** hotel and restaurant services, gas stations, markets, supermarkets, miscellaneous, transport services and gas distribution, as long as these do not conduct activities in indoor spaces with crowds.

[…]

d) Temporarily suspend and until further notice from the health authority, massive events and meetings and congregations of 100+ persons;

[…]

f) Any others that may be determined by the Secretariat of Health, which will be made known to the population in general, through the head of the Undersecretary of Prevention and Health Promotion.

SECTION THREE.- The instrumentalities and entities of the Federal Public Administration must liaise with the Secretariat of Health for the implementation of the measures subject matter of this Resolution.

3. On March 27, 2020, the President of the Mexican Republic in exercise of his powers vested in him by sections 4, fourth paragraph, 73, subsection XVI, 1st and 3rd parts of the Political Constitution of the United Mexican States; 3rd, subsection XV, 4th, subsection II, 17, subsection IX, 134, subsection II and XIV, 140 and 141 of the General Health Law, and 1 and 9, subsection XVII of the Internal Regulations of the General Health Council, and based on the determination by the Health Council in an extraordinary session held on March 19, 2020 (*recognizing the disease epidemic caused by the referred virus in Mexico as a serious disease of priority attention*) issued the Decree to declare several extraordinary actions in the affected regions of the entire national territory in matters related to general health, as well as to authorize the Secretariat of Health to implement the provisions of section 184 of the General Health Law.

Refer                                              to                                              publication
https://www.dof.gob.mx/nota_detalle.php?codigo=5590673&fecha=27/03/2020

4. On March 30, 2020, the General Health Council published in the Official Gazette of the Federation the Agreement declaring a health emergency due to force majeure, the SARS-CoV2 virus (COVID -19) pandemic, pursuant to sections 4, fourth paragraph, 73, subsection XVI, 1st and 3rd parts of the Political Constitution of the United Mexican States; 3rd, subsection XV, 4th, subsection II, 17, subsection IX, 134, subsection II and XIV, 140 and 141 of the General Health Law, and 1 and 9, subsection XVII of the Internal Regulations of the General Health Council, noting that the Secretariat of Health would be in charge of all the actions that may be necessary to attend said emergency.

Refer            to            the            publication            available            at
https://www.dof.gob.mx/nota_detalle.php?codigo=5590745&fecha=30/03/2020

5.      Likewise, on March 31, 2020, the Secretary of Health issued a Resolution on extraordinary measures to attend to the health emergency due to the force majeure events caused by said virus (published in the same official media outlet), mainly determining as follows:

[…]

II. It was determined that only those businesses considered essential may continue to operate, *inter alia*, those from the fundamental sectors of the economy, such as financial, tax collection, distribution and sale of energy, fuel and gas stations, production and distribution of drinking water, food and non-alcoholic beverage industry, food markets, supermarkets, self-service stores,

*Mrs. Paola Montserrat Jiménez Bolaños* – Expert Interpreter & Translator English – Spanish – Portuguese – French
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

groceries and sale of prepared foods, passenger and cargo transportation services; agricultural, fishing and livestock production, agroindustry, chemical industry, cleaning products, hardware stores, courier services, private security guards, nurseries and childcare centers, nursing homes for the elderly, shelters and care centers for women victims of violence and their children, **telecommunications and media**, private emergency services; funeral and burial services; storage and cold chain services for essential supplies; logistics (airports, ports and railways), as well as activities which suspension may have irreversible effects for their continuation.

Refer to the publication at https://www.dof.gob.mx/nota_detalle.php?codigo=5590914&fecha=31/03/2020

6. Subsequently, on April 21, 2020, the amendment of subsection I of the resolution in point 2 was published in the DOF and the immediate suspension was ordered, from March 30 to May 30, 2020, of non-essential activities, so as to mitigate the spread and transmission of the SARS-CoV2 virus in the community, to reduce the burden of the disease, its complications, and death from COVID-19 in the population residing in the national territory. However, subsections II to VIII were left untouched, i.e., those considered essential have the obligation to continue to operate.

