**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

........................................................ x
                                                     :

In re:                                          :    Chapter 11
                                               :

TV Azteca, S.A.B. de C.V.,          :    Case No. 23-10385 (LGB)
                                               :

              Alleged Debtors.[1]       :    (Jointly Administered)
                                               :

........................................................ x

**MEMORANDUM OF LAW IN SUPPORT OF THE ALLEGED DEBTORS'**
**MOTION TO DISMISS THE INVOLUNTARY CHAPTER 11 PETITIONS**

---

[1]    The Alleged Debtors are:  TV Azteca, S.A.B. de C.V. ("TVA"); Alta Empresa, S.A. de C.V.; Asesoría Especializada En Aviación, S.A. de C.V.; Equipo de Futbol Mazatlan, S.A. de C.V.; Producciones Dopamina, S.A. de C.V.; Azteca Records, S.A. de C.V.; Ganador Azteca, S.A.P.I. de C.V.; Operadora Mexicana De Televisión, S.A. de C.V.; Azteca Sports Rights LLC; Producciones Azteca Digital, S.A. de C.V.; Producciones Especializadas, S.A. de C.V.; Productora De Televisión Regional De TV Azteca, S.A. de C.V.; Promotora de Futbol Rojinegros, S.A. de C.V.; Mazatlan Promotora de Futbol, S.A. de C.V.; Publicidad Especializada en Medios de Comunicación de TV Azteca, S.A. de C.V.; S.C.I. de México, S.A. de C.V.; Servicios Aéreos Noticiosos, S.A. de C.V.; Servicios Especializados Taz, S.A. de C.V.; Servicios y Mantenimiento del Futuro en Televisión, S.A. de C.V.; Corporación de Asesoría Técnica y de Producción, S.A. de C.V.; Editorial Mandarina, S.A. de C.V.; Multimedia, Espectáculos y Atracciones, S.A. de C.V.; Servicios Foráneos de Administración, S.A. de C.V.; Servicios Locales De Producción, S.A. de C.V.; Azteca International Corporation; Stations Group, LLC; TV Azteca Honduras, S.A. de C.V; Comercializadora de Televisión de Honduras, S.A. de C.V.; Incotel S.A.; TVA Guatemala S.A; Lasimex, S.A. de C.V.; TV Azteca Global, S.L.U.; Azteca Comunicaciones Perú, S.A.C.; Redes Opticas, S.A.C; Televisora del Valle de México, S.A. de C.V.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ....................................................................................................................... 6

    A.    The Alleged Debtors' Assets and Operations ......................................................... 6

    B.    The Alleged Debtors' Regulation by the Mexican Government ............................ 9

    C.    The Alleged Debtors' Other Creditors.................................................................... 9

    D.    The Notes Held by the Petitioning Creditors ....................................................... 11

    E.    Prior Litigation by the Petitioning Creditors ....................................................... 13

    F.    The Involuntary Chapter 11 Petition & Petitioners .............................................. 15

ARGUMENT .......................................................................................................................... 17

I.    The Involuntary Petitions Should Be Dismissed Pursuant to Section 305(a)(1) of
the Bankruptcy Code or, Alternatively, on *Forum Non Conveniens* Grounds ................. 17

    A.    Dismissal Is Warranted Under Section 305(a)(1). ............................................... 19

    B.    Forum Non Conveniens Also Supports Dismissal of the Involuntary
Petitions................................................................................................................ 24

        1.    Mexico Is an Available Forum, and the Petitioning Creditors'
Choice of this New York Forum Is Owed No Deference. ........................ 24

        2.    The Private and Public Interest Factors Support Dismissal..................... 29

II.    The Involuntary Petitions Should Be Dismissed Because the Petitioning Creditors
Lack Standing to Pursue Them and the Petitions Were Filed for an Improper
Purpose.................................................................................................................................. 31

    A.    The Petitioning Creditors Lack Standing to File Involuntary Petitions
Under Section 303(b)(1) of the Bankruptcy Code. .............................................. 31

    B.    The Court Should Dismiss the Involuntary Petitions for Cause Pursuant to
Section 1112(b) of the Bankruptcy Code............................................................. 35

CONCLUSION....................................................................................................................... 37

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*3C Assocs.* v. *IC & LP Realty Co.*,
    524 N.Y.S.2d 701 (Sup. Ct. 1988) .......................................................................34

*Aenergy, S.A.* v. *Republic of Angola*,
    31 F.4th 119 (2d Cir. 2022) .......................................................................29, 30

*In re AMC Realty Corp.*,
    270 B.R. 132 (Bankr. S.D.N.Y. 2001) .................................................................35

*In re Aminian*,
    No. 07-12957 (AJG), 2008 WL 793574 (Bankr. S.D.N.Y. Mar. 25, 2008) ...........................32

*In re Bancredit Cayman Ltd.*,
    2008 WL 5396618 (Bankr. S.D.N.Y., Nov. 25, 2008) ..........................................27

*In re Bd. of Dirs. of Multicanal S.A.*,
    314 B.R. 486 (Bankr. S.D.N.Y. 2004) ..............................................18, 19, 21, 30

*State Dep't of Revenue* v. *Blixseth*,
    942 F.3d 1185 (9th Cir. 2019) ...........................................................................32

*In re Bos*,
    561 B.R. 868 (Bankr. N.D. Fla. 2016) ................................................................37

*In re C-TC 9th Ave. P'ship*,
    113 F.3d 1304 (2d Cir. 1997) ...........................................................................35

*In re Certa Dose, Inc.*,
    2021 WL 5177376 (Bankr. S.D.N.Y. 2021) ........................................................28

*In re Compania de Alimentos Fargo, S.A.*,
    376 B.R. 427 (Bankr. S.D.N.Y. 2007) ..............................................22, 23, 26, 28

*In re Compania Mexicana de Aviacion, S.A. de C.V.*,
    Case No. 10-14182 (MG), 2010 WL 10063842 (Bankr. S.D.N.Y. Nov. 8,
    2010) .......................................................................................................25

*In re Cozumel Caribe, S.A. de C.V.*,
    482 B.R. 96 (Bankr. S.D.N.Y. 2012) .................................................................25

*Credit Union Liquidity Servs., L.L.C.* v. *Green Hills Dev. Co., L.L.C. (In re Green*
    *Hills Dev. Co., L.L.C.)*,
    741 F.3d 651 (5th Cir. 2014) .............................................................................33

ii

*In re Euro-American Lodging Corp.*,
   357 B.R. 700 (Bankr. S.D.N.Y. 2007) ............................................................32, 35

*Fustolo* v. *50 Thomas Patton Drive, LLC*,
   816 F.3d 1 (1st Cir. 2016) ...................................................................................32

*George H. Nutman, Inc.* v. *Aetna Bus. Credit, Inc.*,
   453 N.Y.S.2d 586 (Sup. Ct. 1982) .....................................................................34

*In re Globo Comunicacoese Participacoes S.A.*,
   317 B.R. 235, 252 (S.D.N.Y. 2004) ..............................................................22, 28

*Grogan* v. *Garner*,
   498 U.S. 279 (1991) ...........................................................................................36

*In re Int'l Admin. Servs., Inc.*,
   211 B.R. 88 (Bankr. M.D. Fla. 1997) ...............................................................22

*Iragorri* v. *United Technologies Corp.*,
   274 F.3d 65 (2d Cir. 2001) (en banc) .......................................................25, 26, 27

*JP Morgan Chase Bank* v. *Altos Hornos de Mexico, S.A. de C.V.*,
   412 F.3d 418 (2d Cir. 2005) ...............................................................................26

*Kingstown Cap. Mgmt., L.P.* v. *Vitek*,
   2020 WL 5350492 (S.D.N.Y. Sept. 4, 2020) .....................................................23

*In re Koffee Kup Bakery, Inc.*,
   No. 21-10168, 2022 WL 141516 (Bankr. D. Vt. Jan. 14, 2022) .........................35

*In re Maddigan*,
   312 F.3d 589 (2d Cir. 2002) ...............................................................................37

*In re Metrofinanciera, S.A.P.I. de C.V.*,
   No. 10-20666, 2010 WL 10063949 (Bankr. S.D. Tex. Sept. 24, 2010) ...............25

*In re Mountain Dairies, Inc.*,
   372 B.R. 623 (Bankr. S.D.N.Y. 2007) ..........................................19, 24, 32, 35

*Matter of MPM Silicones, L.L.C.*,
   874 F.3d 787 (2d Cir. 2017) ........................................................................5, 32, 34

*In re Murray*,
   543 B.R. 484 (Bankr. S.D.N.Y. 2016), *aff'd*, 565 B.R. 527 (S.D.N.Y. 2017),
   *aff'd*, 900 F.3d 53 (2d Cir. 2018) .......................................................6, 35, 36, 37

*In re Navient Sol. LLC*,
   2022 WL 863409 (S.D.N.Y. Mar. 23, 2022) .....................................................33

*In re Navient Sols., LLC*,
　625 B.R. 801 (Bankr. S.D.N.Y. 2021), *aff'd*, 2022 WL 863409 (S.D.N.Y. Mar.
　23, 2022), *reconsideration denied*, 2022 WL 1500771 (S.D.N.Y. May 12,
　2022) ...................................................................................................18, 23, 32, 33

*Northwestern Mut. Life Ins. Co.* v. *Uniondale Realty Assocs.*,
　816 N.Y.S.2d 831 (Sup. Ct. Feb. 3, 2006) ...............................................................34

*In re Orlinsky*,
　No. 06-15417-BKC-RAM, 2007 WL 1240207 (Bankr. S.D. Fla. Apr. 24,
　2007) ...........................................................................................................................33

*In re Persico Cont. & Trucking, Inc.*,
　2010 WL 3766555 (Bankr. S.D.N.Y. Aug. 20, 2010) ........................................24, 32

*Piper Aircraft Co.* v. *Reyno*,
　454 U.S. 235 (1981) ....................................................................................................26

*Pollux Holding Ltd.* v. *Chase Manhattan Bank*,
　329 F.3d 64 (2d Cir. 2003) ..........................................................................................25

*In re Ski Train in Kaprun Austria on Nov. 11, 2000*,
　499 F. Supp. 2d 437 (S.D.N.Y. 2007) .........................................................................27

*In re Spanish Cay Co., Ltd.*,
　161 B.R. 715 (Bankr. S.D. Fla. 1993) ..........................................................20, 22, 29, 30

*In re Taberna Preferred Funding IV, Ltd.*,
　594 B.R. 576 (Bankr. S.D.N.Y. 2018) ..................................................................36, 38

*The Bank of New York Mellon* v. *TV Azteca S.A.B. de C.V. et al.*,
　Index. No. 653101/2022 (N.Y. Sup. Ct., N.Y. County Aug. 26, 2022)....................34

*The Bank of New York Mellon* v. *TV Azteca, S.A.B. de C.V.*,
　No. 1:22-cv-08164-PGG (S.D.N.Y. Oct. 14, 2022) ............................................34, 35

*In re The Bridge to Life, Inc.*,
　330 B.R. 351 (Bankr. E.D.N.Y. 2005) ........................................................................36

*In re TPG Troy, LLC*,
　793 F.3d 228 (2d Cir. 2015) ........................................................................................33

