**AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, New York 10036
Tel:     (212) 872-1000
Fax:     (212) 872-1002
Michael S. Stamer
Abid Qureshi
David Giller

2300 North Field Street, Suite 1800
Dallas, Texas 75201
Tel:     (214) 969-2800
Fax:     (214) 969-4343
Sarah Link Schultz (*admitted pro hac vice*)

*Counsel to the Petitioning Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TV Azteca, S.A.B. de C.V., *et al.*,[1] | ) | Case No. 23-10385 (LGB) |
| | ) | |
| | ) | (Jointly Administered) |
| Alleged Debtors. | ) | |
| | ) | |

**PETITIONING CREDITORS' OPPOSITION**
**TO THE ALLEGED DEBTORS' MOTION TO DISMISS**

---

[1] The Debtors in these cases are TV Azteca, S.A.B. de C.V.; Alta Empresa, S.A. de C.V.; Asesoría Especializada En Aviación, S.A. de C.V.; Equipo de Futbol Mazatlan, S.A. de C.V.; Producciones Dopamina, S.A. de C.V.; Azteca Records, S.A. de C.V.; Ganador Azteca, S.A.P.I. de C.V.; Operadora Mexicana De Televisión, S.A. de C.V.; Azteca Sport Rights LLC; Producciones Azteca Digital, S.A. de C.V.; Producciones Especializadas, S.A. de C.V.; Productora De Televisión Regional De Tv Azteca, S.A. de C.V.; Promotora de Futbol Rojinegros, S.A. de C.V.; Mazatlan Promotora de Futbol, S.A. de C.V.; Publicidad Especializada en Medios de Comunicación de TV Azteca, S.A. de C.V.; S.C.I. de México, S.A. de C.V.; Servicios Aéreos Noticiosos, S.A. de C.V.; Servicios Especializados Taz, S.A. de C.V.; Servicios y Mantenimiento del Futuro en Televisión, S.A. de C.V.; Corporación de Asesoría Técnica y de Producción, S.A. de C.V.; Editorial Mandarina, S.A. de C.V.; Multimedia, Espectáculos y Atracciones, S.A. de C.V.; Servicios Foráneos de Administración, S.A. de C.V.; Servicios Locales De Producción, S.A. de C.V.; Azteca International Corporation; Stations Group, LLC; TV Azteca Honduras, S.A. de C.V; Comercializadora de Televisión de Honduras, S.A. de C.V.; Incotel S.A.; TVA Guatemala S.A; Lasimex, S.A. de C.V.; TV Azteca Global, S.L.U.; Azteca Comunicaciones Perú, S.A.C.; Redes Opticas, S.A.C; Televisora del Valle de México, S.A. de C.V. The location of the Debtors' corporate headquarters is Periférico Sur 4121, colonia Fuentes del Pedregal, alcaldía Tlalpan, C.P. 14140, Ciudad de México, México.

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

 A. The Debtors Conduct Business in and Have Extensive Contacts
  with the United States ...............................................................................2

 B. TV Azteca Decides to Access US Capital Markets to Raise $400
  million and then Elects to Default on its Obligations ................................8

 C. TV Azteca Voluntarily Elects to Repay Structurally Subordinate
  Mexican Creditors Ahead of Schedule and Change the Notes'
  Guarantor Structure ...............................................................................10

 D. Noteholders Organize and Seek to Negotiate a Consensual
  Restructuring with TV Azteca...................................................................11

 E. Noteholders Direct the Indenture Trustee to Accelerate the Notes...........11

 F. TV Azteca Faces Creditor Litigation in the United States........................12

 G. TV Azteca Commences Litigation in Mexico to Avoid its
  Obligations to U.S. Creditors...................................................................13

 H. The Petitioning Creditors File Involuntary Chapter 11 Petitions .............16

ARGUMENT .......................................................................................................................17

 I. The Court has Jurisdiction Over the Debtors...........................................17

 II. The Debtors Cannot Meet the Heavy Burden of Establishing that
  Dismissal is Warranted Under Bankruptcy Code Section 305(a)(1) .....................18

  A. The Chapter 11 Cases Are Not "Objectively Futile" .................................19

   i. These Chapter 11 Cases Would Be Recognized Under
    Mexican Law .............................................................................20

   ii. The Petitioning Creditors Intend to Propose a Viable and
    Confirmable Chapter 11 Plan of Reorganization .........................23

   iii. The Debtors' Case Law is Unavailing ...........................................23

  B. No Other Factors Favor Abstention .........................................................25

 III. Forum Non Conveniens Does Not Support Dismissal .........................................27

  A. The Petitioning Creditors' Choice of Forum is Entitled to
   Substantial Deference ...............................................................................28

  B. Mexico is Not an Adequate Alternative Forum .........................................33

  C. The Private and Public Interest Factors Do Not Support Dismissal..........35

 IV. The Petitioning Creditors' Claims Are Not Subject to Any Dispute, Much
  Less a "Bona Fide" Dispute Sufficient to Sustain a Motion to Dismiss
  Under Bankruptcy Code Section 303(b)(1) .....................................................37

V.      There Is No Basis to Dismiss the Chapter 11 Cases for Cause..............................38

        A.      The Chapter 11 Cases Are More than a Two-Party Dispute .....................39

        B.      The Petitioning Creditors Would Suffer Prejudice by Dismissal...............40

        C.      A Resolution Before This Court Is Not "Objectively Futile" ...................40

CONCLUSION.................................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aenergy, S.A. v. Republic of Angola*,
  31 F.4th 119 (2d Cir. 2022), cert. denied, 143 S. Ct. 576 (2023) ...........................................35

*Atl. Marine Constr. Co. v. United States Dist. Court*,
  571 U.S. 49 (2013).................................................................................................................31, 35

*Bank of Credit & Com. Int'l (Overseas) Ltd. v. State Bank of Pakistan*,
  273 F.3d 241 (2d Cir. 2001).........................................................................................................27

*In re Bd. of Dirs. of Multicanal S.A.*,
  314 B.R. 486 (Bankr. S.D.N.Y. 2004) ...................................................................................24, 25

*In re Bos*,
  561 B.R. 868 (Bankr. N.D. Fla. 2016) ...................................................................................39, 40

*In re Certa Dose, Inc.*,
  2021 WL 5177376 (Bankr. S.D.N.Y. 2021) ................................................................................31

*In re Compania de Alimentos Fargo, S.A.*,
  376 B.R. 427 (Bankr. S.D.N.Y. 2007).........................................................................................31

*Diamond Films Netherlands Cooperatief U.A. v. TV Azteca S.A.B. de D.V.*,
  Index No. 655384/2020 (N.Y. Sup. Ct., N.Y. County April 4, 2023) .....................................12

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
  375 F.3d 168 (2d. Cir. 2004).......................................................................................................31

*In re Globo Comunicacoes e Participacoes S.A.*,
  317 B.R. 235 (S.D.N.Y. 2004)...........................................................17, 18, 19, 25, 31, 36, 37

*Gloria de Los Angeles Trevino Ruiz, et al. v. Azteca America, et al.*,
  Docket No. C-1027-09-C (Tex. Dist. & Cnty. –Hidalgo, 139th Dist. Ct., Apr.
  14, 2009) .......................................................................................................................................13

*In re Grupo Aeroméxico, S.A.B. de C.V.*,
  Case No. 20-11563 (Bankr. S.D.N.Y. 2020) ........................................................................20, 21

*Hong Kong & Shanghai Banking Corp., Ltd. v. Simon (In re Simon)*,
  153 F.3d 991 (9th Cir. 1998), cert. denied, 525 U.S. 1141(1999).....................................17, 18

*Iragorri v. United Techs. Corp.*,
  274 F.3d 65 (2d Cir. 2001)....................................................................................28, 29, 33, 35

*In re J.B. Lovell Corp.*,
    88 B.R. 459 (Bankr. N.D. Ga. 1988) ....................................................................38

*JP Morgan Chase Bank v. Altos Hornos de Mexico*,
    S.A. de C.V., 412 F.3d 418 (2d Cir. 2005) ..........................................................34

*Kingstown Capital Mgt., L.P. v. Vitek*,
    No. 19cv3170 (DLC), 2020 WL 5350492 (S.D.N.Y. Sept. 4, 2020) ....................27

*In re Metrofinanciera, S.A.P.I. de C.V.*,
    No. 10-20666, 2010 WL 10063949 (Bankr. S.D. Tex. Sept. 24, 2010) .................34

*In re Murray*,
    543 B.R. 484 (Bankr. S.D.N.Y. 2016) ..................................................................39

*In re Navient Solutions, LLC*,
    625 B.R. 801 (Bankr. S.D.N.Y. 2021), *aff'd*, No. 21-CV-2897 (JGK), 2022
    WL 863409 (S.D.N.Y. Mar. 23, 2022), *reconsideration denied*, No. 21-CV-
    2897 (JGK), 2022 WL 1500771 (S.D.N.Y. May 12, 2022) ..................................27

*Off. Comm. Of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*,
    549 B.R. 56 (S.D.N.Y. 2016)................................................................................36

*In re Paper I Partners, L.P.*,
    283 B.R. 661 (Bankr. S.D.N.Y. 2002)............................................................18, 27

*Petersen Energia Inversora S.A.U. v. Argentine Republic*,
    No. 15 CIV. 2739 (LAP), 2020 WL 3034824 (S.D.N.Y. June 5, 2020) ....28, 29, 32

*In re Petition of Trevor*,
    No. 92-B-46210, 1992 WL 391289 (Bankr. S.D.N.Y. Dec. 10, 1992) ..................26

*Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*,
    78 F.R.D. 445 (D. Del. 1978) ..........................................................................33, 36

*Pollux Holding Ltd. v. Chase Manhattan Bank*,
    329 F.3d 64 (2d Cir. 2003)....................................................................................33

*In re RHA Stroud, Inc.*,
    No. 20-13482-SAH, 2020 WL 7787034 (Bankr. W.D. Okla. Dec. 30, 2020) ........19

*In re Satellites Mexicanos, S.A.*,
    Case No. 06-11868 (Bankr. S.D.N.Y. 2006) ....................................................20, 21

*In re Satellites Mexicanos, S.A.*,
    Case No. 11-11035 (Bankr. D. Del. 2011) .......................................................20, 21

*Skanga Energy & Marine Ltd. v. Arevenca S.A.*,
 875 F. Supp. 2d 264 (S.D.N.Y. 2012), *aff'd sub nom. Skanga Energy &
 Marine Ltd. v. Petroleos de Venezuela S.A.*, 522 F. App'x 88 (2d Cir. 2013) .............28, 30, 33

*In re Spanish Cay Co., Ltd.*,
 161 B.R. 715 (Bankr. S.D. Fla. 1993)..............................................................................24, 37

*In re Stillwater Asset Backed Offshore Fund Ltd.*,
 485 B.R. 498 (Bankr. S.D.N.Y. 2013) .....................................................................................37

*In re Taberna Preferred Funding IV, Ltd.*,
 594 B.R. 576 (Bankr. S.D.N.Y. 2018) .....................................................................................39

*In re Xacur*,
 219 B.R. 956 (Bankr. S.D. Tex. 1998) ...............................................................23, 24, 34, 37

**Statutes**

11 U.S.C. § 303(b)(1) ....................................................................................................................37

11 U.S.C. § 304(c) .........................................................................................................................24

11 U.S.C. § 305(a)(1)........................................................................................................18, 19, 31

11 U.S.C. § 305(a)(2).....................................................................................................................24

11 U.S.C § 362 ...............................................................................................................................16

11 U.S.C. § 1112(b)(1) ..................................................................................................................39

11 U.S.C. § 1112(b)(4) ..................................................................................................................39

Cyrus Opportunities Master Fund II, Ltd., Plenisfer Investments SICAV - Destination Value Total Return, and Sandpiper Limited (the "Petitioning Creditors"), creditors of TV Azteca, S.A.B. de C.V. ("TV Azteca") and its affiliated debtors, as debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned involuntary chapter 11 cases (the "Chapter 11 Cases"), respectfully submit this brief in opposition (the "Opposition") to the *Motion to Dismiss the Involuntary Chapter 11 Petitions* [ECF No. 26] (the "Motion to Dismiss").

