

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 23-10385-lgb

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    TV AZTECA, S.A.B. DE C.V.,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                  United States Bankruptcy Court

12                  One Bowling Green

13                  New York, NY  10004

14

15                  August 29, 2023

16                  1:20 PM

17

18

19

20

21   B E F O R E :

22   HON LISA G. BECKERMAN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  F. FERGUSON

1    HEARING re Alleged Debtors Motion to Dismiss the Involuntary

2    Chapter 11 Petitions

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 3

1    A P P E A R A N C E S :

2

3    PAUL WEISS RIFKIND WHARTON GARRISON LLP

4        Attorneys for the Alleged Debtors

5        1285 6th Avenue

6        New York, NY 10019

7

8    BY:  WILLIAM A. CLAREMAN

9        KELLEY A. CORNISH

10       JAY COHEN

11

12   SHEPPARD MULLIN RICHTER HAMPTON LLP

13       Attorneys for Diamond Films Netherlands Cooperatief USA

14       30 Rockefeller Plaza, 39th Floor

15       New York, NY 10112

16

17   BY:  KATHERINE ANNE BOY SKIPSEY

18

19

20

21

22

23

24

25

```
 1   AKIN GUMP STRAUSS HAUER FELD

 2        Attorneys for Petitioning Creditors

 3        1 Bryant Park

 4        New York, NY 10036

 5

 6   BY:  DAVID GILLER

 7        ABID QURESHI

 8        SARAH SCHULTZ

 9

10   RIKER DANZIG SCHERER HYLAND PERRETTI LLP

11        Attorneys for the Bank of New York Mellon

12        Headquarters Plaza

13        One Speedwell Avenue

14        Morristown, NJ 07962-1981

15

16   BY:  CURTIS M. PLAZA

17

18   DANIEL RUDEWICZ, Pro se

19

20   ALSO PRESENT:

21   RICK ARCHER

22   AMY L. BARTON

23   JESSICA CHOI

24   ELIZABETH MCCOLM

25   SEAN MITCHELL
```

1    DIANA LAURA MUNOZ PRECIADO

2    XU PANG

3    MICHAEL STAMER

4    LUCIAN WANG

5    SIMONA XU

6    UDAY GORREPATI

7    TAYLOR HARRISON

8    LUCY MONTEIRO

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1                    P R O C E E D I N G S

2              THE COURT:  Court is now in session.  I'm going to

3     go ahead and note this is a continuation of the hearing that

4     began yesterday in case number 23-10385 TV Azteca, S.A.B. de

5     C.V.  And for purposes of the record, I'm going to ask the

6     attorneys again to put their appearances on the record.  I'm

7     going to remind the attorneys they have to speak at the

8     podium to do that.  Thank you.

9              MR. CLAREMAN:  Good afternoon, Your Honor.  Billy

10    Clareman from Paul Weiss on behalf of the alleged Debtors.

11    I'm again joined at counsel table by Kelley Cornish and Jay

12    Cohen.

13              MS. CORNISH:  Good afternoon, Your Honor.

14              THE COURT:  Good afternoon.

15              MR. COHEN:  Good afternoon, Your Honor.

16              MR. QURESHI:  Good afternoon, Your Honor.  Abid

17    Qureshi, Akin Gump Strauss Hauer and Feld, and with me are

18    Michael Stamer, Sarah, Schultz, and David Giller all on

19    behalf of the petitioning Creditors and the indentured

20    Trustee.

21              THE COURT:  Good afternoon.

22              MAN 1:  Good afternoon.  Thank you.

23              MR. PLAZA:  Good afternoon, Your Honor.  Curtis

24    Plaza from Riker Danzig on behalf of Bank of New York as

25    indentured trustee.

Page 7

 1            THE COURT:  Good afternoon, Mr. Plaza.

 2            MR. PLAZA:  Thank you.

 3            MS. BOY SKIPSEY:  Good afternoon, Your Honor.

 4   Katherine Anne Boy Skipsey from Sheppard Mullin on behalf of

 5   Diamond Films.

 6            THE COURT:  Good afternoon.  All right.  Okay.  So

 7   we are here for closing argument, and I presume -- I don't

 8   know who on your side is going to handle it, Mr. Clareman,

 9   whether it's you or one of your partners.

10            MR. CLAREMAN:  Thank you, Your Honor.  I will be

11   splitting --

12            THE COURT:  Uh-huh.  That's fine.

13            MR. CLAREMAN:  -- closing with Kelley Cornish.

14            THE COURT:  Okay.

15            MR. CLAREMAN:  Your Honor, I have a closing dec

16   that I'd like to hand up if I may approach.

17            THE COURT:  Yes.  You may approach.  Thank you.

18            MR. CLAREMAN:  Thank you, Your Honor.  If you turn

19   to page -- the first page of the dec that we handed up, that

20   sets forth a summary of the arguments that we have advanced

21   to dismiss these involuntary cases.  There are four

22   arguments that we've made.  The first is that dismissal is

23   warranted under Section 305(a)(1) of the Bankruptcy Code.

24   Second, that dismissal on the basis of form non-convenience

25   is appropriate.  Third, that dismissal for lack of standing

Page 8

1    under Section 303(b)(1) of the Bankruptcy Code is

2    appropriate.  And fourth, that dismissal under Section

3    1112(b) of the Bankruptcy Code is appropriate on the facts

4    of this case.  I will be addressing arguments under

5    305(a)(1), and form non-convenience, and Ms. Cornish will be

6    addressing the arguments under Section 303(b)(1) and 1112(b)

7    of the Bankruptcy Code.

8             THE COURT:  That's fine, Mr. Clareman.  I guess I

9    should just warn you the way that I usually will probably do

10   this is not interrupt you, probably not interrupt you

11   either, but I will have questions afterwards.  So the two of

12   you will have to figure out who's going to answer my various

13   questions afterwards.  Just warning you.

14            MR. CLAREMAN:  No problem, Your Honor.  Thank you.

15            THE COURT:  Okay.

16            MR. CLAREMAN:  Okay.  I'd like to start if you'd

17   turn to Page 3.  I'd like to start with the hearing and the

18   evidence that came in yesterday.  At the end of the day, the

19   experts agree on at least the following point.  All of the

20   alleged Debtors have an establishment in Mexico under

21   Article 279(6) of the LCM.  They also agree that Article 293

22   of the Bankruptcy Code requires a concurso to be initiated

23   for all of the alleged Debtors to recognize any foreign

24   proceeding that would arise from this case.

25            They also agree that if this Chapter 11 proceeding

Page 9

1    were recognized in Mexico as a foreign non-main proceeding,

2    a full concurso would be required.  And they also agree on

3    what that means.  That means the visita stage under the

4    concurso law must be commenced, the conciliation stage must

5    be observed.  No reorganization's possible over the

6    objection or without the approval of the Debtors.  The IFT,

7    which regulates TV Azteca and provides it with concessions

8    to broadcast television has specific enumerated rights,

9    which include the right to veto any plan of reorganization,

10   to supervise the conciliator, among other things.

11          And the reorganization must otherwise comply with

12   all of the applicable provisions of the LCM, Mexican law,

13   and public policy.  The outcome of that agreement in this

14   case is that there will inevitably be here a do-over in

15   Mexico arising from these proceedings.

16          I'll turn next starting with the next page to

17   address the disagreement that exists with respect to the

18   application of Article 293 to these cases.  There's really

19   only one narrow area of disagreement as it relates to

20   Article 293.  And we submit that Profession Mejan, his

21   testimony on this subject is the testimony that should be

22   credited.

23          Professor Mejan explained that a full concurso is

24   required any time recognition is sought for a Debtor with an

25   establishment in Mexico.  Professor Mejan -- and that exists

Page 10

1    whether it's main or non-main.  Establishment is the key

2    term under Article 293.  Professor Mejan provided that

3    opinion in his opening declaration.  He remained consistent

4    in his subsequent declarations.  He was consistent in this

5    trial on that subject.  His opinion is based on the text of

6    Article 293, which does not differentiate between main and

7    non-main proceedings.  Article 293 and 294 draw a

8    distinction between establishment in Mexico concurso, no

9    establishment in Mexico ancillary.

10           There are other provisions in the LCM including

11   Article 309, for example, that do draw a distinction between

12   main and non-main proceedings.  The LCM says in its text

13   when there is a difference required by -- for recognition of

14   foreign main and foreign non-main proceedings, and that is

15   not contained in Article 293.

16           In contrast to Mr. Mejan's -- Professor Mejan's

17   opinions, Mr. Guerra has been inconsistent in these

18   proceedings with respect to his interpretation of Article

19   293.  We have seen his opinion evolve over the course of

20   declarations and testimony.  In Mr. Guerra's initial

21   declaration, he testified that -- and I'm quoting from JX

22   123 at Paragraph 32, "Starting the concurso from scratch

23   solely because a Debtor's center of main interest is in

24   Mexico is inconsistent with the purpose of Title 12."

25   That's where Mr. Guerra started.

Page 11

1          He did not, in his initial declaration, explain

2     Article 293, how it worked.  That was missing, and he

3     disagreed with the -- or he was purporting to disagree at

4     that time with Professor Mejan's opinions.  In Mr. Guerra's

5     supplemental declaration, after seeing Mr. -- Professor

6     Mejan's two initial declarations, Mr. Guerra stated

7     Professor Mejan is correct that Article 293 provides that a

8     full concurso needs to be initiated for recognizing any

9     foreign proceeding of a company that has an establishment in

10    Mexico.

11          I'm quoting from JX 130 at Paragraph 47.  Mr.

12    Guerra's supplemental declaration did not describe a

13    differentiation between foreign main and foreign non-main

14    proceedings in talking about Article 293 and how it applied.

15    But at trial, Mr. Guerra testified that a full concurso is

16    only required if a Chapter 11 case is recognized as a

17    foreign non-main proceeding if it's -- if recognition is

18    sought and the Chapter 11 cases for a foreign main

19    proceeding.  Then Mr. Guerra testified you don't need to do

20    the full concurso.  You can stop short after the visitation

21    stage.

22          This interpretation has no support whatsoever in

23    Article 293, other provisions of the concurso law, and Mr.

24    Guerra confirmed there were no cases that he was aware of to

25    support his interpretation.  But as a result of that

Page 12

1    reading, that tortured reading of Article 293, Mr. Guerra

2    now has to cling to the opinion that the alleged Debtors

3    COMI is in the United States.  And we submit that that is

4    not a remotely credible opinion.  It -- his opinion that a

5    Mexican court would more likely than not -- that was his

6    testimony, conclude that the alleged Debtors have their COMI

7    in the United States is not only incredible, but that

8    opinion should be weighed by the Court in assessing any of

9    Mr. Guerra's opinions.

10              His claim is essentially that because 3 of the 35

11   alleged Debtors are incorporated or organized under U.S.,

12   that's sufficient to establish that all of the alleged

13   Debtors' COMI is in the United States.  Mr. Guerra ignores

14   the fact that 25 of the 25 alleged Debtors that are

15   domiciled in Mexico, 7 more are domiciled in other countries

16   outside the U.S., and that substantially all of the alleged

17   Debtors' operations, management, employees, offices, and

18   revenues are located in or derived from Mexico.

19              His opinion appears to be intertwined -- we heard

20   some of this in his testimony yesterday that his opinion on

21   COMI perhaps is intertwined with his what I'll call

22   confusion about the relationship between COMI and

23   jurisdiction, that there's no basis for that conclusion or

24   drawing that link.  It isn't, and nothing in Articles 15, 15

25   biz, or 17 of the LCM are to the contrary or support his

Page 13

1    opinions.  None of his opinions about Article 293 has any

2    support in any body of law that he could point to.

3             I'll turn next to Slide 7.  Based on the evidence,

4    at most, at most, these proceedings could be recognized

5    potentially as a foreign non-main proceeding.  That is I

6    think the most that the evidence could ever show for some of

7    the alleged Debtors.  I'm going to come back to

8    establishment.  I'm not conceding that point, but I -- just

9    to frame the consequence of what I think is the clear

10   conclusion based on the evidence is that if these cases were

11   recognized as a foreign non-main proceeding, there would

12   need to be a full concurso.  That is the evidence, and that

13   is the most that I think Mr. Guerra has agreed to.  But I

14   think it is dispositive ultimately here.

15            So what that means is that upon any request for

16   recognition, the visitation stage would start, take 15 to 30

17   days.  If the insolvency test is met, a conciliator would be

18   appointed, and the conciliation phase would be initiated.

19   That would take up to a year.  Any plan of reorganization

20   has to comply with all of the provisions of the LCM.  No

21   plan can be approved by the concurso court without the

22   Debtors' agreement and the requisite amount of Creditor

23   support.

24            Any change to the Debtors' equity requires the

25   consent of TV Azteca shareholders.  Any plan has to be

1    approved by the IFT, which will have substantial rights to

2    appoint and supervise the conciliation stage.  If the

3    conciliation stage is unsuccessful, there would be a

4    liquidation in Mexico, okay?  That is inevitable, and I

5    think that the evidence shows that at this point and cannot

6    be refuted.

7              A Chapter 11 case -- if Your Honor would turn to

8    the next slide, a Chapter 11 case under these circumstances

9    that can only be a prelude to a full concurso will not

10   accomplish a reorganization of the alleged Debtors.  It will

11   impose substantial cost.  It will impose substantial

12   disruption to their business.  The factors courts consider,

13   I will back to these factors in a bit, but the factors that

14   courts have described as relevant to the analysis as to

15   whether to dismiss the Chapter 11 case under Section

16   305(a)(1), all of them point to dismissal under the

17   circumstances we submit.

18             Economy and efficiency of an administration of a

19   reorganization cannot be advanced or achieved by a Chapter

20   11 case.  Chapter 11 proceedings will not produce an

21   enforceable plan of reorganization or distribution of the

22   Debtors' assets.  A second insolvency proceeding would be

23   necessary, would be required in this case rendering this

24   proceeding ultimately superfluous.  A Chapter 11 case that

25   is preliminary to a concurso case would be time-consuming.

Page 15

1    It would be expensive.  Ultimately, it would harm the

2    Debtors.  It would harm their stakeholders.  It would harm

3    their Creditors.

4         If you would turn to the next slide, the features

5    of Mexican law that we have described and that Professor

6    Mejan described, that's the reason why Mexican companies

7    that seek reorganization in the United States don't seek

8    recognition proceedings in Mexico.  That is I think the

9    clear inference for what you're seeing play out in these

10   cases.  The four cases that have been cited by the

11   petitioning Creditors and their expert, Aero Mexico, Sat

12   Mex, Max Com, and Posadas, all of those cases involve

13   voluntary Chapter 11s in the United States, Debtor supported

14   plans, approval by shareholder, or no impact on the equity.

15        But critically, none of them involve any attempt

16   to enforce plans in Mexico or even obtain recognition in

17   Mexico, which is a pretty remarkable thing when you consider

18   the fact that these companies clearly have substantial

19   presence in Mexico.

20        I'll turn next to, briefly, to some of the

21   evidence on the subject of the Debtors' -- of the alleged

22   Debtors' COMI.  As I mentioned before, Mr. Guerra's

23   testimony and conclusion and opinions that the alleged

24   Debtors have their COMI in the United States is, we submit,

25   not credible.  Slide 11 or Slide 10 has 20 -- reflects that

Page 16

```
 1    25 of the alleged Debtors are incorporated in Mexico.  We've

 2    circled those in red here.  Only three of the alleged

 3    Debtors are incorporated or organized under U.S. law.

 4    Substantially all of the alleged Debtors' business is in

 5    Mexico.  Mexico City is where the principal -- where TV

 6    Aztec's principal place of business is.  It's where the

 7    alleged Debtors' management is located.  It's where TV

 8    Aztec's board is located, their controlling shareholder.

 9          It's where 37 of the 50 subsidiaries, that

10    includes non-Debtor subsidiaries, are located --

11    incorporated.  It's where over 3,000 of their employees, 94

12    percent of their employees are located.  It's where 94

13    percent of their revenues are generated or were in 2022.

14    The Mexican government regulates them.  It's where almost

15    all of their real property is located.  It's the center of

16    all of the alleged Debtors have commercial relationships.

17    It's where the majority of their Creditors are and

18    counterparties.

19          I'm going to turn next to the dispute about

20    whether there's an establishment in the United States.

21    There is no dispute that there are establishments for all of

22    the alleged Debtors in Mexico.  That much is agreed on.  And

23    as I've explained, that has significant consequences for

24    this case.  There is certainly no evidence that all 35 of

25    the alleged Debtors have an establishment in the United
```

Page 17

1   States.  There are arguments that have been made that are

2   really directed to, at most, three or four of the alleged

3   Debtors that have contract -- that are contract

4   counterparties, and that have commercial relationships with

5   parties in the United States.  I've reproduced on Slide 12

6   the LCM provision that is similar to what's in the Model Law

7   that provides that an establish shall be understood as any

8   place of operations where the merchant exercises an economic

9   activity with human and material resources or services in a

10  non-transitory manner.

11          We've also reproduced Sections 89 and 90 of the

12  Model Laws guide to Enactment which provides some of the

13  other considerations that courts have considered in

14  relationship -- not just Mexican courts, but courts in the

15  U.S., for example, have found these instructive in

16  connection with evaluating establishment.  And occasional

17  place of operations can't be classified as an establishment.

18  There's no presumption with respect to the determination of

19  establishment.

20          The alleged Debtors, or some of them, used to have

21  an establishment.  That was a long time ago.  The alleged

22  Debtors used to operate a network in the United States.  It

23  was called Azteca America.  It operated in the U.S. through

24  U.S. subsidiaries.  It was sold to HC2, which is an

25  unaffiliated third party, and that sale happened in 2017.

Page 18

1    Thereafter, HC2 operated TV Azteca America Network.  That

2    was on the air until 2022.  It ceased in December of 2022.

3    That network is discontinued.  It does not continue to

4    broadcast in the United States.  And so what remains today

5    are what I'll vestigial entities.  They are entities that

6    were originally set up when there was a network when there

7    was business here.  And they do continue to exist, and they

8    are contract counterparties to certain U.S. parts.

9          Most of those agreements, and they're in the

10   evidence, and I'll comment a little bit more on them

11   shortly, but most of those agreements are a very short

12   duration and for isolated projects and individual show.

13   Things of that nature.  If Your Honor would turn to the next

14   slide.  In evidence on the -- in the stipulated list of

15   exhibits there are 38 contracts in evidence that are relied

16   upon by the petitioning Creditors to show the existence of

17   an establishment to which only four of the alleged Debtors

18   are parties.

19          I'm not including in that group contracts with

20   GSI.  I'll address GSI separately.  Of those contracts, 17

21   are on their face expired or terminated if you look at them.

22   There are 21 that just by their terms are not expired.  The

23   21 contracts are with 11 counterparties.  So for example,

24   there's five contracts with PGA, three with Amazon, and so

25   on.  And the contracts predominantly involve licenses for

Page 19

1     third parties to use content that's developed in Mexico,

2     outside of Mexico.  And with respect to the current

3     contracts, many of those as I mentioned are, in fact, short

4     term contracts that will expire within the next two years.

5          If Your Honor would turn to the next slide, I want

6     to address specifically the Univision contract.  We've heard

7     testimony and we heard questioning yesterday about the

8     Univision contract.  That is a contract that Azteca

9     International Corporation, AIC, has entered into with

10    Univision.  It is a seven-year contract that was a prior

11    contract that existed.  The actual work, everything related

12    to that contract is in Mexico.

13         TV Azteca licenses -- well, AIC licenses to

14    Univision the right to broadcast in the United States the

15    soccer games for two Mexican soccer league teams.  The TV

16    Azteca networks in Mexico, they broadcast these games in

17    Mexico to Mexican audiences, and they send a signal, a TV

18    signal to Univision.  They give them a stream.  It's the

19    same broadcast.  It is shown in the United States on

20    Univision, but that's the contract.

21         If you'd turn to the next slide, there's also been

22    discussion in the past about PGA contracts.  There are

23    several of those.  What those contracts allow TV Azteca to

24    do is host -- and it's Azteca Sports is the actual contract

25    counterparty, but what happens under those contracts is

Page 20

```
 1    there's a golf tournament in Mexico.  And that's a PGA golf

 2    tournament.  It's organized.  It's sponsored.  It happens in

 3    Mexico.  It is broadcast in Mexico by TV Azteca.  There are

 4    rights under certain of the agreements to have a broadcast

 5    in the United States, but they don't have a network in the

 6    United States.

 7            If Your Honor would turn to the next slide, I'll

 8    touch briefly on GSI.  There's a lot about GSI in the

 9    petitioning Creditor's opposition brief.  We heard some

10    questioning about it yesterday.  The claim that TV Azteca

11    maintains operations in the U.S. through GSI is untrue and

12    completely unproven by this evidentiary record.  GSI is a

13    third party contractor.  It performs certain legal and

14    consulting services.  There are employees at and in

15    particular two lawyers who work at GSI who were formerly TV

16    Azteca employees when TV Azteca had U.S. operations.

17    Because it used to have a network here.

18            Those -- a couple of those people work at GSI, and

19    they're lawyers, and they perform legal services.  There are

20    matters of U.S. law that need to be addressed by TV Azteca.

21    That is principally the work that they do.  They also have

22    agreements that allow for other consulting services from

23    time to time, but Mr. Rodriguez testified at his deposition

24    that the current services are limited and primarily involve

25    legal advice.
```

Page 21

```
 1              So ultimately, the record on COMI is crystal
 2    clear.  The COMI for these entities given their management,
 3    their operations, what they do, what their business is,
 4    clearly Mexico.  And the notion that three U.S. subs that
 5    are essentially paper counterparties to other U.S. entities
 6    could drag -- could cause a Mexican court to conclude that
 7    TV Azteca is a -- has its center of main interest in the
 8    United States is not, we submit, credible.  It would be like
 9    concluding that because Comcast or NBC had one or two or
10    three -- Mr. Guerra says one is enough, but let's say three
11    deminimis Mexican subsidiaries, a court might conclude that
12    those, you know, major American companies have, in fact,
13    their COMI in Mexico.
14              The record on establishment is contested.
15    Professor Mejan offered his opinion.  That opinion was based
16    on the declarations of Mr. Rodriguez.  Those declarations
17    describe the contractual relationships with various parties.
18    They describe the nature of the alleged Debtors' U.S.
19    operations, which don't exist, and the Mexican operations.
20    That conclusion is well supported.  It may, at most, be a
21    litigation in Mexico about whether there is an establishment
22    here for a very small number of alleged Debtors.  At most.
23              I want to turn next to the subject of litigation
24    in Mexico because we have obviously heard quite a bit about
25    litigation in Mexico and injunctions that have been issued
```

Page 22

1    by Mexico courts.  At the outset of these involuntary cases,

2    the alleged Debtors made a choice.  They chose to file an

3    involuntary Chapter 11 case in this court instead of

4    initiating an involuntary concurso case.  That decision, we

5    submit on the record, was not made because they believed

6    that they were enjoined from filing an involuntary concurso

7    case at the outset of these cases.  Their statement in

8    support of their petition, filings in connection with the

9    stay motion to be sure complained about the Mexican

10   litigations and raised the Mexican litigations as an issue,

11   but they did not say we are filing in this court because we

12   want to file in Mexico, but we can't file in Mexico.

13          There was a form preference that we submit was

14   motivating the petitions.  There have been allegations or

15   claims about the secret nature of the proceedings in Mexico

16   or the secret nature of filings or ex parte relief.  Mr.

17   Guerra confirmed that as a matter of Mexican practice they

18   complied with Mexican law.  There's not a claim that under

19   Mexican law by Mr. Guerra that procedurally there was

20   something improper about the way that those cases were filed

21   in terms of the disclosure are pursued.

22          The petitioning Creditors have been served with

23   one of the injunctions.  They're litigating that.  They have

24   filed a motion to vacate.  They have challenged other

25   rulings of the Mexican court, one of which was successfully

Page 23

1   challenged.  There was a ruling early on about the amount of

2   time to answer one of the complaints.  There was a ruling

3   against them.  They obtained a ruling in their favor.

4   They're litigating those cases.  The cases, though, have not

5   -- did not have -- before these petitions were filed, they

6   have no effect on the actual litigation that was pending at

7   that time before Judge Gardephe.

8           There was not an argument that was -- they were

9   not advanced in the briefing before Judge Gardephe as a

10  basis to deny their summary judgment motion.  There were

11  other arguments about the summary judgment motion that Ms.

12  Cornish will touch on later, but they were not advanced as a

13  basis to not file them or to rule against them on those

14  motions.

15          If Your Honor would turn to Slide 20, Professor

16  Mejan opined that the injunctions that have been issued by

17  the Mexican courts do not prevent the commencement of an

18  involuntary concurso proceeding.  The experts disagree.  Mr.

19  Guerra has offered the opinion that they would have that

20  effect, but that is the only basis in the record to reach

21  that conclusion.  It is Mr. Guerra's speculation about what

22  would happen.  That proposition was never tested.  There

23  were never -- there was never a concurso filed on an

24  involuntary basis in Mexico which would tell us what the

25  effect of the injunctions actually is.

Page 24

1          We submit that Mr. Guerra's speculation about that

2     subject given his other credibility issues, given the fact

3     that he actually provided the parties with a copy of an

4     injunction that specifically enjoined bankruptcy cases and

5     undermined the rest of his opinion on the effect of the

6     existing injunctions should not be granted.

