Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 23-10385-lgb

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6

7    TV AZTECA, S.A.B. DE C.V.,

8

9             Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

11                   United States Bankruptcy Court

12                   One Bowling Green

13                   New York, NY  10004

14

15                   August 28, 2023

16                   10:00 AM

17

18

19

20

21   B E F O R E :

22   HON LISA G. BECKERMAN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  KS

1    HEARING re Motion to Dismiss Involuntary Petition / Motion

2    to Dismiss Involuntary Chapter 11 Petitions

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    PAUL WEISS RIFKIND WHARTON GARRISON LLP

4        Attorneys for the Alleged Debtors

5        1285 6th Avenue

6        New York, NY 10019

7

8    BY:  AMY L. BARTON

9        WILLIAM A. CLAREMAN

10

11   SHEPPARD MULLIN RICHTER HAMPTON LLP

12       Attorneys for Diamond Films Netherlands Cooperatief USA

13       30 Rockefeller Plaza, 39th Floor

14       New York, NY 10112

15

16   BY:  KATHERINE ANNE BOY SKIPSEY

17

18   AKIN GUMP STRAUSS HAUER FELD

19       Attorneys for Petitioning Creditors

20       1 Bryant Park

21       New York, NY 10036

22

23   BY:  DAVID GILLER

24       ABID QURESHI

25

```
 1   RIKER DANZIG SCHERER HYLAND PERRETTI LLP

 2        Attorneys for the Bank of New York Mellon

 3        Headquarters Plaza

 4        One Speedwell Avenue

 5        Morristown, NJ 07962-1981

 6

 7   BY:  CURTIS M. PLAZA

 8

 9   DANIEL RUDEWICZ, Pro se

10

11   ALSO PRESENT:

12   LUIS MANUEL C. MEJAN

13   JESUS GUERRA

14   JESSICA CHOI

15   JAY COHEN

16   KELLEY A. CORNISH

17   ELIZABETH MCCOLM

18   SEAN MITCHELL

19   DIANA LAURA MUNOZ PRECIADO

20   XU PANG

21   SARAH SCHULTZ

22   MICHAEL STAMER

23   LUCIAN WANG

24   SIMONA XU

25   UDAY GORREPATI
```

Page 5

1    TAYLOR  HARRISON

2    LUCY  MONTEIRO

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1                   P R O C E E D I N G S

2              THE COURT:  Good morning.  Court is now in

3      session.  I'm going to go ahead and call the case, and when

4      I do, I'll ask the attorneys to please put their appearances

5      on the record.  I'll warn the attorneys that in order to be

6      recorded in this courtroom, you actually have to stand up at

7      the podium.  So if you try to use your mics there, it's not

8      going to record for purposes of our record.  So appreciate

9      if you'd come up there.  All right.  Case Number 23-10385,

10     TV Azteca, S.A.B. de C.V.  May I have appearances, please?

11             MR. CLAREMAN:  Good morning, Your Honor.  Billy

12     Clareman, from Paul, Weiss, on behalf of TV Azteca and the

13     alleged debtors.  I'm joined at the table by Kelley Cornish

14     and Jay Cohen, my partners from Paul, Weiss.

15             MR. COHEN:  Good morning, Your Honor.

16             THE COURT:  Good morning.

17             MR. CLAREMAN:  Thank you.

18             MR. QURESHI:  Good morning, Your Honor.  Abid

19     Qureshi, Aiken Gump Strauss Hauer Feld, on behalf of

20     petitioning creditors and the indenture trustee.  With me

21     are Michael Stamer, Sarah Schultz and David Giller.  Thank

22     you, Your Honor.

23             THE COURT:  Thank you.

24             MR. RUDEWICZ:  Good morning, Your Honor.  Daniel

25     Rudewicz, on behalf of the United States trustee.

Page 7

```
 1              THE COURT:  Thank you, Mr. Rudewicz.  It's
 2     actually nice to see you in person.  I see you a lot on
 3     Zoom.
 4              MS. SKIPSEY:  Good morning, Your Honor.  Katherine
 5     Anne Boy Skipsey, on behalf of Diamond Films.
 6              THE COURT:  Thank you.
 7              MR. PLAZA:  Good morning, Your Honor.  Curtis
 8     Plaza, from Riker Danzig, on behalf of The Bank of New York,
 9     as indenture trustee.
10              THE COURT:  Thank you.  Good morning.
11              MR. PLAZA:  Thank you.  Good morning.
12              THE COURT:  Nice to see you again in person.  All
13     right.  So I just had a few questions I thought that we
14     could talk about in terms of housekeeping and how this will
15     go today and then after that we can get started.  So my
16     first question for you, Mr. Clareman, was it wasn't clear to
17     me from the back and forth with my law clerk whether you had
18     an additional -- you were going to go ahead and call the
19     executive from the company or you weren't.  So I thought I
20     would ask so I knew what I should expect.
21              MR. CLAREMAN:  Yes.  So we have reached an
22     agreement -- oh, the podium.
23              THE COURT:  Yes, up there.
24              MR. CLAREMAN:  So we are not planning to call Mr.
25     Rodriguez live.  We have reached an agreement with the
```

Page 8

1    petitioning creditors' counsel to submit his deposition

2    testimony.  He was deposed last Thursday.  So that will be

3    submitted to the Court in full in lieu of a cross-

4    examination --

5              THE COURT:  Okay.

6              MR. CLAREMAN:  -- rather than live.

7              THE COURT:  All right.  That's helpful to know.

8    Thank you.  Okay.  Next question I will ask is I obviously

9    noticed that there were -- while parties agreed on most

10   exhibits, which was helpful, there are obviously some

11   exhibits in dispute.  So people have different ways they

12   like to handle that from my experience.  I sort of have my

13   way, but that doesn't mean I'm not open to other people's

14   ways also.  So my way is usually that I will deal with that

15   when we get to the evidentiary portion of the hearing.

16             I'm willing to do it at the close of the person,

17   the evidentiary record for that side, me dealing with it

18   then before we move on to the next side.  I'm also happy to

19   do it at the beginning if the parties want to do it for both

20   sides that way or if somebody feels they want to handle it

21   at the beginning before they get into their witness

22   testimony on their own side for their own particular issues.

23   So I don't know what you all have discussed or how you all

24   had an idea about, I guess, approaching the issue.

25             MR. CLAREMAN:  Yes.  So I believe -- and someone

Page 9

1  from my side should tug on coat if this isn't correct, but I

2  believe we have an agreement actually on all of the

3  exhibits.

4           THE COURT:  Oh, wow.  Okay.

5           MR. CLAREMAN:  Yes.  It'll make it a lot easier.

6  There are a number of -- so all of the exhibits will be --

7  by agreement between the parties, will come into evidence.

8  There were a number of relevance objections.

9           THE COURT:  And a couple of authentications.

10           MR. CLAREMAN:  Right, and rather than argue

11  admissibility as to those, we will simply argue on the

12  merits that materials are irrelevant or should not be

13  credited and treat that as a merits issue as opposed to an

14  admissibility issue.

15           THE COURT:  Okay, and then I have one particular

16  exhibit I had a question about.  So let me just see if I can

17  find this.  And it's just because of the way that the case

18  law is in our district, so I just wanted to make sure that

19  the parties were all right with this, which it sounds like

20  they are.  But for the record, I actually need to actually

21  ask this for the record.

22           MR. CLAREMAN:  Okay.

23           THE COURT:  So in Exhibit 128, which is one of the

24  reports for the corporation, the annual report, it's all in

25  Spanish, and at the very back there's literally four

Page 10

1    paragraphs in English.  Under our Second Circuit rules,

2    generally the rule, as you know, is that we would have to

3    have a full English translation of the document to be put

4    into evidence.  However there is a case here in our court

5    where Judge Chapman actually had determined that if the

6    parties were in agreement and they weren't planning on

7    relying on the rest of the documents in question, that it

8    was fine to go ahead and just admit a very limited portion

9    in English.  And so I wasn't sure if the parties had

10   discussed that because it obviously jumped out at us when we

11   were reviewing the exhibits, which you would imagine we did.

12           So I just wanted to make sure that everybody was

13   all right with that and also that, for the record, the

14   Debtor was not -- because I believe this is the alleged

15   Debtor's exhibit that they were planning on using.  But I

16   could be wrong -- that whatever party was planning on using

17   this, that they only were planning on referring to, for

18   purposes of the evidentiary record, the part that was

19   actually translated into English.  If they weren't, then I

20   would have to have a full English translation that was

21   provided to me in order for me to accept the document into

22   evidence or if there were other sections that the parties

23   were going to use other than just those particular

24   paragraphs, let's say there were ten paragraphs instead of

25   the four I had that people wanted to use.  As long as I had

Page 11

1    those in English, I would accept that too, as long as the

2    parties are fine.  It was something that jumped out when we

3    reviewed the documents.  And it is generally contrary to

4    Second Circuit case law with the exception, as I said, of

5    this one particular case that I'm happy to rely on, that

6    Judge Chapman found an exception for in circumstances where

7    there was a real limited necessity for using a non-English

8    document and only using a very small portion in English.  So

9    that's why I wanted to make sure I raised that with the

10   parties.

11            MR. CLAREMAN:  Yes.  So I believe that it is the

12   case that the portion that the parties would direct the

13   Court to -- so in terms of what's here, why don't I put it

14   this way.  The parties will only rely on portions that have

15   been translated into English.  I believe there will be at

16   least one very short supplementation to what is in the

17   binder currently, but we will provide that.  And ultimately

18   anything that either party wants to rely on, we'll ensure an

19   English translation is in the record.

20            THE COURT:  Okay.  That's fine.  So just for the

21   record, obviously I will only rely on the English

22   translation portion, and I will only consider that for

23   purpose of the evidentiary record and to the extent that's

24   supplemented by further English paragraphs and the

25   translations of further paragraphs in the document, that's

Page 12

```
 1    fine as well, before the record is closed.  And I'm going to
 2    go ahead and allow that, even though, as I note, general
 3    Second Circuit case law doesn't permit that.
 4           But I felt here, this is a very long document,
 5    while we're lucky in my chambers in that I have a native
 6    Spanish speaker and also I lived in South Florida and have
 7    some Spanish familiarity, nonetheless this is a long
 8    document.  And when I looked at what was being utilized, we
 9    felt we had to look at why that was the case or whether
10    there was a basis for my doing something that was different
11    than the general rules in the Second Circuit.  And as I
12    said, I'm happy to rely on that particular case and allow it
13    in.  Just saying that for purposes -- when we get to it,
14    I'll make sure to say that again, but just raising this
15    upfront.
16           MR. CLAREMAN:  Thank you.
17           THE COURT:  Okay.  That's fine.  All right.  Was
18    there anything else on the housekeeping nature that people
19    wanted to raise up front?  I remember that we had discussed
20    that opening statements were going to be 30 minutes.
21           MR. CLAREMAN:  I think 15 minutes.
22           THE COURT:  Fifteen minutes, was it?  Sorry.
23    That's what I remember.  All right.  Fifteen minutes.  Okay.
24    That's fine.  And is there anything else we needed to
25    discuss before we get to opening statements?
```

Page 13

1          MR. CLAREMAN:  Yes, I believe there are

2     supplemental exhibits that we'd like to hand up.  I'm going

3     to turn the podium over to Amy Barton from Paul, Weiss.

4          THE COURT:  Okay.  Sure.  Good morning, Ms.

5     Barton.

6          MS. BARTON:  Good morning, Your Honor.  Yeah.  We

7     just have a couple of supplemental joint exhibits.  There's

8     no objections to any of them.

9          THE COURT:  Okay.

10          MS. BARTON:  It includes the Rodriguez transcript

11     that Mr. Clareman was talking about and also a supplemental

12     declaration that's being submitted by the petitioning

13     creditors, which the alleged debtors have no objection to.

14     And Mr. Giller will explain that one.

15          THE COURT:  Okay.

16          MS. BARTON:  May I approach?

17          THE COURT:  Yes, you may.  Okay.  Sure.

18          MS. BARTON:  And this has the updated

19     (indiscernible) --

20          THE COURT:  Okay.  Thank you.  All right.

21          MR. GILLER:  Good morning, Your Honor.  David

22     Giller, for Akin Gump, for the petitioning creditors.  So

23     you'll find in your binder at JX-395 there's a supplemental

24     declaration of Mr. Castillo updating the Court on a number

25     of developments in the Mexican litigation that occurred late

Page 14

1       Thursday evening.

2               THE COURT:  Oh, okay.

3               MR. GILLER:  So the find their way into the joint

4       stipulation.  The parties do not object to its admission.

5       Mr. Castillo is here, if needed for cross-examination, but

6       no one objects to it coming in.  The JX-393 is the Spanish

7       version of the order and 394 is the English version of the

8       order that was filed in the Mexican litigation.

9               THE COURT:  Okay.

10              MR. GILLER:  So we would have those both come in

11      and we will, of course, file it on the docket with the

12      Court's permission, if the Court so provides..

13              THE COURT:  Okay.  All right.  That's fine.  Thank

14      you.  That's acceptable.

15              MR. GILLER:  Thank you.

16              THE COURT:  All right.  Will any of that have to

17      be filed under seal?  Sorry, Mr. Giller?.

18              MR. GILLER:  No.  It will not need to be filed

19      under seal.

20              THE COURT:  None of the exhibits either?

21              MR. GILLER:  None of the exhibits either.

22              THE COURT:  Okay.

23              MR. GILLER:  Unless someone tells me otherwise.

24              THE COURT:  I was asking because some of the

25      injunction documents were filed under seal and some weren't.

Page 15

1              MR. GILLER:  Correct.

2              THE COURT:  So I don't know how this interacts

3    with that.  So that's why I'm asking the question.

4              MR. GILLER:  This does not interact with the part

5    of the Mexican litigation that was filed under seal.

6              THE COURT:  Okay, and that's acceptable to the

7    alleged debtors?

8              MR. CLAREMAN:  Yes, Your Honor.

9              THE COURT:  Okay.  Just making sure.  All right.

10   Thank you very much, Mr. Giller.  Appreciate that.

11             MR. GILLER:  Thank you.

12             THE COURT:  All right.  Okay.  All right.  If

13   there's nothing else then, Mr. Clareman, I guess it's time

14   for your side for your opening statement.

15             MR. CLAREMAN:  Thank you, Your Honor.  We'd like

16   to hand up a short deck that will accompany the opening.

17   For the record, Billy Clareman, from Paul, Weiss, on behalf

18   of TV Azteca and the alleged debtors.

19             THE COURT:  Sure.

20             MR. CLAREMAN:  May I approach, Your Honor?

21             THE COURT:  Yes, you may.

22             MR. CLAREMAN:  We have more copies.

23             THE COURT:  No, I'm just asking if the ECRO needs

24   one.  That's why.  Okay.  Okay.  Fine.

25             MR. CLAREMAN:  Your Honor, there are four grounds

Page 16

1    we've argued compel dismissal of these Chapter 11 cases.

2    Those are summarized on Page 2 of the deck that we've handed

3    up.  They really arise from two core deficiencies in these

4    involuntary cases.  The first is going to be the subject of

5    testimony today.  Because TV Azteca is a Mexican company

6    with virtually no presence in the United States and the vast

7    majority of its assets in Mexico, it cannot be restructured

8    on an involuntary basis in the U.S. in a way that is

9    enforceable in Mexico.  As a result, any restructuring here

10   will necessarily be futile and wasteful.  Under Mexican law,

11   there will need to be a full concurso in Mexico.  For that

12   reason, dismissal under Section 305(a)(1) of the Bankruptcy

13   Code is appropriate for substantially the same reasons

14   dismissal for forum non conveniens is appropriate.

15            The second primary ground will not get as much

16   attention today during the testimony, but it is equally

17   important and it arises from the background to these Chapter

18   11 cases before they were filed in this court.  Before these

19   petitions were filed, the petitioning creditors and TV

20   Azteca were litigation adversaries.  They are still

21   litigation adversaries.  The petitioning creditors' first

22   choice, we submit the right choice for this dispute, was a

23   litigation.  That litigation was pending before Judge

24   Gardephe in the Southern District of New York, and there are

25   two significant consequences that flow from that.

Page 17

1                First, because of the litigation before Judge

2     Gardephe, the petitioning creditors are ineligible to file

3     these Chapter 11 cases on an involuntary basis, and that's

4     grounds for dismissal under Section 303(b)(1) of the

5     Bankruptcy Code.  The summary judgment briefing before Judge

6     Gardephe makes crystal clear that there is a bona fide

7     dispute as to the amount of their claim.  That's an

8     independent grounds for dismissal without addressing any

9     other issue in this case.

10               The second consequence of the litigation history

11    is that the motion to dismiss should be denied because this

12    is not a restructuring case at all.  This is a two-party

13    dispute between TV Azteca under a single indenture with the

14    petitioning creditors and it should be dismissed for cause

15    pursuant to Section 1112(b) of the Bankruptcy Code.  The

16    parties have pending litigation here in the Southern

17    District of New York and in Mexico, and there are no other

18    creditors here supporting these petitions.

19               I'd like to make one more point about the

20    litigation history here before returning to the Mexican law

21    issues that will get a lot of attention today.  Dismissal of

22    the petitions does not leave the creditors here without a

23    forum.  They have a forum.  They have a U.S. forum.  That

24    U.S. forum is in Judge Gardephe's courtroom where the

25    underlying issues were being litigated before they were

Page 18

1    halted by the filing of these involuntary petitions six

2    months ago.  So granting the motions, the motion here, does

3    not kick anyone out of court.  It returns the matter to what

4    we submit is the right court, which is Judge Gardephe's

5    courtroom several blocks away.  And of course, the evidence

6    will show that the petitioning creditors can pursue an

7    involuntary concurso in Mexico.  Dismissal here does not

8    preclude that.  And in fact, as we've said, under any

9    circumstance there would need to be a concurso in Mexico.

10   It's inevitable.  So if it's going to happen, it should be

11   at the start, not at the end of any restructuring, if

12   there's going to be a restructuring.

13           Your Honor, I'll turn next to some of the issues

14   under Mexican law.  So there have been five expert

15   declarations, as Your Honor has seen and read.  They

16   collectively discuss a number of provisions under Mexican

17   law.  I'm not going to cover all of those provisions in my

18   opening remarks.  I'm going to focus only on a few that we

19   believe are important and really drive the results here.  If

20   you turn to Slide 3, the first provision I'm going to single

21   out is a unique provision in Mexico's version of the Model

22   Law and cross-border insolvency.  That's Article 293.  I've

23   also excerpted on Slide 3 the portion of 279 that defines

24   establishment, which is one of the terms used in 293.

25           So Article 293 is an important provision in this

Page 19

1    case.  Article 293 says, in sum and substance, if

2    recognition in Mexico is sought for a foreign insolvency

3    proceeding, for a debtor that has an establishment in

4    Mexico, a concurso proceeding is required.  There's a

5    separate provision, Article 294, that applies when there is

6    no establishment in Mexico.  If you're under that provision,

7    you don't need a full concurso.  You can have an ancillary

8    proceeding.  But if you have an establishment in Mexico, you

9    need to go through the concurso process and have a concurso.

10           There's a lot of disagreement between the experts

11   in this case.  There's a lot of disagreement between the

12   parties in this case.  But there is one thing everybody

13   agrees on, and that is that there is an establishment in

14   Mexico for the alleged debtors.  They agree on that, of

15   course, because no one could dispute that TV Azteca and its

16   subsidiaries have an establishment in Mexico.

17           So the next provision I'd like to highlight for

18   the Court is Article 283.  That appears on Slide 4.  Article

19   283 says none of what is set forth in this title, meaning

20   Title 12, which is Mexico's analog to our Chapter 15, may be

21   interpreted in a sense that is contrary to what is set forth

22   in Titles 1, 2, 11 and 13 of this law or in any other way

23   that is contrary to fundamental principles of law that rule

24   in the Mexican Republic.  So all participants in the Mexican

25   bankruptcy case, the judge, the visitor, the conciliador,

Page 20

1    the liquidator, all participants shall refuse, the provision

2    says, to adopt a measure which is contrary to what is set

3    forth in such titles.

4          So not only does Article 293 require a concurso

5    for a company such as the alleged debtors', but Article 283

6    requires conformity with the concurso law.  And the last

7    sentence of Article 293 says that the concurso law applies

8    to the proceeding when there's an establishment in Mexico.

9          So for that reason, the plan structure that has

10   been suggested in the opposition brief by the petitioning

11   creditors would plainly be unenforceable in Mexico.  They've

12   suggested that they could terminate exclusivity, reinstate

13   Mexican creditors and then equitize some or all of their

14   debt.  So I'll highlight a few ways in which this is plainly

15   not possible under Mexican law, and those are summarized on

16   Slide 5.

17         So first, the fact that there is a Chapter 11 case

18   does not actually mean that there can be a concurso because

19   you have to satisfy the insolvency test on the concurso law;

20   so another reason why a concurso should be the first, not

21   the last step.  And second, a plan of reorganization that is

22   recognizable under the concurso law, it has to be in

23   agreement with the debtors.  They don't have the concept of

24   terminating exclusivity and having an involuntary coercive

25   plan over the debtor's objection.  Third, because TV Azteca,

Page 21

1    because the alleged debtors operate concessions licenses

2    from the Mexican government, the government of Mexico has

3    special rights in connection with the bankruptcy case.  One

4    of those rights is the ability to veto a plan.  And one of

5    the alleged debtor entities here owns concessions, so the

6    government has the ability to veto a plan.  They also have

7    specific rights to participate in specific ways in the

8    bankruptcy case.  And fourth, under Mexican law, TV Azteca's

9    shareholders have interests that can't be affected by a

10   restructuring case without their consent.  They have a right

11   to vote as shareholders if there's going to be anything

12   that's going to affect their equity.

13          So all of this just highlights the futility of

14   this exercise ultimately.  You have a Chapter 11 case here.

15   You go through all of these steps, incur all that expense.

16   But what's the result?  The result is a do over in Mexico

17   that goes through the concurso law.  We submit it is not in

18   the best interest of the debtors.  It's not in the best

19   interest of their creditors to have what will ultimately be

20   at most an exhibition season in a Chapter 11.

21          I next want to address briefly the dispute between

22   the experts regarding the center of main interest for TV

23   Azteca and whether there's an establishment in the United

24   States.  Under the concurso law, recognition is extended to

25   two types of proceedings, foreign main proceedings and

Page 22

1    foreign non-main proceedings.  There's no other means for

2    recognition that is described in the concurso law.  A

3    foreign main proceeding is where the debtor has its center

4    of main interest, as I know Your Honor knows, but where the

5    COMI is.  These alleged debtors have their center of main

6    interest in Mexico.  Substantially all of their business is

7    there.  If you turn to Slide 6, we've summarized several of

8    the key points.  I won't read through all of them, but

9    fundamentally, this is a company that has substantially all

10   of its operations are in Mexico.

11           THE COURT:  Where is that coming from?  Okay.

12   Let's just leave it alone.  If it happens again, we're going

13   to have to worry about it.  My apologies for Court

14   Solutions.  I don't know what's going on with that.  But if

15   it happens again, I guess we'll just have to hang up and get

16   my courtroom deputy to come back in.  But meanwhile, please

17   proceed.  Hopefully we won't have that again.  They did warn

18   me we have four -- like we have to hang up every four hours

19   and redial in.  But aside from that anyway, sorry, Mr.

20   Clareman, for the disruption.

21           MR. CLAREMAN:  No disruption at all.  So again,

22   this is the alleged debtors are fundamentally Mexican

23   companies.  They have substantially all thousands of

24   employees in Mexico.  Their management team is in Mexico.

25   It's where they do business.  It's where they broadcast

Page 23

1    television principally.  They have smaller operations than

2    two other South American countries.  But it's where the

3    board of directors are.  It's where they're regulated.  It's

4    where their shareholders, their majority shareholders are.

5    It's where they're publicly traded, or were until that was

6    ceased, but they're regulated in Mexico.  This is a Mexican

7    company.

8           By contrast, there's virtually no connection to

9    the United States.  Three of 35 alleged debtors are

10   organized under U.S. law.  There are no employees, no

11   offices, no operations.  There is at most one member of one

12   board of managers who lives in Florida, one for all of these

13   companies.  These are vestigial entities.  There used to be

14   operations here, but there haven't been for a long time.

15   There is no longer any material presence, substantial

16   presence in the United States.  So these cases could not be

17   recognized as a foreign main proceeding.  There is not a

18   COMI here.

19          We submit the claim by Mr. Guerra, the opposing

20   expert, that somehow three de minimis subsidiaries could

21   drag 35 alleged debtors under Mexican law to have their COMI

22   here, we submit that's simply not credible as opposed to the

23   other way around.  So this case can't be recognized as a

24   main proceeding.  The presence here does not satisfy the

25   establishment test, and therefore it can't be recognized as

Page 24

```
1    a non-main proceeding.  So again, the Chapter 11 cases are

2    not susceptible to recognition in Mexico, and you have to

3    have a do over in Mexico, even if you can get into

4    bankruptcy court in Mexico.  And so the cases we submit

5    should be dismissed under 305(a)(1) of the Bankruptcy Code.

6              Before seating the podium, I will comment only

7    briefly on the two other grounds for dismissal that will get

8    less attention during the testimony today, but will feature

9    more heavily in the closing argument.  As I commented at the

10   outset, the litigation history here compels dismissal under

11   Section 303(b)(1) of the Bankruptcy Code, because the

12   petitioning creditors' claims are subject to a bona fide

13   dispute.

14             Now the petitioning creditors have said that their

15   claim in the bankruptcy case is for their principal and

16   interest only, but that cannot be reconciled with the fact

17   that they directed the indenture trustee to issue an

18   acceleration notice purporting to seek payment of a

19   contested redemption premium.  They later directed a trustee

20   to file litigation seeking payment of the redemption

21   premium.  They litigated and filed an opposition to our

22   objection in Judge Gardephe's courtroom to the redemption

23   premium.  There is no credible dispute, and that case is

24   pending.  It's sub judice before Judge Gardephe, and there's

25   no credible dispute, we submit, that there is a bona fide
```

Page 25

1    dispute as to the amount of the claim.

2          Returning finally to Section 1112(b), I'll add

3    only one final point to what's already been said.  So not

4    only is this a two-party dispute with three beneficial

5    holders under a single indenture, these specific holders are

6    actually investors in the litigation that was brought in,

7    that was pending before Judge Gardephe.  And I'll explain

8    what I mean by that, if you turn to Page 7 of the opening

9    deck.  So the first missed interest payment on these bonds

10   was February 9, 2021.  That was also the day TV Azteca

11   announced that it was going to repay a portion, about a

12   quarter of the CEBURES debt that Your Honor has heard about

13   in prior proceedings in this case.  The petitioning

14   creditors were in the market buying notes starting the day

15   after if you look at the petitions that were filed in

16   connection with the involuntary petitions here, and they

17   continued to buy after acceleration, continued to buy after

18   litigation was commenced, continued to buy after the

19   briefing was being submitted before Judge Gardephe.  And

20   that is summarized and reflected on Slide Number 7.

21          So the petitioning creditors have been investing

22   in the litigation.  They're, not creditors who bought in the

23   initial issuance at par, were surprised by subsequent

24   events.  These are parties who have been invested in the

25   litigation exercise, and that the right forum for this

```
1    dispute is, as I commented a few moments ago, before Judge

2    Gardephe, in Judge Gardephe's courtroom.  I's not a dispute

3    for a bankruptcy court, and it's definitely not a dispute

4    for a U.S. bankruptcy court.  We respectfully submit that

5    for these reasons and others that will be addressed in the

6    course of these proceedings, these petitions should be

7    dismissed.  Thank you, Your Honor.

8              THE COURT:  Thank you, Mr. Clareman.

9              MR. QURESHI:  Good morning, Your Honor.

10             THE COURT:  Good morning.

11             MR. QURESHI:  For the record, Abid Qureshi, of

12   Akin Gump, on behalf of the petitioning creditors and

13   trustee.  Your Honor, we too have a few slides I'd like to

14   take the Court through on opening, if I may approach.

15             THE COURT:  Yes.  Thank you.

16             MR. QURESHI:  Your Honor, I have marked our

17   demonstrative just for identification purposes as PX-1.  And

18   so with that, Your Honor, I would like to use the short

19   opening that we have a little bit differently than Mr.

20   Clareman.  First, I want to just level set on the undisputed

21   facts.  As Your Honor heard this morning, all the exhibits

22   are coming in by consent.  In addition, we have a statement

23   of undisputed facts that the parties also submitted.  I'd

24   like to preview a little bit for Your Honor what the Court

25   can expect to hear from the two live witnesses that will
```

Page 27

1    testify.  And I will conclude, Your Honor, by explaining why

2    the Mexican law issues that Your Honor is going to hear so

3    much about over the next two days are, in fact, not

4    determinative of whether this court ought to abstain from

5    exercising jurisdiction.

6              So if I could ask Your Honor to turn to the first

7    slide, which is a timeline.  In fact, all of the slides are

8    timelines.  The first focuses on events that took place in

9    the United States.  So starting on the left side, Your

10   Honor, it is, of course, undisputed that in August of 2017,

11   TV Azteca came to the United States to access our capital

12   markets and to raise $400 million in unsecured notes.  It is

13   undisputed that those notes were marketed in the United

14   States.  There were roadshows, there was an offering

15   circular and there were purchasers from the United States

16   who purchased those notes.

17             It is also undisputed, Your Honor, as can be seen

18   on the timeline, that there were not one, not two, but three

19   missed interest payments, two in 2021 and the last one

20   before acceleration in February of 2022.  It will also

21   become important, Your Honor, that at no time since the

22   first missed interest payment in February of '21 has TV

23   Azteca undertaken any steps in any court to restructure its

24   obligations to the noteholders and nor are there any out-of-

25   court restructuring discussions taking place with its U.S.

Page 28

1    creditors.

2            It was in August of 2022, Your Honor, that the

3    indenture trustee accelerated the notes.  And later that

4    same month, the New York state collection action was

5    commenced.  That action was subsequently removed by TV

6    Azteca at the federal court in September of last year and in

7    March, of course, of this year, the involuntary petitions

8    were filed.  So that's what's happening here, Your Honor.

9            If we can then turn to the next slide, there were

10   a number of events going on in Mexico at the same time, many

11   of which the petitioning creditors and the indenture trustee

12   did not know about at the time.  So Your Honor, there are

13   two injunctions that will be talked about over the course of

14   the testimony.  One of those we refer to as the COVID

15   injunction.  And so before I get to the injunction itself,

16   after the missed interest payment in February, TV Azteca

17   began purchasing and retiring local peso-denominated Mexican

18   debt referred to as the CEBURES.  By September of 2022, TV

19   Azteca had purchased and retired the U.S. dollar equivalent

20   of $221 million of that debt.  And that debt, Your Honor, is

21   structurally subordinate to the notes in that although the

22   notes and the CEBURES have the same issuer, the ultimate

23   parent entity in Mexico, the unsecured notes benefit from

24   guarantees from a number of entities the CEBURES notes do

25   not.

1              So having entered the course of paying off its

2     Mexican creditors, at the same time TV Azteca began to take

3     ex parte steps in Mexico to actively prevent the U.S.

4     noteholders from seeking repayment.  So in September of

5     2022, after acceleration had occurred, TV Azteca received

6     that first ex parte injunction.  And among other things,

7     Your Honor, what that injunction provides for is that the

8     acceleration notice issued by the trustee is invalid until,

9     and I quote, "Such time as the World Health Organization

10    decrees the extinction of the pandemic known as COVID-19."

11             Fully five months after that injunction was

12    entered by the Mexican court, Your Honor, the indenture

13    trustee was served.  Five months.  At the time we were in

14    active litigation in New York court.  They never told us

15    that they had received this ex parte injunction.  They never

16    told the court that they received the ex parte injunction.

17    Once that injunction was finally served on the indenture

18    trustee, what did the indenture trustee do?  The indenture

19    trustee filed an appeal and filed a response to that

20    complaint.

21             What happened?  In May of 2023 when that was

22    filed, the Mexican court ruled that the indenture trustee's

23    response was untimely.  On May 5th, the World Health

24    Organization issued a declaration.  It did not say that

25    COVID-19 is extinct.  It said something a little different.

Page 30

1    What it said was, and again I quote, "COVID-19 no longer

2    constitutes a public health emergency of international

3    concern."  Shortly after that declaration, TV Azteca went

4    back to the same judge in Mexico, again on an ex parte

5    basis, and this time they sought and received another order

6    and this one prevented TV Azteca from publicly reporting its

7    financial results in Mexico.

8           Why?  According to the order, quote, "To avoid

9    causing uncertainty in the market."  After the World Health

10   Organization issued its proclamation declaring the COVID

11   emergency to be over, the trustee promptly moved to vacate

12   the injunction based on that order.  The noteholders and the

13   trustee also at the time of that World Health Organization,

14   Your Honor, we asked TV Azteca if they would voluntarily

15   withdraw that injunction and no steps were taken to do so.

16          Next Your Honor, the Mexican court changed its

17   mind about the timeliness of the indenture trustee's

18   response to TV Azteca's complaint.  Over the course of this

19   summer, a number of the petitioning creditors were finally

20   served with that injunction.  And most recently and, Your

21   Honor, this is the subject of the supplemental declaration

22   that went in by agreement, just on Thursday of last week,

23   the Mexican court finally ordered TV Azteca to respond to

24   the trustee's motion to vacate that injunction and that

25   response is due in two days on Wednesday.  So Your Honor,

Page 31

1      that's one injunction.

2              If I could ask Your Honor to turn to the next

3      slide, the next slide deals with the second injunction.  I

4      refer to this injunction on the slide as the July 2022

5      injunction.  It actually predates the COVID injunction.  But

6      we didn't know.  There's a theme there.  So this is another

7      ex parte injunction, Your Honor, from a different judge.

8      And what this one purports to do, and again I quote,

9      "Suspension of effects and consequences that could derive

10     from the acceleration notices."  So it purports to render

11     the acceleration notices ineffective.

12             And the second thing it does, Your Honor, and

13     again I quote, is the, quote, "Prohibition of the

14     codefendants from initiating and/or filing any proceeding,"

15     it uses those words, "Any proceeding for the collection

16     and/or payment of the notes."  Once again, in August, TV

17     Azteca one more time went back to that same judge, again on

18     an ex parte basis.  It's not like they didn't know where to

19     find us, Judge.  They went back again and they had that

20     injunction extended.

21             Remarkably this second injunction, the July

22     injunction, we only saw it in connection with discovery.

23     That's where it came to light, discovery related to this

24     motion to dismiss.  To date, we still haven't been served

25     with it.  The trustee hasn't been served with it.  The

Page 32

1    district court wasn't informed of it when we were before the

2    district court and it's undisputed that that injunction

3    remains enforced today.

4              So to just level set on the record, Your Honor,

5    U.S.-issued notes defaulted, not paid.  Subordinate Mexican

6    debt repaid in full.  Multiple injunctions received on an ex

7    parte basis and the trustee and the noteholders actively

8    doing what they can in Mexico to try to make those

9    injunctions go away, albeit and perhaps not surprisingly,

10   unsuccessfully.

11             With that, Your Honor, I would like to turn to a

12   short preview of the expert testimony that the Court will

13   hear.  Each side is offering a Mexican law expert.  I don't

14   believe there will be any disputes about the qualification

15   of these experts.  Professor Mejan, on behalf of TV Azteca,

16   is a respected academic with a long history in Model Law and

17   Chapter 15 matters.  Mr. Guerra, on behalf of the

18   petitioning creditors and the trustee, is a respected and

19   experienced practitioner in the area of Mexican concurso

20   law.  And Your Honor is going to hear widely divergent

21   opinions from these experts on a long list of issues.  I'm

22   going to highlight three for Your Honor.

23             First, whether or not an involuntary Chapter 11

24   proceeding is capable under any circumstances of recognition

25   in Mexico.  Professor Mejan will tell the Court it is not.

Page 33

1    Mr. Guerra will say the opposite.  Importantly Your Honor,

2    the experts agree that that question is an issue of first

3    impression for the Mexican courts.  Second, Your Honor will

4    hear widely divergent opinions about whether or not these

5    debtors have an establishment here in the United States, as

6    that term is defined under Mexican law.  Professor Mejan

7    says they do not.  Mr. Guerra says that they do.  This too,

8    Your Honor, in the facts of this case is an issue of first

9    impression for the Mexican courts.  Third, Your Honor is

10   going to hear opinions as to whether the petitioning

11   creditors would be able, in the face of the injunctions that

12   I just reviewed for the Court, to commence an involuntary

13   concurso in Mexico.  Again, Professor Mejan says not a

14   problem, yes, they can.  Mr. Guerra says no, the injunctions

15   clearly would prohibit that.