Refer to publication at https://www.dof.gob.mx/nota_detalle.php?codigo=5592067&fecha=21/04/20

7. On May 14, 2020, "RESOLUTION establishing a strategy for the reopening of social, educational and economic activities, as well as a traffic light system by region to assess weekly the epidemiological risk related to the reopening of activities was issued in each state, and extraordinary actions were established."

Refer to the publication available at https://dof.gob.mx/nota_detalle.php?codigo=5593313&fecha=14/05/2020

This resolution determined, among other things, the following:

SECTION TWO.- The strategy consists of the reopening of activities in a gradual, orderly, and cautious manner, considering the following stages:

i) Stage 1.- Begins on May 18, 2020, with the reopening of activities in the municipalities where there have been no cases of COVID-19 and which, in addition, are not close to other municipalities with cases of COVID-19;

ii) Stage 2.- It goes from May 18 to 31, 2020, and consists of carrying out actions of general application aimed at preparing for the reopening of activities in general, such as the preparation of health protocols for a safe restart of activities, training of personnel on safety in the work environment, readjustment of spaces and productive processes, as well as the implementation of entry filters, sanitization and hygiene of the work space, *inter alia*, determined by the Secretariat of Health, in accordance with section Four, second paragraph, of this Resolution, and

iii) Stage 3.- Begins on June 1, 2020, in accordance with the regional traffic light system for the reopening of social, educational, and economic activities.

SECTION THREE.- The traffic light referred to in the First and Second sections and which is incorporated as an Annex hereto, uses colors to determine the appropriate health security measures for work and educational activities and the use of public space, *inter alia*.

63

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

SECTION FOUR.- It establishes as an extraordinary action that the activities of the construction industry, mining and those related to the manufacture of transportation equipment, will be considered essential activities.

The companies dedicated to the activities referred to in the previous paragraph, may resume work on June 1, 2020.

The assessment of official media websites in accordance with the provisions of section 288 of the Code of Civil Procedure of supplementary application to this trial; as well as, to the court opinion entitled and copied below are referred to:

Epoch: Ninth Epoch
Registered by: 168124
Proceeding level: Collegiate Circuit Courts
Court opinion type: Court precedent
Source: Judicial Weekly of the Federation and its Gazette
Volume XXIX, January 2009
Matter(s): Local
Dissertation: XX.2o. J/24
Page: 2470

WELL-KNOWN FACT. IT IS MADE UP OF THE DATA THAT APPEARS ON THE OFFICIAL WEB PAGES THAT THE GOVERNMENT INSTRUMENTALITIES USE TO MAKE AVAILABLE TO THE PUBLIC, AMONG OTHER SERVICES, THE DESCRIPTION OF THEIR PLACES, THE DIRECTORY OF THEIR EMPLOYEES OR THE STATUS OF THEIR RECORDS; THEREFORE , IT IS VALID TO RESORT TO THEM OFFICIALLY TO RESOLVE A PARTICULAR MATTER. The data on the official websites used by the government bodies and made available to the public, among other services, the description of their positions, the directory of their employees or the status of their files, constitute a well-known fact that may be resorted to by the courts, pursuant to section 88 of the Federal Code of Civil Procedure, of supplementary application to the Amparo Law; as the information generated or communicated in this way is part of the global system for disseminating and obtaining data called the "Internet", from which it is possible to obtain, for example, the name of a public servant, the organizational chart of an institution, as well as the meaning of its resolutions; hence, it is valid for the jurisdictional bodies to resort, at their own initiative, what has been published in that media outlet to resolve a particular matter.

SECOND COLLEGIATE COURT OF THE TWENTIETH CIRCUIT.

Direct Amparo 816/2006. June 13, 2007. Unanimous vote. Proposing justice: Carlos Arteaga Álvarez. Secretary: Jorge Alberto Camacho Pérez.

Direct Amparo 77/2008. October 10, 2008. Unanimous vote. Proposing justice: Carlos Arteaga Álvarez. Secretary: José Martín Lázaro Vázquez.

Direct Amparo 74/2008. October 10, 2008. Unanimous vote. Proposing justice: Carlos Arteaga Álvarez. Secretary: Jorge Alberto Camacho Pérez.