*Petition of Trevor*,
　1992 WL 391289 (Bankr. S.D.N.Y. Dec. 10, 1992) ...................................................23

*In re Xacur*,
　219 B.R. 956 (Bankr. S.D. Tex. 1998) ..........................................................20, 22, 26, 30

**Statutes**

11 U.S.C. § 105 ................................................................................................................1

11 U.S.C. § 303(b)(1) .....................................................................................................1

11 U.S.C. § 305(a)(1) ......................................................................................................1

11 U.S.C. § 1112(b) .........................................................................................................1

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No.
109–8, §§ 1234(a)(1)(A) and (a)(12), 119 Stat. 23 ..................................................32

**Other Authorities**

Fed. R. Bankr. P. 1011(b) .........................................................................................1, 38

Fed. R. Bankr. P. 1017 .....................................................................................................1

Fed. R. Bankr. P. 1018 .....................................................................................................1

Fed. R. Civ. P. 12(b)(6)...............................................................................................1, 38

The Alleged Debtors, by and through their undersigned counsel, hereby submit this memorandum of law in support of their Motion to Dismiss the Involuntary Chapter 11 Petitions filed by Plenisfer Investments SICAV – Destination Value Total Return, Cyrus Opportunities Master Fund II, Ltd., and Sandpiper Limited (the "Petitioning Creditors"), pursuant to 11 U.S.C. §§ 105, 303(b)(1), 305(a)(1), 1112(b), the doctrine of *forum non conveniens*, Rule 12(b)(6) of the Federal Rules of Civil Procedure, and Rules 1011(b), 1017, and 1018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## PRELIMINARY STATEMENT

1.      TVA and its subsidiaries cannot be restructured in an involuntary chapter 11 case in a United States bankruptcy court.  The Alleged Debtors produce broadcast television and Spanish-language programming in Mexico, where they are headquartered and have over 3,500 employees.  Substantially all of the Alleged Debtors' operations, assets, liabilities, creditors, and other parties-in-interest are in Mexico, and their business is closely tied to and dependent upon licenses (called "concessions") from the Mexican government, which regulates its core business. The assets around which any restructuring would necessarily occur are in Mexico, which will pose an insurmountable obstacle to a successful reorganization here.  Under Mexican law, a chapter 11 case for TVA will not be recognized, so there will be no way for this Court to enforce its orders against any creditors or property in Mexico.  In practical effect, without the consent of all affected parties-in-interest in Mexico, a restructuring of TVA is only possible in Mexico, under the supervision of Mexican courts, with the cooperation of the Mexican government, in accordance with Mexican restructuring law.  There is no reason for these proceedings to commence here— Mexican restructuring law permits an involuntary proceeding to be initiated by the Petitioning Creditors in Mexico, which would be necessary for any reorganization to occur.

1

2.       If the chapter 11 cases proceed here, they will serve only to harm the Alleged

Debtors and their creditors.  That result should be avoided by dismissing them at the pleading stage

pursuant to Section 305(a)(1) of the Bankruptcy Code.  A successful restructuring would require

Mexican courts to give domestic effect to this Court's orders, but Mexican courts cannot do so

under Mexican law.  As the former General Director of the *Instituto Federal de Especialistas de*

*Concursos Mercantiles* ("IFECOM"), Luis Manuel C. Méjan explains in his declaration in support

of this motion (the "Méjan Declaration"), as a matter of Mexican law, an in-court reorganization

of TVA's businesses in Mexico can only take place in a *Concurso Mercantil*, pursuant to

the *Concurso* law ("*Leys de Concursos Mercantiles*," or "LCM").  Because TVA is a Mexican

company with its "center of main interests" in Mexico, and it has no employees or operations in

the United States, a chapter 11 case cannot function as a foreign "main" or foreign "non-main"

proceeding under the LCM, and will not be recognized in Mexico.  Even if those hurdles could be

overcome—and they cannot—Mexican law also requires that any attempt to recognize a foreign

proceeding for a company that has a business establishment in Mexico—which TVA clearly

does—requires the initiation of a *Concurso*.  There is nothing preventing the Petitioning Creditors

from pursuing that now under Mexican law.  A *Concurso* would render this chapter 11 proceeding

either duplicative or superfluous, and it would serve little point to go through the time, expense

and effort of a chapter 11 case only to have the Mexican courts essentially begin the process anew.

3.       For similar reasons, the petitions should be dismissed on *forum non conveniens*

grounds.  Mexico is not merely an adequate "alternative" forum for these cases, it is a ***necessary***

forum, and the ***only*** forum in which an in-court reorganization of the Alleged Debtors can be

accomplished.  The LCM, like the Bankruptcy Code, provides procedures for commencing a

*Concurso*, including by filing an involuntary petition.  The LCM also provides specific rules for

an in-court reorganization involving a concession-owner, such as TVA, which include a special

role for the Mexican governmental authority that granted the concessions at issue.  In this case, the

*Instituto Federal de Telecomunicaciones* ("IFT"), as the authority that granted TVA the

concessions, would have special rights that can be exercised within a *Concurso*.  All of this

confirms that Mexico is a ***necessary*** forum for any in-court reorganization of TVA.

4.      The vast majority of parties-in-interest are in Mexico, the property around which

restructuring must take place is there, and the Alleged Debtors' relationships with creditors,

employees, and the Mexican government are largely governed by Mexican law.  Furthermore, the

creditors of TVA include the Mexican government through the Tax Administration Service

(*Servicio de Administración Tributaria,* or "SAT").

5.      Courts routinely recognize Mexico as a fundamentally fair forum for both litigation

and insolvency proceedings, and there is an extensive body of law in Mexico to enforce creditor

rights, issue preemptive measures akin to the protections afforded by the automatic stay, void

unlawful pre-petition transfers, and distribute value in accordance with parties' priority under the

supervision of a *Concurso* court.  Mexico also has a substantial interest in a restructuring of TVA,

including the protection of its rights in a *Concurso* regarding a concession-owner such as TVA

and its claims as a creditor of TVA.  Unlike a chapter 11 court, there is no question that a Mexican

*Concurso* court would have the ability to enforce its own orders against the Alleged Debtors and

others in Mexico.

6.      The fact that the Indenture relating to the 2024 Notes (each as defined below)

purportedly owned by the Petitioning Creditors contains a forum selection clause requiring

litigation in New York does not compel a different result.  The forum selection clause in the

Indenture for the 8.250% Senior Notes Due 2024, dated August 9, 2017 (the "Indenture") governs

3

bilateral actions between holders of the 2024 Notes (the "Noteholders") and the Alleged Debtors, but does not confer any jurisdiction on New York courts to effect a reorganization of the Alleged Debtors, much less require Mexican creditors to participate in a chapter 11. Indeed, the Offering Circular that accompanied the 2024 Notes (the "Offering Circular") listed as a "Risk[] Related to the Notes" that, if TVA became bankrupt, the Noteholders' recovery could be decided in a *Concurso Mercantil* under Mexican bankruptcy law—a proceeding that could produce an uncertain outcome for the Noteholders. (Clareman Decl. Ex. O at ¶ 26–27.) There is nothing in the 2024 Notes, the Indenture, or the Offering Circular to suggest that TVA consented to an involuntary chapter 11 case here.

7.      In reality, these Involuntary Petitions were not filed to restructure TVA's balance sheet, or give the Alleged Debtors a fresh start. If that were the goal, the Petitioning Creditors would have pursued an involuntary *Concurso* in Mexico. Instead, these petitions were filed as a means of advancing claims that were already the subject of litigation between the Petitioning Creditors and others associated with them, in the United States and in Mexico, in which the Petitioning Creditors seek payment of an allegedly accelerated debt that TVA disputes. That is not a proper purpose for a chapter 11 case, and is grounds for dismissal for two additional reasons.

8.      *First,* the litigation regarding the Alleged Debtors' liability is a threshold, facial deficiency in the petitions, and renders the Petitioning Creditors ineligible to commence these involuntary cases. Under Section 303(b)(1) of the Bankruptcy Code, a creditor may only commence an involuntary case if that creditor's claim is "not contingent as to liability or the subject of a bona fide dispute as to liability **or** amount." (emphasis added). The acceleration notice sent by the Indenture Trustee (as defined below)—at the direction of the Petitioning Creditors and other Noteholders—and the litigation to enforce that notice is the subject of a bona fide dispute: the

Indenture Trustee seeks payment of an amount that includes a "redemption premium" that the bondholders claim they are owed because the acceleration constitutes a prepayment that triggers such a premium. The Alleged Debtors—all defendants in the Indenture Trustee's lawsuit—dispute that acceleration constitutes a voluntary prepayment, which is a contractual prerequisite to liability for the redemption premium. The Alleged Debtors' position, unlike that of the Petitioning Creditors, is supported both by the language of the Indenture and applicable case law. *See, e.g.*, *Matter of MPM Silicones, L.L.C.*, 874 F.3d 787, 802–03 (2d Cir. 2017) ("payment made mandatory by operation of an automatic acceleration clause is not one made at [debtor's] option" and thus does not trigger a redemption premium). That contractual dispute is currently *sub judice* before Judge Gardephe in the District Court for the Southern District of New York, in a case that has been stayed by these proceedings. The Petitioning Creditors' claims against the Alleged Debtors include the disputed premium, which Section 303(b)(1) forbids.

9.     *Second*, not only does the dispute over the redemption premium defeat the Petitioning Creditors' standing to bring these involuntary cases, the Involuntary Petitions should be dismissed for "cause" under Section 1112(b) for the additional reason that they were improperly filed as tactical maneuver in connection with that dispute. By the Petitioning Creditors' own account, the Involuntary Petitions were **not** filed to restructure the Alleged Debtors, but to seek "oversight" over and "intervention" into litigation the Alleged Debtors filed in Mexico, and create "a forum for a global resolution of the multiple actions involving multiple parties across multiple countries."[2] The only "actions" and "parties" and "countries" being referred to are litigations by and against the Indenture Trustee and Noteholders in the United States and Mexico. The

---

[2]    Statement Of The Petitioning Creditors In Support Of The Involuntary Chapter 11 Petition Against TV Azteca and Its Debtor Affiliates, ECF No. 8, ¶ 4.

Involuntary Petitions were filed in an attempt to move those disputes into a forum the Petitioning Creditors prefer, and to use this Court as an "avenue by which the Noteholders may recover payment of the amounts owed." (*Id.*)

10.     Involuntary petitions under chapter 11 of the Bankruptcy Code are not appropriately used as a "tactic in a two-party dispute," or as a debt-collection mechanism. *See In re Murray*, 543 B.R. 484, 486 (Bankr. S.D.N.Y. 2016), *aff'd*, 565 B.R. 527 (S.D.N.Y. 2017), *aff'd*, 900 F.3d 53 (2d Cir. 2018). Judge Gardephe's courtroom is an appropriate forum to determine the amount of the Petitioning Creditors' claims, and to pursue a judgment. If a judgment is won, the Indenture Trustee can seek to enforce the judgment in the United States and in Mexico. But it is not a proper purpose for a chapter 11 case to fast track that process for the Noteholders. The purpose of chapter 11 is to propose and obtain creditor approval for a restructuring plan that allows the debtor to emerge as a going concern. There is no pretense of pursuing that goal here.