### INTRODUCTION

1.     The Debtors seek to dismiss these involuntary Chapter 11 Cases because they allege that TV Azteca cannot be restructured through a chapter 11 proceeding.  The reality, however, is that TV Azteca does not want to restructure its U.S. obligations, whether through a chapter 11 proceeding or otherwise.  Instead, TV Azteca has demonstrated its singular determination to avoid entirely its obligations to U.S. creditors, brazenly ignore its contractual duties under New York law-governed contracts, and pursue specious *ex parte* remedies in the Mexican courts designed solely to deprive its U.S. creditors of any recovery while structurally subordinate Mexican creditors are paid in full.

2.     TV Azteca's actions are all the more brazen as it chose voluntarily to conduct substantial business activities in the United States, and specifically to access U.S. capital markets in order to raise $400 million of debt financing under the protection of U.S. law.  Having now made the decision to disregard their U.S. contractual obligations, the Debtors cannot avoid U.S. jurisdiction.  This Court can and should preside over the restructuring of TV Azteca by entry of an order for relief in these involuntary chapter 11 proceedings.  In fact, TV Azteca would thereby become one of numerous Mexican companies to restructure through chapter 11 without a parallel *Concurso Mercantil* in Mexico.  Most recently, AeroMéxico did exactly that in this Court, preceded by numerous other Mexican companies with their center of main interests in Mexico.

The present facts plainly do not involve debtors that cannot be restructured in chapter 11, but instead a debtor that does not want to be restructured in the U.S. (or elsewhere). Such circumstances—a debtor that simply refuses to restructure and instead chooses selectively to satisfy only certain of its favored creditors—is precisely why the Bankruptcy Code provides for the commencement of involuntary proceedings.

3.      Fundamentally, all the requirements for the commencement of these involuntary chapter 11 proceedings have been satisfied and, therefore, this Court has jurisdiction over the Debtors, which include entities located in the United States, and their assets wherever located. The burden now shifts to the Debtors to demonstrate why this Court should exercise its discretion to dismiss the Chapter 11 Cases. It is a burden the Debtors cannot meet. All the legal theories that the Debtors advance to meet their burden to dismiss these proceedings—(i) that a chapter 11 will not be recognized and therefore cannot be enforced in Mexico, (ii) that TV Azteca can only be restructured in Mexico through a *Concurso Mercantil*, (iii) that the petitions should be dismissed on forum non conveniens grounds, (iv) that Petitioning Creditors do not have standing, and (v) that there is cause to dismiss these Chapter 11 Cases—are equally flawed and unavailing.

4.      Thus, for the reasons fully set forth below, the Petitioning Creditors respectfully submit that the Motion to Dismiss should be denied.

## BACKGROUND

**A. The Debtors Conduct Business in and Have Extensive Contacts with the United States[2]**

5.      TV Azteca is one of the largest producers of Spanish-language television programming in the world, operating three national television networks in Mexico through more

---

[2] Discovery remains ongoing, and the Petitioning Creditors believe that the Debtors have contacts with the United States in addition to those identified here.

than 300 owned and operated stations across the country.  *See Declaration of Abid Qureshi* [ECF No. 36] ("Qureshi Dec."), Ex. 1, AZTECA-00000059, (the "Annual Report") at AZTECA-00000072-3.  TV Azteca also operates or licenses television networks throughout the Americas, including Honduras and Peru.  *Id.* at AZTECA-00000108.  TV Azteca is majority-owned by Grupo Salinas, a special purpose vehicle controlled by billionaire Ricardo B. Salinas Pliego, the third richest person in Mexico.[3]  *Id.* at AZTECA-00000078.  The guarantors under the Indenture are subsidiaries of TV Azteca that provided a guarantee (the "Guarantors") pursuant to section 10.1 of the Indenture, which provides that the Guarantors fully guarantee the obligations of TV Azteca.  Qureshi Dec., Ex. 2 (the "Indenture"), § 10.1.

6.      TV Azteca's business includes a number of U.S. subsidiaries and external partnerships involving U.S. consumers and viewers.  TV Azteca owns and operates several U.S. subsidiaries, including: (i) Debtor Azteca International Corporation ("Azteca International"), a Delaware corporation; (ii) Debtor Stations Group, LLC ("Stations Group"), a Delaware limited liability company; (iii) Debtor Azteca Sport Rights, LLC ("Azteca Sport"), a Delaware limited liability company; (iv) Northstar Media, LLC, a Delaware limited liability company; (v) Northstar McAllen License, LLC, a Delaware limited liability company; and (vi) Dopamine Entertainment, Inc., a Delaware corporation.  *See* Qureshi Dec., Ex. 3, AZTECA-00001311.  TV Azteca's U.S. subsidiaries retain significant assets. ████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

---

[3] In 2006, Salinas settled a law suit brought by the Securities Exchange Commission under the Sarbanes-Oxely Act. Under the settlement, Salinas was forbidden from serving as an executive or director to any publicly listed American company.  Elizabeth Malkin, Billionaire in Mexico Settles Case with S.E.C., THE NEW YORK TIMES (Sept. 15, 2006) https://www.nytimes.com/2006/09/15/business/worldbusiness/15sec.html.

Additionally, as of February 28, 2023, TV Azteca and its subsidiaries owned bank accounts in the

United States with an aggregate balance of approximately $200,000 according to the Debtors.  *See*

Rodriguez Declaration ¶ 24.  Upon information and belief, TV Azteca derives substantial profit

from assets, licenses, and other operations located in the United States.

        7.        TV Azteca's largest U.S. subsidiary, Debtor Azteca International, previously owned

and operated a Spanish-language television network in the United States called Azteca America.

In the second and third quarters of 2017, stations related to Azteca America sold their spectrum

rights in a Federal Communications Commission auction for $156 million.  Annual Report at

AZTECA-00000112–13.  In November 2017, Azteca International sold Azteca America to HC2

Network, Inc. ("HC2").  *Id.*  From November 29, 2017 until December 31, 2022, Azteca

International provided HC2 a license to broadcast audiovisual content and programming from TV

Azteca's video library in the United States.  *See* Qureshi Dec., Ex. 7, AZTECA-00001874; Qureshi

Dec., Ex. 8, AZTECA-00001863.  ███████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████

        8.        █████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

9.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

10.    In addition to its U.S. subsidiaries and licensing agreements, TV Azteca has for years entered into partnerships with various U.S. entities to develop programming for the U.S. market or to obtain licenses to broadcast content created or owned by U.S. entities in Mexico.

- 

- ████████████████████████████████████████████████



- In 2023, TV Azteca and ICARO announced the U.S. launch of "AZTECA NOW," a video application hosting TV Azteca's content, which is sold to U.S. consumers through iOS and Android stores. *See* Qureshi Dec., Ex. 24.

- In 2022, TV Azteca announced a partnership with Estrella Media, Inc. ("Estrella"), a California corporation, to co-create original programming for audiences in the United States and Mexico. *See* Qureshi Dec., Ex. 28.

██████████████████████████████████████████████████████████[4]

11.    ██████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██ Indeed, despite purportedly closing its Miami office in 2019 and filing to withdraw its authority to conduct business in Florida in 2020, Azteca International has continued to apply for trademarks in the United States using a Florida address as recently as December 2022.  *See* Qureshi Dec., Ex. 59.[5]

12.    Upon information and belief, TV Azteca currently maintains and operates U.S. operations in Florida through other companies owned and controlled by Grupo Salinas.[6]  Starting in 2013, Azteca International and a Delaware limited liability company called Castillo LLC shared the same office in Miami.  *See* Qureshi Dec., Ex. 33; Ex. 34.  In April 2019, concurrently with Azteca International allegedly ending its Florida presence, GSI Management USA LLC ("GSI"), a Delaware limited liability company, registered to do business at the same address as Azteca International.  *See* Qureshi Dec., Ex. 35.  A former employee of each of Azteca International Corporation LLC, Castillo LLC, and GSI Management USA LLC described Castillo and GSI as "a $500 million private investment fund and the family office of Grupo Salinas."  *See* Qureshi Dec., Ex. 36.

---

[4] A summary of key contracts between Debtors and U.S. Parties can be found at Qureshi Dec., Ex. 58.

[5] Upon information and belief TV Azteca also maintains significant assets and operations in Europe.

[6] Petitioning Creditors reserve their right to pursue veil piercing or alter ego theories to the extent warranted by the results of further investigation.

13.     It appears that GSI, an allegedly independent company, utilizes employees who appear also to work for TV Azteca.  For example, in its application for authority to do business in Florida, GSI listed a contact person named Lisandra Cassola who used a TV Azteca-related email address (lcassola@aztecaamerica.com) in the application.  *See* Qureshi Dec., Ex. 35.  Further, in 2019, GSI filed an application with the U.S. Department of Labor and identified Horacio Medal as the contact person for GSI, although Mr. Medal provided a TV Azteca email.  *See* Qureshi Dec., Ex. 37.  According to Mr. Medal's LinkedIn Profile, he worked at Azteca America and Azteca International from 2000 until December 2019, at which point he became the Senior Vice President and Chief Legal Officer of GSI.  *See* Qureshi Dec., Ex. 38.  However, ███████████████

███████████████████████████████████████████████████

███████████████████, and Mr. Medal has negotiated agreements on behalf of TV Azteca using his GSI email, Qureshi Dec., Ex. 40.  Finally, GSI moved to a new address in Miami in 2021—the same address Azteca International uses to continue to apply for trademarks.  *See* Qureshi Dec., Ex. 41; Ex. 32.

14.     Additionally, TV Azteca's U.S. subsidiaries remain subject to several tax liens in Los Angeles County, California.  The Los Angeles County Tax Collector has filed liens against Azteca International for unpaid property taxes in 2020, 2021, and 2022.[7]

**B.  TV Azteca Decides to Access U.S. Capital Markets to Raise $400 million and then Elects to Default on its Obligations**

15.     On August 9, 2017, TV Azteca issued $400 million in unsecured notes (the "<u>Notes</u>") pursuant to that certain indenture, dated as of August 9, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Indenture</u>").  Under the terms of the Indenture, TV

---

[7] See Qureshi Dec., Ex. 42; Ex. 43; Ex. 44; Ex. 45.