7          I'll turn now on Page 21 to a discussion of the

8     law, U.S. law, on Section 305(a)(1).  Section 305(a)(1)

9     allows the court, after noticing a hearing, to dismiss the

10    case under this title if the interests of Creditors and the

11    Debtor would be better served by such dismissal.  The

12    standard under the case law is met when there is no

13    reasonable likelihood that the Debtor intended to

14    reorganize, and no reasonable probability that it would

15    eventually emerge from bankruptcy proceedings.  The

16    objective futility -- quoting from Multicanal, the objective

17    futility of any possibility of administering a

18    reorganization in this jurisdiction is grounds for dismissal

19    under Section 305(a)(1).  Again, that's Multicanal.

20          In Jacor, the Southern District of Texas case, the

21    court dismissed an involuntary Chapter 7 petition under

22    Section 305(a)(1) because a Mexican court may not recognize

23    the enforceability of orders issues from a United States

24    bankruptcy court in an involuntary proceeding against a

25    Mexican citizen in domiciliary.

Page 25

1          On the next slide we've collected other factors

2     that courts consider in connection with dismissal of cases

3     under Section 305(a)(1).  And again, I touched on these

4     earlier, but because of the need for a concurso and because

5     of the conflicts between concurso law and how concurso would

6     proceed and U.S. law, keeping these cases here would not

7     promote the economy and efficiency of administration of any

8     reorganization.

9          Another forum is available.  It is there.  It is

10     the necessary forum.  There is no way to avoid that forum.

11     Chapter 11 cases are not necessary, we submit, to reach any

12     just or equitable distribution of assets because they cannot

13     be administered here.  And again, all of the factors that

14     courts look to we submit compel dismissal here.

15          I'd like to turn next to Multicanal specifically,

16     talk a little bit about Multicanal and Globalpar.  We heard

17     about both of those cases yesterday.  So Multicanal has a

18     lot of similarities to this case.  In Multicanal, the court

19     considered an involuntary Chapter 11 petition for an

20     Argentine company headquartered in Buenos Aires.  90 percent

21     of Multicanal's operations were in Argentina.  Multicanal's

22     U.S.-based assets were three bank accounts with an aggregate

23     balance of approximately $9,500.

24          Multicanal did issue U.S. denominated -- U.S.

25     dollar denominated notes pursuant to a New York governed

Page 26

1   adenture.  Those notes accounted for about 97 percent of

2   Multicanal's debt according to Judge Gropper's opinion.  The

3   U.S. notes were registered with the SEC, and those notes

4   were marketed and sold with the assistance of U.S. advisors

5   and underwriters in the United States.  And on the record

6   there, Judge Gropper found that in that case -- he commented

7   that the motives of the involuntary Petitioners are less

8   important than the objective futility of any possibility of

9   administering a reorganization in this jurisdiction and

10  stated that a motion to dismiss -- on a motion to dismiss I

11  should say, a court must take into account its ability to

12  enforce its own orders.

13          He continued that a concurrent U.S. case would

14  conflict with rather than compliment based on the expert

15  testimony there an insolvency proceeding in Argentina, and

16  it would not be recognized in Argentina under Argentine

17  insolvency law.  And that was again a basis to dismiss the

18  petition.

19          Globopar is not to the contrary.  Globopar

20  involved a Brazilian company.  It was headquartered in

21  Brazil.  All of its employees, principal offices, principal

22  place of business was also located in Brazil.  Vast majority

23  of Globopar's property was there, but Globopar also had

24  issued over a billion dollars of U.S. dollar denominated

25  debt, including approximately 750 million, which expressly

Page 27

1    subjected, according to the opinion, Globopar to

2    jurisdiction of New York courts for actions arising out of

3    the bondo.

4           And it was also the case that at Globopar there

5    was expert testimony that was unrebutted that said, quoting

6    from the opinion -- this is 317 B.R. 235 at 244 Note 4 that

7    it seems likely that a Brazilian court would refuse to

8    recognize any judgments or orders issued by the bankruptcy

9    court related to Globopar.  The district court in Globopar

10   did reverse and remand a decision by the bankruptcy court in

11   that case.

12          The reversal, though, was based on the fact that

13   the bankruptcy court had failed to develop a sufficient

14   factual record in the case and had failed to address

15   arguments that had been made by the parties on issues like

16   jurisdiction and service of process among other things.  And

17   there's a lot of frustration when you read Globopar in the

18   fact that the bankruptcy court had failed to develop a

19   record or articulate reasons for all of its rulings.

20          But the Globopar court did observe, based on the

21   record as it was presented to that court, that the case was

22   in fact a strong one for abstention based on the record.

23   And the Court noted that, and I'm quoting, "Potential lack

24   of cooperation from Globopar, foreign Creditors, and the

25   Brazilian courts would certainly stand as a significant

Page 28

1   impediment to the orderly administration of Globopar's

2   bankruptcy estate since there's no indication that the

3   bankruptcy court would be able to obtain the cooperation of

4   foreign Creditors who are not subject to bankruptcy court's

5   jurisdiction.  And a Brazilian court may not compel to

6   participate in any United States bankruptcy proceeding.

7   Such considerations may well weigh heavily in the bankruptcy

8   court's assessment of factors enumerated by Section

9   305(a)(1) of the Bankruptcy Code or by other jurisdictional

10  and equitable dockets."  And again, if the court -- this is

11  a quote, "The petition appears to represent a strong

12  candidate for abstention."

13        Now, Globopar, and this is summarized on Page 27,

14  did say in relation to Multicanal that it did not agree, and

15  I'm quote, "Did not agree with a legal conclusion reached in

16  a decision otherwise well-reasoned recently issued by

17  another bankruptcy court in this district."  And that's

18  referring to Multicanal.  The specific point that the

19  Globopar court identified in Multicanal was that Multicanal

20  stated in the course of the decision that it would be on --

21  that there was concern by the court that it would be unable

22  to exercise effective jurisdiction.

23        And what Globopar says is, well, the bankruptcy

24  courts with in personum jurisdiction.  That how it obtains

25  in rem jurisdiction, and that was not addressed in the

Page 29

1   manner that that an analysis should proceed.  That was

2   essentially the criticism of Multicanal.  But Globopar did

3   not say that on the facts of Multicanal abstention was

4   inappropriate.  Globopar said the opposite.  I submit that

5   Globopar, notwithstanding the dismissal of the lower court's

6   opinion, actually supports dismissal in this case and

7   abstention in this case.  And of course, you only need to

8   reach 305(a)(1) abstention if there is jurisdiction in the

9   first place.

10            I'm going to touch briefly and only briefly on

11  forum non-convenience.  For many of the same reasons -- I'm

12  on Slide 29.  For many of the same reasons, that dismissal

13  is warranted under Section 305(a)(1).  Forum non-convenience

14  dismissal is appropriate.  The factors that guide the

15  court's discretion under forum non-convenience we submit is

16  the court's dismissal.  I'll highlight only a few points on

17  this topic because essentially it is the same facts

18  ultimately that I have discussed before in relation to the

19  alleged Debtors.

20            The petitioning Creditors here are not U.S.

21  entities.  They are foreign funds.  They were organized

22  under the law of the Caymans.  They were organized under the

23  law of Luxemburg.  They are managed by U.S. advisors, or

24  they have U.S. investment advisors, but they're not U.S.

25  funds.

Page 30

1            And Your Honor, if I may, I'm going to go a little

2      bit out of order, but if I may direct your attention to

3      Slide 32, this is an excerpt from the offering circular that

4      accompanied the notes originally.  It stated not for

5      distribution to any U.S. persons.  This offering is

6      available only to non-U.S. persons within the meaning of the

7      Regulation S and the U.S. Securities Act of 1933.

8            On the next slide, the offering circular also

9      described, notwithstanding the forum selection clause that

10     is in the indenture that relates to disputes about the

11     notes, that there was a risk that the issuer and the

12     guarantors could become subject to a concurso mercantile.

13     That is a bankruptcy proceeding in Mexico.  That risk would

14     not be there if there was exclusive jurisdiction over a

15     bankruptcy case in New York.

16            And my last comment on this subject is only that

17     I'm not aware of a case that says a form selection clause in

18     one creditor's agreement should dictate where a plenary

19     restructuring proceeding should take place.  There are other

20     credit -- there's a credit agreement with a secured lender

21     that has a Mexican forum selection clause.  Courts routinely

22     consider that forum selection clauses are outweighed by

23     other considerations in the bankruptcy context.  And with

24     that, I will cede the podium to Ms. Cornish.

25            THE COURT:  Thank you, Mr. Clareman.

1              MS. CORNISH:  Good afternoon, Your Honor.

2              THE COURT:  Good afternoon.

3              MS. CORNISH:  Good afternoon.  Kelley Cornish from

4    Paul Weiss on behalf of the alleged Debtors.  Your Honor,

5    one comment about the slide deck that Mr. Clareman has been

6    walking through, while the contents of the slide deck

7    certainly mirror and include all of the matters that I'm

8    going to cover, I'm not going to follow it verbatim.

9              THE COURT:  That's fine.  I take notes too --

10             MS. CORNISH:  Yeah, I --

11             THE COURT:  -- in case you haven't noticed.

12             MS. CORNISH:  I've watched.  I've seen them,

13   copious notes.  Your Honor, most of the briefing in these

14   matters, and essentially all of yesterday's hearing have

15   been devoted to dealing -- or to dueling expert testimony

16   and argument about the interplay of U.S. and Mexican

17   insolvency law if TV Azteca can be forced into a bankruptcy

18   proceeding here.

19             As Mr. Clareman has extensively argued, we believe

20   that this court should dismiss these involuntary cases

21   because any Chapter 11 plan approved by this court must be

22   subjected to a do-over essentially in a full-blown Mexican

23   concurso.  Mexican law in material respects is incompatible

24   with the petitioning Creditors contemplated in voluntary

25   plan in these cases resulting in undue delay, expense, and

1     value degradation in detriment of the Debtors' enterprise

2     and stakeholders.

3             Aside, Your Honor, from the abstention grounds and

4     forum non-convenience grounds that Mr. Clareman just

5     covered, there are two what we think are silver bullet type

6     independent bases for dismissal of these cases under the

7     bankruptcy code, applicable case law, and the simple

8     undisputed facts that relate to them.

9             First, Your Honor, the petitioning Creditors are

10    ineligible to bring these cases under Section 303(b)(1) of

11    the Bankruptcy Code because a portion of the claim on the

12    notes that they hold is subject -- is the subject of a bona

13    fide dispute as to amount.  And that is, Your Honor, the

14    $16.5 million redemption premium that is part of the claim

15    under the notes.

16            Although the petitioning Creditors are now trying

17    to walk away from that disputed portion of the claim on

18    their notes to avoid the standing issue here, they cannot do

19    that.  Both the directing holders, which included the

20    petitioning Creditors or some of them, and the indentured

21    Trustee at their direction are seeking payment of a $16.5

22    million redemption premium under the notes.  And that issue

23    is squarely joined and pending before Judge Gardephe in the

24    district court litigation that was commenced by the

25    indenture Trustee.

Page 33

1          That dispute cannot simply be circumvented here

2     for standing purposes by the petitioning Creditors.  And

3     I'll come back to this argument in more detail.  Second,

4     these cases should be dismissed for cause under Bankruptcy

5     Code Section 1112(b).  They are nothing more than a two-

6     party dispute filed by the petitioning Creditors because

7     they lost patience with the action on the notes that they

8     directed the indenture Trustee to commence in New York State

9     court, and are frustrated with litigation pending in Mexico,

10    which incidentally, Your Honor, has done nothing to disrupt

11    their lawsuit that's pending here in the Southern District.

12          Let's begin, Your Honor, with the petitioning

13    Creditors' standing under Section 303(b)(1).  To have

14    standing to commence an involuntary case under that section,

15    a petitioning Creditor must not be "the subject of a bona

16    fide dispute as to liability or amount."  The case law is

17    clear that the petitioning Creditor must satisfy both the

18    liability and the amount prong of 303(b)(1).  And there are

19    cases cited in the slides.

20          Also, Your Honor, each and every one of the

21    Southern District New York bankruptcy judges who have

22    considered this issue, and they include Judge Morris, Judge

23    Drain, and Judge Bernstein, plus the Ninth Circuit, the

24    First Circuit, and the Fifth Circuits have held that a bona

25    fide dispute as to a portion of a petitioning creditor's

1     claim is sufficient to render that creditor ineligible to

2     file a voluntary case under the bankruptcy code.  Your

3     Honor, the full citations to those cases are, you know,

4     included in the slide decks and in our briefs.  I won't go

5     through them.

6              Here, it is undeniable that a live dispute is

7     joined and is pending before Judge Gardephe with respect to

8     the noteholder's claim for a $16.5 million redemption

9     premium under the notes.  A brief review of the history of

10    the notes is illuminating for these purposes.  And I will

11    reference Your Honor to Page 46 of the slide deck, which has

12    a timeline, but I'll walk through it.  I'll walk through

13    some of it anyway.

14             Your Honor, the notes were issued in February of

15    2017 by TZ Azteca.  In February 2021, TV Azteca announced

16    deferral of an interest payment, and subsequently also then

17    missed additional payments.  Notably, and this, Your Honor,

18    is on Page 38.  There's a demonstrative on Page 38 of the

19    slide deck.  It relates to the petitioning Creditors'

20    purchase of the notes and the timing of it.

21             So as Slide Deck 38 -- or Page 38 of the slide

22    deck shows, the petitioning Creditors first purchased their

23    notes the day after the first missed interest payment.  They

24    were not initial par purchasers.  Your Honor, we've also

25    included in the joint exhibits at Pages 164 to 204 Bloomberg

Page 35

1     screenshots that reflect the steeply discounted market

2     prices of the notes at points in the timeline when the

3     petitioning Creditors purchased their notes.  And

4     essentially, they're somewhere in the .42 to .44 cent range.

5              As -- also, Your Honor, we included, oh, the

6     demonstrative deck, which I've already pointed you to.  In

7     May of 2022, back to the timeline of the litigation and

8     events leading to the litigation, in May of 2022, the

9     beneficial holders of more than 25 percent of the notes

10    issued a notice of acceleration expressly seeking payment of

11    "premium, if any".  And that's at Joint Exhibit 13 at Page

12    2.

13             On August 5, 2022, the indenture Trustee issued a

14    notice of acceleration that incidentally did not mention

15    premium, and that's Joint Exhibit 14 at Page 1.  Three days

16    later, however, at the direction of the directing

17    noteholders, the indenture Trustee amended the notice to add

18    reference to a "premium".  That's Joint Exhibit 15 at Page

19    1.

20             Later that month, the indenture Trustee commenced

21    litigation on the notes by filing summary judgment in lieu

22    of complaint in New York State court expressly including a

23    demand for payment of a $16.5 million redemption premium.

24    And that's at Joint Exhibit 2, Page 22.  The following month

25    very promptly TV Azteca removed that action to the Southern

Page 36

1    District of New York and filed an opposition to the

2    indenture Trustee's motion in that court.  And the indenture

3    Trustee subsequently filed a reply.  The issue of whether a

4    redemption premium is due and owing on the note is squarely

5    joined in these pleadings and is currently pending before

6    Judge Gardephe.

7            In fact, the issue is addressed no less than ten

8    times in the parties' pleadings, and you can find those

9    pleadings, Your Honor, Joint Exhibit 140 is TV Azteca's

10   opposition and Joint Exhibit 4 is the reply.  Meanwhile, as

11   I previously mentioned, I'll just note the petitioning

12   Creditors have continued to buy notes throughout this entire

13   period of time at a steep discount.

14           Probably recognizing that they had an issue

15   satisfying 303(b)(1)'s requirement that their claims not be

16   the subject of a bona fide dispute as to amount, the

17   petitioning Creditors are now trying to sidestep that issue

18   by, first omitting from their statement in support of these

19   involuntary cases any mention whatsoever of the directing

20   holders or the indenture Trustee's assertions of the

21   disputed claim under the notes for a redemption premium.

22           Specifically, Your Honor, in Paragraph 2 of their

23   statement, they intentionally incompletely state, "On August

24   5, 2022, noteholders owning a majority of outstanding

25   principal amount of notes, including the petitioning

1   Creditors, directed the indentured Trustee to send an

2   acceleration notice to TV Azteca upon which principal and

3   interest", that's the only reference, "immediately became

4   due and payable.  The directing holders then directed the

5   indentured Trustee to initiate a suit in New York State

6   Supreme Court seeking a judgment for the principal and

7   interest," no reference to premium, "due under the

8   indenture."  And that's at Paragraph 2, Your Honor, of their

9   statement in support.  And again, they just conspicuously

10   omit from their description of their claim under the notes

11   payment of a redemption principal -- premium.  Excuse me.

12         The redemption premiums I've mentioned was

13   expressly made, that claim, by the indenture Trustee at the

14   directing holders', including the petitioning Creditors,

15   direction in two places.  One, if you look at the

16   supplemental notice, which I've already made reference to,

17   of acceleration dated August 8th, it reads, "The Trustee by

18   this notice declares the unpaid principal of $400 million

19   premium accrued in unpaid interest and any other amounts

20   owed under the notes to be due and payable immediately as

21   provided under Section 6.21(a) of the indenture."

22         And then the second summary of the claim is in the

23   memo of law in support of summary judgment in lieu of

24   complaint, specifically in the list of relief that's being

25   sought.  Page 6 says, "Award Plaintiff premium consistent

Page 38

1    with the redemption premium at a rate of 104.125 percent of

2    the principal as of the date of acceleration, August 5,

3    2022, as provided in Section 5.1 of the indenture for a

4    premium totaling $16,500,000." As I've mentioned, TV Azteca

5    disputes that the redemption premium is due under the Second

6    Circuit's 2017 MPM decision, and that issue has been

7    extensively brief and is pending for decision before Judge

8    Gardephe in the Southern District of New York action.

9          Your Honor, the Plaintiff's attempt to ignore the

10   bona fide dispute that exists with respect to the amount due

11   on the notes arising from the redemption premium is just

12   ineffective here. There is undeniably a pending dispute

13   with respect to a portion of the noteholder's claims under

14   the notes. If this court proceeds with these involuntary

15   cases, the noteholder's claim, including whether they can

16   collect the redemption premium under the notes, will have to

17   be adjudicated to determine the noteholder's treatment under

18   any plan.

19         The petitioning Creditors are noteholders who will

20   be bound by their class's treatment under any plan. Despite

21   their attempt to insulate themselves from ineligibility to

22   file these cases under 303(b)(1) today by purporting to

23   waive the disputed redemption premium of their claim on the

24   notes, that dispute must be resolved with respect to the

25   notes if these cases go forward.

1            Likewise, very similarly, the petitioning Creditor

2    in Mountain Dairies, Judge Morris' case that looked at these

3    issues, tried to waive disputed portions of its claim for

4    purposes of obtaining standing to file an involuntary

5    Chapter 7 case.  But Judge Morris noted that, "There is no

6    doubt that the dispute over the amount of the petitioning

7    Creditor's claim would continue after the entry of an order

8    for relief."  The petitioning Creditor would have this court

9    find no dispute for purposes of the threshold requirement of

10   an undisputed claim, and then have this court resolve multi-

11   faceted disputes over the amount of that claim.

12            Judge Morris found that, "Those concessions do

13   not, as the petitioning Creditor contends, eliminate the

14   bona fide dispute."  She dismissed the involuntary case on

15   standing grounds.  Also on abstention grounds, but it -- but

16   on standing grounds.  And that's the Mountain Dairies case

17   at Page 634.  Subsequently commenting on Judge Morris'

18   reasoning in a later involuntary Chapter 7 case, Judge Drain

19   in the Persico case noted that the Mountain Dairies

20   petitioning Creditor's attempt to "concede the validity of

21   the Debtor's amount of its claim as resolving their dispute

22   for the purposes of the involuntary petition was no

23   concession at all."  And that's at Page 2 of the Persico

24   Westlaw -- it was an oral decision from the bench, Judge.

25            The petitioning Creditors' attempt here to waive

1    the disputed portion of their claim on the notes for a

2    redemption premium for purposes of establishing standing to

3    file these involuntary cases is the same as in Mountain

4    Dairies.  In the words of Judge Drain in Persico, such a

5    concession "would not count as a waiver at all, and the

6    petitioning Creditor would not satisfy the amount in dispute

7    issue."  Again, Page 2 of the Persico decision.

8           In sum, Your Honor, the petitioning Creditors are

9    ineligible to file these involuntary cases because the

10   redemption premium portion of the noteholder's claims --

11   claim under the notes is the subject of a bona fide dispute

12   in the action before Judge Gardephe.

13          Your Honor, aside from the fact that the

14   petitioning Creditors lack standing here, these cases should

15   be dismissed for cause due to what courts have recognized as

16   "a common practice, the filing of a case under the

17   bankruptcy code as a tactic in a two-party dispute" for

18   which adequate remedies exist at state law.  And that quote,

19   Your Honor, is from Judge Gerber in the Murray bankruptcy

20   court level decision.  And that Murray case is a really

21   important case I think in this area, and which resulted in a

22   dismissal of an involuntary Chapter 7 filing that went all

23   the way up to the Second Circuit and was affirmed in the

24   Second Circuit.  And I'll be coming back to Murray.

25          Your Honor, what Judge Gerber referred to, we

1    believe, is precisely what is going on here.  As we've

2    highlighted extensively throughout the proceedings, last

3    year a group of noteholders, including the petitioning

4    Creditors, directed the indenture Trustee to accelerate the

5    notes and file litigation in New York State court to recover

6    payment on the notes.  TV Azteca promptly removed that case

7    to the federal district court, and the parties have been

8    litigating there primarily with respect to whether the

9    redemption premium is due and payable.

10            Fully briefed summary judgment motions currently

11   are pending before Judge Gardephe, and obviously that case

12   has been stayed by these filings.  Apparently impatient with

13   Judge Gardephe and frustrated by litigation occurring in

14   Mexico, the petitioning Creditors decided to attempt to use

15   the bankruptcy code and this busy court to bring their

16   dispute with TV Azteca to a head.  Incidentally, Your Honor,

17   we've mentioned this before -- actually, a separate point,

18   excuse me.

19            Incidentally, the petitioning Creditors never once

20   pressed Judge Gardephe for a decision on the motion that's

21   pending before him or advised him of any reason for

22   expediting that decision.  Tellingly, the petitioning

23   Creditors' three-page preliminary statement in their

24   statement that was filed in support of these cases, if you

25   look at those three pages, and I'm not going to -- I don't

Page 42

1    have a slide laying them out, but if you go back and look at

2    them and read them, you will see that that entire

3    preliminary statement speaks only of the dispute between the

4    TV Azteca and noteholders under the notes.  That's it.

5         It makes no reference whatsoever to any other

6    debts or Creditors, or to any financial or operational

7    matters requiring a plenary reorganization of TV Azteca in

8    the United States or in Mexico.  In fact, Judge, the

9    ultimate description of their motivation for filing these

10   cases in that preliminary statement, if you go to Page 4 of

11   that preliminary statement, I think it's the last paragraph,

12   it's quite telling.  It smacks of nothing but a two-party

13   dispute.

14        It says, "The Debtor's actions leave the

15   petitioning Creditors no choice but to seek relief from this

16   court.  Without intervention by this court, the noteholders

17   will be permanently harmed, stripped of any due process

18   rights through baseless litigation in Mexico, all of their

19   contractual rights under their New York law governed

20   indenture, and left without a remedy to seek recovery."  All

21   about the notes and frustration.

22        Judge Gerber in the Murray case dismissed, as I

23   mentioned, an involuntary Chapter 7 case "for cause under

24   Section 1112(b) when a single Creditor tried to invoke the

25   involuntary provisions as its personal judgment enforcement

Page 43

1   device."  In Murray, as I've mentioned, the parties were

2   engaged in highly contentious protracted litigation for

3   years until the judgment Creditor ultimately filed an

4   involuntary Chapter 7 petition before Judge Gerber.  In

5   dismissing the case, Judge Gerber focused exclusively on the

6   purpose and policy underlying the bankruptcy system

7   explaining that "bankruptcy is a collective remedy with the

8   original purpose which continues to this day to address the

9   needs and concerns of creditors with competing demands to

10  debtor's assets and with the understandable desire that the

11  debtor's assets not go to the swiftest or most aggressive of

12  them.

13          "Over the years, the bankruptcy system's purposes

14  expanded to accomplish other important social goals to bring

15  an end to debtor's prison, to provide for a discharge, to

16  rehabilitate debtors, and thus to capture going concern

17  value for the benefits of the creditor community as

18  contrasted to selling off assets for scrap and to save jobs,

19  and to benefit the communities in which debtors operate.  If

20  any of those goals needed to be achieved here, a bankruptcy

21  case likely, if not plainly, would make sense."

22          But Judge Gerber -- that's the end of the quote,

23  Judge Gerber concluded in Murray that none of those policy

24  goals were implicated.  Rather, he found that the bankruptcy

25  court cannot properly be employed as a rented battlefield to

Page 44

1    achieve ends for which it never was intended as a collection

2    mechanism to achieve none of the goals the court just noted.

3    And in reaching his decision, Judge Gerber, I would note and

4    emphasize, gave no consideration whatsoever to how long it

5    was taking or how difficult it had been and was for the

6    petitioning creditor to obtain the relief it was seeking in

7    the years of underlying litigation.  I just -- I noticed

8    that you were -- I was just waiting.  That's okay.

9           THE COURT:  No, that's all right.

10          MS. CORNISH:  In the years of underlying

11   litigation.  And in fact, I will also note in terms of

12   adequate remedy of law, in Murray, the judgment creditor was

13   seeking relief, had the ability to get expanded relief in

14   the bankruptcy case under the bankruptcy codes as opposed to

15   in the underlying litigation.  And that did not factor in at

16   all.