16          Now as Your Honor hears testimony about all of

17   these issues, it's important to bear in mind one important

18   thing.  Professor Mejan, his opinion that recognition is not

19   possible in Mexico, it is premised on the assumption that TV

20   Azteca does not cooperate, that everything that happens here

21   happens over their objection.  Now whether it is true or not

22   that that is what would happen, that TV Azteca would never

23   cooperate, only the folks on this side of the courtroom know

24   the answer to that question, Your Honor.  We do not.  But

25   what we do know is that Professor Mejan will say if TV

Page 34

1    Azteca did consent to a plan, whether one proposed by the

2    petitioning creditors or if they proposed their own plan,

3    recognition of this proceeding is possible in Mexico.

4            So his opinion that an involuntary Chapter 11 is

5    incapable of recognition flows directly from TV Azteca's

6    decision to do everything in its power to avoid its

7    obligations to U.S. creditors.  We don't think that's right

8    under Mexican law either, Your Honor.  And you'll hear why

9    from Mr. Guerra.

10           With respect to the opinion about the injunctions

11   and whether those injunctions do or do not prevent an

12   involuntary concurso in Mexico, think about these facts,

13   Your Honor.  At the same time as TV Azteca is taking step

14   after step on an ex parte basis in the Mexican court to get

15   injunction after injunction to get it extended to prevent

16   the publication of any financial records, at the same time

17   as they are doing that, they bring an expert before Your

18   Honor to say, just kidding, those injunctions are not going

19   to stop the petitioning creditors from commencing an

20   involuntary concurso.  I'm sorry, Your Honor, and I don't

21   say this lightly.  They're playing games.  That's just

22   ridiculous on its face.  But that is their position.

23           Pivoting for a moment to another issue Your Honor

24   will hear a lot about in the cross-examination of Mr.

25   Guerra, I expect Your Honor will hear a whole lot of

1    questions about equitization of the note claims and whether

2    that is something that is permissible under Mexican law.  To

3    be clear, Your Honor, there is no plan that is being

4    proposed by the petitioning creditors to equitize the note

5    claims.  Yes, we said in one of our briefs that equitization

6    and/or reinstatement would be among the possibilities that

7    the petitioning creditors might consider if these cases are

8    accepted, if TV Azteca decides not to file its own plans and

9    we subsequently move to terminate exclusivity and propose

10   our own.

11           But Your Honor, absent any, and I mean any

12   financial information from these debtors, and we have none

13   because the debtors have seen to it that we have none, we

14   are clearly not in a position to propose in detail any plan

15   of reorganization.  And so the time they will spend with Mr.

16   Guerra on whether equitization is or is not feasible in

17   Mexico is irrelevant.

18           So Your Honor might quite rightly be wondering, is

19   it really the case that the parties before you today are

20   asking this court to decide Mexican law issues, that in

21   Mexico are issues of first impression?  Are we really

22   saying, Judge, you need to make those findings in order to

23   decide this dispute?  Well, the answer for the petitioning

24   creditors is categorically, no, we are not.  We do not

25   believe that whatever determination Your Honor makes on the

Page 36

1    Mexican law issues should cause this court to abstain from

2    exercising jurisdiction over these cases.

3           In the case of TV Azteca, however, I think they

4    are relying entirely on Your Honor making findings of

5    Mexican law on these issues and we don't think there's a

6    basis for the Court to do that.  Your Honor, whether or not

7    Mexican law allows for recognition of an involuntary Chapter

8    11 under any circumstances, again, it just does not go to

9    the abstention issues.  Importantly, Your Honor, TV Azteca

10   is not contesting this court's jurisdiction over these

11   cases.  Instead, they are asking the court to abstain.  As

12   Your Honor knows, and as we've cited in the case law, they

13   face a heavy burden in convincing the court to abstain.

14          As Judge Marrero put it, in a decision in Globo

15   Comunicacoes, a decision Your Honor is going to hear much

16   more about at closing, he was sitting on appeal from a

17   ruling from the Bankruptcy Court, and he said that the

18   Bankruptcy Court has, and I quote, "A virtually unflagging

19   obligation to exercise the jurisdiction given it."

20          Now in Globopar, like in this case, the foreign

21   debtor was not cooperating with the involuntary Chapter 11

22   case.  Judge Marrero stated as follows with respect to that

23   issue: "Globopar's cooperation would be desirable, but it is

24   not mandated.  Otherwise the Bankruptcy Code would contain

25   no provision for involuntary bankruptcy petitions."

Page 37

1          It cannot be the case, Your Honor, the TV Azteca

2    can use its own lack of cooperation as the basis for this

3    court to abstain from exercising jurisdiction.  It just

4    doesn't make sense.  But that's exactly what they are asking

5    this court to do.  It can't be the case that through their

6    willful lack of cooperation, their deliberate and repeated

7    attempts to avoid their obligations to U.S. creditors that

8    they can thereby satisfy their burden of establishing that

9    abstention is inappropriate.

10          Your Honor, I'll end with one last quote from

11   Judge Marrero in Globopar.  He said, quote, "One of

12   Congress's objectives in adopting the involuntary petition

13   provision of the Bankruptcy Code, 11 USC 303, was to provide

14   a means by which United States creditors could have their

15   claim to the assets of a debtor vindicated in a timely and

16   fair manner.  That is precisely the purpose of these

17   involuntary petitions, nothing less."

18          Your Honor, we firmly believe that sunlight is the

19   best disinfectant and this is a case that is crying out for

20   sunlight.  The U.S. creditors have every right under the

21   involuntary petitions of the Code to force these debtors

22   into a Chapter 11 proceeding.  It's a situation that cries

23   out for oversight of this court.  Unless the Court has any

24   questions, that's all I have.

25          THE COURT:  Thank you, Mr. Qureshi.

Page 38

1           MR. QURESHI:  Thank you.

2           THE COURT:  All right.  Mr. Clareman, we'll turn

3      to the evidentiary portion.  Just a question for you.  Are

4      you planning on using your interpreter?  I only ask because

5      if you are, I actually have to swear the interpreter in, in

6      addition to the witness.

7           MR. CLAREMAN:  We are not planning.

8           THE COURT:  Okay.  Didn't know.  It wasn't clear

9      from yesterday, the other day when we spoke.

10          MR. CLAREMAN:  So Your Honor, we will call as our

11     first witness Professor Luis Manuel Mejan.  His direct

12     testimony is in the form of declarations, JX-29, 37 and 64.

13     And Professor Mejan is here and available for cross-

14     examination.

15          THE COURT:  I'm sorry.  Just give me one second.

16     So 29, 37 and sorry, what?

17          MR. CLAREMAN:  Sixty-four.

18          THE COURT:  Sixty-four.  Okay.  Just want to make

19     sure.  I've read them but didn't remember their numbers.

20     Okay.  All right.  So I assume you're going to call

21     Professor Mejan to the stand and then I can swear him in

22     officially and we can proceed accordingly.

23          MR. CLAREMAN:  Yes.  So TV Azteca calls Professor

24     Mejan to the stand.

25          THE COURT:  Good morning.

```
1               MR. MEJAN:  Good morning, Your Honor.

2               THE COURT:  Good morning.  Very nice to meet you.

3       All right.  Professor Mejan, could you go ahead and raise

4       your right hand, please?  Do you swear that all the

5       testimony you're about to give before this court will be the

6       truth, the whole truth and nothing but the truth?

7               MR. MEJAN:  Yes, I do.

8               MR. CLAREMAN:  Your Honor, I'll cede the podium to

9       Mr. Qureshi unless there's any preliminaries that you would

10      like to address.

11              THE COURT:  Yeah.  I mean, I think I presume you

12      want me to go ahead and admit the three declarations into

13      evidence.

14              MR. CLAREMAN:  Yes.  Well, actually, let me

15      address more broadly as a housekeeping matter --

16              THE COURT:  Yes.

17              MR. CLAREMAN:  -- I believe we should move by

18      stipulation all of the exhibits into evidence --

19              THE COURT:  Okay.  That's fine.

20              MR. CLAREMAN:  -- to make things easier.

21              THE COURT:  Okay.  That's fine.  So we will -- I

22      accept the -- obviously, the parties have moved jointly for

23      that.  They're all admitted into evidence.  I believe that's

24      Exhibits, oh, gosh, 1 through -- where are we -- we had some

25      extra ones -- 392 plus the additional ones today, plus the
```

Page 40

1    binder which is --

2              MR. CLAREMAN:  Yeah.  Oh, no, they're not.

3    They're on the docket.  They are --

4              THE COURT:  -- 395.

5              MR. CLAREMAN:  ECF 61.

6              THE COURT:  Okay.  All right.  So before we go, I

7    just have one other question, which is a good question.

8    Obviously we've read the unredacted versions of these

9    declarations.  There are some provisions of different

10   parties declarations being under seal.  Obviously there were

11   some elements here relating to the Mexican litigation,

12   interest or otherwise, that where some things were redacted.

13             So my question is, do we have any issues with

14   that, with the testimony?  Are you going to let us know when

15   you're going to get to something that's confidential?

16             MR. QURESHI:  Yes.

17             THE COURT:  That's true for you, Mr. Qureshi, on

18   your cross-examination?

19             MR. QURESHI:  Yes.

20             THE COURT:  And then we can go ahead and mark the

21   record as confidential because we're going to need to do

22   that for purposes of our record.  And then when we're

23   finished and we're going off, we're going to have to do

24   that.  That also goes to people in the courtroom.  Is there

25   anybody in the courtroom that's actually not a party to the

1    protective order?  That's a question I have.  I don't know.

2            MR. QURESHI:  So Your Honor, sorry, if I may,

3    again, for the record, Abid Qureshi.  I think I will manage

4    and I will tread very carefully to get through the cross-

5    examination without having to refer to anything that is

6    redacted.

7            THE COURT:  Okay.  That's fine.

8            MR. QURESHI:  Should that change based upon how

9    the cross-examination unfolds, we will hit the pause button

10   and figure out how to address it.

11           THE COURT:  Okay, and I have to ask one other

12   question related to that.  I actually am not sure who's on

13   the phone.  I guess I can look at my list and see if I

14   actually have a list.  So I don't know if there's any issues

15   with that.  Obviously if you don't go into confidential

16   information, it's not a problem.  If we do need to, I have,

17   as I think mentioned before, had to actually, I guess,

18   disconnect.

19           It looks to me like everybody we have listed here

20   though, however, from TV Azteca, it looks like they're, I'm

21   guessing, related to TV Azteca or related to Diamond, who I

22   presume is also a party to the protective order.  I believe

23   we actually have one person on from Debtwire, so actually

24   two, it looks like, that I can see, and one from Reorg

25   Research, it looks like actually too.  So if we do get into

1    anything, we will have to stop so that we can actually

2    disconnect our phone.  And I'm sorry for your clients for

3    that reason, who are on listen-only because that's really

4    going to be difficult otherwise.  And then we can reconnect

5    when we pass out of the confidential section of the

6    testimony.  So I just wanted to make sure that that was

7    clear for the record.  Again, I understand you all hope you

8    won't get there, and that's fine.  But if you are, we're

9    going to need to do that just because obviously you have a

10   protective order for a reason in this case.

11            MR. QURESHI:  Yes.

12            THE COURT:  Okay.  Thank you.

13            MR. CLAREMAN:  Yeah, and just to address it, I

14   believe that the redactions that are in the expert

15   declarations pertain to one of the Mexican litigations.

16            THE COURT:  Yes.

17            MR. CLAREMAN:  And we've agreed that those matters

18   can be addressed in open court.  The petitioning creditors

19   remain subject to the protective order, which affects their

20   ability to use those documents in Mexico.  But we have

21   agreed that they can be addressed in open court without

22   regard to the redactions or confidentiality designations

23   that might otherwise require --

24            THE COURT:  Okay, and you don't have a problem

25   with that if we end up doing that with the press?  That's

Page 43

1   why I'm asking.

2            MR. CLAREMAN:  Yes.  Yes.

3            THE COURT:  Okay.  As you know, we have open

4   courts here in the United States.

5            MR. CLAREMAN:  Yes.  Yes.

6            THE COURT:  Okay.  Let's see.  No, I'm just

7   leaving this here.  Okay.  All right.  So I think we've now

8   gone ahead and admitted the declarations and all the

9   evidence into -- and all the various exhibits into evidence.

10  So I think parties can proceed.  Was there something else

11  you wanted to raise before Mr. Qureshi cross-examines the

12  witness?

13           MR. CLAREMAN:  Yes, just one other housekeeping

14  matter.  The parties have filed at ECF 61 a joint

15  stipulation of undisputed facts.

16           THE COURT:  Yes.

17           MR. CLAREMAN:  And that should also be considered

18  part of the record, the evidentiary record for this

19  proceeding.

20           THE COURT:  Yes, that's fine.  And of course, the

21  Court will accept that into evidence.  I can't recall the

22  top of my head if that had also any redactions, but

23  obviously, if you're going to refer to it -- I don't think

24  it did.

25           MR. CLAREMAN:  It did.

Page 44

1              THE COURT:  It did?  If it's going to refer to

2      anything, I'm just warning people this might be a problem

3      more for argument than for when we're cross-examining

4      witnesses, but just noting same problem.  If you're going to

5      refer to something specifically that's actually subject of

6      the redaction, then we will need to clear off the parties

7      that are not able to participate.

8              MR. CLAREMAN:  Yes.

9              THE COURT:  Obviously that doesn't appear to be

10     anyone in court, but it does appear to be on the telephone.

11             MR. CLAREMAN:  Yes, and I believe that the

12     redactions there are related to the Mexican litigation issue

13     that I addressed before --

14             THE COURT:  Right.

15             MR. CLAREMAN:  -- so for purposes of needing to

16     clear the courtroom, that will not be an issue.

17             THE COURT:  Okay.  All right.  That's fine.

18     Again, it's not limited obviously here in our courts to the

19     party.  So I want to make sure that there's not an issue

20     because, albeit as I understand, I believe the trading of

21     the stock has been suspended, that doesn't mean, of course,

22     that there aren't parties that have an interest in it in the

23     markets, whether the markets in Mexico, for example, as well

24     as the bond markets here in the United States.  So there are

25     reasons for concern.

Page 45

```
 1              MR. CLAREMAN:  Understood.

 2              THE COURT:  All right.

 3              MR. CLAREMAN:  Thank you, Your Honor.

 4              THE COURT:  All right.  Mr. Qureshi?

 5              MR. QURESHI:  Thank you, Your Honor.  We have

 6     prepared some witness binders just to make it a little

 7     easier to direct the witness to documents.  They just

 8     consist of a subset of exhibits that I plan to use.

 9              THE COURT:  Okay, and the other side has seen

10     them?

11              MR. QURESHI:  They're going to get a copy.

12              THE COURT:  Okay.

13              MR. QURESHI:  It's just the subset of the --

14              THE COURT:  That's fine.

15              MR. MEJAN:  Thank you.

16              THE COURT:  Thank you.

17              CROSS-EXAMINATION OF LUIS MANUEL C. MEJAN

18     BY MR. QURESHI:

19     Q    Professor Mejan, good morning.

20     A    Good morning, Mr. Qureshi.

21     Q    Nice to see you again.  Sir, we handed you a binder,

22     and that binder contains a number of exhibits that I plan to

23     refer to today.  If we can start with turning to the reply

24     declaration that you've submitted in this case, that is JX-

25     037.
```

Page 46

```
 1    A     037, yes.

 2    Q     And in particular, sir, I would like to direct you to

 3    Page 18, and specifically to Paragraph 34 on Page 18.  Is

 4    that binder already falling apart?

 5    A     Kind of.  Thirty-four.  Yes.  Okay.

 6    Q     Do you have Paragraph 34 before you, sir?

 7    A     Yes.

 8    Q     Okay, and I would like to direct your attention to the

 9    second half of that paragraph.  And you write in that

10    paragraph, a Mexican bankruptcy court cannot recognize a

11    foreign main proceeding in the absence of a foreign main --

12    I'm sorry, I misread it.  Let me try that again.  A Mexican

13    bankruptcy court cannot recognize a foreign non-main

14    proceeding in the absence of a foreign main proceeding

15    because, by its very nature, the former is intended to be

16    ancillary to the latter.  That is your expert opinion,

17    correct?

18    A     Yes.

19    Q     Okay, and so what you are saying is, under the LCM --

20    first of all, the LCM is how we refer to the concurso law,

21    correct?

22    A     Correct.

23    Q     So you will understand what I mean when I say LCM?

24    A     Yes.

25    Q     And your opinion is that under the LCM, it is
```

Page 47

 1    impossible for a foreign non-main proceeding to be

 2    recognized unless there is also a foreign main proceeding

 3    somewhere, correct?

 4    A    That's my understanding.

 5    Q    And am I also correct, sir, that the LCM itself does

 6    not expressly contain that requirement anywhere?

 7    A    No.

 8    Q    Okay.  Instead, you arrive at that conclusion by

 9    extracting from other provisions of the LCM, correct?

10    A    Yes.

11    Q    Okay, and you agree with me, sir, do you not, that the

12    Model Law -- I'm sorry, let me step back.  You're familiar

13    with the Model Law, correct?

14    A    Yes, I'm familiar.

15    Q    And the Model Law, just for the record, it's at JX-048.

16    It's also in the binder in front of you.  And you agree with

17    me, Professor, do you not, that the Model Law does not

18    anywhere contain a requirement that a foreign non-main

19    proceeding can only be recognized if there is also a foreign

20    main proceeding?  It doesn't say that, does it?

21    A    Yes, that's correct.

22    Q    Okay, and you're also aware, I take it, Professor, that

23    the Model Law comes along with what is referred to as a

24    "Guide to Enactment"?

25    A    Yes.

Page 48

1    Q    It's in the same exhibit that I just referred to, JX-

2    048.  And do you agree with me, sir, that the "Guide to

3    Enactment" that accompanies the Model Law also does not

4    suggest that a foreign main proceeding can only be

5    recognized -- I did it again.  Let me clean that up.  Do you

6    agree with me, sir, that the "Guide to Enactment" that

7    accompanies the Model Law does not suggest that a foreign

8    non-main proceeding can only be recognized if there is also

9    a foreign main proceeding?

10   A    With that precise express words, I agree with you.

11   Q    Okay.  In fact, the "Guide to Enactment" says the

12   opposite, doesn't it?

13   A    No.  It doesn't say so.

14   Q    Okay.  So turn, please, to the "Guide to Enactment,"

15   again, it's JX-48 in your binder.  And I'd like to turn to

16   Page 112 and in particular to Paragraph 234.  Sir, do you

17   see Paragraph 234 here?

18   A    Yes.

19   Q    So let's focus on Page 112 for a minute.  Let's look

20   first.  You can see in the box on that page is reproduced

21   Article 30 of the Model Law, correct?

22   A    Yes.

23   Q    Let me step back.  You understand that the LCM, the

24   Mexican concurso law, it implements into Mexican law the

25   Model Law in the same way that Chapter 15 here in the United

1    States implements the Model Law into U.S. law.  That's your

2    understanding?

3    A    There are some differences.

4    Q    Of course, but generally the purpose --

5    A    Generally, yes.

6    Q    Okay.  So looking at Article 30, and in particular to

7    Subparagraph B of Article 30 --

8    A    B?

9    Q    B as in boy.  It says, if a foreign main proceeding is

10   recognized after recognition or after the filing of an

11   application for recognition of a foreign non-main

12   proceeding, any relief in effect under Article 19 or 21

13   shall be reviewed by the foreign court.  You're familiar

14   with that position, correct?

15   A    Yes.

16   Q    Okay.  Now let's look at Paragraph 234.  You understand

17   that Paragraph 234 is commentary on the Model Law, correct?

18   A    Yes.

19   Q    Okay, and go over, please, to Page 113.

20   A    Yeah.

21   Q    And in the middle of that paragraph, there is the

22   following sentence: under Article 29, which, as a matter --

23   I'm sorry.  I'm having trouble reading today.  Are you

24   there?  It begins, unlike Article 29, it's about four lines

25   down on the top of Page 113.

Page 50

1    A    Okay.  I have it.

2    Q    You found it.  Okay, and what it says is, quote,

3    "Unlike Article 29 (which as a matter of principle gives

4    primacy to the local proceeding) Article 30 gives preference

5    to the foreign main proceeding, if there is one."  See those

6    words?

7    A    Yes.

8    Q    So do you agree with me that the Model Law expressly

9    contemplates that there could be a non-main proceeding in

10   the absence of a main proceeding?

11   A    No.  May I elaborate?

12   Q    No, that's fine.

13   A    Okay.

14   Q    If you disagree, you can disagree.  That's quite all

15   right.  Do you know whether Chapter 15 in the United States

16   has been interpreted to require that a foreign non-main

17   proceeding can only be recognized if there's also a foreign

18   main proceeding?

19   A    I'm not an expert on U.S. law, so I cannot make an

20   opinion about this --

21   Q    Okay.  So you don't know one way or the other, do you?

22   A    Yes.  No, I don't know.

23   Q    Okay.  Well, would you be surprised to learn that

24   that's not the law in the United States?

25   A    Say that again, please.

Page 51

1    Q    You know what?  I'll do it a different way.  I'm going

2    to hand up another document.  I will mark for identification

3    PX-2, which is a case that's not being offered into

4    evidence.

5            MR. QURESHI:  Your Honor, may I approach?

6            THE COURT:  Yes.

7            THE WITNESS:  Thank you.

8            THE COURT:  Is this a Mexican law case?

9            MR. QURESHI:  No.  It's a U.S. case.

10           MR. CLAREMAN:  Your Honor, I --

11           THE COURT:  Okay.  I can see why you're going to

12   be raised -- why Mr. Clareman's jumping up here.

13           MR. CLAREMAN:  Yeah.  Your Honor, if I may object

14   to the use of this case, it's certainly beyond the scope of

15   the direct set forth in the declarations of Professor Mejan.

16   He's not proffered as an expert on U.S. law, and therefore I

17   object to both the exhibit and the line of questioning about

18   this case.

19           THE COURT:  Okay.  Mr. Qureshi?

20           MR. QURESHI:  Sure.  Your Honor, the Model Law,

21   which the LCM purports to implement into Mexican law, has

22   provisions in the Model Law that talk about how the Model

23   Law is to be interpreted.  And those provisions expressly

24   reference how the Model Law is interpreted in other

25   countries.  There is reference in the Model Law and in the

Page 52

1    "Guide to Enactment" to a database provided by UNCITRAL,

2    created by UNCITRAL, the purpose of which is to have

3    opinions from other countries interpreting the Model Law

4    available.

5            THE COURT:  I think then, you have to do some

6    foundational questions.

7            MR. QURESHI:  Sure.

8            THE COURT:  If this is where you're going.  I

9    think you have to ask the witness if he's familiar with it,

10   if he reviews it regularly, what experience he has with it,

11   and then we're going to get to this case if he's ever seen

12   it before because if the answer is no, there's nothing to

13   ask him about.

14           MR. QURESHI:  Okay.  Fair enough.  Well, then, in

15   that case, Your Honor, I will not use the case because I'm

16   sure he has not seen it.

17           THE COURT:  Oh, who knows?

18           MR. QURESHI:  Yeah.

19           THE COURT:  But this is not an unknown case in our

20   district.  But that doesn't mean that he's seen it.

21           MR. QURESHI:  Right.

22   BY MR. QURESHI:

23   Q    Well, Professor Mejan, let me ask you this.  Are you --

24   and this is in your CV.  You are a member of a number of

25   professional organizations, correct?

Page 53

1    A    That's correct.

2    Q    One of them is the International Insolvency Institute,

3    correct?

4    A    Yes.

5    Q    And that institute has as members a number of academics

6    like yourself, correct?

7    A    Yes.

8    Q    Okay, and do you generally follow academic literature

9    on the Model Law?

10   A    Yes.

11   Q    Okay, and are you familiar with any articles that

12   address this question of whether the Model Law requires the

13   existence of a foreign main proceeding in order for there to

14   be a foreign non-main proceeding?

15   A    An academic article, you say?

16   Q    Yes.

17   A    No, I'm not aware if there is one.

18   Q    You don't know whether there are, so you're not

19   familiar with one.

20   A    Yes.

21   Q    Okay.  All right.  Sir, let's turn to a few provisions

22   of the LCM.

23        MR. QURESHI:  And Your Honor, so for the record,

24   with respect to the LCM, in his witness binder at JX-43 is

25   an agreed upon translation, and that translation is one

Page 54

1    provided publicly by the Mexican government.  I believe it's

2    by the Central Bank.  For convenience, I have also included

3    in the witness binder for the witness, as we did in the

4    deposition, a Spanish version.

5              THE COURT:  Okay.

6              MR. QURESHI:  Just to the extent he's more

7    comfortable looking at both versions.  But obviously my

8    questions will focus on the English version, and that's at

9    JX-43.

10   BY MR. QURESHI:

11   Q    Professor, let's start by referring to Article 296,

12   which appears at Page 72.  Just let me know when you have

13   that page in front of you, sir.

14   A    I have it.  Yes.

15   Q    Professor, just again, for your convenience, the prior

16   document in your binder, 42, that has the Spanish version,

17   if you ever never to refer to that.

18   A    Okay.  I have here the English version.

19   Q    Okay, and just to get some terminology out of the way,

20   you agree, right, that where in this translation it uses the

21   words principal foreign procedure, that's the same thing as

22   what we've been calling foreign main proceedings?

23   A    Foreign main.  Yes.

24   Q    And non-principal foreign procedure is the same thing

25   as foreign non-main proceeding, correct?

Page 55

1    A    Correct.

2    Q    And where the statute uses the word merchant, you

3    understand that to be the same as debtor?

4    A    Yes.

5    Q    Okay, and finally, in this provision, where there is

6    reference to the center of principal interests, you

7    understand that to be the same thing as the center of main

8    interests or COMI, correct?

9    A    COMI.  Yes.

10   Q    Okay.  So now let's turn for a moment to Article 283,

11   and that is on Page 70 of this exhibit.

12   A    Yes.

13   Q    And you understand, right, that Article 283 provides

14   that nothing in the LCM may be interpreted in a way that is

15   contrary to, among other things, fundamental principles of

16   law that rule --

17   A    Not in -- not in this title.

18   Q    I'm sorry?

19   A    The text is none of what is set forth in this title.

20   Q    Right.

21   A    Not in the LCM in general.

22   Q    Okay.  I'm sorry, you are correct.

23   A    Okay.

24   Q    In this title shall be interpreted in a way that is

25   contrary to, among other things, fundamental principles of

Page 56

1    law that rule in the Mexican Republic, correct?

2    A    Yes.  Yes.

3    Q    Okay.  Now let's go back to Article 296.  And I

4    apologize, sir, there will be a lot of back and forth as we

5    flip through provisions.  Let's focus on the first line of

6    296, and what it says is, except for what is set forth in

7    Article 281 of this law, a recognition shall be granted to a

8    foreign procedure when, and then there are four subsections.

9    Do you see that?

10   A    Yes.

11   Q    Okay, and I want to focus on the word shall.  Do you

12   agree with me that shall is mandatory language?  Meaning, if

13   the requirements that are set forth below are satisfied,

14   subject to Article 283 being consistent with fundamental

15   principles of Mexican law, then recognition shall be granted

16   by the court, correct?

17   A    Yes.

18   Q    Okay.

19   A    Subject to 283.

20   Q    Correct.  Okay.  So now I'd like to go through the four

21   requirements that are listed in Article 296 for recognition.

22   And the first one simply requires that there be a foreign

23   procedure; that is, a legal procedure in the sense of

24   Subsection 1 of Article 279 above.  Happy to refer to that

25   subsection, but, Professor, you agree with me, don't you,

1    that a Chapter 11 proceeding can be a foreign procedure, as

2    that term is used in Article 296, Subsection 1?

3    A    Yes.

4    Q    Now let's go to the second requirement of Article 296,

5    and that one is the requirement that the foreign

6    representative that requests the recognition is a person or

7    an organization in the sense of Subsection 4 of the cited

8    Article 279.  Now again, you agree with me, do you not, sir,

9    that a foreign representative of this Chapter 11 proceeding

10   could meet the requirements of being a foreign

11   representative, as required here?

12   A    Yes.

13   Q    Okay.  Now let's go to the third provision in Article

14   296.  And the third provision, Professor, that in turn

15   requires compliance with three other provisions of the LCM,

16   292, 293 and 294, correct?

17   A    Yes.

18   Q    Okay.  So let's refer to those.  Let's start with 292.

19   So if you can go back to Page 71.  Are you with me,

20   Professor?

21   A    Yes.

22   Q    Okay, and what Article 292 does is it sets forth the

23   various documents that need to accompany a request for

24   recognition by the foreign representative, correct?

25   A    Yes.

1    Q    And I take it, Professor, you're not aware of any

2    reason why a foreign representative in this case could not

3    meet the requirements of Article 292?

4    A    Well, I don't know whether he can get the certified

5    copies or the certificate issued by the court.  That resides

6    on the court to decide, not on the foreign representative.

7    Q    Okay.  So if the foreign representative is able to get

8    from the U.S. court certified copies of the things

9    identified in Article 292, you agree with me that the

10   foreign representative of this proceeding could comply with

11   Article 292?

12   A    Yes.

13   Q    Okay.  Now let's go back again to 296.  This is

14   Subsection 3, and it refers next to Article 293, correct?

15   A    Yes.

16   Q    Okay.  So let's go to 293.  Article 293 appears on the

17   very bottom of Page 71.

18   A    Yes.

19   Q    And what Article 293 provides in part is when the

20   recognition of a foreign procedure is requested in respect

21   of a merchant that has an establishment in Mexico, the

22   provisions of Chapter 4 of Title 1 of this law must be

23   observed, including those relative to the imposition of

24   injunctive reliefs and precautionary measures, correct?

25   A    Yes.

Page 59

1   Q    Okay, and you agree with me, correct, that the TV

2   Azteca entities that are debtors in this proceeding, they

3   all have an establishment in Mexico, as that term is used in

4   Article 279, correct?

5   A    Yes.  I would say it has more than establishment.  A

6   COMI.

7   Q    In light of the fact that the debtors here have at

8   least an establishment and, in your view, a COMI, do you

9   agree with me that this Chapter 11 proceeding would comply

10  with Article 293?

11  A    Yes.

12  Q    Okay.  Now let's turn back to 296 one more time and the

13  last subsection that is referenced in 296, Subsection 3, is

14  Article 294, correct?

15  A    Yes.

16  Q    Okay.  So let's go to 294.  It's directly above on the

17  same page.  And you agree with me, do you not, that Article

18  294 is only applicable in the case of a foreign debtor that

19  does not have an establishment in Mexico, correct?

20  A    Yes.

21  Q    And so Article 294 is not applicable to this foreign

22  proceedings, correct?

23  A    Yes.

24  Q    And therefore, sir, you agree with me that these

25  Chapter 11 cases are capable of meeting all of the first

Page 60

1    four enumerated subsections of Article 296, correct?

2    A    Yes.

3    Q    Okay.  Now let's go on to the next part of 296.  What

4    it says next is, right, if the prior subsections are

5    satisfied, the foreign procedure shall be recognized.  And

6    again, it uses the word shall, correct?

7    A    Yes.

8    Q    And you agree with me that shall is a mandatory word?

9    A    Mandatory is the consequence, yes.

10   Q    Okay, and it then has two possibilities.  As a foreign

11   main proceeding or, and it uses the word or, a foreign non-

12   main proceeding, correct?

13   A    Yes.

14   Q    And so you understand that by use of the word or in

15   this section of the statute, if the requirements for

16   recognition above are met, the foreign proceeding must be

17   recognized as either one or the other.  A foreign main or a

18   foreign non, right?

19   A    One or the other.  Yes.

20   Q    And Professor Mejan --

21   A    Or none of them.

22   Q    I'm sorry?

23   A    Okay.  No.  Go ahead.  I'm sorry.

24   Q    No, no.  Please.

25   A    No, because there is a third possibility, avoiding the

Page 61

1    chapter of this second paragraph.  It's a case where the

2    foreign procedure shall not be recognized.  It doesn't meet

3    neither of those two possibilities.

4    Q    Okay.  So you're referencing the Shakur case?

5    A    No.  No.  I'm not referencing --

6    Q    I'm sorry.  I didn't hear you.

7    A    No, I'm not referencing that case.  What I'm saying is

8    that the court asked to recognize the foreign proceeding,

9    finds that the debtor doesn't have a center of main interest

10   in the foreign country, and nor it has an establishment in

11   the foreign country, then the foreign proceeding won't be

12   recognized.

13   Q    So Professor, despite our agreement that this Chapter

14   11 proceeding is capable of satisfying all of the

15   requirements that we just reviewed of Article 296, and

16   despite your agreement that Article 296 uses mandatory

17   language, it says shall be recognized --

18   A    Yes.

19   Q    -- your expert opinion is that this Chapter 11

20   proceeding cannot be recognized at all in Mexico, whether as

21   a foreign main or a foreign non-main proceeding, correct?

22   A    Correct.

23   Q    Okay.  All right.  Sir, before we move on to another

24   section, do you have some water up there?  Do you need some?

25   A    No.  I'm good.

Page 62

1    Q    You're good.  Okay.  So let's go to another provision

2    of the LCM, which is Article 279, and that is on page -- I'm

3    sorry.  Article 279, which is the definition of

4    establishment.  And that definition, sir, appears on Page

5    70.  So 279 starts on Page 69, and it's subsection Roman

6    Numeral (vi), which is on Page 70.  And that is where the

7    definition of establishment appears.  Do you see that?

8    A    Yes.

9    Q    Okay, and your expert opinion is that this Chapter 11

10   proceeding cannot meet the requirements of a foreign non-

11   main proceeding because the alleged debtors do not have an

12   establishment, as that term is defined in this article,

13   correct?

14   A    Correct.

15   Q    Okay, and let's turn for a minute to your opening

16   expert report, if you could.  It is JX-29.  It's in your

17   binder.

18   A    Thirty-nine?

19   Q    Twenty-nine.

20   A    Twenty-nine.

21   Q    JX-29.  Do you have it?

22   A    Yes.

23   Q    Okay.

24   A    Which --

25   Q    Fifty-five.  And that appears on Page 22.  You have

Page 63

1    that?

2    A    Yes.

3    Q    Okay.  So in that paragraph, you give the opinion that

4    the Mexican court would not recognize the involuntary case

5    as a non-main for several reasons, and I want to refer to

6    the first one.  You write, first, based on the Rodriguez

7    declaration, I do not believe the alleged debtors maintain

8    an establishment in the United States, or at a minimum, it

9    would be contested that any establishment exists in the

10   United States because there are no offices or employees

11   there.  That's your opinion, right?

12   A    Yes.

13   Q    And you rely for that opinion solely on the Rodriguez

14   declaration?

15   A    Yes.

16   Q    Okay, and you added a parenthetical in what I just

17   wrote, what I just read, and in the parenthetical, you

18   write, or at a minimum, it would be contested that any

19   establishment exists in the United States, right?  You put

20   that in parentheses, correct?

21   A    Yes.

22   Q    Okay, and the reason you added that parenthetical to

23   your opinion is that you recognize that there is a

24   possibility that the Mexican Court could disagree with you,

25   correct?

Page 64

1    A    Yes.

2    Q    Okay.  Now as stated in this paragraph, the reason you

3    give for the lack of an establishment is the lack of offices

4    or employees in the United States, correct?

5    A    Yes.

6    Q    And when you use the word offices in this paragraph of

7    your opinion, you mean a physical location, correct?

8    A    Yes.  Correct.

9    Q    And when you use the word employees in Paragraph 55,

10   you mean direct employees of TV Azteca, correct?

11   A    Yes, that's the meaning of employees.

12   Q    Okay.  So let's go back --

13   A    It's more than that, but okay.

14   Q    Please.

15   A    Yes.  Yes.  No.  This is part of the definition of

16   establishment.

17   Q    Very well.  So let's go back to that.

18   A    Okay.  So --

19   Q    I'm sorry.  I didn't mean to cut you off.  Keep going.

20   A    Okay.  So the definition of establishment is a large

21   one.  You already pointed in the LCM, and when it uses terms

22   like offices or employees, it refers to human means or goods

23   in general.

24   Q    So Professor, why don't we look at that definition

25   together, okay?

Page 65

1    A     Okay.

2    Q     Let's go back to the definition of establishment in

3    Article 279.  Again, apologies for all the flipping back and

4    forth.  It's on Page 70, and it's JX-43, in case you're

5    having trouble finding it.

6    A     279.  Okay.  I have it.

7    Q     You have it?

8    A     Yes, I have it in the Spanish version, but it doesn't

9    matter.

10   Q     Okay, and you're looking at Subsection 6, which

11   contains the definition of establishment?

12   A     Yes.

13   Q     Okay, and what it says is, and I quote, "Establishment

14   shall be understood as any place of operations where the

15   merchant exercises an economic activity with human and

16   material resources or services in a non-transitory manner."

17   Sir, the word employees does not appear in that definition,

18   correct?

19   A     No, I understood that human means includes employees.

20   Q     Right.  You interpret the word human, the words human

21   resources to mean employees, correct?