Direct Amparo 355/2008. October 16, 2008. Unanimous vote. Proposing justice: Antonio Artemio Maldonado Cruz, court clerk authorized by the Judicial Career Commission of the Federal Judiciary Council to serve as Justice. Secretary: Rolando Meza Camacho.

*Mrs. Paola Montserrat Jiménez Bolaños* – Expert Interpreter & Translator English – Spanish – Portuguese – French
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

8. According to what was published by the Secretariat of Health and according to the traffic light by region, the return of non-essential activities was gradual from the orange traffic light "Public space" with reduced capacity in public space activities in open places and " General economic activities" related to work activities considered essential and non-essential activities with a reduced operation, but the essential ones worked 100%, as is the case of my client that continued to operate and provide its concession television and radio broadcasting services and under the minimum protection considerations for its personnel because functionality was privileged, and not the health of workers.

9. As of July 1, 2020, non-essential activities resumed their operations reduced to 30%, in compliance with the provisions of the "Guidelines for the Implementation of the Gradual Plan towards the new normal in Mexico City" issued by the Head of Government and published on May 29, 2020, in the Official Gazette of Mexico City.
Refer              to              the              publication              available              at
https://medidassanitarias.covid19.cdmx.gob.mx/dHome/medidas_sanitarias/GACETAOFICIALC
IUDADDEMEXICO_290520.pdf

With the above narrative, it is proven that the referred actions were issued based on the provisions of the Political Constitution of the United Mexican States, which establishes that every person has the right to health protection and that the person in charge of ensuring that right is the General Health Council, created as an authority directly reliant on the President of the Republic and that its general provisions (such as the agreements listed above) are mandatory in the country.

The Federal Constitution itself provides that the health authority to lead said actions and that its provisions must be observed by the administrative authorities of the country.[6].

Accordingly, the resolutions issued by the General Health Council and the Secretary of Health are mandatory for all citizens of the Mexican Republic, regardless of any contractual will, i.e., the official governmental actions that constitute a force majeure event come from the Supreme Law of our country and its performance is under the supra subordination there is between an authority and its citizens.

Pursuant to the General Health Law, the Secretariat of Health is responsible for preparing and carrying out, in coordination with the institutions of the health sector and with the state governments, programs or temporary or permanent campaigns, for the control or eradication of those communicable diseases that constitute a real or potential problem for the general health of the Republic, including the outbreak of the SARS-CoV2 virus (COVID-19) in the national territory.

Said ordinance provides for that, in cases of serious epidemics, danger of invasion of communicable diseases, emergency situations or catastrophes that affect the country, the instrumentality referred to in the previous paragraph shall immediately dictate the necessary measures to prevent and combat damage to health, subject to such measures which will be later sanctioned by the President of the Republic.

The National Development Plan 2019-2024, item II, "Health for the entire population", states that the right to health protection cannot be partially or totally denied, especially to the most unprotected sectors of the Mexican population.

---

[6] For further reference, said section is transcribed in the footer above.

65

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

Page 66

Furthermore, it is important to remember that our legal system regulates that:

1.      The General Health Law generally observed throughout the Republic, as its provisions are related to public order and social interest.

2.      The standard recognizes the Secretariat of Health as a health authority with powers to take ordinary and extraordinary measures in the event of pandemics and serious illnesses.

3.      The Secretariat of Health has full power to dictate extraordinary measures in urgent cases, such as combating and mitigating the COVID-19 pandemic.

The ordinary and extraordinary measures adopted by the Secretary of Health established that so as to attend to the health emergency due to force majeure caused by the SARS-CoV2 virus, it was mandatory to continue operating essential activities, such as the case of telecommunications and media service and, in the case of non-essential activities (as is the case of input suppliers or the supply chain), the health authority ordered the suspension of the activities of those non-essential services and their return was determined gradually, with a reduction in its influx of workers and consumer clients, causing a delay in the ordinary resume of activities that implicitly impact on the activities of my client.