11.     For these and others reasons set forth below, the Involuntary Petitions should be dismissed.

## **BACKGROUND**

### A.     **The Alleged Debtors' Assets and Operations**

12.     The Alleged Debtors own closely-regulated telecommunications assets in Mexico (plus Honduras and Guatemala) and derive substantially all of their revenue from their television and related operations in Mexico. The Alleged Debtors have no substantial assets, operations, or employees in the United States. (Rodríguez Decl. ¶ 15.) Nearly all of the Alleged Debtors' creditors—including their critical vendors—are also in Mexico. (Rodríguez Decl. ¶ 21–26.) The majority of its equity is held by an investor group led by Ricardo B. Salinas Pliego, a citizen of Mexico. (Rodríguez Decl. ¶ 3.) A minority of TVA's equity is publicly traded on Mexican and

Spanish Stock Exchanges.  (Rodríguez Decl. ¶ 3.)  None of TVA's equity or debt is publicly traded on any U.S. exchange or otherwise regulated in the United States.  (Rodríguez Decl. ¶ 3.)

13.    TVA's television stations are an integral part of daily life for tens of millions of viewers in Mexico.  In addition to the two national stations, TVA's programming is broadcast through a network of hundreds of local television stations throughout Mexico.  (Rodríguez Decl. ¶ 7.)  TVA's programming runs the full range from news to entertainment.  It is a source of popular entertainment, as well as an essential source of daily local news, sports, and weather to millions of people in Mexico.  (Rodríguez Decl. ¶ 7.)

14.    On a consolidated basis in 2022, the Alleged Debtors derived more than 94% (US$791 million) of their annual revenues from their operations in Mexico.  (Rodríguez Decl. ¶ 9.)  The vast majority of TVA's programming content is produced for the Mexican broadcast business, and is created in Mexico.  (Rodríguez Decl. ¶ 5.)  Most of TVA's revenues come from advertising, product placement, and infomercials (together, roughly 80% of revenue), and are therefore dependent on its television broadcast business in Mexico.  (Rodríguez Decl. ¶ 5.)

15.    TVA has fifty direct or indirect subsidiaries, thirty-four of which are Alleged Debtors.  (Rodríguez Decl. Ex. A.)  The Petitioning Creditors selected the Alleged Debtors because they are obligors (TVA as issuer, and the rest as guarantors) under the Indenture.  Twenty-four of the thirty-four Alleged Debtors (including TVA) are incorporated in Mexico.  (Rodríguez Decl. Ex. A.)  Seven more are incorporated and/or have headquarters in Honduras, Guatemala, Peru, and Spain.  (*Id.*)  Only three Alleged Debtor entities—Azteca International Corporation, Stations Group, LLC, and Azteca Sport Rights, LLC—are incorporated in the United States (in Delaware).  (*Id.*)  As explained below, those entities do not represent a material part of TVA's ongoing business.

16.    The offices and facilities in which TVA and its subsidiaries operate, generate content, and broadcast television are primarily in Mexico, where it employs over 3,500 people (employees and independent contractors).  (Rodríguez Decl. ¶ 6.)  TVA's directors, officers, and controlling persons also reside and work in Mexico.  (Rodríguez Decl. Ex. A.)  TVA and its subsidiaries have two broadcast locations outside Mexico (in Guatemala and Honduras) and 266 employees outside Mexico, but there are no offices and no employees in the United States. (Rodríguez Decl. ¶¶ 4, 6.)   Virtually all of the television content the Alleged Debtors produce is created in Mexico, for its Mexican audiences.  (Rodríguez Decl. ¶¶ 7, 8.)

17.    Contrary to the Petitioning Creditors' claims,[3] TVA does **not** operate television networks in the United States.  Azteca International Corporation (formerly d/b/a Azteca America) operated Azteca America in the United States from 2001 to 2017.  (Rodríguez Decl. Ex. B at 55.) The assets used by Azteca International Corporation to operate Azteca America including the television stations were sold in 2017 to an unaffiliated third party, HC2 Network Inc. ("HC2"). (Rodríguez Decl. ¶ 16.)  At the time of the Notes offering, those legacy U.S. operations contributed only 9% of TVA's revenue.   (Rodríguez Decl. ¶ 17.)   Subsequently, HC2 discontinued broadcasting Azteca America content via these stations as of December 2022.  (Rodríguez Decl. ¶ 16.)

18.    In total, the Alleged Debtors have only *de minimis* assets in the United States, and derive less than 4% of their consolidated revenue here.  (Rodríguez Decl. ¶ 9.)  90% of TVA's U.S. revenue comes from one licensing deal with Univision for U.S. broadcasts of two Mexican soccer teams.  (Rodríguez Decl. ¶¶ 19, 23.)  Azteca International Corporation is a party to that

---

[3]    Statement Of The Petitioning Creditors In Support Of The Involuntary Chapter 11 Petition Against TV Azteca and Its Debtor Affiliates, ECF No. 8, ¶ 5.

contract but relies on Mexican affiliates to provide the broadcasting content necessary for it to perform under that agreement, since the soccer games all take place in Mexico. (Rodríguez Decl. ¶ 19.)

**B.     The Alleged Debtors' Regulation By The Mexican Government**

19.     Under Mexican law, the broadcast spectrum is sovereign property of Mexico. Broadcast television in Mexico is regulated by the Secretariat of Infrastructure, Communications and Transportation and IFT. (Rodríguez Decl. ¶ 25.) Private telecommunications companies like TVA are permitted to broadcast pursuant to "concessions," which are granted by IFT. TVA currently holds 6 concessions, (Rodríguez Decl. Ex. D at 5, Ex. E at 4, Ex. F at 5, Ex. G at 5, Ex. H, Ex. I.,) and those concessions are central to TVA's business, because without them TVA cannot broadcast television anywhere in Mexico. (Rodríguez Decl. ¶ 25.)

20.     TVA's concessions cannot be transferred without the prior approval of IFT. (Rodríguez Decl. ¶ 27.) Under the *Ley Federal de Telecomunicaciones y Radiodifusión*, concessions can be revoked if the holder fails to comply with certain legal requirements. (Rodríguez Decl. ¶ 26.) Mexican law also provides special rights to the Mexican government in any *Concurso* proceeding involving a concession-owner. For example, the government has a right to be heard in connection with the appointment of any *conciliador* or trustee, and to approve any plan of reorganization; IFT also must approve any transfer of a controlling stake in the equity of the TVA which is also required by law to be majority owned by Mexican investors. (Méjan Decl. ¶¶ 40, 43.)

**C.     The Alleged Debtors' Other Creditors**

21.     TVA has a secured, revolving credit facility with Banco Azteca (as amended, the "Banco Azteca Facility"). (Rodríguez Decl. ¶ 29.) TVA owed approximately 1.69 billion pesos ($87 million) of outstanding principal under the Banco Azteca Facility as of December 31, 2022.

TVA's obligations under the Banco Azteca Facility are secured by (i) TVA's concessions in Mexico; (ii) pursuant to the 2021 Amendment, a trust that holds several real estate properties; and (iii) a pledge over certain subsidiaries of TVA.  (Rodríguez Decl. ¶ 29.)  The Banco Azteca Facility Credit Agreement and other collateral and ancillary agreements are governed by Mexican law and subject to exclusive jurisdiction in Mexican courts.  (Rodríguez Decl. ¶ 29.)

22.     Until 2022, TVA owed 4 billion pesos ($222 million) on *Cebures*, which are corporate bonds governed by Mexican law.  (Rodríguez Decl. ¶ 32.)  TVA repurchased the *Cebures* on the open market throughout 2021 and 2022.  (Rodríguez Decl. ¶ 32.)  On September 20, 2022 TVA redeemed the *Cebures* in full.  (Rodríguez Decl. ¶ 32.)  They are no longer on TVA's balance sheet.  (Rodríguez Decl. ¶ 32.)

23.     At the March 29, 2023 hearing in this Court, Petitioning Creditors noted the repayment of the *Cebures* as among the reasons they needed relief from this Court.  (Clareman Decl. Ex. U at 11) (arguing that TVA had "flout[ed] its U.S. law contractual obligations" by retiring the *Cebures*).  In fact, nothing in the Indenture precluded TVA from redeeming the *Cebures* without first paying interest or principal on the Notes.  (Clareman Decl. Ex. M).  Petitioning Creditors have not and cannot point to provision in the Indenture that states otherwise. (Clareman Decl. Ex. O at 10.)

24.     At year-end 2022, TVA's balance sheet reflected obligations with suppliers and creditors of $635 million pesos ($32.8 million).  (Rodríguez Decl. ¶ 33.)  These obligations are reflected in TVA's Other Accounts Payable balance.  (Rodríguez Decl. ¶ 35.)

25.     The company leases the use of satellite transponders, which are paid either based on use or through fixed monthly contracts.  (Rodríguez Decl. ¶ 34.)

26.    At year-end 2022, TVA's balance sheet reflected various categories of "non-financial liabilities" of 6.2 billion pesos ($320 million).  (Rodríguez Decl. ¶ 35.)  This category includes production costs, operational expenses, commissions, suppliers and creditors, labor liabilities, dividends and capital refunds, Perú Project, exhibition rights, Accounts payable to related parties and Other Revenues and Expenses.  (Rodríguez Decl. ¶ 35.)  An additional amount of 3.8 billion pesos ($196 million) related to customer advance payments, including barters.  (Rodríguez Decl. ¶ 35.)  TVA also owed balance-sheet tax liabilities of 1.189 billion pesos ($61.4 million) to the Mexican tax authorities.  (Rodríguez Decl. ¶ 36.)

27.    TVA is also defending three claims by Mexico's tax authority, SAT.  (Rodríguez Decl. ¶ 39.)  In the first action, SAT alleges an underpayment by TVA related to income in FY 2013.  (Rodríguez Decl. ¶ 39, Ex. J.)  In August 2022, the Mexican Federal Court of Administrative Justice ordered TVA to pay $ 2.62 billion pesos ($141 million).  (Rodríguez Decl. ¶ 40, Ex. J.)  TVA is appealing that ruling.  In the second action, on April 26, 2022, a Mexican Federal Tax Court imposed a tax assessment of Mex$ 3.4 billion (equivalent to $166 million in USD) related to income in FY 2009.  (Rodríguez Decl. ¶ 41.)  TVA filed a constitutional challenge to this assessment that is currently pending.  In the third action, TVA was assessed Mex$ 46 million ($2.5 million in USD) for deferred income tax in FY 2010, and an annulment lawsuit filed by TVA on September 28, 2022 is currently pending.  (Rodríguez Decl. ¶ 42.)  As a result, the Mexican government is a substantial contingent creditor in addition to owning the concessions on which TVA's business relies.

### D.    The Notes Held by the Petitioning Creditors

28.    The Bank of New York Mellon is the Indenture Trustee (the "Indenture Trustee") for the 8.250% Senior Notes Due 2024 (the "Notes"),  (Clareman Decl. Ex. N.)  The Notes were accompanied by disclosures in the form of an Offering Circular.  issued by TVA under an

Indenture dated August 9, 2017 (the "Indenture").  (Clareman Decl. Ex. M.)  The Notes have a principal amount of $400 million—approximately one-third of the liabilities on its balance sheet—with a stated maturity of August 9, 2024, with interest payments on February 9 and August 9 each year until maturity.  (Clareman Decl. Ex. M.)  Several of TVA's subsidiaries are guarantors of the Notes.  (Clareman Decl. Ex. M.  At the time the Indenture was executed there were 56 guarantors, although the number of guarantors has been reduced since then, pursuant to provisions in the Indenture for releasing guarantors.  The Petitioning Creditors have complained that they did not receive notice of these changes to the composition of the guarantors, but there is no obligation under the Indenture to provide any notice of these corporate actions.  (Clareman Decl. Ex. M.)