Azteca is obligated to make semi-annual interest payments at the rate of 8.250% per annum on the $400 million principal sum on August 9 and February 9 of each year during the term of the Indenture.  Indenture § 3.1, A-1.  The Indenture further provides that the Guarantors fully guarantee the obligations of TV Azteca, "whether at maturity, by acceleration, by redemption or otherwise," under the Indenture.  Indenture § 10.1.

16.    The Indenture was negotiated and the Notes were issued in New York.  TV Azteca relied on agents located in the U.S. to market and place the Notes at TV Azteca's direction.  Specifically, upon information and belief, Morgan Stanley and Jefferies Group LLC (both headquartered in Manhattan) and BCP Securities (headquartered 45 minutes outside of New York City in Greenwich, Connecticut) acted as underwriters for the issuance, and Winston & Strawn LLP (with offices in New York City) acted as legal counsel to TV Azteca.  *See* Indenture § 11.1.  Upon information and belief, TV Azteca also sold the Notes via a roadshow that included cities in the U.S. such as New York, Los Angles, and Boston.  The Indenture contains New York choice-of-law and forum selection clauses by which TV Azteca agreed that any action may be commenced in any court in the State of New York sitting in Manhattan.  *Id.* at § 11.7.  Specifically, the parties to the Indenture, including each of the Debtors, agreed that the Indenture "shall be governed by, and construed in accordance with, the law of the State of New York" and that "***any suit, action or proceeding*** against it arising [from] or relating to this Indenture (including the Note Guarantees) or the Notes . . . may be instituted in any court of the State of New York or any [U.S.] court sitting, in each case, in the Borough of Manhattan, The City of New York, New York."  *Id*. (emphasis added).  TV Azteca further consented to the "exclusive jurisdiction of any court of the State of New York or any [U.S.] court sitting, in each case, in the Borough of Manhattan."  *Id.*  The parties to the Indenture took no steps to carve out insolvency proceedings from the jurisdictional grant.

9

17.     On February 9, 2021, TV Azteca publicly announced that it would "defer" the interest payment due on that date, despite the absence of any provision allowing such a deferral under the Indenture.  *See* Qureshi Dec., Ex. 46.  TV Azteca elected not to make every interest payment due thereafter, including the payments due on August 9, 2021, February 9, 2022, August 9, 2022, and February 2023.  *See* Qureshi Dec., Ex. 47.

**C.   TV Azteca Voluntarily Elects to Repay Structurally Subordinate Mexican Creditors Ahead of Schedule and Change the Notes' Guarantor Structure**

18.     In the same February 9, 2021 press release in which TV Azteca announced it would defer payments to holders of the Notes (the "Noteholders"), TV Azteca stated that it would amortize early up to 1.2 billion Mexican pesos of principal, out of 4 billion pesos of principal outstanding, of its unsecured local debt, the Certificados Bursátiles ("CEBURES").  *See* Qureshi Dec., Ex. 46.  The CEBURES debt is structurally subordinate to the Notes in that, unlike the Notes, it has no credit support from the Guarantors.  On March 5, 2021, TV Azteca finalized the purchase, at or near par, and cancelation of 1.21 billion pesos of the CEBURES on the secondary market.  At the same time TV Azteca was ignoring its contractual obligations under the Notes, it was voluntarily amortizing its local Mexican subordinate indebtedness.  *See* Qureshi Dec., Ex. 48.  TV Azteca paid off the remainder of the CEBURES in the fourth quarter of 2022.  *See* Qureshi Dec., Ex. 49, AZTECA-00000495, at AZTECA-00000502.

19.     During this time period, TV Azteca also eliminated 23 of 57 original Guarantors of the Notes either through merger with other TV Azteca entities or sale to third parties, all without notice to the Noteholders or the Indenture Trustee.  Further, upon information and belief, in 2021 TV Azteca entered into an amendment to a revolving credit facility with Banco Azteca, a Mexican bank controlled by Grupo Salinas, that granted Banco Azteca a security interest in a trust holding several real estate properties.  In addition, upon information and belief, TV Azteca transferred into

a trust certain of its principal assets—including its licenses and concessions—in order to secure its

obligations in favor of Banco Azteca.

**D. Noteholders Organize and Seek to Negotiate a Consensual Restructuring with TV Azteca**

20.     Following TV Azteca's initial missed interest payment, Noteholders holding in

excess of 65% of the aggregate principal of the Notes outstanding, including each of the Petitioning

Creditors, formed an ad hoc group (the "Ad Hoc Group") to seek a negotiated solution for TV

Azteca's default, as well as TV Azteca's debt more broadly.  The Ad Hoc Group repeatedly sought

to engage in constructive dialogue with TV Azteca and made numerous restructuring proposals,

most of which received no response.  The Ad Hoc Group is now aware that, at the same time as

TV Azteca was purporting to negotiate, it was simultaneously pursuing ex parte remedies in

Mexico, making clear that it never had any intention of paying the principal or interest due on the

Notes.

**E. Noteholders Direct the Indenture Trustee to Accelerate the Notes**

21.     On May 3, 2022, as a result of the Events of Default (as defined in the Indenture)

due to the missed interest payments, Holders of more than 25% of the aggregate principal amount

of outstanding Notes (the "Directing Holders") issued a notice of acceleration to TV Azteca and

the Indenture Trustee (the "Holder Acceleration Notice") pursuant to and in accordance with the

terms of the Indenture.  *See* Qureshi Dec., Ex. 50.  On August 5, 2022, a result of the Events of

Default and the lack of progress in negotiations with TV Azteca, despite the best efforts of the Ad

Hoc Group, the Directing Holders directed the Indenture Trustee to issue a notice of acceleration

to TV Azteca.  On the same date, the Indenture Trustee issued a Notice of Acceleration to TV

Azteca (the "Trustee Acceleration Notice" and, collectively with the Holder Acceleration Notice,

the "Acceleration Notices").  *See* Qureshi Dec., Ex. 47.  On August 8, 2022, the Indenture Trustee,

at the direction of the Directing Noteholders, issued a supplement to the Trustee Acceleration Notice. *See* Qureshi Dec., Ex. 51. On August 8, 2022, TV Azteca issued a press release acknowledging receipt of the Acceleration Notices. *See* Qureshi Dec., Ex. 52. As of the date of the filing of these Chapter 11 Cases, the Debtors have failed to pay in excess of $494 million of principal and interest due on the Notes.

### F. TV Azteca Faces Creditor Litigation in the United States

22.     On August 26, 2022, at the direction of the Directing Noteholders, the Indenture Trustee initiated litigation against TV Azteca and the Guarantors in New York State Supreme Court (the "New York Litigation") seeking compensatory damages totaling the aggregate amount of accrued and unpaid interest based on TV Azteca's failure to make three interest payments, the full amount of interest up to the date of acceleration on August 5, 2022, and the full amount of principal due under the Indenture at that time, collectively totaling $469,783,272.[8] On September 23, 2022, TV Azteca removed the New York Litigation to the U.S. District Court for the Southern District of New York (the "Federal Litigation"). The Federal Litigation has been stayed since the filing of the Chapter 11 Cases.

23.     The Noteholders are not TV Azteca's only U.S. creditors to have commenced legal action. On October 16, 2020, Diamond Films Netherlands Coöperatief U.A. ("Diamond") commenced an action against TV Azteca in New York State Supreme Court for breach of a license agreement between Diamond and TV Azteca (the "Diamond Litigation"). After TV Azteca failed to timely appear in the Diamond Litigation, Diamond moved for a default judgment on December 30, 2021. Only then did TV Azteca appear, arguing that Diamond's action should be dismissed

---

[8] The New York Litigation included the Redemption Premium, valued at $16,500,000.

for improper service.  On February 23, 2022, the court granted Diamond's motion for a default

judgment and denied TV Azteca's motion to dismiss.  TV Azteca later moved to vacate the default

judgment.  Following the commencement of this proceeding, the court denied TV Azteca's motion

without prejudice to renewal.  *See* Qureshi Dec., Ex. 53.

24.     TV Azteca is also a defendant in an ongoing lawsuit in the courts of Texas brought

by Gloria Trevi, a Mexican singer and actress, arising out of allegedly defamatory on-air remarks

concerning Trevi and her minor son.  *See Gloria de Los Angeles Trevino Ruiz, et al. v. Azteca*

*America, et al.*, Case No. C-1027-09-C (Tex. Dist. & Cnty. –Hidalgo, 139th Dist. Ct., Apr. 14,

2009).  TV Azteca is currently appealing the denial of its motion for summary judgment.

*See* Qureshi Dec., Ex. 54.

**G.   TV Azteca Commences Litigation in Mexico to Avoid its Obligations to U.S. Creditors**

25.     On September 22, 2022, TV Azteca commenced litigation (the "September 2022

Mexican Litigation") against certain Noteholders and the Indenture Trustee in the Superior Court

of Justice of Mexico City (the "Mexican Superior Court").  *Declaration of Fernando del Castillo*

*in Support of the Petitioning Creditors' Opposition to the Alleged Debtors' Motion to Dismiss the*

*Involuntary Chapter 11 Petitions* [ECF No. 37] (the "Castillo Dec.") ¶ 9.  TV Azteca's Complaint

sought declaratory and injunctive relief to excuse TV Azteca's missed interest payments and to

prevent any efforts by the Noteholders to collect either principal or interest under the Indenture on

the purported basis that, among other things, the outbreak of the COVID-19 pandemic and

subsequent related orders by the Mexican government represented "Acts of God and Force

Majeure events" that rendered TV Azteca's performance under the Indenture impossible from the

date the World Health Organization declared the COVID-19 outbreak a pandemic—March 11,

2020—until the present day.  *See id.* ¶¶ 8–9.  The Complaint also asserted various arguments that

the Acceleration was purportedly improper and that TV Azteca is under no obligation to pay the

principal or interest on the Notes.  *See id.*  TV Azteca commenced the September 2022 Mexican

Litigation without informing the Petitioning Creditors, any other Noteholders, or the Indenture

Trustee, and without notice to the court presiding over the Federal Litigation.  *See id.* ¶ 11.  Notably,

the September 2022 Mexican Litigation was commenced only ***one day*** before removing the New

York Litigation to federal court.

      26.     On September 27, 2022, the Mexican Superior Court issued an ex parte injunction

(the "<u>First Injunction</u>") to "keep the current factual situation" by, among other things, purporting

to block payment on the Notes, prohibiting any proceedings to enforce the Notes, and deeming the

Acceleration Notices ineffective until the World Health Organization ("<u>WHO</u>") decrees the end of

the COVID-19 pandemic.  *See id.* ¶ 10.