17          Judge Gerber, rather, went on to list the

18   undisputed facts in Murray demonstrating there was nothing

19   but a two-party dispute before him.  Most are remarkably

20   similar to these cases, and you'll see in the slide deck we

21   actually line these up, but I'll go through them now orally.

22   Judge Gerber noted or listed the facts as follows.  This

23   court is the most recent battlefield in the longstanding

24   two-party disputes.  This case has been brought solely as a

25   judgment enforcement mechanism.  There are no creditors

Page 45

1    competing with each other to be first in line to collect on

2    claims.  There were no other creditors to help.

3         Assuming arguendo that there were any fraudulent

4    transfers that could be avoided and then recovered, the

5    petitioning Creditor could -- Creditors could do so on its

6    own without resorting to the bankruptcy court.  The

7    petitioning Creditor has adequate remedies under non-

8    bankruptcy law, obviously referring, Your Honor, to the

9    pending litigation and etcetera.  Further, no assets would

10   be lost or dissipated in the event that the bankruptcy case

11   did not continue.

12        The petitioning Creditors' interest in the

13   judgment -- there it was a judgment enforcement proceeding

14   as opposed to a pending litigation -- and its ability to

15   enforce the judgment against the Debtor will remain.

16   Finally, the Debtor does not need or want a discharge.  Your

17   Honor, similar undisputed facts are present here.  First,

18   the petitioning Creditors filed these cases while litigation

19   that they commenced in New York State court is pending

20   providing them an adequate remedy under non-bankruptcy law.

21        I would also note that there's potentially an

22   involuntary proceeding in Mexico as well, but we can focus

23   on the New York State pending litigation.  No other --

24   second, no other creditors have come forward here in this

25   matter seeking the assistance of a bankruptcy process in the

Page 46

1    U.S. or Mexico, for that matter.  Although the pendency of

2    these cases has been widely publicized, including in the

3    financial press and in TV Azteca's securities filings.  As

4    Your Honor knows, Diamond, a judgment Creditor, did appear

5    at the initial hearing in these cases, but has shown no

6    interest in participating since then and forcing TV Azteca

7    into a full-blown bankruptcy.  Presumably, Diamond is

8    content to continue its own two-party dispute with TV Azteca

9    outside of this court.

10          There is currently no evidence of dissipation of

11   TV Azteca's assets in Mexico, here, or otherwise, or a race

12   to the bottom to collect on debts by multiple creditors or

13   constituents of creditors.  There is no evidence that TV

14   Azteca is in need of a comprehensive financial or

15   operational restructuring.  Rather, the petitioning

16   Creditors' reorganization plan that they intend to file

17   after terminating TV Azteca's exclusivity would be their

18   intent.

19          That plan, that contemplated plan on its face

20   demonstrates that they do not intend to effect a true

21   reorganization of TV Azteca's debts or business as described

22   by Judge Gerber in Murray or is contemplated.  To the

23   contrary, their purpose -- they propose, excuse me, to force

24   the entire TV Azteca enterprise into prolonged expensive and

25   value destructive U.S. involuntary Chapter 11 cases that

Page 47

1    would admittedly have to be followed by a full-blown Mexican

2    concurso.  That would affect the notes and try to affect

3    equity, although as we've, we think, shown through Mr.

4    Mejan's testimony can't do it.  Everyone else under that

5    contemplated plan is unaffected.  We don't need the

6    bankruptcy court to, as they contemplate, treat the taxing

7    authorities and oversight of the ITF "in accordance with

8    applicable non-bankruptcy law."  Don't need the bankruptcy

9    courts for that.

10            In addition, reinstating the revolving credit

11   facility for Banco Azteca, don't need that.  Reinstate

12   general unsecured Creditors' claims.  So again, this smacks

13   of a two-party dispute.  Nobody else is being affected other

14   than equity that cannot be.  Your Honor, the petitioning

15   Creditors' plan is not a reorganization operationally or

16   financially at all.  Again, no Creditor claims other than

17   the notes will be affected.

18            As the Second Circuit said in Murray, "After

19   considering the purpose of involuntary petitions, the goals

20   of the bankruptcy code, and the bankruptcy court's authority

21   under Section 1112(b)" the Second Circuit affirmed Judge

22   Gerber's dismissal in Murray of the involuntary chapter

23   filing for cause explaining that, "Such a remedy exists as

24   an avenue of relief for the benefit of the overall Creditor

25   body.  It was not intended to address the special

Page 48

1    grievances, not matter how legitimate of particular

2    Creditors.  Such Creditors must seek redress under state law

3    in the state courts and not in the bankruptcy court."

4         The reasoning and holding in the Murray decisions

5    by Judge Gerber all the way up to the Second Circuit we

6    think are applicable here, Judge.  The indenture Trustee and

7    TV Azteca have been litigating over the notes in an action

8    commenced by the indenture Trustee, which provides the

9    noteholders with an adequate remedy at law.  There are no

10   other Creditors that have come forward seeking to

11   participate in a reorganization of TV Azteca here or in

12   Mexico.

13        The petitioning Creditors' own contemplated plan

14   would seek to impair or affect only the noteholders' claims

15   other than equity, which they cannot do.  As demonstrated in

16   their own statement in support of these cases, Your Honor,

17   the petitioning Creditors are not proposing a reorganization

18   of TV Azteca for the benefit of all of its stakeholders and

19   to maximize value and recovery on all of their claims in

20   interests, or to avoid the future dissipation of assets or a

21   liquidation of TV Azteca, or to preserve TV Azteca as a

22   going concern.

23        None of those goals are implicated here.  Rather,

24   the petitioning Creditors have decided to change forums to

25   exert maximum pressure to recover on their notes, which they

Page 49

1   purchased with eyes wide open and at a steep discount.

2   Judge Gardephe is already handling that two-party dispute.

3   These cases should be dismissed for cause under Section

4   1112(b) of the Bankruptcy Code.  Thank you, Your Honor.

5            THE COURT:  Okay.  I guess I'll just start asking

6   my questions, and then you two can figure out who's

7   answering them.  Okay.  When I reviewed the pleadings before

8   Judge Gardephe, which as you imagine I have not only

9   reviewed the ones that are in the binders, but I've reviewed

10  all of them, as well as all of the ones in the state court

11  because I'm allowed to take judicial notice of anything

12  that's happening in some court, it didn't seem to me that

13  there was any argument made by the alleged Debtors as to the

14  principal amount and whether that's due and owing.  Is that

15  right?

16           MR. CLAREMAN:  Your Honor, that's correct.  That

17  argument was not made in the pleadings in the matter before

18  Judge Gardephe.

19           THE COURT:  But yet we've -- I've read the

20  pleadings in Mexico in the -- I'll call it the unserved

21  injunction litigation, and certainly the language of those

22  pleadings goes beyond what one would expect in an

23  injunction, which is just to stop things from happening.

24  But the underlying action beyond just the initial injunction

25  seems to argue about whether there was validity to various I

1   guess acceleration was his word given.  Is that right?

2              MR. CLAREMAN:  That is correct with respect to

3   pleadings in Mexico, yes.

4              THE COURT:  Okay.  All right.  So can you explain

5   why the Debtor is making one argument in the United States

6   and another argument in Mexico?

7              MR. CLAREMAN:  Well, the way I would answer it is

8   just to say that I'm not a Mexican lawyer, and the arguments

9   that can be made in a Mexican court are arguments that

10  Mexican lawyers have made, will made, if they're -- and if

11  they are -- should be dismissed, they should be set aside

12  and not --

13             THE COURT:  How about there's no jurisdiction

14  based on the contract that you all agreed to in the

15  indenture for the Mexican court to be dealing with any of

16  those issues?  And the fact that you all have commenced

17  actions seeking that is in violation of your contract.  Now,

18  look, it's clearly not what's before Judge Gardephe.  He has

19  no idea based on the papers that are filed before him, at

20  least that I could see, about what's going on in terms of

21  Mexico unless people have filed these things that I've only

22  recently seen with the translations to him.

23             So how would he then know that this argument is

24  being made?  But regardless, you know, the Debtor signed a

25  contract that says -- and I think no one disputes this part

1    of it.  I understand there's a dispute about what does it

2    mean vis-a-vis my proceeding here today, but I think at

3    least with respect to the issue of where issues about

4    adjudication of the notes, and what's owed under the terms

5    of the indenture, and whether potential provisions of the

6    indenture were complied with or not, what's owed based on

7    the indenture, that this is all subject to New York law and

8    a New York forum by virtue of the agreement of the parties

9    in Section 11.7.

10           So I'm having a really hard time understanding

11   what the legal basis is for this litigation and it happening

12   elsewise.  The reason that I'm asking about this is you're

13   asking me to take a position as to what's going on Judge

14   Gardephe's court with respect to whether there's a bona fide

15   dispute.  Okay.  Understand the argument on the premium.

16   Obviously, I've read Momentum myself of course.  Never mind

17   that we were involved in it.  Not me, but other people years

18   ago.  And of course I'm familiar with cases such as American

19   Airlines, some of the other things that Momentum cites to

20   because some of those cases I was involved in myself, and

21   also the state court issues with respect to premiums.

22           So I understand there's a dispute there, and I

23   think that's laid out before Judge Gardephe, and I get that.

24   But it seems to me that I have a secondary dispute going on

25   here and that no one's asserted before Judge Gardephe.  But

Page 52

1    yet it is asserted in two different courts about the

2    principal.  So what position am I supposed to take with

3    respect to that?  It seems to me that I have to take a

4    position that, based on my reading of this indenture that

5    wasn't asserted in front of Judge Gardephe, it can't

6    possibly be a bona fide dispute.  Because a bona fide

7    dispute has to comply with what people agree to.

8              MR. CLAREMAN:  So, Your Honor, this is -- I would

9    answer your question as (indiscernible).  I don't disagree

10   with what Your Honor has said as a matter of New York law

11   with respect to the indenture and what it means.  And I --

12   arguments have not been made in front of Judge Gardephe that

13   are -- no arguments inconsistent with what Your Honor has

14   said have been made in front of Judge Gardephe.

15             THE COURT:  Right.  I've read it.  Yep.

16             MR. CLAREMAN:  And what I would suggest is if

17   there is an issue in terms of actions being taken that are

18   in some manner interfering with Judge Gardephe's ability to

19   handle the case, Judge --

20             THE COURT:  He needs to know about them.

21             MR. CLAREMAN:  That is -- of course that's true.

22   That's true, but that request can -- that sort of relief can

23   be sought by litigants in that case.  There is a --

24             THE COURT:  For certain, but again, respectfully,

25   you know, when you're litigating in front of a bankruptcy

Page 53

```
 1    court or a district court, there is things that are the law

 2    that parties all understand.  And I think what you all are

 3    arguing -- which I understand the argument, and I've read

 4    the indenture.  I obviously have my own opinion.  My own

 5    opinion doesn't matter because this won't be just decided by

 6    me necessarily.  I guess maybe it could matter, but it

 7    doesn't matter for now.  Judge -- it's in front of Judge

 8    Gardephe.  I have my own opinion about it.

 9            But I certainly understand the arguments that are

10    to be made.  I understand issues about premiums.  Obviously,

11    my previous life I did a lot of litigation on premiums.  I

12    know the issue.  I understand it.  This is, to me, taking an

13    argument that the parties have agreed should be in front of

14    it if someone's going to make it, in front of Judge Gardephe

15    and his court, or for that matter my court if I kept this

16    proceeding, but some court in New York that has

17    jurisdiction.  And it shouldn't be being made somewhere

18    else.  It almost makes me have to perhaps make a finding

19    about the bona fide nature of that.

20            And if -- I'm just raising it so the people

21    understand why this is bothering me in particular in

22    addition to people not complying with contracts.  But I also

23    note that the fact that the court doesn't know about it

24    bothers me a lot.  And it bothers me a lot not for something

25    that's a legal reason because I accept the arguments that
```

1    were made yesterday by your -- by the parties that they

2    don't have to necessarily legally tell people until they're

3    served and everything.  But there's also professional

4    conduct.  We go by that in our courts.

5            And so I think not telling people, most

6    importantly not telling the tribunal if it's an issue so

7    that they're aware of it, is a problem for me.  And I'm just

8    noting that.  That has nothing to do with my ruling except

9    perhaps adding an additional potentially dispute, which may

10   or may not be bona fide that's out there.  But I note that I

11   don't think that that -- this is appropriate conduct on the

12   part of parties.

13           And so you know, you can -- however this goes, I'm

14   just putting this on the record so -- because perhaps, who

15   knows, Judge Gardephe might read my statement that he

16   understands that I was distressed and don't think that

17   that's appropriate conduct, and that he does need to be

18   notified even in a stayed litigation about what's going on.

19   So I think parties need to consider that.

20           All right.  Going on to other questions, if I deny

21   the motion to dismiss, would the alleged Debtors actually

22   comply with their obligations under the bankruptcy code?

23   This seems to be an issue that actually is important.

24   Because on one hand, if the Debtors tell me they're not

25   going to comply, they're not going to file schedules and

1      statement of affairs, they're going to ignore their

2      fiduciary duties, they're not going to attend 341 meetings,

3      they're not going to file monthly reports, they're not going

4      to propose a plan.  In other words, if I don't dismiss this

5      litigation, they're just going to completely act in their

6      own way acquit their fiduciary responsibilities, that could

7      make things very difficult for me.  Also for anybody

8      enforcing.

9              On the other hand, if you actually complied with

10     all those things, proposed your own plan, which would then

11     be consensual on your part, whether it got confirmed or not,

12     you'd have a consensual Chapter 11 proceeding in some ways,

13     potentially, or certainly one that you had input in.  And

14     certainly you have exclusivity, and there's a process for

15     that.  And that might be a different situation.

16             One of the things I'm trying to figure out in the

17     abstention issue is how likely is this going to be a

18     scorched earth situation.  That's my worry.  And so I'm

19     going to ask you what are you going to do.

20             MR. CLAREMAN:  Well, let me address the question

21     in a couple of different ways because I have a few

22     reactions.  So number one, of course, speaking for counsel,

23     we will comply with orders of this court.  There would be, I

24     anticipate at a number of points, issues of conflict of laws

25     that would need to be addressed in terms of what can be done

Page 56

1    as a matter of Mexican law and what -- and how that

2    interacts with the bankruptcy code.  So I would anticipate

3    that those issues would arise.

4         Ultimately, our argument is not that these cases

5    should be dismissed because or in anticipation of obstinance

6    or scorched earth tactics by the alleged Debtors.

7    Ultimately, even in a cooperative from the alleged Debtors'

8    perspective, in order to be enforceable in Mexico binding on

9    shareholders, binding on the government, binding on the

10   secured Creditors, binding on trade Creditors, the consent

11   of the Debtor doesn't get you all the way there.  You have

12   to have a further recognition proceeding in Mexico that runs

13   into the exact same problems they serve at.

14        THE COURT:  Well, maybe and maybe not.  I mean, no

15   disrespect.  I mean, if Group Aeromexico had started as an

16   involuntary and ended up as a plan proposed by Group

17   Aeroméxico that was voted in favor by their shareholders,

18   which it was -- and for full disclosure, I did work on Group

19   Aeroméxico before I took the bench.  I wasn't there at the

20   end, but I was there at -- for a big chunk of it.  So I --

21   there, that's one example of where there was a consensual

22   proceeding here in the U.S. that didn't involve having to go

23   back to Mexico to do anything.

24        I mean, that could happen here if the parties did

25   that.  I don't think that's impossible.  I understand that

Page 57

1    if the parties don't have an agreement or if the parties

2    want to -- do not have the support of the Mexican

3    government, the Mexican government doesn't have their rights

4    in here in this process, the Mexican government is adversely

5    affected, other Creditors' rights are adversely affected in

6    Mexico, you might end up with what you're saying.  I

7    completely understand that even if everybody agreed.

8            But there are examples.  Granted, they didn't

9    start out as involuntaries.  I understand that.  But if the

10   Debtors -- it was the Debtors' plan in those circumstances,

11   the Debtor isn't going to propose a plan here either that

12   doesn't comply with the laws in Mexico.  I can't believe

13   that.  So it strikes me as it's not impossible to get to

14   that role if people are willing to cooperate and recognize

15   those things.  It doesn't mean every proceeding would have

16   to end up there.

17           I think it could.  I'm not disagreeing with that.

18   Certainly if the Debtors aren't on board with it and I

19   confirm the plan over their objection, again hypothetically,

20   I definitely think you'd end up back in Mexico in that

21   circumstance.  I really don't disagree with that.  I think

22   that would be a problem.  You'd have to go back to Mexico

23   then.  But I think it is possible for that to occur.

24   Sometimes people actually reach arrangements in proceedings

25   if they don't start out the right way.

Page 58

1                I mean, that's the problem with what you're

2       arguing on the other side.  You're arguing about an

3       involuntary concurso as being an option.  Okay.  Maybe.

4       Maybe it is, maybe it isn't.  Why do I say maybe?  I say

5       maybe because you have to decide you're not going to get

6       sued before the superior court on that injunction language

7       unless it gets vacated.  It's a risk.  People have to decide

8       they're going to do it.

9                Again, you may -- you know, your expert certainly

10      doesn't think it's a problem.  The other side thinks it's a

11      problem.  You have issues.  No one knows.  Hasn't been

12      before anyone.  What they did agree on is that the concurso

13      court can't override it, so you are definitely going to be

14      dealing with whatever the superior court thinks.  I have no

15      idea what the superior court thinks, but that's an issue.

16               Okay.  You also have to pass the insolvency test,

17      which is harder in an involuntary because there's two parts.

18      It's also potentially harder because of the issues that have

19      been raised in the Mexican proceeding that -- involving the

20      acceleration notices possibly, but it also may be that

21      simply the test can't be met because the company isn't doing

22      that badly.  I have no idea.  No one has any idea sitting

23      here today for sure.  So then that isn't really an option if

24      you can't meet the insolvency test.  And so you're telling

25      me that that's the best other option for the other parties,

Page 59

1    and I'm not really sure that's the best other option.

2         Then the other argument that you all are making to

3    me is that, okay, they should just get their judgment in

4    front of Judge Gardephe, which believe me, I know Judge

5    Gardephe.  He is not a person to sit on things.  And one of

6    the things that Ms. Cornish said is right.  I think that if

7    he knows there is a fire that needs to get done, he actually

8    does do that.  He's one of the district court judges that

9    actually moves reasonably fast.  And I know this from

10   experience.

11        So he rules.  He -- there's a judgment, but we

12   heard the testimony about the judgment enforcement process

13   in Mexico, which is obviously not short either.  It's a few

14   years, etcetera.  In the meantime, no disrespect, you have

15   notes that are maturing next year, okay?  The fact that

16   somebody is going to sit here today and tell me that this

17   isn't a restructuring scenario, I just -- I'm sorry.  I have

18   a hard time buying that because, you know, we are talking

19   about a fairly large amount of notes.  We are talking about

20   the fact that those are going to have to be dealt with,

21   whether now or you manage to hold them all off until 2024

22   from this litigation.

23        Let's just say your litigation strategy works.

24   Because no offense, you have one too, and that occurs.  You

25   have maturity.  They're going to be due then.  So the

Page 60

1    parties need to really be -- so your argument that they

2    should be filing an involuntary concurso, I should be

3    dismissing this, and there should be no restructuring going

4    on isn't going over very well with me.  And that's where my

5    problem is.  So that's going to get to some of my other

6    questions later on.

7                MR. CLAREMAN:  Okay.

8                THE COURT:  All right.  So first question -- next

9    question is are the noteholders in Diamond the only U.S.

10   Creditors right now where there's an argument that there's a

11   past due amount outstanding in the United States with

12   respect to U.S. Creditors that you're aware of.  I'm not

13   saying you agree that that's true.

14               MR. CLAREMAN:  Yeah.  So why don't I start with

15   the last question if I may?  So the last question that you

16   asked about whether there's any U.S. creditors that we're

17   aware of, Diamond has a disputed claim.  I wouldn't describe

18   Diamond as a U.S. creditor.  I think it's a Dutch entity.

19   They have a contingent litigation claim that is in state

20   court.  I'm aware of a litigation claim that's been pending

21   for a very long time brought by a Mexican singer that is

22   pending in Texas.  Again, there's a contingent litigation

23   claim.

24               There is -- there has been brought to our

25   attention that there are claims, I think it's approximately

Page 61

```
 1    $20,000 or less that have been asserted by a tax authority

 2    in California.  We believe that those taxes are -- not

 3    agreed that they're due.  We believe that they're associated

 4    with properties that were sold.  That is what we are aware

 5    of.

 6              THE COURT:  Okay.

 7              MR. CLAREMAN:  Shall I move to the other questions

 8    that Your Honor --

 9              THE COURT:  Yes.

10              MR. CLAREMAN:  Okay.  So I'll address the question

11    about the prospects of a Chapter 11 case here.  Certainly

12    the origins of this case, not only are they involuntary,

13    there's clearly a lot of dispute and litigation between the

14    parties.  It is --

15              THE COURT:  Which just makes me feel like I should

16    send you all to mediation.  How do you feel about that?

17              MR. CLAREMAN:  Well, I -- Your Honor, I'd need to

18    -- I would need to discuss that with my co-counsel, with the

19    client, but we believe fundamentally that these claims

20    should be dismissed.  That is what we're arguing here, so

21    I'm sorry to not answer.

22              THE COURT:  I understand.  I get that.  But -- I

23    get that, and I understand that.  And if the parties don't

24    feel like they want to sit down and have a conversation with

25    each other, that's fine.  We'll go forward with litigation.
```

Page 62

1    I'll rule.  Don't worry.  But my point to you is that sooner

2    or later, people are going to have to try to resolve these

3    issues.  And whether you're arguing with me, you know,

4    you're making the argument to me that this shouldn't be done

5    through a collective proceeding, it doesn't need to be done

6    through a collective proceeding, well, probably every pre-

7    pack on earth with like no holder issues either end up as an

8    out-of-court, end up with a pre-pack.

9            We have a lot of issues where people just have

10   proceedings that deal with the notes and nothing else in a

11   proceeding.  Everything else leaves -- gets untouched.

12   Otherwise, we would never have pre-packs.  So there are

13   processes we have here to deal with that, and that's I'm

14   sure true in Mexico also because the Mexican experts both

15   talked about pre-packed concursos.  So I'm not saying the

16   U.S. is the only way to do that.

17           But there obviously are insolvency proceedings

18   that go on that don't reorganize the entire company or don't

19   affect everybody and are very limited as to who is being

20   affected in it.  We have it here, and apparently they have

21   it there.  And there's reasons for that because you have to

22   figure out sometimes how you're going to deal with the fact

23   that we have noteholders who all are -- you know, who are,

24   you know, all over the world, and you have to consents from

25   them, and you need a certain amount.  Not always so easy to

Page 63

1    do without everybody consenting.

2         And also, that sometimes you only need to

3    restructure your funded debt.  And even here, maybe not even

4    all your funded debt because obviously it doesn't seem like

5    you have issues with your bank facility.  Anyway, I just --

6    I'm having a hard time accepting the argument that this

7    isn't a situation where the parties really need to be

8    dealing with the ultimate issue, which is what are you doing

9    with this.  You know, you can litigate all you want.  At the

10   end of the day, there's going to be some kind of judgment

11   here.

12        Whether it's just a judgment on the interest and

13   the principal, or it's a judgment on the redemption, that's

14   where you're headed with Judge Gardephe.  Just leaving that

15   aside for the moment, what does that take you to?  I mean,

16   the parties have to eventually get somewhere on this.

17   Unless the company really has a check right now that they

18   could write to them or they're planning on writing to them

19   when they -- when maturity happens, which I don't really

20   think is the issue based on the declarations that were

21   submitted.

22        So I'm having a hard time understanding the

23   resistance to the fact that there needs to be some kind of

24   restructuring here, whether it happens here or in Mexico.

25   And you guys haven't -- the Debtors, alleged Debtors,

Page 64

1    haven't filed concursos either.  So you obviously haven't

2    gotten to the point where you're prepared to submit yourself

3    to that.

4            MR. CLAREMAN:  That's correct.  So to answer Your

5    Honor's question about mediation, we would agree to a

6    mediation if that was -- if that -- if the Court felt that

7    that was appropriate or helpful under the circumstances.  I

8    -- but returning to the prospects in the absence of a

9    mediating agreed outcome, which would --

10           THE COURT:  Mm-hmm.

11           MR. CLAREMAN:  -- necessarily need to involve a

12   lot of parties given the Mexican law issues and would not be

13   a simple matter, ultimately, in the cases that have pursued

14   restructuring in the U.S., the four cases that managed to

15   have restructurings here successfully, and I'm, you know,

16   not a Mexican lawyer, but pre-packs in Mexico I presume are

17   the same way, that there needs to be broad consensus in

18   order for them to work.  And so from the standpoint of

19   today, in the absence of a mediation, I'm just talking about

20   if we --

21           THE COURT:  Mm-hmm.

22           MR. CLAREMAN:  -- proceed, and if the motions were

23   denied, we would be in a situation of uncertainty starting

24   from the standpoint of a litigious posture with the

25   noteholders, because that is where the posture is today.

Page 65

1    There are other parties in Mexico whose interests are

2    unlikely to align with -- and clearly I think don't align

3    with the noteholders.  I'm talking about equity.  It is a

4    majority controlled company.  So I think that launching into

5    a Chapter 11 case with an uncertain outcome and no basis

6    today to believe it would be successful ultimately runs into

7    all of the problems that I was describing.