22   A     Among others.

23   Q     Among others.  Okay.  So now I'd like you to turn to

24   your supplemental declaration, your reply declaration.  It's

25   also in your binder.  It is JX-37.

```
 1   A     Okay.

 2   Q     In particular Page 15.

 3   A     Page 15.

 4   Q     On Page 15, you will find Paragraph 29.

 5   A     Okay.

 6   Q     Do you have Paragraph 29 in front of you?

 7   A     Yes.

 8   Q     Okay.  So I would like to direct your attention to the

 9   last line on Page 15, and it carries over to the next page.

10   And you will see there that you are quoting the "Guide to

11   Enactment," correct?  The last line on Page 15.

12   A     The last line on that page.

13   Q     Right, it says as the "Guide to Enactment" explains.

14   And then there begins a quote.  Are you with me?

15   A     Yes.

16   Q     Right.  And what you put in the quote is, again,

17   quoting from the "Guide to Enactment", "The emphasis on an

18   economic activity having to be carried out using human

19   resources," and then you put in brackets, "[i.e. employees]

20   shows the need for a minimum level of organization required

21   for an establishment," correct?

22   A     Yes.

23   Q     And you cite Paragraph 89 of the "Guide for Enactment"

24   as the source of this quote, correct?

25   A     Yes.
```

1   Q    So let's look at the "Guide to Enactment".  It can be

2   found at JX-48, and that particular quote is at Page 55.

3   And in particular, it's Paragraph 89 on Page 55 of the

4   "Guide to Enactment".  Professor, just let me know once you

5   have that in front of you.

6   A    Fifty-five.  Paragraph 55 of the enactment --

7   Q    I'm sorry.  Page 55 of the "Guide to Enactment".  And

8   on Page 55 -- I'm sorry, sir, it's a little unclear because

9   there are two page numbers.  I'm referring to the bottom of

10  the page that says 55 of 122.  Those are the page numbers

11  I'm referring to.

12  A    Yes.  Yes.  Fifty-five.

13  Q    And on Page 55, I hope you will see Paragraph 89.

14  A    Yes.

15  Q    Great.  And in Paragraph 89, in the "Guide to

16  Enactment", you see the second subsection there that begins

17  the emphasis.

18  A    Yes.

19  Q    That's what you quoted from, right?  The emphasis on an

20  economic activity having to be carried out using human

21  resources shows the need for a minimum level of

22  organization.  That's what you quoted in your report,

23  correct?

24  A    Yes.

25  Q    Only you added in square brackets, employees.  And the

Page 68

1    reason you put it in brackets is the "Guide to Enactment"

2    doesn't say employees, does it?

3    A    Sorry, I'm not following you.

4    Q    Sure.  In your expert report, you added to this

5    quotation in square brackets i.e. employees.  And the

6    reason, Professor, that you put the word employees in

7    brackets is the "Guide to Enactment" does not refer to

8    employees expressly anywhere when it is discussing

9    establishment, correct?

10   A    No.  The footnote in the declaration refers to the

11   general meaning of what I'm saying.  It does not refer to

12   the word employees.  The footnote is put at the end of the

13   paragraph.  So the footnote refers to the whole content of

14   Paragraph 29, and not only to the word employees in

15   brackets.

16   Q    So, Professor, my point is a different one.  You agree

17   with me, do you not, that Paragraph 89 in the "Guide to

18   Enactment" does not expressly use the word employees?

19   A    No.  Yes, I agree with you that the word employees does

20   not appear on 89.

21   Q    Okay, and your opinion is that, for example,

22   consultants that might be working on behalf of one of the

23   debtors in the United States would not be considered, quote,

24   "human resources," as that term is used in Article 279 of

25   the LCM, right?

Page 69

1   A    No, I think the term human resources, human means, as I

2   understand the Model Law uses, includes those advisors for

3   people that are not employees, but can be used by a company.

4           MR. QURESHI:  Can we get his deposition, please?

5   Your Honor, may I approach?

6           THE COURT:  Yes.

7           MR. QURESHI:  Apologies, Your Honor.  I just

8   couldn't find my copy of the deposition.

9           THE COURT:  No.  That's okay.  I think we could

10  give you one.

11          CLERK:  Yeah, we could give you one.

12          MR. QURESHI:  Oh, I'm sure we have it.  I have a

13  marked up copy, which --

14          THE COURT:  Okay.  That's fine.  But if not, we'll

15  happily hand over one back.  You need it to cross-examine

16  the witness.

17          MR. QURESHI:  Your Honor, apologies for the delay.

18          THE COURT:  No problem.  That's fine.

19          MR. QURESHI:  It'll be just a couple of minutes.

20  Apparently I left it in the other room.

21          THE COURT:  Okay.  That's all right.

22          MR. QURESHI:  Thank you.

23          THE COURT:  No problems.

24          MR. QURESHI:  Thank you, Your Honor.  Apologies

25  for the delay.

Page 70

```
 1   BY MR. QURESHI:

 2   Q    Professor Mejan, you recall that on Monday, I think it

 3   was of last week, I took your deposition, right?

 4   A    Tuesday.

 5   Q    Was it Tuesday?

 6   A    Yes.

 7   Q    You recall being deposed?  Yes?

 8   A    Yes.

 9   Q    Okay, and you understood that you were under oath

10   during your deposition?

11   A    Yes.

12   Q    Okay.  Professor, please turn to Page 97 of your

13   deposition transcript, and the page numbers are on the top

14   of the page.  Do you recall, sir, that I asked you the

15   following question and you gave the following answer, and

16   this appears at Line 13 through 24 of Page 97:

17        "Question: Okay, and for purposes of determining under

18   the LCM whether there is an establishment in the United

19   States, are the presence of consultants or people working on

20   behalf of the company who are not direct employees relevant?

21        Answer:  For the purpose of creating an establishment,

22   no.  This kind of people or persons providing services don't

23   qualify as employees."

24        That was your testimony, correct?

25   A    Yes.
```

Page 71

1           MR. CLAREMAN:  Objection, Your Honor.

2    Completeness.  The discussion and question and answering

3    concerning that was just read continues on Page 98, and I

4    would ask that the witness also be read Page 98, Line 6

5    through Line 15, as well as Page 100, Line 10.

6           THE COURT:  I think I'm going to let you do that

7    on redirect.

8           MR. CLAREMAN:  All right.  Thank you, Your Honor.

9           THE COURT:  Just make a note to yourself.

10   BY MR. QURESHI:

11   Q    Now Professor, you can put the deposition transcript to

12   the side for the moment.  The basis, as I understand it,

13   sir, for your opinion that the word human resources, as used

14   in the LCM, means employees is because the definition of

15   establishment uses the phrase non-transitory to describe the

16   type of activity taking place, correct?

17   A    Not exactly.  I think -- can I give my explanation?

18   Q    Sure, go ahead.

19   A    Thank you.  The definition that is explained in the

20   "Guide of Enactment," the paragraph we already saw in the

21   following paragraphs, establish a combination of elements

22   that can be taken into account for the court that has to

23   decide whether or not they are an establishment.  The

24   elements that the definition provides are a place, an

25   economic activity, a non-transitory way and the use of human

Page 72

1    means or goods.  So what in the deposition and here is what

2    I'm trying to explain is that the definition has to be taken

3    in a complete way.  And as this is a factual nature, the

4    facts can be brought to the court who has the task to define

5    whether or not there is an establishment.  That's why in my

6    declaration I say, at minimum, or at least that is what the

7    court is have to decide.  And if I'm referring to offices or

8    employees or human resources or any other element, those

9    have to be combined before the court to arrive to that

10   decision.  That's my understanding of the definition of

11   establishment.

12   Q    And you understand that the definition of establishment

13   uses the phrase non-transitory, correct?

14   A    Yes.

15   Q    Okay, and that is to describe the nature of the

16   activity taking place.  And your opinion is that if you are

17   doing something that is transitory, you can hire

18   consultants, professionals to do that work, and you're not

19   constrained to call them employees, right?

20   A    Yes.

21   Q    Okay, and in your analysis, there isn't any specific

22   time period around transitory.  It depends on all of the

23   facts, right?

24   A    Yes.

25   Q    Okay.

Page 73

```
 1   A     And that was the purpose of the Model Law.

 2   Q     Right, and so transitory could be a month, it could be

 3   a year, it could be two years.  It just depends.

 4   A     Yes.

 5   Q     Okay, and when you concluded in Paragraph 55 of your

 6   report that TV Azteca has no employees and no offices, you

 7   relied on Mr. Rodriguez for that, correct?

 8   A     Correct.

 9   Q     Okay, and, in fact, you rely solely on Mr. Rodriguez's

10   declarations for the conclusion that there is no

11   establishment in the United States, correct?

12   A     Yes.

13   Q     Okay.  Now we can look again, if you like, sir, at

14   Article 279, but it does not use the term office, correct?

15   A     In Article 279?

16   Q     279.  The definition of an establishment.

17   A     Let me go one second.

18   Q     Sure.

19   A     Remember the top --

20   Q     It's Page 70 of 89, if you look at page numbers on the

21   bottom.

22   A     (indiscernible) exercise (indiscernible) human and

23   material (indiscernible)  sources of services in a non-

24   transitory manner.  Yes.  Okay.  Doesn't use the word

25   employees.
```

Page 74

1  Q    I'm sorry.  My question was different.  It doesn't use

2  the word office, correct?

3  A    It does not use the word office.  Yes.

4  Q    And you read the words material resources to be office,

5  correct?

6  A    Include office.

7  Q    To include office.  Okay, and in your opinion, when a

8  Mexican bankruptcy court undertakes the establishment

9  analysis in the LCM, the court is supposed to do so on an

10  entity-by-entity basis and not with a group of debtors as a

11  whole, correct?

12  A    Yes.

13  Q    So in this case, if there were to be a recognition

14  proceeding on behalf of the 35 debtors, the Mexican court

15  would need to go debtor by debtor to determine on an

16  individual basis whether or not each one has an

17  establishment, correct?

18  A    Yes.

19  Q    Okay, and therefore, I assume, sir, it is possible that

20  some entities may be found to have an establishment in a

21  foreign jurisdiction and other entities may be found not to,

22  correct?

23  A    Yes.

24  Q    All right, and in arriving at your opinion in this

25  case, you did not conduct an entity-by-entity analysis,

Page 75

 1   correct?

 2   A     Correct.

 3   Q     And that's because you relied solely on the four

 4   corners of the Rodriguez declarations, and in that

 5   declaration, there is no entity-by-entity analysis, correct?

 6   A     Correct.

 7   Q     Okay.  Now you are aware, Professor, that of the 35

 8   alleged debtors in this case, three of them are incorporated

 9   in the United States, correct?

10   A     Yes.

11   Q     And you know that from the Rodriguez declaration?

12   A     Yes.

13   Q     And for those specific entities, the U.S. debtors, you

14   did not engage in any analysis of the activities that they

15   engage in in the United States other than what is referred

16   to in the Rodriguez declaration, correct?

17   A     Yes.  Correct.

18   Q     So you did nothing to analyze the contractual

19   relationships that those debtor entities have entered into

20   in the United States, correct?

21   A     Correct.

22   Q     And you understand that -- you are aware of at least

23   one of those U.S. debtors that has a subsidiary that is also

24   incorporated in the United States, but that is a non-debtor,

25   correct?

Page 76

1    A    Yes.

2    Q    You know of one?

3    A    Yes, I know of one out of Rodriguez's declaration.

4    Q    Okay.  Do you know if Rodriguez's declaration refers to

5    more than one that has a U.S. subsidiary?

6    A    Not that I recall.

7    Q    Okay, and in your opinion, whether the presence in the

8    U.S. of a non-debtor subsidiary of the debtor entity is

9    relevant to the establishment to the establishment analysis,

10   it depends on the circumstances.  It depends on what that

11   subsidiary does, right?

12   A    Yes.

13   Q    And that's important to you because the subsidiary, the

14   non-debtor subsidiary, it's a separate legal entity, right?

15   A    Yes.

16   Q    Okay, and you didn't do that analysis here, correct?

17   A    No.

18   Q    Okay.  But you agree that analysis should be done to

19   determine the nature --

20   A    Of the establishment.

21   Q    Okay, and you agree that you should analyze whether

22   that non-debtor subsidiary of a U.S. debtor, for example,

23   has employees, correct?

24   A    Could have.  could have --

25   Q    I'm saying you should inquire into the question of

Page 77

1   whether it has employees, correct?

2   A    Employees, offices.

3   Q    Right.

4   A    Advisors.

5   Q    Right, and you didn't do any of that, correct?

6   A    Yes.

7   Q    And you should analyze the nature of the economic

8   activity undertaken by the subsidiary, right?  Yes?

9   A    Right.

10  Q    And you didn't do that, correct?

11  A    No, I didn't.

12  Q    And you should analyze whether that economic activity

13  is transitory or non-transitory in nature, correct?

14  A    Yes.

15  Q    And you didn't do that, correct?

16  A    I didn't do that.

17  Q    Now are you aware, sir, from Mr. Rodriguez's

18  declaration that one of the debtor entities in this case is

19  party to a contract that is referred to as a services

20  agreement with an entity called GSI Management USA?

21  A    That it's mentioned in Mr. Rodriguez's declaration.

22  Q    Right.

23  A    Yes.

24  Q    And in connection with your analysis as to whether or

25  not there is an establishment in the United States, you did

Page 78

1    not look at that services agreement, correct?

2    A    No, I didn't look at the services agreement.

3    Q    Okay.  Professor, I'd like to refer you, please, back

4    to your reply declaration, and in particular to Paragraph

5    31, which appears on Page 16.  Let me know once you have

6    that in front of you, sir.

7    A    We are on the first --

8    Q    Your second report.

9    A    The reply declaration.  Okay.  Paragraph 31st?

10   Q    Paragraph 31.

11   A    Thirty-one.

12   Q    Which appears on Page 16.  Are you with me?

13   A    Yes.

14   Q    Okay, and in that paragraph, you will see I'd like to

15   draw your attention to the last point that you make in that

16   paragraph, which begins, third.  Do you see where I am?

17   A    Yes.

18   Q    And you write, third, the existence of various

19   production and licensing contracts with U.S. counterparties

20   cannot satisfy the, quote, "establishment," close quote

21   requirement in the absence of showing that the alleged

22   debtors' activity related to the negotiation and execution

23   of such documents took place at the alleged debtors' place

24   of operations in the United States (the absence of which Mr.

25   Guerra does not contest).  Those are your words, correct?

1    A    Yes.

2    Q    Professor, you don't know one way or the other, do you,

3    whether the execution and negotiation of the contracts of

4    the debtor entities that Mr. Guerra referred to took place

5    in the United States or somewhere else?

6    A    Mexico, for instance.  Could be.

7    Q    Or Mexico, for instance.

8    A    Yes.

9    Q    But you don't know one way or the other.

10   A    Yes, I don't know one way or the other.

11   Q    Okay.

12   A    I just rely on the declaration of the chair of the

13   board and director general of the company.

14   Q    And did you assume that that activity took place in

15   Mexico?

16   A    No, I'm not assuming.

17   Q    You don't know one way or the other.

18   A    Yes, I don't know.

19   Q    You didn't ask the question, correct?

20   A    Yes, I didn't ask the question.

21   Q    You're aware that the Rodriguez declaration refers to a

22   number of contracts, correct?

23   A    Yes.

24   Q    And none of those contracts are actually attached to

25   his declaration, correct?

Page 80

1    A    Yes.

2    Q    And you didn't look at any of them, did you?

3    A    I didn't.

4    Q    Okay, and you're aware that one of the contracts that

5    Mr. Rodriguez refers to in his declaration is one that a

6    U.S. debtor known as Azteca International has with

7    Univision.

8    A    Has?

9    Q    With Univision.

10   A    Okay.  Used to have.  I think Mr. Rodriguez referred to

11   that part as something in the past.

12   Q    Okay.  You're not aware that TV -- I'm sorry.  You're

13   not aware that the debtor known as Azteca International,

14   which is a U.S. debtor, currently has a contract with

15   Univision?

16   A    No, I don't know.

17   Q    You don't know.  Okay.  All right.  Sir, if you can

18   turn in your binder to JX-154.  It should be the very last

19   document in your binder.

20   A    Please, repeat where I should --

21   Q    Sorry, the very last document in the binder.  The tab

22   should say JX-154.

23   A    Yeah.

24   Q    Have you seen this document before, sir?

25   A    No, this is the first time I see it.

Page 81

1   Q    Okay.  You will see, sir, that it is a press release.

2   It is dated New York, New York, January 17, 2023.  Do you

3   see that?

4   A    Yes, at the beginning of the article.  Yes.

5   Q    Right, and if you go to the last page, that's where it

6   says it's a press release.  On the very last page, three or

7   three, it says, this press release can be viewed online at

8   and then it gives a website.  Do you see that?

9   A    Yes.

10  Q    Okay.  Now go back to the first page of the press

11  release.  You see that in the first paragraph, this press

12  release is referring to the launch of something called the

13  Azteca Now premium video app for smart devices.  See that?

14  A    Yes.

15  Q    Now I would like to direct your attention, sir, to the

16  second paragraph of the press release.

17  A    Yes.

18  Q    And in that paragraph, it reads -- let me just find the

19  spot.  I'm sorry, sir.  It's on the second page.  I directed

20  you to the wrong spot.  Turn the page.  Page 2 of 3.

21  A    Excuse me, I'm not following where we are.

22  Q    The second page of that document.

23  A    The second page.

24  Q    Do you see, toward the top of that page, there is a

25  quote.  It reads --

1    A    We're very excited.

2    Q    Right.

3    A    Okay.

4    Q    And what it says is, "We are very excited to be able to

5    offer the Azteca Now app in the U.S. market." close quote,

6    stated Jorge Gutierrez paid TV director for TV Azteca

7    Internacional.  He goes on to say in this press release, and

8    I quote, "This is one of the most important milestones so

9    far for this app partnership between Azteca and Icaro.  I am

10   sure that the thousands of hours of premium content we are

11   offering will connect with American audiences."  Professor

12   Mejan, that is not information that you considered when

13   analyzing whether these debtors have an establishment in the

14   United States, correct?

15   A    No.  This is the first time I see this article that

16   refers to a plan in the future.

17   Q    Professor, turn in your binder to the prior document.

18   It is JX-136.  Let me know when you have that open.  You

19   have that in front of you, sir?

20   A    Yes.

21   Q    And you'll see on the first page, it simply says

22   Dopamine, correct?

23   A    Yes.

24   Q    And are you aware that one of the debtor entities in

25   this case is an entity that is named, and I'll butcher the

1   pronunciation, Producciones Dopamina, S.A. de C.V.

2   A    It's one of the alleged debtors.

3   Q    Yes.

4   A    Okay.  I don't remember the name, but I can take your

5   word for it.

6   Q    Sure.  I will represent to you, sir, that it's in the

7   org chart of debtors that is attached to the Rodriguez

8   declaration.  And so this exhibit, which is in evidence, is

9   a Dopamine document.  And I would like to direct your

10  attention to the third page of that document.  And in

11  particular, on the third page, I would like to point you to

12  the very bottom of that page where it is written, currently

13  our first U.S. film owned delivery --

14  A    Excuse me.  I found another part.  I have on Page 4 of

15  8?

16  Q    I'm sorry.  It's Page 3 of 14.  If you look at the

17  bottom --

18  A    Three of 14?

19  Q    Three of 14.  I may have misdirected you.  If I did, I

20  apologize.

21  A    Okay.  Okay.

22  Q    Okay, and I'm looking at the very bottom of that page.

23  A    Yes.

24  Q    And what it says is, and I quote, "Currently our first

25  U.S. film Home Delivery (2022) is being filmed in

Page 84

1    coproduction with Les Spoirs (sic), and two of the most

2    ambitious original series are underway," and it goes on from

3    there.  I take it, sir, because you've never seen this

4    document, that you were not aware that Dopamine is working

5    on or at the time of this document was working on a U.S.

6    film.

7    A    This is my first encounter with this information.

8    Q    Okay.  You can put that document to the side.  Let's

9    switch topics for a moment, Professor, and talk for a moment

10   about Mexican public policy.

11   A    Okay.

12   Q    Now your opinion that you're offering to this court is

13   that any plan of reorganization that the court might approve

14   in this Chapter 11 case would violate Mexican public policy

15   regardless of the terms of the plan.  Doesn't matter what it

16   says, correct?

17   A    Yes.

18   Q    Okay, and it is also your opinion that it is impossible

19   under the LCM for any involuntary Chapter 11 case to be

20   recognized in Mexico, correct?

21   A    No, I think that you are putting words that I didn't

22   use.  Maybe you can show me --

23   Q    Well, Professor --

24   A    -- where I did say that.

25   Q    Sure.  I'm happy to show you, sir.

1    A     Please.

2    Q     Take a look at your deposition that's in front of you.

3    A     Okay.  The deposition?

4    Q     Yes.

5    A     Okay.

6    Q     And in particular, I would like you to turn to Page

7    161.  Let me know when you're there, sir.

8    A     161, I'm there.

9    Q     Okay.  Line 15.  I ask you the following question.

10   A     Yes.

11   Q     "Is it your testimony then that it is impossible for

12   any involuntary Chapter 11 case to be recognized under the

13   LCM," and your answer was, "Yes, that is my opinion."

14   A     Okay.

15   Q     See that?

16   A     Yes.

17   Q     Okay.  Now sir, you agree with me -- you can put the

18   deposition aside.  There is no provision in the LCM that

19   expressly says that a foreign involuntary proceeding cannot

20   ever be recognized under the LCM, correct?

21   A     Those express words do not exist on the LCM.

22   Q     Right, and so --

23   A     The reason to my answer can be other.

24   Q     And so, Professor, your opinion is that the only way

25   that a Chapter 11 plan could ever be recognized in Mexico

Page 86

1    would be if TV Azteca consented to the plan, right?

2    A    This Chapter 11.

3    Q    This Chapter 11.

4    A    If TV Azteca's consent in that plan.

5    Q    Right, and in addition, the plan would have to comply

6    with all of the rights of the stakeholders under Mexican

7    law, correct?

8    A    No, because when reorganization plan is reached in this

9    proceeding, you have to go to the Mexican court and ask for

10   the recognition.  The recognition should consider whether

11   what has happened in the Chapter 11 of the foreign

12   proceeding for that case is according to the rest of the

13   Mexican law.  And if the debtor has an establishment in

14   Mexico, as it has (indiscernible) it has, then a new

15   concurso should be started, according our the 293 article on

16   LCM.  So that's why I'm saying that it's not recognizable,

17   not at this point, but it has to follow all these.

18   Q    Okay.  So if I understand your testimony correctly,

19   Chapter 11 plan can never be recognized because in the case

20   of an involuntary that lacks the debtor's consent, your

21   interpretation of the LCM is that can never be recognized.

22   And if it is a voluntary plan that TV Azteca consents to,

23   then TV Azteca needs to start a whole new concurso

24   proceeding in Mexico, correct?

25   A    No.  You're asking me several questions.  In your

Page 87

1   question, there are several questions.

2   Q    Okay.  Let me break it up.

3   A    Let's go part for part, please.

4   Q    Okay.  So I think we've established that your opinion

5   is that an involuntary Chapter 11 plan can never be

6   recognized in the LCM, correct?

7   A    No, no.  No, the never is too strong.  I understand

8   that this implication --

9   Q    Well, sir --

10  A    -- the situation is not possible.

11  Q    Okay.  So --

12  A    The situation under LCM must be different.

13  Q    Okay.  Well, sir --

14  A    In the terms that you are asking the question, I would

15  say no.  In this terms, this plan of reorganization cannot

16  be recognized or enforced, more than recognized, because

17  what you recognize is the proceeding, not the plan of

18  reorganization.

19  Q    Are you done?

20  A    Yes.

21  Q    Okay.

22  A    Sorry if I extended.

23  Q    So Professor, we've reviewed your deposition testimony,

24  and at your deposition you very clearly said to me that it

25  is impossible for any involuntary case under the LCM to be

Page 88

1    recognized.  Are you changing your testimony?

2    A    No, no, I'm not changing --

3    Q    Okay.  So is what you told me in the deposition

4    inaccurate?

5    A    No, it's not inaccurate.

6    Q    Okay.  That's fine.  Then we can leave that, Professor.

7    A    Okay.

8    Q    Now if TV Azteca proposes a plan voluntarily in this

9    case, so my hypothetical is this court accepts the Chapter

10   11 petition.

11   A    Yes.

12   Q    You understand enough about Chapter 11 to know that TV

13   Azteca would then still have exclusivity, would have the

14   right to propose a plan, right?

15   A    They had that possibility.

16   Q    Right.  Yes, and so if TV Azteca did that, they

17   proposed the plan of reorganization, and if that plan

18   complied with the rights of stakeholders under Mexican law,

19   and if the regulators in Mexico, TV Azteca being a regulated

20   entity, have their rights honored in the plan, then that

21   plan could be recognized in Mexico, right?

22   A    After following the concurso proceeding in Mexico.

23   Q    Sir, let's go to your opening report, which is JX-29,

24   and let's go to Paragraph 64.  Let me know when you're

25   there, sir.  It's on Page 26, if that helps.

Page 89

1   A     Okay.  I have it.

2   Q     Okay, and in Paragraph 64, you offer in the second

3   sentence the following opinion: the financial and

4   administrative burdens imposed on the alleged debtors

5   associated with a foreign insolvency proceeding in the

6   United States are far greater than any associated benefits

7   to the alleged debtors' business and their ability to

8   preserve their employees and personnel and protect all of

9   their creditors.  That's your opinion, correct?

10  A     Yes.

11  Q     Okay, and the basis for this opinion is your experience

12  that litigation in other jurisdictions is more expensive

13  than a case in Mexico, right?

14  A     Yes.

15  Q     Okay, and in arriving at that opinion, you assumed that

16  the alleged debtors in this case would oppose everything

17  being done in this court and would litigate everything that

18  is happening in the United States, correct?

19  A     Do I said so in this paragraph?  I think I didn't say

20  that the alleged debtors are going to object.

21  Q     That was not my question.  I'm not suggesting that you

22  said it in the report.

23  A     Okay.

24  Q     I'm saying that that was your assumption when you

25  arrived at this opinion.

Page 90

1    A    Well, I don't know what is in the head of the alleged

2    debtors in order to how to deal with this.  But the

3    possibility you mentioned is a possibility.

4    Q    Right, and it's the one you assumed would take place,

5    correct?  That they would oppose everything?

6    A    Could be.

7    Q    Sir, let's switch topics one more time and talk about a

8    number of other Mexican companies that are mentioned in both

9    of the expert reports --

10   A    Yes.

11   Q    -- that have restructured in Chapter 11.  And

12   specifically, I am referring to Satmex, Mexcom, Posadas and

13   Aeromexico?

14   A    Yes.

15   Q    You're familiar with that back and forth in the report?

16   A    Yes.  Same general terms.  Yes.

17   Q    Okay, and you understand that all four of those

18   companies had their COMI in Mexico, correct?

19   A    Yes.

20   Q    And you also understand that all four of them commenced

21   voluntary Chapter 11 cases in the United States, correct?

22   A    Yes.

23   Q    And in the case of at least three of those companies,

24   Satmex, Mexcom, and Aeromexico, you agree that, like TV

25   Azteca, they are highly regulated in Mexico, correct?

Page 91

1   A    Yes.

2   Q    And you agree that each of those companies was able to

3   implement a Chapter 11 plan in Mexico, correct?

4   A    Yes.

5   Q    And they did so without having to seek recognition of

6   that plan under the LCM, correct?

7   A    Yes.

8   Q    Or present --

9   A    They haven't seek recognition.

10  Q    Right, and nor did they present the plan for approval

11  to any other Mexican court, correct?

12  A    Correct.

13  Q    And they were able to do that because those Chapter 11

14  plans were consensual, correct?

15  A    Yes.

16  Q    Okay, and so --

17  A    Nobody opposed.

18  Q    That's what I mean by consensual.  Nobody opposed, I

19  agree with you.  So Professor, where a Chapter 11 plan --

20  A    Let me clarify my word opposed.  They were consenting

21  formally, but it could be some stakeholders that consent

22  without doing anything or even if they could have done it,

23  just as a matter of examining the possibilities in those

24  cases.  Okay.

25  Q    You done?

1    A    Yeah.

2    Q    Okay.  So where a Chapter 11 plan of a Mexican company

3    that has its COMI in Mexico is not objected to by any

4    creditors in Mexico --

5    A    Yes.

6    Q    -- it can be implemented in Mexico without recognition

7    under the LCM, right?

8    A    Yes.

9    Q    Okay, and your opinion is that if even one creditor,

10   just one in Mexico, in any of those cases, decided to oppose

11   the plan in Mexico, or challenge the plan in Mexico, things

12   could have turned out very differently, as you put it,

13   correct?

14   A    Yes.  And not even creditors, also other authorities,

15   Q    Right.  Okay.  But nonetheless, all of those companies

16   obviously commenced Chapter 11 proceedings here in the U.S.,

17   right?

18   A    Yes.

19   Q    Okay.  Sir, let's switch topics one last time and

20   you'll be happy to know I'm onto the last topic.  Or maybe

21   not happy, maybe you're enjoying this.  Professor, let's

22   talk about the injunction.  Now let's go to your reply

23   declaration, please.  It's JX-37 and I want to point you to

24   Page 30.  Page 30, 3-0.

25   A    Yes.  I'm on Page 30.

```
 1   Q    You will see that in the middle of the page you have

 2   heading Roman Numeral V --

 3   A    Yes.

 4   Q    -- which says the injunctions do not prevent the

 5   petitioning creditors from commencing an involuntary

 6   concurso proceeding in Mexico.

 7   A    Yes.

 8   Q    That's your opinion, right?

 9   A    Yes.

10   Q    And in connection with your work in arriving at that

11   opinion, you read the injunctions that have been entered by

12   the Mexican court, correct?

13   A    Yes.

14   Q    Okay, and you believe that those injunctions would not

15   prohibit the petitioning creditors or the parties that are

16   bound by those injunctions from commencing an involuntary

17   concurso under the LCM because you don't consider an

18   involuntary concurso to be an action that involves

19   collection of debts, correct?

20   A    Yes.

21   Q    Okay, and you understand, sir, that the trustee for the

22   bonds issued an acceleration notice after the missed

23   interest payment, correct?

24   A    Yes, I know that.

25   Q    And you also understand that the purpose of the
```

1    injunctions, among other things, is to effectively prevent

2    that acceleration, correct?

3    A    Yes.

4    Q    Okay.  Now let's look at the wording of the injunction

5    itself, because I think this is important.  And you can find

6    it at JX-30 in your binder.

7    A    Thirty?

8    Q    Thirty, and so the way this exhibit is organized is

9    first is the original Spanish version, and then what follows

10   is the translation.  Are you there?

11   A    Yes.

12   Q    So I'm going to refer you to the English parts because

13   it's the only part I can read.  And if you look at the page

14   numbers at the bottom of the page, I would like you to turn

15   to Page 35 of 40.

16   A    Thirty-five of 40.

17   Q    Right.

18   A    Okay.

19   Q    Let me know when you're there.

20   A    I look for the translation, the original wording in

21   Spanish.  Okay.  I have both.

22   Q    You have both?

23   A    Yes.

24   Q    Okay.  By both you mean you have the Spanish original

25   and the translation in front of you?

Page 95

1    A    Yes.

2    Q    Okay, and if you turn to -- so on Page 35 of 40, you

3    will see there's the lead-in, it says consist of, and then

4    there are a number of paragraphs.  The first one says,

5    maintain the existing factual situation related to the

6    issuance, and then it refers to the indenture for these

7    notes.  Do you see that?

8    A    (indiscernible)

9    Q    Are you with me?

10   A    Yes.

11   Q    Okay.  Turn to the next page.  And on the next page,

12   Paragraph Number 2 states maintain the existing de facto

13   situation until such time as the World Health Organization

14   decrees the extinction of the pandemic known as SARS-CoV-2

15   (COVID-19), it is prohibited to make payments of obligations

16   due prior to the present lawsuit.  Do you see that?

17   A    Yes.

18   Q    So you understand, sir, that the purpose of Paragraph 2

19   is to prevent TV Azteca from paying interest or principal on

20   the notes, correct?

21   A    Yes, and to maintain de facto situation.

22   Q    Right, and it goes on to say, it is prohibited to make

23   payments of obligations due prior to the present lawsuit.

24   A    Okay.  Yes.

25   Q    See that?  Okay, and then let's look at Paragraph 3.

Page 96

1    What Paragraph 3 says is to maintain the existing factual

2    situation and to this end, the prohibition to the

3    codefendants to initiate and/or file any proceeding for the

4    collection and/or payment of the unpaid principal of the

5    bonds issued under the issuance agreement dated August 9,

6    2017.  And it goes on from there.  And my question to you,

7    sir, is your interpretation of this language is that despite

8    the injunction's use of the words any proceeding, you do not

9    believe that it applies to an involuntary concurso, correct?

10   A    Yes, correct.

11   Q    Okay, and you agree with me, sir, that the only court

12   that has the authority to determine if this injunction has

13   been violated is the court that issued this injunction.

14   A    I'm not an expert in that kind of situation, but that

15   is my understanding so far.

16   Q    And so if any of the entities that are the subject of

17   this injunction were to commence an involuntary concurso,

18   the bankruptcy court in Mexico that would hear that

19   involuntary concurso would not have the authority to rule

20   that the injunction does apply, doesn't apply or to modify

21   the injunction in some way to permit the concurso, correct?

22   A    The bankruptcy court in Mexico could issue some

23   precautionary measures like this injunction.  But the

24   bankruptcy court has not the authority to intervene in the

25   proceeding for this injunction has been issued.

1   Q    Well, so let's make sure we're very clear on this

2   point.  So the bankruptcy court in Mexico does not have the

3   authority to rule that this injunction is inapplicable to an

4   involuntary concurso, correct?

5   A    Or applicable, to rule about that.

6   Q    Right.  It cannot rule one way or the other.

7   A    Yes.

8   Q    Nor can the bankruptcy court in Mexico modify this

9   injunction in any way, correct?

10  A    Yes.

11  Q    So if creditors were to commence an involuntary

12  concurso that were also the subject of this injunction, TV

13  Azteca, should it decide to enforce the injunction, could go

14  back to the court that issued it, correct?

15  A    Yeah, that is a possibility.

16  Q    Right.  Now let's talk for a minute about the

17  involuntary concurso process in Mexico.  Am I correct that

18  should an involuntary concurso be commenced --

19  Q    In the United States?

20  Q    In Mexico.  In Mexico.  The first stage of that

21  proceeding would be what I think you refer to as the

22  examination stage, correct?

23  A    Yes.  Citatorio, in Spanish.

24  Q    The cita stage.

25  A    Yes.

Page 98

1   Q    Okay.

2   A    It's a kind of audit.

3   Q    Right.  And in that stage, there would be appointed an

4   individual known as a visitador, correct?

5   A    Yes, that's correct.

6   Q    And that person's function under the LCM would be to

7   determine if in fact TV Azteca is insolvent, correct?

8   A    Well, the authorities that the visitador has are mainly

9   two.  One, to rank what we call not the LCM, but in the

10   legal term we call it insolvency case that has a purpose to

11   determine whether the debtor is insolvent in that it meets

12   the requirements of the insolvency test.

13   Q    Right.

14   A    That's the first authority.  The second authority that

15   the visitador has is to request the court to provide any

16   precautionary measures that are acceptable or necessary in

17   the proceeding.

18   Q    Okay.  So let's focus on the first of those.  The

19   visitador is tasked with applying an insolvency test to

20   determine if the debtor is insolvent, correct?

21   A    Yes.

22   Q    And only if the debtor is found by the visitador to be

23   insolvent may there then be an involuntary concurso

24   proceeding, correct?

25   A    No, I don't understood your question.

Page 99

1    Q    Sure.

2    A    You said only if.

3    Q    Let me try it again, sir.

4    A    Okay, please.

5    Q    In order for there to be an involuntary concurso, the

6    debtor must be insolvent, correct?

7    A    And also for a voluntary concurso.

8    Q    Okay.  But I'm talking about involuntary.

9    A    Yes.

10   Q    For an involuntary concurso in Mexico, the debtor must

11   be insolvent, correct?

12   A    Yes.

13   Q    And the person under the Mexican statute that makes

14   that determination is the visitador, correct?

15   A    At the end, it's the court, because what the visitador

16   has to do is conduct this examination and then present the

17   facts he has found and issues an opinion about if it is or

18   not insolvent.  And the court will decide, taking into

19   account the examination and some other --

20   Q    So the visitador conducts an examination of the

21   debtor's books and records, makes a determination as to

22   whether the debtor is solvent or insolvent --

23   A    Yes.

24   Q    -- and then provides the result of that to the court,

25   correct?

Page 100

1    A    Yes.

2    Q    And the court, of course, then has the ultimate

3    decision, but there must be a finding of insolvency,

4    correct?

5    A    Yes.

6    Q    Okay, and in arriving at the opinions that you do,

7    namely that an involuntary concurso in this case could be

8    commenced, you did not analyze TV Azteca's books and records

9    to determine if TV Azteca meets the insolvency requirements

10   of the LCM, correct?