Now, I draw Your Honor's attention to the fact that the implementation of the operation without suspension of the activities deemed essential was in full compliance with an order from the health authority, confirmed by the Federal Telecommunications Institute itself, expressing in its communications that "in the face of the contingency that is registered in our country due to the Coronavirus pandemic (COVID19), and taking into consideration what is established by the health authorities of the Federal Government and what is specified by the Government of Mexico City in the Gradual Plan towards the New Normal in Mexico City, the Plenary of the Federal Telecommunications Institute (IFT) agreed to extend the suspension of face-to-face activities, to June 30, 2020, with the intention of preserving the safety of its human capital and contributing to preventive measures of social distancing."

And that, "due to force majeure events, the first Resolution to suspend face-to-face work was issued on March 27 of this year, the Institute **will continue working to ensure compliance with its constitutional mandate to monitor the continuity and quality of telecommunications and broadcasting services for the benefit of all users and audiences in Mexico."**

That is, the Secretariat of Health since it established the preventive measures that were implemented to mitigate and control the health risks that the SARS-CoV2 virus disease (COVID-19) implies; forced my client to continue operating as an essential activity but without determining a specific treatment to mitigate its own effects of the pandemic and those caused by not having the operations from its clients that were classified as non-essential, for suspending work, which caused, since the beginning of the pandemic and to this day, instability in the face of these provisions.

For this reason, before said mandatory measure for TV Azteca, S.A.B. de C.V. saw the need to deal with a concessioned public service and not suspend operating activities but commercial activities, without expressing its will but by order of a sanitary provision, since it expressly stated that telecommunications operations should continue to run and media, hence the legal and material impossibility of continuing to operate ordinarily without considering that for my client the

*Mrs. Paola Montserrat Jiménez Bolaños* – Expert Interpreter & Translator English – Spanish – Portuguese – French
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

act of God and force majeure event decreed by the Federal Government and Mexico City took place.

Continuing to operate in the face of an emergency situation such as this, mainly caused damages that are impossible to repair that transgress the legal sphere of my client before its creditors, for the performance of contractual obligations, agreed upon before the pandemic was declared.

This impact consists mainly of:

| ESSENTIAL ACTIVITIES | NON-ESSENTIAL ACTIVITIES |
|---|---|
| My client was forced to continue with its activities, pursuant to telecommunications and media, in compliance with the mandatory acts by the health authority. | Decrease in income of the companies that were forced not to operate due to the total suspension and the gradual return to the insertion of a reduced modality, i.e., those that had been carrying out non-essential activities due to the health contingency were suspended, causing a lack of control in the flow of supplies and a negative impact on the essential ones |
| No special treatment was established to cover, at the operational level, its activities in the face of a declaration of health emergency due to a force majeure event caused by the COVID-19 pandemic that put its workers at risk. | No procedure, treatment or regulation was specified to consider and classify the companies that are truly essential in the flow of the commercial chain, i.e., input suppliers. |
| Companies with essential lines of business and public services under concession did not have benefits and/or prerogatives in the imposition of extraordinary measures for economic and financial support. | Reduction of non-essential services that are listed in the accounts of consumer clients of essential companies, i.e., the reasonableness criterion was not established for companies to adjust to the needs of the health emergency. |

A clear example of the non-essential activities that had repercussions on the economy of my client are advertising expenses. In the case of television, it can be seen that advertising spending has been reduced in recent years, both internationally and in Mexico. In Mexico, the share of spending on television advertising fell by 8 percentage points between 2017 and 2020. However, this drop has persisted since 2010 and the decrease has accelerated with the pandemic.

That is, the pandemic in the case of television,[7] accelerated a reduction in spending for advertising carried out in this media outlet, since it has been reduced in recent years both internationally and in Mexico. The graph shows that from 2017 to 2018 there was a drastic drop of 5 percentage points in television advertising spending compared to spending on other media outlets, a drop that continued until 2019. Although a slight increase is observed in 2020, it is still far from reaching pre-2017 levels and, given the growth of digital services, it seems unlikely that it will recover those levels.

---

[7] It includes FTA and paid television.

67

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx



*Graph . Share of advertising spending on television.*



Source: Study Value Total Media, Mexico 2021 of IAB.