29.    The Petitioning Creditors allege that TVA missed interest-only payments on February 9, 2021, and two successive interest payments, allegations that the Alleged Debtors do not dispute.  (Rodríguez Decl. ¶ 31.)  The Indenture Trustee served two purported Notices of Default—first on March 22, 2021, and again on March 29, 2022—on the basis of these missed interest payments, and declared Events of Default under the Indenture.  (Rodríguez Decl. ¶ 31, Clareman Decl. Ex. P, Ex. Q.)

30.    In early 2021, TVA initiated a dialogue with a group of beneficial holders of the Notes in the hopes of reaching an appropriate agreement in light of the Alleged Debtors' current financial situation and secular decline of broadcast television in an internet age of "cord-cutting," and effects of the pandemic.  (Rodríguez Decl. ¶ 31.)  Despite TVA's efforts, no agreement has been reached.  (Rodríguez Decl. ¶ 31.)

31.    On May 3, 2022, self-described "beneficial holders" of the Notes served a purported acceleration notice, claiming to accelerate the principal and accrued interest under the Notes.  (Clareman Decl. Ex. R.)  Because that notice was invalid under the terms of the Indenture—

beneficial holders cannot accelerate the debt—on August 5, 2022, the Trustee, at the direction of

beneficial holders (including the Petitioning Creditors), served a second Notice of Acceleration,

claiming to accelerate the principal and accrued interest.  (Clareman Decl. Ex. S.)  Three days

later, on August 8, 2022, the Trustee served a Supplement to Notice of Acceleration, superseding

the August 5 notice, and added a demand for payment of "premium," referring to a Redemption

Premium due under the Indenture in the case of a voluntary prepayment by the TVA, which had

not occurred.  (Clareman Decl. Ex. T.)

### E.   Prior Litigation by the Petitioning Creditors

32.    On August 26, 2022, at the direction of the Petitioning Creditors and other

beneficial holders, the Indenture Trustee filed a lawsuit in New York Supreme Court against TVA.

The Indenture Trustee did not file a complaint, but rather sought to prosecute the action by

invoking a procedural device under the CPLR called a "motion for summary judgment in lieu of

complaint."  (Clareman Decl. Ex. A.)  It sought payment of $488,623,510, calculated based on the

principal amount, plus unpaid accrued and outstanding interest, the Redemption Premium, and

statutory prejudgment interest on all of those amounts.  (Clareman Decl. Ex. A.)  It further sought

entry of judgment not only against TVA but also against 56 alleged guarantors of the Notes.

(Clareman Decl. Ex. A.)

33.    TVA removed the action to federal court based on diversity of citizenship and filed

an opposition to the Indenture Trustee's motion for summary judgment.  (Clareman Decl. Ex. B.)

TVA disputed the Indenture Trustee's entitlement to the Redemption Premium and its claims

against the released guarantors, and argued that a federal court could not entertain a motion for

summary judgment in lieu of complaint, a procedural device permitted under the CPLR which has

no analog in the Federal Rules of Civil Procedure ("FRCP").  *Id.*  TVA also cross-moved for an

order requiring the Indenture Trustee to file a complaint, as required by the FRCP.  *Id.*  The

Indenture Trustee voluntarily dismissed claims against the released guarantors but maintained a right to payment of the Redemption Premium, arguing that acceleration of the principal triggered an obligation to pay Redemption Premium even though the Indenture makes clear that it is only payable upon a *voluntary prepayment*, which had not happened.  (Clareman Decl. Ex. C.)  The Indenture Trustee's motion for summary judgment and TVA's cross-motion were fully briefed in October 2022 and remain pending before Judge Gardephe.  (Clareman Decl. Ex. D.)

34.    On September 22, 2022, TVA filed a complaint against certain Noteholders and the Indenture Trustee in Mexico.[4]  That complaint asserted, among other things, that the acceleration of the Notes was improper and, as such, TVA was under no obligation to pay the principal or interest on the Notes.[5]  On September 27, 2022, the Superior Court of Justice of Mexico City entered a preliminary injunction deeming the acceleration notices sent by the Noteholders and the Indenture Trustee ineffective until the World Health Organization decrees the end of the SARS-COVID-19 pandemic.[6]  The Indenture Trustee was served with the complaint and preliminary injunction order on February 21, 2023.[7]  On March 15, 2023, in response to the injunction, the Indenture Trustee filed an amparo proceeding in the 12th District Court in Mexico, seeking to invalidate the injunction.[8]  On March 23, 2023, the Mexican court dismissed Indenture Trustee's

---

[4]    Declaration Of Fernando Del Castillo Elorza In Support Of The Joint Motion Of The Bank Of New York Mellon And The Petitioning Creditors For Entry Of An Order (I) Affirming The Applicability Of And Enforcing The Automatic Stay, Or, In The Alternative, (II) Granting Limited Relief From The Automatic Stay Pursuant To 11 U.S.C. 362, ECF No. 11 at ¶ 9, Ex. 2.

[5]    *Id.* ¶ 12, Ex. 2.

[6]    *Id.* ¶ 15, Ex. 3.

[7]    *Id.* ¶ 11.

[8]    *Id.* ¶ 19.

Amparo proceeding without prejudice, stating that the parties must exhaust all appellate remedies in the underlying litigation before pursuing such relief.[9]

### F.    The Involuntary Chapter 11 Petition & Petitioners

35.    On March 20, 2023, the Petitioning Creditors filed involuntary petitions against TVA in this Court and on March 21, filed an amended petition against TVA.[10]

36.    The Petitioning Creditors are three investment funds incorporated outside the United States.   Petitioner Plenisfer Investments SICAV Destination Value Total Return is an investment company with variable capital ("ICVC") organized under the laws of Luxembourg.[11] Petitioner Cyprus Opportunities Master Fund II, Ltd. is an exempted limited company organized under the laws of the Cayman Islands.[12]  Petitioner Sandpiper Limited is an exempted company organized under the laws of the Cayman Islands.[13]  The Petitioning Creditors list their claims as "unsecured bond claims" in item 13 of the form involuntary petitions.[14]  The Petitioning Creditors describe their claims against the Alleged Debtors as claims "based upon certain of [their] holdings of the Notes" in their statements in support of the involuntary petitions.[15]  The Petitioning Creditors claim they are entitled to "at least" an aggregate amount of $63,315,000—which is the aggregate principal of notes they hold—based on their alleged holdings of the Notes.[16]

---

[9]    *Id.* ¶ 22.

[10]    Involuntary Petition, ECF No. 1, Amended Involuntary Petition, ECF No. 2.

[11]    ECF No. 2 at 24.

[12]    *Id.*

[13]    *Id.* at 61.

[14]    *Id.* at 3.

[15]    Statement of the Petitioning Creditors in Support of the Involuntary Chapter 11 Petitions Against TV Azteca and its Debtor Affiliates ECF No. 8, ¶¶ 30–32.

[16]    *Id.*

37.    The Involuntary Petitions—and the Petitioning Creditors' other filings to date—do not profess to have any reorganization purpose for filing the Petitions.  They are entirely devoid of any discussion about the propriety of a chapter 11 case here and have instead focused on litigation claims in Mexico by the company as the reason for these chapter 11 cases.   The Involuntary Petitions say nothing accurate about the Alleged Debtors' assets or where they are located, or the nature of the Alleged Debtors' business, or anything else about the Alleged Debtors' other creditors.

38.    On March 27, 2023, the Petitioning Creditors moved for an order affirming the applicability of the worldwide stay, among other relief.[17]  The Petitioning Creditors inaccurately characterized the Alleged Debtors as maintaining television network operations in the United States (Pet. Cred.'s Mot. at ¶ 11); as noted in above, TVA sold its U.S. network operations in 2017.  The Petitioning Creditors also claimed that the reason for the chapter 11 filing in this court was to respond to litigation filed in Mexico, and to enjoin those proceedings.  (*Id.* at ¶4.)[18]  There is no explanation in the brief for how a restructuring could feasibly occur here, or how actions by the Mexican Courts—the motivating cause for these involuntary petitions—could be effected by a chapter 11 court.

39.    The other creditor that has appeared in this proceeding is in essentially the same position. Diamond Films Netherlands Coöperatief  U.A. ("Diamond")—a business organized under the laws of the Netherlands with its principal place of business located in Amsterdam, the

---

[17]    Joint Motion Of The Bank Of New York Mellon And The Petitioning Creditors For Entry Of An Order (I) Affirming The Applicability Of And Enforcing The Automatic Stay, Or, In The Alternative, (II) Granting Limited Relief From The Automatic Stay Pursuant To 11 U.S.C. 362, ECF No. 9.

[18]    *Id.* at ¶ 4 ("In the alternative, the Indenture Trustee and the Petitioning Creditors request that the Court enter an order, attached hereto as Exhibit B, granting limited relief from the automatic stay in order to permit the Indenture Trustee to file and prosecute an appeal of the Mexican Injunction Litigation and the Amparo before the expiration of the applicable deadline.").

Netherlands—filed a "response" to the Petitioning Creditor's motion to enforce the worldwide

stay.[19]  Like the Petitioning Creditors, Diamond is also a party to a bilateral contract dispute with

TVA and its appearance here stems from a default judgment in that dispute in Diamond's favor in

New York State Court, which TVA moved to vacate.  (Clareman Decl. Exs. F, G, I–K; Rodríguez

Decl. ¶ 44.)  Diamond and TVA are also litigating in Mexico.  (*See* Clareman Decl. Ex. H.)  The

basis for TVA's motion to vacate in New York is that it was never properly served with the

complaint in the litigation here, and obtained an appellate ruling in Mexico that service by

Diamond was ineffective as a matter of Mexican law.  (Clareman Decl. Ex. G ¶ 1–2.)  The motion

to vacate was pending when the Involuntary Petitions were filed.  (Rodríguez Decl. ¶ 44.)  After

Diamond filed a notice of this bankruptcy case, the court dismissed the motion without prejudice

to renewal.  (Clareman Decl. Ex. L, Rodríguez Decl. ¶ 44.)

## ARGUMENT

### I.      The Involuntary Petitions Should Be Dismissed Pursuant to Section 305(a)(1) of the Bankruptcy Code or, Alternatively, on *Forum Non Conveniens* Grounds.