      27.     TV Azteca first notified the Indenture Trustee of the September 2022 Mexican

Litigation when TV Azteca delivered boxes of documents containing the Complaint and the

Injunction on February 21, 2023, approximately five months after the First Injunction had been

entered and one month before the present Chapter 11 Cases were commenced.  *Id.* ¶ 11.  To date,

no Petitioning Creditor, and upon information and belief no Noteholder, has been served with the

Complaint in the September 2022 Mexican Litigation or the First Injunction.  *Id.* ¶ 24.

      28.     The Debtors have only recently, in the course of discovery related to the Motion to

Dismiss, identified the existence of a second Mexican lawsuit against the Indenture Trustee and

the Noteholders (the " ███████ <u>Mexican Litigation</u>").  ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████[9]

29.     On May 5, 2023, the WHO declared that COVID-19 "no longer constitutes a public health emergency of international concern." *Id.* ¶ 17.  Then, on May 9, 2023, Mexico's President López Obrador concurred with WHO and issued a decree that determined that COVID-19 is no longer a health emergency in Mexico. *Id.*  On May 12, 2023, the Indenture Trustee requested via a letter (the "May 12th Letter") to the Debtors' U.S. bankruptcy counsel Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss"), that TV Azteca vacate the First Injunction. *Id.* ¶ 18. On May 17, 2023, Paul, Weiss responded to the May 12th Letter (the "May 17th Letter").  The May 17th Letter stated (1) that Paul Weiss does not represent TV Azteca in the action pending before the Mexican Superior Court and, therefore, (2) that the Indenture Trustee's counsel should reach out directly to TV Azteca's Mexican counsel. *Id.* ¶ 21.

30.     On May 15, 2023, at the direction of the Directing Holders, the Indenture Trustee filed before the Mexican Superior Court a submission requesting that the First Injunction be vacated on the grounds that the WHO has declared that COVID-19 "no longer constitutes a public health emergency of international concern" and that the Mexican president has issued a decree

---

[9] The Debtors produced voluminous Spanish language materials concerning this lawsuit to the Petitioning Creditors on June 9, 2023. The Petitioning Creditors are still in the process of translating the documents and will provide an English translation to the Court when that is complete.

declaring that COVID-19 is no longer a health emergency in Mexico (the "Motion to Vacate"). *Id.* ¶¶ 19–20. To date, the Mexican Superior Court has not ruled on the Motion to Vacate. *Id.* ¶ 23.

31.     On May 9, 2023, at the Debtors' request, the Mexican Superior Court issued an order purporting to prohibit the Debtors' release of financial reports for the first quarter of 2023 for the stated rationale of avoiding "uncertainty" amid the Debtors' litigation with the Indenture Trustee in New York. *Id.* ¶¶ 8, 33. The Debtors represented in a statement released on May 10, 2023 that they intend to comply with the Mexican Superior Court's order. *Id.* ¶ 36. On June 1, 2023, the Mexican Stock Exchange suspended trading of TV Azteca's stock for TV Azteca's failure to report its Q1 2023 results. *See* Qureshi Dec., Ex. 55.

32.     TV Azteca has also utilized similar litigation tactics to evade payment to creditor Diamond Films through the Diamond Litigation. TV Azteca has filed three separate proceedings in Mexico seeking to invalidate the license agreement, enjoin Diamond from enforcing its rights under the license agreement, and attack Diamond's service of process. *See Response of Diamond Films Netherlands Coöperatief U.A. to the Joint Motion of the Bank of New York Mellon and the Petitioning Creditors for Entry of an Order (I) Affirming the Applicability of and Enforcing the Automatic Stay, or in the Alternative, (II) Granting Limited Relief from the Automatic Stay Pursuant to 11 U.S.C § 362* [ECF No. 15] (the "Diamond Response") ¶ 1 n.2.

**H. The Petitioning Creditors File Involuntary Chapter 11 Petitions**

33.     On March 20, 2023, the Petitioning Creditors filed an involuntary petition seeking relief from this Court.

34.     A majority of the Petitioning Creditors' principal place of business is in the U.S., and many of the Petitioning Creditors' employees work in or close to New York. For example, Cyrus Capital Partners, L.P. ("Cyrus Capital") has approximately 30 employees based in the U.S., most of whom are in New York, and its main location of operations is in New York. *See* Qureshi

Dec., Ex. 56, Cyrus Cap. Partners, L.P. Uniform Application for Investment Adviser Registration and Report by Exempt Reporting Advisers ("Form ADV") (Mar. 31, 2023) ("Cyrus Capital ADV"). Additionally, Contrarian Cap. Mgmt. LLC ("Contrarian Capital"), the investment advisors for SandPiper Limited, is headquartered in Greenwich, Connecticut only an hour away from this Court. *See id.*, Ex. 57, Contrarian Capital Management LLC, Uniform Application for Investment Adviser Registration and Report by Exempt Reporting Advisers (Form ADV) (May 3, 2023) ("Contrarian Capital ADV"). All of Contrarian Capital's employees also work in the U.S., mainly out of the Greenwich office. *Id.* The only non-U.S. based Petitioning Creditor is Plenisfer Investments SICAV - Destination Value Total Return ("Plenisfer"), which is a fund registered in Luxembourg and managed by an investment manager registered in Italy.

## ARGUMENT

### I.     The Court has Jurisdiction Over the Debtors

35.     As a threshold matter, and as the Debtors concede, this Court has personal jurisdiction over the Debtors and their assets wherever located. At no point do the Debtors argue that this Court cannot assert personal jurisdiction over the Debtors or that doing so violates the Debtors' Due Process rights.[10] As such, "there is no reason why the court could not issue an order asserting control over all of [the Debtors'] assets, wherever located." *In re Globo Comunicacoes e Participacoes S.A.*, 317 B.R. 235, 250 (S.D.N.Y. 2004) ("*GloboPar*"). It is well-established that "Congress intended extraterritorial application of the Bankruptcy Code as it applies to property of the estate." *Hong Kong & Shanghai Banking Corp., Ltd. v. Simon (In re Simon)*, 153 F.3d 991, 996 (9th Cir. 1998), cert. denied, 525 U.S. 1141(1999). Further, the extraterritorial jurisdiction

---

[10] Nor could they. The Debtors have significant contacts with the United States as set forth herein and in the Qureshi Declaration. *See* Background section A, *supra*.

that this Court has over a debtor's assets applies equally to involuntary chapter 11 proceedings. As noted by the Court in *GloboPar*, extraterritorial jurisdiction exists over a debtor's assets "even absent the consent of that debtor." *GloboPar* 317 B.R. at 251–52.

## II.    The Debtors Cannot Meet the Heavy Burden of Establishing that Dismissal is Warranted Under Bankruptcy Code Section 305(a)(1)

36.    The gravamen of the Debtors' argument under 305(a)(1) is the contention that these Chapter 11 Cases are "both futile and wasteful." *Memorandum of Law in Support of the Alleged Debtors' Motion to Dismiss the Involuntary Chapter 11 Petitions* [ECF. No. 28] (the "MOL") ¶ 43. They are neither.  The Debtors intentionally conflate their unwillingness to restructure under United States law with purported legal hurdles that would allegedly preclude the implementation of a chapter 11 plan.  As explained below and in the Guerra Declaration, a chapter 11 plan that effectuates a reorganization of TV Azteca is viable, confirmable, able to be implemented and—to the extent necessary—recognized in Mexico. *See, e.g.*, *Declaration of Jesús Ángel Guerra Méndez in Support of the Petitioning Creditors' Opposition to the Alleged Debtors' Motion to Dismiss* [ECF No. 38] (the "Guerra Dec.") ¶¶ 11–12, 24, 50–56, 62, 64.  The Debtors also cannot point to any abstention factors[11] that support dismissal or demonstrate, as is their burden, that abstention is in the best interests of the creditors.

37.    Under Bankruptcy Code section 305(a), a court, after notice and a hearing, may dismiss a case if "the interests of creditors *and* the debtor would be better served by such dismissal

---

[11] These factors include "([i]) economy and efficiency of administration; ([ii]) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; ([iii]) whether federal proceedings are necessary to reach a just and equitable solution; ([iv]) whether there is an alternative means of achieving an equitable distribution of assets; ([v]) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; ([vi]) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and ([vii]) the purpose for which bankruptcy jurisdiction has been sought." *In re Paper I Partners, L.P.*, 283 B.R. 661, 679 (Bankr. S.D.N.Y. 2002).

or suspension." 11 U.S.C. § 305(a)(1) (emphasis added).  It is well-established that abstention "is an extraordinary remedy, and that dismissal is appropriate under that provision **only** where the court finds that **both** 'creditors and the debtor' would be 'better served' by a dismissal." *GloboPar*, 317 B.R. at 255 (internal citation omitted) (emphasis added).  As a result, "both creditors and debtors [must] benefit from the dismissal, rather than applying a simple balancing test to determine whether dismissal is appropriate." *Id*.  Further, the "burden of proof regarding abstention rests on the party seeking abstention." *In re RHA Stroud, Inc*., No. 20-13482-SAH, 2020 WL 7787034, *18 (Bankr. W.D. Okla. Dec. 30, 2020).

38.     Here, the Debtors ignore that abstention must benefit **both** creditors and debtors.  In fact, the Debtors fail to identify **any** abstention factor that supports dismissal.  Instead, the Debtors' entire argument for abstention rests on the faulty premise that dismissal is warranted where "there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings" and therefore the Chapter 11 Cases are "objectively futile."  MOL ¶ 44.  This argument is circular and amounts to nothing more than a claim that these Chapter 11 Cases are futile *because the Debtors have no intention or ability to reorganize*.  In addition to being untrue, this is not the law.

### A.  The Chapter 11 Cases Are Not "Objectively Futile"

39.     These Chapter 11 Cases are not "objective futile" or wasteful.  To the contrary, these proceedings are the best (and perhaps only) means by which to reach a global resolution that benefits all creditors.  Further, a plan of reorganization in these Chapter 11 Cases is, under Mexico's analogue to chapter 15, capable of being recognized in Mexico and also confirmable under the Bankruptcy Code.