8            Because ultimately, you can have the Chapter 11

9    process.  It would, I think we can all agree, would likely

10   be expensive and time-consuming in the absence of a rapid

11   agreement.  And then you would have all the problems

12   associated with needing to go back to Mexico for enforcement

13   if not -- if all of the stakeholders were not in agreement.

14   And there are a significant number of other stakeholders

15   that have rights that may be implicated by whatever happens

16   here.

17           THE COURT:  Understood.  Since the filing of the

18   petitions by the petitioning Creditors -- I'm asking this

19   for a reason.  The record requires it actually for the

20   abstention cases, have any restructuring negotiations taken

21   place?

22           MR. CLAREMAN:  Since the filing of the petitions?

23   No.  There were discussions prior to the filing of the

24   petitions at various points in time.  That has been

25   referenced I think in some of the briefing that's been

1    filed.

2              THE COURT:  Right, but that they were

3    unsuccessful.

4              MR. CLAREMAN:  Correct.

5              THE COURT:  And I know the cases seem to point to,

6    on abstention, some of the things that they look at are

7    whether or not there's another remedy that's out there

8    that's imminent.  I mean, the case you cited to that I

9    believe was Judge Bernstein's case, the -- you know, there's

10   -- oh, actually, no, Judge Gropper's case, there's

11   definitely issues about whether or not there's another

12   proceeding that's out there and whether or not there's

13   options available.  And some of the things that they look at

14   is whether or not there is out-of-court restructuring

15   discussions going on, other types of negotiations, or input

16   somewhere else.  So we don't have another in-court

17   proceeding --

18              MR. CLAREMAN:  Right.

19              THE COURT:  -- that which we know about --

20              MR. CLAREMAN:  Right.

21              THE COURT:  -- that's an insolvency proceeding

22   anyway.  A restructuring proceeding.  Okay.  Do the alleged

23   Debtors have sufficient cash on hand today to repay the

24   notes?

25              MR. CLAREMAN:  I have -- I'm not in the position

Page 67

1    to answer that question.

2              THE COURT:  Okay.  That's fine.  You've answered

3    my question there.  What is the case law support that you

4    have for informed non-convenience as a separate legal basis

5    for a dismissal on the 11 case?  Other than is that court

6    case, which was a 7, and I think one other case.  I haven't

7    really found any cases about that in the context of 11.  And

8    in fact, in our district, there had been some cases that say

9    that that's not something that should be permitted.  And

10   Judge Drain in the Kerwin case, for example, basically said

11   that he didn't believe that that is even an argument in

12   connection with this as a separate argument.

13             It's obviously part of the analysis you do under

14   305, but he was talking about it as a separate defense or

15   basis for dismissal.  And I think the reason that he felt

16   that is that, while that's an argument sometimes for a

17   specific dispute between parties in an adversary proceeding,

18   and certainly there are cases that use it as a basis for

19   dismissal in an adversary proceeding, it's not something for

20   a -- what I would describe as a fulsome, overall

21   restructuring, you know, process.  And that there hasn't

22   been anything in our circuit that supports that.  Do you

23   have any cases that support that that you could cite me to?

24             MR. CLAREMAN:  Other than Jacor, no.

25             THE COURT:  Okay.  Fine.  With respect to your

Page 68

1   Multicanal I guess discussions, my understanding about that

2   case, and I might be wrong, was, wasn't there an Argentinian

3   proceeding pending?

4           MR. CLAREMAN:  There was, Your Honor.

5           THE COURT:  Okay.

6           MR. CLAREMAN:  You're correct.  And if I may

7   address that with a little --

8           THE COURT:  Sure.

9           MR. CLAREMAN:  -- some light connection, so there

10  -- in Multicanal, yes, there was an Argentine proceeding

11  pending.  And I believe that there was a similar set of

12  circumstances (indiscernible).  But the -- so then there's

13  not a foreign pending proceeding here, at least a foreign

14  restructuring proceeding.  And so that is -- that obviously

15  the case here, but what we are saying the experts ultimately

16  agreed to is there will need to be a foreign proceeding.  So

17  there is not one pending now, but there is only -- there

18  needs to be.

19          And the only court that actually can effectuate a

20  restructuring ultimately given the effect of 293, given the

21  effect of the establishment in Mexico and the agreement on

22  that point, there would ultimately need to be a second

23  proceeding.  And so there is not one today, but the text of

24  Section 305(a)(1) does not require there to be a pending

25  proceeding in order for a dismissal to be appropriate.

Page 69

```
 1              THE COURT:  Okay.  And I think these are probably,
 2     sorry, questions for Ms. Cornish, so I apologize for this.
 3     So the argument that you are making about Murray in the
 4     Second Circuit decision, obviously I've read the cases, so
 5     one of the things I think that the court looked at there, at
 6     least my reading of it, is first the fact that they were
 7     really using it as judgment enforcement.  We don't have a
 8     judgment here.
 9              MS. CORNISH:  Correct.
10              THE COURT:  So we're not -- this is not yet
11     judgment enforcement.  If --
12              MS. CORNISH:  Right.
13              THE COURT:  -- you guys come back, if I dismissed
14     it and it went to Judge Gardephe, for example, and then you
15     got the judgment and then it came back again, maybe not even
16     to me, some -- maybe to somebody else, then I could see that
17     argument being made.  But here today, that's not what we
18     have before me.  And then the argument that you made about
19     an adequate remedy outside of the bankruptcy process, again,
20     I'm having a hard time accepting that.  And it's not because
21     I don't think it's impossible for somebody to just get a
22     judgment on the notes, go to Judge Gardephe, get a judgment
23     on the notes, and then go try to collect on that in Mexico,
24     that certainly is possible.
25              And it -- I think the testimony from both of the
```

Page 70

1    experts is that it would take a couple of years.  You know,

2    at least a year and eight months I think was the shortest we

3    got out of anybody.  So a little while, but it was -- would

4    be possible potentially to collect on it.  But is there

5    anything else you're pointing to that's an adequate remedy

6    for the parties?

7              MS. CORNISH:  Yeah.  I mean, look, it obviously

8    wasn't at issue in Murray, and this case is a very unusual

9    situation.

10             THE COURT:  True.

11             MS. CORNISH:  But we think there are two possible

12   paths here going back to Judge Gardephe, getting a judgment,

13   and seeking to enforce that judgment.  Or going down to

14   Mexico and instituting an involuntary concurso.  And you

15   know, the abstention argument is if that's the path, if the

16   path is a concurso, starting here and going through the

17   whole process here makes no sense.  Because for all the

18   reasons I'm not going to, you know, repeat the arguments,

19   and that's why we're arguing for abstention with respect to

20   that other alternative path.

21             THE COURT:  Right.

22             MS. CORNISH:  So I --

23             THE COURT:  But you're not -- your clients aren't

24   willing to avail themselves of the Mexican courts.  And as

25   you know, the insolvency test is much harder in an

Page 71

1   involuntary than it is an involuntary because you have to

2   meet two parts of that test.  And I'll just say for whatever

3   it's worth, probably everyone -- most people in this court

4   anyway I know who knew me before know, look, I looked at the

5   financial information that I have, which is not great.  It's

6   not detailed enough to figure out the answer to this

7   question, and I'm certainly not a visitador.  But I'll just

8   say I can't figure out for certain that today you would meet

9   both of the insolvency tests, and that's even if I assume

10  that the petitioning Creditors win on every one of their

11  arguments before Judge Gardephe, which I'm not saying will

12  happen.

13          But I'm just saying that I can't figure out that

14  that's a certainty.  And that's leaving aside the fact that

15  they might get enjoined from doing it.  Again, I'm not

16  arguing that the experts -- that anyone's expert is wrong or

17  right.  I think it's just very uncertain because they could

18  still be subject to somebody arguing that it violates the

19  superior court.  Maybe you would never argue that.  Maybe

20  they would never argue it.  Maybe it would never come up.

21          But if it did, it might be that you can't even

22  commence the action right now.  Maybe that could change in

23  the future.  I get that because those injunctions could go

24  away potentially.  But I'm just saying to you right now I'm

25  not sure you could do that without a risk.

Page 72

1              MS. CORNISH:  Understood that there are risks, and

2      they've been identified.  But I guess the point is nobody's

3      tried at this point.  And we have the testimony of Mr. Mejan

4      that he does not -- and I understand that's maybe cold

5      comfort, but there is that testimony.  But nobody's tried.

6      And --

7              THE COURT:  I understand.

8              MS. CORNISH:  -- the insolvent -- the issue of

9      satisfying the insolvency test, that's -- I don't think that

10     goes away because you're going to have to go back down to

11     Mexico anyway.

12             THE COURT:  It doesn't go away, but it goes away

13     depending on the circumstances that you're in.  I really

14     appreciate the arguments of people are making, but in my

15     world, I see a lot more restructuring opportunities than you

16     all do I guess.  Because I'm -- and you know, maybe it's

17     just that I'm not in the middle of the fighting with the

18     parties, and you know, that's just not my perspective.  But

19     I understand of course sometimes people reach out-of-court

20     restructuring.  If people were talking, maybe that could

21     happen.  Maybe it won't.  Don't know, okay?

22             MS. CORNISH:  Yeah.

23             THE COURT:  Then there's -- in Mexico there's a

24     voluntary concurso.  I assume that if this manages to go on

25     until there's a maturity, there might not be a lot of issues

Page 73

1    about it.  There might have to be a voluntary concurso at

2    some point.  There might not.  I don't know.  But that's one

3    option.  The Debtors certainly allege Debtors have that

4    option, and they will have an easier time meeting the

5    insolvency test right now because only one part -- or in the

6    future because only part is necessary.

7           Then you have the involuntary concurso.  Okay.

8    Someone has to decide they're not going to take any risks on

9    the injunction issue, and they have to meet both parts of

10   the insolvency test, also part.  Or we have Chapter 11.  It

11   has happened.  People have used Chapter 11 to restructure

12   major Mexican corporations before.  Generally, voluntarily.

13   I grant you this is a unique one here, but it is a

14   possibility.  It's a way to restructure whether it's now or

15   in the future, that's all I'm saying to you.

16          So I think personally just sitting here as a

17   court, I see a lot more opportunities that may or may not

18   involve having to go back for a concurso in the future.

19   Even if I dismissed these cases now, at some point, unless

20   the parties reach an agreement, which they're not going to

21   do if they don't talk, we're going to -- you're going to be

22   at a point where there'll have to be something that happens.

23   And I don't think -- you know, I'm not sure the fact that

24   they could something and they chose to do something else

25   means that it's inevitable that it will have to go back to

Page 74

1    the Mexican court.

2         It would if you all don't reach an agreement.

3    That's true.  But that's within people's purview, both

4    sides.  Not just one.  I've been berating the Debtors.

5    Trust me, I'll be berating -- alleged Debtors.  I'll be

6    berating the other side too about this.  So --

7         MS. CORNISH:  Your Honor, we don't feel berated.

8    You're entitled to all of your questions.  I do want to make

9    one note.  I have consulted with Mr. Cohen with respect to

10   your question to Mr. Clareman as to, you know, what would

11   happen, how would our -- what would our client do if these

12   cases went forward and your -- all of your comments about

13   the prospects of a consensual situation, a pre-pack.

14        I understand that sometimes one (indiscernible)

15   notes gets restructured through a pre-pack, and that is in a

16   sense a reorganization.  It's not a reorganization of the

17   whole company, but it is.  All we can say about that right

18   now is that the parties have been obviously in litigation

19   for quite some time.  They haven't had negotiations for some

20   time.  And we have no reason to believe at this point in

21   time that TV Azteca is going to participate here in a

22   consensual proceeding.  We have no basis to make that

23   representation to Your Honor.

24        THE COURT:  I understand.  Okay.  That -- I mean,

25   that's sufficient.  I understand you can only tell me what

Page 75

1    you can tell me.

2             MS. CORNISH:  Yeah.

3             THE COURT:  And I relate that.

4             MS. CORNISH:  Yeah.  And I -- you know, if past is

5    prologue, there is certainly a real possibility that this

6    would not be a cooperative proceeding.

7             THE COURT:  Okay.  And I guess I'm really trying

8    to have a -- trying to figure out for me, again, this is

9    just for me because I think you all know I'm not -- I'm -- I

10   don't share card work, but this is not going to be an easy

11   decision.  But my point to you is I'm happy to just go ahead

12   and render my decision here at some point at the end of --

13   you know, after I've reviewed the transcript and everything

14   else and I write a decision.  Because I know this will be

15   going up on appeal.  No disrespect to anybody.

16            So that's okay.  That's what happens in these

17   cases.  I've learned over the years not surprisingly.  But I

18   think what I would -- what I'm trying to decide on my side

19   is, you know, is that really the best course here, or

20   letting the parties talk first the best course here.  That's

21   why I asked my question.

22            MS. CORNISH:  Yeah.  Understood.  And I think Mr.

23   Clareman made clear that Your Honor mentioned mediation.  I

24   think we can pretty confidently say that we would

25   participate in that.  We haven't had our clients actually

1    tell us that, but if that's what Your Honor's referring to.

2              THE COURT:  Yeah.  I'm thinking about it because

3    honestly just sitting here listening to a day's worth of

4    testimony, and obviously I've read all the papers before,

5    and I've read everyone's cases, and everything else before I

6    took the bench for sure yesterday, I -- you know, I just --

7    I feel like I could rule and send you guys back to three

8    years of litigation minimum.  Maybe.  Maybe a little

9    shorter.  Who knows?  And I'm not sure that would be a

10   helpful thing.  Or we could have a lot of litigation before

11   me if I kept it.  I'm not sure that's the best course

12   either.

13             So I feel like I'm trying to see if there's a

14   better course here than my just deciding this.  Not because

15   I don't want to decide it.  I'm happy to decide things.

16   That's what my job is.  But because I'm not sure it's the

17   best result for the parties given where things are.  So I

18   just note that for whatever it's worth.  All right.  Well,

19   we can talk about that again after we finish closing

20   arguments and everything like that about that.  But I thank

21   you for answering my questions.

22             MS. CORNISH:  Okay.  Thank you.

23             THE COURT:  That's all my questions.

24             MS. CORNISH:  Thank you, Your Honor.

25             THE COURT:  All right.  Okay.  Mr. Qureshi, you're

1   up.

2            MR. QURESHI:   Thank you, Your Honor.

3            MS. CORNISH:   And I don't even know whose this is.

4            MR. QURESHI:   I'll grab the 101.

5            MS. CORNISH:   I don't know whose this is.

6            MR. QURESHI:   Your Honor, good afternoon.   For the

7   record, Abid Qureshi, Akin Gump on behalf of the petitioning

8   Creditors.   Your Honor, before I hand up my dec, if I could

9   just address a couple of the questions that the Court just

10  asked of the Debtors.

11           THE COURT:   Mm-hmm.   The alleged Debtors.

12           MR. QURESHI:   I'm sorry.   The alleged Debtors.

13  Your Honor, let me start with why is the Debtor making one

14  argument in Mexico and another one in the United States.

15  And all I want to --

16           THE COURT:   Are you clairvoyant?

17           MR. QURESHI:   I'm sorry?

18           THE COURT:   I said are you clairvoyant?   How are

19  you going to answer that one?

20           MR. QURESHI:   I am not other than to tell Your

21  Honor that at the time that we briefed the issues before

22  Judge Gardephe, we, the indenture Trustee in that case, did

23  not know of the existence of the injunctions because they

24  had been received on an ex parte basis and not yet served on

25  the indenture Trustee.   They clearly did know.

Page 78

1           Your Honor, with respect to the Court's question

2     of well, where does this take us?  What do we now?  Well,

3     Your Honor, first off, the debt has matured because it has

4     been accelerated.  So it's not 2024.  It's matured.

5           THE COURT:  Okay.  I'll accept your statement

6     there for your purposes because it certainly was your

7     argument in front of Judge Gardephe.  Of course I have my

8     own opinions, but I'm just saying to you there -- certainly

9     that's not all that's been argued in Mexican court anyway.

10          MR. QURESHI:  Fair enough.  That is absolutely

11    true.  Your Honor, we are all in favor of mediation, but

12    under the right circumstances.  And we think the right

13    circumstances are that in order for relief be entered first

14    and then mediation take place.  And the reason for that,

15    Your Honor, is we truly don't know what's going on because

16    of the injunctions that they have received that prohibit the

17    publication of any financial information.

18          Our concern absolutely is that assets are being

19    removed from this jurisdiction.  One hundred percent we

20    believe that that is taking place, and that is a concern

21    that we have.  And in fact, Your Honor, we believe that that

22    explains the conduct.  What these Debtors are saying to Your

23    Honor is rather remarkable.  They are saying we will not

24    cooperate with the federal bankruptcy court that has

25    jurisdiction.  Think about that, Your Honor.

Page 79

1              Now, why would they make that statement?  Because

2     their strategy is not to restructure our debt.  It's to

3     avoid it completely.  As I noted, Your Honor, in the

4     timeline in opening statement --

5              THE COURT:  Mm-hmm.

6              MR. QURESHI:  -- that we know very little about

7     the financial situation, but we know this.  There was more

8     than enough money to make the coupon payment in February of

9     '21 and also in August of '21, and maybe even after that.

10    How do we know?  Because they voluntarily redeemed a total

11    of $221 million in the local Mexican Sabora Stat.  They made

12    a choice.  They said we're going to pay our Mexican

13    Creditors and we're going to avoid our U.S. Creditors.

14              Now, why would they do that?  Well, it certainly

15    is a set of circumstances that gave rise to our concern that

16    while all of this was going on, assets have been leaving the

17    U.S. jurisdiction.  We can't prove it.  We have no

18    information.  So Your Honor, certainly we think that the

19    best course, the most practical course to actually make some

20    progress given our experience with these Debtors, I think

21    the only way, and in light of the statement Your Honor just

22    heard about their refusal to cooperate, the only way that

23    they will be a serious and good faith participant in a

24    mediation is if this court takes jurisdiction over these

25    cases and doesn't dismiss it.

1              And Your Honor, and I'll get to this in greater

2    detail during my argument, but the idea that these Debtors

3    can stand before Your Honor and say we have no reason to

4    believe that TV Azteca will ever cooperate with this court,

5    and at the same time argue that Your Honor ought to abstain

6    from exercising jurisdiction, I'm sorry, Your Honor, it's

7    absurd.  And there's no legal basis for it.  It cannot be

8    the case that that kind of bad conduct is used to reward the

9    Debtor to give them what they are asking for, which is a

10   dismissal of these cases.

11             So Your Honor, if I could hand up a dec that I

12   plan to use for argument.

13             THE COURT:  Sure.  Thank you.

14             MR. QURESHI:  So Your Honor, if I could start by

15   just giving the Court a bit of a preview of how I plan to

16   proceed through argument, first I'll talk about the burden

17   of the Debtors' there in this proceeding.  Second, I'll

18   address why they failed to meet their burden in

19   demonstrating that this is just a two-party dispute that

20   should be dismissed under 1112.  Third, I will talk about

21   the abstention argument.  And in connection with the

22   abstention argument, I will return to what Your Honor asked

23   about, which is Chapter 11 scenarios, what might happen in

24   this case.

25             Fourth, I'll address the conflicting expert

Page 81

1    testimony that Your Honor has heard on the Mexican concurso

2    procedures.  Fifth, I will talk, and I'll keep it brief,

3    about forum non-convenience.  And sixth, the injunctions.

4    And I plan to conclude, Your Honor, with what I discussed

5    yesterday at opening, which is the Globopar case.  So

6    turning to the petition itself, if I could ask Your Honor to

7    turn to the first slide.

8              THE COURT:  Okay.

9              MR. QURESHI:  Your Honor, the petitions that have

10   been filed to commence these involuntary proceedings, they

11   satisfy the requirements of Section 303 of the

12   (indiscernible).  So there are four.  There is one that is

13   in dispute, and that is the one that I'm going to address,

14   and that is that the claim is subject to a bona fide A

15   dispute.  But first, Your Honor, I would like to turn -- and

16   this on the next slide, to the petition itself.  And there

17   are of course a lot of them.  And we have excerpted from

18   just one here.  And this shows what it is, that the

19   petitioning Creditors are Claimant.  And the petitions are

20   all the same.

21             What it says is that -- oh, I'm sorry, Your Honor.

22   Slide 2 is the stipulated facts.  And Your Honor asked about

23   this too.  What is their position?  Well, clearly different

24   positions depending on the day and depending on the court.

25   In this court, they have taken the position that the

Page 82

1    principal and interest is due and owing.  So that's all we

2    can say.

3          Your Honor, I'm sorry.  The next slide is Slide 3,

4    and that is the petition.  And what that shows is that the

5    claim that is being filed as the basis for this involuntary

6    petition is for principal and interest.  And we also

7    extracted on this slide, Your Honor, a footnote from our

8    opposition brief.  If it weren't clear enough from the

9    petitions themselves, which make no claim to any kind of a

10   premium, a redemption premium, another premium, or a

11   premium, if any, it is only requesting principal and

12   interest.

13         The footnote says, to be clear, the petitioning

14   Creditors are not seeking to collect the redemption premium

15   in these Chapter 11 cases.  So let's turn, Your Honor, to

16   Ms. Cornish's silver bullet.  That gun, from my perspective,

17   Your Honor, fired a blank, not a silver bullet.  And the

18   reason is the litigation before Judge Gardephe, Your Honor,

19   the parties to that litigation are the indenture Trustee and

20   TV Azteca.  The petitioning Creditors are not a party to

21   that dispute.

22         Now, Ms. Cornish says, wow, the petitioning

23   Creditors directed the Trustee, and the petitioning

24   Creditors were behind it.  Your Honor, the petitioning

25   Creditors on their own don't hold enough notes to direct the

Page 83

1    indenture Trustee.  So what Ms. Cornish is asking Your Honor

2    to do is to impute into our involuntary bankruptcy petitions

3    an issue that another party chose to litigate in the other

4    case.  And what we have done in these petitions is to make

5    as clear as we possibly could in the petitions itself that

6    we are not claiming a redemption premium.  And then to say

7    it again in our brief that we are not seeking a redemption

8    premium.

9         Mr. Cornish talked about a case -- and I think I

10   have a note somewhere -- oh, the Mountain Dairies case.  And

11   in the Mountain Dairies case, Judge Morris, when dismissing

12   that involuntary petition, said that essentially, she's not

13   going to be duped into a situation where the creditor says

14   there's no dispute for purposes of commencing an

15   involuntary, and then come back and ask the Court to resolve

16   at a later stage a number of disputes.

17        I know Ms. Cornish did not mean to suggest, Your

18   Honor, that we, on behalf of the petitioning creditors,

19   would ever come back to this Court and start arguing for a

20   redemption premium after the statements in our petition, in

21   our brief, and by me on behalf of our clients here today.

22        So, next, Your Honor, I would like to turn -- and

23   this is on the next slide in the book, which is Slide 5.  I

24   apologize, Your Honor.  It's Slide 4 and 5.  So, what we

25   have done on 4 and 5 is we have listed the cases that are

Page 84

1   cited in the Debtors' brief that purportedly support the

2   proposition that there is a -- that when there is a bona

3   fide dispute, the case should be dismissed and you can't

4   somehow abandon the disputed portion of the claim.

5          Your Honor, what makes every single one of these

6   cases relevant is that in each one the dispute concerned a

7   claim that was part of the petition, quite logically so.

8   Here, the claim that Ms. Cornish spent so much time talking

9   about is not part of the petition.  It's in a different

10  litigation between different parties in a different court.

11  So, there is no silver bullet, Your Honor.

12         Now on to the two-party dispute.  So, Ms. Cornish

13  directed the Court to Section 1112 and case law thereunder

14  for the proposition that if it's a two-party dispute, the

15  case needs to be dismissed.  And again, it's their burden to

16  establish that dismissal is appropriate.

17         So, the first thing I wanted to do, Your Honor, is

18  to talk about, again, what would happen in this respect if

19  an order for relief were to be entered.  Well, eventually,

20  whether we have a cooperative Debtor or not, there would be

21  a claims bar date.  And when that claims bar date comes, the

22  indenture trustee would know that, file a proof of claim on

23  behalf of all the beneficial holders of the notes.  And

24  whatever other creditors might show up would know of that

25  bar date as well.

Page 85

1           And each holder of the notes is a unique creditor.

2    Each holder would be entitled to vote on a Chapter 11 plan

3    and participate in the process.  We have no idea, Your

4    Honor, we the petitioning creditors, of how many beneficial

5    holders of the notes might be out there.  We certainly know

6    that it's more than three.

7           In fact, Your Honor, there is some record evidence

8    that there are approximately 30 holders of the notes.  How

9    do we know?  Because TV Azteca sued them in Mexico.  Those

10   are the number of parties that are named in the proceedings

11   in which they got injunctions.  So we know at least that

12   there are a lot of noteholders who no doubt would want to be

13   repaid and would have the right to participate in this

14   proceeding.

15          If Your Honor could next turn to Slide 6.  And

16   Slide 6 addresses Diamond.  So, how do we know that this

17   isn't a two-party dispute?  Well, there's Diamond.  How do

18   we know that Diamond is a creditor?  Because they say so,

19   Judge.  This is a quote from their response and a

20   reservation of rights that they filed before Your Honor.

21   Paragraph 7.  Paragraph 7.  "Diamond is a creditor of the

22   bankruptcy estates of the alleged debtors in an amount not

23   less than the $25 million arising from a judgment that they

24   have."