11   A    You mean if I did the job of the visitador?

12   Q    Yes.

13   A    No.

14   Q    Okay.  So you --

15   A    That's not my job.

16   Q    Right.  So you don't know one way or the other whether

17   TV Azteca is insolvent, as that term is defined --

18   A    Yes, yes -- I don't know --

19   Q    Sorry, sir, let me finish my question.

20   A    Sorry.

21   Q    Just so we have a clean record.

22   A    Yes, yes.  I apologize.

23   Q    You remembered that from the deposition.

24   A    Yes.

25   Q    So you don't know one way or the other, sir, whether TV

Page 101

1    Azteca would meet the requirements of being insolvent, as

2    those requirements are laid out in the LCM, correct?

3    A    Yes.

4    Q    Okay, and you -- am I also correct, sir, that when you

5    offered the opinion that you do in this report --

6    A    Yes.

7    Q    -- and again, the opinion I'm talking about is that

8    these injunctions do not prevent the commencement of an

9    involuntary concurso in Mexico, you were not aware that TV

10   Azteca had received ex parte orders from the court that

11   exempted it from any further obligation to publicly file

12   financial statements in Mexico.  You didn't know that,

13   right?

14   A    Well, I learned afterwards.

15   Q    Right.  You didn't know about it when I took your

16   deposition, correct?

17   A    Yes.  Yes.

18   Q    You learned about it at your deposition.

19   A    Yes, yes.

20   Q    So you didn't know about it --

21   A    And even I went to read the documents, yes.

22   Q    Okay.  So you didn't know about it at the time you

23   authored your report.

24   A    Yes.

25   Q    Okay, and you agree with me, sir, that if the

Page 102

1   visitador, this is, again, the person that does the

2   insolvency test, they rely on the debtor's books and

3   records, right?

4   A    Yes.

5   Q    Okay, and if those books and records of TV Azteca that

6   you haven't seen and certainly that we haven't seen do not

7   reflect that the bond debt has been accelerated, then that

8   acceleration could not be the cause of an insolvency,

9   correct?

10  A    At least I think the visitador will find that there is

11  the petition of the acceleration.  And I'm not talking about

12  applying Mexico and insolvency law, but I'm giving this

13  opinion out of my experience in concurso cases.  He can put

14  a note saying that as a contingency.

15  Q    Professor, turn to your deposition again, please.  Page

16  215.

17  A    Two hundred and --

18  Q    Fifteen.  Let me know when you're there.

19  A    It finish on Page 230.

20  Q    I'm sorry, 215, 2-1-5.

21  A    2-1-5.  Oh, I'm sorry.  Okay.

22  Q    Line 5 through Line 23 of that page.  Did I ask you the

23  following questions, sir, and did you give the following

24  answers?

25       "Question: Okay, and so if a visitador in an

Page 103

1    involuntary concurso is inspecting the books and records of

2    TV Azteca, and the books and records of TV Azteca reflect

3    that there is no acceleration because they have an

4    injunction rendering the acceleration ineffective?

5         Answer: So they are not insolvent.

6         Question: Right.  You agree that they are not

7    insolvent?

8         Answer: Uh-huh.

9         Question: And if they are not insolvent, then they

10   would not meet the requirement for commencing an involuntary

11   concurrent?

12        Answer: That's true."

13   A    Yes.  The question --

14   Q    Yes.  That was your testimony, right, sir?

15   A    Yes.  But the question you made in this part is

16   different than the point I made just right now.

17   Q    Now, Professor, when you arrived at your opinion that

18   these injunctions do not prevent the commencement of an

19   involuntary, fair to say that you weren't terribly confident

20   in that opinion?

21   A    I'm confident in my opinions, yes.

22   Q    Okay.  Well, TV Azteca, your client, they asked you if

23   it would be important to you to get another opinion about

24   these injunctions, correct?

25   A    Yes.

Page 104

1    Q    Okay, and you said, yes, that would be helpful.  I'd

2    love to have another opinion.  Right?

3    A    Yes.

4    Q    Okay, and so what TV Azteca then did is they retained

5    another attorney, correct?

6    A    Correct.

7    Q    Not the attorney that already represented them in the

8    injunction proceedings, but somebody else.

9    A    I don't know whether he was involved.  I think no.

10   Q    Right.  Okay, and you already knew this attorney that

11   TV Azteca hired for purposes of talking to you, correct?

12   A    Yes.

13   Q    His name is Mr. Sepulveda, correct?

14   A    Yes.

15   Q    Okay, and you understand that the purpose for which TV

16   Azteca retained this Mr. Sepulveda was so that he could talk

17   to you about your expert opinions concerning the injunction?

18   A    No.  About what were his opinions.  At the end, he

19   conclude with me that they wanted another opinion.

20   Q    Sir, turn to your deposition again, Page 50.  Let me

21   know when you're there.

22   A    Page 50.

23   Q    Line 19 through 23.

24   A    Yes.

25   Q    Did I ask you the following question and you give the

Page 105

1    following answer?

2        "So is it your understanding then that TV Azteca

3    retained Mr. Sepulveda for purposes of talking to you about

4    your opinions concerning the injunction?

5        Answer: Yes."

6        That was your testimony, right?

7    A    Yes.

8    Q    Okay.  Thank you.  Now after you told TV Azteca -- and

9    this conversation that you had with Mr. Sepulveda, it

10   occurred a couple of days before you submitted this

11   declaration, correct?

12   A    Yes.

13   Q    And it was one conversation?

14   A    Just one conversation.

15   Q    And you assume that Mr. Sepulveda had the injunctions,

16   but you didn't provide them to him, correct?

17   A    I didn't provide them, but he knew the injunction.

18   Q    He knew them.  So you assumed that TV Azteca sent him

19   the injunction, you think?

20   A    Yes.

21   Q    Okay, and in your conversation with Mr. Sepulveda, you

22   told him what your opinion was.  You said, my opinion is

23   that these injunctions do not prevent the creditors that are

24   bound by them from commencing an involuntary concurso,

25   right?  That's what you told him?

Page 106

1    A    Yes.

2    Q    And he agreed with you?

3    A    Yes.

4    Q    And this conversation that you had with Mr. Sepulveda,

5    it was important to you because it gave you confidence in

6    the opinion that you reached, correct?

7    A    Yes.

8    Q    And you didn't disclose anywhere in your reports that

9    you had this conversation with Mr. Sapalvida, did you?

10    A    No.  No, I didn't put this conversation in the report.

11    I wrote a couple of days or the day after that.  Yes.

12            MR. QURESHI:  That's all I have, Your Honor.

13            THE COURT:  Okay.  I'm going to ask a question

14    about how people want to proceed.  I do have questions.  I'm

15    sure I warned you this is when I ask my questions.  So you

16    all were prepared for that.  Do you want to take a break

17    now?  Do you want to take a lunch break?  Do you want me to

18    go forward with my questions?  I'm ready to do whatever you

19    want.

20            MR. CLAREMAN:  I think, given the hour, I would

21    suggest a lunch break now.

22            THE COURT:  Okay.  That's fine.  I'm fine with

23    that.

24            MR. CLAREMAN:  Okay.

25            THE COURT:  I will just remind, of course,

Page 107

1    Professor Mejan, that you're still under oath, and what that

2    means is you're going to come back and have questions from

3    me, but also, you're not to talk about your testimony.

4              THE WITNESS:  Okay.

5              THE COURT:  And you're going to come back on the

6    stand.  So just warning you you're under oath.

7              MR. CLAREMAN:  Yeah, and Your Honor, if I could

8    add, just so it's clear to Professor Mejan, he is not to

9    talk about his testimony with anybody.

10             THE COURT:  With anybody.

11             MR. QURESHI:  Not just with counsel.

12             THE COURT:  Yes.  Even on your side --

13             THE WITNESS:  Yes.

14             THE COURT:  As strange as that sounds.

15             THE WITNESS:  Yes.

16             THE COURT:  It's our U.S. process.  What can I

17   tell you?

18             THE WITNESS:  Okay.  Okay.  Okay.

19             THE COURT:  So how long a break would you like?

20   Would you both like to talk to each other and figure it out?

21             MR. CLAREMAN:  Your Honor, we're fine with a

22   relatively short break.

23             THE COURT:  I'm fine whenever you want.

24             MR. CLAREMAN:  1:30?

25             MR. QURESHI:  I was going to say 1:15, but 1:30.

Page 108

1           MR. CLAREMAN:  Whatever you guys say.

2           THE COURT:  1:30.  Okay.  That's fine.

3           MR. CLAREMAN:  Sure.

4           THE COURT:  So we can come back on the record at

5    1:30.  All right.  That's fine.  All right.  Well, then

6    court is adjourned until 1:30.

7           (Recess)

8           THE COURT:  You may be seated.  So I'm going to

9    ask my questions.  So I think we discussed that.  So you

10   might want to sit.  It won't be like five minutes.  Thank

11   you.  Okay.

12          So, Professor, good afternoon.

13          THE WITNESS:  Good afternoon, Your Honor.

14          THE COURT:  Okay.  So now you can educate me on a

15   few things about Mexican insolvency law.

16          So when was the LCM adopted?

17          THE WITNESS:  May, the year 2000.

18          THE COURT:  Okay.  And am I correct that the

19   specialized federal bankruptcy courts were not formed until

20   2022?

21          THE WITNESS:  Yes.  Last year in March '22, the

22   two bankruptcy courts were created.

23          THE COURT:  Okay.  And prior to those courts being

24   formed, which Mexican courts then handled the Concurso

25   proceedings from 2000 to 2022?

Page 109

1              THE WITNESS:  Which is the question?  What they

2      do?

3              THE COURT:  No, which courts.  Who was handling

4      the Concurso proceedings before you had these specialized

5      courts, which courts?

6              THE WITNESS:  All the district judges in the

7      country.

8              THE COURT:  Okay, great.

9              THE WITNESS:  The federal district judges.

10             THE COURT:  Okay, thank you.  Just give me a

11     second.  I'm making a note to myself.  All right.

12             Mr. Qureshi had asked you a bit about the

13     insolvency test for Concurso.

14             THE WITNESS:  Yes.

15             THE COURT:  I have some other questions myself

16     about the insolvency test.

17             THE WITNESS:  Okay.

18             THE COURT:  So I hope you'll bear with me.

19             THE WITNESS:  Okay, thank you.

20             THE COURT:  So first, in the insolvency test, what

21     are considered to be outstanding liabilities?

22             THE WITNESS:  There is -- well, let me go -- the

23     balance sheet of the debtor has to be considered.  In the

24     liability part of the balance sheets, the debtor will be

25     insolvent if he has the 35 percent of the total of

Page 110

1    liabilities overdue for more than 30 days.  That's in the

2    part of liabilities.  And in the part of assets, the debtor

3    is insolvent if he or she doesn't have the 80 percent of the

4    liabilities overdue in liquid assets.  And the law gives a

5    definition of what liquid assets are.

6          THE COURT:  that was going to be my next question.

7    So what are liquid assets?

8          THE WITNESS:  Okay.  Cash, banks.  The...

9          THE COURT:  Accounts receivable?

10         THE WITNESS:  The accounts that are collectable in

11   the next 90 days.  Some investment in a short period of time

12   for the next days.  That's the idea.

13         THE COURT:  Okay.

14         THE WITNESS:  The debtor is insolvent, and there's

15   a difference if the case is a voluntary case or an

16   involuntary case.  If there is a voluntary case, only one of

17   those presumptions must be complied, the one of the

18   liabilities or the one of the assets.  And if it is an

19   involuntary case, then both extremes can be met in order to

20   be insolvent.

21         THE COURT:  Must be met, right?

22         THE WITNESS:  Excuse me?

23         THE COURT:  They must be met.

24         THE WITNESS:  Yes, they must be met.  In an

25   involuntary case, both must be met.  Yes.

Page 111

1          THE COURT:  Okay.  And then Mr. Qureshi was

2     talking to you a little bit about the visitor.  What

3     information does a visitor typically have access to when

4     it's doing its job?  When it's appointed and has to come in,

5     what does it do?

6          THE WITNESS:  Yes.  He is allowed to go through

7     every document, through all of the books of the debtor and

8     even has the authority to talk and to ask questions with the

9     main directors, the main officers, and even to advisors that

10    the Debtor has had in order to compose the financial

11    situation.

12          THE COURT:  Okay.  All right.  For a company the

13    size of the alleged debtors -- obviously I know there's more

14    than one company, 35 companies.  But how long do you

15    estimate it would take a visitor to examine the records of

16    the companies and be able to make a determination as to

17    their solvency?

18          THE WITNESS:  The law establishes 15 days.

19          THE COURT:  Fifteen?  One five?

20          THE WITNESS:  Fifteen days.

21          THE COURT:  One five.

22          THE WITNESS:  One five, yes.

23          THE COURT:  Oh wow.

24          THE WITNESS:  And he is able to ask for an

25    extension for another 15 days.

Page 112

1           THE COURT:  Okay.  So it's relatively quick.

2           THE WITNESS:  Yes.  At the end it will be 30 days.

3           THE COURT:  Okay.  All right.  Have there been any

4     involuntary Concurso proceedings filed against a large

5     corporation in Mexico?

6           THE WITNESS:  Yes.

7           THE COURT:  Okay.  Give me an example of one.

8           THE WITNESS:  An involuntary Concurso.  Let me

9     remember.  The balance between involuntary and voluntary

10    concurso are 60 percent on the voluntary cases and 40

11    percent of the involuntary cases.  And I don't remember

12    right now at this moment the name of a large company --

13          THE COURT:  All right.  Well, you can think about

14    it while I'm asking the rest of the questions.  Because, you

15    know, you're invoking -- you're suggesting that there's a

16    procedure that's available to the creditors, the petition

17    creditors here.  But what I often have found when I've had

18    foreign insolvency proceedings to me is there's things that

19    happen in smaller circumstances.  They don't always happen

20    for bigger corporations.  Because when someone files a

21    concurso like that, just like it would be here with an

22    involuntary, it gets a lot of publicity I'm sure in a large

23    case.

24          THE WITNESS:  Yes.

25          THE COURT:  There's a lot of -- it's -- you know,

Page 113

1   you will want to make sure you can actually possibly be

2   successful if you're going down that way.

3            THE WITNESS:  Yes.

4            THE COURT:  Because we're going to talk about what

5   happens maybe if it's not.  And that's not different than

6   here I'm guessing.

7            THE WITNESS:  Yes.

8            THE COURT:  So that's why we don't see very many

9   involuntary petitions filed against large corporations here.

10  It does happen.

11           THE WITNESS:  Yes.  Okay.

12           THE COURT:  It's not never in Chapter 11, but it's

13  not that common.

14           THE WITNESS:  Yes.

15           THE COURT:  And part of it is for the reasons I

16  said.

17           THE WITNESS:  Yes.  And we have made some

18  comparisons with other countries in general.  And I remember

19  the case of the U.S., the numbers they gave me was 90

20  percent of the cases were voluntary and the rest were

21  involuntary.  And in some cases, there have been both

22  filings.

23           THE COURT:  Yes.  Yes.  Here in the United States

24  for sure.

25           THE WITNESS:  Happens the same.

Page 114

1          THE COURT:  Yes, same.  It's happened where one

2     files one and then the other person files another.  It does

3     happen.

4          THE WITNESS:  Yes, yes.

5          THE COURT:  So we've had a voluntary sometimes

6     followed by an involuntary.  Because people would like to

7     have it in another jurisdiction.  We've had involuntaries

8     followed by a voluntary.  We have a process here where

9     people can just consent after an involuntary is filed if

10    they don't want to fight it.  We have a number of types of

11    things.  But we have some big cases where we've had a fight

12    between the involuntary and the voluntary that were filed in

13    different locations.  That's not unusual.  Caesars is a good

14    example.

15         THE WITNESS:  It's kind of forum shopping.

16         THE COURT:  Yeah.  We have some of that too, yes.

17    Okay.  Mr. Qureshi had asked you a little bit and discussed

18    the fact that there were acceleration notices give in August

19    of 2022.

20         THE WITNESS:  Yes.

21         THE COURT:  So here's my question sort of

22    following up on some of the things that he had asked you in

23    his cross examination, which is does the fact that the

24    acceleration notices were given after the first inunction

25    technically not on -- not that anyone was aware of it,

Page 115

1   apparently, but that there was somewhere an injunction in

2   place, does that mean that somebody might argue that the

3   principal amount of the notes might not be considered to be

4   outstanding liabilities over 30 days due and owing for the

5   purposes of the insolvency test that we just talked about?

6   Is that possible?

7            THE WITNESS:  Yes, that is possible.  I think the

8   situation is (indiscernible) going to find that there is a

9   contingency.  The accounting people call this situation like

10  that.  (indiscernible) contingencies.  Maybe this part of

11  your liabilities are overdue, and maybe not.

12           THE COURT:  Right.  The court is going to have to

13  decide the answers to that, isn't it?

14           THE WITNESS:  Yes.

15           THE COURT:  Because we can't find that the test is

16  met unless there's actually outstanding liabilities over 30

17  days overdue.

18           THE WITNESS:  Yes, yes.

19           THE COURT:  So it has to find it is an outstanding

20  liability, not that it's a contingent liability or that's 30

21  days overdue.

22           THE WITNESS:  Yes, yes.  That's right.

23           THE COURT:  Okay.  And also for the other part of

24  the test, testifying that it's a matured obligation, right?

25  Because -- if you were considering it.

Page 116

1              THE WITNESS:  Yes.  Yes.  That's correct.

2              THE COURT:  Okay.  All right.  So now another

3     question about cross quarter world.  Since the notes here

4     are governed by New York law, would the concurso court or

5     the visitor defer to the district court in New York to

6     determine what amounts are currently due and owing under the

7     notes?

8              THE WITNESS:  Could be possible because the

9     authority that the visitor has is very wide.  So it could be

10    asking questions for the foreign court, yes.

11             THE COURT:  All right.  So then we talked a little

12    bit about obviously recognition.  And obviously we do that a

13    lot here in this court.  So my question for you really has

14    to go with what would the concurso court think of some

15    things.  Because I know how we would do them here, but that

16    doesn't mean that's how they would do them in the concurso

17    court.

18             Has the concurso court had to actually consider

19    the COMI of a group of foreign debtors in a recognition

20    proceeding?

21             THE WITNESS:  Yes.  I think it's the tax -- the

22    bankruptcy court asks in order to define whether the foreign

23    debtor has a situation that can be defined as a COMI or as

24    an establishment or neither of those.

25             THE COURT:  Okay.  And then how do they approach

Page 117

1    analyzing the COMI of multiple debtors?  I mean, I know here

2    in the U.S. in front of us we do it the way I think that you

3    said you were guessing that the concurso court would do,

4    which was on an individual-by-individual entity basis.

5              THE WITNESS:  Yes.

6              THE COURT:  That's what our caselaw says as well

7    here in the SDNY.  So what factors does the concurso court

8    consider when it does its analysis?  Here we have a number

9    of tests that have been applied, some of which people have

10   used in Europe, some in addition to here.  I'm just not

11   familiar with what people do in the concurso court.  So I

12   would like to hear from you what factors would the concurso

13   court consider in its COMI analysis.

14             THE WITNESS:  Yes.  Well, we have some provisions

15   referring to the insolvency of corporate groups.  But what

16   the -- and the dispositions we had in the LCM is very narrow

17   because it deals only with the jurisdiction of the court who

18   is going to take those cases.  And one of the articles

19   provide that it is possible to file the concurso situation

20   together for several or all of the members of the group and

21   then the court will have all those cases.  But he has to

22   conduct the concurso in a one-by-one case.  Mainly if they

23   are put under the same number of docket but they are

24   separated in order that the decision made in one of the

25   proceedings does not collide with the decision made in

Page 118

1    another of the companies subject to that.

2             THE COURT:  Okay, understood.  And what factors

3    does the court look to when it's doing the analysis?  I

4    think you mentioned some of them of course.  And I want to

5    get back and ask about establishment in a second.

6             THE WITNESS:  Yes.

7             THE COURT:  But what other things does it look at?

8    Does it look at -- you know, here of course we look at I

9    guess the place of -- the law under which it's organized.

10   Obviously different factors including things that you

11   mentioned and establishment exists.

12            THE WITNESS:  Yes, yes.

13            THE COURT:  But also just wherever there's other

14   factors about the company's liabilities and assets, like

15   where are their employees, where are their boards of

16   directors, what happens in their business, where does it

17   take place, et cetera.  We have pretty broad things we look

18   at here under various tests.

19            THE WITNESS:  Yes.

20            THE COURT:  Is that similar in --

21            THE WITNESS:  Yes, that is similar.  The burden to

22   get all the evidence is the -- it's put on the part who is

23   filing.

24            THE COURT:  Same here.

25            THE WITNESS:  Okay.  So they have to provide all

1      the evidence to the court in order to decide.

2              THE COURT:  Okay.  Mr. Qureshi asked you a bit

3      about establishment and went through the definitions.

4              THE WITNESS:  Yes.

5              THE COURT:  I have one question as follow-up

6      there.  Has the concurso court itself issued any opinions

7      interpreting establishment under the LCM 279, and if so,

8      what did it hold?

9              THE WITNESS:  What -- you're asking for a specific

10     case?

11             THE COURT:  Yes.  I'm asking you where -- you

12     know, because there seems to be obviously a disagreement

13     about how narrowly or now broad establishment should be

14     considered.

15             THE WITNESS:  Yes.

16             THE COURT:  And the party that would have to

17     consider what establishment means is the concurso court, not

18     me.  I know how we do it here.

19             THE WITNESS:  Okay.

20             THE COURT:  So the issue is what would they do --

21     you know, what would -- you know, how would the concurso

22     court -- has the concurso court in other cases, because it

23     has been in existence since 2022, had to interpret what

24     establishment means under the LCM Article 279, and if so,

25     what did it look at?  What did it hold?

Page 120

```
 1              THE WITNESS:  Let me tell you an experience I had

 2    personally.

 3              THE COURT:  Okay.

 4              THE WITNESS:  I was involved in a case where we

 5    were asking the recognition of a foreign main proceeding

 6    that was conducted in Toronto, I think, in Canada.  And we

 7    presented the case to the -- at that time the district

 8    court, saying that it was the case of a 294 article because

 9    it has no establishment.

10              And we said that because we were looking for a

11    domicile of the company in order to serve the filing of the

12    case and we were not able to find any domicile.  So we ask

13    the post service, we ask different government agencies,

14    taxes and things like that.  And neither of those could

15    provide us with the domicile.  So we filed for a 294

16    recognition without a non-main proceeding.

17              THE COURT:  Okay.

18              THE WITNESS:  But the debtor came with some

19    evidence showing that he indeed had an establishment.  And

20    he presented some documents.  Leasing of the office, some

21    agreements on the contracts they have conducted which we

22    never had news.

23              So the court ruled in favor of the debtor and said

24    you have to start full concurso because there is an

25    establishment.
```

Page 121

1          At the end, we were challenging this decision or

2     thinking and going to a full concurso, but the client stop

3     us and says leave it like that.  So we were not able to file

4     the situation.

5          THE COURT:  Understood.  Okay.  That's helpful.

6     So I think you're aware and I think you were asked a little

7     bit about the fact that there is a proceeding going on, at

8     least before it got stayed because of this proceeding, in

9     the district court here in the Southern District of New York

10    about the notes dispute.

11         THE WITNESS:  Yes.

12         THE COURT:  If that proceeding were to continue to

13    judgement, would it need to be final and non-appealable,

14    that judgment, before it could be enforced under the

15    homologation before the Mexican court?  Because that's what

16    I understood I guess your declarations to say.  Is that

17    right?

18         THE WITNESS:  Okay.  Is there a civil litigation?

19         THE COURT:  Yes.

20         THE WITNESS:  Yes, okay.

21         THE COURT:  So it's the litigation that's going on

22    in the district court right now that got stayed because of

23    this bankruptcy proceeding.  But it's --

24         THE WITNESS:  Okay.  In order to be enforced in

25    Mexico, has to be final...

Page 122

1             THE COURT:  Final and non-appealable.

2             THE WITNESS:  Res judicata.

3             THE COURT:  Right.  Okay.  Understood.  And then

4     how long does a homologation process take place in Mexico?

5     How long does that process take from the time you have a

6     judgment that's final?

7             THE WITNESS:  You are asking the only question

8     that a lawyer, a Mexican lawyer never can answer; how long

9     it will take.

10            THE COURT:  I understand.  But some estimate.

11            THE WITNESS:  I'm sorry for giving you so -- so

12    candid answer, but it's very difficult to decide because

13    there are appeals, there are amparos, there are similar

14    things, yes.

15            THE COURT:  Okay, all right.  My understanding is

16    that it's your position that the concurso court would not

17    enforce a plan in this Chapter 11 proceeding.  If I kept it,

18    didn't dismiss it, we had a plan eventually.

19            THE WITNESS:  Yes.

20            THE COURT:  Which the Debtor didn't agree to, you

21    know, which they won't agree to.  Because that would violate

22    Article 157 of the LCM.  Is that right?

23            THE WITNESS:  It's one of the provisions that

24    could be violated for taking reorganization plan coming from

25    other jurisdiction without taking into account the rights

                                                                Page 123

1    that creditors and the classes of creditors ruled in 157

2    (indiscernible) by the Mexican law.  So --

3                THE COURT:  Yeah, no, understood.  But we have a

4    process here for making sure creditors get taken into

5    consideration.  My understanding was that the issue of if

6    there is a non-consensual plan, it might meet the creditor

7    standards because you might be able to do that.  You solicit

8    the creditors, they have the right to vote.  They get the

9    same treatment they would otherwise under Mexican law.  It

10   seems possible to me that you could do that.  But what I was

11   just trying to understand is it doesn't seem possible the

12   way you interpret Article 157 of the LCM that you could have

13   a non-consensual plan that the concurso court would enforce.

14   That's what you're saying, right?

15               THE WITNESS:  Well, actually, there are not such a

16   thing of a non-consensual plan.  The plan has to be

17   consented --

18               THE COURT:  Has to be consensual, yes.

19               THE WITNESS:  Yes.

20               THE COURT:  But if you had one in our proceeding

21   that was not consensual, what you're saying is that they

22   would not enforce it because it has to be consensual.

23               THE WITNESS:  Okay, yes.

24               THE COURT:  It violates public policy, you have to

25   have a concurso.  I just want to make sure I understand

Page 124

1     that.

2                 THE WITNESS:  Yes.  You are right, Your Honor.

3                 THE COURT:  Now, in the context of whether there

4     is an involuntary concurso, and that -- just hypothetically

5     assume that one was commenced by the petitioning creditors

6     and ultimately somehow the visitor and the concurso court

7     held that the insolvency test was met.  My understanding of

8     what you've explained about Mexican law is that there would

9     still have to be an agreement with the debtors on a plan in

10    the concurso process or the debtors would have -- there

11    would have to be a liquidation, right?  Because there has to

12    be an agreement with the creditors and the debtor in the

13    concurso process.  And if they can't ever get to that

14    agreement, then the company ends up in liquidation.  Is that

15    right?

16                THE WITNESS:  Not exactly.

17                THE COURT:  Okay.

18                THE WITNESS:  The idea is the involuntary case

19    will start.  And that means that the first part of the

20    concurso is the receita.

21                THE COURT:  Right. But I'm assuming they get past

22    that.  It's insolvent.

23                THE WITNESS:  Okay, they passed.  So the court has

24    to rule whether the debtor is insolvent or not.

25                THE COURT:  Right.  The court does.

Page 125

1            THE WITNESS:  Okay.  And in that part of the

2    judgement, the court has to decide whether it's a main

3    proceeding or a non-main proceeding, the one he is

4    recognizing.  And then the next stage, which is actually the

5    first stage of the concurso is the conciliation.  So proof

6    of claims come and then a plan has to meet the numbers and

7    the percentages of the 157.  And that is in that part where

8    the reorganization plan coming from the recognized

9    proceeding could be -- could be taken into account.  And let

10   me add another thing.  If the concurso is started because,

11   as I think is the case we are talking about, a non-main

12   proceeding because the debtor has an establishment in

13   Mexico, then the assets and creditors that are to be taken

14   into account in this new concurso are those who are in

15   Mexico.  The idea is to treat the establishment like an

16   independent entity.

17            THE COURT:  Right.

18            THE WITNESS:  And it is possible to mix the

19   decision reach in a foreign proceeding with the decision

20   made in the reorganization plan in Mexico and combine.  That

21   is part of the corporation.  Unfortunately, Mexico has not

22   adopted, and as I understand it United States cannot either

23   (indiscernible) --

24            THE COURT:  Not yet.

25            THE WITNESS:  Yeah.  You know what I'm talking

Page 126

1    about.

2         THE COURT:  Yeah.  Enforcement of the new

3    judgement.

4         THE WITNESS:  The enforcement of judgement related

5    with the insolvency cases and the model on insolvency on the

6    group.

7         THE COURT:  Yeah, group.

8         THE WITNESS:  The groups.  And we are finishing on

9    the story about whose law will be applicable, saying what

10   has to supersede the other.  The next 40 concurso are the

11   local and they have different provisions.  That's the task

12   we have now in (indiscernible) trial.  I think in next

13   December we will be trying to finish that part.

14        THE COURT:  Understood.  Well, it's very hard to

15   always draft these (indiscernible).

16        THE WITNESS:  Yes.

17        THE COURT:  That's for sure.  So let me just go

18   back for a second though.  Just assume for the moment this

19   is just purely a Mexican company.  Just assume we're talking

20   about hypothetically it's a Mexican company.

21        THE WITNESS:  Yes, okay.

22        THE COURT:  Okay?  And there's an involuntary

23   concurso that's commenced.  The visitor and the concurso

24   court hold that the insolvency test was met.  Both the court

25   and the visitor agree, it gets approved.  My understanding

Page 127

1    is though in that circumstance, just even though it started

2    as an involuntary concurso, with respect to the plan, it

3    still has to be an agreement of the debtors and the

4    creditors.  Is that correct?

5              THE WITNESS:  Yes.  Yes.

6              THE COURT:  And if they can't reach an agreement,

7    then the next step is liquidation.  Is that right?

8              THE WITNESS:  Yes.

9              THE COURT:  Okay, fine.

10              THE WITNESS:  But even our law has a provision

11    that permits that reorganization plan could be achieved

12    during the liquidation process.

13              THE COURT:  Interesting.  Yeah.  We don't have

14    that exactly, but we have the idea that you can have a

15    liquidating Chapter 11 plan in the reorganization process.

16    But your reorganization process can be a liquidation in

17    essence.

18              THE WITNESS:  Yes, okay.

19              THE COURT:  So it's a little different, but

20    interesting.  Okay.  I have just a couple more questions for

21    you.

22              If the debtors don't -- I guess you've said that a

23    concurso seems the only way for the debtors to reorganize in

24    Mexico.

25              THE WITNESS:  Yes.  So far, yes.

Page 128

1              THE COURT:  Right, okay.  And the Debtors so far

2        obviously have missed some interest payments.  I think

3        everyone acknowledges that.

4              THE WITNESS:  Yes.

5              THE COURT:  And they obviously haven't paid some

6        more interest payments because they're still under the

7        injunction since the original time.

8              THE WITNESS:  Yes.

9              THE COURT:  And what happens if the debtor doesn't

10       have the ability to refinance the notes?  Do you know why?

11       Or what is in consideration as to why a debtor doesn't

12       choose or chooses to commence a concurso proceeding?

13       Because it seems odd to me that if you miss six interest

14       payments, so you clearly aren't paying the funds, you might

15       or might not owe the whole principal depending on what you

16       think about the acceleration provision.

17             THE WITNESS:  Yes, okay.

18             THE COURT:  You need a restructuring.  This is my

19       perspective.

20             THE WITNESS:  Yes, yes.

21             THE COURT:  So is there some reason why these

22       debtors, if you know, have chosen not to commence a concurso

23       proceeding at this point given all that?

24             THE WITNESS:  Yes.  The decision can be tried to

25       reorganize through the concurso.  And it can be a regular

Page 129

1    concurso, either voluntary or involuntary.  Or if you have

2    the consent of enough percentage of your creditors, you can

3    start a prepackaged concurso.

4              THE COURT:  Okay.  So they have prepackaged

5    concurso.  Okay.

6              THE WITNESS:  Yes, yes.

7              THE COURT:  Interesting.

8              THE WITNESS:  We have the prepackaged.  We need

9    the consent of more than 50 percent of the amount of

10   creditors.

11             THE COURT:  Okay.

12             THE WITNESS:  And that proceeding is the same

13   without the visit part.  Because in the case of the

14   prepackaged, we don't need the visit to be conducted.

15             THE COURT:  Okay, that's helpful to know.

16             THE WITNESS:  The other possibility is forget

17   about the concurso and do a civil litigation asking to

18   repayment of whatever is due.

19             THE COURT:  Yeah.  So far that doesn't seem like

20   that's going so well, but I hear you.  Understood.  Okay.

21   All right.  Well those were all my questions.

22             THE WITNESS:  Okay.

23             THE COURT:  So now I'm going to obviously let

24   redirect occur.

25             THE WITNESS:  Okay.

1              THE COURT:  Thank you for answering my questions.

2      I appreciate that.

3              THE WITNESS:  Thank you.  Thank you, Your Honor.

4              MR. CLAREMAN:  Your Honor, we would like to hand

5      up a redirect binder.

6              THE COURT:  Sure.

7              MR. CLAREMAN:  I am also handing the witness a

8      redirect binder as well as some demonstrative exhibits which

9      are just excerpts from the LCM.

10             THE COURT:  Yes.  You may approach.

11             THE WITNESS:  Thank you.

12             MR. CLAREMAN:  Your Honor, if the binder --

13     Professor Mejan, you have the redirect binder and you also

14     have a demonstrative set of slides.

15             THE WITNESS:  Yes.

16             MR. CLAREMAN:  Okay.  Do you still have the binder

17     that was handed to you earlier by --

18             THE WITNESS:  Yes.

19             MR. CLAREMAN:  Okay.  I may refer to all of these

20     sources.

21             THE WITNESS:  Okay.

22             THE COURT:  Okay, great.

23             MR. CLAREMAN:  Okay.

24           REDIRECT EXAMINATION OF LUIS MANUEL C. MEJAN

25     BY MR. CLAREMAN:

1   Q    Professor Mejan, If I can ask you in the demonstratives

2   exhibit to please turn to Tab 13.

3   A    Thirteen.

4   Q    Yes.

5   A    Article 293.

6   Q    Yes, Article 293.  Now, this provision is not in the

7   model law.  Is that correct?

8   A    No, it's not correct.  Although it is implied somehow

9   in the guide of enactment, there is one part saying that the

10  enactment (indiscernible) take this decision about the

11  establishment.  But it's only a commentary done within the

12  guide of enactment.

13  Q    Okay.  So it's contemplated by the guide to enactment

14  that an enacting state could adopt a provision like this.

15  A    Yes.

16  Q    Okay.  And Mexico made a choice to adopt --

17            MR. QURESHI:  Objection, Your Honor.  This is

18  redirect.  A little bit leading.

19            THE COURT:  Okay.  All right.  Sustained.

20  Objection sustained.

21  BY MR. CLAREMAN:

22  Q    Professor Mejan, you testified on cross-examination

23  concerning Article 293.  Do you recall being asked questions

24  and discussing this a bit with Mr. Qureshi on cross?

25  A    Sorry, I didn't catch the question.

Page 132

1   Q    Do you recall testifying on cross-examination about

2   Article 293?

3   A    Yes.

4   Q    Okay.  Now, can you explain for the Court what the

5   consequence of Article 293 is when a Debtor seeks

6   recognition of a foreign insolvency proceeding in Mexico?

7   A    Okay.  The idea is that the Debtor whose insolvency

8   proceeding is being recognized owns or has an establishment

9   in Mexico.  Then the idea is to start a full, new concurso

10  proceeding of this part of the establishment that the debtor

11  has in Mexico.  That's the idea.

12  Q    Okay.  Now, if you look at the first sentence of

13  Article 293, it says when the recognition of a foreign

14  procedure is requested in respect of a merchant that has an

15  establishment in Mexico, the provisions of Chapter 4 of

16  Title 1 of this law must be observed.  Do you see that?

17  A    Yes, yes.

18  Q    Can you explain what that means?

19  A    Yes.  That means -- Chapter 4 of Title 1 in the LCM

20  refers to this part of the proceeding which is called the

21  visitor we were talking about.  And this is the -- this part

22  of the article says that this visitor and the whole Chapter

23  Four has to be observed and taken into account.  So the

24  situation will be that the judge receiving the petition

25  should ask if (indiscernible) to appoint a visitor or run

Page 133

1   all the visit and all those parts of the proceeding that we

2   have to in order to start a new concurso.

3   Q    Okay.  And then the second sentence of Article 293 says

4   the judgement that Article 43 of the statute refers to shall

5   also include a declaration that the procedure, foreign

6   procedure in question is recognized.  Can you explain what

7   the judgment in Article 43 is?