It is evident that the COVID-19 outbreak  accelerated the digitization process, as it will be briefly described later, so it is estimated that the downward trend in audience and advertising revenue will continue, meaning that even though the advertising spending has not been as severe as the transformation to digital platforms.

Accordingly, the act of God and force majeure event that took  place for my client to perform its obligations, has not only been caused by the declaration of the COVID-19 pandemic and the acts imposed by the Federal Government and the health authorities federal and local authorities, but also because of the acceleration that said event caused in the development of new information and content transmission technologies, such as the Internet, which has increased the channels through which content is delivered to the audiences and with this the emergence of new business models, which were largely influenced by the mobility and affluence of the  population.

That precisely in contrast to the situation that my client is experiencing, advertising spending on digital media in Mexico has increased significantly, going from accounting for 27.4% of total investment in 2017 to accounting for 48.9% in 2020. It is relevant that it is the only media hub that showed an increase in the amount of advertising carried out during the first year of the COVID-19 pandemic, which may be an indication of a reallocation of spending derived from the increase in the consumption of digital media.

This situation puts broadcasters at financial risk, since the drop in their income hinders their operation and, ultimately, has an impact on the content they broadcast. In this way, the fall in broadcasters' income has important implications for low-income people, since it is mainly these who only have access to this means of communication.

The above statements are proven with the detailed study developed by GAMES Economics at the request of my client, entitled "Recent performance of the broadcasting sector" dated August 2022, attached hereto.

68

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx

### b) Violation of the Principle of Weighing Human Rights

In this short chapter, I draw the attention of Your Honor to recognize that an act of God and force majeure event took place by virtue of the fact that my client, as well as multiple other companies, that were classified as essential to face the Covid-19 outbreak and especially to those aimed at telecommunications and the media, were affected by these events because so as to privilege the health of the population, the sector that was already vulnerable due to technological changes was violated.

In other words, my client has not only been affected as it had to continue to operate at 100% since the beginning of the declaration of emergency, in compliance with the decree of the health authority under unimplemented and circumstantial conditions according to eventualities, but also, over the past decade, the communications industry and the transmission of audiovisual content have faced an important technological change as a result of innovations. In particular, digital convergence has blurred the line between the different media that offer analog and digital content through a variety of channels, such as broadcast television, cable, satellite, the Internet and over-the-top (OTT) digital platforms.

New technologies and the digital economy have led to the emergence of technological platforms that have become large digital conglomerates; for example, Google owns YouTube, while Amazon Inc. offers a variety of digital services including online commerce (Amazon), streaming of on-demand audiovisual content (Prime Video), streaming of audio content, music, and podcasts, through Amazon Music, in addition to its gaming platform (Amazon Games). Despite the efficiencies these platforms offer to users and the productive sector as a result of innovation and the new service offer, their emergence and evolution has been accompanied by regulatory asymmetries that confront them with linear television broadcasters and that have contributed to reduce the significance and consumption of the past

Accordingly, the media sector was mainly affected by the obligation to abide by the resolutions issued by the General Health Council and the Secretariat of Health that constitute a force majeure event that totally prevented my client to perform its obligations, as it prioritized health over the vulnerability of the sector.

In Mexico, as we stated above, the actions taken by the Executive Branch to mitigate and control the SARS-CoV2 (COVID-19) pandemic were considered to protect the population's right to health as a guiding principle for any other private interest, pursuant to the following:

International Covenant on Economic, Social and Cultural Rights
Adopted and open for signature, ratification, and adherence by the General Assembly in its resolution 2200 A (XXI), dated December 16, 1966
Effective date: January 03, 1976
[…]
Section 12
1. The States Parties to this Covenant recognize the right of everyone to the enjoyment of the highest attainable standard of physical and mental health.

2. Among the measures that the States Parties to the Covenant must adopt so as to ensure the full realization of this right, will include those necessary to:

*Mrs. Paola Montserrat Jiménez Bolaños* – **Expert Interpreter & Translator English – Spanish – Portuguese - French**
contacto@languagesolutions.com.mx – Tel: (+52)(1) 8488-4728 – Mobile: (+52)(1) 55 3916-0805
www.languagesolutions.com.mx