40.      The Involuntary Petitions should be dismissed because it is not feasible to

reorganize TVA in an involuntary chapter 11 case.  As the Méjan Declaration explains, orders and

judgments by this Court will be unenforceable in Mexico, where nearly all of the Alleged Debtors'

assets and creditors are located, because there is no effective process for giving domestic effect to

a chapter 11 case for a company like TVA that has its "center of main interests" in Mexico.  For a

company like TVA, Mexican law requires a *Concurso*, and any plan of reorganization must

comply with the *Concurso* law.  Restructuring in this Court will not only be futile, but poses an

---

[19]    Response Of Diamond Films Netherlands Coöperatief U.A. To Joint Motion Of The Bank Of New York Mellon And The  Petitioning Creditors For Entry Of An Order (I) Affirming The Applicability Of And Enforcing The Automatic Stay, Or In The Alternative, (II) Granting Limited Relief From The Automatic Stay Pursuant To 11 U.S.C. 362, ECF No. 15.

unacceptably high risk of destroying value through inevitable delay and litigation that would follow from any attempt to reorganize outside of Mexico.  Additionally, these chapter 11 cases should be dismissed because they were filed for the improper purpose of gaining leverage in a bilateral debt collection litigation by the Petitioning Creditors.

41.     Dismissal is expressly authorized by the Bankruptcy Code where "the interests of creditors and the debtor would be better served by such dismissal or suspension."  11 U.S.C. § 305(a)(1).  Where, as here, a U.S. chapter 11 case would be "objectively futile" because there is no reasonable prospect of reorganization and the Court has no ability to enforce its own orders against the Alleged Debtors' property and its creditors in a foreign country, the chapter 11 petitions should be dismissed.  *In re Bd. of Dirs. of Multicanal S.A.*, 314 B.R. 486, 523 (Bankr. S.D.N.Y. 2004).  Dismissal is also warranted under Section 305(a)(1) where, as here, involuntary petitions are filed for an improper purpose to collect a debt.  *In re Navient Sols., LLC*, 625 B.R. 801, 821 (Bankr. S.D.N.Y. 2021), *aff'd*, 2022 WL 863409 (S.D.N.Y. Mar. 23, 2022), *reconsideration denied*, 2022 WL 1500771 (S.D.N.Y. May 12, 2022).

42.     Dismissal does not leave Petitioning Creditors without or access to courts—indeed, they have been litigating in both the United States and Mexico.  They can resume their nonpayment litigation against TVA in this District, and seek to enforce any judgment they obtain in either the United States or Mexico, or both.  And if circumstances truly warrant an involuntary bankruptcy case, they can pursue that remedy in a Mexican *Concurso*.  The existence of alternative forums for their claims; the manifest inconvenience for the Mexican debtors and creditors of litigating; and the far greater public interest on the part of Mexico in a reorganization of the Alleged Debtors is also cause to dismiss the petitions on *forum non conveniens* grounds.

A.    **Dismissal Is Warranted Under Section 305(a)(1).**

43.    This chapter 11 case would be both futile and wasteful.  The vast majority of the Alleged Debtors' assets and creditors, all of the Alleged Debtors' principals, and nearly all employees and documents, are located in Mexico, and Mexican courts will not recognize a U.S. restructuring for a company that has substantially all of its assets in Mexico.  A minority of the Alleged Debtors' creditors hold the Notes under a New York law governed Indenture, but the Alleged Debtors have no material assets here.  There is simply no reason for the Court to take on this attempted reorganization, which promises only to destroy value and cannot result in a viable chapter 11 plan.

44.    In evaluating dismissal under § 305(a)(1), courts have considered a variety of non-exclusive factors, including: (i) the economy and efficiency of administration; (ii) whether another forum is available to protect the interests of both parties; (iii) whether chapter 11 proceedings are necessary to reach a just and equitable distribution of assets; (iv) whether there is an alternative means of achieving an equitable distribution of assets; (v) whether a non-federal insolvency has proceeded so far that it would be costly and time-consuming to start afresh with the federal bankruptcy process; and (vi) the purpose for which bankruptcy jurisdiction has been sought.  *In re Mountain Dairies, Inc.*, 372 B.R. 623, 635 (Bankr. S.D.N.Y. 2007).  In a case such as this one, however, "the motives of the involuntary petitioners are less important than the 'objective' futility of any possibility of administering a reorganization in this jurisdiction," *In re Multicanal*, 314 B.R. at 523, and dismissal is warranted "where 'on the filing date there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings.'"  *Id.* (quoting *In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1309 (2d Cir. 1997)).

19

45.     In *In re Xacur*, the Bankruptcy Court for the Southern District of Texas dismissed an involuntary petition filed against a foreign debtor under § 305(a)(1) where the debtor was domiciled in Mexico, had assets in Mexico, and it was "doubtful" that any bankruptcy court orders issued by the U.S. court could be enforced in Mexico.  219 B.R. 956, 968–69 (Bankr. S.D. Tex. 1998).  In *Xacur*, there was no pending insolvency proceeding in Mexico, but the court concluded that "the best interests of the creditors and the alleged debtor would be better served by dismissal." *Id.* at 969.  The court expressed concern that "[a] Mexican court may not recognize the automatic stay of a United States bankruptcy proceeding and may not recognize the enforceability of orders issued from a United States bankruptcy court in an involuntary proceeding against a Mexican citizen and domiciliary."  *Id.*  The court also noted that "[t]here are pending Mexican lawsuits to collect on some of the [debts] at issue and there is no impediment inhibiting the petitioning creditors from filing an involuntary bankruptcy against [the alleged debtor] in Mexico."  *Id.*  The *Xacur* court concluded that the "involuntary bankruptcy will not result in an economical and expeditious administration of Xacur's estate because of the doubtful enforceability of bankruptcy court orders . . . in Mexico," and dismissed the petitions pursuant to 305(a)(1) and other grounds. *Id.*; *see also In re Spanish Cay Co., Ltd.*, 161 B.R. 715, 725 (Bankr. S.D. Fla. 1993) ("The potential for a successful Chapter 11 reorganization in this case is questionable, at best, since certain orders of this Court may be given no effect in the Bahamas.").

46.     These same considerations apply equally here.  As explained in the Méjan Declaration, Mexican law would not recognize the orders and judgments of this Court.  Under the LCM (similar to chapter 15 in the Bankruptcy Code), a foreign insolvency proceeding can only be recognized as either a "main" proceeding—where the debtor has its "center of main interests" ("COMI")—or as a "non-main" proceeding—in a jurisdiction where the Debtor has an

"establishment." TVA clearly does not have a COMI in the United States, and it has no

establishment here—it has no operations or employees—and so recognition for these cases is

unlikely in Mexico. (Méjan Decl. ¶¶ 10, 58–59, 61, 66.) As Professor Méjan also explains,

Mexican courts also would reject any attempt to use a chapter 11 proceeding—which is a plenary,

main proceeding under U.S. law—to involuntarily restructure a Mexican company, particularly

one for which there is significant government interest in Mexico. In addition, Mexican law

requires that any reorganization of a company with an "establishment" in Mexico open a *Concurso*,

and if a *Concurso* is necessary, there is no purpose for a chapter 11. (Méjan Decl. ¶¶ 10, 58–59,

60.)

       47.     As a result of these features of Mexican law, there is no reasonable prospect of any

Mexican court granting recognition to a plenary U.S. chapter 11 case, and there are significant

parties-in-interest in Mexico who would be encouraged to litigate in Mexico if this Court adopts

a plan that impairs their rights under Mexican law. Under these circumstances, the "'objective'

futility" of pursuing a chapter 11 case here compels dismissal. *See In re Multicanal*, 314 B.R. at

523. As Judge Gropper explained in *Multicanal*:

> In the instant involuntary case, the motives of the involuntary petitioners are less
> important than the 'objective' futility of any possibility of administering a
> reorganization in this jurisdiction. In a situation where the debtor is steadfastly
> opposed to a U.S. Chapter 11 case, where there are assets worth only $9,500 over
> which the Court could assume jurisdiction, and where the principals of the debtor
> have no nexus to the United States, that "objective futility" is sufficiently shown.
> On a motion to dismiss a court must take into account its ability to enforce its
> orders. The inability of this Court to force the rehabilitation of this debtor over its
> objection provides a further reason for dismissal of the involuntary proceeding.

*Id.* (citations omitted); *see also In re Compania de Alimentos Fargo, S.A.*, 376 B.R. 427, 439–40

(Bankr. S.D.N.Y. 2007) (concluding that "[a]n attempt [at reorganization] by this Court would

certainly be difficult if not futile" where "someone would have to take the confirmed [chapter 11]

plan to Argentina, and ask the local courts to grant comity"—an "undertaking fraught with uncertainty"); *In re Globo Comunicacoes e Participacoes S.A.*, 317 B.R. 235, 253 (S.D.N.Y. 2004) (recognizing that a "potential lack of cooperation from [the alleged debtor], foreign creditors, and Brazilian courts would certainly stand as a significant impediment to the orderly administration of [the alleged debtor]'s bankruptcy estate, since there is no indication that the Bankruptcy Court would be able to obtain the cooperation of foreign creditors who are not subject to the Bankruptcy Court's jurisdiction and whom a Brazilian court may not compel to participate in any United States bankruptcy proceedings."); *In re Int'l Admin. Servs., Inc.*, 211 B.R. 88, 93 (Bankr. M.D. Fla. 1997) (recognizing that "[a] trustee or debtor-in-possession cannot exercise control over assets in a foreign jurisdiction that are property of the estate without first obtaining recognition and permission from the court of the foreign jurisdiction in which the assets are located," without which "the bankruptcy court practically lacks the power to enforce such jurisdiction without the recognition and assistance of the courts in the foreign country").[20] The "objective futility" concern applies equally here and compels the same result.

48.    In light of the significant risk of futility, attempting a restructuring here would be inefficient and wasteful, and therefore value-destructive.  There would be a substantial risk of litigation (and re-litigation) in Mexico concerning this Court's orders, which would be extremely inefficient and costly.

49.    Enforcement issues aside, litigation here could be inefficient and costly on its own. The witnesses and documents are in Mexico, including the Alleged Debtors' officers, employees, and books and records. *See Petition of Trevor*, 1992 WL 391289, at *2 (Bankr. S.D.N.Y. Dec. 10,

---

[20]    *See also, e.g.*, *In re Xacur*, 219 B.R. at 969; *In re Spanish Cay*, 161 B.R. at 725 (abstaining under § 305(a)(2) where debtor was a Bahamian company with its principal asset located in the Bahamas and where the court determined that the Bahamas retained the greatest interest in liquidating the debtor's assets).

1992) (finding "best interests of all concerned" served by dismissal where the relevant witnesses were located in another jurisdiction). Those witnesses are predominantly native Spanish speakers, with varying levels of English proficiency; many would require a translator to testify. The pertinent documents are also in Spanish and would need to be translated to English at considerable expense. *See Kingstown Cap. Mgmt., L.P.* v. *Vitek*, 2020 WL 5350492, at *7 (S.D.N.Y. Sept. 4, 2020) (finding abstention warranted where administrative difficulties included costs associated with translating documents from various languages to English). Every issue involving Mexican law will require expert witnesses, and potentially depositions and live testimony. "[T]he physical location of the parties in interest" weighs in favor of dismissal. *Fargo*, 376 B.R. at 439.