### i. These Chapter 11 Cases Would Be Recognized Under Mexican Law

40.     The Debtors' argument that "Mexican law would not recognize the orders and judgments of this Court," and that as a result "there is no reasonable prospect of any Mexican court granting recognition to a plenary U.S. chapter 11 case," has no merit.  MOL ¶¶ 46–47.  As an initial matter, and as set forth in the Guerra Declaration, the Debtors ignore a number of successful U.S. chapter 11 reorganizations of important Mexican companies that have taken place over the years, including (1) Grupo Aeroméxico, S.A.B., de C.V. ("Aeroméxico"), (2) Satellites Mexicanos, S.A. ("SatMex"), (3) Maxcom Telecomunicaciones, S.A.B. de C.V. ("Maxcom"), and (4) Grupo Posadas, S.A.B. de C.V. ("Posadas").[12]  Creditors in these bankruptcies included government entities Secretaria de Hacienda y Credito Publico (Mexican Ministry of Finance and Public Credit), Aeropuerto Internacional de la Ciudad de Mexico S.A. de C.V. (Mexico City International Airport), and Tesoreria de la Federacion (Mexican Treasury Department).  While the Debtors argue that any in-court reorganization of a Mexican company that owns concessions must occur in Mexico, Aeroméxico, SatMex, and Maxcom all owned concessions from the Mexican government and still reorganized in the United States.  Guerra Dec. ¶ 35.  As such, it is clear that the Debtors can be reorganized in the United States.  Further, it does not stand to reason that Aeroméxico, SatMex, Maxcom, and Posadas would opt to engage in multi-million dollar restructurings in U.S. bankruptcy court if none of those orders or judgments—including the order confirming their respective final chapter 11 plans—were enforceable both in and outside the United States.  *Id.* at ¶¶ 36, 47.  In fact, the only relevant distinction between TV Azteca and the above-referenced

---

[12] *See In re Grupo Aeroméxico, S.A.B. de C.V.*, Case No. 20-11563 (Bankr. S.D.N.Y. 2020); *In re Satellites Mexicanos, S.A.*, Case No. 11-11035 (Bankr. D. Del. 2011); *In re Satellites Mexicanos, S.A.*, Case No. 06-11868 (Bankr. S.D.N.Y. 2006).  *In re Maxcom Telecomunicaciones, S.A.B. de C.V.*, Case No. 19-23491 (Bankr. S.D.N.Y. 2019*); In re Grupo Posadas, S.A.B. de C.V.*, Case No. 21-11831 (Bankr. S.D.N.Y. 2021).

chapter 11 proceedings is that, unlike the Mexican entities in those other proceedings, TV Azteca plainly seeks to avoid restructuring at all while refusing to pay its creditors, which include bondholders, the City of Los Angeles, and Diamond. These circumstances are precisely why the Bankruptcy Code provides for the commencement of involuntary chapter 11 proceedings.

41.     The Debtors' statements that because "Mexican law requires that any reorganization of a company with an 'establishment' in Mexico open a *Concurso* . . . there is no purpose for a chapter 11" is plainly wrong. MOL ¶ 46. First, it ignores the purpose of Title 12 of the *Ley de Concursos Mercantiles* ("Title 12") under Mexican law, which is specifically designed to recognize and effectuate, and generally aid and assist, foreign bankruptcy proceedings and enforce related orders, such as a U.S. chapter 11 proceeding. *See* Guerra Dec. ¶¶ 29–32. Second, it is belied by the successful resolution of chapter 11 proceedings involving Mexican companies. *See Aeroméxico*, Case No. 20-11563; *SatMex*, Case No. 11-11035; *SatMex*, Case No. 06-11868.

42.     Further, these Chapter 11 Cases are, to the extent necessary, capable of recognition based on several grounds established under Title 12. As a threshold matter, there is little question that the Chapter 11 Cases qualify as a "foreign proceeding" because they are a judicial collective proceeding heard in a Foreign Country (i.e., the United States) according to the regulation governing the restructuring and insolvency of the Debtors (i.e., chapter 11 of the Bankruptcy Code) where the assets and business of the Debtors are under the control or supervision of the Foreign Court (i.e., this Court) for restructuring. *See* Guerra Dec. ¶ 39.

43.     The Chapter 11 Cases are a "foreign main proceeding" because at least three of the Debtors have their "center of main interests" ("COMI") in the United States due to their incorporation in Delaware. Under Title 12, there is a rebuttable presumption that a debtor's COMI is its place of incorporation. *Id.* ¶ 42. Further, those individual Debtors have significant

21

connections to the United States. For instance, as discussed above, Azteca International has numerous agreements with U.S. companies to access the U.S. markets, which together are worth tens if not hundreds of millions of dollars in potential revenue. *See* Background section A, *supra*. Under the LCM, because some of the Debtors have their COMI in the United States, that is sufficient for the entirety of the Chapter 11 Cases to be considered a "foreign main proceeding."[13] *See* Guerra Dec. ¶¶ 40, 42.

44.     The Chapter 11 Cases also clearly qualify as a "foreign non-main proceeding" under Mexican law because the Debtors have an "establishment" in the United States. This "establishment" is evidenced by the Debtors' significant financial, commercial, and other activities in the United States, including its connections to the U.S. markets and the issuance of the Notes in U.S. markets pursuant to the Indenture. *Id.* ¶ 45. In addition, at least three of the Debtors are incorporated in the United States,[14] and three non-Debtor subsidiaries or affiliates of the Debtors are incorporated in the United States.[15] *Id.*

45.     Further, the Debtors' contention that "Mexican courts also would reject any attempt to use a chapter 11 proceeding" is false. As the Guerra Declaration explains, a plan of reorganization that is confirmed as part of these Chapter 11 Cases would be enforced fully or otherwise relied on as a starting point in any *Concurso* in Mexico. *See* Guerra Dec. ¶ 51. The only grounds to reject a chapter 11 plan altogether is if it violates Mexican law and public policy and cannot be amended to address this deficiency due to some fundamental defect in the plan. *See*

---

[13] At a minimum, the Chapter 11 cases for those entities incorporated in Delaware with agreements and contracts with American companies are a "foreign main proceeding."

[14] Debtors Azteca International, Stations Group, and Azteca Sport are incorporated in Delaware.

[15] Northstar Media, LLC, Northstar McAllen License, LLC, and Dopamine Entertainment, Inc are incorporated in Delaware.

Guerra Dec. ¶¶ 24, 53. There is nothing to indicate that such a result would occur, and the Debtors have not suggested that a plan of reorganization in these Chapter 11 Cases would somehow violate Mexican law or public policy. Even indulging such a pure hypothetical, the Mexican Court would, before refusing to recognize a chapter 11 plan that is contrary to Mexican law or public policy, first seek to amend and modify it to avoid any such conflict. *See id.* ¶¶ 12, 53, 55.

### ii. The Petitioning Creditors Intend to Propose a Viable and Confirmable Chapter 11 Plan of Reorganization

46.     Once this Court denies the Motion to Dismiss, the Petitioning Creditors intend to move quickly to terminate exclusivity and propose a chapter 11 plan (the "Proposed Plan") that will comply with both the requirements of the Bankruptcy Code and, to the extent applicable, Mexican law including with respect to the treatment of taxing authorities and, if necessary, the oversight of the *Instituto Federal de Telecomunicaciones* (the "IFT"). Currently, the Petitioning Creditors envision that the Proposed Plan would (a) reinstate the revolving credit facility with Banco Azteca, (b) reinstate general unsecured creditors' claims, and (c) reinstate and/or equitize the Noteholders' claims pursuant to a structure that prohibits the Noteholders from obtaining a controlling stake in TV Azteca, potentially eliminating the need for the IFT's involvement.[16] As discussed in the Guerra Declaration, the Petitioning Creditors may use Title 12, the Mexican Commercial Code, and/or the Mexican Federal Civil Proceedings Code to seek recognition of the confirmation order. *See* Guerra Dec. ¶¶ 37–49, 62–64.

### iii. The Debtors' Case Law is Unavailing

47.     Finally, the cases cited by the Debtors are inapposite. MOL ¶¶ 45, 47. Several of the cases deal solely with foreign creditors and foreign law. In *In re Xacur*, the court dismissed

---

[16] It is not clear that IFT involvement would even be required for all Debtors. *See* Guerra Dec. ¶ 28.

the case *and* found that it had no jurisdiction over the parties when the petitioning creditors were three **Mexican** banks that held notes issued in **Mexico** under **Mexican** law against a **Mexican** citizen with property in the United States. *In re Xacur*, 219 B.R. 956, 969 (Bankr. S.D. Tex. 1998). Similarly, in *In re Spanish Cay*, the debtor was a **Bahamian** corporation, the creditors were a **Canadian** bank, the property in question was located in **the Bahamas**, there were imminent liquidation hearings in **the Bahamas**, and the parties contracted that **Bahamian** law applied. *In re Spanish Cay Co., Ltd.*, 161 B.R. 715, 725 (Bankr. S.D. Fla. 1993).[17]  Those are not the facts here. The Petitioning Creditors have significant connections to the United States and New York, there is no foreign restructuring proceeding pending in Mexico, the Notes are governed by New York law, and the parties contracted for a New York forum selection clause.

48.     The Debtors' reliance on *Multicanal* is particularly unavailing.  As a threshold matter, in that case the Court held it could not "assert effective jurisdiction over Multicanal" because Multicanal had no operations or ongoing business in the United States and no assets and only one account worth approximately $9,500 in the United States.  *In re Bd. of Dirs. of Multicanal S.A.*, 314 B.R. 486, 492, 522-23 (Bankr. S.D.N.Y. 2004).  That is a far cry from the facts here, where the Debtors have not contested jurisdiction and possess significant connections to, and assets in, the United States.  Further, in *Multicanal*, the debtor had been pursuing a foreign out-of-court restructuring process for more than a year prior to the commencement of the involuntary case and had already received court approval for the associated proposed restructuring transactions. *Id*. at 522.  Here, there is no competing insolvency proceeding.

---

[17] It is worth noting that *In re Xacur* and *In re Spanish Cay*, 25 and 30 years old respectively, each appear to rely on 11 U.S.C. 304(c), which specifically identified the doctrine of comity as a factor when considering dismissal.  That section has since been repealed, and section 305(a)(2) has since been revised.  The factors incorporated into a section 305(a)(2) analysis *no longer include the doctrine of comity*.  11 U.S.C. § 305(a)(2).

49.     More importantly, the legal underpinning of *Multicanal* has been called into question by *GloboPar*. *GloboPar*, 317 B.R. at 254.  In *GloboPar*, the District Court held that the Bankruptcy Court improperly dismissed an involuntary petition filed against a foreign debtor when it "improperly concluded that its exercise of jurisdiction over [the Debtor] would be futile." *Id*. The District Court explained that the debtor was "properly subject to personal jurisdiction in the Bankruptcy Court by reason of its voluntary decision to seek approximately $1 billion of debt in [U.S.] markets from [U.S.] creditors and then fail[ure] to pay that debt as it became due," and as such, "should be prepared to face potential reasonable foreseeable consequences flowing from that decision." *Id*.  Further, the Court would not "assume[]" that the debtors "would fail to comply with any hypothetical order" of the bankruptcy court.  *Id*. at 254 n.14.  While the Court was not directly addressing section 305(a)(1), the District Court in *GloboPar* also specifically questioned *Multicanal's* holding and analysis as it relates to an uncooperative foreign debtor:

> The *Multicanal* court's analysis inverts the proper consideration of a bankruptcy court faced with an uncooperative foreign debtor by focusing on the current location of the debtor's assets rather than the nature and extent of the debtor's contacts with the United States.

*Id*. at 252.

**B.  No Other Factors Favor Abstention**

50.     As noted above, abstention is a form of "extraordinary relief."  No factors that merit abstention are present here.[18]

51.      First, these Chapter 11 Cases concern almost all of the unsecured debt associated with TV Azteca, and to the Petitioning Creditors' knowledge **no** other creditors oppose the Chapter

---

[18] Nor can the Debtors demonstrate that any of the abstention factors associated with an involuntary petition are met: "([i]) the petition was filed by a few disgruntled creditors and most creditors oppose the bankruptcy proceeding; ([ii]) there is an out-of-court restructuring in progress; and ([iii]) the debtor's **and** creditors' interests are furthered by dismissal." *GloboPar*, 317 B.R. at 255 (emphasis added).