25          So, it's undisputed that this is not a two-party

1    dispute.  It isn't a two-party dispute, even if it were just

2    the notes.  And there's more than that.  There is at least

3    Diamond.  And Your Honor, the idea that somehow Diamond

4    doesn't count because they didn't stand up before Your Honor

5    and say, we support the involuntary petition, is neither

6    here nor there.  There's no obligation -- there's no case

7    law under 1112 that says, well, you're only creditor in an

8    involuntary petition if you stand up and support the

9    involuntary.  They're a creditor.

10            Their lack of participation in this proceeding --

11   and I would note that their counsel has been here every day,

12   has participated in the depositions, has had access to

13   discovery, so to say they're not participating isn't quite

14   accurate either -- but the fact that they have taken no

15   position is neither here nor there.  It is entirely

16   irrelevant.

17            Your Honor, on to the next slide, which is -- was

18   referenced by Mr. Clareman when Your Honor asked are their

19   other creditors.  These are the tax liens from the LA County

20   Tax Assessor's Office.  There are four of them.  They are in

21   the record.  JX-389, 390, 391 and 392.

22            Now, in aggregate amount, Mr. Clareman is right,

23   it's only about $20,000.  But show we the provision in the

24   Bankruptcy Code that says you don't count as a creditor

25   unless you have a huge claim.  They are a creditor.  That is

Page 87

1     the record before Your Honor.

2            So, Your Honor, I won't spend any more time on

3     that argument.  It clearly must fail on the record before

4     the Court.

5            Your Honor, if I could next turn to abstention.

6     And if I could direct the Court, please, to Slide 8.  And

7     first, Your Honor, under Section 305(a) of the Bankruptcy

8     Code, a court may dismiss a case if the interests of both

9     creditors and a debtor would be better served by such

10    dismissal.  On this slide, we have extracted a couple of

11    cases that talk about the burden.

12           First of all, it clearly rests on the party

13    seeking abstention, which is, of course, the alleged

14    debtors.  Secondly -- and this comes from what I concede is

15    my favorite case, Your Honor, Globopar -- where the court

16    said abstention is an "extraordinary remedy."  And the court

17    also emphasized in (indiscernible) that both creditors and

18    debtors must benefit from dismissal.  It's not a balancing

19    test.  It's not, is one party hurt or does one party gain

20    more than the other.  It's look at both and see what

21    happens.

22           On this record, Your Honor, this is an utterly

23    impossible burden for the Debtors to comply with,

24    particularly in light of what Ms. Cornish has told the Court

25    today, that they're not going to cooperate.  Or to be

1    accurate, that there is no reason to believe that they will

2    cooperate.

3              Your Honor, so let's turn, if we could, to Slide

4    9.   I put this here now -- I'll come back to it, Your Honor,

5    but these are the factors.  There's seven of them.  And

6    after I review the record, I will come back to it one at a

7    time.

8              Before then, I now want to turn to what happened

9    in these Chapter 11 cases.  And so, let's talk about that at

10   Slide 10.  And Your Honor asked the question.  There are two

11   alternatives, and I have coined them good debtor or bad

12   debtor.  Ms. Cornish answered the question.  I didn't know -

13   - I now know -- it's bad debtor.  But let's look at what

14   would happen if we had a good debtor.

15             Well, what would a good debtor do?  A good debtor

16   would marshal assets, ultimately would arrange for DIP

17   financing, if that was required.  Take advantage of all of

18   the tools that Chapter 11 has to see if there are any

19   contracts or leases or other parts of the business that

20   could benefit from restructuring.  Negotiate with

21   stakeholders.  How about that?  Ultimately propose a plan of

22   reorganization.  Prosecute and confirm that that plan in

23   accordance with -- wait for it -- their fiduciary duties

24   because they have even in Mexico.  Try to maximize value for

25   the benefit of all creditors.  It's simple.

1           How do we know it works, Your Honor, for a Mexican

2      company?  Slide 11 -- and Your Honor brought this up --

3      Aeroméxico, Satmex, Posadas, Maxcom, all cases of companies

4      that were unquestionably primarily Mexican companies.

5      Whether we want to say COMI in Mexico or not, I'm fine with

6      that.  These are Mexican companies.  And they all

7      restructured successfully in Chapter 11,  And in all cases

8      it was voluntary.  Good debtor.  It's possible they are

9      choosing not to.

10           They are choosing to be bad debtor.  That's on the

11     next slide, Your Honor, Slide 12.  So what does the bad

12     debtor do?  Well, actually the bad debtor is worse than what

13     I envisioned when putting this slide together.  So bad

14     debtor maintains the injunctions that preclude payment of

15     the noteholders.

16           By the way, just as an aside on the injunctions,

17     Your Honor may recall in the supplemental declaration that

18     was put in, they actually have a brief due tomorrow in

19     Mexico on the appeal from the injunction.  I was expecting

20     good debtor to show up and say, Judge, we're letting you

21     know we're going to withdraw that injunction because COVID

22     is over.  I was wrong.  Bad debtor.  They're going to keep

23     those injunctions in place, it appears.

24           They're going to force creditors to use the tools

25     that are available to Chapter 11 to conduct an

Page 90

1     investigation, figure out what assets they have.  Have they

2     been spiriting assets out of the United States?  What is

3     their liquidity like?  What capacity do they have to pay?

4     We have no idea, because there are injunctions that prevent

5     us from accessing that information.  Creditors might need to

6     propose a DIP facility to pay for the cases.

7               Ultimately, if they're not going to participate,

8     creditors might have to terminate exclusivity and propose a

9     plan.  Not might; we would have to do that.  Might a Chapter

10    11 trustee be necessary?  Certainly.  That's a possibility.

11              Your Honor, and not to hide from the fact that in

12    the bad debtor scenario, there absolutely could be follow-on

13    litigation in Mexico.  Nobody is suggesting that the bad

14    debtor scenario would be easy.  The whole point of the bad

15    debtor scenario, which again is what they have said they

16    want to do, is to make it as difficult as possible.  But

17    that can't be a reason to dismiss the cases, Your Honor.

18    That would make no sense.  Not supported by the law and

19    fundamentally inequitable.

20              So now, Your Honor, I would like to turn to the

21    experts and their divergent opinions.  So these are the ones

22    that I will cover.  And to be clear, Your Honor, there are

23    more than just these that the experts disagree on.  Is an

24    involuntary Chapter 11 ever capable of being recognized in

25    Mexico?  Professor Mejan says no; Mr. Guerra says yes.

1           Second issue.  Can a concurso court determine that

2     the Debtors, all 35 of them, have a COMI in the United

3     States.  Again Professor Marjan says, no; Mr. Guerra says,

4     yes.  Do the Debtors have an establishment in the United

5     States?  They disagree on that too.  And then finally is an

6     involuntary Chapter 11 plan ever capable of being enforced,

7     as distinct from recognized in Mexico?

8           So those are the issues that I will cover.  Let's

9     start, Your Honor, if we could, with recognition of an

10    involuntary.  And this is on Slide 14.  So, Your Honor will

11    recall that on cross-examination, I took Professor Mejan

12    through Article 296, and he agreed with me that Article 296

13    is mandatory.  It uses the word "shall".  It is not

14    permissive; it is mandatory.

15          He further agreed with me that in these

16    involuntary Chapter 11 cases, a foreign representative would

17    be able to comply with the four subsections that are

18    identified in Article 296.  Having also agreed that the

19    language is mandatory, what would then follow if one is

20    guided by the statute is recognition of either a foreign

21    main or a foreign non-main proceeding.

22          Now, Professor Mejan did attempt to walk back a

23    little bit his opinion, and just how firmly he believed or

24    under what circumstances he believed an involuntary was

25    incapable of recognition.  And so he needed to be impeached,

1      which by the way, happened several times.

2              And as a result of that, on the next slide, Your

3      Honor, is the portion of his deposition testimony that is

4      part of the record.  And he was very clear in his

5      deposition.  "Is it your testimony that it is impossible for

6      any involuntary Chapter 11 case to be recognized under the

7      LCM?  Answer: Yes."

8              So, now let's turn to COMI.  And Your Honor has

9      heard Mr. Clareman at length talk about how, in their view,

10     it's just ridiculous, to put it bluntly, that Mr. Guerra

11     could ever conclude that these Debtors have a COMI in the

12     United States.

13             So let me start, Your Honor, with -- again, this

14     is in the record -- COMI under the LCM, under the Mexican

15     concurso law, is not determined in the same way that it is

16     under Chapter 15.  It is a different process.  What Mr.

17     Guerra testified to, it flowed from his understanding of the

18     statute and how the statute is written.  And for Mr. Guerra,

19     Your Honor, COMI is clearly not a comparative exercise.

20     Right?  The analysis is not, in his view, compare the

21     contacts Mexico to the contacts with the United States and

22     decide on that basis where the COMI is.

23             Were that the test, there is no doubt that the

24     COMI could not be in the United States, because

25     unquestionably these debtors are Mexican and they have more

Page 93

1    contacts with Mexico than with the United States.  Instead,

2    his opinion flows from the LCM.  And he starts with -- he

3    referred Your Honor to three articles, 15, 15 bis, and 17.

4          And under Article 15, which I have on Slide 16,

5    what he relies on in particular is that holding companies

6    and subsidiaries or affiliates form a business group.  And

7    this provision also says the commercial bankruptcy

8    proceedings of business organizations that are part of the

9    same business group shall be consolidated.  And so he

10   concludes from this language in Article 15 that the 35

11   Debtors constitute a business group, and therefore can be

12   consolidated.

13         Your Honor, he next turns to Article 15 bis, which

14   I have extracted on the following slide.  And in this

15   Article, it provides that in the case of one or more

16   merchants that are members of a business group that is

17   facing the same situation, their creditor or creditors may

18   claim -- may file their joint judicial declaration of

19   commercial bankruptcy.  And the Article says the bankruptcy

20   shall be conducted under one proceeding.

21         So Mr. Guerra's testimony is that there is an

22   established business group under Article 15 that consists of

23   all the Debtors.  And we then turned to Article 17, which is

24   also on this page, and under Article 17, it's provides that

25   any judge with jurisdiction where the merchant has its

1    domicile -- and this is the link between jurisdiction and

2    domicile that Mr. Guerra testified to -- can oversee a

3    bankruptcy filing.

4            On that basis, Mr. Guerra concluded that U.S.

5    debtors being domiciled in the U.S. have a COMI here.  It's

6    a rebuttable presumption, but he concluded that as a result

7    of their domicile, they have a COMI here.  And he explained

8    that on that basis, in light of these provisions of the LCM,

9    a Mexican court could conclude that all 35 Debtors therefore

10   have their COMI in the United States.

11           Now, Mr. Guerra's analysis did not stop there

12   because he did look at the contracts that have been entered

13   into by the U.S. Debtors, and he did examine the nature of

14   the contacts of those U.S. Debtors to the United States.  To

15   be clear, he did not do that for all 35 Debtors, but he did

16   for the U.S. Debtors.  And he concluded that there was no

17   evidence that he was aware of that would rebut the

18   presumption that because of the domicile of those entities,

19   their COMI is in the United States.

20           Your Honor, let me now turn to the next issue that

21   divides the experts, which is the question of establishment.

22   And for that, I'd begin on Slide 18, if I may.  Your Honor,

23   on Slide 8 in the bottom right hand is an excerpt from Mr.

24   Mejan's report.  Your Honor will recall this provision from

25   the cross-examination, where he says, "Based on the

1    Rodriguez declaration, I do not believe the Debtors maintain

2    an establishment.  And at a minimum, it would be contested."

3    And then he goes on to say, "Because there are no offices or

4    employees."  So he acknowledges that this is a litigable

5    issue in Mexico.  Is there an establishment or not?

6              There was much discussion about the importance of

7    employees and offices, of the lack thereof.  I think

8    ultimately, Your Honor, both experts acknowledge that it's a

9    broader test.  You've got to look at more than just

10   employees and offices, although Professor Mejan doesn't say

11   that in his report, he got there.

12             But then let's look at what the record says.  And

13   Your Honor, I should have said this earlier and I'll say it

14   now, so that these decks don't go to people they shouldn't

15   go to.  Slide 19 has one piece of information that is

16   confidential.  I am not going to mention it here and this

17   book is not going on the record.  Sorry I didn't mention

18   that earlier, but I think everybody here is covered by the

19   protective order.

20             So, Your Honor, I'm going to now talk about a

21   number of contacts with the U.S.  And to be clear, on Slide

22   19, the blue box at the top of the page that has some

23   numbers in it, I'm not allowed to say what those numbers

24   are.  I am allowed to say they're big.  And I believe that

25   they are.

Page 96

1           So this page discusses the contract between a U.S.

2    and Univision.  That fact is not confidential.  Mr. Mejan

3    not only did not review this contract, he wasn't aware of

4    it.  What he was aware of was a prior contract with

5    Univision that has expired.  And if Your Honor turns the

6    page, this is the prior contract.  The prior contract ran

7    from 2016 through 2023.  And in the Rodriguez declaration,

8    Mr. Rodriguez mentions that the value of the prior contract

9    -- somebody will get me the number; I believe it was two

10   hundred and fifty--some-odd-million dollars that this entity

11   received under the old contract.  Your Honor now knows the

12   number under the new contract, which I will state on the

13   record.  Professor Mejan says, well, the old contract is

14   irrelevant because it's expired, because it was expired as

15   of the petition date.  He's wrong, Your Honor, because

16   establishment -- $259 million was the value of the prior

17   contract -- thank you.

18           Your Honor, Professor Mejan is wrong when he says

19   the expired contracts are irrelevant for purposes of an

20   establishment.  Why?  Because a critical element of

21   establishment is the non-transitory nature of the economic

22   content.  So you can't ignore what happened before the

23   petition date.  He ignores it.  So, what happened here?

24   From 2016, all the way under the extended contract through

25   2030, this U.S. Debtor under this U.S. contract, with a U.S.

Page 97

1   counterparty, is going to earn hundreds of millions of

2   dollars.  That is relevant to whether there is an

3   establishment in the United States.

4           Your Honor, next, Slide 21.  So 21 and 22, Your

5   Honor, contain a list of contracts.  They are all in the

6   records.  We have indicated the JX number for each of them.

7   The first chart on Page 21 indicates in force active

8   contracts where there is a U.S. counterparty to the

9   contract.  The checkmark column -- and there is a checkmark

10  beside seven of those contracts -- indicate that for those

11  contracts, there was an earlier one that has since expired.

12  And again, it demonstrates continuity.  Non-transitory

13  presence in the United States.

14          The next chart, Your Honor, is a list of the

15  expired contracts.  Again, so that Your Honor can see how

16  long a business has been established in the United States,

17  how active that business has been.  And here, the column

18  with the checkmarks, and there are six, indicates contracts

19  that have expired but that have been renewed.  Again,

20  because we believe that is relevant for purposes of an

21  establishment.  Mr. Guerra looked at this information.

22  Professor Mejan did not.

23          Your Honor, Slide 23.  Slide 23 contains signature

24  pages from a contract with PGA, again extracted from

25  documents that are in evidence.  So, why is this here?  It's

1    here, Your Honor, because Professor Mejan testified that it

2    matters, in his mind, to the establishment analysis where

3    the contracts were negotiated, where the contracts were

4    signed.  So he says it's important, but at the same time, he

5    says he has no idea because he didn't look at the contracts.

6    Didn't ask the question.

7          So we know from the record, Your Honor, at least

8    with respect to the PGA contracts, Your Honor can see that

9    the signatory in all of these contracts -- and there are

10   three -- is a gentleman by the name of Horacio Medal.  And

11   at the top of the page, it indicates that he is a manager of

12   Azteca Sports.  And that excerpt is from JX-85.  It's a list

13   of directors that was produced by the Debtor.  And that

14   document produced by the Debtor says that he is a manager of

15   that entity and that his residence is Miami, Florida.  And

16   he is a signatory on all of these contracts.

17         Can I represent definitively that he was in Miami

18   when the contracts were signed?  I cannot.  But certainly

19   the best evidence we have is that these contracts were

20   executed by a manager of a U.S. Debtor, apparently not an

21   employee according to Mr. Rodriguez, because he says there

22   are none, but a manager, whatever that is, in Miami.

23         Now, Your Honor, on the next slide, Slide 24, on

24   the right side is information that we pulled from Mr.

25   Medal's LinkedIn profile.  It's in the record.  It's JX-386.

Page 99

1   And Mr. Medal indicates here what his work experience is.

2   And he describes it, Your Honor can see, Azteca

3   International Corporation, 16 years and four months, and he

4   gives his positions.  First, the Director of Legal affairs,

5   then a Vice President and Chief Legal Officer, and more

6   recently -- and it does say -- then it says under Senior

7   Vice President and Chief Legal Officer, the entity as of

8   December of 2019, is GSI Management, USA.

9            And so, Your Honor also heard testimony about a

10  services agreement.  That's also extracted on this page.

11  And that services agreement is between GSI, so the entity

12  that this Mr. Medal is apparently the SVP and Chief Legal

13  Officer of, and a TV Azteca entity.  And GSI, we know, is a

14  U.S. entity.  We know it has offices in Florida.

15           And under this agreement, we know that this U.S.

16  entity performs legal and consulting services on behalf of

17  the Debtor.  And we know that its Chief Legal Officer was

18  the general counsel at TV Azteca entities from 2000 until

19  2019, when GSI was apparently established, at which time he

20  became the Senior Vice President and Chief Legal Officer

21  there.

22           Curiously, though, Your Honor, if the Court goes

23  back to Slide 21 for a minute -- I'm sorry -- Slide 23, the

24  PGA contract excerpts, Mr.  Medal, in 2021, is executing

25  these contracts on behalf of Azteca Sports Rights LLC.

Page 100

1            So you know, Mr. Rodriguez says we have no

2    employees in the United States.  We have somebody called the

3    manager.  We have this GSI entity shares an office with or

4    has the same address as this Azteca entity.  We have Mr.

5    Medal executing contracts on behalf of a U.S. debtor.

6    That's the record, Your Honor.

7            So, Your Honor, to address a few additional

8    contacts with the United States, if I could as the Court to

9    turn to Slide 25, please?  In the record are the number of

10   trademarks that various Debtors hold in the United States.

11   Two dozen or so trademarks; more than two dozen, I believe.

12   On this page, what I've highlighted simply the most recent

13   seven, because these are all trademarks that were applied

14   for or registered in the United States in 2023.  Again, not

15   considered by the good professor.

16           Trademarks in the United States certainly suggests

17   certainly suggests business activity in the United States.

18   Otherwise, what would be the point of trademarks?  Seven of

19   them in 2023 certainly suggests that the activity going on

20   in the United States is not all history.

21           Your Honor, on Slide 26 -- and Your Honor may

22   recall this exhibit from the cross-examination of Professor

23   Mejan -- and as Your Honor heard and is in the record, this

24   is a press release from January of 2023.  And it is a press

25   release between two entities.  Icara, not a debtor, not

Page 101

1   affiliated with TV Azteca, as far as we know, and TV Azteca.

2            So, Your Honor, doesn't have to take my word for

3   what TV Azteca is trying to do in the United States.  Take

4   the word of Mr. Jorge Gutiérrez, the paid TV Director for TV

5   Azteca Internacional.  What does he say?  He says the Azteca

6   Now app, which is a joint product with TV Azteca, "will

7   target a potential audience of more than 52.5 million U.S.

8   Residents, for whom Spanish is their primary language."  Not

9   my words, Your Honor.  That's the record.  And again, not

10   something Professor Mejan considered.

11            So, Your Honor, on to the last of the expert

12   issues that I planned to address, which is whether an

13   involuntary Chapter 11 plan could ever be enforced in

14   Mexico.  Now, Mr. Clareman, actually, Your Honor, did me a

15   favor because he stated more clearly than I can why it was

16   that I told Your Honor at opening that the Mexican issues,

17   they don't help the Debtors with their abstention arguments

18   at all.

19            What Mr. Clareman told you is that a do-over of

20   any plan of reorganization that might ever be confirmed in

21   this court is inevitable.  So he's saying it too.  Bad

22   debtor.  Because that's the only circumstance in which there

23   needs to be a do-over in Mexico.

24            Now, the reasons that are offered, and that were

25   offered by Professor Mejan, and that Your Honor heard from

Page 102

1    Mr. Clareman about as to why a do-over would be necessary.

2    First, they talk about the telecoms regulator.  Well, again,

3    not an answer, Your Honor, because Aeroméxico, Satmex and

4    Satcom -- I may have just butchered the names -- but three

5    of those four entities at least we know are highly regulated

6    entities.  It's in the record.  The experts don't disagree.

7    They all had regulators that have the same rights as the IFT

8    does under the LCM, and they all managed to get their

9    regulators onboard with implementing a Chapter 11 plan in

10   Mexico.

11          Next, there was a lot of discussion about public

12   policy and Mexican law, and how it would be impossible to

13   enforce a Chapter 11 plan because there is no way it could

14   ever comply with Mexican public policy.  Well, again, not

15   true.  We know it's not true because it's been done in this

16   record by at least four Mexican Debtors.

17          Lastly, Your Honor, I point -- and it's extracted

18   on this Slide -- to Article 307 of the LCM.  Because what it

19   says is that a concurso court, to the extent necessary, can

20   modify a Chapter 11 plan to comply with Mexican public

21   policy.  And Your Honor heard this from Mr. Guerra.  He

22   explained it.  Well, if -- in the case of an involuntary,

23   yes, there needs to be a concurso.  But it's not a do-over

24   because there's a plan.  And what the conciliator would do

25   in Mexico is start with that plan.  Why?  Because the

Page 103

1    conciliator is trying to be efficient.  The conciliator is

2    not assuming a bad debtor.

3            So the conciliator would look at the Chapter 11

4    plan and say, does this make sense?  Does it comply with

5    Mexican law?  Does it comply with Mexican public policy?  If

6    it does, maybe it makes sense to move forward with this

7    plan?  If it doesn't, maybe there are some changes that need

8    to be made.  It's not a do-over, Your Honor.

9            So, Your Honor, switching gears -- and I'll try to

10   speed it up for this section -- forum non conveniens.

11   Again, we don't think it applies here at all.  But just

12   briefly review the standard, because I don't think it can be

13   met, again, the Debtor bears the burden, and like with

14   abstention, it's a heavy burden.  Great weight is given to

15   the plaintiff's choice of forum.  In this circuit, three

16   factors are considered, and they are set forth at the bottom

17   of this slide, Your Honor.  And I will move through them

18   rather quickly.

19           And the first, on Slide 29, the petitioning

20   creditor's choice of forum is entitled to substantial

21   deference.  We've quoted a couple of cases from the Second

22   Circuit in the Southern District on this slide.  That choice

23   of forum should "rarely be disturbed.  The greater the

24   plaintiff's or the lawsuit's bona fide lawsuits connection

25   from the United States and to the forum of choice, the more

Page 104

1    that the considerations of convenience favor the conduct of

2    the lawsuit in the United States, and the more difficult it

3    will be for the defendant to dismiss on form non-grounds.

4           So, what do we have in this case?  Well, we've got

5    on Slide 30, Your Honor, two of the petitioning creditors

6    with their primary place of business in the United States.

7    In the case of Cyrus, it's New York; in the case of

8    Contrarian, it's Connecticut.  We have the note itself.

9    Slide 31.  As Your Honor is well aware, New York related

10   provisions all over this indenture.  Right?  Notice

11   provisions, submission to New York law, submission to the

12   exclusive jurisdiction of New York courts, in this very

13   borough of Manhattan.

14          And that, Your Honor, is  not the only contract in

15   which the Debtors have submitted to the jurisdiction of U.S.

16   courts.  On Slide 32, we have a few more that are in

17   evidence.  So, Diamond -- Your Honor, this is at ECF 15;

18   this is in their response to the automatic stay and they

19   state in their pleading -- ah, okay, thank you -- Diamond

20   states in their pleading that its contract with the Debtors

21   has a New York forum selection clause.

22          And Your Honor, Mr. Giller saved the day again by

23   telling me that the next two contracts are in fact

24   confidential, so I won't talk about them, other than to say

25   the next two contracts have New York law, in the case of

Page 105

1    one, and in the case of the second, both a New York law

2    provision and exclusive jurisdiction of New York courts.

3           So, next slide, Your Honor, 36, and I think this

4    one should be easy.  Mexico is not an adequate alternative

5    forum.  An alternative forum is adequate, according to the

6    case law, if it permits litigation of the subject matter

7    dispute.  Your Honor, we are being pummeled by ex parte

8    injunctions.  We don't know when the next letter rogatory is

9    going to show up with another one.  The Debtors apparently

10   don't feel the need to disclose when they have one in their

11   back pocket that they haven't served.

12          But very clearly, Mexico is not an adequate forum.

13   And it's not enough, by the way, to satisfy their burden

14   under the forum non-test to simply say that there's another

15   forum out there in which we could litigate.  That doesn't

16   cut it.  On these facts, Mexico is certainly not an adequate

17   forum.

18          And Your Honor, apparently the strategy that TV

19   Azteca is taking with respect to the noteholders is not that

20   different from what they are doing with Diamond Films.  Page

21   34, another extract from the Diamond Films motion, or brief,

22   I should say, in response to the lift stay motion.  They say

23   instead of appearing in New York to litigate the merits of

24   their breach of contract case, TV Azteca has hid in Mexico

25   and filed legal proceedings, three of them apparently, to

Page 106

1    collaterally attack the New York judgment in Mexico.  At

2    least their strategy is consistent, Your Honor.

3         Now the last slide I will point Your Honor to for

4    why -- actually, it's the second to the last -- why Mexico

5    is not an adequate forum is Slide 35.