8   A    Yes.  It's the logical consequence of the visit.  If

9   you see Chapter 4 finish on Article 41, it says that the

10  judge will take all what has to happen in the visitor to the

11  consequences provided by the law.  And the next article, 42,

12  ask for provide the judgement.  And 43 is the description of

13  what the judgement considering a debtor insolvent or subject

14  to a concurso has to do.  Forty-three is a checklist for the

15  court to decide what is going to happen in the concurso

16  because the situation, the legal situation of debtor and

17  even creditors have change as a consequence of the

18  declaration of insolvency of the debtor.

19  Q    Okay.  And if you turn to Tab 4 of the demonstrative

20  binders, you'll see an excerpt from LCM, Article 43.  Do you

21  see that?

22  A    Yes.

23  Q    Is this part of the list of things that need to be

24  contained in the concurso judgement that's described in

25  Article 293?

Page 134

```
1    A    Yes, yes.

2    Q    Okay.  And if I can focus your attention on Article --

3    on Subsection Four.

4    A    Yes.

5    Q    It states the order to institute -- to the institute to

6    appoint a bankruptcy conciliator through the random

7    mechanism previously established.  Can you explain what that

8    provision requires in the concurso judgement that is being

9    referred to in Article 293?

10   A    Yes.  The order to appoint a conciliator is that with

11   this judgment, the 43 article judgement, starts the first --

12   the first stage of the concurso, which is the conciliation.

13   And meaning original agreement.  And in order to comply with

14   this part of the law, the conciliator is an insolvency

15   professional who has the task of trying to reach an

16   agreement among the debtor and creditors to draft and to

17   achieve a plan of reorganization.

18   Q    Okay.  And if you look at V on that page, it states the

19   declaration of the opening of the conciliation stage unless

20   the bankruptcy of the merchant was filed.  Can you explain

21   what the declaration of the opening of the conciliation

22   stage refers to?

23   A    Yes.  It's exactly the consequences of appointing a

24   conciliator.  Maybe the other one around starting the

25   conciliation stage and then appoint the conciliator.  But at
```

Page 135

1    the end it's the same.  Because it means that a period of

2    180 days (indiscernible) possible extension starts in order

3    to reach reorganization plan.  And during this conciliation

4    period also the proof of claims is conducted.  So we can

5    have a list, a record of who are all the creditors, how much

6    they are allowed to -- the amount of the creditors.  And

7    even start the qualification of the creditors belonging to

8    different classes just in case we go into liquidation or if

9    there is a different way to vote on the reorganization plan.

10   Q    Okay.  And the reference in V that says unless the

11   bankruptcy of the merchant was filed.  Can you explain what

12   that means in this context?

13   A    Yes.  When -- either in a voluntary or an involuntary

14   concurso, the petitioner who is filing can ask that the

15   concurso skips the conciliation and go directly to

16   bankruptcy.  If it's an involuntary case, going to

17   bankruptcy only happens if the debtor agrees with going to

18   the liquidation stage.  Other than that, the conciliation is

19   taken and directed.  And of course it's possible that the

20   debtor ask for the liquidation because he doesn't want to

21   reach an organization plan.

22   Q    Okay.  Now, if you turn to Tab 5 in the demonstrative

23   binder, we see here LCM -- an excerpt of LCM, Article 157 I

24   believe, which the Court was asking you about a moment ago.

25   A    Yes.

Page 136

```
 1    Q    Do you have that?  And it states to be effective, the
 2    composition deed must be subscribed by the merchant and its
 3    admitted creditors that represent more than 50 percent of
 4    the sum of.  And then there's two roman numerals here.
 5    A    Yes.
 6    Q    What is the composition deed?
 7    A    What is the composition deed?  It's a not good
 8    translation of the plan of reorganization.
 9    Q    Okay.  And subscribed by the merchant, what does that
10    mean?
11    A    The Debtor itself.
12    Q    Okay.  Is that an agreement by the debtor?
13    A    Yes, yes.
14    Q    You should turn your phone off.
15    A    Sorry, sorry.  Turn it off.
16    Q    Okay.  Now, does Article 157 apply in a concurso
17    procedure that is commenced pursuant to Article 293 when
18    there is recognition sought for a debtor with an
19    establishment in Mexico?
20    A    Yes, yes.
21    Q    Now, if you could turn back to Article 293.  This is
22    Tab 13.  It's Tab 13.
23    A    Which number tab, sorry?
24    Q    Tab 13.
25    A    Thirteen.
```

Page 137

1    Q     One three.

2    A     Yeah.

3    Q     Okay.  And then the last sentence of Article 203 says

4    the commercial bankruptcy shall be governed by the

5    provisions of this law.

6    A     Yes.

7    Q     Can you explain what that is in the context of --

8    A     Yes.  That means that the complete concurso proceeding

9    must be conducted.

10   Q     Okay.  Now, if you turn to Tab 14, you see Article 294.

11   Do you have that in front of you?

12   A     Yes.

13   Q     All right.  And Article 294 states that the merchant

14   does not have an establishment in the Mexican Republic, the

15   procedure shall be processed between the foreign

16   representative and the merchant.  And then the next

17   paragraph says the trial shall be processed following the

18   provisions that are included in Title 10 of this law for the

19   ancillary proceedings.  Do you see that?

20   A     Yes.

21   Q     Okay.  Now, can you explain when you're under 294 and

22   there is no establishment in Mexico, how does this

23   proceeding differ from the proceeding in 293 where there is

24   an establishment in Mexico.

25   A     Yes.  the idea is that in this case what the Mexican

Page 138

```
1    court is bound to do is cooperate and help the foreign

2    representative of the judgement that has been recognized

3    (indiscernible) that has been recognized in order to

4    complete whatever they need in order to cover for instance

5    the assets that the Debtor has in Mexico or to collect the

6    (indiscernible) recovery on assets, collect the debts for

7    the debtor.

8    Q    Okay.  And if you look at Article 293, is there any

9    distinction drawn whether the foreign proceeding is

10   determined to be a foreign main proceeding or a foreign main

11   proceeding with respect to Article 293?

12   A    No, no.  There is no difference.  It can be a case of a

13   foreign main or can be a case of a foreign non-main

14   proceeding.

15   Q    So in either case is it correct that a full concurso is

16   required?

17   A    Yes.  Yes.

18   Q    Now, you've testified that in your opinion, the alleged

19   debtors do not have an establishment in Mexico.  Do you

20   recall that testimony?  I'm sorry --

21   A    Please repeat the question.  I lost one word.

22   Q    I'm sorry.  Yes.  I made a mistake.  I made a mistake.

23   You testified that the alleged debtors do not have an

24   establishment in the United States.

25   A    I testified that the Debtor in this case --
```

Page 139

1   Q     Yes.

2   A     -- had not establishment in the United States.

3   Q     Correct.

4   A     Yes.

5   Q     Yes.  Okay.

6   A     I did so.

7   Q     All right.  So no establishment in the United States.

8   A     no.

9   Q     If a concurso court were to disagree with that

10  conclusion and find that some of the alleged debtors had an

11  establishment in the United States and a case was brought

12  for recognition in Mexico on the basis of an establishment

13  as a non-main proceeding in Mexico, would a full concurso

14  still be required under Article 203?

15  A     Yes, for the goods, creditors and things that the

16  debtor has in Mexico.

17  Q     You also testified about the basis for your opinion

18  that there is no establishment for the alleged debtors in

19  the United States.  Do you recall that testimony?

20  A     Yes.

21  Q     If you turn to Tab 10 in the demonstrative binder,

22  we've excerpted a portion of LCM Article 279.  Is this the

23  definition from the LCM that defines when there is an

24  establishment in the jurisdiction?

25  A     Yes.

Page 140

1   Q    Okay.  Now, you were asked questions about employees.

2   You were asked questions about officer by Mr. Quereshi on

3   cross-examination.

4   A    Yes.

5   Q    Could you explain for us how you believe a court in

6   Mexico will ultimately decide whether there is an

7   establishment in the United States for any of the alleged

8   debtors or not?

9   A    Yes.  I think the court has to receive evidence and

10  decide whether those possibilities put in the definition

11  have been met.  Because it's a very broad definition.  So

12  what the Mexican court has to decide is whether -- is there

13  a place, a corporation, economic activity is conducted and

14  if this is in a non-transitory way, then they are using the

15  material and human resources.

16  Q    And why is the presence of employees and offices in a

17  specific jurisdiction relevant to the determination of

18  whether there is an establishment?

19  A    Because the presence of those circumstances can be a

20  sign that there is an establishment.

21  Q    And what does the non-transitory portion of this

22  definition refer to?

23  A    I think that's the most difficult term to understand in

24  this definition, the non-transitory.  What the guide of

25  enactment explains about not being non-transitory is that

Page 141

1    the drafters in this case, the (indiscernible) and then

2    after that the model law is not to commit themselves to put

3    an extension of time because this extension of time can be

4    irrelevant even if it's too long or it's too short because

5    what is short and what is long, it's difficult.  So they put

6    the non-transitory.  And I think where we have to see in

7    order to decide whether it's transitory or non-transitory is

8    the way the debtor is conducting their business.  Maybe they

9    can say, okay, we are doing this for now even if that is too

10   long.  But we are not planning to stay any more than that.

11   And maybe they will change their mind. I think this is the

12   most difficult part to decide in the finding if some

13   situation meets the definition of establishment.

14   Q    Okay. Well, does the existence of employees and offices

15   indicate in some manner that a company has a permanent

16   business in a particular place?

17   A    Can be.  Can be.  The presence can be one of the

18   arguments to say that, yes.

19   Q    Okay.  Now, you were asked questions by Mr. Qureshi

20   about the work that you did to reach your conclusion that

21   there is no establishment for any of the alleged debtors in

22   the United States.  Do you recall that?

23   A    Yes, I recall it.

24   Q    And you testified that you relied on the declaration by

25   Mr. Rodriguez.  Do you recall that?

Page 142

1   A     Yes, that's right.

2   Q     Okay.  And did you review Mr. Rodriguez's declarations

3   in full?

4   A     Yes.  Yes --

5   Q     Go ahead.

6   A     I went through all of them (indiscernible) because I

7   understood that my job was to explain how to interpret some

8   articles of the LCM and not going through the merits of the

9   case.  So I didn't conduct any investigation.  And mainly if

10  Mr. Rodriguez is the chairman of the board, it is the

11  director general.  He is saying that I think he has

12  credibility, at least my credibility.

13  Q     And did you also rely on Mr. Rodriguez' declarations in

14  forming an opinion concerning where the COMI of the alleged

15  debtors is?

16  A     Yes, yes.

17  Q     And what was your conclusion about the COMI of the

18  alleged debtors?

19  A      Yes.  I think that if there is not an establishment

20  laid along the center of main interest, the center of main

21  interest for me after the declaration of Mr. Rodriguez is

22  very clear that it's in Mexico.

23  Q     Okay.

24  A     And even as a private citizen, I have seen what TV

25  Azteca has done through many years, so I understand that

Page 143

1    it's a Mexican company and the center of main interest is in

2    Mexico just out of my observing like a common citizen.

3    Q    Okay.  If you turn in the redirect binder that you have

4    in front of you to Tab 4.

5    A    Tab 4, yes.

6    Q    Tab 4, for the record, is JX17, which is the

7    declaration of Rafael Rodriguez Sanchez.  Could you turn

8    please to Paragraph 6 of the declaration?

9    A    Yes.  It says principal place of business is located in

10   Mexico.

11   Q    And this is one of the declarations that you testified

12   you reviewed in full in connection with your opinion.

13   A    Yes, yes.

14   Q    If you look at Paragraph 6, it states TVA's principal

15   place of business is located in Mexico City.  The company's

16   infrastructure, operations, and assets are centered in

17   Mexico City, and its directors, officers, and controlling

18   persons reside in Mexico.  TVA and its subsidiaries have

19   more than 3,500 employees in Mexico, including more than 250

20   unionized employees whose contracts are subject to Mexican

21   employment law.

22       Can you explain how that information in Mr. Rodriguez's

23   declaration supports or corresponds to your opinion

24   concerning the COMI of the debtors?

25   A    Yes.  I think the main point is when he refers that the

1    directors, officer, and controlling persons reside in

2    Mexico.  Because that is the justification for the

3    infrastructure, operation, and assets centered in Mexico.

4    So there is not only the offices and the main factor like

5    the director officers, all is centered in Mexico City.  I

6    think that part is the most relevant for me to reach the

7    conclusion that he has tried saying that he has not

8    (indiscernible) COMI in the United States, but in Mexico.

9    Q    Okay.  And if you go to Paragraph 10 of Mr. Rodriguez's

10   declaration, that states, TVA's real properties primarily

11   consist of broadcasting, production, and office facilities,

12   almost all of which are located in Mexico, including its

13   principal offices in Mexico City with (indiscernible).  Do

14   you see that?

15   A    Yes.

16   Q    Okay.  And can you explain how that type of information

17   is relevant to your analysis of where the COMI is for the

18   (indiscernible)?

19   A    The principal offices and operation -- let me say

20   something that maybe is not relevant.  But in my way to hold

21   my hat too close for those premises almost every day, twice

22   or three times a day.  And even in some cases I was asked to

23   be interviewed, but some reporters choose in that place.  So

24   I know -- I know exactly what this premises are in Mexico

25   City.

Page 145

```
 1   Q    Now, if you turn to Paragraph 15 of this declaration.

 2   A    Yes.

 3   Q    You testified on cross-examination that in your opinion

 4   there's no establishment for the alleged debtors in the

 5   United States.  Paragraph 15 states, TVA does not operate

 6   television networks in the United States today.  TVA also

 7   has no offices, no operations, and no employees in the

 8   United States.  Do you see that?

 9   A    Yes.

10   Q    I know you were asked if you did an analysis one-by-one

11   of all the alleged debtors in reaching the conclusion that

12   there is no establishment.

13   A    No, I did not, a one-by-one case.

14   Q    Okay.  And you were asked did Mr. Rodriguez in his

15   declaration do a one-by-one analysis.  Do you recall that?

16   A    Yes.  Yes.  Because in this part and in some other

17   parts, he is referring some specific operation of some of

18   the companies belonging to the group.

19   Q    Okay.  But he's referring to all of the alleged debtors

20   in discussing his declaration where the operations are and

21   offices and employes, correct?

22   A    Yes, yes, yes.  That's correct.

23   Q    And you relied on that broad statement about all of the

24   companies in forming your opinion about each.  Is that fair?

25   A    Yes.
```

Page 146

1   Q    Okay.  Now, if you turn to Paragraph 19 of Mr.

2   Rodriguez's declaration.

3   A    The certain contract agreements.

4   Q    Yes.  So this paragraph, the first sentence, it says

5   TVA is currently a party to certain contractual agreements

6   with United States entities, including contracts for

7   advertising on Mexican television, original content sales,

8   programming produced in Mexico, and the resale of soccer

9   broadcasting rights.  Do you see that?

10  A    Yes.

11  Q    Okay.  How can it be that a party could have contracts

12  with parties in the United States but still have no

13  establishment in the United States?  Can you explain that,

14  please?

15  A    Yes.  I think it's very common.  One person residing in

16  one jurisdiction can make some contract with people or

17  companies who has the residence in another country, in

18  another jurisdiction without having an establishment in that

19  part.  So if a company wants to go and to make a contract,

20  for instance, Jamaica, that doesn't mean that he is moving

21  to Jamaica his operation.

22  Q    Okay.  So when there is a contract with a country such

23  as the United States, what do you have to do in order to

24  determine whether or not there is an establishment here or

25  not?

Page 147

```
 1   A    Well, that contract, it has to be seen what kind of

 2   contract is that.  What kind of goods or obligations come

 3   out of that contract?  That's the first one.  The second one

 4   would be is that an economic activity or not.  Because it

 5   can be some non-economic activity.  Third one, how

 6   transitory or how permanent is that agreement.  And you can

 7   say this agreement is undefined about the relation of the

 8   agreement or has a period, a duration of X amount of time,

 9   short or long, that's subjective.

10        So I think you have to consider all those things around

11   this agreement in order to define if this constitutes or not

12   an establishment.

13   Q    And did you consider in the course of your analysis the

14   descriptions of the contractual agreements that Mr.

15   Rodriguez has in his various declarations?

16   A    I think the whole idea I got from this declaration is

17   that yes, we have business over there.  Of course we do

18   business and agreements in other countries, but that doesn't

19   mean that we are operating in that as part of the work.

20   Q    Now, you were shown on cross-examination -- if you

21   still have the book -- you have the book there that Mr.

22   Qureshi was showing you.  If you can turn to JX154 in the

23   cross-examination book.

24   A    154 on cross-examination.

25   Q    Yeah.
```

Page 148

1   A      Yes, yes, I remember this.

2   Q      I'm turning to it myself.  Okay.  Now, this is a news

3   article that discusses an agreement or discusses something

4   between ICARO and TV Azteca International.  Is that right?

5   A      Mm-hmm.  Yes, yes.

6   Q      And you testified on cross that you had not seen this

7   news article before.  Is that correct?

8   A      This is -- today was my first time.

9   Q      Okay.  But if you turn back if you could to JX17, which

10  is the Rodriguez declaration.  Do you still have that

11  available to you?

12  A      Seventeen, yes.

13  Q      Okay.  Now, if you look at Paragraph 20.

14  A      Yes.

15  Q      Okay.  You see if you go to the second sentence in that

16  paragraph, it says in 2021.  Do you see that?

17  A      Yes.

18  Q      Okay.  It says in 2021, TVA entered into a commercial

19  partnership and licensing agreement with ICARO Media Group

20  Inc., a U.S. corporation, to distribute TVA's content

21  through the ICARO Super App, which is a video management

22  platform that organizes, posts, distributes, and edits

23  content that powers ICARO's direct-to-consumer product

24  suite.  The primary anticipated market for this product is

25  Latin America.

Page 149

```
 1   A    Yes.

 2   Q    The content created for this app is primarily generated

 3   in Mexico.  Do you see that?

 4   A    Yes.

 5   Q    And then to date, TVA has not received any payments

 6   from ICARO over that agreement.  Do you see that?

 7   A    Yes.

 8   Q    Okay.  So did you consider the description of the

 9   actual contractual arrangement with ICARO when you were

10   forming your opinions in this cases?

11   A    Okay, I didn't realize that this piece of news was

12   related with this.  How I see this paragraph 20 was some

13   plans for the future for doing some agreements and some

14   operations and still not intended to be a permanent

15   establishment in the foreign country.  So now --

16   Q    So you relied on Mr. Rodriguez's description of the

17   contractual arrangement --

18   A    Yes, yes.

19   Q    -- that actually exists as opposed to a news article.

20   Is that fair?

21        MR. QURESHI:  Your Honor, I'm sorry.  I've given

22   Mr. Clareman a lot of leeway.  He really needs to stop

23   telling the witness what his opinions are and asking the

24   witness to agree and ask a proper open-ended question.  This

25   is direct.
```

Page 150

1            THE COURT:  Sustained.

2    BY MR. CLAREMAN:

3    Q    So, Mr. Rodriguez, can you see that both Paragraph 20

4    and the news article both refer to ICARO.  Is that -- do you

5    see that?

6    A    Yes.

7    Q    Okay.  And in relying on the Rodriguez declaration, you

8    were relying -- well, were you relying on Mr. Rodriguez's

9    description of the --

10   A    Yes.

11   Q    Okay.  Now, if you can turn to -- if you go back to the

12   document that was being shown to you on cross, which is

13   JX36.  I'm sorry, 136.  I apologize, 136.

14   A    Which one?

15   Q    It's in the cross book.  136.

16   A    One, three, six.

17   Q    Yes.

18   A    (indiscernible), yes.

19   Q    Okay.  And you were shown -- and you testified on cross

20   that you hadn't seen this document before.  Is that correct?

21   A    Yes.

22   Q    Okay.  Now, you were shown Page 3 of the presentation

23   and you were directed to language about co-production of a

24   U.S. (indiscernible).  Or something about a U.S.

25   (indiscernible).  Do you recall that?  It's at the bottom of

Page 151

1   Page 3 of JX136.

2   A    Yes.

3   Q    Yes?  Okay.  If you turn to Page 5 of JX136.

4   A    Yes.

5   Q    Okay.  Do you see this page that's entitled "Our

6   Business Units"?

7   A    Yes.

8   Q    Okay.  And do you see that there are two geographies

9   here that are circled?

10  A    Yes.  Mexico and Spain, yes.

11  Q    Okay, Mexico and Spain.  Is the United States circled

12  on this page?

13  A    No.

14  Q    Okay.  You can put that aside.  If I can direct you

15  back to the redirect binder that was just handed up to you.

16  If you go to Tab 5 of the redirect binder, you'll see --

17  A    For what?

18  Q    Tab 5.

19  A    Yes.

20  Q    You'll see the reply declaration of Mr. Rodriguez.

21  A    Yes.

22  Q    If I can direct you -- this is JX36.  If I can direct

23  you to Paragraph 3.

24  A    The opposition -- okay.

25  Q    So this is Mr. Rodriguez's reply declaration.

Page 152

1   Paragraph 3 towards the bottom states -- actually, it starts

2   towards the top.  It says the petitioning creditors point to

3   three other U.S. subsidiaries of TVA, Northstar Media,

4   Northstar McAllen License, and Dopamine Entertainment Inc.

5   as evidence of TVA's U.S. connections.  Do you see that?

6   A    Yeah.

7   Q    Okay.  And then it says those entities are not alleged

8   debtors and do not have any current operations in the United

9   States or elsewhere.  Do you see that?

10  A    Yes.

11  Q    Okay.  Can you explain how if at all Mr. Rodriguez's

12  statements about Dopamine were relevant to your opinion that

13  there is no establishment in the United States?

14  A    Okay.  Because having a company organize and -- how do

15  you say incorporated in one jurisdiction doesn't mean that

16  your operation is in that place.  And I think either the LCM

17  and the Model Law forbid you from this purpose have the same

18  idea that the domicile has the presumption of being the

19  center of main interest.  But that can change.  And if the

20  company has started their operation in a different

21  jurisdiction, then you cannot say that you are the owner of

22  a subsidiary incorporated in another country that you are

23  having your COMI over there.

24  Q    Okay.  And does the LCM establish a presumption if a

25  corporation is organized under the law of a country

1    concerning where its COMI is?

2    A    The LCM (indiscernible) a presumption is that the

3    domicile, what we call in Mexico the social domicile, which

4    is the one put on the bylaws and the register, there is the

5    presumption that that part is the real domicile.  But if you

6    face in reality -- and that's the word used by LCM, in

7    reality it has not been translated in this copy we have.

8        In the case in reality of that domicile, then you get

9    to go to the place where the main administration is

10    conducted.

11    Q    And how does a court know where the main administration

12    is conducted under Mexican law in the LCM?

13    A    The petitioner who (indiscernible), either voluntary or

14    involuntary, has to provide the evidence to the court when

15    that happens.

16    Q    You were asked questions on cross-examination

17    concerning injunctions that have been issued in Mexico.  Do

18    you recall that?

19    A    Yes.

20    Q    And you testified in response to questions by Mr.

21    Qureshi that the injunctions would not prohibit the filing

22    of a concurso petition.

23    A    Yes, that was my interpretation.

24    Q    Okay.  And can you explain the basis for that

25    interpretation of the injunctions that you reviewed?

Page 154

1    A    Yes.  Not having the text, but the idea is that the

2    injunction enjoins the people that have rights with the

3    injunctions to stop any proceeding with the purpose of

4    colleting or being repaid.  I think those are the words that

5    used.  And why I say that that does not cover an insolvency

6    proceeding, because my idea and my understanding of what an

7    insolvency proceeding is, it's much wider than that.  And

8    the purpose of an insolvency proceeding, and especially the

9    one we have in Mexico, is defined in article first of the

10   LCM, is to try to avoid the ruin of the debtor and try to

11   avoid that this ruin can drag along other companies that

12   made business with the company.  So the idea I said for a

13   corporate restructuring of insolvency case is that it tries

14   to take together all the legal relationships that the debtor

15   has and try to fix them in order to say, okay, we have had

16   some problems and we are not performing well, but maybe we

17   can find a way to cover that.  And maybe we have time, we

18   have some other things.  But we need to keep this debtor in

19   operation, and I don't want to cause any damage to you who

20   do business with me.

21        And even if that is not possible, then the output of

22   the concurso proceeding could be the liquidation.  But

23   that's the last resort, the last thing that had to happen.

24   Because the main objective has not been accomplished, has

25   not been possible to be accomplished.  So I don't see

Page 155

1    insolvency proceeding as a way to collect on its debt.

2        I think in the civil and the (indiscernible) we have a

3    lot of proceedings to recover one single debt.  And the

4    purpose of an insolvency case is much bigger than that.

5    Q    Now, did you review or have you reviewed an example of

6    an injunction that was submitted by Mr. Guerra in connection

7    with one of his reports?

8    A    Yes.  I saw that exhibit, yes.

9    Q    Okay.  Can you turn to Tab 12 of the redirect binder?

10   A    Yes.

11   Q    And is this a copy -- do you have it in front of you?

12   A    Yes.

13   Q    Okay.  Is this a copy of the injunction that Mr. Guerra

14   submitted that you reviewed?

15   A    (indiscernible) I have the supplemental declaration of

16   Mr. Guerra.

17   Q    Right.

18   A    But not (indiscernible).

19   Q    Okay.  Well, but you have reviewed the injunction that

20   he actually --

21   A    Yes, yes.

22   Q    So if you turn to Page 24 of JX161.  I'm sorry, it's --

23   I'm sorry, Tab 12 of the redirect.

24           THE COURT:  Sorry, what page?

25           MR. CLAREMAN:  So Tab 12 of the redirect binder,

Page 156

```
 1    page 24 of 28.  That's where I am.

 2              Do we have copies of JX161 that we can...

 3              MR. QURESHI:  Tab 12 in my binder is JX130.

 4              THE COURT:  Yes, so is mine.

 5              MR. CLAREMAN:  Okay.  Well...

 6              THE COURT:  But, I mean, you think it's in your

 7    exhibits.  So you could just -- might have to give it to the

 8    witness.

 9              MR. CLAREMAN:  Yes.

10              THE COURT:  So what are you using?  It was Joint

11    sixty-what?

12              MR. CLAREMAN:  This is JX161.

13              MR. QURESHI:  That's at Tab 10.  It's at Tab 10.

14              MR. CLAREMAN:  All right.  Apologies, Your Honor.

15    My numbering was different.  May I approach the witness just

16    to see if he's looking at the same?

17              THE COURT:  Yes.

18              MR. CLAREMAN:  Let's go to Tab 10.

19    BY MR. CLAREMAN:

20    A    Tab 10?

21    Q    Yes.  That's JX161 (indiscernible).

22    A    Yes.

23    Q    Do you see the numbers JX161?  Okay.  Now, if you turn

24    -- so this is a copy of an injunction you've seen before

25    that Mr. Guerra had attached to one of his declarations,
```

Page 157

1    correct?

2    A     Yes, that's correct.

3    Q     So if you turn to Page 24 of 28.

4              THE COURT:  Mr.  Clareman, I'm just going to ask

5    you a question before you ask him a question.

6              THE COURT:  Yes.

7              THE COURT:  On mine, this is shaded.  Should --

8    everything is okay with that, right?  Just making sure.

9              MR. CLAREMAN:  Yes.  This is how it was provided

10   to us.  The highlighting, is that what's --

11             THE COURT:  Fine.  Just making sure.  Okay.

12             MS. BARTON:  Your Honor, I think we put on the

13   exhibit list ones that were highlighted that we had agreed

14   that Your Honor should disregard, but we don't have an

15   objection to it being in evidence.

16             THE COURT:  Okay, fine.  No, I understand.  I

17   already admitted it.  I just want to make sure we weren't

18   getting into something or having a confidential issue.  Just

19   making sure everything is good as you go along, no

20   confidential problems.  Okay.

21             MR. CLAREMAN:  Yes.  Thank you, Your Honor.

22   BY MR. CLAREMAN:

23   Q     Do you see the text at the bottom of that page?  It

24   says, "In order to maintain the existing factual situation

25   due to the corporate and commercial purpose of the companies

Page 158

1    and traders who are now petitioners here too, considering

2    that it is public policy to preserve them and to prevent

3    their failure to pay their obligations from jeopardizing

4    their viability in other business relationships, the

5    initiation or continuation of any enforcement proceeding is

6    prohibited, prevented, and/or denied, including the

7    execution of guarantee trusts, attachment, summons, or

8    bankruptcy proceedings in any of its stages against the

9    following companies.  Do you see that?

10    A    Yes.

11    Q    Okay.  How does this injunction differ from the

12    injunctions that you have reviewed that were obtained in

13    connection by TV Azteca?

14    A    The difference is very simple.  Because in this

15    injunction, bankruptcy proceeding is included.

16    Q    Okay.

17    A    But it was not in the other injunctions.

18    Q    All right.  And how if at all does the fact that this

19    injunction refers to bankruptcy proceedings specifically

20    impact your conclusion regarding the effect of the other

21    injunction?

22    A    Okay.  This Court and in this situation you have to

23    offer all the circumstances but decided that in order to

24    maintain (indiscernible) situation, it was needed to enjoin

25    a bankruptcy proceeding (indiscernible).  And the other --

```
 1    the court didn't make that consideration.

 2              MR. CLAREMAN:  One moment, Your Honor, please.

 3              THE COURT:  Sure.  No problem.

 4    BY MR. CLAREMAN:

 5    Q    Professor Mejan, do you recall that Judge Beckerman was

 6    asking you when she was addressing questions to you before

 7    my questioning started --

 8    A    Yes.

 9    Q    -- about whether you could recall a large involuntary

10    bankruptcy proceedings in Mexico.

11    A    In Mexico.  Yes.

12    Q    And you testified that you couldn't recall any.

13    A    I couldn't recall.

14    Q    Okay.  Are you familiar with a bankruptcy case

15    involving Oceanografia in Mexico?

16    A    Yes, yes.

17    Q    Do you know whether that was an involuntary bankruptcy

18    or not?

19    A    That was an involuntary concurso filed by the fiscal

20    attorney in Mexico, yes.

21    Q    Is that a large bankruptcy case?

22    A    Yes, a very large bankruptcy case, yes.

23    Q    Are you familiar with what Oceanografia is?

24    A    Yes.

25    Q    Can you describe it for the Court?
```

Page 160

```
 1    A    Yes.  I had some participation in -- an arbitration

 2    coming out of those situations.  So I am more or less

 3    knowledge -- I have more or less knowledge about that

 4    situation.

 5    Q    What is the business of Oceanografia?

 6    A    They were renting oil platforms for extracting oil.

 7    And that was the main business, renting platforms.  And I

 8    think also vessels to the -- or were renting vessels.  I

 9    don't remember whether they were providing the vessels or

10    renting the vessels.  But their business was related with

11    extracting oil.  And they have some agreements with the

12    Mexican company that runs all the oil business in Mexico,

13    which is (indiscernible) and subsidiaries.  And in that

14    capacity, they perform some other agreements with third

15    parties involving that business.

16    Q    And are you familiar with a bankruptcy case involving a

17    company called Altos Hornos de Mexico?

18    A    Yes.  Well, that was one case that started before the

19    LCM was adopted.  That was started at the end of '99 or '98.

20    Q    And what about Corporacion Geo, G-E-O?  I may be

21    mispronouncing that.

22    A    Corporacion...

23    Q    Geo, G-E-O.

24    A    Oh, I don't identify the -- oh, G-E-O, yes.  It's a

25    builder of homes.  Yes, it's a company that build homes and
```

Page 161

1    sell homes with mortgages and things like that.  Yes.

2    Q    Do you know if that was a voluntary or an involuntary

3    case?

4    A    No, I don't -- I remember that at the time of

5    Corporacion Geo, we say in Spanish, became involved in

6    bankruptcy, there were several other builders of homes

7    involved in the insolvency cases.  And I don't recall

8    whether this one was involuntary or voluntary.  I don't

9    know.

10   Q    Okay.  I'll just ask about one more .  Are you familiar

11   with the bankruptcy case involving EchoPAC de Mexico?

12   A    EchoPAC?  No.

13   Q    No, okay.

14            MR. CLAREMAN:  Thank you, Your Honor.  I have

15   nothing further.

16            THE COURT:  Recross?

17            MR. QURESHI:  Your Honor, very briefly, if I may.

18            THE COURT:  Sure,  yes.

19            RECROSS EXAMINATION OF LUIS MANUEL C. MEJAN

20   BY MR. QURESHI:

21   Q    Again, for the record, Abid Qureshi on behalf of the

22   petitioner-creditors.

23        Professor, just a few follow-up questions for you.  I

24   want to start with the subject that the judge asked you

25   about, which was the homologation process.

Page 162

1   A     What was that?

2   Q     The process for enforcing judgements in Mexico.

3   A     Okay.

4   Q     Okay.  So -- and the Court asked you if it is correct

5   that before the petitioning creditors here could enforce a

6   judgement in Mexico -- and I'm talking about the action that

7   is in the federal district court here, the one that was

8   stayed --

9   A     Okay.

10  Q     -- that it would need to be a final and non-appealable

11  judgement.  And you agreed with that, correct?

12  A     Yes.  Res judicata, yes.

13  Q     Okay.  And you were then asked how long would it take -

14  -

15  A     Yes.

16  Q     -- to take that judgement, have it enforced in Mexico.

17  Not through the LCM, but through the regular enforcement

18  process, right?

19  A     Yes.

20  Q     And you were not able to tell the Court how long it

21  would take, correct?

22  A     Yes, yes.

23  Q     Fair to say it would take years?

24  A     Could be.

25  Q     And you agree that under the model law, one of the

Page 163

1    purposes of the model law is to provide creditors with a

2    faster way to get recognition of judgements and ultimately

3    to enforce judgment in the case of an insolvency, correct?

4    A    No, I don't think that the objective is to short any

5    other proceeding.

6    Q    You don't agree with that?  Okay.

7    A    No.

8    Q    Okay.  Sir, just one other area.  You were asked by Mr.

9    Clareman a number of questions about establishment.  And you

10   gave an example of how an entity can have contractual

11   relationships but still not establishment.  Do you recall

12   that?

13   A    Yes.

14   Q    And the example that you gave is that one person

15   resides in one country and enters into contracts with

16   somebody in another country.  Right?

17   A    Yes.

18   Q    Doesn't mean they have an establishment in that other

19   country, correct?

20   A    Yes.

21   Q    But you agree with me that if both of those parties

22   reside in the same country, the question of whether there is

23   an establishment in that country is a slightly different

24   one, correct?

25   A    No, I don't -- I don't follow.  They decide in the same

Page 164

1    country what's the purpose of defining an establishment.

2    Q    So if -- in the case of TV Azteca, you understand that

3    there are some debtors that are incorporated in the United

4    States, correct?

5    A    Yes.

6    Q    And you understand that those debtors that are U.S.

7    debtors, they are U.S. entities, have entered into contracts

8    with other U.S. entities in the United States.

9    A    Yes.

10   Q    Okay.  And for your purposes, is it your testimony that

11   for purposes of analyzing whether there is an establishment,

12   that that is the same as analyzing a contract that was

13   entered into by a Mexican entity?

14   A    Yes.  Let me explain why I said that.  It is possible

15   that in a corporate group the main direction of this group

16   can operate through a foreign company, a foreign-organized

17   company.  And get that company asking or conducting

18   contracts with third companies.  But still all the operation

19   comes from the main center of the operations in the regional

20   country. That's what I tried to explain as a possibility.

21   Q    All right.  Well, Professor, let's look at in the

22   redirect binder that you were provided by Mr. Clareman --

23   A    Redirect, okay.

24   Q    Yes, at Tab 5 is the reply declaration of Mr.

25   Rodriguez.  And it is JX 36 for the record.

Page 165

```
 1    A    Yes.

 2    Q    Okay.  Turn if you could to Paragraph 6.

 3    A    Yes.

 4    Q    And this is the paragraph you will see that discusses

 5    contracts involving three alleged debtors; TV Azteca, AIC,

 6    and Azteca Sport.  And you understand those to be the three

 7    U.S. debtors, correct?

 8    A    Yes, (indiscernible) TV Azteca, AIC, and Azteca Sport.

 9    Okay.

10    Q    Now, look onto the following page, Page 4.  And you

11    will see there is a reference in that part of the paragraph

12    to a contract with -- between AIC and Univision.

13    A    I don't find it.  Where is that place?  Paragraph 7?

14    Q    No, Page 4.

15    A    Page 4, yes.

16    Q    It's still in Paragraph 6.  It's towards the top.

17    A    Okay.

18    Q    The sentence begins, "The opposition also notes".

19    A    Okay.

20    Q    Right?  Between 2016 and 2023 under a currently-expired

21    contract, AIC licensed soccer broadcast rights to Univision

22    for $259 million, correct?

23    A    Yes.

24    Q    Now, when we spoke about this earlier, you told me that

25    your understanding was that the Univision contract was
```

Page 166

1   expired, correct?