50.     The Court should dismiss these cases under 305(a)(1) for this further reason that they were filed without a proper restructuring purpose, but rather to collect on a contested debt. As the court observed in *Navient*, "using an involuntary petition to attempt to collect a debt is an improper purpose," which warrants abstention under Section 305(a)(1). *In re Navient*, 625 B.R. at 821.[21]   As described in Section II.B. *infra*, these involuntary petitions were filed in direct reaction to litigation in Mexico, and to advance debt collection litigation by the Indenture Trustee in New York. Like the petitioning creditors in *Navient*, the Petitioning Creditors are attempting to improperly use the bankruptcy system as a debt collection tool, which is a misuse of process.[22]

---

[21]     In *Navient*, Judge Glenn dismissed an involuntary petition where the petitioning creditors filed an involuntary chapter 11 petition against the alleged debtor seeking refunds related to alleged overpayments on student loans. 625 B.R. at 805. At the time the petition was filed, other litigation against Navient regarding alleged overpayments was pending. *Id.* Judge Glenn concluded that dismissal was proper because the petitioning creditors were "[p]ractically . . . acting as a 'sole petitioner,'" rather than as part of a "joint effort of the creditor body," and were "simply seeking to satisfy unadjudicated obligations they believe they [were] owed." *Id.* at 821. Thus, Judge Glenn found the petitioning creditors were "attempting collection efforts against [the debtor] through the guise of the Involuntary Petition," as opposed to "furthering public policy goals underpinning the Bankruptcy Code and the chapter 11 process." *Id.* at 821.

[22]     The Petitioning Creditors acknowledged that "[t]he Involuntary Petitions were filed because the [Alleged] Debtors have failed to pay [the Notes]," which was exactly the issue currently being litigated in the proceeding before Judge Gardephe. *See* Statement of the Petitioning Creditors in Support of the Involuntary Chapter 11 Petitions Against TV Azteca and its Debtor Affiliates, ECF No. 8, Preamble.

*See id.*; *see also In re Mountain Dairies*, 372 B.R. at 635 (dismissing an involuntary case that was "essentially a two-party dispute for which the parties have adequate remedies in state court") (Morris, J.); *In re Persico Cont. & Trucking, Inc.*, 2010 WL 3766555, at *4–5 (Bankr. S.D.N.Y. Aug. 20, 2010) (observing that bankruptcy "should not be used a debt collection tool" and dismissing an involuntary case that was a two-party dispute where "the proper forum for [the parties'] dispute should be in the District Court") (Drain, J.).

51.     For all of these reasons, dismissal under Section 305(a)(1) is warranted here.

**B.     *Forum Non Conveniens Also Supports Dismissal of the Involuntary Petitions*.**

52.     This Court should also dismiss the Involuntary Petitions on the basis of *forum non conveniens*.  A United States Bankruptcy Court an inconvenient forum because it cannot practically achieve a reorganization—a *Concurso* proceeding will be necessary and therefore, a chapter 11 case will only generate wasteful litigation and costs.

**1.     Mexico Is an Available Forum, and the Petitioning Creditors' Choice of this New York Forum Is Owed No Deference.**

53.     Three factors guide this Court's exercise of its discretion to dismiss a case under the doctrine of *forum non conveniens*: first, whether an adequate alternative forum exists; second, the degree of deference owed to plaintiffs' choice of forum; and third, the public and private interest factors.  If any adequate alternative forum exists, and if the combined public and private interest factors weigh in favor of litigation in the alternative forum rather than here (after taking into account the degree of deference), then the Court should dismiss the case.  *See Iragorri* v. *United Technologies Corp.*, 274 F.3d 65, 73 (2d Cir. 2001) (en banc).

54.     As to the first factor, "[a]n alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute."  *Pollux Holding Ltd.* v. *Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003).  Here,

there is no doubt that Mexico is an adequate alternative forum.  Indeed, Mexico is a necessary and essential forum.

55.    The Alleged Debtors are amenable to service of process in Mexico.  Twenty-four of the thirty-four defendants are Mexican companies, and the others are subsidiaries are Mexican companies.  All can be served with process in Mexico.

56.    Mexico also permits litigation of the subject matter of the dispute.  Mexico has specialized *Concurso* laws and specialized *Concurso* courts to manage restructuring proceedings. (Méjan Decl. ¶¶ 11–12.)  *Concurso* proceedings can be commenced on a voluntary or involuntary basis, as under U.S. law.  (Méjan Decl. ¶ 14.)  The LCM also provides for stay of collection efforts, upon commencement of a *Concurso*, recovery for certain types of unlawful pre-petition transfers, and provides due process for creditors.  (Méjan Decl. ¶¶ 15, 18, 43–45.)  Numerous U.S. courts have reached the conclusion that Mexican Concurso proceedings provide fair and adequate protections to protect the rights of parties-in-interest.  *See In re Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 114–16 (Bankr. S.D.N.Y. 2012) (finding that Mexican Concurso contains adequate procedural safeguards sufficient to stay U.S. proceedings); *In re Compania Mexicana de Aviacion, S.A. de C.V.*, Case No. 10-14182 (MG), 2010 WL 10063842 , at *1 (Bankr. S.D.N.Y. Nov. 8, 2010) (recognizing a Mexican Concurso as a foreign main proceeding); *In re Metrofinanciera, S.A.P.I. de C.V.*, No. 10-20666, 2010 WL 10063949 at *2 (Bankr. S.D. Tex. Sept. 24, 2010) (recognizing a Mexican Concurso proceeding, and finding it provides just treatment of creditors and interest holders in accordance with due process*); see also JP Morgan Chase Bank* v. *Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 429 (2d Cir. 2005) (dismissing claims out of deference to a pending Mexican insolvency proceeding); *In re Xacur*, 219 B.R. at 970 (dismissing claims on the basis of *forum non conveniens* and finding Mexico an adequate alternative forum for

involuntary proceeding where "Mexico ha[d] not been shown in this case to treat the parties

unfairly or [did] not deprive the petitioning creditors of remedies").

57.     In *Fargo*, the bankruptcy court dismissed an involuntary petition on *forum non

conveniens* grounds, based in part on its finding that Argentina's system for administering

bankruptcy cases was "similar to a chapter 11 case in the United States."  376 B.R. at 435.  Among

other things, the court concluded that the Argentine proceeding "provide[d] for the filing and

determination of claims, classification and priority of claims, the filing of an *acuerdo preventivo*

(or plan of reorganization), objections to the *acuerdo preventivo* (including the right to discovery),

the voting on the *acuerdo preventivo*, judicial approval and appellate review."  *Id.*  All of these

features exist in  Mexican *Concurso* proceedings.  (*See* Méjan Decl. ¶ 29.)

58.     As to the second factor, the Petitioning Creditors' choice of a U.S. forum is also

entitled to no deference.  This Court is not the "home forum" of the Petitioning Creditors, which

are foreign funds.  *See Iragorri*, 274 F.3d at 71 ("[A] foreign resident's choice of a U.S. forum

should receive less consideration, as representing consistent applications of a broader principle

under which the degree of deference to be given to a plaintiff's choice of forum moves on a sliding

scale depending on several relevant considerations."); *see also Piper Aircraft Co.* v. *Reyno*, 454

U.S. 235, 256 (1981) ("When the plaintiff is foreign, however, th[e] assumption [that a plaintiff's

choice of forum is convenient] is much less reasonable.").

59.     Also weighing against deference, there is also virtually no connection between the

chapter 11 case and New York.  *Iragorri*, 274 F.3d at 72.  The Alleged Debtors' assets, most of

their creditors, and all of their employees and controlling persons are located in Mexico.  In these

circumstances, a restructuring proceeding—which is a collective proceeding *in rem* to adjudicate

all creditor rights worldwide with respect to property that is overwhelmingly in Mexico—has no

substantial connection to this forum. *See In re Bancredit Cayman Ltd.*, 2008 WL 5396618, at *3 (Bankr. S.D.N.Y., Nov. 25, 2008) ("[N]either the parties nor the events have any connection to this forum. This is not the plaintiffs' home court, and their choice of this forum is not entitled to any special deference."). That lack of connection raises the inference that "plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons." *Iragorri*, 274 F.3d at 72; *see also In re Ski Train in Kaprun Austria on Nov. 11, 2000*, 499 F. Supp. 2d 437, 442 (S.D.N.Y. 2007) ("Additionally, where indicia of forum shopping are present, the presumption in favor of the plaintiff's choice of forum 'may not apply, either at all or with full force.'").

60. The Indenture governing the Notes held by the Petitioning Creditors has a forum selection clause specifying that claims relating to the Notes should be instituted in New York, but that forum selection clause does not give consent to a plenary restructuring effecting all of TVA's creditors. (Clareman Decl. Ex. M). The Indenture provides as follows:

> [TVA] agrees that any suit, action or proceeding against it arising out of or relating to this Indenture (including the Note Guarantees) or the Notes, as the case may be, may be instituted in any court of the State of New York or any United States court sitting, in each case, in the Borough of Manhattan, The City of New York, New York, United States of America, and any appellate court from any court thereof.

> [TVA] irrevocably consents and submits to the exclusive jurisdiction of any court of the State of New York or any United States court sitting, in each case, in the Borough of Manhattan, The City of New York, New York, United States of America, and any appellate court from any court thereof.

(*Id.* §§ 11.7(b)(i), (iii).)

61. That clause reasonably encompasses bilateral claims between the parties to the Indenture (such as in the case before Judge Gardephe). But it does ***not*** amount to consent to the commencement of a plenary involuntary chapter 11 case involving all of the Alleged Debtors' assets and liabilities, and relationships with all creditors worldwide. *See In re Certa Dose, Inc.*, 2021 WL 5177376, at *16 & n.5 (Bankr. S.D.N.Y. 2021) (considering clause employing "arising

out of or relating to" language and observing that "[t]here is a question as to whether a forum selection clause applies in the context of filing a Chapter 11 case," and "that a forum selection clause argument may be more persuasive in connection with venue for an adversary proceeding"); *In re Globo*, 317 B.R. at 258 (remanding on issue of "the meaning and scope of Globopar's contractual consents to jurisdiction, which [] subject[ed] Globopar to the jurisdiction of New York state or federal courts in "any action or proceeding arising out of or relating to" the bank debt); *Fargo*, 376 B.R. at 429 n.1 (abstaining under 11 U.S.C. § 305(a)(1) and not deciding issue of consent to jurisdiction in forum selection clause).

62.     The parties to the Indenture have always understood that an insolvency proceeding would take place in a Mexican *Concurso* proceeding and was not governed by the Indenture.  The Offering Circular that accompanied the issuance of the Notes specifically identified as a "risk factor" that TVA and the guarantor subsidiaries could become subject to a *Concurso Mercantil*, which would create uncertainty for the Noteholders' recovery.  (Clareman Decl. Ex. O at 26–27.) Nothing in the Offering Memorandum, or in the Indenture or the Notes, reflects any agreement by the parties that TVA could be subjected to an involuntary chapter 11 case in the U.S.  And there is no authority from any court construing a forum selection clause in a single creditor contract as sufficient to find consent to a plenary bankruptcy proceeding in that forum.  In fact, "every person who deals with a foreign corporation impliedly subjects himself to such laws of the foreign government, affecting the powers and obligations of the corporation with which he voluntarily contracts as the known and established policy of that government authorizes." *In re Spanish Cay*, 161 B.R. at 725 (citing *Matter of Culmer*, 25 B.R. 621, 632 (Bankr. S.D.N.Y. 1982)).