11 Cases. To the best of the Petitioning Creditors' knowledge, all of TV Azteca's Mexican creditors have either been paid off or are being kept current and are not in default. Second, there is no other in or out-of-court restructuring in process as it relates to U.S. creditors of TV Azteca. Finally, dismissal is not in the best interests of the Debtors' creditors. If these Chapter 11 Cases are dismissed, the Debtors will continue to refuse arbitrarily to pay their debts as they come due, with no mechanism to prevent the depletion or transfer of the Debtors' assets to the detriment of any future recovery by the Debtors' creditors. Further, due to the Injunctions, the Petitioning Creditors will be prevented from seeking effective recovery, including pursuing an insolvency proceeding such as a *Concurso*, in the Mexican courts. *See* Guerra Dec. ¶¶ 59–60; Castillo Dec. ¶ 25.

52.     The Debtors' remaining arguments also lack merit. The Debtors claim that the Court should abstain due to the alleged "significant risk of futility" and because the Chapter 11 Cases "would be extremely inefficient and costly." MOL ¶¶ 48–49. First, as explained in more detail above, there is no "significant risk of futility" because the plan can be confirmed by this Court and enforced in Mexico.[19] Second, these Chapter 11 Cases will not be prohibitively costly. The capital structure of the Debtors is straightforward and, assuming exclusivity is terminated, the Petitioning Creditors are prepared to quickly present and confirm a chapter 11 plan on an expedited timeline. Further, it is not dispositive that many of the "witnesses and documents are in Mexico" (MOL ¶ 49), as evidenced from the multiple examples, described above, of Mexican companies who successfully pursued chapter 11 cases in the United States.[20]

---

[19] As addressed above, the Petitioning Creditors are also aware that the Debtors' have assets in Spain and other countries in which a Chapter 11 plan can be enforced.

[20] The cases cited by the Debtors are without merit. The court in *Petition of Trevor*, dismissed the case under 305(a) because the record showed "[n]o connection with this district." *In re Petition of Trevor*, No. 92-B-46210, 1992 WL 391289, at *2 (Bankr. S.D.N.Y. Dec. 10, 1992). Here, the Petitioning Creditors have ties to New York; the Debtors

53.    Nor were these Chapter 11 Cases filed "without a proper restructuring purpose, but rather to collect on contested debt."  MOL ¶ 50.  The Chapter 11 Cases were filed for a proper purpose—commencing a restructuring of the Debtors' defaulted and outstanding debt obligations in an equitable, court-supervised process aimed at assisting all creditors of the Debtors. Importantly, immediately upon commencement of these Chapter 11 Cases, Diamond (another creditor who has been unable to collect from TV Azteca) entered an appearance, filed pleadings, and attended the initial hearing in these Chapter 11 Cases.  Indeed, these Chapter 11 cases are uniquely suited to the facts of this case because the Debtors hold assets throughout the world and these cases can best facilitate an equitable distribution of the Debtors' assets to their creditors to support maximum recovery for all creditors.  *See In re Paper I Partners*, 283 B.R. at 679 (stating that "[e]conomy and efficiency are served where . . . creditors need not go around the country or the world to obtain relief []").[21]

## III.    Forum Non Conveniens Does Not Support Dismissal

54.    The Debtors' reliance on forum non conveniens is fatally flawed because the argument assumes, incorrectly, that no reorganization is possible in this Court.  That is incorrect, as described above and in the Guerra Declaration.  Additionally, the Debtors fall well short of meeting the high bar to demonstrate that forum non conveniens is appropriate.  *See Bank of Credit*

---

have significant ongoing business in the United States; and the Notes are governed by New York law and subject to a New York forum selection clause.  The court in *Kingstown Capital*, dismissed the case where defendants "shown that they will be seriously prejudiced by being required to litigate in New York" due to parallel proceedings.  *Kingstown Capital Mgt., L.P. v. Vitek*, No. 19cv3170 (DLC), 2020 WL 5350492, at *7 (S.D.N.Y. Sept. 4, 2020).  There are no such parallel proceedings and Debtors have made no showing of being "prejudiced" seriously or otherwise.

[21] *In re* Navient *Solutions, LLC.*, does not require a different result.  In that case, unlike here, the court focused on the fact that petitioning creditors were acting solely for their own benefit and the involuntary was a "transparent" attempt to leapfrog other litigation against Navient.  *See In re Navient Solutions, LLC,* 625 B.R. 801, 811 (Bankr. S.D.N.Y. 2021), *aff'd*, No. 21-CV-2897 (JGK), 2022 WL 863409 (S.D.N.Y. Mar. 23, 2022), *reconsideration denied*, No. 21-CV-2897 (JGK), 2022 WL 1500771 (S.D.N.Y. May 12, 2022).  Here, the Petitioning Creditors are focused not on individual claims but on TV Azteca's default on the $400 million Notes and are not the sole creditors in this case.

& Com. Int'l (Overseas) Ltd. v. State Bank of Pakistan, 273 F.3d 241, 246 (2d Cir. 2001) (stating

that "[t]he defendant bears the burden of proof on all elements" in the forum non conveniens

analysis).  The Debtors cannot demonstrate that the Petitioning Creditors choice of forum is not

entitled to substantial deference, that Mexico is an adequate alternative forum, and that any private

or public factors favor dismissal.

### A.  The Petitioning Creditors' Choice of Forum is Entitled to Substantial Deference

55.     It is well-established that a plaintiff's—here, the Petitioning Creditors'—choice of

forum is entitled to substantial deference.  *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71-72 (2d

Cir. 2001) *see also Skanga Energy & Marine Ltd. v. Arevenca* S.A., 875 F. Supp. 2d 264, 272

(S.D.N.Y. 2012), *aff'd sub nom. Skanga Energy & Marine Ltd. v. Petroleos de Venezuela S.A.*, 522

F. App'x 88 (2d Cir. 2013) (unless the balance is strongly in favor of the defendant, the plaintiff's

choice of forum should rarely be disturbed").  While courts have noted the relevance of whether

the case is brought by a foreign plaintiff, "the degree of deference afforded to a plaintiff's chosen

forum is determined on a sliding scale."  *Petersen Energia Inversora S.A.U. v. Argentine Republic*,

No. 15 CIV. 2739 (LAP), 2020 WL 3034824, at *6 (S.D.N.Y. June 5, 2020).  Specifically, "[t]he

greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum

of choice and the more it appears that considerations of convenience favor the conduct of the

lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for

forum non conveniens."  *Iragorri*, 274 F.3d at 72.  Here, (i) a majority of the Petitioning Creditors

have their principal place of business in the United States and have a substantial connection to

New York and the United States, (ii) the restructuring has a significant connection to New York

(and in fact had to be brought here under applicable law), and (iii) the choice of this forum was

not motivated by forum shopping.

56.     As a threshold matter, it is not dispositive that the Petitioning Creditors are funds incorporated abroad because the majority of them have substantial contacts to New York.  As such, their choice of forum should receive great deference.  *See Petersen Energia Inversora S.A.U.*, 2020 WL 3034824, at *6 (stating "[the] place of [a fund's] registration should not serve as a basis for affording lesser deference to their choice of forum").  The majority of the Petitioning Creditors' primary place of business is in the United States.  Many of the Petitioning Creditors' offices and employees are located in or close to New York, and the investment managers that manage and control the majority of the funds of the Petitioning Creditors are U.S. entities.[22]  The Debtors' argument that the Petitioning Creditors are foreign funds ignores this critical fact.[23]  MOL ¶ 58.  As such, the Petitioning Creditors' choice of New York should receive deference.  *See Iragorri*, 274 F.3d at 72 (noting "the convenience of the plaintiff's residence in relation to the chosen forum" is a factor that support greater deference to the plaintiff's forum choice).

57.     Regardless, the Petitioning Creditors' choice of forum is also entitled to substantial deference because there is a "bona fide connection" between these Chapter 11 Cases and New York.  The Debtors' claim that there is "virtually no connection between the chapter 11 case and New York" is wrong both as a matter of fact and law.  MOL ¶ 59.  Both the Petitioning Creditors and the Notes themselves have a significant connection to New York.

---

[22] For example, Cyrus Capital has approximately 30 employees based in the United States, most of whom work in New York, and its main center of operations is in New York.  *See* Cyrus Capital ADV, Ex. 56. Additionally, Contrarian Capital is headquartered in Greenwich, Connecticut, only an hour away from this Court.  All of Contrarian Capital's employees also work in the United States, mainly out of the Greenwich office.  *See* Contrarian Capital ADV, Ex. 57.

[23] The Debtors' reliance on *Iragorri* is particularly inapposite.  In *Iragorri*, the Second Circuit ***vacated*** the District Court's decision dismissing the case for forum non conveniens and noted, among other things, that "the reason we give deference to a plaintiff's choice of her home forum is because it is presumed to be ***convenient***."  274 F.3d at 71. As here, due to the numerous connections between the Petitioning Creditors and New York specifically and the U.S. generally, the proceeding here is convenient.

58.     First, the Notes have significant connections to New York and the United States. The Notes are governed by an Indenture that requires TV Azteca to satisfy all of its obligations using U.S. legal tender (Indenture § 3.1(a)) and make all payments through the Indenture Trustee located in New York before the payments are transmitted physically (through bank accounts in New York) to their ultimate recipients.  *See Skanga Energy & Marine Ltd. v. Arevenca S.A.*, 875 F. Supp. 2d 264, 267 (S.D.N.Y. 2012), aff'd, 522 F. App'x 88 (2d Cir. 2013) (ruling that plaintiff's choice of forum was entitled to deference where the plaintiff, a Nigerian company, bought oil from the defendants via an agreement that provided all payments would be made in U.S. dollars through the seller's account in New York).  Further, as noted earlier, TV Azteca sold the Notes through a roadshow in New York and other cities in the U.S., and employed U.S. legal and financial advisors.

59.     Second, the Indenture includes a forum selection clause (the "Forum Selection Clause") that clearly states that the TV Azteca "agrees that *any* suit, action or proceeding against it *arising out of or relating to* this Indenture (including the Note Guarantees) or the Notes" must be brought in a state or federal court in New York and "*irrevocably consents to the exclusive jurisdiction*" of any state or federal court in New York.  Indenture § 11.7(b)(ii)–(iii) (emphasis added).  In addition, the Indenture provides that the Debtors specifically "waive[] to the fullest extent permitted by applicable law . . . *any claim that any suit, action or proceeding in such a court has been brought in an inconvenient forum* and any right to any other jurisdiction to which it may be entitled on account of place of residence or domicile, or for any other reason."[24]  *Id.*

---

[24] It states in full: Each of the parties waives to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding, any immunity from the jurisdiction of such courts over any suit, action or proceeding, its right to bring action in any other jurisdiction that may apply by virtue of its present or future domicile or for any other reason, any claim that any suit, action or proceeding in such a court has been brought in an inconvenient forum and any right to any other jurisdiction to which it may be entitled on account of place of residence or domicile, or for any other reason.  Indenture § 11.7(b)(ii).