6         TV Azteca's friend, Judge -- not my words, Your

7    Honor -- this is from a Mexican publication called "Reforma"

8    -- and Your Honor can see what it says.  There is a judge,

9    the judge that issued the COVID injunction, who apparently

10   is frequented by companies that are controlled by Mr.

11   Salinas, TV Azteca being one of them.  And so that's another

12   reason, Your Honor, why we do not believe that Mexico is it

13   adequate alternative forum.

14        Finally, Your Honor, the existing litigation

15   before the Southern District of New York, which again

16   involves different parties.  But this is at Slide 36, just

17   so Your Honor -- I know the Court has read all of the

18   pleadings, but just to refresh on the timeline.  So it was

19   removed on September the 23rd.  On September the 30th, what

20   TV Azteca did is they asked the judge, essentially, to make

21   us go back to the beginning.  We had taken advantage of the

22   summary judgment complaint procedure.

23        And so, I think the right way -- that was fully

24   briefed by October, and then in March, we commenced this

25   proceeding.  The stay kicked in.  I think the right way to

Page 107

1    characterize the procedural posture of the Southern District

2    action, Your Honor, is we're not at the beginning.  We're

3    before the beginning, because TV Azteca has decided to

4    litigate the question of should we be required to start

5    again and file a complaint, as opposed to just having the

6    District Court treat our summary judgment motion from the

7    state court as a summary judgment motion and respond to

8    that.  So --

9              THE COURT:  Isn't that up to Judge Gardephe?

10             MR. QURESHI:  I'm sorry?

11             THE COURT:  Isn't that up to Judge Gardephe to

12   decide?  He might decide that he's going to deny that

13   request and then go on to the --

14             MR. QURESHI:  Oh, absolutely.

15             THE COURT:  -- (indiscernible) merit --

16             MR. QURESHI:  Absolutely --

17             THE COURT:  It's within his power --

18             MR. QURESHI:  A hundred --

19             THE COURT:  And there are other examples of where

20   that's actually occurred and people were not required to

21   file complaints.  You know, I know in my past and probably

22   in yours you've seen it.  So, it definitely does happen.

23             MR. QURESHI:  Your Honor, to be clear, 100 percent

24   that is Judge Gardephe's decision.  My point is TV Azteca

25   could have consented to simply proceeding on summary

1   judgment.  Bad debtor, Your Honor.  They didn't.  They are

2   looking for delay.  They are trying to avoid us.  That's the

3   strategy.

4          MR. QURESHI:  Finally, Your Honor, private and

5   public interest factors.  And this is on Slide 37.  And Your

6   Honor, this is the final factor, and again, the emphasis in

7   considering these factors is on fair and equitable, timely

8   and fair.  We've quoted a couple of cases.  I don't need to

9   belabor the point.  That clearly is not what is happening in

10  Mexico.

11         So, Your Honor, now back to the injunctions.  And

12  before I proceed going through the deck, I just wanted to

13  note, Your Honor, that Mr. Clareman accused the petitioning

14  creditors of one thing that he is absolutely right about.

15  He said we have a forum preference.  Guilty, Your Honor.  I

16  sure hope that's been obvious.  We absolutely believe that

17  this is the right forum.  This is our preferred forum, and

18  this is where it should be.

19         Now, as explained in opening yesterday, Your

20  Honor, the Debtors have been trying to avoid their

21  obligations to the noteholders since 2021.  You know,

22  they've received multiple injunctions.  And what I'm going

23  to focus on is what is practical import of those

24  injunctions.

25         And so, Your Honor, if we can turn to the next

Page 109

1    slide.  So, first of all, with respect to COVID injunction,

2    Your Honor should be aware that once the WHO declared, not

3    the extinction of COVID, which is what the injunction speaks

4    to, but instead the end of COVID as a public health

5    emergency, so, slightly different.  But nonetheless, we

6    were, hindsight, apparently foolishly optimistic that maybe

7    the Debtors would take this injunction off the table.

8              And at the time, it was the only one that we knew

9    about.  And we wrote a letter and we said, please withdraw

10   the injunction.  Not only has the WHO said that COVID is

11   over, but the President of Mexico, shortly after the WHO

12   declaration, issued his own, which is also in the record,

13   and it says the same thing, that COVID is no longer a public

14   health emergency.

15             The response from the Debtor was from Paul Weiss,

16   on behalf of the Debtor, was go talk to Mexican counsel.  It

17   will not surprise Your Honor to learn that here we are, the

18   injunction is still in force.  It has not been voluntarily

19   withdraw.

20             So, Your Honor, now let's turn to the second

21   injunction, the July 2022 injunction.  And Your Honor asked

22   both experts a number of questions about the timing of these

23   injunctions, about their impact on acceleration, and so

24   that's what I want to focus the Court on.

25             And so, with respect to this July injunction,

Page 110

1   again, this is the one that has not been served.  We don't

2   know when it might be served, but it has not been, to our

3   knowledge.  In May of 2022, the noteholders issued an

4   acceleration notice.  Not the Trustee.  Different

5   acceleration notice.

6          It's clear that the July injunction was obtained

7   in response to the noteholder acceleration notice.  How do

8   we know that?  Because the July 2022 injunction refers

9   expressly to that acceleration notice.  In Paragraph 2 it's

10  referred to as the notice of early maturity, dated May 3rd

11  of 2022.  So we know that they got this injunction expressly

12  to extinguish any effect of the acceleration notice that was

13  sent.

14         Now, if Your Honor turns to the next slide, on

15  August the 5th, and then again on August the 8th, we have

16  more acceleration notices.  This time from the indenture

17  trustee.  So, what happened when the indenture trustee

18  issued an acceleration notice?  Well, on the very next day,

19  on August the 9th, we now know TV Azteca got the judge to

20  issue an extension and modification of the injunction.  The

21  indenture trustee was added as party.  And the injunction

22  now declared that the August 5th and the August 8th

23  acceleration notices, the indenture trustee's acceleration

24  notices, were of no effect.  Right?

25         So, clearly, the objective -- and as with our

Page 111

1    system, Your Honor, it's not just the injunction.  It's an

2    injunction accompanied by a complaint.  Right?  So there's

3    no question at all that in Mexico, bad debtors, they're

4    taking the position that they don't owe us anything.  In

5    this Court, they're stipulate that they owe us $400 million

6    and that they've missed a bunch of interest payments.

7    So slide 42.  Your Honor asked the experts, what do these

8    injunctions mean for the insolvency showing?  If we're

9    supposed to take solace, we the petitioning creditors, in

10   the idea that we can go to Mexico and file an involuntary

11   petition -- they say it again and again.  And Your Honor, I

12   made this point at opening, but I'll come back to it.  Let's

13   just pause and think about the absurdity of the situation.

14          They are saying, oh, don't worry about it.  You

15   have a remedy.  You can file an involuntary in Mexico.  So,

16   Judge, abstain from taking the case.  And at the same time,

17   they're running around in secret in Mexico to get

18   injunctions that have to be designed to preclude exactly

19   that.  Because what the injunctions say is that there are no

20   due obligations.  None.

21          I think the experts were quite clear -- certainly,

22   Mr. Guerra was -- that again, based on the very limited

23   financial information that we have access to, with these

24   injunctions in place it would not be possible to satisfy the

25   insolvency test for purposes of commencing an involuntary

Page 112

1        proceeding in Mexico.

2              And, Your Honor, moreover, the fact that the July

3        injunction -- first of all, the COVID injunction does that

4        job all on its own.  So the second injunction is just an

5        add-on.  But the fact that it has not been served?

6        Irrelevant.  Irrelevant.  And the reason it's irrelevant is

7        that that injunction finds TV Azteca from the moment that

8        they received it.

9              On Slide 43, Your Honor, I just extracted the

10       relevant excerpt from the two expert reports that deal with

11       the injunctions and the force of those injunctions.  And I

12       think I've belabored the point enough, so I will move on.

13             And back, now that we have the record, to

14       abstention.  Slide 44, Your Honor, again it's a repeat of

15       the seven factor test, this time with some colorful red Xs

16       behind each one to denote.  And I'm not sure I got the

17       symbol right, because clearly the X is meant to denote that

18       it is not a requirement that they meet.  I probably should

19       have put a check mark on the other side.  I thought that

20       would be confusing.  But each of these factors, it actually

21       supports our case, Your Honor.

22             So let's go through them.  The first is economy

23       and efficiency of administration.  Well, Your Honor, no

24       doubt in the minds of petitioning creditors that economy and

25       efficiency of administration would best be served by these

Page 113

1    cases remaining right here in Your Honor's courtroom.

2            With respect to the petitioning creditors, we are

3    seeking to restructure the notes issued in the U.S.,

4    governed by New York law, in a court that can move

5    expeditiously.  There is no court in this country that moves

6    as economically and efficiently as the Bankruptcy Courts.

7    The fact that these Debtors are Mexican Debtors, some of

8    them, 30 -- 25, or whatever the exact number is -- 32 are

9    foreign.  That fact does not change anything about this

10   first prong of the test, economy and efficiency of

11   administration.

12           As the record demonstrates, highly regulated

13   Mexican companies, even ones with a COMI in the U.S., can

14   and have been effectively restructured in this very Court.

15   That, by the way, is one of few points of agreement between

16   the experts.

17           So, what the Debtors can't do, they plainly don't

18   satisfy this factor, based on the record before the Court.

19   And what they can't do, Your Honor, is say, we're going to

20   be the bad debtor and we're going to object to everything,

21   and therefore, this proceeding is going to be really

22   expensive and it's going to take really long.  You don't get

23   to do that.  You can't satisfy a requirement like this by

24   saying, I'm going to be a bad debtor.  And that's what

25   they're saying.

Page 114

1              Factor 2, whether another forum is available to

2       protect the interests of both.  And I emphasize the words

3       "both parties."  Or there is already a pending proceeding in

4       state court.  So, let's go through this, Your Honor.

5              TV Azteca -- again, I won't belabor the

6       injunctions -- we don't have a forum in Mexico.  That has

7       been made very clear.  Because to the extent we ever had a

8       forum in Mexico, they have taken it away from us.  End of

9       discussion, Your Honor.  They have taken it away from us.

10      Any proceeding to collect on the notes, any proceeding --

11      those are the words used in both injunctions -- that is what

12      we are precluded from doing in Mexico.

13             Your Honor, these Debtors have made clear, both in

14      the United States and in Mexico that they're going to do

15      whatever they can to avoid their obligations.  So Factor 2

16      is clearly not satisfied.

17             Factor 3, whether federal proceedings are

18      necessary to reach a just and equitable solution.  Sunlight,

19      Your Honor.  I talked about it at opening.  We really need

20      it.  There needs to be some transparency.  We know nothing.

21      We absolutely think that a federal proceeding -- not just a

22      federal proceeding -- this federal proceeding is necessary

23      to reach a just and equitable resolution and a just and

24      equitable distribution of assets.

25             Your Honor, without these Chapter 11 cases, the

Page 115

1   petitioning creditors, and by the way, other creditors like

2   Diamond Films, for example, they would be forced to pursue

3   TV Azteca through piecemeal litigation, probably in multiple

4   jurisdictions at the same time.  So this factor cannot be

5   satisfied.

6            Factor 4, whether there is an alternative means of

7   achieving an equitable distribution of assets overlaps

8   substantially with Factor 3.  And again, the record

9   demonstrates the opposite, Your Honor.  They're doing

10  everything they can to avoid these obligations.  There is no

11  alternative means.  Your Honor asked Mr. Clareman directly,

12  have there been any discussions since the filing of this

13  petition to restructure out of court?  No, there haven't.

14  There haven't been any discussions for a very long time,

15  Your Honor.

16           And that goes to Factor 5, whether the Debtor and

17  the creditors are able to work out a less expensive, out of

18  court arrangement which better serves all interests in the

19  case.  I needn't say anything further about that one, in

20  light of their answers to your questions, Your Honor.

21  Factor 6, whether a non-federal insolvency has proceeded so

22  far in those proceedings that it would be costly and time-

23  consuming to start afresh with the federal bankruptcy

24  process.  There is no non-federal insolvency proceeding.

25  And so Factor 6 is not in play.

Page 116

```
 1              And finally, Factor 7, the purpose for which

 2    bankruptcy jurisdiction has been stopped.  Your Honor, we

 3    are here in this court TV Azteca has elected, for reasons

 4    known only to TV Azteca, not to commence a concurso.  They

 5    certainly could have.  They certainly could have.  Your

 6    Honor has asked the question, why haven't they?  Unless I

 7    was out of the courtroom at the time, I haven't heard an

 8    answer.

 9              So, again, Your Honor, the purpose of this Chapter

10    11 proceeding is simple.  A fair and equitable and a quick

11    process.  That's what the Bankruptcy Code does.  That's what

12    it's for.  That's what we and other creditors need in this

13    circumstance.

14              So now, almost at my favorite part, which is

15    Globo, starts at Slide 45.  But before I get there, I need

16    to digress.  If I may approach, Your Honor, with some copies

17    of the Multicanal case.  Your Honor, if I could ask the

18    Court to turn to Mr. Clareman's demonstrative book.

19              THE COURT:  Just give me a second here.

20              MR. QURESHI:  Yeah.

21              THE COURT:  Okay.  What page?

22              MR. QURESHI:  23, Your Honor.  And 23 is the page

23    of this book that describes the Multicanal case.  And Your

24    Honor already raised this issue with Mr. Clareman.  Your

25    Honor asked, didn't it involve an Argentinian proceeding?
```

Page 117

1    Well, Your Honor, I just want to put a point on that.  Look

2    at their slide.  Their slide says the facts of Multicanal

3    are strikingly similar to those of this case.  They go on to

4    very selectively describe 90 percent of Multicanal's

5    operations were located in Argentina; U.S. based assets were

6    three bank accounts, aggregate balance of $9,500.

7              They forget one thing, Your Honor.  Multicanal, in

8    my parlance, that was a good debtor.  This is a bad debtor.

9    It's not -- so, Your Honor, here's what they left out, and

10   this appears in --

11             THE COURT:  Maybe it's more accurate to say a

12   debtor that decided to try to restructure under the laws

13   that is organized under.

14             MR. QURESHI:  Mm hmm.

15             THE COURT:  Forget that.

16             MR. QURESHI:  But my nomenclature is at least

17   short.

18             THE COURT:  It is.

19             MR. QURESHI:  Your Honor, if I could direct the

20   Court to -- if Your Honor is looking at the page numbers on

21   the bottom right of each page, it's Page 21.

22             THE COURT:  Mm hmm.

23             MR. QURESHI:  In the lefthand column there is a

24   paragraph that begins, "A U.S. Chapter 11 proceeding."

25             THE COURT:  Okay.

Page 118

1           MR. QURESHI:  It's the last paragraph on the

2    lefthand column, last full paragraph.

3           THE COURT:  Okay.

4           MR. QURESHI:  And it's the last two sentences that

5    I would like to direct the Court's attention to.  The APE,

6    which is the acronym for an Argentinian insolvency

7    proceeding, the APE is far along, and with the caveats

8    previously discussed provides for the just treatment of

9    Multicanal's creditors.  Given that this -- given the

10   Section 304 factors have been substantially met with regard

11   to Multicanal's APE, it is neither necessary nor practical

12   for a U.S. Chapter 11 proceeding to go forward.  Well,

13   that's the bit that they left out of this case.  It doesn't

14   help them at all.

15          This was a debtor that was doing the right thing,

16   negotiating with its creditors, starting a foreign

17   proceeding, proposing a plan.  Not being a bad debtor, Your

18   Honor.  Very misleading.

19          So, Your Honor, if we can go back to my exhibits

20   and to Page 45, where we discussed Globo?  And I would like

21   for a minute to provide the Court with what I certainly

22   endeavored to be a more complete description of the relevant

23   facts in Globo.  And these, I think, truly are quite similar

24   to what we have here.

25          Globo was a holding company organized in Brazil.

Page 119

1    It owned, directly or indirectly, one of the largest

2    television production centers in the world.  So it was in

3    the same business, apparently.  And its headquarters and all

4    of its employees were located in Brazil.  Its principal

5    office and principal place of business was in Rio.  In the

6    case of Globo -- and the vast majority of its property and

7    other holdings were located outside of the United States.  A

8    lot of similarities so far.

9           It had one U.S. debtor, and that debtor possessed

10   a 30 percent interest in each of three Delaware general

11   partnerships.  Globo frequently availed itself of U.S.

12   capital markets.  Sounds a little familiar.  $750 million

13   worth of bonds in U.S. markets.  And again, like our Debtor

14   here, subjected itself to jurisdiction.

15          Now, Mr. Clareman drew Your Honor's attention to

16   the fact -- and to my surprise, they cite this this case in

17   their briefing too -- that the judge in Globo said that

18   Globo was actually a strong candidate for abstention.

19   Recall, Your Honor, the procedural posture.  The District

20   Court reversed and remanded.  And when it went back to the

21   Bankruptcy Court with instructions to develop a further

22   factual record.

23          And in connection therewith, the District Court

24   observed that on the limited factual record that was before

25   it, it was a good candidate for abstention.  Why?  Well,

Page 120

1    that's the important part.  Again, Your Honor, good debtor.

2    Not bad debtor.

3            What did the good debtor do in Globo?  They

4    actively pursued, actively pursued, a consensual out of

5    court restructuring in Brazil.  What did these guys do?

6    They actively seek ex parte injunctions to prevent a

7    restructuring in Mexico, and certainly don't commence one on

8    their own, much less out of court.

9            In Globo, the negotiations that the debtor there

10   undertook had "borne fruit" and resulted in the formation of

11   a steering committee of creditors.  One apparently for

12   holders of bank debt, another for holders of bond debt.

13   Globopar paid millions in fees to the professionals of the

14   creditors so that they could get them in a room to negotiate

15   a consensual restructuring.  So that's why the court made

16   the observation in Globo that it was a good candidate for

17   abstention.  This case is not.  Globo doesn't help them, not

18   one bit.

19           So the court in Globo -- and if I could ask Your

20   Honor to turn to Page 47 of the presentation -- like in this

21   case, in Globo the debtor did not want to be a foreign

22   debtor in an involuntary proceeding.  We now know why it was

23   doing and out of court restructuring and apparently making

24   some progress.  And what the court noted is that the

25   Bankruptcy Court had a "obligation" -- and it uses that

Page 121

1    word, obligation -- to exercise its authority, even if the

2    possibility existed that a foreign court would ignore it.

3              So translate that to this case, Your Honor.

4    Professor Mejan, he says, waste of time, Judge.  Nothing you

5    do in this involuntary proceeding is ever going to get

6    recognized or implemented or anything else in Mexico;

7    categorically.  That's what he says.

8              What does the District Court of New York say?

9    District Court of New York, Your Honor, says that this Court

10   has an obligation to exercise its authority to not abstain.

11   And by the way, this is a case where jurisdiction is agreed.

12             Even if -- that obligation exists, even if

13   Professor Mejan is right.  Even if he's right.  That's why I

14   said at opening Your Honor, it doesn't matter if they're

15   right.  It doesn't help them.  Your Honor can't abstain

16   under applicable law.

17             The court went on to explain that whether or not

18   debtor cooperated, not relevant to the analysis.  So, bad

19   debtor?  Not relevant.  Actually, it's a little the opposite

20   here, right?  Bad debtor not only not relevant, but

21   certainly can't help with meeting the abstention standard.

22   That would make no sense.  That would give parties all the

23   wrongs incentives, Your Honor.

24             So, Your Honor, in Globopar -- and we're now on

25   the last page of the presentation -- the court recognized a

Page 122

1   number of considerations, including the lack of cooperation

2   by the debtor in that case.  Foreign creditors in Brazilian

3   courts would be a significant impediment to the orderly

4   administration of an involuntary case.  And the court

5   recognized the possibility that foreign creditors who are

6   not subject to the Bankruptcy Court's -- the U.S. Bankruptcy

7   Court's jurisdiction, might not cooperate.  And that a

8   Brazilian court might not compel them to participate in a

9   U.S. proceeding.  Notwithstanding these considerations, the

10  court said that federal courts should exercise the full

11  measure of the authority that they have.

12          And so Your Honor, the Court should not focus on

13  what may or may not occur in Mexico.  It just doesn't bear

14  on the abstention analysis on the facts that are before

15  Court in this case.  And they're all in the evidentiary

16  record.

17          I should add, Your Honor, that it certainly is

18  within the authority of this Court to decide to accept some

19  of the petitions and to dismiss others.  Doesn't have to be

20  all of them.  I'm certainly not advocating for that.  I

21  think the record is applicable to all 35.  Your Honor could

22  decide to keep only the U.S. Debtors, although again, on the

23  facts and on the evidence before the Court, I don't think

24  that makes any sense and I don't think there is a basis to

25  draw that distinction.  Clearly, abstention is inappropriate

Page 123

1    on these facts.

2            So, to conclude, Your Honor, based on the

3    evidentiary record before the Court, and based on the

4    Debtors' consistent actions to delay and to obstruct our

5    ability to recover on the notes, which is in a very

6    plentiful way in the record, and based on the ex parte

7    nature of all of the injunctions that the Debtors have

8    received in Mexico, it would be fundamentally inconsistent

9    with U.S. notions of due process, of fairness and of equity

10   for these cases to be dismissed on this evidentiary record.

11           Your Honor, these cases cry out for U.S.

12   Bankruptcy Court intervention and supervision.  And with

13   that, I'm happy to address the Court's questions.

14           THE COURT:  Okay.  Oh, my law clerk is telling me

15   that we have to redial (indiscernible) at 4:45 PM, and so

16   that maybe we should break now, before I start my questions,

17   so that we can redial in.

18           MR. QURESHI:  Sure.

19           THE COURT:  Okay.  So maybe, like, five minutes?

20   I don't need more than that.  It takes us five minutes to

21   dial in.  Is that all right?

22           MR. QURESHI:  Of course.

23           THE COURT:  Do you want more time.

24           MR. QURESHI:  No.

25           THE COURT:  Okay.

Page 124

1           MR. QURESHI:  Five minutes is certainly fine with

2      us, Your Honor.

3           THE COURT:  And the next --

4           MAN:  It takes 10 minutes to get to the restrooms.

5           THE COURT:  Okay.

6           MR. QURESHI:  Ten minutes it is.

7           THE COURT:  Okay, 10  minutes.  That's fine.

8      Okay.

9           (Recess)

10          THE COURT:  All right.  Mr. Qureshi, one of the

11     things you mentioned I agreed with, is that, you know, if

12     the bankruptcy proceeding continued here and I didn't

13     dismiss it that we would have a bar date and that the

14     indenture trustee would be filing claims on behalf of all

15     the noteholders.  And that's what indenture trustees do.

16     And, in fact, the indenture here in 6.9 says that the

17     indenture trustee is going to file proof with claim.

18          So I want to understand how you square that with

19     the fact that your individual noteholders have not asserted

20     in the petitions claims for the redemption premium even

21     though the indenture trustee is seeking that on behalf of

22     all the noteholders.  That's what I'm having a bit of

23     trouble for because what will happen in this case, if I did

24     keep it, is that they will assert a proof of claim in front

25     of me and I don't think they're waiving their redemption

Page 125

1    premium unless, for example, Judge Garvey denied it or

2    something in between.  But realistically, it would be

3    asserted against me.  And therefore, it is something that is

4    in dispute between them.  And your claims are based on the

5    indenture and obviously the notices of acceleration that the

6    indenture trustee raised, your individual claims.

7            And in the bankruptcy proceeding, you know, I

8    don't see how that isn't going to be an issue that I'll have

9    to decide that's being disputed in front of me or Judge

10   Gardephe.  So please explain that to me.

11           MR. QURESHI:  Well, certainly, Your Honor, before

12   Judge Gardephe, that's a separate issue from the bankruptcy.

13   Your Honor, the Court is right.  The proof of claim would be

14   filed by the indenture trustee.  And the simple answer, Your

15   Honor, is we don't know sitting here today what the proof of

16   claim filed by the indenture trustee would say.  But what we

17   do know is that the petition creditors have very clearly

18   said that they are not pursuing that claim.  And so, Your

19   Honor, I think the question before the Court, in the current

20   posture of the case is, is there a disputed claim?  And the

21   answer is there is not.  Again, there is a disputed claim

22   and a separate litigation which is the litigation before

23   Judge Gardephe.

24           THE COURT:  Okay.  I guess, I think you're going

25   to -- this will be an easy question for you, I'm guessing,

Page 126

1    which was, why haven't you all commenced an involuntary

2    concurso proceeding?  I assume it's because of the

3    injunction?

4            MR. QURESHI:  Yes, Your Honor.

5            THE COURT:  Okay.  I guess, I know, I know you

6    have made what I will describe as the bad actor argument as

7    to why I should ignore what I was told might happen in this

8    case -- or in fairness, what I posited could happen in this

9    case to the alleged debtors.  They didn't raise this.  I

10   did.  So in fairness, I shouldn't be putting it back on them

11   -- which is if I were to deny the motion to dismiss, what

12   happens if they don't quit their fiduciary duties?  How do

13   you envision that the cases could proceed?  The only way I

14   could see that happening is by appointing a Chapter 11

15   trustee in that circumstance, which probably then, that

16   person would have to try to get access to all of the

17   operations and control of the operations which are all in

18   Mexico except for the ones here in the United States.

19           So the rest of the debtors, certainly the 25 that

20   are located in Mexico, leaving aside for the moment TV

21   Azteca, which clearly has some contracts here in the United

22   States, but just going with my comment here, and some of the

23   other entities that have so far we haven't turned up

24   anything with the United States. I mean, they're, you know,

25   how are, you know, do you expect the Mexican courts, they

1    are going to recognize my Chapter 11 trustee and let them go

2    in and supplant the board of directors and the management of

3    TV, TV Azteca and force them to turn over control, physical

4    control and otherwise of the buildings and the operations of

5    the, of the debtors to that person?