2   A    I said that Univision was expired?

3   Q    That was your recollection of the Rodriguez

4   declaration, right?

5   A    Yes, okay.  Okay, yes.

6   Q    So look at the next sentence. The next sentence says

7   AIC is party to a new soccer rights agreement with Univision

8   and is less lucrative than the previous agreement.  Do you

9   see that?

10  A    Yes, yes.  I remember, yes.

11  Q    Now, you don't know -- the prior contract it says in

12  this declaration was for $259 million.  You don't know how

13  much the new contract with Univision is for because you

14  didn't review it, correct?

15  A    Yes, that's right.

16  Q    Okay.  And if you continue reading, you will see in the

17  last sentence that that contract, which Mr. Rodriguez

18  characterizes as much smaller than the aggregate amount of

19  the expired contract, lasts until 2030, correct?

20  A    Yes.

21  Q    Okay.  So you understand this is a contract between two

22  U.S. entities.  And it goes until '23, correct?

23  A    Yes.

24  Q    And you don't know because you haven't looked how much

25  revenue will be generated in the United States from this

Page 167

1    contract, correct?

2    A    Yes.  I only know that it's lesser than the previous

3    one.

4    Q    Right.  But whatever it is, you are confident that it

5    is insufficient for there to be an establishment in the

6    United States for AIC, correct?

7    A    Yes, that's correct.

8    Q    Okay.

9            MR. QURESHI:  That's all I have, Your Honor.

10           THE COURT:  Okay.  All right.  Thank you.  Okay.

11   He's putting his things down here.  Just give me one second.

12   Okay.

13           I assume you've -- Mr. Clareman, any further --

14           MR. CLAREMAN:  I have no further questions.

15           THE COURT:  Okay.  Professor, thank you so much

16   for coming today.  I appreciate it.  I know it's a very long

17   trip for you as well, and thank you for being here.  And you

18   may step down.

19           THE WITNESS:  Okay.  Thank you very much, Your

20   Honor.

21           THE COURT:  Yeah, you can leave the books. Don't

22   worry about that.

23           MR. CLAREMAN:  Your Honor, as I mentioned at the

24   outset of the proceedings today, Mr. Rodriguez isn't

25   testifying live by agreement between the parties.  We are

Page 168

1    offering his testimony by way of declaration.  Those

2    declarations are in evidence at JX 17 and JX 36.  And the

3    parties have agreed to also admit Mr. Rodriguez's deposition

4    testimony, which is also --

5            THE COURT:  Right.  Which I believe I also already

6    accepted into evidence.

7            MR. CLAREMAN:  Yes.

8            THE COURT:  Okay.  That's right.  And I look

9    forward to my evening reading.

10           MR. CLAREMAN:  All right.  And we have no further

11   witnesses, so we rest.  Thank you.

12           THE COURT:  All right. Mr. Qureshi?

13           MR. QURESHI:  Your Honor, our next witness is Mr.

14   Guerra.  Our next and only witness, our expert.  If I could

15   suggest a short break?

16           THE COURT:  Sure.  How long would you like?

17           MR. QURESHI:  Ten minutes.

18           THE COURT:  Ten minutes is fine.  All right.  We

19   will reconvene at -- I guess it's approximately quarter

20   after.

21           MR. QURESHI:  Very well.  Thank you, Your Honor.

22           THE COURT:  Thank you.

23           (Recess)

24           THE COURT:  You may be seated.

25           MR. GILLER:  Good afternoon, Your Honor.  David

Page 169

1    Giller --

2              THE COURT:  Good afternoon.

3              MR. GILLER:  Good afternoon, Your Honor.  David

4    Giller of Akin Gump.  Petitioning creditors would like to

5    put forward Jesus Guerra.  His opening report can be found

6    on JX 123 and his supplemental declaration on JX 130.  We're

7    submitting them in agreement and (indiscernible) direct.  I

8    would ask him to take the stand.

9              THE COURT:  Yes, please.

10             MR. GUERRA:  Good afternoon, Your Honor.

11             THE COURT:  Good afternoon to you, too.  Would you

12   please raise your right hand?  Do you swear that the

13   testimony you are about to give is the truth, the whole

14   truth, and nothing but the truth?

15             MR. GUERRA:  Yes I do, Your Honor.

16             THE COURT:  Thank you very much.  Okay.

17             MR. COHEN:  Good afternoon, Your Honor.  Jay Cohen

18   for the alleged debtors.

19             THE COURT:  Good afternoon, Mr. Cohen.

20                  CROSS-EXAMINATION OF JESUS GUERRA

21   BY MR. COHEN:

22   Q    Good afternoon, Mr. Guerra.

23   A    Good afternoon, Mr. Cohen.

24   Q    We met at your deposition last week.

25   A    Yes.  It was a pleasure.

Page 170

1    Q    Okay.  And we're going to do the same thing that Mr.

2    Qureshi did with Professor Mejan.  So we have a book for you

3    with some exhibits and a few other things that I'll explain.

4    A    Thank you.

5              THE COURT:  Thank you.

6    BY MR. COHEN:

7    Q    So your book, Mr. Guerra, has your declarations and

8    various other documents.  It has the English and Spanish

9    versions of the LCM.  And I'm also going to use this

10   demonstrative --

11             THE COURT:  Oh, the same?  No, I have

12   (indiscernible).  That's fine.

13   BY MR. COHEN:

14   Q    Exhibits that has certain provisions of the LCM.

15             MR. COHEN:  Are you all set, Your Honor?

16             THE COURT:  Almost.  Sorry.

17             MR. COHEN:  Okay.

18             THE COURT:  Okay.  Now I'm good.  Thanks.  Sorry.

19   BY MR. COHEN:

20   Q    And so this demonstrative has provisions of the LCM.

21   If you want to refer to the original in English or Spanish,

22   feel free.  I'm trying to make it so there are fewer pieces

23   of paper to move around.  Okay?

24   A    Thank you.

25   Q    Does that sound reasonable?

Page 171

1   A    Yes.

2   Q    Okay.

3        MR. COHEN:  Do you have copies?

4        UNIDENTIFIED SPEAKER:  Yes, we do.  Thank you.

5        MR. COHEN:  May I proceed, Your Honor?

6        THE COURT:  Yes, you may.

7   BY MR. COHEN:

8   Q    Mr. Guerra, you are a named partner in a law firm in

9   Mexico, correct?

10  A    Correct.

11  Q    And you spend about half of your time on restructuring

12  matters?

13  A    Yes.

14  Q    And about half the time you actually litigate

15  commercial cases, correct?

16  A    Correct.

17  Q    And you have an LLM from BU Law School?

18  A    Correct.

19  Q    And you're a member of the New York Bar?

20  A    Correct.

21  Q    But you're not offering any opinions here today by U.S.

22  law, right?

23  A    Absolutely correct.

24  Q    And no opinions about U.S. bankruptcy law, correct?

25  A    Correct.

Page 172

1   Q     Okay.  And is it fair that you have -- your LLM was not

2   in bankruptcy, it was in more general subject?

3   A     One of the subjects of the LLM was in bankruptcy, but I

4   would say, as my master's degree establishes, that it has --

5   I don't recall the exact word, but it is -- it has a mastery

6   in international business practice.

7   Q     Okay.  And you've never appeared in a U.S. bankruptcy

8   proceeding, for example, as a lawyer, right?

9   A     No, never.

10  Q     And I think you say in one of your declarations that

11  you've been involved in a number of cross-border

12  bankruptcies.  Is that right?

13  A     Yes, that is correct.

14  Q     But you've never participated in a proceeding in Mexico

15  in which a party attempted to recognize a U.S. judgement in

16  Mexico, correct?

17  A     That is correct.

18  Q     So if you were to be involved in this one, this would

19  be the first one, right?

20  A     Correct.

21  Q     And in fact, you're not aware, are you, of any

22  proceeding in Mexico in which recognition was given over the

23  objection of the debtor?

24  A     I have not.

25  Q     No, right?

Page 173

```
 1    A    Yes, no.

 2    Q    Okay.  So let's look at your first declaration, which

 3    is JX 123.  And that's behind Tab 1 of your cross book.

 4    A    Yes.

 5    Q    Let me know when you're there.  And would you turn to

 6    Paragraph 10, the summary of your opinions, on Page 4.  Let

 7    me know when you have that.

 8    A    I am here.

 9    Q    Okay.  And in Paragraph 10 -- actually, Paragraph 11,

10    the summary of your opinions tender the questions, and 11

11    are your answers, right?

12    A    Yes.

13    Q    Okay. And in Paragraph 11, what you say is a plan of

14    reorganization entered in Chapter 11 cases may be

15    effectuated in Mexico without formal recognition of your

16    Title 12 or other applicable Mexican law which has occurred

17    in other cases, including most recently Aero Mexico.  Do you

18    see that, sir?

19    A    Yes.

20    Q    Okay.  Now, the cases that you refer to were all

21    voluntary, consensual cases in the United States, correct?

22    A    Correct.

23    Q    So if we turn to Paragraph 35 of your declaration --

24    let me know when you're there.  You'll see it starts with a

25    reference to the Aero Mexico Chapter 11.
```

Page 174

1    A    Yes.

2    Q    So that was a consensual bankruptcy in the U.S., right?

3    A    Yes.

4    Q    And then you refer to (indiscernible).  Do you see

5    that, sir?

6    A    Yes.

7    Q    And that was a consensual, voluntary proceeding in the

8    U.S., right?

9    A    That I understand.

10   Q    And you refer to NexCom.  That was another consensual

11   proceeding?

12   A    Yes.

13   Q    And Grupo (indiscernible) is another consensual

14   proceeding, correct?

15   A    Yes.

16   Q    Now let's turn -- I think Professor Mejan referred to

17   the LCM.  And I think in our deposition we talked about the

18   concurso law.  Do you understand it's the same thing?

19   A    Yes.

20   Q    I'll use one or the other and you'll use whichever one

21   you are more comfortable with.

22   A    I will understand.

23   Q    Okay, thank you.  And let's turn to generally the

24   procedure for recognizing the U.S. bankruptcy judgement in

25   Mexico.  And of course it's governed by the Concurso law.

Page 175

1    Right?

2    A    Yes.

3    Q    Okay.  And if we turn to Title 12 in the Concurso,

4    let's turn -- before we get to the specific provisions,

5    let's turn to JX 43, which is the English language version

6    of the entire law that's behind Tab 3 and turn to Title 12,

7    which begins just before Article 278.  That's why I'm going

8    to give you the tab so you don't have to put your pen down

9    every time.

10   A    I will be using both English and Spanish versions.

11   So...

12   Q    Whatever you are most comfortable with.  So am I

13   correct that between Article 278 through Article 310, those

14   are the provisions of the concurso law which deal with the

15   recognition of foreign judgements.  Is that right?

16   A    Yes, that is right.

17   Q    Okay.  And now let's if we can go to the demonstrative

18   book.  But you don't have to.  I'm going to go to Article

19   292.  And Article 292 is behind Tab 12 of the demonstrative

20   book.  But again, whichever version you want to use.  The

21   words are all the same.

22   A    Sorry, which tab in the demonstrative?

23   Q    It's Tab 12, Article 292.

24   A    Thanks.  I'm here.

25   Q    And this is the first provision in the concurso law

Page 176

1    which deals with recognitions of foreign judgements, right?

2    A    That is correct.

3    Q    And it relates to recognition proceedings commenced by

4    a foreign representative, correct?

5    A    Yes.

6    Q    Okay.  And now let's go to Article 296, which is behind

7    Tab 16.  Do you see that, sir?

8    A    Yes.

9    Q    And three-quarters of the way down in this article, it

10   says the foreign procedure shall be recognized as one.  And

11   Roman I is what we have been calling a main foreign

12   proceeding, right?

13   A    Correct.

14   Q    Or it could be recognized as, two, a non-main foreign

15   proceeding, yes?

16   A    Correct.

17   Q    Okay.  And you have opined that this case, if a Chapter

18   11 judgment were entered here, could be recognized in Mexico

19   as either a main or a non-main proceeding, correct?

20   A    Yes.

21   Q    Those are the two choices under Article 296, correct?

22   A    Correct.

23   Q    So let's turn to your opinion that this bankruptcy

24   proceeding in the U.S. could be recognized as a foreign main

25   proceeding.  That's based on your conclusion, is it not,

Page 177

1   that the center of main interests for the group of 35

2   alleged debtors as a whole is in the United States, not in

3   Mexico, right?

4   A    Do you mind rephrasing the question, sir?

5   Q    Okay.  Is your conclusion that this proceeding, this

6   bankruptcy proceeding in the U.S., could be recognized as a

7   foreign main proceeding based on your conclusion that the

8   center of main interest of all of the alleged debtors as a

9   group is the United States, not Mexico?

10  A    Yes.

11  Q    And what Article 296 says is that a foreign proceeding

12  is recognized as a main proceeding if the COMI is in the

13  jurisdiction in which the proceeding takes place, right?

14  A    Yes.

15  Q    And you would agree, would you not, that a corporate

16  debtor's COMI is its principal place of business, right?

17  A    I mean, center of its principal interest is an

18  immaterial concept.  But in general terms, I would agree.

19  Q    You would agree, would you not, that a principal -- a

20  company's principal place of business is its COMI, yes?

21  A    Yes.

22  Q    Okay.  And here the alleged debtors are made up of 35

23  different entities which are subsidiaries and affiliates of

24  a holding company based in Mexico, right?

25  A    Yes.

Page 178

```
 1   Q    Okay.  And that's laid out in an organizational chart

 2   attached to Mr. Rodriguez's deposition that you've examined,

 3   yes?

 4   A    Correct.

 5   Q    Okay.  So let's look back in your exhibit book at JX

 6   18, which is that organizational chart.  And it's behind Tab

 7   5 of the exhibit book.  And I apologize for keeping going

 8   back and forth.

 9   A    No worries.

10   Q    I'll try to make this as easy for you as I can.  Okay.

11   Are you there?

12   A    Yes.

13   Q    okay.  And what JX 18 shows is the entity that is the

14   top of this organizational chart is TV Azteca S.A.B. de

15   C.V., which is the Mexican holding company, right?

16   A    Right.

17   Q    And the initials S.A.B. de C.V. -- I'm not going to

18   test myself, but we know it means it's a Mexican company,

19   right?

20   A    It means it is a Mexican public company.

21   Q    Okay.  And what this shows -- by the way, you know, do

22   you not, that TV Azteca S.A.B. de C.V., the parent that's

23   orange and blue on JX 18, that was the issuer of the notes,

24   correct?

25   A    Correct.
```

Page 179

```
 1    Q    Right.  And the remainder of the alleged debtors, which

 2    are in green boxes, those are guarantors of the debt, right?

 3    A    Correct.

 4    Q    And there are 34 guarantors in all?

 5    A    Yes.

 6    Q    And the overwhelming majority of those 34 guarantors

 7    are Mexican companies, are they not?

 8    A    Yes, correct.

 9    Q    I count 25.  Does that sound right to you?

10    A    About right, yes.

11    Q    Okay.  So 25 of the 35 companies in this group are

12    Mexican companies, right?

13    A    Yes.

14    Q    And a handful more were organized in different Latin

15    American or South American countries, right?

16    A    Yes.

17    Q    And of these 35 alleged debtors, only three are

18    incorporated in the U.S., correct?

19    A    Correct.

20    Q    So that's Azteca International, yes?

21    A    Yes.

22    Q    (indiscernible), yes?

23    A    Yes.

24    Q    And Azteca Sports, right?

25    A    Yes.
```

Page 180

```
 1    Q    And am I correct that in reaching your conclusion that
 2    the COMI for the debtors as a whole is in the United States,
 3    you did not separately analyze the COMI of each of the 35
 4    alleged debtors, correct?
 5    A    Correct.
 6    Q    Even though the concurso law provides a presumption
 7    that the corporate domicile of the debtor is its COMI,
 8    right?
 9    A    Correct.
10    Q    So let's look at Article 295 of the concurso law.  And
11    that's behind Tab 15.  Let me know when you're there.
12    A    I'm here.
13    Q    And the last paragraph of Article 295 says, "Unless
14    there is evidence to the contrary, it shall be assumed that
15    the corporate domicile of the merchant --" the merchant is a
16    debtor, right?
17    A    Correct.
18    Q    "Or its regular residence if it is the case of an
19    individual is that of the center of its main interests."  So
20    the corporate domicile of a company is its COMI, yes?
21    A    Yes.
22    Q    And for 32 of the 35 entities, that corporate domicile
23    is not the United States, correct?
24    A    Yes.
25    Q    Now, you've also reviewed Mr. Rodriguez's declaration,
```

Page 181

1    have you not?

2    A    Sorry, reviewed?

3    Q    Reviewed.

4    A    Yes.

5    Q    And in coming to your opinion, you considered Mr.

6    Rodriguez's declaration, correct?

7    A    Yes.  I reviewed it.

8    Q    And just in case you need to look at it again, that's

9    behind Tab 11, JX 17 behind Tab 11 in the cross book.  And

10   he lays out certain facts concerning the companies

11   (indiscernible), does he not?

12   A    Which specific ones?

13   Q    Which exhibit am I looking at?

14   A    No, no.  I mean I didn't understand your question.

15   Q    Okay.  Let me rephrase the question.  I'm sorry.  Mr.

16   Rodriguez lays out certain facts relating to the operations

17   of the companies in the TV Azteca group, yes?

18   A    Yes.

19   Q    And you do not dispute any of the facts that Mr.

20   Rodriguez recites in connection with the operations of TV

21   Azteca that are set out in JX 17, right?

22   A    No.

23   Q    And as a resident of Mexico City, you know that TV

24   Azteca is one of the two principal national television

25   broadcasting companies in Mexico, right?

Page 182

```
 1   A     Yes.

 2   Q     And you know they have studios in Mexico, right?

 3   A     Yes.

 4   Q     The operate under concessions from the Mexican

 5   government, correct?

 6   A     Yes.

 7   Q     He says and you don't dispute that they have thousands

 8   of employees in Mexico, right?

 9   A     Yes.

10   Q     Headquarters are in Mexico, correct?

11   A     Yes.

12   Q     The vast majority of the revenue is in Mexico, right?

13   A     Yes.

14   Q     And none of those facts change your opinion that the

15   COMI of the TV Azteca debtors as a whole is the United

16   States, not Mexico, right?

17   A     That is correct.

18   Q     Now, are you aware of any case decided by a Mexican

19   court in which the COMI of a group of debtors was decided as

20   a whole rather than on a company-by-company basis?

21   A     Sorry, could you please rephrase the question?

22   Q     Yes, okay.  Your testimony here is that you can decide

23   the COMI of the alleged debtors as a group by looking at the

24   COMI of the entire group as a whole, right?  Is that

25   correct?
```

Page 183

```
 1    A     That is correct.

 2    Q     And you have not cited any case that supports your

 3    conclusion, correct?

 4    A     Correct.  It is a matter of first impression.

 5    Q     You have not cited any case, right?

 6    A     Correct.

 7    Q     Okay.  And if you look at -- let's look at paragraph 40

 8    of your first declaration.  So that is in the cross-

 9    examination book, JX 123, paragraph 40.

10    A     Sorry, which -- could you please remind me what is

11    the...

12    Q     The tab number?  It's tab 1.

13    A     Tab 1, okay.  This paragraph?

14    Q     Paragraph 40.

15    A     One moment.  This just broke.

16    Q     A lot of books.  I apologize.

17    A     Paragraph 40?

18    Q     Yes.  And I'm actually interested in the sentence at

19    the beginning of Page 15 that carries over to 16.  "Thus,

20    for the Chapter 11 cases."  Do you see that sentence?

21    "Thus, for the Chapter 11 cases in their entirety to be

22    recognized as a foreign main proceeding, it is not necessary

23    for each and every debtor to have its center of main

24    interest, COMI, in the United States."  Do you see that,

25    sir?
```

Page 184

1   A     Yes.

2   Q     There's no case that supports your opinion in that

3   sentence, is there?

4   A     Yes, that is correct.

5   Q     That is correct.  And then you say, "Rather, it is

6   enough that a subset of the debtors has its COMI in the

7   United States."  Do you see that?

8   A     Yes.

9   Q     Again, there's no case or interpretation of the

10  concurso law that supports your conclusion.

11  A     That is correct.

12  Q     Now, did you analyze the operations of the non-Mexican

13  companies in connection with your COMI decision?  Let me ask

14  a better question.

15  A     Yes, thank you.

16  Q     You were puzzled.  Let me ask a better question.  There

17  are three U.S. debtors, right?

18  A     Correct.

19  Q     And they have their place of incorporation in the

20  United States, correct?

21  A     Correct.

22  Q     So under Article 295, unlike the other 32, there is a

23  presumption that can be rebutted that their COMI is the

24  United States.

25  A     That is correct.

Page 185

1  Q    Okay.  Did you do a COMI analysis on a company-by-

2  company basis for each of the three U.S. debtors?

3  A    No.

4  Q    Now, in concluding -- so your conclusion is that these

5  three U.S. debtors would drag along the other 32 in a

6  Mexican concurso and lead a Mexican court to conclude that

7  the COMI of the entire group of 35 is in Mexico, right?

8  A    Yes, correct.

9  Q    And is it your testimony that you're confident more

10 likely than not that a judge in a concurso court would agree

11 with you?

12 A    Now I understand perfectly what more likely than not

13 means.  We did have an exchange on that.  Yes.  It is my

14 opinion.  It is more likely than not.

15 Q    So without any caselaw support, your opinion before

16 this Court is that the COMI of 32 companies that comprise

17 almost all of the revenues of the group and employ all of

18 the employees of the group and are the place of operation

19 and the center of headquarters of the (indiscernible) group,

20 all of that would be disregarded and it's more likely than

21 not that a concurso judge would say, TV Azteca U.S.  Right?

22 That's your testimony?

23 A    Yes, it is.

24 Q    Okay.  Now, your position would be the same if one

25 instead of three subsidiaries had its COMI in the U.S.,

Page 186

1    right?

2    A    Correct.

3    Q    And your position would be the same if that one company

4    transacted a thousand dollars a year of business, right?  It

5    wouldn't matter.

6    A    Yes, it wouldn't matter.

7    Q    You didn't consider the relative size of the business.

8    A    No.

9    Q    Okay.  And is there any provision -- we know there's no

10   case.  Can you point me to a provision of the concurso law

11   that says that the center of main interest, one, should be

12   decided as a group.  Is there such a provision?

13   A    A single provision?  No.  You have to construe the law.

14   Q    Okay.  And is there a single provision that says in

15   deciding the COMI for my hypothetical, one American company,

16   34 Mexican companies, that you disregard the COMI of the 34

17   and assign the COMI to the one (indiscernible).  Is there

18   any provision that says that?

19   A    You're only speaking about COMI?

20   Q    Yes.

21   A    No, there is no provision about COMI.

22   Q    Well, we're talking about COMI now, right?

23   A    Yes.

24   Q    We're only talking about your determination of COMI.

25   Now, the provisions you did look at are Articles 15, 15 bis,

Page 187

1    and 17 of the concurso law.  Do I understand that correctly?

2    A    Perfectly correct.

3    Q    Okay.  So let's look at those articles in order.  So if

4    we go to the demonstrative book, with any luck it's going to

5    be in numerical order.  And if we look at Tab 1, we have

6    Article 15.  Now, let me know when you're there.

7    A    I am here.

8    Q    Okay.  So this is the provision of the concurso law

9    that allows a Mexican concurso court, a bankruptcy court, to

10   consolidate the proceedings of different companies in court,

11   right?

12   A    Correct.

13   Q    And if we look at the second paragraph, it says the

14   Commercial bankruptcy proceedings of business organizations

15   that are part of the same business group shall be

16   consolidated, but they shall be processed and recorded

17   independently.  Do you see that?

18   A    Yes.

19   Q    Okay.  There is nothing in Article 15 that makes any

20   reference to a center of main interest for any company,

21   correct?

22   A    Correct.

23   Q    There is nothing in Article 15 that says that if a

24   subset of a group of companies, as you have said, has its

25   center of main interest in the United States, all of the

Page 188

1    companies must be treated as if their COMI is in the United

2    States, correct?

3    A    Correct.

4    Q    The second provision you rely on is 15 bis, which is

5    behind Tab 2.  Let me know when you're there.

6    A    I am here.

7    Q    Now, again, there is nothing in Article 15 bis that

8    makes any reference to the determination of COMI that's

9    required under Title 12 of concurso law, correct?

10   A    Correct.

11   Q    And then you also rely on Article 17, which is Tab 3.

12   Right?

13   A    I'm here.

14   Q    And there is nothing in Article 17 that instructs the

15   court on how to determine the center of main interests for a

16   holding company and its subsidiaries, correct?

17   A    Correct.

18   Q    And your testimony is -- are you disputing that the

19   COMI of the Mexican entities individually is in Mexico?

20   A    I didn't make an analysis on entity-by-entity, but I am

21   not disputing that.

22   Q    But you know enough about the parent, TV Azteca, to

23   agree with me that its COMI is in Mexico, correct?

24   A    Correct.

25   Q    And your understanding of these articles is that taken

Page 189

```
 1    together, they require a concurso court to conclude that the

 2    COMI of the group must be in the United States because it

 3    has a subsidiary in the United States, correct?

 4    A    Correct.

 5    Q    And it requires the concurso court in your opinion to

 6    ignore the fact that the COMI of 25 of the companies,

 7    including the parent, has its COMI in Mexico.

 8    A    Correct.

 9    Q    Okay.  I understand your opinion.  You can put that

10    aside.  Let's turn actually to Article 293.  And that is

11    behind Tab 13.  Let me know when you're there.

12    A    I am here.

13    Q    Okay.  And you were in court this morning.  You heard

14    there was a lot of discussion already about Article 293,

15    right?

16    A    Yes.

17    Q    Okay.  And Article 293 I think you would agree with me

18    is based on the model law, UNCITRAL Model law?

19    A    Excuse me?

20    Q    I'm sorry, bad question.  The concurso law is based on

21    the model law.

22    A    Yes, Title 12.  Yes.

23    Q    Title 12.  But Article 293, which is part of Title 12,

24    is not part of the model law, right?

25    A    Correct.
```

Page 190

```
1    Q    It's an extra feature of Mexican insolvency law that

2    applies to Mexican companies that have an establishment in

3    Mexico, correct?

4    A    Correct.

5    Q    And you are not disputing, are you, that TV Azteca, the

6    group of debtors, has an establishment in Mexico?

7    A    No, I'm not disputing it.

8    Q    So therefore, Article 293 would apply to any proceeding

9    involving recognition of a judgement from this court if one

10   were to occur in Mexico, right?

11   A    Correct.

12   Q    Now, like COMI, you did not analyze the establishment

13   of each of the 35 debtors one by one, right?

14   A    Correct.

15   Q    You just relied on them as a group, correct?

16   A    Correct.

17   Q    And your conclusion about establishment is that these

18   companies have an establishment in both Mexico and the

19   United States?

20   A    Correct.

21   Q    So let's just make sure we're clear about this.  For

22   COMI, you could only have one COMI because it's your main or

23   principal place of business, right?

24   A    Yes.

25   Q    But for establishment, you can have an establishment in
```

Page 191

```
 1    more than one jurisdiction.

 2    A    Correct.

 3    Q    So you've agreed that all of the entities have an

 4    establishment in Mexico, right?

 5    A    Yes.

 6    Q    Now let's talk about the establishment in the U.S.  Did

 7    you look at any facts relating to the 25 Mexican companies

 8    in determining that those companies have an establishment in

 9    Mexico?

10    A    In Mexico?

11    Q    In the United States.  Thank you.  No wonder you were

12    puzzled.  Let me ask the question again.  Did you look at

13    any of the facts relating to the 25 debtors that are

14    incorporated in Mexico in determining that they have an

15    establishment in the United States?

16    A    Yes.  I reviewed the points of contact with the U.S.

17    Q    For all 25 of the Mexican companies?

18    A    I mean, I don't know if was everything.  I reviewed --

19    again, I did not review on a case-by-case basis of an

20    entity-by entity basis, but as a group.

21    Q    Okay.  I think that was maybe the point I was trying to

22    get at.  I didn't do it that artfully.  When I was trying to

23    (indiscernible), I didn't do it that artfully.

24        You didn't analyze the Mexican companies one-by-one to

25    determine if they have an establishment in the U.S., right?
```

Page 192

1    A    Correct.

2    Q    And you didn't determine whether the five non-U.S.

3    South American or Latin American companies have an

4    establishment in the U.S., right?

5    A    Correct.

6    Q    You did that on a groupwide basis, right?

7    A    Correct.

8    Q    Okay.  Now, if we look at Article 293, what it provides

9    is that for recognition of a foreign procedure for a debtor

10   that has an establishment in Mexico, the provisions of

11   Chapter 4 of Title 1 of this law must be observed.  Do you

12   see that?

13   A    Yes.

14   Q    And Chapter 4 of Title 1 is the visitor or inspection.

15   I think we call it the inspection stage of the proceeding.

16   A    Correct.

17   Q    Okay.  So under 293 for a company that has an

18   establishment in Mexico, any proceeding to recognize a non-

19   Mexican bankruptcy would start with a filing of a concurso

20   proceeding in Mexico, correct?

21   A    No.  It will start with a request for recognition of

22   the foreign proceeding.

23   Q    Okay.  And then after that, what Article 293 tells us

24   is there must be an inspection as provided in the concurso

25   law, correct?

Page 193

1   A    Correct.

2   Q    So if this were just a domestic concurso, a debtor or a

3   group of creditors would file a petition, right?  Yes?

4   A    Yes.

5   Q    And then it would go to the inspection stage, right?

6   A    Right.

7   Q    And what you're saying here is the way that a

8   recognition works is the foreign representative files a

9   request for recognition and then you go to the inspection

10  stage, right?

11  A    Correct.

12  Q    And there's no difference between the inspection stage

13  for a domestic insolvency and one that takes place after a

14  request for recognition of a foreign judgement, correct?

15  A    Well, there is a difference.

16  Q    At the inspection stage?

17  A    I mean, technically speaking, yes, there is a

18  difference.

19  Q    What's the difference?

20  A    One, it's a fresh and new proceeding.  And the other

21  one, there is a proceeding for recognizing a foreign

22  proceeding.  So there is already an insolvency proceeding

23  which was (indiscernible) to a specific merchant.

24  Q    But in both proceedings, the first thing that would

25  happen would be the appointment of an inspector or a

Page 194

```
 1    visitor, correct?

 2    A    That is correct.

 3    Q    And in both proceedings, domestic or recognition of a

 4    foreign, the visitor is instructed to do the same things

 5    under the concurso law, correct?

 6    A    Correct.

 7    Q    And Article 293 refers next to the judgement in Article

 8    43.  Do you see that?

 9    A    Yes.

10    Q    And Article 43 is the judgement that a Mexican court

11    needs to make at the end of the inspection stage about

12    whether or not to admit into a concurso, declare a

13    bankruptcy, right?

14    A    Yes.  It is what we call the concurso ruling or the

15    concurso judgement.

16    Q    Thank you.  That's very helpful.  And what Article 293

17    says, the judgement that Article 43 of the statute refers to

18    shall also include the declaration that the procedure or a

19    foreign procedure in question is recognized, right?

20    A    Correct.

21    Q    So what Article 293 is telling a concurso judge is when

22    it's a recognition proceeding, you have to enter a judgment

23    that satisfies Article 43 and also make a declaration of

24    recognition, correct?

25    A    Correct.
```

Page 195

1    Q    Let's look at Article 43.  And that's behind Tab 4.

2    Let me know when you're there.

3    A    Sure.  Yes, I am here.

4    Q    Okay.  So Article 43 spells out five different

5    requirements that need to be included in a concurso

6    judgement, right?

7    A    Eleven I think.  Or 13.  Fifteen, sorry.

8    Q    Fifteen.  I'm only looking at the first page.  Isn't

9    that terrible?

10        Okay, there are 15 specific elements that have to be in

11   a concurso judgement, correct?

12   A    Correct.

13   Q    And what 293 says, if this is a recognition, you need

14   to make all of those 15 rulings plus one on recognition,

15   correct?

16   A    Correct.

17   Q    Let's look at Section V in Article 43.  It's on the

18   first page of this demonstrative.  The declaration of the

19   opening of the conciliation stage, unless the bankruptcy of

20   the merchant was filed.  Do you see that?

21   A    Yes.

22   Q    So let me just take a step back and say let's just

23   assume this was a domestic Mexican insolvency proceeding.

24   First there would be a petition filed that had to meet

25   certain requirements, right?

Page 196

1    A     Yes.

2    Q     Then the concurso court would appoint an inspector.

3    A     Correct.

4    Q     And after the judge received the inspection report, he

5    or she would make this judgement of concurso in accordance

6    with Article 43 plus recognition, right?

7    A     No.

8    Q     I'm sorry, I confused you -- I confused myself.  If

9    there's a domestic, it would just be a declaration of

10   concurso, right?

11   A     Yes.

12   Q     And in a domestic proceeding, the next step is what's

13   called the conciliation step, correct?

14   A     Yes.

15   Q     And the conciliation step is reorganization, a

16   reorganization plan?

17   A     Yeah.  It's a workout stage.

18   Q     Okay.  And your opinion, if I understand it, is that if

19   this proceeding sought recognition as a -- in Mexico and the

20   judge determined it was a foreign main proceeding, no -- it

21   would not proceed to the conciliation stage, correct?

22   A     Correct.

23   Q     And if the judge determined to recognize this

24   proceeding as a foreign non-main proceeding because the COMI

25   was somewhere other than the jurisdiction in which the

Page 197

1  foreign proceeding took place, you would move to a

2  conciliation stage, correct?

3  A    No.  Unless -- because you said that the COMI is

4  somewhere else.  If the COMI is found to be in Mexico and

5  therefore the judge believes that a foreign proceeding, it's

6  a foreign non-main proceeding and the Mexican proceeding is

7  a foreign-main proceeding, yes, a conciliation will occur.

8  Q    All right.  So let me do that again (indiscernible) the

9  confusion.  All right?  Your opinion is that upon

10 recognition, if there is a foreign main proceeding declared,

11 no conciliation stage.  Correct?

12 A    Correct.

13 Q    And a foreign non-main proceeding, you go to

14 conciliation.

15 A    If the Mexican proceeding is found to be the main

16 proceeding, yes.

17 Q    That's correct.  And there is nothing in Article 43, is

18 there, that says that a judgement that has to be entered

19 under Article 293 shall not declare the opening of

20 conciliation stage, correct?

21 A    Could you please repeat the question?

22 Q    Yes.  So Article 293 says that if you have an

23 establishment in Mexico, the judge has to enter -- upon

24 recognition, the judge has to enter a judgement that

25 satisfies the requirements of Article 43, right?

Page 198

1    A    I mean, my -- let me look at the law.

2    Q    Yes, please.

3    A    But I think that is not what Article 293 says.

4    Q    Okay.  Let's look at the exact words.  We looked at the

5    first paragraph.  That's the inspection stage, right?

6    A    Yes, second paragraph.

7    Q    293, which applies to any debtor that has an

8    establishment in Mexico, which includes this group of

9    debtors, right?

10   A    Yes.

11   Q    Okay.

12   A    I am here.  Sorry.

13   Q    Okay.  No worries.  The judgment that Article 43 of

14   this statute refers to shall also include the declaration

15   that the procedure or foreign procedure in question is

16   recognized.  Do you see that?

17   A    Yes.

18   Q    So what Article 293 is saying is at the conclusion of

19   the inspection stage in a recognition proceeding, not only

20   do you have to satisfy the 15 elements of Article 43, you

21   also have to include this declaration of recognition,

22   correct?

23   A    No.

24   Q    Well, let me ask you this.  What provision in Article

25   43 or anywhere else draws a distinction between what a

Page 199

1    concurso judge is supposed to do at the conclusion of the

2    inspection stage between a foreign main proceeding and a

3    foreign non-main proceeding?

4    A    Second paragraph of Article 293 does not say that the

5    concurso judgement shall satisfy all 15 requirements.  It

6    only says the judgement that Article 43 of this statute

7    refers to shall also include the declaration that the

8    foreign procedure in question is recognized.

9         So in other words, it is making reference to the

10   judgement of Article 43.  When you decide -- when the judge

11   decides what are going to be the decisions made in the

12   concurso judgment or in the concurso ruling, the judge will

13   have to weigh in whether it is a foreign main proceeding,

14   the one recognized, or a foreign main proceeding, the one

15   recognized.  Because according to the principles, for

16   example, of Article 1, one of the principles is speediness

17   and efficient procedure on the one hand.

18        And on the second hand, according to Article 285, you

19   have to satisfy the rules of construction, Title 12.  You

20   have to construe this title considering its international

21   origin.

22        So if you put all that together, it is obviously to me

23   that there is no conciliation needed because there has

24   already a foreign main proceeding.

25   Q    It may be obvious to you, but nothing in Article 43

Page 200

1    draws a distinction between a judgement issued in a

2    proceeding for recognition of a main foreign proceeding or a

3    non-main foreign proceeding, correct?