63.     Bankruptcy cases—under both U.S. and Mexican law—are collective proceedings in which a debtor and all of its creditors appear, have an opportunity to heard, and negotiate a

collective reorganization affecting all of their rights going forward.  It is not a bilateral action.  For

TVA, the vast majority of its creditors are in Mexico, and are unlikely to voluntarily appear here,

and cannot be compelled to appear in the United States.  Therefore, even if TVA was subjected to

a chapter 11 case in New York, that cannot compel TVA's Mexican creditors to appear in

jurisdiction other than Mexico, which would fundamentally frustrate the purposes of chapter 11.

And because U.S. law and the LCM differ, imposing U.S. law in Mexico is contrary to public

interests in Mexico, including those of the Mexican government.

### 2.    The Private and Public Interest Factors Support Dismissal.

64.    The private and public interest factors weigh strongly in favor of dismissal.  The

relevant private interest factors include:  "the relative ease of access to sources of proof; the

availability of compulsory process for attendance of unwilling, and the cost of obtaining

attendance of willing, witnesses; . . . and all other practical problems that make trial of a case easy,

expeditious and inexpensive."  *Aenergy, S.A.* v. *Republic of Angola*, 31 F.4th 119, 132-33 (2d Cir.

2022) (quoting *Gulf Oil Corp.* v. *Gilbert*, 330 U.S. 501, 508 (1947)).  And the public interest

factors include "the interest in having localized controversies decided at home" and "avoiding

difficult problems in conflict of laws and the application of foreign law." *Id.* at 133 (quoting *Gulf

Oil*, 330 U.S. at 508).

65.    The difficulties of enforcing this Court's orders in Mexico are a significant

consideration with regard to the public interest factors.  As the Méjan Declaration shows, Mexico's

refusal to recognize a foreign main restructuring of a debtor with a Mexican COMI, and

particularly a debtor that operates government concessions, reflect important public policy

judgments of Mexico.  As a matter of comity, this Court should not engage in a restructuring of a

Mexican debtor that the courts of Mexico are unlikely to recognize.  *See In re Xacur*, 219 B.R. at

970 ("Any act of this Court to compel compliance with its orders against a Mexican citizen

inherently creates a diplomatic issue with Mexico.  The Court finds that Mexican courts have a superior inherent interest in adjudicating the disputes in this case."). *In re Spanish Cay Co., Ltd.*, 161 B.R. 715, 725 (Bankr. S.D. Fla. 1993) ("The courts of the Bahamas have the greatest interest in liquidating the assets of the [Bahamian] Debtor."); *In re Multicanal*, 314 B.R. at 521 ("Multicanal's expert witness on Argentine law explained that a concurrent U.S. case would be deemed to conflict with, rather than complement the [insolvency proceeding in Argentina], and that it would receive no recognition in Multicanal's home country under Argentine insolvency law to the extent it purported to administer assets in Argentina.").

66.    This matter also involves "localized controversies" that should be "decided at home." *Aenergy*, 31 F.4th at 133.  Those include the treatment of the concessions that allow TVA to broadcast on the radio spectrum in Mexico, which Mexico regards as part of its sovereign dominion; the continued availability of broadcasting content to tens of millions of viewers in Mexico, including content affecting the public interest, such as news; and any pre-petition transactions that the Petitioning Creditors seek to challenge between TVA and other creditors or former creditors in Mexico.

67.    This matter also involves "difficult problems in conflict of laws and the application of foreign law." *Id*.  Conflict of law and Mexican law issues will inevitably arise as to the validity and priority of creditor claims; the interaction of this proceeding with other litigation in Mexico, both those that are presently pending and additional actions that would inevitably arise; the response of the Mexican tax and regulatory authorities to this proceeding; and the enforcement of any result in this proceeding in Mexico.

68.    For all these reasons, the action should be dismissed on *forum non conveniens* grounds, in favor of Mexico as the more appropriate forum.

**II.     The Involuntary Petitions Should Be Dismissed Because the Petitioning Creditors
Lack Standing to Pursue Them and the Petitions Were Filed for an Improper
Purpose.**

69.     The Involuntary Petitions should be dismissed because they were filed as a

litigation strategy, and not to reorganize TVA.  The litigation pending between the Noteholders

and the Alleged Debtors gives rise to two additional, independent, grounds for dismissal.  First,

the Petitioning Creditors lack standing under the Bankruptcy Code to pursue them because the

amount of their claims is subject to ongoing litigation.  And second, the Petitioning Creditors have

made clear they commenced these cases as a countermeasure in litigation with TVA in Mexico,

which is not a permissible basis to pursue an involuntary chapter 11 case under the Bankruptcy

Code, and the petitions should be dismissed for cause.

**A.     The Petitioning Creditors Lack Standing to File Involuntary Petitions Under
Section 303(b)(1) of the Bankruptcy Code.**

70.     The Petitioning Creditors are ineligible to file involuntary petitions under Section

303(b)(1) because they hold claims—referred to as "unsecured bond claims" in the Petitions—

against the Alleged Debtors that are currently the subject of a bona fide dispute in pending

litigation in the Southern District of New York (initiated at the direction of the Petitioning

Creditors, acting with other Noteholders).  That dispute includes a purported aggregate $16.5

million "Redemption Premium"—plus pre- judgment interest on the Redemption Premium—that

the Petitioning Creditors say they are owed as a result of their own acceleration, even though that

claim is foreclosed by the plain language of the Indenture and by binding Second Circuit law.  *See,

e.g.*, *MPM Silicones*, 874 F.3d at 802–03.   Thus, the Involuntary Petitions fail to satisfy the

requirements of Section 303 and should be dismissed.

71.     Section 303(b)(1) of the Bankruptcy Code provides that an involuntary case must

be commenced by petitioning creditors whose claims are "not contingent as to liability or the

23-10385-lgb    Doc 28    Filed 04/25/23    Entered 04/25/23 22:58:21    Main Document
Pg 38 of 44

subject of a bona fide dispute as to liability *or* amount." 11 U.S.C. § 303(b)(1) (emphasis added). "A creditor must satisfy both prongs of [Section 303(b)(1)]: the claim must not be subject to a bona fide dispute as to *either* liability *or* a dispute as to amount." *In re Navient*, 625 B.R. at 810 (quoting *In re TPG Troy, LLC*, 793 F.3d 228, 234 (2d Cir. 2015)) (emphasis added). The phrase "as to liability or amount" was added to Sections 303(b)(1) and (h)(1) following the phrase "bona fide dispute" by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109–8, §§ 1234(a)(1)(A) and (a)(12), 119 Stat. 23, which abrogated prior case law holding that a dispute limited to the amount was not a bona fide dispute under the prior version of Section 303(b)(1). *See In re Euro-American Lodging Corp.*, 357 B.R. 700, 712 n.8 (Bankr. S.D.N.Y. 2007).[23]

72.      This "deliberately high bar" "is a feature, not a bug," of Section 303(b)(1). *In re Navient Sol. LLC*, 2022 WL 863409, at *7 (S.D.N.Y. Mar. 23, 2022). "An involuntary bankruptcy case cannot be the means of pressuring a debtor to pay a legitimately disputed debt." *Id.* "Pending litigation over a claim strongly suggests the existence of a bona fide dispute." *In re TPG Troy*,

---

[23]  *See also, e.g., In re Mountain Dairies*, 372 B.R. at 634 ("disputes as to amount—not just liability—are sufficient to create a bona fide dispute.") (Morris, J.); *In re Aminian*, No. 07-12957 (AJG), 2008 WL 793574, at *2 (Bankr. S.D.N.Y. Mar. 25, 2008) (same) (Gonzalez, J.); *In re Persico*, 2010 WL 3766555, at *2  ("I agree with my colleagues in the Southern District that if, in fact, an amount is in dispute even though an amount is not in dispute, the code as amended renders the petitioning creditor ineligible to commence or to seek the commencement of an involuntary case.") (Drain, J.); *See State Dep't of Revenue* v. *Blixseth*, 942 F.3d 1185, 1186 (9th Cir. 2019) ("We agree with our sister circuits' adherence to the statute's plain meaning and hold that a creditor whose claim is the subject of a bona fide dispute as to amount lacks standing to serve as a petitioning creditor under § 303(b)(1) even if a portion of the claim amount is undisputed."); *Fustolo* v. *50 Thomas Patton Drive, LLC*, 816 F.3d 1, 10 (1st Cir. 2016) ("We decline to read a materiality requirement into section 303"; "we follow the straightforward reading of section 303, which places no qualifiers on the requirement that any asserted claim be free of 'bona fide dispute as to . . . amount."); *Credit Union Liquidity Servs., L.L.C.* v. *Green Hills Dev. Co., L.L.C. (In re Green Hills Dev. Co., L.L.C.)*, 741 F.3d 651, 660 (5th Cir. 2014) (rejecting the petitioner's contention that an offsetting counterclaim can never be the basis of a bona fide dispute because it does not call into question the validity of the debts owed to the petitioner on the basis that "Congress has made clear that a claimholder does not have standing to file an involuntary petition if there is a 'bona fide dispute as to liability or *amount*' of the claim.") (emphasis in original); *In re Orlinsky*, No. 06-15417-BKC-RAM, 2007 WL 1240207, at *1 (Bankr. S.D. Fla. Apr. 24, 2007) (holding that three professional firms whose fee claims were "partially disputed" were not eligible petitioning creditors as their claims was subject to "a bond fide dispute as to liability or amount").

793 F.3d at 234; *see also In re Navient*, 625 B.R. at 812 ("[O]ngoing litigation [] involv[ing] the same nucleus of facts speaks strongly to the likelihood that there is a bona fide dispute in this case."). "Courts apply an objective test in determining whether a bona fide dispute exists." *In re TPG Troy*, 793 F.3d at 159. Petitioning creditors bear the burden of establishing that no bona fide dispute exists. *Id*. Courts are required to ascertain whether a "bona fide" dispute exists; the court is not required to actually resolve the dispute at the pleading stage in an involuntary chapter 11 case. *Id*.

73. Here, there is a bona fide dispute as to the amount that TVA owes each Noteholder, including the Petitioning Creditors, on the Notes. The Petitioning Creditors assert claims against the Alleged Debtors based upon their holdings of the Notes—described by the Petitioning Creditors as "unsecured bond claims."[24] They directed the Indenture Trustee to sue the Alleged Debtors for these same claims, including a Redemption Premium of $16.5 million.[25] As the Alleged Debtors have argued to Judge Gardephe, under the plain language of the Indenture and Second Circuit law, a Redemption Premium would be due only if TVA had redeemed the Notes prior to maturity by pre-paying the principal.[26] And optional prepayment would require, among

---

[24] *See* ECF No. 2 at 3 (listing the nature of the Petitioning Creditors' claims as "unsecured bond claims" in item 13); *see also* Statement of the Petitioning Creditors in Support of the Involuntary Chapter 11 Petitions Against TV Azteca and its Debtor Affiliates, ECF No. 8, ¶¶ 30–32.