(emphasis added). Significantly, the Supreme Court has held that "a valid forum-selection clause [should be] given controlling weight [in any forum non conveniens analysis] in all but the most exceptional cases" because it "may have figured centrally in the parties' negotiations and may have affected how they set monetary and other contractual terms; it may, in fact, have been a critical factor in their agreement to do business together in the first place." *Atl. Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49, 63, 66 (2013) (citation omitted).

60.     The language in the Forum Selection Clause evidences a decision to consent to New York jurisdiction for *all* actions involving the Notes. The Debtors' argument that this language "does not amount to consent to the commencement of a plenary involuntary chapter 11 case" is not supported by the Debtors' cases[25] and is contradicted by the plain language of the Indenture. MOL ¶ 61. Nor can the Debtors point to any carve out in the grant of jurisdiction for restructurings or insolvency proceedings. Because the Forum Selection Clause in the Indenture "is complete, clear and unambiguous on its face[, it] must be enforced according to the plain meaning of its terms." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d. Cir. 2004) (internal citation omitted). TV Azteca has also entered into other contracts with New York forum selection clauses. Specifically, TV Azteca's contract with Diamond contains a New York forum selection clause. Diamond Response ¶ 1 n.2. Based on this clause, Diamond commenced a lawsuit against TV Azteca in New York and received a $25 million default judgment

---

[25] The Debtors provide no support for their assertion that forum selection clauses do not apply in the context of a chapter 11 case or forum non conveniens analysis. *See In re Certa Dose, Inc.*, 2021 WL 5177376, at *16 & n.5 (Bankr. S.D.N.Y. 2021) (denying a motion to transfer venue from the U.S. Bankruptcy Court for the Southern District of New York to the U.S. Bankruptcy Court for the District of Colorado); *GloboPar*, 317 B.R. 235, 255 (S.D.N.Y. 2004) (remanding the issue of forum non conveniens to the bankruptcy court to weigh the private and public interest factors with the debtor's burden of proof in mind and deference to the plaintiff's choice of forum); *In re Compania de Alimentos Fargo, S.A.*, 376 B.R. 427 (Bankr. S.D.N.Y. 2007) (abstaining under 11 U.S.C. § 305(a)(1) because a proceeding in Argentina had already been commenced and the petitioning creditors' complaints hinged on differences between Argentinean law and U.S. law, not fundamental notions of fairness).

31

for a breach of contract claim. [26]   As TV Azteca appears to use New York forum selection clauses routinely, it "would be strange for the court to afford lesser deference to the . . . [p]laintiffs' choice of forum while ignoring that the [Debtors] solicited" business from Diamond and the Petitioning Creditors in New York.  *See Petersen Energia Inversora S.A.U.*, 2020 WL 3034824, at *6.

61.    The Debtors incorrectly state that the "parties to the Indenture have always understood that an insolvency proceeding would take place in a Mexican *Concurso*."  MOL ¶ 62. Their reliance on the Offering Circular is misplaced because it only identifies a ***potential*** risk factor that "TVA and the guarantor subsidiaries could become subject to a *Concurso Mercantil*, which would create uncertainty for the Noteholders' recovery."  MOL ¶ 62.  This counterfactual is irrelevant.  That the Debtors ***could*** initiate a Mexican *Concurso* does not prohibit bondholders, at a payment default, from commencing an involuntary chapter 11.  Further, the Debtors' contention regarding all parties' understanding regarding a future restructuring is belied by the Indenture itself.  The Indenture defines "Bankruptcy Law"[27] broadly to include U.S. proceedings and contemplates the potential for an involuntary petition.  Indenture § 1.1 (defining a Bankruptcy Law Event of Default to include "a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (A) is for relief against any Bankruptcy Party in an involuntary case[.]").

62.    Finally, the Debtors incorrectly claim that the Petitioning Creditors' choice of forum is not entitled to deference because parties-in-interest in Mexico will not participate due to cost. MOL ¶ 63.  The Debtors have provided no evidence for this proposition or evidence of unpaid Mexican creditors who would choose to appear in the cases, and the Court should not assume this

---

[26] TV Azteca utilized the same tactics with Diamond as the Petitioning Creditors and TV Azteca sought to evade the jurisdiction of New York.  Instead of appearing before a New York court, TV Azteca filed at least three legal proceedings in Mexico to collaterally attack its contract with Diamond.  Diamond Response ¶ 1 n. 2.

[27] The Indenture defines Bankruptcy Law as "any bankruptcy, *concurso mercantil,* insolvency or other similar laws now or hereafter in effect."  Indenture § 1.1.

is true. The Petitioning Creditors are unaware of any Mexican local financial debt in default. The only such debt at issue, though subordinate to the Notes, was paid off in full despite the Notes' being in payment default. The Debtors' argument also rings hollow considering other relevant bankruptcies of Mexican corporations where Mexican parties participated in U.S. proceedings, as well as TV Azteca's own participation in these Chapter 11 Cases through able counsel.

### B. Mexico is Not an Adequate Alternative Forum

63.     The Debtors' self-serving statements aside, the facts demonstrate that Mexico is not an adequate alternative venue and that these Chapter 11 Cases afford the only judicial process that will allow for any recovery by creditors.

64.     Courts will not dismiss a case unless there is a strong showing that an adequate alternative forum exists. *Skanga*, 875 F. Supp. 2d 264 at 275. As a general rule, "[a]n alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003) (citation omitted). Thus, if a party is not able to bring litigation then an alternative forum does not exist. *See Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*, 78 F.R.D. 445, 445 (D. Del. 1978). However, a "defendant does not carry the day simply by showing the existence of an adequate alternative forum"; it must also demonstrate that the chosen forum is "genuinely inconvenient and the selected forum significantly preferable." *Iragorri*, 274 F.3d at 74-75.

65.     The Debtors claim that Mexico is an appropriate forum because they are "amenable to service of process in Mexico" and because Mexico "permits litigation of the subject matter of the dispute." MOL ¶¶ 55–56. The Petitioning Creditors question the ease with which the Debtors could be served based on the difficulty encountered by Diamond. More importantly, the Petitioning Creditors could not even file an involuntary *Concurso* petition in Mexico because the First Injunction purports to prohibit any proceeding to enforce the Notes, which necessarily

33

encompasses the filing of an involuntary *Concurso*.[28]  *See* Guerra Dec. ¶¶ 59.  As of the date of

this filing, and despite the best efforts of the Petitioning Creditors, the First Injunction remains in

effect.  *See* Castillo Dec. ¶ 23.[29]  To be clear, because the First Injunction appears—based on TV

Azteca's own statements—to be predicated now on the ***existence*** of COVID-19, as opposed to any

emergency declared by the WHO, there is no conceivable end to the First Injunction in sight.  *See*

*id*. ¶ 22.  Further, it is the Petitioning Creditors' understanding that the September 2022 Mexican

Litigation cannot be concluded until ***all*** parties have been served.  *See id*. ¶ 25.  As of this filing,

only the Indenture Trustee has served.  As a result, the First Injunction could remain in place

indefinitely, preventing any potential relief for the Petitioning Creditors in Mexico.  *Id.*[30]

66.     

*See* Guerra Dec. ¶ 60.[31]

---

[28] The Petitioning Creditors' concern is amplified by recent actions.  As outlined in the Castillo Declaration, the Mexican court improperly ruled that the Petitioning Creditors' answer to the Mexican complaint was late.  *See* Castillo Dec. ¶ 14.  The Judge reconsidered only following a motion to reconsider.  *Id*. ¶¶ 15–16. Based on local Mexican reports, this is not the first time TV Azteca has received favorable treatment from this judge.  *See TV Azteca has its 'friend judge'*, Euro ES Euro (May 12, 2023, 10:13 AM) https://euro.eseuro.com/tv/352238.html.

[29] The cases cited by the Debtors are inapposite.  In none of those cases, as here, was there a question as to whether a party could access the *Concurso* regime or litigate the matter in the foreign venue.  *See In re Metrofinanciera, S.A.P.I. de C.V.*, No. 10-20666, 2010 WL 10063949 at *2 (Bankr. S.D. Tex. Sept. 24, 2010) (recognizing a Mexican *Concurso* proceeding because, among other reasons, it allows U.S. creditors the ability to process their claims); *JP Morgan Chase Bank v. Altos Hornos de Mexico*, S.A. de C.V., 412 F.3d 418, 429 (2d Cir. 2005) (granting comity to a pending Mexican insolvency proceeding in which the debtors' creditors participated); *In re Xacur*, 219 B.R. 956 (Bankr. S.D. Tex. 1998) (finding Mexico an adequate alternative forum when "Mexico ha[d] not been shown in this case to treat the parties unfairly" and the creditors were allowed to and had proceed against the debtor in Mexican court).

[30] The actions taken by TV Azteca and the Mexican courts differ from the facts in *Fargo*, the case cited by the Debtors for the proposition that Concursos are an adequate alternative forum.  In *Fargo*, the petitioning creditors had a full opportunity to litigate the case as they had received notice of the Argentinian Concurso, were represented by counsel, and were given the opportunity to present their case in Argentinian courts.  Most importantly, there was no injunction preventing the petitioning creditors in that case from bringing the action as there is here.

[31] However, the Injunctions would not prevent the filing of a recognition action of a chapter 11 plan in Mexico because the chapter 11 plan would be a court-ordered global resolution and most likely brought in Mexico by a court-appointed foreign representative.  Guerra Dec. ¶ 61.

67.     Even if the Debtors could demonstrate that Mexico is an alternative forum (which they cannot), they have not demonstrated that the chosen forum is "genuinely inconvenient." *Iragorri*, 274 F.3d at 74.  The Debtors are sophisticated parties and have retained able counsel, which has represented the Debtors for years, and are thus fully able to appear in the Chapter 11 Cases.  Further, any argument that this proceeding is not convenient is contradicted by the Debtors' assent to the Forum Selection Clause whereby TV Azteca waived any ability to argue that New York is an inconvenient forum.  *Atl. Marine Constr. Co.*, 571 U.S. at 63, 66.  Indeed, "whatever 'inconvenience' [the defendant] would suffer by being forced to litigate in the contractual forum as [they] agreed to do was clearly foreseeable at the time of contracting."  *Id.*

### C.  The Private and Public Interest Factors Do Not Support Dismissal

68.     The private[32] and public interest[33] factors favor the Court's retention of these Chapter 11 Cases.

69.     As a threshold matter, the Debtors do ***not*** argue that the private interest factors support dismissal.  *See* MOL ¶¶ 64–67.  Nor could they.  A court evaluating a defendant's motion to dismiss "based on a forum-selection clause should not consider arguments about the parties' private interests."  *Atl. Marine Constr. Co.*, 571 U.S. at 64.  By agreeing to the Forum Selection Clause, the Debtors waived their right to challenge these Chapter 11 Cases as inconvenient.