6            MR. QURESHI:  So the realist, the realistic answer

7    to that last question, Your Honor, is no.

8            THE COURT:  Okay.

9            MR. QURESHI:  I would not expect that that would

10   happen.  But let me answer the Court's question, what would

11   happen?  And again, what we are positing is a scenario in

12   which after this court enters orders for relief and denies

13   the motion to dismiss, the debtors continue to ignore the

14   Court and continue to ignore their fiduciary duty.  That's a

15   big assumption.  Maybe that will happen.  If it does --

16           THE COURT:  Well, not based on your presentation

17   it's not a big assumption.

18           MR. QURESHI:  Certainly, certainly not because

19   that's how they have behaved consistently, Your Honor.  So

20   what would happen?  Well, the first thing I think that would

21   happen is the noteholders would exercise some of the tools

22   available to us under the bankruptcy code.  And one of the

23   first would be to try to find out what's there, right?  We

24   don't have financial information.  We don't know what assets

25   exist.  We don't know what financial --

Page 128

1          THE COURT:  Why are you dissing and dismissing my

2   idea about a mediation, because I really don't, when I'm

3   sitting here today and you're making your bad debtor

4   arguments to them.  The problem is that I, I, look, I

5   understand your client's frustration here.  I get it.  I've

6   obviously expressed some of my own frustration about what's

7   going on in Mexico and my own view about what should or

8   should not be going on down there in those courts.  So I

9   understand your frustration.  But what I think is the right

10   answer here is at least the party should really make a good

11   faith effort to have a discussion about what's going on and

12   to try to see if they could negotiate a resolution.

13          And it's not because I'm afraid to rule on this

14   motion.  I'm not.  Okay?  And if you decide to me that

15   you're not willing to go forward with mediation right now,

16   then I am going to rule and whether you like it or not,

17   that's where we're going to be.  And -- no, let me finish.

18   And I feel that, you know, you can paint the debtors as bad

19   actors or potential bad actors, but they at least have said

20   yes, I'm willing to sit down.  And you know something?  If

21   you don't sit down in that circumstance, I don't know how

22   you're going to paint them as such bad actors because at

23   least then they're willing and open to having a

24   conversation.  And why that hasn't happened to date, I have

25   no idea.  Why they don't filed a concurso,  I have no idea.

Page 129

1    You're right.  I don't know.  But what it tells me is there

2    has to be a restructuring here.  I don't think you disagree

3    with that.  And the only way a restructuring happens is when

4    usually most of the time when people talk.  And if you don't

5    talk, it's not going to happen.

6              MR. QURESHI:  So, Your Honor, in one of our briefs

7    that we filed before the Court, we pointed out that we had

8    tried for months to get these debtors to engage with us in

9    out-of-court discussions.  Clearly, that didn't work.  Here

10   we are.  What I said to the Court and what I believe is that

11   the posture in which a mediation is likely to be most

12   effective is first of all, one in which the Court can order

13   it once the orders for relief are entered and the Court has

14   the case.  But secondly, Your Honor, that is now a

15   circumstance in which I think realistically TV Azteca has no

16   choice but to deal with the $400 million worth of bonds.

17   Because up until now, their entire strategy appears to have

18   been to just ignore it entirely.  So, Your Honor, while we

19   are willing to mediate what we believe to be the case is

20   that that mediation is only going to be effective if they

21   are in a proceeding where they have to deal with it.

22   Otherwise, it's going to be no different than the last two

23   years of trying to get them to engage.

24             THE COURT:  Except you guys haven't sat down in a

25   room and actually had a conversation.  Certainly not since

Page 130

1    you filed these proceedings before me.

2              MR. QURESHI:  And not for many months before that,

3    Your Honor.

4              THE COURT:  All right.  Well, I understand.  Okay.

5    Doesn't, I think, the LCM require a concurso proceeding in

6    order for the plan to be enforced in Mexico?  I'm not saying

7    it's necessary to it.  There might not be a circumstance

8    where that's required.  It might be that they agree on a

9    plan.  But assuming no consensuality here, because we're

10   going with your bad debtor idea, aren't, aren't you going to

11   have to have a concurso proceeding in that circumstance?

12             MR. QURESHI:  So setting to the, setting to the

13   side, Mr. Guerra's testimony and his report concerning an

14   alternative procedure that exists in Mexico to enforce

15   foreign judgments, yes, through the LCM to the extent that

16   we require recognition in Mexico of a Chapter 11 plan that

17   would require the opening of the concurso proceeding.

18             THE COURT:  Okay.  And then when you say, "to the

19   extent you require recognition," to me that seems like where

20   you don't have a consensual restructure here under US law.

21             MR. QURESHI:  Correct.

22             THE COURT:  Because if it's a consensual

23   restructuring under US law, there's plenty of examples where

24   people have not had to go to the Mexican court to do that.

25             MR. QURESHI:  Yes.

Page 131

1          THE COURT:  Maybe there's reasons to do it or not

2     do it, but I'm just saying to you it doesn't seem to be

3     required.  We have plenty of large case examples of that.

4          MR. QURESHI:  Right.

5          THE COURT:  But I think everybody agrees there are

6     consensual arrangements as long as they comply with all the

7     Mexican laws, they involve the Mexican authorities, people

8     are not impaired or they get proper shareholder votes,

9     everything is done according to Mexican law that's required,

10    that there's no need necessarily to go to concurso court.

11         MR. QURESHI:  So, Your Honor, agree completely

12    that in the event that we require recognition of a

13    nonconsensual plan, there would need to be a concurso.

14    However, I draw Your Honor's attention to Mr. Guerra's

15    testimony and his report in which he says, so let's assume

16    the conciliation stage in Mexico fails to reach a plan

17    because the debtor won't consent.  And in that circumstance,

18    a liquidator is appointed and Mr. Guerra testified, and on

19    this point, Mr. Mejan agreed that it is possible to

20    functionally have a plan imposed by the liquidator.  It

21    doesn't have to be a sale of assets.  When the liquidator is

22    appointed, the liquidator has a duty to maximize value.  In

23    that circumstance, there would be a confirmed Chapter 11

24    plan that would certainly be provided to the liquidator.

25    And the proponents of that plan would no doubt argue to the

Page 132

1    liquidator here is a basis to reorganize and to achieve much

2    more value than would be the case if you start auctioning

3    off the assets of these debtors.

4              And in addition to that, Your Honor, in the

5    concurso scenario -- so the hypothetical being an

6    involuntary plan without their consent gets confirmed before

7    Your Honor and off we go to Mexico, hard to conceive that at

8    that point, the Mexican debtor before the Mexican court

9    would continue to ignore the court.  Hard to imagine a

10   scenario in that circumstance where at the conciliation

11   stage in front of a court that plainly has jurisdiction over

12   all of its assets in Mexico, that the debtor would continue

13   to say we're going to ignore our fiduciary duties.  We're

14   going to destroy shareholder value to the extent they're not

15   insolvent and we're going to continue to ignore this and

16   actually let a liquidator with statutory authority to sell

17   its assets, go in and start auctioning off the assets of the

18   second largest broadcaster in Mexico, that, Your Honor,

19   seems unlikely.

20             THE COURT:  Okay.  If I understood the testimony

21   yesterday, I think Mr. Guerra even agreed with this point,

22   which is that there isn't any precedent with respect to how

23   the concurso court is going to look at COMI, whether it's

24   going to look at it on an individual debtor-by-debtor basis

25   or it's going to look at it separately.

Page 133

1        MR. QURESHI:  Correct.

2        THE COURT:  So we don't know whether -- what the

3   court is going to do with that.  Obviously, an insolvency

4   court, like the concurso court is, will look at what it

5   thinks is appropriate, but it probably doesn't surprise you

6   that when you take a look back at our early cases here in

7   the United States where other countries had passed the model

8   law before us, before we had Chapter 15, that people looked

9   at other countries and what happened in other countries and

10  how they approached it.  And obviously, here in the United

11  States and in many of the other countries around the world

12  that have a model law, people have approached it on an

13  entity-by-entity basis.  So there's no certainty, I think

14  based on today, that it's going to look at a group approach

15  in COMI.  You don't know what they're going to do.  I don't

16  know what they're going to do.  That's why I asked the

17  question, if there was any question.

18        MR. QURESHI:  No, I think Your Honor, Your Honor

19  is right that there are different possibilities.  These are

20  many of the issues, if not most of the issues, that the

21  experts are opining on, are issues of first impression in

22  Mexico.  And that's hardly surprising given the relatively

23  recent enactment of the LCM and even more recently, the

24  specialized concurso courts, but also, shall we say,

25  somewhat peculiar facts of this case?

1            THE COURT:  Well, they are unusual.  That's true.

2    All right.  Well you mentioned a concern about assets

3    leaving the United States.  I guess I really wanted to

4    understand what the concern is about that.  I think there

5    obviously has been some discovery -- and I'm going to be

6    careful not to say anything that's confidential, of course,

7    on the record -- about what's here now, also what contracts

8    parties were entered into in the past.  You obviously have

9    looked at what things were at various times and you know

10   that there was a sale of assets, because that's public, of

11   the, of the, I guess the network that was here in the United

12   States.  And that that occurred to a third party and when

13   that occurred and that eventually, that shut down as well --

14   the third party shut it down, not TV Azteca, of course,

15   because it belonged to the third party at that point.  What

16   is the basis for the concern about there being a lot of

17   assets here in the United States?  Again, I don't have all

18   the data much like you don't have all the data, but the data

19   that I do have and that you've provided from discovery,

20   certainly seems like there were a handful of entities that

21   operated in the United States, the US, the US incorporated

22   entities, as well as TV Azteca itself had some operations

23   here because there are some contracts.  But it doesn't

24   appear from the discovery that you received that there was

25   anything that indicates that prior to that there was any

Page 135

1     other real obligations.  And some of those contracts go back

2     to when the notes were issued, you know, the years of -- the

3     year that the note was issued.  There's certainly

4     information that was provided.  Certainly there's a lot of

5     information, financial information about, at least some

6     information about '19 and '20 and 2021 and 2022.  Where is

7     the concern coming from assets dissipating from the United

8     States?  Because I need to really understand that, why

9     that's a concern, because it just doesn't seem to me like

10    there was that many assets that were in the United States.

11            MR. QURESHI:  Sure.  Right.  So to be clear, Your

12    Honor, we did get some discovery and what we know Your Honor

13    knows because everything that is conceivably relevant is

14    part of the record before the Court.  And, Your Honor, we

15    certainly don't have any specific information that would

16    suggest that assets are being moved.  Here is the nature of

17    the concern.

18            Subsequent to the sale of the broadcasting assets

19    in the United States -- that occurred in, I believe it was

20    2019 if I have my years right -- so it was 2021 when the

21    debtor decided that they were going to stop paying interest.

22    And at that time, we know that they had plenty of liquidity

23    because they went on to voluntarily redeem 200-plus million

24    dollars of the Mexican debt.  And so the basis of our

25    concern is that if the debtors are engaged in a long term

Page 136

1    plan to pull back from the US market, so they sold the

2    broadcasting assets, are they in the process of taking other

3    assets out of the country?  Are they in the process of, for

4    example, pulling back on some of the operations that we

5    talked about when we talked about contacts with the US

6    jurisdiction?  To be clear, Your Honor, we don't know.  But

7    with the injunctions in place, that is the concern.  We

8    don't have access to any information.  And again, a

9    cooperative issuer would be providing financial information,

10   at a minimum, to the trustee.  And where we have the

11   combination of a debtor that is not cooperating and a debtor

12   that at the same time is obtaining all of these ex parte

13   injunctions that says there has been no acceleration, there

14   are no obligations owing, in those circumstances Your Honor

15   can understand why the noteholders are concerned that what

16   the debtors are doing is taking anything that might be

17   reached that is of value by the noteholders and making it go

18   away.

19            THE COURT:  Okay.  I guess another question I had

20   for you, I guess my understanding is, you know, under our

21   obviously state LLC laws, usually an LLC is either member

22   managed or manager managed.  And so I, my impression of what

23   you were talking about vis a vis the US entity, and who was

24   signing contracts on their behalf, is a little different

25   than perhaps your impression was of it or the way that you

Page 137

1   were characterizing it.  So I just wanted to make sure I

2   wasn't missing something.  I mean, when I would see that in

3   an LLC myself, understanding how LLCs operate, I would

4   assume that they had a position.  There wasn't -- in an LLC,

5   typically there's not directors unless there's something

6   unusual and that they either have members or managers.  So

7   my assumption would be that this might be a manager managed

8   LLC.  But you seem to be sort of using the title and I guess

9   in a way that sort of implied that maybe the party was an

10  employee.  And I'm not sure I would take that, that would be

11  my interpretation of it.  Just based on what I understand

12  about LLC law, my interpretation would be that the person

13  has a position at that entity where they have authority to

14  operate as a manager under their operating agreement or

15  their, their LLC agreement, which I obviously haven't seen,

16  but just, I would assume that that's something that was

17  there and not that this meant that they were an employee or

18  acting as an employee of the debtor.  So I just want to make

19  sure I wasn't missing something.

20        MR. QURESHI:  Sure, certainly, Your Honor.  So

21  first of all, no, we have no reason to believe that that

22  person may be an employee as opposed to a manager of an LLC.

23  More importantly, Your Honor, that's not the relevant point

24  because our view of establishment is that the formal

25  designation, employee or not, isn't relevant.  What's

Page 138

1  relevant is the economic activity.

2          THE COURT:  Right.

3          MR. QURESHI:  In this case, the economic activity,

4  whether it's undertaken by a manager of an LLC or a manager

5  that is also an employee, it's neither here nor there.  So

6  that point is not relevant to what we were arguing, Your

7  Honor.

8          THE COURT:  Right.  I understand.  And it could be

9  obviously that they're taking, which would make sense

10 because this happens in LLCs, the manager is taking, making

11 decisions on behalf of the entity and acting as any manager

12 would.  And if that person is in the United States, that

13 would certainly be some evidence of activity by the party

14 who has, who can make decisions at least legally for

15 purposes of the agreement under it.  But obviously, I

16 haven't seen the LLC agreement, so I have no idea.

17         MR. QURESHI:  Right.  And, Your Honor, if I may

18 just return to a prior question the Court asked about, the

19 concern with respect to assets.  So Your Honor has in the

20 record the Univision contract you have to use as an example,

21 right?  That is with the US entity.  And we know that there

22 are substantial revenues pursuant to that contract.  We

23 don't know where that cash is going.  So that -- the

24 exhibits that I put before Your Honor had a schedule that

25 shows the timing of the payments.  They're quite regular.

Page 139

1    No idea where that cash is going.  Is, is that cash that is

2    for a moment in time sitting in the account of the US debtor

3    here in New York or somewhere else in the United States and

4    immediately going to Mexico?  We don't know and this is

5    again one of the high priority items that in a Chapter 11,

6    we would use the tools available to us immediately to find

7    out what is going on with cash among other assets.

8            THE COURT:  Okay.  All right.  That's helpful.  I

9    actually don't have any other questions.  Thank you.

10           MR. QURESHI:  Thank you, Your Honor.

11           THE COURT:  I'm sure you wanted to respond, Mr.

12   Clareman.

13           MR. CLAREMAN:  Yes, Your Honor.

14           THE COURT:  I know.  That's okay, I was expecting

15   it.

16           MR. CLAREMAN:  I'll be brief.

17           THE COURT:  Before you get started, I just wanted

18   to make sure I said something.  I know counsel for Diamond

19   is here.  And before counsel for Diamond had asked me if

20   they could make a statement and I told them when everyone's

21   argument was finished, which it isn't yet, Mr. Clareman,

22   that they were going to be allowed to make a statement.  But

23   I just didn't want anyone to be surprised when counsel makes

24   a statement.  So sorry for that for the record.

25           MR. CLAREMAN:  Your Honor, I would like to start

Page 140

1    with the bad debtor argument and construct.  What I think we

2    have really heard is that in the petitioning creditor's

3    view, a bad debtor is a debtor that doesn't do what they

4    want the debtor to do.  There -- I told Your Honor in my

5    initial argument that there have not -- in response to your

6    question -- that there have not been discussions since the

7    petitions were filed.  We have said we are willing to

8    mediate.  There were discussions before the petitions were

9    filed.  They were not successful.  There is not a record on

10   which to judge who, as between the parties, is at fault for

11   those talks breaking down.  And I'm not going to say

12   anything more about that other than to comment that there's

13   not a record about that.  And I think --

14            THE COURT:  No, understood.  I think I asked a

15   question for a different reason because the case law

16   basically says, is there something else imminent?  And it

17   requires me to look at whether there's other things going on

18   that are imminent that might resolve the dispute between the

19   parties, including other insolvency proceedings, which we

20   know aren't here, and out-of-court discussions.

21            MR. CLAREMAN:  Right.

22            THE COURT:  And since I did not know without

23   asking you what is going on in an out-of-court discussion, I

24   had to ask the question.

25            MR. CLAREMAN:  I understand and I think the fact

Page 141

1    that we are here saying we are willing to mediate and the

2    fact that the petitioning creditors are saying enter an

3    order to relief first is relevant to that question.  We

4    heard from Mr. Qureshi about his concerns about what the

5    debtors are doing and do they have the information that they

6    need?  We have certainly been making an effort to provide

7    information to produce discovery.  We produced two new

8    contracts last week.  We've made an effort.  We have a sworn

9    statement from the CEO.  The CEO was deposed about the US

10   assets.  Your Honor asked questions about this, but I don't

11   think there is a basis in the record to be concerned about

12   dissipation of assets.  We've heard about the Cebures --

13            THE COURT:  And I also, before you go on any

14   further, I also did read the deposition transcript last

15   night.  So I know what was said at the deposition.

16            MR. CLAREMAN:  Thank you, Your Honor.  We heard

17   about the Cebures and the fact that the Cebures were paid.

18   That was publicly disclosed when that decision was initially

19   made.  The Cebures were due to mature in September of 2022.

20   So they were a first maturing debt.  There was nothing in

21   the indentures that prevented the payment of the Cebures.  I

22   know that they don't like that the Cebures were repaid, but

23   there are reasons for that.  And there was no, there was no

24   there are reasons for that and there was no breach of the

25   indenture associated with that.  And it was the first

Page 142

1      maturing debt.  So it would be natural to address it first.

2              You know a lot of the argument that we've heard

3      and we've heard it a lot and Your Honor commented on it, was

4      the good debtor/bad debtor construct.  A lot of the argument

5      here boils down to bad Mexico.  There are numerous courts

6      that have considered Mexican procedure, have addressed it as

7      an adequate alternative forum.  They had an expert on

8      Mexican law come and testify.  Did not testify that things

9      were being done that were contrary to Mexican law.  That

10     opinion was not offered.  Our argument, fundamentally, is

11     you need Mexico in order to have a restructuring.  And

12     that's the point of the ultimate agreement between the

13     experts under 293 and the agreement that there is clearly an

14     establishment in Mexico.

15             So the question of what Mexico will do is one that

16     is inevitable, how Mexico treats restructuring, how its law

17     differs from our law.  There is no way around it.  The --

18     and I'll just say further on that point, we heard again from

19     Mr. Guerra.  I think the new theory that maybe a liquidator

20     could take a Chapter 11 plan and use that.  Fundamentally,

21     Mexican law is what it is.  There needs to be, it needs to

22     comply with Mexican law and there's no reason to believe

23     that a confirmable plan here would be the same thing as the

24     liquidator might adopt after some hypothetical concurso

25     process and all the other processes associated with Mexican

Page 143

1   law.  I think that's just speculation at this point.

2          We also heard complaints about the proceedings

3   before Judge Gardephe and defenses that were asserted.  A

4   complaint -- in summary judgment, a complaint was filed.

5   The case was removed from federal court.  The arguments that

6   were made were all arguments that are consistent with

7   applicable US law.  Judge Gardephe could have ruled on them.

8   Surely he will if the cases are unstayed.  And

9   fundamentally, that courtroom, that is the, that's the deal

10  that was signed up for.  I understand that there may be

11  difficulties enforcing a judgment, the amount of time it

12  will take if there is a judgment from Judge Gardephe and

13  going back to Mexico.  But that is the bargain when you do,

14  when you do business with a Mexican company.  That is just

15  part of the process.

16          And my last comment -- and Ms. Cornish may have

17  some additional points to make in response to some of the

18  issues that she addressed, and of course, if Your Honor asks

19  questions for me, I'd be happy to address them.  This is

20  also on the bad debtor point.  This is a Mexican company.

21  It doesn't want to restructure in the United States.  That

22  is not an unusual thing.  A US company would want -- not

23  want -- many US companies would not want to involuntarily

24  restructure in Mexico.  We would think it very strange

25  actually, if NBC or Comcast, or one of these other countries

Page 144

1    was being hailed into a Mexican concurso court on an

2    involuntary basis, on the basis of the record that's here in

3    terms of the contacts with that country.  If it was the shoe

4    was on the other foot, so to speak, we would think that very

5    unusual.  I think that would look very strange.

6            And the suggestion that even if -- this is in

7    response to Mr. Qureshi's comments about Multicanal and

8    Globopar and the fact that there were some restructuring

9    negotiations there.  I've already made comments about, I

10   think, the effect of our willingness to mediate on that.

11   But fundamentally, there is no case that I'm aware of where

12   A US court looked at the law of the foreign jurisdiction and

13   concluded this won't work under the circumstances.  It's not

14   enforceable and it's not doable in a manner that is

15   consistent with the foreign jurisdiction's law and said

16   nevertheless, we'll go ahead and exercise jurisdiction and

17   deny a request for extension.

18           Unless Your Honor has any questions at this time,

19   I'll turn the podium back to Ms. Cornish.

20           THE COURT:  I have two things.  Sorry.  One

21   though, you really haven't answered my question about then

22   why not file in Mexico yourself?  Why isn't there a concurso

23   there?  No disrespect, if you're not going to have a

24   consensual out-of-court restructuring of this debt, which is

25   not insubstantial, and at least in front of Judge Gardephe,

Page 145

1    you've agreed you owe 466 -- your client owes $466 million

2    US or approximately that from the interest payments and the

3    principal payment, forget the redemption payment for a

4    moment, premium for a moment.  I mean I've seen the

5    financials.  I mean the company has to operate, it has to

6    have cash to operate.  It hasn't managed to refinance these

7    notes in three years.  It just sounds like it needs a

8    restructuring.  And a restructuring can happen in a lot of

9    ways, not just the way you're saying in court.  It can

10   happen out of court, but that requires people to talk to

11   each other and for people to actually try to have an out-of-

12   court restructuring and understand that it is restructuring

13   time and they have to approach it that way.  It also means

14   that they could file in Mexico and seek to use the Mexican

15   laws to restructure.  Whether that will be, they ultimately

16   come up with something consensual and that works, who knows?

17   And the Mexican laws are clear that there has to be an

18   agreement that's acceptable to the debtor -- between the

19   debtors and their creditors, so it's both.  Or we have our

20   bankruptcy proceeding.

21            I do not disagree with you, but the first place

22   one would think a Mexican company is going is in Mexico and

23   not here.  I agree.  But it's one thing to say, you don't

24   think the restructuring should take place in Mexico, should

25   take place in the United States.  It's another to say, I'm

Page 146

1   ducking restructuring.  That's why I'm having some problems

2   here.  And does that -- it is just clear to me that a

3   restructuring has to take place.  And yes, your client could

4   certainly take the bull by the horns and file concurso

5   itself.  And that would certainly lend credence to why I

6   would have to abstain, for example, under the case law

7   because there would be a pending proceeding.  For sure, you

8   know, that would be a different argument.  It certainly

9   would mean there's a basis for parties for resolving their

10  problems.

11        It doesn't require the note holders to have to

12  potentially violate -- be in violation of superior court

13  orders in Mexico.  It doesn't require the same insolvency

14  test.  It requires a less difficult insolvency test.  And if

15  parties actually reached an agreement, they might be able to

16  avoid an insolvency test at all through the prepack nature

17  that people discussed in the concurso law.

18        So yes, if your clients were desperately trying to

19  restructure, otherwise, I think those arguments are very

20  helpful and appropriate.  But what I see here is somebody

21  who's just trying to avoid restructuring.  And you're right

22  that maybe that's not my job to be the restructuring police,

23  but I just don't think it's realistic to argue, yeah, this

24  should be, this all should happen in Mexico.  Yeah, it's not

25  right for it to happen here, but then not to have it

Page 147

1    happening in some way, whether it's through the out-of-court

2    arrangement or through the Mexican process.  And the problem

3    that I have here, which is unlike most of the abstention

4    cases, most of the abstention cases that discuss non --

5    foreign non-convenience, is I don't have another form that's

6    pending and I don't have any evidence that there's an out-

7    of-court restructuring here.  And this is why I have a

8    problem with this.  And it's a horrible, Hobson's choice as

9    well.  Okay.  It's a horrible Hobson's choice that you all -

10   - that is before me.  I understand.  But I don't think you

11   can tell me that I should on one hand, consider it odd that

12   someone wants to come here and restructure when you don't

13   fit into all the cases for abstention, most of them, because

14   the debtor in this case or in this case, I'll make it clear,

15   the alleged debtors have not taken the bull by the horns and

16   actually availed themselves of either out-of-court

17   restructuring on a current and continuing basis, which if

18   you look at those cases, there's like recent cases, cases

19   where progress is being made.  Yourself, you noted that in

20   Multicanal, cases where things are going on, or cases where

21   there's a foreign proceeding.  I don't have that.  It makes

22   this case very unique.