4    A    Because Article 43 does not deal with foreign

5    proceedings or foreign non-main proceedings.  It deals with

6    domestic proceedings.

7    Q    Which are followed upon recognition.  That's what we've

8    been talking about for the last 20 minutes, right?

9    A    No.

10   Q    Procedures are followed.

11   A    No.

12   Q    Okay.  Is there anything Article 293 that instructs the

13   court to make a different determination for a company that

14   has an establishment in Mexico, whether it's main or non-

15   main?

16   A    Article 293 leaves open for the court to make that

17   determination.  If you look at Article 296, the judge has

18   two possibilities; to recognize it as a foreign main

19   proceeding or as a foreign non-main proceeding.  If you look

20   at second paragraph of Article 293, there is nothing in

21   there that says the judgement of Article 43 shall contain

22   all the requirements of Article 43.

23   Q    So your reading that says the judgment of Article 43 of

24   this statute shall also include a declaration is that a

25   judge is free to skip any of the steps in an Article 43

Page 201

1    judgement in a recognition proceeding, right?

2    A    I'm not really sure that I am following your question.

3    Q    Okay.  Is there any case you can point me to that draws

4    a distinction on the recognition between the main proceeding

5    and the foreign non-main proceeding?

6    A    No.

7    Q    Is there anything in the text of 293 that refers to a

8    main proceeding or a non-main proceeding?

9    A    No.

10   Q    Is there anything in Article 43 that instructs the

11   judge to write a different concurso judgement in a foreign

12   main proceeding or a foreign non-main proceeding?

13   A    No.

14   Q    Okay.  So let's for a moment think about this as a

15   foreign non-main proceeding.  So the hypothetical I'm

16   offering you is that at the end of the inspection stage, the

17   concurso judge finds that the debtor does not have a center

18   of main interest in the United States and therefore it's a

19   foreign non-main proceeding.  Okay?

20   A    Understood.

21   Q    If it's a foreign non-main proceeding, the next step

22   after that judgement is a conciliation stage, correct?

23   A    Correct.

24   Q    And the conciliation stage that a judge follows upon

25   recognizing a foreign non-main proceeding is procedurally

Page 202

1    the same as a domestic concurso filed in the first instance,

2    right?

3    A    Correct.

4    Q    And if you look at your reply declaration, which is

5    behind Tab 2, it's JX 130, Paragraph 47.  This is where

6    discussion of the back and forth between you and Professor

7    Mejan with respect to Article 293.  Do you see that?

8    A    Yes.

9    Q    And you say in Paragraph 37, "Mejan is correct that

10   Article 293 provides that a full concurso needs to be

11   initiated for recognizing any foreign proceeding of a

12   company that has an establishment in Mexico.  Do you see

13   that, sir?

14   A    Yes.

15   Q    And that was a truthful statement, right?

16   A    Yes.

17   Q    You can put that to one side.  Now, when you get to the

18   reconciliation stage, a conciliator is appointed, right?

19   A    We continue to be in the non...

20   Q    We're in the non-main world now.  Leaving main behind

21   for now.  Okay?

22   A    Okay.

23   Q    Unless I tell you otherwise --

24   A    We're continuing --

25   Q    -- we're still in -- we've recognized the non-main

Page 203

1   proceeding for a company with an establishment in Mexico.

2   A    And its COMI.

3   Q    Pardon?

4   A    Sorry.

5   Q    No, an establishment in Mexico.  Because 293 applies.

6   Right?

7   A    But it is a non-main proceeding.  A foreign non-main

8   proceeding.

9   Q    Yes, a non-main proceeding.

10  A    And I assume a main proceeding in Mexico.  So the COMI

11  -- the Mexican company does not only have an establishment,

12  but also COMI.

13  Q    Is that your assumption?

14  A    No.  I mean, I'm asking you.

15  Q    I'm just asking you -- well, what 296 says, you have to

16  recognize either a main proceeding or a foreign non-main

17  proceeding, right?

18  A    Correct.

19  Q    And now I'm asking if you assume what the court has

20  concluded is that it's a foreign non-main proceeding, right?

21  A    Yes.  For that example, it is one important fact is

22  what is the determination of the Mexican court regarding its

23  jurisdiction.  Because it is the possibility -- it is also a

24  possibility that the concurso court finds that the foreign

25  main proceeding is a non-main proceeding.  The Mexican

Page 204

1    proceeding is also a non-main proceeding.  And a foreign

2    proceeding is somewhere else.

3    Q    Okay.  But if it concludes that the U.S. proceeding is

4    a foreign non-main proceeding, you go to the conciliation

5    stage in that proceeding in Mexico, correct?

6    A    Only if the Mexican court finds that Mexico is the

7    foreign main proceeding.

8    Q    Where is that provision in the law?

9    A    I mean, it is -- again, the principles of Article 293

10   and 296.

11   Q    It's not in 293, is it?

12   A    Those are the principles.  Because that is --

13   Q    I'm just asking you if -- let's go to 296.  296 says

14   the foreign procedure shall be recognized, down at the

15   bottom.  One is a main foreign proceeding or a non-main

16   foreign proceeding, right?

17   A    Right.

18   Q    Does 296 say that the recognition of a foreign non-main

19   proceeding requires a main proceeding to be occurring in

20   Mexico?

21   A    No.

22   Q    Does 293 say that?

23   A    No.

24   Q    So if there is a foreign non-main proceeding which is

25   past the inspection stage, like recognition, it moves to

Page 205

1   conciliation, correct?

2   A    If Mexico finds to be the COMI, yes.

3   Q    Okay, I'll take that.  So if the Mexican court finds

4   that TV Azteca, the second-largest broadcaster in Mexico,

5   has a center of main interest in Mexico as opposed to some

6   other country, then that's the judgement we're looking for,

7   right?

8   A    Yes.

9   Q    Okay.  So assume that.  The conciliation stage is

10  overseen by a conciliator appointed by the court or by the

11  institute?

12  A    Depends.

13  Q    Okay.  And just explain for us what the institute is.

14  Because it's a slightly different procedure.

15  A    I mean, I don't know how to translate that into

16  English.  But it is Institute (indiscernible)

17  telecommunications.  It's Federal Institute for Telecom.

18  Q    And sometimes it appoints the conciliator and sometimes

19  the conciliator is appointed by the concurso judge?

20  A    By the (indiscernible).

21  Q    Okay.  Okay.  But for a company like TV Azteca that has

22  concessions from the Mexican government, from the

23  telecommunications commission, one other party plays a role

24  in the appointment of conciliator, right?

25  A    You're talking about domestic (indiscernible) entity?

Page 206

1   Q    I'm talking about TV Azteca, the broadcaster that has a

2   business that depends upon concessions granted by the

3   Mexican government.

4   A    My understanding is it is two entities other than TV

5   Azteca, the holding company, that actually hold those

6   concessions.

7   Q    Okay.  But in your judgement, everything can be dealt

8   with as a group, right?

9   A    Correct.

10  Q    Okay.  So they're in the group.  And if they're in the

11  group, there's a different rule for conciliation in Mexico,

12  correct?

13  A    A different rule?

14  Q    Yes.

15  A    I mean, the rule is the same.  Only the person who

16  appoints the conciliator is different.

17  Q    Okay.  Let's look at Article 240, which is behind Tab

18  6.  This article refers to debtors that operate businesses

19  pursuant to a government concession, right?

20  A    Yes.

21  Q    And the grantor is the concessionaire, correct?

22  A    Yes.

23  Q    Okay.  And here you know that the grantor is the IFT,

24  which is the telecommunications commission, right?

25  A    Yes.

Page 207

1    Q    And what 240 provides is the granting authority shall

2    propose to the judge all that is relative to the

3    appointment, removal, and substitution of the bankruptcy

4    conciliator and the liquidator that participate in the

5    commercial bankruptcies that this chapter refers to as well

6    as supervising the activities of the same.  Right?

7    A    Yes.

8    Q    Okay.  So in our hypothetical, the COMI is in Mexico.

9    Judgment has been entered for recognizing this proceeding as

10   a foreign non-main proceeding and we're at the conciliation

11   stage.  The IFT must be (indiscernible), right?

12   A    Must appoint, must propose a judge, the appointment,

13   removal, or substitution.

14   Q    And supervise the activities of the conciliator, right?

15   A    Correct.

16   Q    So if this proceeding were filed in Mexico, the

17   government telecommunications commission would have the

18   right to oversee the insolvency proceeding, correct?

19   A    No.  To oversee the activities --

20   Q    Of the conciliator.

21   A    -- of the conciliator.

22   Q    I take your amendment.  So let me ask again.  If this

23   were in Mexico, the IFT would oversee the activities of the

24   conciliator, right?

25   A    Yes.

Page 208

1   Q    And the conciliation phase in Mexico that would occur

2   after recognition of a non-main proceeding would occur first

3   for a period of 185 days?

4   A    Yes.

5   Q    With two possible 90-day extensions.

6   A    Yes.

7   Q    So in a recognition proceeding involving a company with

8   its COMI in Mexico, debtors with their COMI in Mexico and

9   recognition of a non-main proceeding, the conciliation stage

10  in Mexico would take a year, right?  Could take a year.

11  A    Yes.

12  Q    Even if there had been a plan approved in the foreign

13  proceeding, correct?

14  A    Yes.

15  Q    And are the rules different in Mexico with respect to

16  the concurso for a voluntary or involuntary proceeding with

17  respect to conciliation?

18  A    With respect to conciliation, no.

19  Q    So whether a voluntary proceeding is filed in Mexico or

20  an involuntary proceeding is filed in Mexico, first to the

21  inspection stage, right?

22  A    Yes.

23  Q    Then you go to the conciliation stage, yes?

24  A    Yes.

25  Q    And if the conciliation stage, you go to the

Page 209

1    liquidation stage, correct?

2    A    Yes.

3    Q    Thank you.  Now let's look at Section 283 of the

4    concurso law.  And that's behind Tab 11.  Let me know when

5    you're there.

6    A    Which tab?  Sorry.

7    Q    Tab 11, Section 283.

8    A    Thank you.  I am here.

9    Q    Are you with me?

10   A    Yes.

11   Q    Okay.  283 is part of Title 12, the recognition

12   provisions, correct?

13   A    Yes.

14   Q    And 283 says, "None of what is set forth in this title

15   --" Title 12, yes?

16   A    Yes.

17   Q    "-- may be interpreted in a sense that is contrary to

18   what is set forth in titles 1, to 11 and 13 of this law of

19   in any other way that is contrary to fundamental principles

20   of law that rule in the Mexican Republic."  Do you see that,

21   sir?

22   A    Yes.

23   Q    And then it goes on to say, "Consequently, the judge,

24   the Institute, the inspector, the bankruptcy conciliator, or

25   the liquidator shall refuse to adopt a measure when it is

Page 210

1    contrary to what is set forth in such titles or when it may

2    violate the aforementioned principles."  Do you see that?

3    A    Yes.

4    Q    So what 283 tells us is that in a proceeding that

5    starts with recognition, the concurso court must act in

6    accordance with the entire concurso law, right?

7    A    Not really sure I understand your question.

8    Q    Title 1 to 11, and 13 is the entire concurso law other

9    than recognition, is it not?  How many titles are there in

10   the concurso law?

11   A    Fourteen.

12   Q    Fourteen.  What's Title 14?

13   A    Prepack.

14   Q    Okay.  So other than  Title 14, what this says is in a

15   recognition proceeding, the recognition must be -- the judge

16   must interpret in a way that is consistent with the rest of

17   the concurso law other than the prepack title, yes?

18   A    Correct.

19   Q    And also must be consistent with Mexican public policy,

20   right?

21   A    Yes.  The interpretation.

22   Q    Interpretation.  Now, in our hypothetical, COMI in

23   Mexico, foreign non-main proceeding recognized, in the

24   conciliation stage, a plan could not be adopted without the

25   approval of TV Azteca, correct?

Page 211

1    A    In our hypothetical?

2    Q    Yes.

3    A    Correct.

4    Q    And just so we all know exactly what we're talking

5    about, that's what Article 147 provides, right?

6    A    Yes.

7    Q    Article 157, which is behind Tab 5 -- and I think Mr.

8    Mejan went through this with Mr. Clareman -- the composition

9    deeds that must be subscribed with the merchant means a plan

10   of reorganization must be approved by the debtor, correct?

11   A    Yes.

12   Q    And in a conciliation stage involving a concession -- a

13   company that holds concessions such as TV Azteca, one party

14   gets approval rights, right?

15   A    Excuse me?

16   Q    The IFT would have to approve as well, correct?

17   A    No.

18   Q    Okay.  Let's look at Article 242.  That's behind Tab 8.

19   Any agreement proposed in terms of Title 5 -- Title 5 is the

20   conciliation stage, right?

21   A    Correct.

22   Q    "Any agreement proposed in terms of Title 5 of this law

23   must be notified to the granting authority."  Here that

24   would be the IFT, correct?

25   A    Correct.

Page 212

1    Q     "Which may veto it in a term provided in Article 162 of

2    this law."  Correct?

3    A     Correct.

4    Q     So if a plan is not approved by TV Azteca, the

5    conciliation stage turns into a liquidation, correct?

6    A     Correct.

7    Q     And even if it is approved by TV Azteca, the

8    telecommunications authority can veto it, correct?

9    A     Correct.

10   Q     Okay.  Now, am I understanding your opinions correctly,

11   Mr. Guerra, that you have opined that even if the concurso

12   court would not grant recognition of the judgement from this

13   Court and this proceeding, there could be other grounds for

14   enforcing in Mexico?

15   A     Other grounds?

16   Q     Oher vehicles, other...

17   A     Yes.

18   Q     Yes, okay.  And let's just talk about enforcement for a

19   minute.

20   A     Sure.

21   Q     Am I correct that a Mexican court will not enforce a

22   judgement of a U.S. court that violates Mexican law or

23   Mexican public policy?

24   A     Correct.

25   Q     And am I correct that a federal bankruptcy court in

Page 213

1   Mexico would not enforce a judgment of a U.S. bankruptcy

2   court that violates Mexican law or Mexican public policy?

3   A    Correct.

4   Q    Now, your opinion -- let's look at your supplemental

5   declaration, which is behind Tab 2 in your book, the cross

6   book.  I apologize for going back and forth.

7   A    Don't worry.

8   Q    And it's JX 130.  And it's Paragraph 62.  Let me know

9   when you're there.

10  A    I am here.

11  Q    And in the third sentence of Paragraph 62, you say,

12  "However, the petitioning creditors would only need to seek

13  recognition and/or enforcement under the commercial code and

14  federal civil proceedings code in the event they are unable

15  to obtain recognition under Title 12."  Do you see that,

16  sir?

17  A    Yes.

18  Q    So your hypothesis is if a judgement is issued by this

19  Court which a Mexican bankruptcy court would not enforce, an

20  alternative means would exist for enforcement in Mexico.

21  A    I think that the word I use is recognized.

22  Q    Okay.  So if it were not recognized -- actually, that's

23  a good question.  When we talk about recognition, the

24  language of Article 296 says that Mexican courts shall

25  recognize.

Page 214

1    A    Correct.

2    Q    Is it your opinion that a Mexican court doesn't have

3    the authority to refuse to recognize a foreign proceeding?

4    A    No.  If the conditions are met, it is not -- I mean, it

5    shall be recognized.

6    Q    But if a Mexican court concludes that the conditions

7    are not met, say that the U.S. bankruptcy judge violates

8    public policy, it wouldn't recognize it, would it?

9    A    I think we're talking about different things.

10   Q    Okay.  Help me out here.

11   A    For recognition under 296, the only thing that has to

12   be complied with are the four requirements of the first

13   paragraph of Article 296.  For enforcement, yes.

14   Q    Okay.

15   A    The foreign relief that is sought to be enforced in

16   Mexico has not to contradict Mexican law or Mexican public

17   policy.

18   Q    Okay.  So let me try to clean up what I asked you

19   before.  If a Mexican court recognized the judgement from

20   this court as say a foreign non-main proceeding, it could

21   still refuse to enforce that judgement if it concluded that

22   the judgement violated Mexican law or Mexican public policy,

23   correct?

24   A    Correct.

25   Q    And if instead what happened, as you posit in Paragraph

Page 215

1    62 of your supplemental declaration, JX 130, a Mexican

2    bankruptcy court did not grant recognition, enforcement

3    could be sought in, say, under the commercial code or

4    federal civil procedures, right?

5    A    If the recognition was denied.

6    Q    Right.

7    A    Of the foreign proceeding.

8    Q    Right.  But each of those courts would not enforce if

9    it determined that the judgment for which enforcement was

10   sought violated Mexican law or Mexican public policy,

11   correct?

12   A    Correct.

13   Q    And violations of Mexican law could include violations

14   of the concurso law, correct?

15   A    Depends.

16   Q    You're not saying they couldn't include it, are you?

17   A    No, I'm not saying it couldn't.

18   Q    It's a possibility that a Mexican court can ask to

19   enforce a judgment that was not recognized by the concurso

20   court could refuse to enforce on the ground that the

21   judgement violated provisions of the concurso law, right?

22   A    It's possible.

23   Q    Including Article 157, right?

24   A    I don't think so.

25   Q    But it's possible, right?

Page 216

1    A    But it's possible.  It will be if the judge decides to

2    refuse recognition because no conciliator was appointed in

3    the foreign proceeding.

4    Q    Now, if enforcement is sought in one of these other

5    courts, the judgment here has to be a final, non-appealable

6    judgement, correct?

7    A    Correct.

8    Q    And if enforcement is sought under the commercial code,

9    one of the two possibilities, the commercial code does not

10   permit enforcement of a judgement that arises from an in rem

11   action, correct?

12   A    Correct.

13   Q    So if the Mexican commercial court decided that this

14   bankruptcy court was conducting in an in rem proceeding, it

15   would not enforce it, correct?

16   A    If it was an in rem action, that is correct.

17   Q    But under the concurso law, the only way to recognize a

18   judgement is under Article 296, correct?

19   A    It does not provide it is exclusive.

20   Q    How else can you enforce a judgement under the concurso

21   law?

22   A    Maybe I did not understand your question.  Could you

23   please repeat it?

24   Q    Let me ask the question again.  I might have confused

25   you.  296, which has a name in -- foreign main and foreign

Page 217

1    non-main proceeding is the only provision of the concurso

2    law that governs recognition of a foreign bankruptcy

3    judgement proceeding, right?

4    A    Yes.

5    Q    Okay.  Now, let me turn to what we've been calling the

6    injunctions in this case, right?

7    A    Okay.

8    Q    The ones in Mexico that TV Azteca (indiscernible),

9    correct?

10   A    Okay.

11   Q    There are two of them, right?

12   A    Correct.

13   Q    One from July of 2022, right?

14   A    I don't remember the exact dates.  But if you tell me

15   the judge, that would be easier.

16   Q    Well, one is from the Ninth Civil Court, and one is

17   from the 63rd, correct?

18   A    Yes.  I understand the 63 to be the first and the Ninth

19   Civil Court to be the second.

20   Q    Okay.  And the 63rd is what I think Mr. Qureshi in his

21   opening referred to as the (indiscernible), right?

22   A    Yes.

23   Q    Okay.  Now, the injunction from the Ninth Court has not

24   been served on any of the petitioning creditors, correct?

25   A    That is my understanding.

Page 218

1   Q    Now, TV Azteca to your understanding obtained ex parte

2   orders from these two courts, correct?

3   A    Correct.

4   Q    And the procedures of those courts provide for

5   injunctions to maintain the status quo to be (indiscernible)

6   an ex parte basis, do they not?

7   A    I understand so.

8   Q    Okay.  So when Mr. Qureshi referred to ex parte

9   injunctions, it's because Mexican procedure allows a party

10  such as TV Azteca to seek such an injunction ex part, right?

11  A    Yes.

12  Q    And when one tries to serve a judgement on a foreign

13  party, there are very specific procedures in Mexican law for

14  service of process, correct?

15  A    Yes.

16  Q    Through the Hague Convention, correct?

17  A    When the Defendant has its domicile abroad, yes.

18  Q    Correct.  And what TV Azteca did here with respect to

19  the COVID injunction is it sought to serve the injunctions

20  on the petitioning creditors in accordance with the

21  procedures set out in the Hague Convention because the

22  petitioning creditors do not have a domicile in Mexico,

23  correct?

24  A    I assume.  I did not review that specific information

25  on that TV Azteca is doing.

Page 219

```
 1    Q     And have you been involved in service of process on

 2    companies that are not in Mexico?

 3    A     Yes.

 4    Q     It takes a long time to get to the Hague, doesn't it?

 5    A     Four months, six months.

 6    Q     Four to six months.  Okay.  And with respect to the

 7    other injunction, the one from the Ninth Civil Court,

 8    service to your understanding has not been effective,

 9    correct?

10    A     To the best of my understanding as of today, it hasn't

11    been effectuated.

12    Q     Now, when a party like TV Azteca serves process under

13    the Hague convention, who is responsible for making sure the

14    foreign party receives service?

15    A     Could you please rephrase the question?

16    Q     What is the procedure?  TV Azteca files appears with

17    what court or what entity?

18    A     The process for serving process on a foreign entity?

19    Q     Yes.

20    A     Well, you file the complaint.  The complaint is

21    admitted.  The judge orders service of process through the

22    Hague Convention.  The judge issues a letter of authority.

23    The letter of authority is provided either to official

24    channels.  It is the Ministry of Exterior or to the party

25    that sought the injunction.  And the next step is for either
```

Page 220

1    the party who obtained the injunction or the Ministry of

2    Exterior to send the letter of authority to the agency

3    appointed for that effect in the United States.  And the

4    United States office will then -- process server will serve

5    process on the defendant.

6    Q    Do you have any information to suggest that TV Azteca

7    did not follow that procedure with respect to either

8    injunction here?

9    A    As I explained, I don't have any information on what TV

10   Azteca did or did not do.

11   Q    And the second injunction that hasn't been served on

12   the parties is not binding on those parties under Mexican

13   law until service is effected, correct?

14   A    Just for -- to understand, the second injunction you

15   mean --

16   Q    The non-COVID injunction.

17   A    The non-COVID injunction.

18   Q    The Ninth --

19   A    The Ninth Civil Court.

20   Q    The Ninth Civil Court.

21   A    Yes.  Could you please repeat your question?

22   Q    Yes.  Until service is effected through the Hague

23   Convention, that injunction is not binding on the parties

24   for which the injunctive relief was sought, correct?

25   A    No.  Judicial orders in Mexico are binding from the

Page 221

1   moment they are entered into.

2   Q    What's the consequences of them not being served?

3   A    The legal remedy is to contest, to challenge.  Or the

4   assumptions to disobey the order are not (indiscernible).

5   Q    So (indiscernible) in the enforcement proceedings with

6   respect to the injunctions for which service has been

7   completed, correct?

8   A    Again, it depends.

9   Q    It depends.  Okay.

10  A    Because if the party has actual knowledge, that would

11  be a different scenario.

12  Q    Is there any case in which you are aware of that you

13  can cite to us in which a foreign party which has knowledge

14  of but has not been served with an injunction had been held

15  accountable for contempt or other sanctions in the Mexican

16  court?

17  A    No.

18  Q    Now, one of the things that you did in your

19  supplemental declaration is you attached a copy of an

20  injunction from a non-concurso court enjoining the filing of

21  a bankruptcy proceeding, correct?

22  A    Yes.

23  Q    And that's JX 30, which is Tab 9 in your cross book.

24  And I'm going to direct you -- I'm sorry, I steered you to

25  the wrong exhibit.  Withdraw.

Page 222

1      JX 161, which is Tab 10 in your cross book, that's the

2  injunction in the (indiscernible) case that you attached to

3  your supplemental declaration, correct?

4  A    Correct.

5  Q    Okay.  And if we look at JX 161, Page 25 of 28 of the

6  translation -- it's actually highlighted in yellow.  Do you

7  see that?

8  A    Yes.

9  Q    Did you provide that highlighting?

10 A    Yes.

11 Q    Okay.  And it enjoins on a preliminary basis an entity

12 from filing a bankruptcy proceeding, correct?

13 A    Yes.

14 Q    Okay.  And the injunctions, either the one that was

15 served or the one that wasn't served, that were obtained by

16 TV Azteca could not specifically enjoin bankruptcy

17 proceedings, correct?

18 A    No, it does not contain a specific language.

19 Q    Thank you, Mr. Guerra.

20         MR. COHEN:  I pass the witness.

21         THE COURT:  Okay.  Mr. Guerra, this is now when I

22 get my questions.

23         THE WITNESS:  Thank you, Your Honor.

24         THE COURT:  All right.  So I'm sorry if I ask

25 anything that seems -- but I'll appreciate your help in

Page 223

1    understanding the analysis.  Okay.

2            So first I guess explain why your interpretation

3    of establishment doesn't seem to require that there be

4    employees or offices or other locations in the jurisdiction.

5            THE WITNESS:  I believe this a recognition by

6    the legislative power that a business operation can take

7    many forms and could be performing in many different

8    circumstances.  So as oppose of trying to find a restrictive

9    language, the legislative power found compelling to include

10   -- to use a broader language, something that could include

11   anything.

12           THE COURT:  Okay.  And is there any precedent from

13   the concurso court regarding what an establishment is?  Have

14   they rendered any decisions in the last two years since the

15   court was established about this?

16           THE WITNESS:  No, Your Honor, I am not aware of

17   any.

18           THE COURT:  That's fine.  In your declaration, you

19   mention Article 307 of the -- pardon me for using this

20   phrase -- the LCM.

21           THE WITNESS:  Is perfect.

22           THE COURT:  Requiring that there be a proceeding

23   in Mexico.  Does that require that there be a proceeding in

24   Mexico and a foreign proceeding?

25           THE WITNESS:  Yes.  And my understanding of this

Page 224

1   set of circumstances is that upon recognition of a foreign

2   proceeding, there will be a proceeding in Mexico.  So this

3   is where I believe Article 307, Section 2 applies to our

4   case.

5            THE COURT:  And so I think what you're saying is

6   you're going to have a recognition proceeding then in the

7   concurso court.  Then you're going to obviously, if it's a -

8   - I think we've discussed if it involves an establishment of

9   a Mexican party, you're also going to have to file an actual

10  concurso.  And then you're going to have a Chapter 11

11  proceeding that we already had.  Is that right, that we'd

12  have that type of proceeding, a recognition proceeding

13  followed by a regular concurso if it was a non-main type of

14  recognition?

15           THE WITNESS:  I'm not really sure I understand

16  your question, Your Honor.  Sorry.

17           THE COURT:  Sure.  Let me go through this

18  carefully.  Sorry.  Let me find my statutes.

19           So I think what you've explained in your testimony

20  is that basically if there is a foreign non-main recognition

21  by the court, you'll have had to apply for that recognition

22  and the Mexican court will have to decide that it's a

23  foreign non-main circumstance.  And right now I'm assuming

24  in my hypothetical that we have these Chapter 11 proceedings

25  there and that's what the Mexican court does.  So we've had

1  a recognition proceeding that was applied for before the

2  concurso courts, and they've had to decide that they're

3  recognized.  You've already got the Chapter 11 proceedings

4  that have been pending here, just hypothetically.

5        Then my understanding is you would also have the

6  regular concurso process because if there is an

7  establishment -- if it turns out that the court determines

8  there is establishment in Mexico, you would also have the

9  regular concurso process going forward.  Is that right?

10        THE WITNESS:  No.  What I meant I believe is

11 Paragraph 47 of my supplemental declaration, the one we have

12 discussed, Mr. Cohen and I.

13        THE COURT:  I think that's number two in the book.

14        THE WITNESS:  It is where I make the statement.

15 And it is correct that Article 203 provides that a full

16 concurso needs to be initiated for recognizing any foreign

17 proceeding of a company that has an establishment in Mexico.

18        What I understand that to mean when making

19 (indiscernible) of my own is that an inspection has to

20 happen.  Because that is for the recognition.  So in other

21 words, it's before the judgment of Article 43 happens.

22        THE COURT:  Right.  But then --

23        THE WITNESS:  So there will not be -- let me put

24 it this way, there will not be a recognizing proceeding in

25 Mexico and a concurso proceeding in Mexico.  There will be a

Page 226

1    recognizing proceeding which will have to carry out an

2    inspection visit.  And then the judge will make the

3    determination.  And depending on what the determination

4    makes the judge, the case will continue either as a main or

5    as a non-main proceeding.

6            THE COURT:  Okay.  I understand.  But also you

7    might continue along the concurso path depending on what

8    happens, right?  Because...

9            THE WITNESS:  Yes.  Yes.

10           THE COURT:  Okay.  I'm just making sure I

11   understand that.  All right.  Is there any precedent where

12   the concurso court has enforced a plan of reorganization or

13   a scheme approved by a foreign court where the debtors

14   didn't agree to the scheme or the plan?

15           THE WITNESS:  No.

16           THE COURT:  All right.  Let's see.  All right.  So

17   now another sort of hypothetical here.  Oh, another question

18   for you.  Has any foreign restructuring plan or scheme been

19   enforced by the Mexican courts in Mexico under the two

20   sections that you were just speaking about before, which

21   were Article 1347A of the commercial code and Article 5571

22   of the federal civil proceedings code since the passage of

23   the LCM?

24           THE WITNESS:  No.

25           THE COURT:  Okay.  Again, this is a hypothetical a

Page 227

1    little bit.  And, sorry, it deals a little bit with what

2    might happen to me, but I need to get a sense of what might

3    happen on your side of -- you know, in Mexico if something

4    happened here.  So if I were to deny this motion to dismiss,

5    the debtors under our bankruptcy code -- which I realize

6    you're not a U.S. law expert, so you have to take what I'm

7    saying as face value here -- would be required to make

8    certain filings and take certain actions as a fiduciary.  If

9    the debtors refuse to do so, this court might have to take

10   other actions here.  We might have to, example, appoint a

11   Chapter 11 trustee.  This happens when there is an

12   involuntary petition sometimes and the person is not

13   cooperative.  Sometimes that does occur.  Would a Mexican

14   court enforce an order of this court which removed existing

15   management and the boards of directors of being charge of

16   operations?  Because that's in essence what a Chapter 11

17   trustee order does.  It supplants.  The Chapter 11 trustee

18   supplants the management of the board in their operations.

19            THE WITNESS:  Yes.  It is something that the

20   Mexican court will definitely do.  Because it is within the

21   rights of the foreign representative to request the

22   enforcement of any relief granted in the foreign proceeding.

23            THE COURT:  Are you aware of any time you've seen

24   that happen by the concurso court or in a concurso situation

25   or a foreign main, foreign non-main recognition proceeding?

Page 228

1              THE WITNESS:  No.  To the best -- no, Your Honor.

2     Unfortunately, to the best of my understanding, there has

3     never been a foreign proceeding recognized in Mexico other

4     than (indiscernible), which is...

5              THE COURT:  Yeah, understood.  Everyone cites to

6     that case.  Okay.  All right.  Going back to the insolvency

7     test.  Because obviously one of the discussions has been

8     whether really there is the ability of the petitioning

9     creditors to commence the involuntary concurso and what

10    would happen if they did.  So what is your opinion about

11    what are considered to be outstanding liabilities for the

12    purposes of the insolvency test under the concurso law?

13             THE WITNESS:  In my opinion it's all debts and

14    obligations that are due and payable 30 days before the

15    filing of the involuntary petition or the voluntary

16    petition.

17             THE COURT:  Okay.  And in your opinion, what do

18    you consider to be liquid asset for purposes of the

19    insolvency test?

20             THE WITNESS:  Cash, public shares or shares held

21    in public companies, and receivables that have to be paid in

22    the 90 following days.

23             THE COURT:  Okay.  Do you have any opinion sitting

24    here today as to whether the insolvency test would be met?

25             THE WITNESS:  Excuse me?

Page 229

1            THE COURT:  I said do you have any opinion sitting

2     here today whether the insolvency test would be met?

3            THE WITNESS:  I personally don't believe it will

4     be met because the injunctions as I understand them prevent

5     the debt to be declared in default and prevent

6     (indiscernible) to be due and payable.  Therefore, at the

7     time of the filing, either a voluntary or involuntary

8     filing, it will be hard to meet the first requirement.t

9            THE COURT:  That's where I was going to go next

10    with that.  That's what I was interested in.  And I

11    obviously asked Mr. Mejan these questions, too.  It seems to

12    me that the I guess what I'll describe as the first

13    injunction in time, it seems like there's a difference of

14    opinion, the one that hasn't been served yet, but was filed

15    in July on an ex parte basis, but no service has been

16    effectuated.  It seems like there's a dispute over both

17    whether that would be enforceable -- I think you're saying

18    that the parties might be bound by it.  And I think --

19    meaning the petitioning creditors even if they haven't been

20    served (indiscernible).  Right?  And the alleged debtor's

21    expert, Professor Mejan, saying no, that they wouldn't be

22    bound by it at this point.  And then I think there also

23    seems to be a difference of opinion from your testimony as

24    to whether or not ultimately even if it had been served in a

25    case for example of the -- what I'll call, using Mr.

Page 230

1   Qureshi's words, the COVID injunction -- with respect to the

2   COVID injunction, which has actually been served on some of

3   the parties, whether that would then include parties from --

4   you know, would be interpreted as having precluded that

5   acceleration.  The reason I'm asking that question is the

6   acceleration notice is given in August.  This COVID

7   injunction is a September injunction.  It's true there was a

8   July injunction.  So whether that applies or not makes a

9   difference it seems to me because if it does, it might mean

10  that it would preclude it.  If it doesn't, because it wasn't

11  enforceable, going with the alleged debtor's sort of

12  arguments that it wouldn't be enforceable, then maybe the

13  September inunction would be enforceable now that it's been

14  served.  That's the argument.

15          You might argue, if I understand your testimony,

16  that it would have been enforceable when it was issued.  But

17  that still would have been September. And the acceleration

18  notice was given in August.  So you can understand why it's

19  a little confusing for me trying to figure out what kind of

20  argument somebody is going to make.

21          I understand of course having read the papers and

22  the injunction proceedings there are certainly positions

23  taken by the parties -- including in the one that hasn't

24  been served yet, because I've read the papers on that --

25  that would certainly say that that acceleration wasn't valid

Page 231

1    and disputed.  And so I guess I would be interested in your

2    view about what the concurso court is likely to do with this

3    if it ended up in front of them.  Because it seems to me

4    that there's a real issue about whether you could or could

5    not make the argument that that principal has been

6    accelerated or not depending on whether you think the

7    injunction is effective, the first one, or not.  I think

8    it's harder with the second one because the acceleration

9    happened before the second one.  What's your thought on

10   that?

11            THE WITNESS:  I mean, it's a very good question.

12   And I would like to talk a little bit about personal

13   experience.

14            THE COURT:  Sure.

15            THE WITNESS:  I remember having a case back in

16   2003 where there was a shareholder meeting.  That

17   shareholder meeting was -- sorry, a board meeting.  And

18   there was a resolution extending the board meeting.  Between

19   the actual issuance of the injunction and the service of

20   process, one month elapsed.  And some actions were performed

21   during that month.  We sought the (indiscernible) of the

22   specific action that was taken within that month.  And the

23   court found that the directors that took the specific action

24   were not held liable, (indiscernible) consider that this

25   contract violated the injunction and as a consequence of

Page 232

1    that declared the nullity of the contract.

2              That is in my experience and that is very much the

3    (indiscernible) of what I am saying, that Mexican orders,

4    just like any judicial order in the world, becomes effective

5    the moment it is entered into.  The service of process of

6    the order, it only has effects -- for the persons to

7    exercise the rights, they have to challenge or to context or

8    to be sanctioned for violating the injunction.

9              Now, when I see this set of circumstances, the

10   inunctions in my view are not only binding on the

11   defendants, they are also binding in the plaintiffs.  In

12   other words, from the moment injunctions were granted, those

13   injunctions had an impact in the plaintiff's books and

14   records, and they have to reassert the notes as not

15   accelerated.

16             So when the official examiner will be conducting

17   his report, the official examiner or the inspector or the

18   visitor, will be reviewing the plaintiff's or the debtor's

19   books and records, which most likely will reflect that the

20   notes were not accelerated.  So regardless of the injunction

21   being served or not on the defendants of those cases, those

22   injunctions already had an effect or an impact on the

23   accounting of TV Azteca and its subsidiaries.