[25] The Petitioning Creditors have neglected to directly state in their papers before the Court (including the Petitions) that the Indenture Trustee—at their direction—is seeking payment of the Redemption Premium in the litigation before Judge Gardephe. (*Compare* Statement of the Petitioning Creditors in Support of the Involuntary Chapter 11 Petitions Against TV Azteca and its Debtor Affiliates, ECF No. 8, ¶ 22 ("The New York Litigation sought compensatory damages totaling the aggregate amount of accrued and unpaid interest based on TV Azteca's failure to make three interest payments, the full amount of interest up to the date of acceleration on August 5, 2022, and the full amount of principal due under the Indenture at that time, collectively totaling $469,783,272."), *with* Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment in Lieu of Complaint, Dkt. No. 3 at 1, *The Bank of New York Mellon* v. *TV Azteca S.A.B. de C.V. et al.*, Index. No. 653101/2022 (N.Y. Sup. Ct., N.Y. County Aug. 26, 2022) (seeking, among other things, (i) an award of compensatory damages for the full amount of principal due under the Indenture of $469,783,272, **(ii) a Redemption Premium for a total of $16,500,000**, (iii) prejudgment interest, and (iv) attorneys' fees).)

[26] Memorandum of Law in Support of Defendants' Opposition to Plaintiff's Motion for Summary Judgment in Lieu of Complaint and in Support of Defendants' Motion to Compel Plaintiff to File a Complaint, ECF No. 9 at 14–15, *The Bank of New York Mellon* v. *TV Azteca, S.A.B. de C.V.*, No. 1:22-cv-08164-PGG (S.D.N.Y. Oct. 14,

other things, a resolution of TVA's board of directors, delivery of a Notice of Redemption to the

Indenture Trustee, and a deposit of funds with the Indenture Trustee.[27]   None of those things

happened, but the Indenture Trustee has nevertheless asserted that "acceleration of the []Notes

constitutes redemption."   (Clareman Decl. Ex. A at 15.)   As such, the Alleged Debtors deny

liability for a Redemption Premium, because a "payment made mandatory by operation of an

automatic acceleration clause is not one made at [debtor's] option" and thus not a redemption that

causes a redemption premium to be owed.  *MPM Silicones*, 874 F.3d at 802–03.[28]   That issue has

been joined before Judge Gardephe, who will, once the stay in that litigation is lifted, determine

the amount of the Petitioning Creditors' claims.[29]

74.   Accordingly, at least until Judge Gardpehe decides that dispute, the Petitioning

Creditors' claims are "subject of a bona fide dispute as to liability or amount."  *See* 11 U.S.C. §

303(b)(1); *In re Mountain Dairies*, 372 B.R. at 634; *In re Euro–American Lodging*, 357 B.R. at

---

2022); *see also* Clareman Decl. Ex. M §§ 5.1–5.3; *MPM Silicones*, 874 F.3d at 802–3 (holding that the optional redemption premium would not be due upon an automatic acceleration upon the debtor's bankruptcy filing but would only be due if the debt was repaid "at or before maturity").

[27]   *Id.* §§ 5.4–5.5, 5.7-5.8.

[28]   *See also, e.g.*, *George H. Nutman, Inc.* v. *Aetna Bus. Credit, Inc.*, 453 N.Y.S.2d 586, 587 (Sup. Ct. 1982) ("The election by the [creditor] [] to accelerate the [debt] and to treat the . . . debt as due was not a voluntary act by the [debtor] sufficient to bring the prepayment penalty into operation."); *Northwestern Mut. Life Ins. Co.* v. *Uniondale Realty Assocs.*, 816 N.Y.S.2d 831, 836 (Sup. Ct. Feb. 3, 2006) ("A prepayment premium will not be enforced under default circumstances in the absence of a clause which so states."); *3C Assocs.* v. *IC & LP Realty Co.*, 524 N.Y.S.2d 701, 702 (Sup. Ct. 1988) (no redemption premium owed after acceleration because the "terms of [indenture] make clear that [premium] is an obligation which becomes due and payable only if there is a voluntary exercise of the right to prepay").

[29]   *See* Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment in Lieu of Complaint, Dkt. No. 3 at 1, *The Bank of New York Mellon* v. *TV Azteca S.A.B. de C.V. et al.*, Index. No. 653101/2022 (N.Y. Sup. Ct., N.Y. County Aug. 26, 2022) (requesting the Court to enter a judgment against TVA "for the full principal amount, [redemption] premium, accrued and unpaid interest, and other amounts due on certain 8.250% Senior Notes due 2024"); Memorandum of Law in Support of Defendants' Opp. to Plaintiff's Motion for Summary Judgment in Lieu of Complaint and in Support of Defendants' Motion to Compel Plaintiff to File a Complaint, Dkt. No. 9 at 14–15, *The Bank of New York Mellon* v. *TV Azteca, S.A.B. de C.V.*, No. 1:22-cv-08164-PGG (S.D.N.Y. Oct. 14, 2022); Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment and in Opposition to Defendants' Motion to Compel Plaintiff to File a Complaint, Dkt. No. 14 at 1, *The Bank of New York Mellon* v. *TV Azteca, S.A.B. de C.V.*, No. 1:22-cv-08164-PGG (S.D.N.Y. Oct. 14, 2022) ("Plaintiff is entitled to a judgment against Defendants for the principal, premium, and accrued and unpaid interest due under the [] Note[s].").

712 n.8; *In re Koffee Kup Bakery, Inc.*, No. 21-10168, 2022 WL 141516, at *7 (Bankr. D. Vt. Jan.

14, 2022).   Accordingly, the Involuntary Petitions should be dismissed because the Petitioning

Creditors fail the eligibility requirements of Section 303(b)(1) of the Bankruptcy Code.

> **B.     The Court Should Dismiss the Involuntary Petitions for Cause Pursuant to
> Section 1112(b) of the Bankruptcy Code.**

75.     Section 1112(b) of the Bankruptcy Code authorizes dismissal of a chapter 11

petition for "cause."  11 U.S.C. § 1112(b).  While the Bankruptcy Code does not define "cause,"

section 1112(b)(4) sets forth sixteen non-exclusive examples.  *See id.*  Courts have considerable

discretion to grant dismissal for an "unenumerated cause" other than those sixteen.  *See In re

Murray*, 543 B.R. at 492; *see also In re AMC Realty Corp.*, 270 B.R. 132, 147 (Bankr. S.D.N.Y.

2001) (dismissing chapter 11 case for "non-enumerated cause").  Section 1112(b) gives bankruptcy

courts "equitable powers to reach an appropriate result in individual cases."  *C-TC 9th Ave. P'ship*

v. *Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1311 n.5 (2d Cir. 1997) (quoting H.R.

REP. NO. 95–595, 95th Cong., 1st Sess., at 405–6, U.S. Code Cong. & Admin. News 1978, pp.

5787, 6363–64).

76.     "Inappropriate use of the Bankruptcy Code may constitute cause to dismiss,"

whether or not such misuse rises to the level of "bad faith."  *In re Murray*, 900 F.3d at 60–61

(noting that "[w]e need not, however, classify misuse of the Bankruptcy Code as bad faith in order

to accept it as cause to dismiss"); *see also In re Taberna Preferred Funding IV, Ltd.*, 594 B.R. 576,

606 (Bankr. S.D.N.Y. 2018) (following *Murray* and dismissing involuntary petition that was not

a "genuine attempt to reorganize the [alleged debtors] so that it can reemerge from bankruptcy as

a viable on-going business," but rather "a last-ditch effort by a senior sophisticated noteholder to

further its personal, tactical and pecuniary aims").  "[A] central purpose of the Bankruptcy Code

is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace

with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"  *Grogan* v. *Garner*, 498 U.S. 279, 286 (1991) (quoting *Local Loan Co.* v. *Hunt*, 292 U.S. 234, 244 (1934)).  In *Murray*, the Second Circuit affirmed the dismissal of an involuntary bankruptcy petition that failed to serve that purpose.  *In re Murray*, 900 F.3d at 61.

77.     As in *Murray*, this case "present[s] a variant of a common practice in cases in this Court and elsewhere—the filing of a case under the Bankruptcy Code as a tactic in a two-party dispute," for which "adequate remedies existed in state law."  *In re Murray*, 543 B.R. at 486; *see also In re The Bridge to Life, Inc.*, 330 B.R. 351, 357 (Bankr. E.D.N.Y. 2005) (dismissal for cause appropriate in two-party dispute "involving non-bankruptcy law brought in the bankruptcy court in the guise of being a reorganization of some sort under Chapter 11") (quoting *In re HBA E., Inc.*, 87 B.R. 248, 260 (Bankr. E.D.N.Y. 1988)).

78.     Here, as discussed above ¶¶ 31–33, prior to the filing of the Involuntary Petitions, the Petitioning Creditors and the Alleged Debtors were litigating before Judge Gardephe over the amount due on the Notes, and in Mexico.  The Petitioning Creditors had an adequate remedy in the action before Judge Gardephe.  They are also defending cases in the courts of Mexico, and if they believed in a stay in Mexico was warranted, they could have asked Judge Gardephe to enjoin litigation in Mexico, or asked for injunctive relief in Mexico.  Instead, the Petitioning Creditors sought to move the litigation over their claims from Judge Gardephe to this Court, and to circumvent the high standard for an injunction against litigation in a foreign court by seeking the same result through the automatic stay.

79.     The Petitioning Creditors will suffer no prejudice as a result of a for-cause dismissal because they will enjoy adequate remedies before Judge Gardephe and the courts of Mexico.  The

Petitioning Creditors' "preference for bankruptcy remedies to solve a two-party dispute cannot outweigh the lack of any other bankruptcy-related purpose." *In re Murray*, 900 F.3d at 62; *see also In re Bos*, 561 B.R. 868, 901 (Bankr. N.D. Fla. 2016) (for-cause dismissal proper even if the petitioning creditor may enjoy greater remedy in bankruptcy).

80.    The necessity of a "for cause" dismissal is reinforced by the objective futility of a U.S. chapter 11 restructuring, for the reasons discussed above. "[T]he general purpose of bankruptcy law is to provide the bankrupt with comprehensive, much needed relief from the burden of his indebtedness by releasing him from virtually all his debts." *In re Maddigan*, 312 F.3d 589, 596 (2d Cir. 2002) (internal quotations omitted). "Comprehensive" relief to the Alleged Debtors is unattainable in this forum because the Alleged Debtors' Mexican creditors will be able to pursue remedies in Mexico, which will not recognize the automatic stay; no releases given here will be honored there, and not reorganization here will be given any effect there.

81.    For all these reasons, "this is not the type of case for which Congress enacted Chapter 11 of the Bankruptcy Code," and so a for-cause dismissal is appropriate. *In re Taberna*, 594 B.R. at 602, 606.

## CONCLUSION

82.    For the reasons set forth above, the Alleged Debtors respectfully request entry of an order dismissing the Involuntary Petitions with prejudice pursuant to Sections 105, 303, 305, and 1112(b) of the Bankruptcy Code, the doctrine of *forum non conveniens*, Rule 12(b)(6) of the Federal Rules of Civil Procedure, and Rules 1011(b), 1017, and 1018 of the Bankruptcy Rules. TVA further reserves the right to seek judgment pursuant to Section 303(i) of the Bankruptcy Code.

New York, New York
Dated: April 25, 2023

/s/ Jay Cohen

Jay Cohen
Elizabeth R. McColm
William A. Clareman
Sean A. Mitchell
Shane D. Avidan

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**

1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
jcohen@paulweiss.com
emccolm@paulweiss.com
wclareman@paulweiss.com
smitchell@paulweiss.com
savidan@paulweiss.com

*Counsel to the Alleged Debtors*