---

[32] As the Debtors outlined, the private interest factors include: "the relative ease of access to sources of proof; [the] availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; [the] possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Aenergy, S.A. v. Republic of Angola*, 31 F.4th 119, 132–33 (2d Cir. 2022), cert. denied, 143 S. Ct. 576 (2023) (citation omitted).

[33] The public interest factors include "administrative difficulties associated with court congestion; the unfairness of imposing jury duty on a community with no relation to the litigation; the interest in having localized controversies decided at home; and avoiding difficult problems in conflict of laws and the application of foreign law."  *Id.*

70.    The public interest factors also do not support dismissal.  There is no expectation

of administrative difficulties associated with these Chapter 11 Cases.  On the other hand, the

Petitioning Creditors have a strong interest in having this controversy decided at home.  Indeed,

the repayment of debt raised in U.S. markets is the epitome of a "localized controversy" that should

be decided by U.S. courts.  *See Off. Comm. Of Unsecured Creditors of Arcapita v. Bahrain Islamic

Bank*, 549 B.R. 56, 71 (S.D.N.Y. 2016) ("[T]he United States has a strong interest in adjudicating

claims that arise under its Bankruptcy Code so that both creditors and debtors can obtain the

remedies and relief that the United States Congress has determined are fair and equitable.").  While

there may be questions of foreign law, that is not dispositive.  *See Phoenix Canada Oil Co. Ltd.*,

78 F.R.D. at 455 (citation omitted) (holding that the private and public interest factors weighed in

favor of the plaintiff even when questions of Ecuadorian law and policy were implicated because

"the relinquishment of jurisdiction could result in serious detriment to (plaintiffs') causes of

action").  Further, U.S. courts generally, and New York Courts specifically, have an interest in

these Chapter 11 Cases since there are multiple creditors with ties to New York.

71.    The Debtors also note that the "difficulties of enforcing this Court's orders in

Mexico should be a significant consideration with regard to the public interest factors."  MOL ¶ 25.

As an initial matter, this is incorrect as a matter of law, and the Debtors can point to no case that

was dismissed under forum non conveniens because of a concern that the court's orders would not

be followed.  In fact, the court in *GloboPar* held that a bankruptcy court should ***not*** dismiss a case

just because there is a concern that a foreign jurisdiction may not enforce U.S. federal bankruptcy

law.  *GloboPar*, 317 B.R. at 253–254.  The court noted that the involuntary petition provision of

the Bankruptcy Code is designed to "provide a means by which United States creditors could have

their claims to the assets of a debtor vindicated in a timely and fair manner" and that it

36

> would unduly frustrate this objective if a federal bankruptcy court automatically deferred
> even to a hypothetical prospect that foreign courts may assert exclusive jurisdiction over
> bankruptcy matters, no matter how much debt the prospective bankrupt raised in the United
> States and owed to United States creditors, and no matter how extensive the foreign entity's
> other contacts in the United States.

*Id* at 254.[34]  Regardless, there is no reason to believe that Mexico will decline to recognize these

Chapter 11 Cases under Title 12 or another statutory basis and not enforce or otherwise rely on a

confirmed chapter 11 plan as part of any restructuring.  *See, e.g.*, Guerra Dec. ¶¶ 24, 54, 64.

## IV.    The Petitioning Creditors' Claims Are Not Subject to Any Dispute, Much Less a "Bona Fide" Dispute Sufficient to Sustain a Motion to Dismiss Under Bankruptcy Code Section 303(b)(1)

72.    Contrary to the Debtors' contention, there is no dispute, bona fide or otherwise,

regarding the liability or amount owed to the Petitioning Creditors.  It is well-established that

"petitioning creditors must first establish a prima facie case that there is no bona fide dispute" and

"then the burden shifts to the putative debtor to show the existence of such a dispute."  *See In re*

*Stillwater Asset Backed Offshore Fund Ltd.*, 485 B.R. 498, 505 (Bankr. S.D.N.Y. 2013) (internal

citations omitted).  Courts use an objective test to determine whether there is a bona fide dispute,

and the debtor's "subjective belief or intent does not satisfy its burden."  *Id.*  The mere fact "that

litigation is ongoing related to a petitioning creditor's claim is insufficient to rebut its prima facie

validity."  *Id.* at 509.

73.    The Petitioning Creditors have more than established a prima facie case that there

is no bona fide dispute with regard to the missed interest payments or the acceleration of the Notes.

As the Debtors admit, they "missed interest-only payments [on the Notes] on February 9, 2021,

---

[34] The Debtors' other citations are no more availing and either exclusively involve Mexican entities or involve a concurrently competing foreign insolvency proceeding—neither of which is the case here.  *See In re Xacur,* 219 B.R. at 970 (involving a private Mexican citizen who contracted with a Mexican bank); *In re Spanish Cay Co., Ltd.*, 161 B.R. 715, 725 (Bankr. S.D. Fla. 1993) (involving ongoing liquidation proceedings in the Bahamas).

and two successive interest payments." MOL ¶ 29. After removing the New York Litigation to federal court, the Debtors challenged only the Noteholders' entitlement to the Redemption Premium, **not** the principal or interest amounts due and payable as a result of acceleration. *See* MOL ¶ 33. However, that is irrelevant here because the Petitioning Creditors' recovery in this proceeding does **not** include, and is not otherwise based on, the Redemption Premium. Rather, the amount owed to the Petitioning Creditors, as calculated in their petitions, is based solely on the aggregate principal amount of and unpaid interest on the Notes they hold—amounts the Debtors do not dispute are due and payable.

74.     Accordingly, the Petitioning Creditors' claims are clearly not subject to a bona fide dispute. *See In re J.B. Lovell Corp.*, 88 B.R. 459, 462 (Bankr. N.D. Ga. 1988) (finding that pending litigation did not evidence bona fide dispute, in part because the debtor had admitted to the liability at issue).[35] Nor are the Chapter 11 Cases a "means of pressuring a debtor to pay a legitimately disputed debt." MOL ¶ 72. The Debtors admit that they have not made any interest payments to Petitioning Creditors since February 2021 and that the Notes were validly accelerated by the Indenture Trustee.

## V.     There Is No Basis to Dismiss the Chapter 11 Cases for Cause

75.     The Court should not dismiss these Chapter 11 Cases for "cause."[36] A fundamental purpose of the involuntary bankruptcy laws is to protect creditors from the depletion of assets by a debtor. The Petitioning Creditors have come to this Court to obtain the exact type of protection for which involuntary chapter 11 filings were designed. Nor are they alone. At a minimum, Diamond is an additional significant creditor and state tax authorities may be another.

---

[35] To be clear, the Petitioning Creditors are not seeking to collect the Redemption premium in these Chapter 11 Cases.

[36] The Debtors do not allege that this filing was made in bad faith.

76.     Bankruptcy Code section 1112(b) authorizes courts to dismiss or convert chapter 11 cases "for cause" if dismissal or conversion is in the best interests of *creditors* and the estate.  11 U.S.C. § 1112(b)(1).  Section 1112(b)(4) sets forth 16 factors that may constitute cause for purposes of section 1112(b)(1) although "cause is a fact-specific inquiry and a variety of factors may be relevant."  *In re Taberna Preferred Funding IV, Ltd.*, 594 B.R. 576, 601 (Bankr. S.D.N.Y. 2018).  The Debtors do not identify any of those 16 factors as a reason for dismissal and instead state that dismissal is appropriate because: (i) this is a two-party dispute; (ii) there is in fact "prejudice" if the proceeding is dismissed for cause; and (iii) of the purported "objective futility" of this proceeding.  MOL ¶¶ 77, 79–80.  However, none of these additional considerations are meritorious let alone warrant dismissal of these Chapter 11 Cases under section 1112(b).

## A.  The Chapter 11 Cases Are More than a Two-Party Dispute

77.     This Court has already acknowledged that these Chapter 11 Cases are not a two-party dispute.  At the hearing on March 29, 2023, the Court acknowledged the presence and participation of counsel for Diamond.[37]  Diamond has been engaged in a multiyear litigation against the Debtors and has obtained an approximately $25 million judgment against the Debtors in New York State Supreme Court.  Diamond is therefore a third party to this proceeding with a large, outstanding claim against the Debtors and has been actively participating in these Chapter 11 Cases since their filing, with recognition from the Court.  The Petitioning Creditors have also identified other potential creditors such as the State of California.[38]

---

[37] "With respect to the argument that you raised in your – I guess in your papers and also performing today that this is a two-party dispute. How do you square that with the fact that Mr. Driscoll's standing here today . . . ."  3/29/23 Hr'g Tr. 56:2-5.

[38] The facts here differentiate these Chapter 11 Cases from *In re Murray*, on which the Debtors rely.  In *In re Murray*, the involuntary case was filed by the only creditor of the alleged debtor—petitioning or otherwise.  *In re Murray*, 543 B.R. 484, 485 (Bankr. S.D.N.Y. 2016).  Likewise, *In re Bos*, like *In re Murray*, concerned a strictly two-party dispute

**B.  The Petitioning Creditors Would Suffer Prejudice by Dismissal**

78.       There is a significant risk of prejudice if the filing is dismissed.  Due to the existing

Injunctions in the September 2022 and ▇▇▇▇▇ Mexican Litigations, the Petitioning Creditors

cannot commence an involuntary *Concurso* proceeding in Mexico or seek any sort of relief through

other procedures available in Mexico.  *See* Guerra Dec. ¶¶ 59–60.

**C.  A Resolution Before This Court Is Not "Objectively Futile"**

79.       As described in Argument section A.ii, *supra*, there is a clear path forward for the

Petitioning Creditors to obtain recovery as a result of a resolution in this proceeding.  Further, as

previously noted, the Debtors cannot rely solely on hypothetical noncompliance to support a

futility argument.  For all of the reasons stated in Argument section A, *supra*, the purported

"objective futility" asserted by the Debtors does not provide a basis for the Court to dismiss the

Chapter 11 Cases for cause.

<u>**CONCLUSION**</u>

For all the foregoing reasons, the Debtors' Motion to Dismiss should be denied.

---

to enforce a judgment.  *In re Bos*, 561 B.R. 868 (Bankr. N.D. Fla. 2016).  Further, *In re Bos* did not involve a for-
cause dismissal, contrary to the Debtors' citation, but rather concerned a dismissal under section 305(a).

Dated:   June 16, 2023
         New York, New York          By: /s/ *Abid Qureshi*
                                      Michael S. Stamer
                                      Abid Qureshi
                                      David Giller
                                      **AKIN GUMP STRAUSS HAUER & FELD LLP**
                                      One Bryant Park
                                      New York, NY 10036
                                      Tel:     (212) 872-1000
                                      Fax:     (212) 872-1002
                                      Email: mstamer@akingump.com
                                             aqureshi@akingump.com
                                             dgiller@akingump.com

                                      Sarah Link Schultz (*admitted pro hac vice*)
                                      2300 North Field Street, Suite 1800
                                      Dallas, Texas 75201
                                      Tel:     (214) 969-2800
                                      Fax:     (214) 969-4343
                                      Email: sschultz@akingump.com

                                      *Counsel to the Petitioning Creditors*