23             MR. CLAREMAN:  All right.  I think the best answer

24   that I can give is that -- and maybe Ms. Cornish may have

25   more to say about this particular thing -- but the fact that

Page 148

1    there is a dispute with this group of creditors is, I agree,

2    a good reason to have a conversation and negotiation with

3    that group of creditors.  And we are willing to mediate.

4    The decision to file a plenary bankruptcy case and

5    restructure potentially all of the assets and liabilities of

6    the company in accordance with Mexican law, dealing with all

7    the stakeholders, is a complicated decision that goes far

8    beyond a dispute with them no matter the size of the

9    obligation.  And so I think there can be very legitimate

10   reasons not to take the step of filing a concurso.  That may

11   not be the best thing for the company.  It may not be the

12   best thing even for them.  I think that this proceeding --

13            THE COURT:  No, I agree.  I think if the parties

14   actually talked and reached an agreement that might

15   ultimately be the right answer and how you memorialize that

16   agreement is going to be determined by what the agreement

17   is.  And I'm assuming in this context that there's actually

18   an agreement, meaning the company, the alleged debtors and

19   the noteholders all agree on how to restructure it.  Then,

20   yes, you're right.  There could be a lot of other ways of

21   influencing this.  And I do not have -- personally think

22   that an involuntary Chapter 11 is the best way here

23   necessarily, but it can't be that there isn't a process here

24   to ask me then to abstain.  I mean you are asking me to

25   abstain where there's nothing happening.  And I'm not sure

Page 149

1    you can point me to a case where there was nothing happening

2    in those abstention cases.  And I think you need to go back

3    and look at them, but I can tell you, I can't find that.

4              MR. CLAREMAN:  I agree that I haven't seen a case

5    where there is nothing happening.  I agree with that.  But

6    what I would say in response to that is only right now, we

7    are actually agreeing to proceed with the process with them

8    to try to negotiate with them and we are hearing resistance.

9    We're hearing, please, Judge, enter an order --

10             THE COURT:  I understand.  I get that.  Maybe

11   that's -- if they decide that's the way they're going to go,

12   then they're going to get my ruling, good, bad, indifferent.

13             MR. CLAREMAN:  But I would also say that in terms

14   of the case law and the existence of a parallel proceeding,

15   it is I agree.  The cases involve other frequently foreign

16   proceedings or some discussions, you know, overseas with

17   creditor constituencies.  But the point that I made earlier,

18   which I do think is relevant and I do think is consistent

19   with the case law, is that there will be a foreign other

20   proceeding inevitably.  And that foreign proceeding --

21             THE COURT:  Well maybe not.  We just talked about

22   how there might not be a foreign proceeding inevitably.  If

23   you all reach an agreement, maybe this will be done as an

24   out-of-court restructuring.  That is possible.  It does

25   happen if you have the requisite votes for bondholders.  I

Page 150

1    don't know whether you can get them, but it occasionally

2    happens. It can be done as prepack concurso perhaps.  It can

3    even be done as a prepackaged 11 in that case.  You might

4    decide that's the best thing depending on where all your

5    noteholders are and where you want to get the injunctions.

6    Who knows?  Until you actually have a deal, you don't know

7    the answer about where the best place is for it.  But I

8    understand your point that, that, you know, that there are

9    issues about it being here under these circumstances.  I get

10   that, believe me.  You know I've had some interesting things

11   since I went on the bench myself in the international

12   environment.  One of my first large debtor cases, large

13   cases I got was a gold mine in the Kyrgyz Republic where

14   the, where the, you know, where the country of the Kyrgyz

15   Republic was fighting everything.  So not only did I have

16   the issues that you're raising about abstention and whether

17   I should have jurisdiction over it, but I also have the

18   added things of issues about foreign sovereign immunity,

19   which made things really exciting for me.

20           MR. CLAREMAN:  I was actually involved in that

21   case with Alan Kornberg and Paul Weiss.  We were

22   representing the parent company.

23           THE COURT:  Yeah, it's been -- you know all about

24   it then.

25           MR. CLAREMAN:  Yeah.

Page 151

1            THE COURT:  And I mean, I think that's an example

2     of sometimes where things end up in front of our court that

3     don't make a lot of sense and ultimately, they lead to

4     people resolving things in ways that made sense.  And maybe

5     you all need to resolve things.  And I'm not saying my

6     proceeding is absolutely the right way to do this or that an

7     involuntary is the right way to do this, especially under

8     these facts.  These are very unusual facts, believe me, I

9     understand that.  But people not making any effort to

10    resolve it and then there not being another proceeding or

11    process going on, and then you ask the Court to abstain,

12    that makes that a little harder.

13            MR. CLAREMAN:  And my, my last point on this will

14    be in terms of people not making any effort.  I don't think

15    that it is -- the record is susceptible to evaluating whose

16    fault that is, who is making --

17            THE COURT:  I'm not, I'm not making fault.  I'm

18    just pointing out that it hasn't been happening.  Again, I

19    asked because every case that I looked at on this issue,

20    every case my law clerks found on this issue -- and believe

21    me, we do our own research -- and we, you know, and you

22    know, from the first time you started this, even long before

23    we saw your briefs, we started looking at some of these

24    issues because we knew where this was going.  I knew where

25    this is going.  I've been in this field too long to not know

Page 152

1     where it was going.  But I, you know, every case that pretty

2     much exists out there where courts have abstained under

3     these circumstances, it's because something else was

4     happening and that's where I have a problem here.  I don't

5     have a something else, which is why I'm suggesting that

6     parties really try to have a something else.  That parties

7     don't want to try to have a something else now, then that's

8     fine.  I'll get to my ruling.  That's the answer because

9     that's where we have to go next.  But I will say this is

10    not, you know, it's not a, it's, it's not, well, I really

11    acknowledge how horrible it would be perhaps for me to be

12    allowing this case to go forward, just go with the "your

13    client doesn't cooperate" argument and my having to issue a

14    billion orders that will probably be ignored in Mexico.  I'm

15    not going to enjoy that if that's where we're going.

16    Believe me, I understand.

17          But, you know, the abstention cases abstain for

18    reasons and those abstention cases are usually cases where

19    something else is happening.  And I'm just not sure I'm

20    seeing that here and that's my problem.  And I just don't

21    find it fits in the case law.  And again, it's not because I

22    would love to have a case like that.  I would not, just flat

23    out, I would not enjoy that.  You know I've certainly had

24    situations where I issued orders that other courts have

25    ignored, particularly in that case that I mentioned.  And

Page 153

1   that's not fun for me either.  But I, I have to look at the

2   case law and I have to say, well, this case is just

3   completely different than every other abstention case that's

4   come before any other court, including respectively,

5   respectfully, the arguments that were made to the district

6   court, the arguments that were made to the other bankruptcy

7   courts before me.  This is not, there's just not facts like

8   this.

9           And so, you know, when you're arguing to me that I

10  should abstain and some of this is in your control, I have

11  to think about that too.

12          MR. CLAREMAN:  Understood, Your Honor.

13          THE COURT:  Okay.

14          MS. CORNISH:  Your Honor, I know we've been here a

15  long time.  Just a couple things.

16          THE COURT:  Nah, this is not bad at all.  Come on.

17          MS. CORNISH:  Your Honor, first off, I don't, I

18  don't want to rehash your discussion with Mr. Clareman, but

19  I do want to point out that the something else has been and

20  continues to be, and it may not be sufficient in your eyes,

21  and the something else has clearly been the pendency of an

22  action that was filed by the noteholders at their -- excuse

23  me, at their direction by the indenture trustee represented

24  by Akin Gump.  You know it has been fully briefed and is

25  pending before Judge Gardephe.  That's the something else.

Page 154

1     As to why the company has not filed a full blown plenary

2     concurso proceeding in Mexico, Your Honor, Mr. Clareman made

3     this point, but this is one indenture, one set of notes.

4     Companies in the United States don't file, large companies

5     with global operations and lots of creditors and government

6     regulators and everything, don't just go file plenary

7     proceedings without any kind of a deal --

8             THE COURT:  Agreed.

9             MS. CORNISH:  -- in order to -- and so I get the

10    notion why didn't you file a voluntary case?  There was a

11    lawsuit, there is a lawsuit pending with respect to these

12    notes.  I understand that if there ultimately were a deal

13    that we had to deal with holdouts, that's the prepack.  We

14    all know that.  That's how it works, right?  It works, it

15    works that way here.  I'm presuming the prepack in Mexico

16    works the same way.  You use that pre pack and that plenary

17    proceeding, which we all know, doesn't affect anybody else.

18    It's done to deal with holdouts.  We're not at that place.

19    So it would make no sense for a company like TV Azteca, nor

20    would it make any sense to Billy's point for NBC to file a

21    full blown Chapter 11 case in order to deal with a dispute

22    over one series of notes that has not yet been packaged up

23    into a prepack.  So from a business perspective, I'm not

24    answering the question.  Okay.  But from a legal perspective

25    and from a practical perspective, that's why.  Okay?

Page 155

1            THE COURT:  Okay.  But then also it's been three

2    years, two years, whatever it is.

3            MS. CORNISH:  Understood.  And unfortunately, I

4    haven't been around for those three years.

5            THE COURT:  I hear that.

6            MS. CORNISH:  But I'm telling you that, you know -

7    -

8            THE COURT:  But it's three years of interest

9    payments.  You acknowledged, at least in front of Judge

10   Gardephe, and I say it that way because it's clear to me

11   there are some other arguments in the Mexican part, that the

12   entire principle is also due and owing.

13           Okay, there's a dispute over -- I don't mean to

14   diminish it or to say it's not important because I

15   understand it is a dispute and it is going to have to be

16   resolved somewhat -- $17 million.  Okay.  Clearly, there's

17   still an issue with paying the 400 whatever it is, 60-

18   million dollars, 65-million dollars in US debt.

19           MS. CORNISH:  Understood.

20           THE COURT:  And that's not a small amount even for

21   a large company like --

22           MS. CORNISH:  Understood, Judge.  Even so, that's

23   not a reason like right now to just file a voluntary

24   bankruptcy.

25           THE COURT:  But it's a reason why negotiations

Page 156

1     should have been going on because --

2              MS. CORNISH:  And as Mr. Clareman has said, Your

3     Honor has put out the notion of mediation.  And we will, we

4     will do that.  We've said that.  We will -- we are not

5     agreeing with the approach that Your Honor rules and enters

6     an order for relief to give them all the leverage --

7              THE COURT:  I understand.  I don't think that was

8     -- that was not my proposal.

9              MS. CORNISH:  Understood.  And I just want to make

10    that very, very clear.  But yes, yes, we will enter into

11    those discussions.  It should not be a surprise, the bad

12    debtor stuff while using the first 25 times, really is

13    offensive.  It's, it's offensive.  This, these companies

14    have done nothing and there is not an ounce of evidence in

15    this record that these companies have breached any duties,

16    that these companies have done anything illegal or improper.

17    In fact, we've been participating promptly in the New York

18    litigation.  In Mexico, the petitioning creditor's own

19    expert testified that everything that was going on there was

20    pursuant to Mexican law, which we are not experts in.  And

21    the issue of secrecy, there is no secrecy.  It's called the

22    Hague Convention.  Okay?  And whether we should have picked

23    up the phone or not, that's a different issue.  But the

24    point being --

25              THE COURT:  It didn't bother me that you didn't

Page 157

1    pick up the phone to opposing counsel.

2              MS. CORNISH:   Thank you, Your Honor.

3              THE COURT:   What bothered me is that you didn't

4    tell Judge Gardephe.

5              MS. CORNISH:   Understood, Your Honor, understood.

6              THE COURT:   That's a different situation.

7              MS. CORNISH:   Understood.

8              THE COURT:   You've asked him to decide something

9    where there's a contrary process going on in a court outside

10   of the country when your own indenture says really clearly

11   that it's supposed to be going on in front of him.   And I

12   don't know what he'd want to do with that, but he doesn't

13   know about it.

14             MS. CORNISH:   Understood.   Understood, Your Honor.

15   And I think that was around the issue of service and

16   everything else.   But I, again, I don't, I don't need to

17   belabor it.   And we hear Your Honor's concern loud and

18   clear.   Please believe that.

19             I guess the last point I'd make before I move to

20   my very narrow point on standing is it should come, it

21   should come as no surprise, and it should not brand a

22   company, okay, a large multinational Mexican company as a

23   bad debtor to say that when that company, which is a Mexican

24   company period, end of story, but has three vestigial -- is

25   that the right word? -- vestigial US entities that are

Page 158

1    contract parties and a handful of contracts and some

2    manager, okay, is, is being dragged into an involuntary

3    plenary, highly-publicized Chapter 11 proceeding in the

4    United States.  It should come as no surprise to hear that

5    perhaps -- and we have not discussed it with our clients --

6    but perhaps our clients would not be inclined to happily

7    come along and people are using the word "cooperate."  I

8    don't know what cooperate means.  If it means we're going to

9    agree to the treatment that the petitioning creditors have

10   laid out in their, in their papers, no, we're not.  We're

11   not.  And that should not come as a surprise and it should

12   not brand this company as a bad debtor

13             THE COURT:  Okay.

14             MS. CORNISH:  So let me move on, Your Honor, onto

15   the narrow issue of standing.  Mr. Qureshi argues that our

16   standing, our standing argument fails because the

17   petitioning creditors are not the same parties as the

18   indenture trustee.  That it's the trustee, not the

19   petitioning creditors, it's the trustee that's seeking

20   payment of the redemption premium.  In the words of Judge

21   Drain, their concession is no concession at all.  It was the

22   petitioning creditors along with the rest of the noteholders

23   required to get the requisite number to direct the -- first

24   of all, to file the first notice of default, notice of

25   acceleration that demanded the premium.  They were, they

Page 159

1      were signatories essentially to that.  And then secondly,

2      directing the indenture trustee, who's no more than an agent

3      or a representative for the noteholders, including the

4      petitioning creditors.  They filed, they sent the notice of

5      acceleration.  They actually -- the indenture trustee didn't

6      get it right the first time.  They directed him to file an

7      amended notice on their behalf to seek the premium and then

8      they filed the lawsuit.  And we didn't see the petitioning

9      creditors in that lawsuit who now are represented by Akin

10     Gump.  And the indenture trustee is represented by Akin

11     Gump, right?  Same lawyers.

12              We didn't see the petitioning creditors then

13     saying, oh, no, no, no, Judge, we don't want the redemption

14     premium, but everyone else does.  No, it is only when it

15     comes time to, in our view, seek to maximize pressure on TV

16     Azteca in connection with the dispute over the notes.  It's

17     only then that the petitioning creditors are saying that

18     they're not going to seek to collect that, that premium.

19     Your Honor, as I've said, and as Mr. Clareman noted, the

20     petitioning creditors are noteholders.  Under the indenture,

21     there's going to be a process if this case proceeds where

22     Your Honor is going to have to -- and you said this as well

23     -- Your Honor is going to have to determine the amount of

24     the claim under the indenture and the notes.  And the

25     petitioning creditors are noteholders and whatever Your

Page 160

1   Honor decides, whether they get the premium or not, is going

2   to bind them.  There is a current, live dispute including

3   with these petitioning creditors over that issue.  And we

4   believe that alone, Your Honor, is cause to dismiss these

5   cases for lack of standing.  Thanks.

6         THE COURT:  All right.  I think I'm going to, if

7   it's all right, I'm going to allow counsel for Diamond to

8   make their statement that they wanted to on the record.  Is

9   that acceptable?

10        MS. BOY SKIPSEY:  Thank you, Your Honor.  For the

11   record, Katherine Anne Boy Skipsey from Sheppard Mullin on

12   behalf of Diamond Films.  Reserving all rights on this

13   particular motion, Diamond takes no position.  Thank you.

14        THE COURT:  Thank you.  Okay.  Great.   Mr.

15   Qureshi, I'm taking your statement as saying you do not want

16   me to order you all to mediation now and you would like me

17   to go ahead and rule.  Is that what you're telling me?  I

18   just want to have it clear for the record.

19        MR. QURESHI:  So, Your Honor, we certainly would

20   need to talk to our clients to see if there would be a

21   willingness to mediate now before a ruling.  But let me

22   articulate in perhaps a little more detail the concern.  In

23   the absence of an order for relief, number one, we don't

24   think they're going to be a good faith participant.  Number

25   two, we are concerned about a continued free pass on paying

Page 161

1    interest.  If we're stuck in a process for who knows how

2    long, where we are mediating, they're not really

3    participating in good faith.  They're just extending

4    essentially a free option, that's part of the concern.

5              THE COURT:  Okay.  What's going to happen if I do

6    one of two things that's different than that?  Number one, I

7    agree with Ms. -- hypothetical, if I agree with Ms.

8    Cornish's argument that until you have a judgment from Judge

9    Gardephe where the disputes resolve, there's nothing for me

10   to do here and I dismiss it, you're going back to Judge

11   Gardephe.  You're not getting paid interest.  You're still

12   litigating in Mexico.  That doesn't get you what you're

13   talking about.  If I go ahead and deny the motion to dismiss

14   and we get into a Chapter 11, you're talking about unsecured

15   notes.  You're not going to get paid interest either.  Why

16   is that any different?  What is the issue about the

17   economics about the delay?

18             MR. QURESHI:  So, so Your Honor, I think the

19   circumstances under which absent entering in order for

20   relief, mediation, I think would be something that our

21   clients would likely agree to now would be first if there's

22   a time limit on it so that it is not a process that drags

23   out for an indefinite period of time.  Second, Your Honor,

24   that it be a process where we actually get financial

25   information.

Page 162

1              THE COURT:  I agree with you.  You have to get

2     some information because I don't know how you can negotiate

3     a restructuring without information.  I'm just being

4     realistic.  That can't make any sense.

5              MR. QURESHI:  Right.

6              THE COURT:  Otherwise people could just stare at

7     each other.

8              MR. QURESHI:  Correct.  And, Your Honor, the third

9     condition, I shouldn't call it a condition.  The third

10    suggestion is also that Mr. Salinas be required to

11    participate in the mediation.  As the majority equity owner

12    of the company, it is certainly the view of the noteholders

13    that nothing is going to get done without his participation

14    in the mediation.  And I would imagine, Your Honor, that

15    with, with those parameters around the mediation, if we

16    could have a short break, we likely would be able to get our

17    client's agreement to mediate.

18             THE COURT:  I highly doubt Mr. Salinas is going to

19    agree to participate in this.  And no disrespect, Paul Weiss

20    doesn't represent Mr. Salinas.  So they can't bind Mr.

21    Salinas.  Mr. Salinas is not before this Court.  There's

22    nothing I can do to order him to do that.  I have the

23    alleged debtors before this Court because you filed the

24    petition.  I certainly have the ability to order the parties

25    to mediation while they're still before me even under these

Page 163

1    circumstances.  I don't have the authority to order Mr.

2    Salinas to mediation.  Obviously, if Mr. Salinas wants to

3    participate, he could, but I cannot promise you that I'm

4    going to be able to order Mr. Salinas.  And even if I had,

5    even if I had denied the motion to dismiss, my jurisdiction

6    is still over the debtor, it's not over Mr. Salinas.  So I

7    don't know how I could require Mr. Salinas to participate in

8    this.  I understand that if there's any negotiations that

9    are going to happen about changing the equity structure of

10   the company, I'll just put it that way, that for certain Mr.

11   Salinas is going to have to be consulted about that because

12   under Mexican law, there's shareholder approvals that are

13   required.  And yes, I do know that because we had to do it

14   in Grupo Aeromexico.  So I'm only too familiar with what the

15   rules are.

16           So I understand that he would have to be involved

17   at that point.  So I get that he's going to be one of those

18   parties that necessarily won't have to be in the room.  And

19   I don't know if that will make things happen, but I can't

20   compel him at this point.  Even if I have denied the motion

21   to dismiss, I still don't have an ability to force him to

22   come to the United States and participate in a mediation.

23           MR. QURESHI:  Understood, Your Honor.  Your Honor,

24   may I ask the Court for a short break so we can talk to our

25   clients?

Page 164

1                THE COURT:  Yes.  How long would you like?

2                MR. QURESHI:  15 minutes, Your Honor.

3                THE COURT:  Sure.

4                MR. QURESHI:  Thank you.

5                (Off the record)

6                THE COURT:  Okay.

7                MR. QURESHI:  Your Honor, again for the record,

8     Abid Qureshi on behalf of the petitioning creditors.  We had

9     the opportunity to speak with our clients and also to Paul

10    Weiss on behalf of the alleged debtors.  Your Honor, we

11    agree to mediate.  We would suggest the following and these

12    are all things we've discussed with the debtors and I think

13    we're in general agreement on.

14                First, we think the right period of time for

15    mediation would be 60 days.  Secondly, we would like access

16    to financial information.  I think that's a subject that's

17    going to need to be discussed further, perhaps also with the

18    assistance of the mediator to make a determination as to as

19    to what financial information we will receive.  But that

20    clearly is something that will be necessary.  Third, we

21    would like the mediation to be in person and with decision

22    makers in the room.  And again, we've already had a

23    discussion about who for the debtors that most likely

24    decision makers are to be.  And fourth, Your Honor, we would

25    like a former judge as a mediator.  We have begun discussing

Page 165

1   potential mediators and I think, Your Honor, we need a

2   little more time to do that.  And then we'll come back to

3   the Court if that's ok with the suggestion.

4           THE COURT:  Yes.  No, that's fine.  Of course.  I

5   would have suggested that anyway, that you have a former

6   judge handle it because this strikes me as a case where

7   that's kind of necessary given what the issues are.  And I

8   would have, I would have suggested 60 days.  So that was

9   fine.  And meanwhile, that would mean I would keep working

10  on my decision.  Trust me, I won't stop doing that.

11          MR. QURESHI:  And the last point, Your Honor, and

12  I think this is an obvious one, but for purposes of Your

13  Honor considering the issue to the extent a ruling is

14  required, the mediation will not be a factor taken into

15  account in the ruling itself.

16          THE COURT:  Okay.  No, that makes sense to me.  I

17  think that's only fair for both sides.  I mean, I'm asking

18  you to do it in essence, both of you.  So I don't think --

19  that seems fair.

20          MR. QURESHI:  Okay, thank you, Your Honor.

21          THE COURT:  Okay.  All right.  So I guess you all

22  need a little more time to talk about it.  Should we, do you

23  want to set a time or a date for a status conference so you

24  can tell me where things are going with it.  It seems like

25  that might be a good idea.

Page 166

1            MR. CLAREMAN:  Yes, we agree, Your Honor.

2            THE COURT:  Okay.  So when would you like to do

3    that?  I guess that's a question for you.  I know we have a

4    holiday coming up.  End of next week?  Okay.  Yeah, end of

5    next week is fine.  I would have to do it I think Friday, if

6    it's going to be the very end Friday afternoon, maybe any

7    time really after 10.  They actually have to look and see if

8    I have something else after 10.  But it is fine.  I have a,

9    I'm speaking at a conference in Chicago next Thursday and

10   Friday.  I'm actually speaking on Friday at 8 a.m. at the

11   ABA conference.  But after that, I don't mind going to my

12   hotel room and having a conference.  That's fine.  So if you

13   bear with me a second, I might have to go get my other

14   phone.  One of the things about being a judge is that I have

15   three phones and, you know, two phones and three calendars,

16   including my hearing calendar.  So it keeps things a little

17   lively.  Oh, yeah, we have training at 10 a.m.  She's

18   reminding me that's the answer.  So, no, you answered my

19   question because I thought there was something I had agreed

20   to at 10 a.m. which is probably right.  How would it be --

21   would it be okay -- sorry.  We have mandatory training for

22   our court at 10 a.m. which is what --

23            MR. QURESHI:  Your Honor, we can certainly do

24   Thursday as well if that's easier.  I don't know if you got

25   something.

1              THE COURT:  It's ok for me too.  So any time on

2      Thursday in the afternoon is fine because I'm traveling to

3      Chicago in the morning.  So anytime in the afternoon is

4      fine.

5              MR. QURESHI:  Okay.  4:00 Thursday?

6              THE COURT:  4:00 is fine.  Would that work for you

7      all?

8              MR. CLAREMAN:  Yes.

9              THE COURT:  Okay, fine.  So we'll set up a

10     schedule for that, a Zoom, on our end for status conference.

11     Okay.  All right.  And then I just wanted to thank

12     everybody.  I know obviously it's been a busy two days and

13     also a tremendous amount of work and preparation.  So I

14     greatly appreciate that.  And also I will just say it's

15     really nice for my law clerks to get the opportunity to see

16     fine counsel all around.  Trust me, that doesn't happen all

17     that often.  Not nearly as much as you would think even in

18     our district.  So it's actually really always a good

19     opportunity for them.  And I told my intern that now he's

20     spoiled because he's seen really fine lawyers.  And so the

21     next time we have a hearing, which is Thursday, he's going

22     to be disappointed he's not seeing the same things exactly

23     as we saw here the last few days.  And that, as I said to

24     him, it's just going to go downhill from here.  That was my

25     joke to him.  So, anyway, thank you all for your hard work

Page 168

1    and your fine arguments.  I appreciate it and preparation.

2    All right.  Is there anything else we need to discuss then

3    before we adjourn for the day?

4              MR. QURESHI:  Nothing, Your Honor.

5              THE COURT:  All right.  With that, Court is

6    adjourned.  I appreciate everyone's hard efforts and have a

7    nice rest of the day.

8              (Whereupon these proceedings were concluded at

9    6:14 PM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 169

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *[signature]*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  September 1, 2023