24             THE COURT:  Okay.  Well, to add some more

25   complication to this, you probably are aware -- it probably

Page 233

1    won't surprise you when I say this.  But again, I'll just

2    ask you to take my word for it.  The indenture itself

3    obviously provides very clearly that if there is a dispute

4    over the notes and the process for anything relating to the

5    indenture of the notes, that this is governed by New York

6    law and also that the matter should be litigated before a

7    New York court that the parties agreed with.

8            So I guess another thing that I'm having a hard

9    time understanding is how is the Mexican court going to look

10   at that?  Because, quite candidly, whether or not somebody's

11   acceleration notice was valid or not, for purposes of the

12   indenture, we would be governed by New York law based on

13   indenture.  So whether they complied with the indenture,

14   violated the indenture, the language is right under the

15   indenture, the notice was given to the right party, it was

16   given properly, et cetera, would all be governed by our

17   indenture.  And the fact that there's already been two

18   proceedings going on that relate to acceleration notice that

19   seemed to be governed by New York law where the parties at

20   least for this part agreed this was going to happen before

21   the New York court, that issue anyway.  Not necessarily what

22   we're here on today, but that issue.  I have a hard time

23   knowing what the Mexican court is going to do with that and

24   why they would even enter those injunctions.  Because it

25   seems to me at least in terms of the substantive of issue --

Page 234

1   maybe not the injunctions themselves, but the substantive

2   issues that would have to be determined in those actions are

3   whether the acceleration notices were appropriately given.

4   And that seems to me to be determined under the indenture.

5         THE WITNESS:  I fully agree.  I believe that the

6   judge, when receiving these petitions, should have submitted

7   the parties to the jurisdiction of New York courts, as I

8   have seen in many instances in other cases.  Just like when

9   it happens when there is an arbitration agreement, the judge

10   has the obligation to submit the parties to the arbitration

11   agreement.

12         However, in these circumstances, the judge did not

13   make that finding.  So he decided to take jurisdiction and

14   to issue the injunctions.

15         THE COURT:  It seems like two of them did.

16         THE WITNESS:  Yes.

17         THE COURT:  Not just one judge, two.  It's

18   understandable.  Okay.  Assuming for the moment -- I think I

19   asked this question of Professor Mejan, too.  If the

20   district court proceeding before Judge Gartephe were to

21   continue to judgement, it seems like it would need to be

22   final and non-appealable before that specific judgement on

23   account of the notes could be enforced under the process

24   before the Mexican Court.  Is that right?

25         THE WITNESS:  Under the process --

1            THE COURT:  Homologation --

2            THE WITNESS:  Commercial code and the --

3            THE COURT:  Yeah, exactly.

4            THE WITNESS:  Yes, it is correct.

5            THE COURT:  Ook.  And then how long do you

6    estimate that process taking?  I think we heard Professor

7    Mejan was honest.  He couldn't guess.

8            THE WITNESS:  Yeah.  I mean, the process, I would

9    say it's fairly simple.  This process is heard as a motion

10   as an ancillary motion.  So basically the moving party has

11   to file an ancillary motion with the judge.  The judge has

12   to serve process on the defendant, which is expected to last

13   15 days.  Then the judge will open a proceeding, a mini-

14   trial let's say, because the periods are very short.  And I

15   would expect the first (indiscernible) resolution on that

16   topic, between four to six months.

17           Afterward, the losing party will have the right to

18   file an appeal, which I will expect that will be heard

19   within four months, heard and decided, sorry, within four

20   month.  Afterwards, the losing party will have the right to

21   file an amparo, which is a constitutional appeal or an

22   appeal on constitutional grounds.  That process will take at

23   the most one year.  So my best guess is it is something

24   about one year and eight months and one year and ten months.

25           THE COURT:  Okay.  Thank you.  That's very

Page 236

1    helpful.  All right.  Those are my questions.

2              THE WITNESS:  Thank you, Your Honor.

3              THE COURT:  All right.  Sorry, I'm just going to

4    warn you all of something.  Sorry, just my law clerk was

5    just telling me.  This is just technology, nothing else.

6              We are going to actually have to take a break

7    around like 5:15-ish, 5:20, to actually go ahead and hang up

8    our phone and redial back in.  Sorry about that.  It's just

9    otherwise we're going to lose our technology.  And also at a

10   certain point obviously we have -- our ECRO is going to

11   leave.  We can keep going, but we just need to have a

12   process there.

13             Anyway, I wanted to warn people before you got

14   started because I'll probably have to tell you at 5:15 we

15   have to take a break.  Do don't feel upset.  If you're not

16   done with your redirect, I understand.  We'll just take a

17   break for like five minutes and then we can go back on.

18             MR. COHEN:  Would it be easier for Your Honor to

19   take a break now and then do it?

20             THE COURT:  Would it?  Oh, okay, that's fine.

21   Okay, yeah, that's fine.  So how long would you like?

22             Five minutes?  Yeah, we need five minutes.  That's

23   it.  I just need to -- we need to redial and hang up.  Okay,

24   yes.  Sorry.

25             (Recess)

Page 237

```
 1              CLERK:  All rise.

 2              THE COURT:  You may be seated.  All right.

 3              MR. GILLER:  Thank you, Your Honor.

 4                  REDIRECT EXAMINATION OF JESUS GUERRA

 5    BY MR. GILLER:

 6    Q    Hi, Mr. Guerra.

 7    A    Hi, Mr. Giller.

 8    Q    Mr. Guerra, do you recall a number of questions about

 9    TV Azteca's COMI?

10    A    Yes.

11    Q    And do you recall that there were a number of questions

12    about what type of analysis you did?

13    A    Yes.

14    Q    And I believe -- and the result that you reached?

15    A    Yes.

16    Q    And the result being that due to -- and I believe that

17    you were shown by opposing counsel Article 15, Article 15S,

18    and Article 17 (indiscernible) how you came to your opinion

19    about COMI?

20    A    Yes, correct.

21    Q    So first what was your decision about whether or not TV

22    Azteca's COMI was within the United States?

23    A    In my opinion there is a link between COMI and

24    jurisdiction.  So it is impossible to separate one from the

25    other.  I would say in international practice, it is pretty
```

1   much what we understand to be COMI shift, where we have seen

2   entities from one place dragging other entities from

3   different places to restructure under the jurisdiction of

4   the very same court.

5        In my opinion, that is what Article 15 attempted to

6   recognize an (indiscernible) of the law, which was later

7   amended and included Article 15 and 17.  That is the purpose

8   under the 2000 law.

9        Later on, in 2014, after the (indiscernible) case, the

10  law was amended to include 15 bis an addition to 17.  And by

11  incorporating those additions, what Mexico tried to do is

12  opposed to having multiple insolvency proceedings in

13  multiple places, I believe what the concurso did was to

14  create let's say a controlling jurisdiction for the -- when

15  there is a concurso for the entities that belong to a

16  corporate group.  So that is my understanding.

17       So when we apply the provisions of the jurisdiction to

18  the determination of the COMI, if the determination of the

19  COMI was made with respect to one of the entities that

20  belong to a corporate group, the same principals of

21  jurisdiction will apply to the determination of the COMI for

22  that effect.

23  Q    And I believe you testified that the three debtors that

24  are incorporated in the United states have a rebuttable

25  presumption that the COMI is in the United States.

Page 239

```
 1    A    Yes.

 2    Q    And how or what provisions are you relying on in the

 3    LCM to demonstrate that TV Azteca's COMI is -- sorry, that

 4    TV Azteca as the organization is able to have its COMI in

 5    the United States seeing those three entities that were

 6    incorporated in the United States.

 7    A    I believe we have -- I mean, the evidence is sufficient

 8    to demonstrate that there are three debtors incorporated in

 9    the United States.  So according to Article 15, 15 bis, and

10    17 -- and again, those are Mexican law provisions.  So I am

11    only opining on Mexican law.

12         For the Mexican court to find jurisdiction and

13    therefore COMI, it will be sufficient that those entities

14    are incorporated in the United States and that the judge

15    hearing the bankruptcy proceeding of those three entities

16    have jurisdiction over those three entities.  That will

17    direct the rest of the corporate groups that is deemed to be

18    insolvent into the process.

19    Q    And how is that?  What in Article 15 allows that to

20    occur?  Did you want to turn to Article 15?

21    A    Sure.

22    Q    I believe you can just use opposing counsel's binder.

23    The LCM is Tab 3.

24    A    Yes.  If I may.  Article 15, second paragraph.  "Ther

25    commercial bankruptcy proceeding of business organizations
```

Page 240

1    are part of the same business group --" which is what I call

2    corporate group -- "shall be consolidated, but they shall be

3    processed and recorded independently."

4         Afterwards, Article 15 bis, which is a little longer,

5    provides two different scenarios.  Sorry, just to be clear,

6    Article 15 is mandatory.  This is a provision that applies

7    to the judge.  Article 15 bis is a provision that applies to

8    the parties, to the merchant, and to the involuntary -- the

9    creditors that are filing and involuntary.  So those

10   merchants that form part of the same business group may

11   simultaneously file a joint judicial declaration of

12   commercial bankruptcy without consolidation of their

13   estates.  For the joint declaration of commercial

14   bankruptcy, it shall be enough for one of the members of the

15   group to meet any of the conditions mentioned in Articles

16   10, 11, and 20 (indiscernible) of this law.  And that said

17   condition make it so that one or more of the members of the

18   business group is in the same situation.

19        In the case of one or more merchants that are members

20   of a business group that is facing the same situation as

21   those mentioned in the preceding paragraph, their creator or

22   creators may claim their joint judicial declaration of

23   commercial bankruptcy.  First paragraph deals with

24   voluntary, second paragraph deals with involuntary.

25        In the cases set forth in this article defining a claim

1       of joint declaration of commercial bankruptcy shall be

2       conducted under one proceeding with a judge being able to

3       appoint one inspector, bankruptcy conciliator, or liquidator

4       for (indiscernible).  It is inappropriate for the purposes

5       of the proceeding.  So these three paragraph deals with

6       simultaneous filing.

7           The last paragraph, the joint declaration of commercial

8       bankruptcy proceeding may be added to other commercial

9       bankruptcy proceedings pursuant to what is set forth in

10      Article 15.  So the last paragraph of Article 17 deals with

11      subsequent filings.  So let's say there was first a filing

12      of one of the entities, members of the group, and there is a

13      subsequent filing for the rest of the members of the group.

14      And then if you look at Article 17, Article 17 contains

15      similar provisions that deal with business groups.

16          So the general provision is the district judge with

17      jurisdiction in the place where the merchant has its

18      domicile has competence to hear the commercial bankruptcy

19      (indiscernible) of a merchant except for what is set forth

20      in the following paragraph.

21          So in other words, each debtor has its own let's say

22      court or its own jurisdiction within the court of its

23      domicile except as set forth in paragraph second and third.

24          In the case of filing of claims for commercial

25      bankruptcy that represented by or against holding companies

Page 242

```
 1   that have already encouraged their subsidiaries or

 2   affiliates to declare commercial bankruptcy and when the

 3   filing of claims for commercial bankruptcy are presented

 4   against subsidiaries of affiliates that have started the

 5   process of a commercial bankruptcy of the holding company or

 6   holding business association, the consolidation that Article

 7   15 of this law refers will take place.

 8        In this case, the judge (indiscernible), the first

 9   trial shall be competent, and it will be enough to present

10   the subsequent filing of claims before (indiscernible) for

11   its submission.

12        Third paragraph.  The judge of the place where the

13   company that is a member of the business group that meets

14   any of the conditions explained in Articles 10, 11, and 20

15   bis as its domicile shall be competent to hear the joint

16   commercial bankruptcy judgement referred to in Article 15

17   bis of this law.

18        In other words, what will happen under Paragraph two

19   and third is that the first judge to hear an insolvency

20   proceeding with respect to a corporate group to one of the

21   members of a corporate group is the one that will have

22   jurisdiction over the entire corporate group.

23   Q    In this case, you understand -- what is your

24   understanding of whether TV Azteca is such a corporate

25   group?
```

Page 243

```
 1    A     Excuse me?

 2    Q     Let me rephrase the question.  Do you believe that TV

 3    Azteca is the type of corporate group you just discussed?

 4    A     Yes.

 5    Q     You recall you were shown your declaration and a

 6    sentence that a full concurso needs to be initiated.  This

 7    is in your declaration, which is Tab 1.  Sorry, it's your

 8    reply declaration.  I apologize.  So that's Tab 2, JX 130

 9    for the record.  Paragraph 47.

10    A     Yes.

11    Q     You wrote that Mejan is correct, that Article 293

12    provides that a full concurso needs to be initiated for

13    recognizing a foreign proceeding of a company that has an

14    establishment in Mexico.  What did you mean by that?

15    A     What I mean is under Article 293, before recognition

16    happens, a full concurso has to be initiated.  In other

17    words, you have to carry on what we call an inspection

18    visit.  The only proceeding under the concurso law that does

19    not carry an inspection visit is a prepacked proceeding.  So

20    as opposed to -- I mean, a voluntary concurso, a voluntary

21    concurso, or a concurso under Title 12 under the auspices of

22    Article 293, there will be an inspection visit.  That is

23    what I mean for full concurso.  And the key words here needs

24    to be initiated.  It's a key word for me, for recognizing.

25    So for recognizing it is before recognition happens.  So I'm
```

Page 244

```
 1    not implying that after recognition there will be a full

 2    concurso.  That will be the case only, as I explained or as

 3    I tried to explain, if the concurso court finds that the

 4    Mexican court has its COMI to hear of the main proceeding.

 5    Then it will open a full-fledged concurso, or what I

 6    understand to be a full-fledged, or concurso with stags.

 7              MR. GILLER:  I want to use a demonstrative.  May I

 8    approach, Your Honor?

 9              THE COURT:  Yes.

10              MR. COHEN:  Mr. Giller, could you just wait a

11    moment?  I haven't seen it yet.  If you could just give me a

12    second.

13              MR. GILLER:  Of course.

14              MR. COHEN:  Thank you.

15    BY MR. GILLER:

16    Q    Mr. Guerra, obviously we've discussed the concurso and

17    enforcement process through your -- during your cross.  And

18    I thought this would be helpful to ground some of the

19    questions that you received and help the explanation

20    process.

21         So when you said earlier that a concurso had to be

22    initiated, I believe you said that was in respect to -- in

23    relation to the inspection stage.  Is that correct?

24    A    Just let me clarify something.  Concurso is for us like

25    bankruptcy is for you.  It is the name of the proceeding.
```

Page 245

1   So it is not -- what I'm trying to say is not all concurso

2   have inspection visits, not all concurso have -- I mean, I

3   am making reference to the name of the proceeding when I

4   refer to concurso, just like you understand a bankruptcy

5   case under Chapter 11 or a bankruptcy case under Chapter 7,

6   et cetera.  So a concurso, a bankruptcy filing has to be

7   made.

8   Q    And so assuming that there is a Chapter 11 plan that is

9   confirmed in the United States, you've testified on your

10  understanding of the first step no matter what, as evidenced

11  by box 2 in this chart, is the foreign representative has to

12  seek recognition in Mexico.  Is that correct?

13  A    That is correct.

14          MR. COHEN:  Your Honor -- it's an objection for

15  leading.  Same -- I'll adopt Mr. Qureshi's objection.

16          MR. GILLER:  I'll rephrase.

17          THE COURT:  Okay, thank you.

18  BY MR. GILLER:

19  Q    Mr. Guerra, do you see the second box on this chart?

20  A    Yes.

21  Q    What is your understanding of what this represents as

22  far as the (indiscernible) in the concurso process?

23  A    Well, the foreign representative goes down to Mexico

24  and seeks recognition of a foreign proceeding according to

25  the concurso law.

Page 246

```
 1    Q    Does that have to happen?

 2    A    For recognition to happen, yes, it is a (indiscernible)

 3    proceeding for recognition.

 4    Q    And I believe you discussed this before, but the next

 5    two boxes, what do they represent?

 6    A    Well, the (indiscernible) representative seeks the

 7    recognition.  The next thing that will happen is that the

 8    judge will order an admission receiving the petition for

 9    recognition and requiring, depending on the circumstances,

10    the (indiscernible), or the IFT, to appoint an examiner, a

11    visitor.  So the concurso court will appoint a visitor to

12    commence the examination.  The visitor, as Mr. Mejan

13    described, will have the opportunity to provide a report

14    after reviewing the books and records of the debtors.  So

15    that report has to be rendered within 15 calendar days, but

16    that period could be extended for another 15 calendar days.

17    So the visitor will then issue its report or will provide

18    its report to the court.

19    Q    And after the visitor delivers its report to the

20    concurso court, what happens next?

21    A    Well, the concurso court simultaneously -- it will all

22    happen in the very same ruling.  It is what we call the

23    concurso ruling.  Because in Mexico -- and this is a little

24    different from what I understand it is in the U.S. -- there

25    is a form declaration of concurso.  It is not -- you are not
```

Page 247

1   subject to concurso until you are declared to concurso.  So

2   there isa judgement declaring the concurso that is according

3   to Article 43.  So the judge will deliver the concurso

4   judgement or the concurso ruling.  And in that ruling, the

5   judge will recognize a foreign proceeding and will make the

6   determination whether it is a main proceeding or a non-main

7   proceeding.

8   Q    And there was a line of questioning about Article 43.

9   Do you recall that line of questioning?

10  A    Yes, I do.

11  Q    And just so the record is clear, I believe you were

12  directed to Article 43 in the fifth section of that.

13  Article 43, Section 5, which is JX 43, Page 14.  And it

14  states that the declaration -- strike that.  Mr. Guerra, how

15  does the language in Article 43, Section 5 interact with

16  Title 12 of the LCM?

17  A    First we need to put in context Article 43.  Article 43

18  is within the general provisions of the LCM.  So there is a

19  difference.  So, for example, it is just like you will not

20  see in the general provisions a reference to Title 12.  But

21  Title 12 has to be consistent with the general provisions of

22  the LCM.

23       So what Article 43 provides for -- and let me open this

24  -- is that a concurso judgement has to be rendered.  There

25  has to be a declaration of the merchant in concurso.  And

Page 248

1    the judgement that Article 43 of this statute refers to

2    shall also include the declaration that the foreign

3    proceeding in question is recognized.

4        So in other words, what the second paragraph of Article

5    93 is making reference to is to the concurso judgement.  And

6    the judge will have to issue the concurso judgement.  And

7    one of the things that the court will have to decide is

8    those things that are provided for under Article 296.  It

9    is, number one, recognition of the foreign proceeding.  And

10   second, the determination on whether it is a foreign main

11   proceeding or a foreign non-main proceeding.

12   Q    Is this the recognition stage?

13   A    Yes.  It is the moment -- the concurso judgement is the

14   very same moment when actual recognition happens.

15   Q    So following the recognition stage, it's a main foreign

16   proceeding, what happens?

17   A    Let me go back to the chart.  As we discussed, there is

18   two possibilities.  There is a foreign main proceeding or a

19   foreign non-main proceeding.  In your hypothesis, we are

20   recognizing -- in Mexico, it is recognized a foreign

21   proceeding as a foreign main proceeding.  What will happen

22   is the judge will appoint a conciliator, examiner.  You

23   don't have those officials in U.S. proceeding.  But the

24   visitator, the conciliator, and the liquidator are officials

25   that aid to the court.  They serve a purpose to the court.

Page 249

```
 1    So the court does not deal with day-to-day things.  They

 2    deal with those things the conciliator or the liquidator

 3    depending on the estate, the processes.

 4        So in this case, considering that it is coming from a

 5    Chapter 11, there will be a conciliator appointed to oversee

 6    the debtor.

 7        And it will be the entity or the person who will be in

 8    contact with a foreign representative.  According to Article

 9    282, the Mexican conciliator, visitor, or liquidator are

10    deemed to be the Mexican firm's representative.

11        So the foreign representative will be requesting these

12    officials to take action in court.

13    Q    And what action would the foreign representative be

14    seeking?

15    A    For example, I mean, the foreign representative could

16    require the conciliator to seek injunctions or to seek a

17    specific relief from the Mexican court.  If the conciliator

18    fails to act at the request of the foreign representative,

19    then the foreign representative could actually go and file

20    something with the court complaining that the conciliator is

21    not doing his job.

22    Q    And with regards to the Chapter 11 plan, what would the

23    foreign representative be doing?

24    A    Yes.  The foreign representative will be the one

25    entitled to seek enforcement.
```

```
 1   Q    And there had been a discussion earlier with opposing

 2   counsel regarding the role of the IFT in this process.  Do

 3   you recall that?

 4   A    Yes.

 5   Q    And specifically you were asked about whether the IFT

 6   had to appoint the conciliator.  Do you recall that?

 7   A    Yes.

 8   Q    Is there anything that would -- what is your

 9   understanding of whether or not the IFT could appoint the

10   conciliator in the process you just outlined?

11   A    Well, I definitely believe that the conciliator -- that

12   the IFT will have the right to appoint a conciliator for

13   respect to those two entities that have the concession

14   title.  And according to Article 15 of the law I believe the

15   judge has the authority to -- sorry, I need to review the

16   Spanish version.

17   Q    I think I can make this a little bit easier for Mr.

18   Guerra.

19        Is there anything that -- I think you just said this,

20   but what -- is there anything that prevents the IFT from

21   fully being able to appoint a conciliator?

22   A    No.

23   Q    So turning quickly to the non-main proceeding.  So if

24   there is a recognition as a non-main foreign proceeding,

25   what is the first step that happens?
```

Page 251

```
 1    A    Well, assuming Mexico has the COMI of the entities, the

 2    next thing that will happen is the judge will order the

 3    opening of the conciliation stage, will ask the IFT to

 4    appoint a conciliator.  The conciliator will be appointed.

 5    Claims recognition process will take place.  And eventually

 6    a claims recognition and granting a priority judgement will

 7    be issued.

 8    Q    Thank you  I actually forgot to ask a question before,

 9    so I apologize.  Just go to back to the main foreign

10    proceeding for a second.

11    A    Yes.

12    Q    There has been a line of questioning about that any

13    plan that had to be -- any plan that could be enforced in a

14    Mexican court had to comply with public policy.  So you

15    recall that?

16    A    Yes.

17    Q    If the foreign representative couldn't forward a plan

18    that did not comply with public Mexican public policy, would

19    the concurso court have a way to address that?

20    A    Yes.

21    Q    How?

22    A    Well, the Mexican court will have -- in making a

23    determination whether it violates Mexican public policy, the

24    judge will make the determination.  Yes, it meets the

25    standard, the judgement is enforced.  If it does not meet
```

Page 252

1    the standard, the judge has two options, either to reject it

2    or to amend it.

3    Q    So it's your view that the -- so is it your view that

4    the Mexican court as the power to amend a proposed Chapter

5    11 plan to comply with public policy?

6    A    Yes.  If the judge finds that it does not comply with

7    Mexican public policy, it is my view that the judge will

8    most likely amend it.  Because when looking at these

9    provisions, you have to consider there are two principals

10   under Article 1 that are very relevant.  Though the actions

11   by the court shall be held considered procedural economy and

12   speediness.  So -- and if you look at Article 285, it

13   provides the international principles of enforcing cross-

14   border insolvency proceedings, insolvency awards or orders.

15   So I believe that the most desirable outcome for serving

16   this process and complying with these principles is for the

17   judge to amend the provisions that he believes could

18   potentially or actually violate Mexican public policy.

19   Q    All right.  So turning back to the non-main foreign

20   proceeding, I believe you said that a conciliator would be

21   appointed.  And you just testified that that could be by --

22   the IFT could appoint that person, correct?

23   A    Correct.

24   Q    What would happen next?

25   A    Well, the conciliator, as in any domestic concurso,

Page 253

1     will begin with a claim recognition process, provide a

2     provisional list of claims.  Objections will be allowed by

3     the debtor or the merchant and the creditors.  And then a

4     final list of claims will be provided to the court.

5     Finally, the court will decide or will issue based on all

6     that a claims recognition ranking and priority judgement.

7     Q    And what happens after the judgement for recognition,

8     ranking, and priority of claims?

9     A    The conciliator will begin the negotiations between the

10    Debtor and the creators.  And that is exactly the point

11    where I believe that the conciliator will use a foreign

12    restructuring plan already approved as a starting point for

13    those negotiations.  Because, again, it is consistent with

14    principles of procedural economy and speediness.

15    Q    So what will happen next?  Or what can happen next?

16    A    Well, a restructuring agreement is reached or not

17    reached.  If it is reached, happy ending for everyone.  That

18    is restructuring or a restructuring plan is approved.  If it

19    is not, well, liquidation happens.

20    Q    So what -- I think the liquidation has a different term

21    or means a different thing possibly in Mexico to the United

22    States.  So can you describe the liquidation stage for us?

23    A    Yes.  I mean, I have to explain liquidation with this

24    definition.  The purpose of the liquidation is to sell the

25    Debtor's assets, its business operations, and everything in

1    its power for repayment of the creditors.

2    Q    Does it have an overall duty, the liquidator?

3    A    Yes.

4    Q    What is that duty?

5    A    Well, the liquidator will become the manager of the

6    debtor's assets.  He has to comply with his duties, what we

7    call in Mexico the good father of a family.  So that is the

8    standard.  So you have to be a good father of a family.  And

9    he has to maximize value of the assets.

10   Q    And there was a Chapter 11 plan in existence already,

11   as there would be in any foreign non-main proceeding, what

12   is your view on how the liquidator might maximize value?

13   A    Well, as a general rule, the liquidator has to sell all

14   the debtor's assets through an auction process, an auction

15   process that will normally dilute a lot of value because it

16   is a complex process, it requires holding an auction,

17   setting a price, et cetera, et cetera.  An auction process

18   under the concurso.

19        The alternative is there is a provision -- there are

20   two provisions, I believe Article 25 and 28, that provide

21   alternatives for the liquidator to sell the assets.

22        When, for example, we have assets that require

23   immediate selling because failing to do so will destroy

24   their value -- let's say bananas.  If they are not sold,

25   they will rot.  So they need to be sold.  So in that case,

Page 255

1    the conciliator -- the liquidator does not require court

2    approval to sell those bananas.  Right?  It only requires to

3    exercise his duty to maximize value.

4         There is another alternative, which is when he believes

5    there is a process that provides more value to creditors and

6    potentially to the debtor.  So that is what I believe, that

7    the liquidator could use the restructuring plan approved or

8    the plan confirmed in the U.S. as an alternative means for

9    the liquidation.  Because it will obviously bring more value

10   to all the parties involved in the restructuring.

11   Q    There were a number of questions about the injunction

12   that you received.  Do you recall those questions?

13   A    Yes.

14   Q    When I say the injunctions, I mean the two injunctions

15   against petitioning creditors and the indenture trustee.

16   A    Yes.

17   Q    I believe you had a number of questions about the

18   injunction in the Ninth Circuit, his is the second

19   injunction, and whether or not it was potentially being

20   enforced because -- or whether it could be enforced because

21   it has not been served to anyone yet.  Do you recall that?

22   A    Yes.

23   Q    And I believe there was a line of questioning that it

24   has to go through a rogatory process.  Is that right?

25   A    Yes, for service of process.

Page 256

```
 1    Q     If it was going through -- if TV Azteca was seeking to

 2    serve the petitioning creditors of the indenture trustee

 3    through the letters of rogatory process now, is there any

 4    way that petitioning creditors or the indenture trustee

 5    would know that?

 6    A     No.

 7    Q     There was also a line of questioning about the fact

 8    that the injunctions were ex parte injunctions.  Do you

 9    recall that?

10    A     Yes.

11    Q     And that ex parte injunction is a normal process in

12    Mexico, correct?

13    A     Yes.

14    Q     To your knowledge, does Mexican procedure prevent a

15    party that obtains an ex parte injunction from notifying the

16    parties that are subject to the injunction that the

17    injunction exists?

18    A     I'm very sorry, I think I don't understand the

19    question.

20    Q     I'll rephrase the question.  Is there anything that

21    prevented TV Azteca from notifying the petitioning creditors

22    that this injunction existed?

23    A     No.

24    Q     I want to show you the injunction.  It should be in

25    your binder I believe at Tab 9.  So this is JX 30 for the
```

1    record.  This is the first injunction, what we're calling

2    the COVID injunction.

3    A    Yes.

4    Q    I believe there was some testimony regarding its

5    application.  Can you please turn to page 36 of 40?

6    A    Yes.

7    Q    And number three says to maintain the existing factual

8    situation and to this end the prohibition to the co-

9    defendant to initiate and/or file any proceeding for the

10   collection and/or payment of the unpaid principal of the

11   bonds issued under the issuance agreement dated August 9th,

12   2017.  What is your understanding of what that precludes the

13   petitioning creditors or the indenture trustee from doing?

14   A    Can I consult with the English version of the

15   injunction?

16   Q    Yes.

17   A    Well, it's a prohibition to bring any lawsuits aimed at

18   the collection of the debt, of the notes.

19   Q    How broad do you view them?

20   A    Extremely broad.

21   Q    Would it include a concurso proceeding?

22   A    In my view, yes, it is.  It will.

23   Q    I want to go to number six.  It says to maintain the

24   existing factual situation and to this end the suspension of

25   all payment obligations arising from the issuance agreement

Page 258

1   dated August 9th, 2017.  Do you see that?

2   A    Yes.

3   Q    And what is your understanding of how this prohibition

4   in that paragraph affects the insolvency test with regards

5   to filing an involuntary concurso?

6   A    Well, basically it is preventing the debtor to makes

7   any payments.  And therefore, it prevents the debtor to

8   consider the debt to be due and payable.

9   Q    And what does that effect on an involuntary concurso?

10  A    Well, there will be no sufficient due and payable

11  obligations to meet the first objective test or the first

12  objective insolvency test.

13  Q    What would happen if the petitioning creditors violated

14  the injunctions or the indenture trustee?

15  A    Well, it is a long process.  The first time that they

16  violate the inunctions, they will be fined by the court.  So

17  they will be fined by the court.  An actual fine, monetary

18  fine.  And the judge will require them to obey by the

19  injunction.  If they fail to abide by the injunction, they

20  will be fined for a second time.  And the judge will again

21  ask them to comply with the injunction.  If they fail to

22  comply with the inunction again, the judge will issue a

23  third fine, will impose a third fine on the person violating

24  the injunction.  And will require them to obey by the

25  injunction.  If they continue to fail obeying the injunction

Page 259

1    or violating the injunction, then the court will recommend

2    the case to the attorney general for investigating the crime

3    of disobedience.

4              MR. GILLER:  No further questions, Your Honor.

5    Thank you, Mr. Guerra.

6              THE COURT:  Thank you.

7              THE COURT:  Thank you.  Recross?

8              MR. COHEN:  Very briefly, Your Honor.  I am

9    mindful of the time.

10              THE COURT:  No, that's all right.  We're here.  No

11    worries.  I knew what I was in for when I took this job.

12              RECROSS EXAMINATION OF JESUS GUERRA

13    BY MR. COHEN:

14    Q    Mr. Guerra, look at the demonstrative that Mr. Giller

15    showed you.  Did you participate in the preparation of this?

16    A    Yes.  I read it.

17    Q    Did you read it before it was finalized?  Did you

18    review it before it was finalized?

19    A    Yes, I think so.

20    Q    Look under main proceeding.  You have as a possibility

21    a conciliator would be appointed after the judgment of

22    concurso for a foreign main proceeding, right?

23    A    Excuse me?  Can you...

24    Q    Conciliator appointed as auxiliary of a concurso court

25    --

Page 260

1    A    Yes.

2    Q    Okay.  Have you anywhere in your two declarations ever

3    mentioned the possibility that a conciliator could be

4    appointed after a judgement of concurso -- admission to

5    concurso in a foreign main proceeding?

6    A    No.

7    Q    When did you decide to add that to your opinion?  After

8    the deposition?

9    A    Yes.

10   Q    And you just testified in response to Mr. Biller's

11   questions about various fines and second violations and

12   third violations and criminal proceedings.  Can you show me

13   where you discussed that , your two declarations, including

14   the one you submitted in August of this year?

15   A    I was not asked that at the time.

16   Q    So you decided to add that after your deposition?

17   A    I was asked today about it.

18   Q    Now, if you look please at your reply declaration back

19   at Paragraph 47, the one that I showed you and Mr. Giller

20   returned to, supplemental declaration, paragraph 47.

21        Here what you're doing is you're responding to

22   Professor Mejan's opinion that a full concurso would be

23   required in a case of recognition of either a main or a non-

24   main proceeding in Mexico, correct?

25   A    No, that is not what I said.

Page 261

1   Q    So when you say Mejan is correct that Article 293

2   provides that a full concurso needs to be initiated, what

3   you meant was a full concurso of the non-main and a half-

4   full concurso for a main?

5   A    No.  I think -- let me explain what I said.  Mejan is

6   correct.  That is the one thing that I said.  Mejan says

7   Article 293 provides that full concurso needs to be

8   initiated for recognizing any foreign proceeding of a

9   company that has an establishment in Mexico.  So this full

10  concurso refers to something that happens before

11  recognition.  So what it means is that it requires either --

12  I mean, at this point we will not -- whether it is a foreign

13  main proceeding or a foreign non-main proceeding.  This is

14  before recognition.  So before recognition, a full concurso

15  needs to be initiated.  At the full concurso under these

16  circumstances, I mean, one that requires an inspection

17  visit.  After concurso is declared, after recognition

18  happens, there are these two options.

19  Q    One involves a second full concurso and one involves a

20  less full concurso, main or non-main?

21  A    Let's put it differently.  Looking at it from this side

22  of the border, a foreign main proceeding or a foreign non-

23  main proceeding.

24  Q    When you said you agreed with Professor Mejan that a

25  full concurso needed to be initiated, what did you mean by

Page 262

```
 1    the word full?

 2    A    I mean one that requires inspection visit.

 3    Q    That's what full means to you.

 4    A    Before recognition, yes.

 5    Q    And you understood Professor Mejan to be making the

 6    same point that you agree when you say he was correct?  You

 7    think he was referring to an inspection only?

 8    A    I really don't know what he was referring to.  I am

 9    telling you what I understand.

10    Q    But you did say under oath that Professor Mejan was

11    correct, right?

12    A    Yes, because I believe needs to be initiated for

13    recognizing any foreign proceeding.  So that is before

14    recognition.

15    Q    A different topic.  You testified to Mr. Giller's

16    questions that you see a link between COMI and jurisdiction,

17    right?  Did I hear you correctly?

18    A    Yes.

19    Q    You could be subject -- a company can be subject to

20    jurisdiction in multiple jurisdictions, correct?

21    A    Correct.

22    Q    But only one COMI, right?

23    A    Yes.

24    Q    And in your description of Articles 15, 15 bis and 17,

25    I want to make sure I understand what you're saying.  Are
```

```
 1    you saying that if a judge is asked to recognize a company

 2    that has an establishment in Mexico, if one of the debtors

 3    has a COMI in the U.S., he is absolutely required to apply

 4    that to the whole group, correct?

 5    A    Yes.

 6    Q    And if he is asked to recognize a proceeding involving

 7    a group of companies with an establishment in Mexico and 25

 8    of those companies have COMI in Mexico, he is required to

 9    make that a foreign main proceeding because the COMI of the

10    one subsidiary trumps the COMIs of all the others, right?

11    A    Yes.

12              MR. COHEN:  Nothing further, Your Honor.

13              MR. GILLER:  Nothing further.

14              THE COURT:  Okay.  All right.

15              MR. GILLER:  The petitioning creditors have no

16    further witnesses.

17              THE COURT:  Okay, thank you.  All right.  So I

18    guess we should talk about tomorrow.  Sorry, excuse me.  My

19    apologies, Mr. Guerra.  You are free to step down.  Again,

20    thank you for coming.  I know coming all of this way to

21    testify before the Court, we very much appreciate it.  And

22    you may go ahead and step down.

23              THE WITNESS:  Thank you very much, Your Honor.  It

24    was a pleasure.

25              THE COURT:  Okay.  So I guess what time would you
```

Page 264

```
 1    like to schedule your closing arguments?  Because I believe

 2    that's all we have left, right?  Do you want to --

 3               MR. COHEN:  Can we confer for a moment, Your

 4    Honor?

 5               THE COURT:  Yes.  Go right ahead.

 6               MR. COHEN:  Thank you.

 7               THE COURT:  Feel free.  Confer.

 8               MR. COHEN:  So we have conferred and we would

 9    propose a start of 1:00 p.m. tomorrow.

10               THE COURT:  Okay, that's fine.  No problem.  That

11    was fine.  We will let our ecro assistant know before he --

12    okay.  And I guess for those of you on the phone, I think

13    we're going to be finished with court shortly.  And so when

14    we hang up on you, you'll know why.  Because we ended for

15    today.  And that will be commencing tomorrow at 1:00.

16               MR. COHEN:  Your Honor, just a procedure question.

17    Would you like us to put any kind of a notice on the docket

18    that we're starting at 1:00 tomorrow?

19               THE COURT:  It's probably a good idea just for

20    parties.

21               MR. COHEN:  We'll do that, Your Honor.

22               THE COURT:  Okay, thank you.  It's no problem, but

23    obviously parties have been spending the time listening to

24    this now.  And I suspect because of the press that probably

25    other people know, too.  But we don't know.  So I think it's
```

Page 265

1    a good idea.  Okay.

2            Is there anything else that the parties wanted to

3    discuss before we adjourn for the day?  Just asking.

4            MR. GILLER:  Nothing further, Your Honor.  Thank

5    you.

6            THE COURT:  Give me just one second to gather up

7    my belongings, and I will leave.  Okay.  Thank you all.  I

8    want to wish you all a good night.

9            (Whereupon these proceedings were concluded at

10   5:44 PM)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 266

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  September 1, 2023